# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**D.L**; **K.S.F.**; and **K.B.**, by and through her
parent and next friend **H.B.**,

       Plaintiffs,

v.

 

**MICHIGAN DEPARTMENT OF
EDUCATION**, a governmental agency,
      Defendants.

Hon. Robert J Jonker

Mag. Phillip J. Green

Case No. 1:22-cv-00838

**FIRST AMENDED COMPLAINT**

**JURY DEMAND**

---

**Attorneys for Plaintiffs**
Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
**Disability Rights Michigan**
4095 Legacy Parkway
Lansing, Michigan 48911
517-487-1755
ediaz@drmich.org
msickon@drmich.org

Elizabeth K. Abdnour (P78203)
**Elizabeth Abdnour Law, PLLC**
1100 W. Saginaw Street, Ste. 4A-2
Lansing, Michigan 48915
517-292-0067
elizabeth@abdnour.com

Jennifer B. Salvatore (P66640)
**Salvatore Prescott Porter & Porter**
105 E. Main Street
Northville, Michigan 48167
248-679-8711
salvatore@sppplaw.com

**Attorneys for Plaintiffs**
Jacquelyn N. Babinski (P83575)
**MI AECRES**
PO Box 705
Ludington, Michigan 49431
231-794-2379
jbabinski@miaecres.org

## COMPLAINT

Plaintiffs D.L., K.S.F., and K.B., by her parent and next friend H.B., through their attorneys, bring this First Amended Complaint and Jury Demand and state:

## PRELIMINARY STATEMENT

1.      Plaintiffs are former students with disabilities in Kalamazoo Public School (KPS) who suffered substantial academic harm and lost educational experience and opportunity due to MDE's systemic failure to monitor and remedy KPS's known and continuous violations of state and federal laws regarding the identification and education of students with disabilities.

2.      During the 2020-2021 school year, 203,585 students with disabilities were identified as eligible for special education services in the State of Michigan. "Child Find" is the process that requires the State to ensure that "[a]ll children with disabilities residing in the State…who are in need of special education and related services, are identified, located, and evaluated." 34 C.F.R. § 300.111. Due to the ongoing nature of the Child Find responsibility, the actual number of students with disabilities eligible for special education services always exceeds the number identified as eligible.

3.      Disability Rights Michigan (DRM) is the agency designated by the State of Michigan, pursuant to state and federal laws, to protect and advocate for the rights of individuals with disabilities. The authority and responsibility of DRM as a federally mandated, state designated Protection and Advocacy organization is outlined in both state and federal law, including:

- 42 U.S.C. § 15043, the Developmental Disability Assistance and Bill of Rights Act;

- 42 U.S.C. § 10801, the Protection and Advocacy for Individuals with Mental Illness Act;

- 29 U.S.C. § 794e, the Protection and Advocacy for Individual Rights Act; and

- M.C.L. § 330.1748, of the Mental Health Code.

4.      Pursuant to this authority, DRM advises and represents parents and students regarding their rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794 *et seq.*, and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*

5.      Over the past four years, on average, DRM has received over eight hundred calls each year requesting assistance regarding actual or alleged violations of disability anti-discrimination and special education laws. This need far exceeds DRM's capacity for individual representation. DRM must carefully steward its limited resources to achieve the greatest impact for the greatest number of students with disabilities.

6.      DRM is not responsible for ensuring that each eligible child in the state receives a free appropriate public education (FAPE). That responsibility, under state and federal law, lies with the Michigan Department of Education (MDE) as a state educational agency (SEA).

7.      The IDEA clearly outlines MDE's role. "The SEA is responsible for ensuring…[t]hat the requirements of [the IDEA] are carried out." 34 C.F.R. § 300.149(a)(1). The IDEA provides SEAs with mechanisms for meeting this responsibility. The SEA must "have in effect policies and procedures to ensure that it complies with [] monitoring and enforcement requirements." *See* 34 C.F.R. §§ 300.600-02 and §§ 300.606-08. The SEA must "have procedural safeguards in effect to ensure that" due process complaints can be filed and heard compliant with the IDEA. 34 C.F.R. § 300.121. Further, pursuant to IDEA's implementing regulations, every SEA must also adopt state complaint procedures. 34 C.F.R. §§ 300.151-53. An SEA's state complaint system is "critical to each State's exercise of its general supervision responsibilities" as it is a "powerful tool to identify and correct noncompliance" with IDEA. 71 Fed. Reg. 46601, Aug. 14, 2006.

8.      State complaints play a unique role in an SEA's responsibility to ensure compliance with IDEA. State complaints provide the SEA with first-hand examples of noncompliance with IDEA by school districts (or local educational agencies (LEAs), as they are referenced in the IDEA).

9.      In 2010, DRM began filing state complaints to bring noncompliance to MDE's attention, with the expectation that MDE would, in its oversight role, ensure correction.

10.      Ensuring the correction of identified noncompliance is a fundamental component of a legally-sufficient state complaint system. IDEA requires that, in correction, the SEA must address both the educational loss of the individual child and ensure the "[a]ppropriate future provision of services for *all* children with disabilities." 34 C.F.R. § 300.151(b)(2) (emphasis added).

11.      MDE's mandate to ensure that every student with a disability is identified, located, evaluated, and provided with a FAPE is neither permissive nor discretionary. Rather, it is an imperative requiring the MDE's affirmative oversight, supervision, evaluation, and correction of LEAs in the identification of students with disabilities requiring special education and the provision of a FAPE to those students.

12.      The MDE's oversight and enforcement are critical to ensuring students with disabilities have access to the education to which they are entitled, *particularly* in those districts in which the MDE has found repeated noncompliance with IDEA.

13.      When MDE fails its oversight and enforcement duties, as it did in this and other cases, students and families suffer. They lose access to essential and basic resources, are subjected to punitive rather than rehabilitative or educational processes, fall farther behind in their educational development, and are involuntarily placed in harmful environments that worsen their disabilities, circumstances, and educational outcomes.

14.     MDE's charge is to provide general supervision; that is, to oversee, supervise and enforce the provision of FAPE to Michigan's students with disabilities. With Plaintiffs and many other students, MDE has failed to do so, resulting in substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity.

15.     DRM cannot enforce the rights of the more than 203,585 students identified as having disabilities in Michigan, and the countless students needing special education or disability accommodations who are unidentified due to deficient Child Find processes, by acting on behalf of one student at a time. Through this action, however, Plaintiffs seek to vindicate their rights and make systemic change.

16.     This action, therefore, brings claims against the MDE for violations of the IDEA, Section 504, and the ADA. The experiences of the Plaintiffs in this action are, upon information and belief, representative of the experiences of students throughout the State whose districts are failing to provide appropriate special education services or otherwise comply with Child Find obligations often due to inadequate oversight, support from, and corrective action by the MDE.

## PARTIES, JURISDICTION AND VENUE

17.     Plaintiff D.L. is a 20-year-old young adult with specific learning disabilities who attended the Kalamazoo Public Schools (KPS) from 2007 until his graduation in 2021. D.L. was eligible for special education and entitled to receive a free appropriate public education at all relevant times.

18.     Plaintiff K.S.F. is a 20-year-old young adult who attended KPS beginning in kindergarten. Since 2020, K.S.F. was eligible for special education services and, for her full KPS tenure, was entitled to receive a free appropriate public education under Section 504.

19.     Plaintiff K.B. is a 16-year-old student who attends KPS. K.B. was, at all relevant

times, and remains as of this filing, eligible for special education services and entitled to receive a free appropriate public education.

20.     Defendant MDE is the state educational agency (SEA) primarily responsible for the supervision of the provision of special education in Michigan's public elementary and secondary schools, or local educational agencies (LEAs). 20 U.S.C. § 1401(19), (32).

21.     MDE receives IDEA funding by submitting to the Secretary of the U.S. Department of Education "assurances … that the State has in effect policies and procedures to ensure that …[a] free appropriate public education is available to all children with disabilities residing in the State." 20 U.S.C. § 1412.

22.     MDE also receives federal assistance and qualifies as a program under Section 504, 29 U.S.C. § 794.

23.     As an SEA, MDE is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131.

24.     Jurisdiction is conferred upon this Court by the IDEA, 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provides U.S. district courts with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, based upon the federal question raised herein, and 28 U.S.C. § 1343, because this action is brought to vindicate Plaintiffs' civil rights.

26.     This Court also has jurisdiction pursuant to the ADA, as amended, 42 U.S.C. § 12101 *et seq*., and Section 504, 29 U.S.C. § 794.

27.     This Court has supplemental jurisdiction over claims arising under the Michigan Mandatory Special Education Act (MMSEA), M.C.L. § 380.1701 *et seq*., and Michigan Administrative Rules for Special Education (MARSE), Mich. Admin. R. 340.1701 *et seq*.,

pursuant to 28 U.S.C. § 1367(a).

28.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Western District of Michigan, and all events and omissions giving rise to this Complaint occurred in this district. Additionally, Defendant operates within the Western District of Michigan.

29.     To the extent that administrative exhaustion is required against the MDE, Plaintiffs have each exhausted their remedies by filing individual due process actions against MDE, all of which have been dismissed.

30.     On February 11, 2022, K.B. filed a due process complaint against KPS, the Kalamazoo Regional Educational Services Agency (KRESA), MDE and Michael Rice in his official capacity as State Superintendent.

31.     On March 16, 2022, the administrative law judge (ALJ) granted the motions to dismiss MDE, Superintendent Rice, and KRESA. Upon settlement between the remaining parties, on August 17, 2022, the ALJ dismissed K.B.'s complaint against the remaining defendant, KPS.

32.     On February 18, 2022, K.S.F. filed a due process complaint against KPS, KRESA, Comstock Public Schools, MDE, and Michael Rice in his official capacity as State Superintendent.

33.     On April 6, 2022, the ALJ granted the MDE's motion for summary disposition and dismissed the case against MDE. On April 15, 2022, the ALJ granted motions to dismiss KRESA and KPS. Upon settlement between the remaining parties, on June 17, 2022, the ALJ dismissed K.S.F.'s complaint against the remaining defendant, Comstock Public Schools.

34.     On October 21, 2021, D.L. filed a due process complaint against KPS, KRESA, MDE and Michael Rice in his official capacity as State Superintendent.

35.     On December 20, 2021, the ALJ granted the motions to dismiss MDE, Superintendent Rice and KRESA. As to the remaining defendant, KPS, the hearing on D.L.'s

complaint began January 10, 2022, and concluded January 13, 2022. Pursuant to an ALJ order issued on March 28, 2022, the ALJ's decision with respect to D.L.'s complaint was due on August 1, 2022. On July 28, 2022, the ALJ extended the decision date to August 31, 2022. On September 6, 2022, the ALJ's office notified Plaintiffs that the decision would be forthcoming although no decision date was provided. On October 13, 2022, the ALJ issued a Decision and Order denying D.L.'s complaint and dismissing all claims with prejudice.[1]

36.　　As it pertains to this Complaint against MDE, D.L. has fully complied with all due process complaint requirements.

37.　　There remains no other forum in which Plaintiffs' claims against MDE can be vindicated.

## **GENERAL ALLEGATIONS**

**IDEA and FAPE: The Obligation to Provide a Free and Appropriate Public Education in the Least Restrictive Environment**

38.　　Congress passed the IDEA to ensure "that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(1)(A), (B).

39.　　Under the IDEA, each state must "ensure that … [a] free appropriate public education [FAPE] is available to all children with disabilities residing in the state aged 3 to 21, inclusive, including children with disabilities who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A).

40.　　"Special education" means specially designed instruction that meets the unique

---

[1] D.L. will appeal the ALJ's decision in a separate action.

needs of a child with a disability *See* 20 U.S.C. § 1401(29).

41.     "Related services" mean the supportive services required to assist a child with a disability to benefit from special education and related services to each eligible student with a disability by implementing an "individualized education program" (IEP). 20 U.S.C. § 1401(26).

42.     An IEP is an individually-tailored plan of action that is developed, reviewed and revised by an IEP team that includes the child's parent and academic and therapeutic professionals. *See* 20 U.S.C. § 1414(d).

43.     The IDEA further requires that the states "ensure," through the "least restrictive environment" mandate, that:

> [t]o the maximum extent appropriate, children with disabilities … are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes … cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5).

44.     The IDEA requires that qualifying children with disabilities receive a FAPE. 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). To achieve this goal, the IDEA requires that LEAs, or any other educational agency responsible for providing special education services to the child, design and develop an IEP for each qualifying child with a disability in their district. 20 U.S.C. § 1412(a)(4), § 1414(d); 34 C.F.R. § 300.112, §§ 300.320-24.

45.     An IEP must contain several key pieces of information to ensure that the education program provided is "appropriately ambitious in light of [a student's] circumstances," and afford the student the opportunity to "meet challenging objectives." *Endrew F. v. Douglas Cnty. Sch. Dist. Re-1*, 137 S. Ct. 988, 1000 (2017). Such pieces of information include: (1) a statement of the student's present levels of academic achievement and functional performance; (2) a statement of measurable annual academic and functional goals; (3) a statement of the special education and related services that will be provided to the student; (4) an explanation of the extent, if any, to

which the student will not participate with nondisabled students in regular classes; (5) a statement of any individual appropriate accommodations necessary to measure the academic achievement and functional performance of the student; (6) the projected start date for any related services; and (7) transition services for students who have reached the age of 16. 20 U.S.C. § 1414(d)(3).

46.     The IDEA requires, to the maximum extent possible, that children with disabilities be educated with children who are not disabled, and that removal from the regular education environment occurs only when education in traditional classes with the use of supplementary aids and services cannot be satisfactorily achieved. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2). Districts must have available a continuum of alternative placements for children with disabilities. 34 C.F.R. § 300.115.

**The IDEA's "Child Find" Requirements**

47.     Pursuant to the IDEA's Child Find mandate, the MDE must have in effect policies and procedures to ensure that all children with disabilities residing in the State who need special education and related services are identified, located, and evaluated, regardless of the severity of their disabilities. 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i).

48.     The IDEA and its implementing regulations define a "child with a disability" as a child with intellectual disabilities, a hearing impairment (including deafness), a speech or language impairment, visual impairment (including blindness), a serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

49.     The categories under which K.B., K.S.F. and D.L. qualify for special education services are "other health impairment" (for K.B. and K.S.F.) and "specific learning disability" (for D.L.).

50.    An "other health impairment" means having

limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that – (i) [i]s due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) [a]adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9)(i-ii).

51.    A "specific learning disability" means a

disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. . . . Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of intellectual disability, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

34 C.F.R. § 300.8(c)(10).

52.    Under the IDEA, a state or local educational agency must conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability. 20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. § 300.301(a).

53.    The initial evaluation shall consist of procedures to determine whether a child is a child with a disability and to determine the educational needs of that child. 20 U.S.C. § 1414(a)(1)(C)(i); 34 C.F.R. § 300.301(c)(2). The parent, SEA, other State agency, or LEA may initiate a request for an initial evaluation. 20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b).

54.    The initial evaluation must be conducted within 60 days of receiving parental consent, or within the timeframe established by the State, if the State establishes such a timeframe. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1). Under Michigan law, the initial evaluation must be conducted, and an eligibility determination must be made, within 30 school

days of receiving parental consent. Mich. Admin. R. 340.1721b(1).

55.     The SEA (MDE in this case) and the LEA must ensure that a reevaluation of each child with a disability is conducted if the educational or related services needs of the child warrant a reevaluation. 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. §§ 300.33; 300.303(a)(1). An LEA is also responsible for ensuring that a reevaluation is conducted if the child's parent or teacher requests one. 20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. § 300.303(a)(2). At a minimum, a reevaluation must occur on a triennial basis, even in the absence of an explicit request or qualifying circumstance, unless the parent and the LEA agree that a reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2).

56.     The IDEA outlines detailed and comprehensive procedures for the conduct of evaluations, requiring the SEA and LEA to

> use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining—(i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum.

20 U.S.C. § 1414(b)(2)(A); *see also* 34 C.F.R. § 300.304(b)(1).

57.     While MDE is responsible for ensuring that the Child Find mandate is carried out, the IDEA directs that each LEA "shall ensure that the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). Areas related to the suspected disability include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 34 C.F.R. § 300.304(c)(4).

58.     The Child Find mandate expressly includes all children with a suspected disability, even if they are advancing from grade to grade. 34 C.F.R. § 300.111(c)(1).

59.     LEAs must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."

20 U.S.C. § 1414(b)(2)(C); 34 C.F.R. § 300.304(b)(3). LEAs must also ensure that "assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient." 34 C.F.R. § 300.304(c)(2).

60.     The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

61.     As part of an initial evaluation, if appropriate, and as part of any reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A); 34 C.F.R. § 300.305(a)(1).

62.     On the basis of that review, and input from the child's parents, the IEP Team and other qualified professionals, as appropriate, must identify what additional data, if any, is needed to fulfill the Child Find obligations under the IDEA. 20 U.S.C. § 1414(c)(1)(B); 34 C.F.R. § 300.305(a)(2). The LEA must administer the assessments and evaluation measures needed to produce such additional data. 20 U.S.C. § 1414(c)(2); 34 C.F.R. § 300.305(c).

63.     In addition, LEAs are charged with ensuring that assessments "are administered by trained and knowledgeable personnel." 20 U.S.C. § 1414(b)(3)(A)(iv); 34 C.F.R. § 300.304(c)(1)(iv).

64.     Finally, in interpreting the evaluation data for the purpose of determining whether a child qualifies as a child with a disability under the IDEA and the educational needs of the child, LEAs must "[d]raw upon information from a variety of sources, including aptitude and

achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior." 34 C.F.R. § 300.306(c)(1)(i). LEAs must "[e]nsure that information obtained from all of these sources is documented and carefully considered. 34 C.F.R. § 300.306(c)(1)(ii).

65.     MDE is ultimately responsible for ensuring a functioning Child Find process for all students with disabilities in Michigan, as a part of its supervisory duties. 20 U.S.C. § 1412(a)(11); 34 C.F.R. §§ 300.100; 300.111.

**The IDEA and Procedural Safeguards in the Disciplinary Process**

66.     In order to ensure that each child with a disability is provided with a free appropriate public education (FAPE), the IDEA has established a number of procedural safeguards that must be provided to a student with a disability who is subject to disciplinary removals.

67.     IDEA requires that students with disabilities be granted certain procedural safeguards with respect to the disciplinary process to ensure that they are not removed from the learning environment on account of their disabilities.

68.     Under IDEA, when a child with a disability is removed from his or her original educational placement for more than ten cumulative school days in an academic school year, procedural protections and services must be provided to the student. 20 U.S.C. § 1415(k). One such procedural protection is a manifestation determination review (MDR) to determine whether the student's behaviors are a manifestation of his or her disabilities. 20 U.S.C. § 1415(k)(1)(E). This requirement helps ensure that a school does not impose a long-term suspension, series of suspensions, or expulsion on a special education student on account of a behavior that is merely a "manifestation" of his or her disability. 20 U.S.C. § 1415(k)(1)(E).

69.     The IDEA mandates that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, their current school placement and

be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior. 20 U.S.C. § 1415(k)(1)(F). These behavioral supports include a functional behavioral assessment to determine the function or cause of the child's disability and an accompanying behavioral intervention plan to adequately accommodate the student's educational and behavioral needs. 20 U.S.C. § 1415(k)(1)(F)(i)-(ii).

70.     An MDR is triggered after ten cumulative days of suspensions or expulsions. Additionally, the IDEA and its implementing regulations state that a series of removals totaling more than 10 school days can form a "pattern" of behavior (e.g. "because the child's [disciplined] behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals") that also triggers a mandatory MDR. 34 C.F.R. § 300.536(a)(2). The scope of the MDR is not limited to determining whether the behavior at issue is a byproduct of the child's disability but must additionally inquire into whether it may be the consequence of the district's failure to adequately implement the child's IEP. 20 U.S.C. § 1415(k)(1)(E)(i).

71.     There are, however, certain specific behaviors that permit a school district to alter a student's prescribed placement in favor of an "interim alternative educational setting" for up to 45 days. 20 U.S.C. § 1415(k)(1)(G). This exception is restricted to the following three behaviors: (1) carrying a weapon to school; (2) knowingly possessing or using illegal drugs, or selling or soliciting the sale of a controlled substance, at school; or (3) inflicting serious bodily injury on another individual at school. *Id.*

72.     Nevertheless, the interim alternative educational setting must still provide the child a free and appropriate public education. The placement must also include services designed to adequately address the behavior for which the student is being suspended. 20 U.S.C. § 1415(k)(1)(D).

73.     Under the IDEA, even students with disabilities who do not already have an IEP in

place are equally entitled to the same procedural safeguards afforded to their special education peers. Indeed, disciplinary protections extend to students who the educational agency knew or should have known are students with disabilities. 20 U.S.C. § 1415(k)(5).

74.     In order to vindicate these rights, students with disabilities and their parents are afforded two separate avenues to allege violations of the special education laws by educational agencies. They are (1) the due process complaint, 20 U.S.C. § 1415(b)(6); 34 C.F.R. §§ 300.507-16, and (2) the state administrative complaint. 34 C.F.R. § 300.151-53.

75.     The due process complaint is a formal legal proceeding that takes place in an administrative forum. The Supreme Court of the United States has repeatedly described the administrative and judicial review of IDEA special education claims as "ponderous." *Honig v. Doe*, 484 U.S. 305, 322, 108 S. Ct. 592, 603, 98 L. Ed. 2d 686 (1988) (citing *Burlington School Committee v. Massachusetts Dept. of Education*, 471 U.S. 359, 370, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985)).

76.     In comparison, the state administrative complaint process is relatively easier for students with disabilities and their families to pursue remedy for alleged violations of the special education laws. This state administrative process relies upon the investigation of allegations of violations by MDE, pursuant to Mich. Admin. R. 340.1853, and should noncompliance be found, MDE is responsible for correcting the noncompliance for the student at issue and "for all children with disabilities" statewide. 34 C.F.R. § 300.151(b).

**Michigan Department of Education's Duties and Obligations**

77.     MDE is the state educational agency that is responsible for administering and enforcing laws related to public education. M.C.L. § 16.400-16.402.

78.     As an SEA, MDE is responsible for the State supervision of public elementary and secondary schools and is specifically "responsible for ensuring" all eligible Michigan children with

disabilities receive a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(11)(A), (a)(1), (a)(5).

79.     As an SEA, MDE also has general supervisory responsibility for implementing IDEA's requirements. 20 U.S.C. § 1412(a)(11)(A).

80.     MDE is specifically "responsible for ensuring" that IDEA's regulations are carried out and is responsible for its general supervision over each educational program for children with disabilities to ensure the programs meet MDE's educational standards, which include IDEA's regulatory requirements. 34 C.F.R. § 300.149(a).

81.     Such responsibility includes coordinating with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under IDEA. 20 U.S.C. § 1412(a)(12).

82.     Under the IDEA, MDE, as the SEA, also has additional responsibilities when it comes to resolving administrative complaints. The IDEA provides that in resolving an administrative complaint:

> In which the SEA has found a failure to provide appropriate services, and SEA, pursuant to its general supervisory authority under Part B of the [IDEA], must address - 1. The failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and 2. Appropriate future provision of services for all children with disabilities.

34 C.F.R § 300.151(b).

83.     MDE's duties are similarly codified in state law.

84.     For example, the Michigan Mandatory Special Education Act (MMSEA) is a state law, enacted to meet the requirements of IDEA,[2] that ensures special education to Michigan's children with disabilities from birth to age 26. M.C.L. § 380.1701 *et seq.*

---

[2] *Miller ex rel. Miller v. Lord*, 262 Mich. App. 640, 645 (2004).

85.     The Michigan Administrative Rules for Special Education (MARSE) set forth the requirements for special education and related services for the State of Michigan, providing how special education is to be implemented in Michigan. Mich. Admin. R. 340.1701c(c).

86.     MARSE defines special education as "specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential." Special education includes instructional services defined in Mich. Admin. R. 340.1721a.

87.     Pursuant to MARSE, "[t]he individualized education program team shall determine the programs and services for a student with a disability in accordance with 34 C.F.R. part 300. The individualized education program shall not be restricted to the programs and services available." Mich. Admin. R. 340.1721e(4).

88.     MARSE charges MDE to maintain an effective complaint resolution process for claims of denied education or failure of the district to provide evaluations, programs and services in accordance with MARSE. Mich. Admin. R. 340.1851-55.

89.     The IDEA incorporates the standards of the MMSEA and MARSE. *Doe By and Through Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455, 457 (6th Cir. 1993) (stating, in the 6th Circuit, it is "settled" that violations of any state law that enlarges the scope of an educational agency's obligations are still enforceable under IDEA, even if federal law is satisfied) (citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990) (It is "beyond cavil that the federal [IDEA] standard explicitly incorporates some of a state's substantive law.")).

90.     As Michigan's SEA, MDE bears the ultimate responsibility for ensuring that all public schools in Michigan comply with the IDEA, including, by extension, the MMSEA and MARSE.

91.     To fulfill its responsibilities, MDE, among other things, must engage in "effective monitoring" to ensure that the local school districts provide a FAPE in the least restrictive environment (LRE) to all eligible children. *See* 20 U.S.C. § 1416(a)(1)(C), (a)(3)(A), (a)(3)(B).

92.     While the MDE must use data to measure school districts' performance, maintain an administrative complaint process, and take corrective action upon finding any violation of the act, its duties require far more. 20 U.S.C. § 1411(e)(2)(B)(i), 1415, 1416(a)(3).

93.     Rather than focusing on technical compliance, the MDE's "primary focus" must be on "improving education results and functional outcomes for all children with disabilities." 20 U.S.C. §  1416(a)(2)(A).

94.     The State must ensure that students actually receive a FAPE in the LRE. *See* 20 U.S.C. § 1412(a)(1), (a)(5); 1416(a)(1)(C), (a)(3)(A).

95.     Accordingly, the State must guarantee that districts meet the "markedly more demanding" standard for a free appropriate public education as clarified by the Supreme Court in *Endrew F.*, which explicitly demands that every child with a disability receive an "ambitious" education, with the chance to meet "challenging objectives," and anticipates that most children can do so in the general education classroom. *Endrew F. v. Douglas Cnty. Sch. Dist. Re-1*, 137 S. Ct. 988, 1000 (2017).

96.     To this end, the IDEA requires states receiving IDEA funds to have "in effect policies and procedures to ensure that the State meets each of the following conditions": (1) "A free appropriate public education is available to all children with disabilities …"; (2) "An individualized education program . . . developed, reviewed, and revised for each child with a disability in accordance with section 1414(d) of this title;" and (3) "Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title," among others. 20 U.S.C. § 1412.

97.     The IDEA requires local educational agencies receiving IDEA funding to "submit[] a plan that provides assurances to the State educational agency that … [t]he local educational agency, in providing for the education of children with disabilities within its jurisdiction, has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412 of this title." 20 U.S.C. § 1413(a).

98.     As the Supreme Court has held, "[t]o meet its substantive obligation under IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.* at 999.

99.     In some instances, the MDE partners with an intermediate school district (ISD) to monitor and ensure local compliance with special education requirements and to implement corrective measures within the ISD's constituent local school districts.

100.    The relevant ISD in this case is KRESA, the Kalamazoo Regional Educational Services Agency.

101.    KRESA, as the ISD in Kalamazoo County, is an educational service provider as is any other local education agency.

102.    KRESA, therefore, is responsible for having a district-wide plan in place that complies with the IDEA. Mich. Admin. R. 340.1837. KRESA is also responsible for maintaining a database with up-to-date information on each student with a disability within its jurisdiction. Mich. Admin. R. 340.1861.

103.    KPS, the local district Plaintiffs attend(ed), is within the KRESA intermediate school district.

104.    In partnering with KRESA, MDE neither relinquished, nor was it absolved of, its own statutory duties to oversee and ensure the identification and education of students requiring special education services. Rather, the MDE retained its oversight and enforcement obligations,

not only over the local districts, including KPS, but also over the processes and deficiencies of the ISDs, including KRESA.

**MDE's Failures**

105.   Whereas under the IDEA, MMSEA and MARSE, MDE should be recognizing and addressing KPS's systemic problems with identifying students requiring services and ensuring the provision of such services, MDE has instead exacerbated the problem by rubber-stamping clearly deficient practices, or failing to monitor those that were identified for correction, thereby depriving Plaintiffs and others of a FAPE.

106.   MDE's failure to properly monitor for compliance was not an isolated or new event. In February 2021, the Michigan Department of Education Office of Special Education released the Dispute Resolution Program Review ("Review"). The Review examined prior recommendations to MDE to inform its general supervision of compliance with special education law, including that MDE "[t]rack the issues investigated in state complaints and issues heard by a due process hearing officer[] in order to identify critical areas of potential noncompliance across the state;" "[d]evelop a system of targeted program or district monitoring in the event of systemic noncompliance;" "[u]se the number, frequency, and severity of complaints as part of the risk rubric or monitoring selection process utilized by MDE OSE to identify the districts that should be monitored;" "[u]se monitoring to follow long term corrective action to ensure appropriate future provision of services for all children with disabilities;" and "[c]onsider including findings of noncompliance resulting from dispute resolution as part of the local determination process."

107.   Per the Review, in addressing the progress that MDE made on these recommendations to shore up its monitoring for noncompliance as of 2020, "Stakeholders stated concerns with the consistency and enforcement of corrective action.  Specifically, stating some corrective action was inadequate to address long standing and continued noncompliance."  The

Review also observed, "Many stakeholders felt like the development of dispute resolution corrective action was disconnected from other monitoring activities, including graduated sanctions for similar noncompliance." "Some Stakeholders voiced concern regarding the accountability and verification of corrective action implementation."

108.    In its repeated failure to effectively correct KPS's noncompliance through the administrative complaint process and through its reliance on KRESA knowing that KRESA itself violated laws regarding the identification of and provision of services to children needing special education services, MDE has failed in its responsibilities under federal law to "address" KPS's "failure to provide appropriate services" and has failed to "address" the "[a]ppropriate future provision of services for all children with disabilities," including Plaintiffs. 34 C.F.R. § 300.151(b).

109.    MDE's failure to address the appropriate future provision of services in attempting to resolve state complaints has resulted in continued denial of FAPE to students, including Plaintiffs, in violation of 34 C.F.R. § 300.151.

**K.B.**

110.    Plaintiff K.B. is a sixteen-year-old student who resides in Kalamazoo, Michigan, and K.B. is African American.  When K.B. was in the fifth grade, her mother (a single mom) became legally blind and now cannot drive.   This became a challenge for the family to manage. K.B. began Hillside Middle School in 2017 and was repeatedly sent home for disciplinary issues. Her mother, H.B., would struggle to find transportation to pick K.B. up and K.B. slowly began to disengage from school.

111.    K.B. was unilaterally placed in KPS's Alternative Learning Program (ALP) in October 2017, where she was around many other students with behavior problems, resulting in her behaviors escalating.  K.B. was assigned to attend ALP for the entire 2017-2018 and 2018-2019 school years. She was there for the entirety of 6th grade and 7th grade, where she was repeatedly suspended for disrespect and not following directions.

112.    During one of her suspensions, K.B. went to the local elementary school to play, went inside to get a drink, and while there fought another student.  She got removed from ALP in April 2019 for the rest of the school year.  H.B. was told that K.B. could return to ALP in September 2019 after she had completed five therapy sessions and engaged with services from Integrated Services of Kalamazoo (ISK).

113.    In the summer of 2019, ISK identified K.B. as having Attention Deficit/Hyperactivity Disorder (ADHD), Adjustment Disorder, and Oppositional Defiant Disorder. Despite two years of significant behavioral issues, she had not previously been identified by KPS as a student with any disabilities.

114.    On August 23, 2019, the Michigan Department of Health and Human Services found K.B. clinically eligible to receive services through the Special Targeted Home and Community-Based Services Waiver program as a child with a serious emotional disability.

115.    On September 9, 2019, K.B.'s advocate filed a special education state complaint with MDE alleging that KPS had failed to properly evaluate and identify K.B. as a student with a disability.

116.    Millwood Middle School performed an evaluation resulting in a Multidisciplinary Evaluation Team (MET) Report of K.B. in October 2019.  KPS's MET team found K.B. ineligible for special education services even though her scores reflected a need for interventions through IEP eligibility.

117.    On November 8, 2019, MDE issued a finding and corrective action plan in response to the state complaint the family had filed in September.

118.    MDE found KPS in violation of IDEA and MARSE for failing to properly identify and evaluate K.B. as a student with a disability.

119.    MDE ordered KPS to do the following:

a.   conduct a Review of Existing Educational Data and comprehensive evaluation of K.B., prepare a MET report, and conduct an IEP team meeting to determine K.B.'s eligibility for special education services by January 15, 2020;

b.   if K.B. was found eligible for special education services, by January 22, 2020, develop a plan for 37 hours of compensatory education to be provided to K.B. before September 1, 2020;

c.   develop and revise the KPS Child Find proceedings by June 15, 2020, to ensure that KPS was in compliance with the requirements of the IDEA and MARSE; and

d.   provide appropriate professional development to KPS staff by June 15, 2020.

120.    Remarkably, MDE's decision specifically stated that if K.B. was found eligible for special education services, then MDE would find KPS further in violation of MARSE for failing to provide services to an eligible student under MARSE.

121.    KPS failed to conduct the required evaluation and simply notified H.B. that it was relying on prior evaluations of K.B. conducted in January 2018 and October 2019 to again find her ineligible for special education services.

122.    With regard to the January 2018 MET, H.B. was never notified that it had occurred and was never asked to provide information for the evaluation process, in violation of the IDEA.

123.    To date, KPS has failed to comply with  MDE's November 2019 finding and corrective action plan.

124.    Upon information and belief, MDE has failed to enforce its own corrective action plan against KPS.

125.    In November 2019, K.B. was involved in a behavioral incident at school involving a fight with another student.   Barry Smith, Assistant Director of Student Services for KPS, told

K.B. that she was either going to be expelled or she could go to the Youth Advancement Academy (YAA), a "strict discipline charter school" that serves middle and high school students who have been expelled or placed by court order.  She was then sent to YAA purportedly through February 2020.

126.    In February 2020, however, K.B. had a hearing in Juvenile Court and was ordered to write an apology to the family of the student she fought with at the elementary school.  She was placed in Juvenile Detention until she completed the letter. Because K.B. struggles with reading and writing, she remained there for three to four weeks as versions of her letter were rejected by officers of the Court.

127.    During her time in Juvenile Detention, K.B. attended the school there, in the Intensive Learning Center (ILC), where she received instruction from certified special education teachers but without an IEP.  H.B. asked for an evaluation of K.B. from ILC.  H.B. asked verbally, because she is blind, and was told that it was in the file, but upon review her advocate learned that it was not contained in the file.

128.    On December 14, 2020, KPS notified H.B. that it was not going to provide an IEP to K.B. because it had previously found her ineligible for special education services.

129.    During the 2020-2021 school year, K.B. was suspended for a total of 12 days through four separate behavior incidents.

130.    On January 25, 2021, K.B.'s advocate filed a complaint against KRESA with MDE.

131.    On March 23, 2021, the MDE found that KRESA "did not meet its child find obligation to identify, locate, and evaluate [K.B.] with a suspected disability," in violation of 34 C.F.R. §§ 300.111 and 300.301 and Mich. Admin. R. 340.1721, R. 340.1721a and R. 340.1721.

132.    MDE ordered a multi-step student-level corrective action plan and a district-wide corrective action plan.

133.    The district-wide plan demonstrates MDE's knowledge that KPS had system deficiencies, requiring KPS to "revise or develop regarding child find" to "document and ensure" for all students that "[t]he District has a consistent system to identify, locate and evaluate students with disabilities who may require special education and related services while in the juvenile detention facility" and that "[t]he special education referral/evaluation process is initiated for students with a suspected disability who may require special education and related services while in the juvenile detention facility, ensuring the child find procedure includes staff referrals and parent requests."

134.    MDE required the district to provide professional development by October 15, 2021, and to submit evidence of change in the district's practices to the Office of Special Education for verification.

135.    MDE failed to oversee, ensure and enforce the  March 2021 corrective action plan.

136.    On April 12, 2021, an initial Review of Existing Evaluation Data (REED) meeting for K.B. was conducted.

137.    The REED was signed on April 19, 2021.

138.    An  evaluation  plan  for  K.B.  was  developed  in  the  areas  of social/emotional/behavioral, achievement, and medical and mental health.

139.    On April 20, 2021, KPS issued  another behavioral incident report to K.B.

140.    On May 17, 2021, K.B.'s physician verified K.B.'s ADHD diagnosis and found that K.B.'s health was deteriorating and that she had trouble completing work and getting along with other students due to her diagnoses.

141.    On May 26, 2021, the KPS evaluation team recommended that K.B. be found eligible for special education services under the Other Health Impairment (OHI) disability category.

142.    The same day, an IEP meeting was held, and an IEP was finally created for K.B. However, the services and accommodations under the IEP failed to appropriately meet K.B.'s educational needs.

143.    Through 2021 and into 2022, KPS continued to punish K.B. for behaviors stemming from her disability, resulting in K.B.'s frequent suspension from school and deprivation of educational services.

144.    Eventually, K.B. simply stopped attending school because she was being disciplined constantly and was unable to learn.  K.B.'s self-esteem and motivation to learn were very low during this time.

145.    As detailed above, K.B. filed a due process complaint against KPS, KRESA, and MDE to vindicate her special education rights on February 11, 2022. *See supra*, paragraph 30.

146.    K.B. returned to KPS for the fall 2022 semester, and she is currently enrolled at Loy Norrix High School.

147.    K.B. is in the process of being (re)evaluated for special education services.

148.    Per KPS's May 2021 evaluation, K.B.'s academic performance was below the 5th percentile in all areas except word recognition, which was at the 25th percentile. She only did schoolwork about 50% of the time and only then with staff prompting support; was failing half of her classes; and experienced significant behavioral challenges which interfered with her ability to learn. Other tests placed her math mastery and reading levels at around the 2nd grade level.

149.    Because of MDE's failure to properly oversee KPS, which failed to properly evaluate and accommodate K.B., she has suffered educational, social, and behavioral impacts and other damages.

**K.S.F.**

150.    Plaintiff K.S.F, is a 20-year-old student who resides in Kalamazoo, Michigan, and

is African American.   After being placed at ALP by KPS without her mother's consent, her mother

transferred K.S.F. out of KPS in 2020. K.S.F. began 11th grade in the fall of 2020 at Compass

Alternative High School in Comstock Public Schools.

151.    K.S.F. is diagnosed with sickle cell anemia, borderline intellectual functioning,

major depressive disorder, major neurocognitive disorder, generalized anxiety disorder,

trichotillomania (hair-pulling disorder), and ADHD, and experiences severe pain which interferes

with her ability to obtain an education.

152.    Due to her sickle cell anemia, K.S.F. has to miss school frequently for blood

transfusions and due to severe pain.  K.S.F.'s pain can get so severe that it can cause her to have

to spend up to a week in the hospital.

153.    K.S.F. is also severely negatively affected by stress and cold temperatures.

154.    K.S.F. received accommodations for her sickle cell anemia via a 504 plan while

enrolled in KPS schools.

155.    K.S.F.'s mother had also requested of KPS that K.S.F. be evaluated for special

education services, as her mother felt that K.S.F. needed additional supports and accommodations

that her 504 plan could not provide in order to fully access her education.

156.    K.S.F. repeatedly experienced severe bullying by other female students at KPS.

Online, students attacked K.S.F. for her physical appearance as well as her disability, punctuating

those comments with emojis of weapons and coffins.

157.    Though K.S.F.'s mother reported the online harassment, upon information and

belief, KPS did nothing to address the bullying K.S.F. experienced.

158.    During one incident on January 15, 2018, rather than protecting K.S.F., a KPS staff

member put K.S.F. in a headlock, exacerbating her sickle cell symptoms and causing her physical

trauma.

159.     On October 4, 2019, K.S.F., through an advocate, filed a state complaint with MDE alleging that KPS had failed to properly identify and evaluate K.S.F. as a student with a disability.

160.     On November 22, 2019, KPS filed an IDEA due process complaint against K.S.F. with the Michigan Office of Administrative Hearings and Rules ("MOAHR"), presumably to avoid having to go through the process of the state complaint and having a finding made against them by KPS.

161.     K.S.F.'s mother was able to obtain pro bono legal representation for the due process proceeding that was filed against K.S.F., and her attorneys were able to successfully get the due process complaint against K.S.F. dismissed and the state complaint proceeding reinstated.

162.     While the proceeding was ongoing, K.S.F.'s mother decided to disenroll K.S.F. from KPS and enroll her in a different district in order to protect her.

163.     On April 18, 2020, MDE issued a decision finding KPS in violation of the IDEA and MARSE for failing to have appropriate procedures in place to identify children under Child Find.

164.     MDE ordered KPS to do the following:

    a.   develop and revise the KPS Child Find proceedings by November 15, 2020, to ensure that it was in compliance with the requirements of the IDEA and MARSE; and

    b.   provide appropriate professional development to KPS staff by November 15, 2020.

165.     KPS did not comply with the requirements of MDE's corrective action plan.

166.     Upon information and belief, MDE did not enforce its own corrective action plan against KPS.

167.     As of March 2021, KPS's evaluations of K.S.F. indicated that her levels of

academic mastery ranged from 4th to 11th grade reflecting weaknesses in attention/concentration and higher cognitive processes needed for math computation and reading comprehension, respectively. Evaluation results further indicated K.S.F.'s despondency about her health challenges, past academic experiences, concerns about her future and her self-worth, and oppressive feelings about being underestimated. Because of MDE's failure to properly evaluate and accommodate K.S.F. and MDE's failure to properly oversee KPS, K.S.F. has suffered educational, social, and behavioral impacts and other damages.

168.    As detailed above, K.S.F. filed a due process complaint against KPS, Comstock Public Schools, KRESA, and MDE to vindicate her special education rights on February 18, 2022. *See supra*, paragraph 32.

**D.L.**

169.    D.L. is a 20-year-old young man who resides in the KPS district and has been eligible for special education services since 2012.

170.    At all relevant times, D.L. was a student with a disability as defined by IDEA and MARSE under the primary category of Specific Learning Disability. He is also an individual with a disability within the meaning of Section 504 and the ADA, as he has been diagnosed with a severe specific reading disorder, a severe mathematics disorder, ADHD combined-type, post-traumatic stress disorder, complicated grief, major depressive disorder in remission, panic disorder in remission, and rule-out diagnoses of Disruptive Mood Dysregulation Disorder, Mild neurocognitive/post concussive effects affecting cognitive and fine motor functioning, and Central Auditory Processing Disorder, which substantially limit one or more major life activities, including reading, learning, communicating and interacting with others. 28 C.F.R. § 35.108.

171.    In 2012, KPS held an initial IEP meeting, finding D.L. eligible for special education under its Specific Learning Disability category. However, KPS failed to conduct *any*

comprehensive evaluations at that time.

172.    During his time in KPS, D.L participated in reading interventions, including System 44 and Read 180.

173.    Per KPS's own records, D.L. failed to make progress under System 44, and, according to What Works Clearinghouse (WWC), as of July 2010, there were no studies on Read 180 that met WWC's criteria for students with disabilities, meaning WWC[3] could not determine the effectiveness of the intervention for students with disabilities.

174.    D.L's NWEA Reading scores ranged from second (2.0) to fourth (3.0) grade equivalents and back to third (3.0) grade.

175.    D.L.'s most recent standardized test data documented by KPS, from the Fall of 2017, placed him at a third-grade reading proficiency.

176.    There are no standardized test scores or reading data recorded on D.L.'s IEP or supporting documents after Fall 2017.

177.    Though D.L. did not make sufficient progress in reading, KPS continued to use a reading intervention program that was not shown to be effective by WWC.

178.    KPS also did not amend D.L.'s IEP to provide more supports.

179.    In 2017, D.L.'s cousin died, an event that significantly impacted D.L. emotionally.

180.    Special education covers both academic and functional performance. Therefore, trauma that may affect a student's functional performance must be evaluated and supported if it impairs that student's ability to make progress. Subsequently, KPS began documenting increased behavior incidents; however, social work services were never added or contemplated according to

---

[3] What Works Clearinghouse (WWC) is the database created by the U.S. Department of Education's Institute of Education Sciences, which "reviews the existing research on different programs, products, practices and policies in education … to provide educators with the information they need to make evidence-based decisions." Found at https://ies.ed.gov/ncee/wwc/.

the subsequent IEPs.

181.    In 2018, KPS declined to conduct comprehensive evaluations to determine D.L.'s lack of progress.

182.    In the fall of 2018, D.L. suffered a head injury while playing football for KPS, which may have negatively affected D.L. academically or functionally. KPS failed to hold an IEP meeting to determine whether D.L. needed any additional special education services or supports based on the head injury.

183.    In 2019, KPS held IEP meetings on April 16 and October 16. In both meetings, KPS wrote identical math and transition goals for D.L. Alarmingly, the onus for ensuring that KPS met its legal obligation under IDEA was placed on D.L. as the transition goal was that D.L. will "ask[] his teacher to ensure he is receiving those accommodations when needed 85% of the time as measured by teacher documentation and informal teacher observation."  The language of this transition goal is directly contrary to the language and spirit of the IDEA, which requires LEAs to identify and provide appropriate services to students.

184.    In 2020, KPS held an IEP meeting on October 12. The same year, it held a REED, that is, a Review of Existing Evaluation Data, meeting to determine whether D.L. is a student with a disability, whether he required special education and whether his IEP needed modification. However, rather than conduct comprehensive evaluations to determine these needs, KPS relied on the incomplete and then five-year-old 2015 data.

185.    In each of these three IEP meetings over a two-year period, in 2019 and 2020, KPS repeated the identical reading goal: D.L. "will progress from reading a grade appropriate text and providing a summary that includes 2 details to reading various genres of classic, contemporary narrative, and informational texts grade level and use comprehension strategies to identify 4-6 important key details, make connections, and inference with 85% accuracy as measured by grade

level assessments and student work samples," except that it change the accuracy target from 85% to 80% from October 2019 to October 2020.

186.    Despite D.L.'s lack of meaningful progress, KPS did not add any supplementary aids or services or increase D.L.'s resource room time from 50 minutes per week.

187.    In 2020, D.L.'s uncle, who was like a father to him, was murdered. This was a traumatic event for D.L., and his behaviors in school again began to escalate.

188.    From fall 2017 through early spring of 2020, KPS documented 32 behavior incidents involving D.L. In March 2019, KPS "excluded" D.L. for the remainder of the school year, 51 days, without convening a manifestation determination review (MDR). The district issued him five suspensions before ever creating a behavior intervention plan. In doing so KPS neither determined the root-cause nor modified D.L.'s IEP to add a behavior-related goal.

189.    When KPS finally held an MDR, on October 16, 2019, the district noted that D.L. was "struggling to make any progress toward his academic goals and objectives," and "can struggle with adult interactions, which can lead to altercations."

190.    Inexplicably, KPS failed to find that D.L.'s behavior was a manifestation of his disability, nor did it initiate further evaluations to determine the cause of the behavior.

191.    D.L.'s trauma-based behavioral incidents should have triggered KPS's intervention. KPS, however, failed to convene an IEP meeting, failed to provide social work supports to assist him, and failed to establish behavior-related goals.

192.    In January 2021, D.L.'s advocate filed an MDE state complaint on D.L.'s behalf asserting that KPS was violating special education law and that D.L. was graduating while functionally illiterate.

193.    Despite D.L.'s obvious lack of significant progress and reports that clearly showed that D.L. made only very limited progress toward his reading goal and failed English, MDE relied

on the 2018 and 2020 REEDs, which relied on outdated 2015 data, to determine that KPS complied with the law.

194.    Thus, despite the fact that KPS's REED evaluations were based on outdated 2015 data, despite the fact that there were significant traumatic post-2015 events affecting D.L.'s emotional health, despite the fact that D.L. exhibited concerning post-2015 behaviors that should have been evaluated, and despite the fact that D.L. still read at an elementary grade level, MDE determined that KPS provided a "free appropriate public education."

195.    MDE's inexplicable sanction of KPS's failures are made more egregious given MDE's knowledge, through other cases, that KPS had systemic deficiencies in its child find process and was frequently out-of-compliance with laws governing the identification of students with disabilities or needing services (Child Find activities), including in 2017-2020. *See e.g.*, MDE State Complaints 17-0159, 18-0085, 19-0088, 19-0188, 19-0213 and 19-0220.

196.    At all times subsequent to, at the latest, August 29, 2017, MDE was *fully* aware that KPS was failing to conduct comprehensive educational evaluations of students in violation of IDEA, MARSE and Section 504.

197.    On June 9, 2021, KPS held an IEP meeting. KPS claimed that D.L. attended.

198.    However, in fact, D.L. graduated high school *five days earlier,* on June 4, and he has not been in contact with KPS since his graduation.

199.    In August 2021, D.L. learned the magnitude of his disabilities once he completed comprehensive neuropsychological evaluations. According to his evaluation, D.L.'s atypical neurological profile, while notable for large discrepancies between his verbal and perceptual abilities and significant working memory deficits, did not limit him from understanding and retaining information. D.L. could learn English and math and other school subjects. Though his academic testing showed mastery of concepts in English and math in the third- and fourth-grade

range, he was capable of much more.

200.   KPS never evaluated D.L.'s reading abilities after 2017, outside of classroom assignments and tests. A KPS school psychologist estimated that about six months before graduation, D.L.'s reading ability was that of a third grader, consistent with the last tests performed in his ninth grade. KPS likewise never evaluated his math abilities after 2018, outside of classroom assignments and tests. During his due process hearing, D.L. testified that he understood addition and subtraction but not division, and he could only reliably multiply by factors of 2, 5, and 10. Nevertheless, during his high school career, KPS gave D.L. passing marks in seven different algebra classes.

201.   As detailed above, D.L. filed a due process complaint against KPS, KRESA, and MDE to vindicate his special education rights on October 21, 2021. *See supra*, paragraph 34. Nearly a year later, on October 13, 2022, the ALJ issued a Decision and Order denying D.L.'s remaining claims against KPS. The ALJ's decision demonstrates the systemic hurdles faced by students with disabilities like D.L. through all phases of the special education process. Such barriers include decisionmakers determining a student's entitlement to education without reference to, or application of, the actual law; relying on the students' behaviors or failures, which are often manifestations of their disabilities or tactics to navigate difficult academic and social environments for which they are not fully equipped, to excuse or justify the LEA's or SEA's noncompliance with special education law; attributing a student's lack of progress to laziness; and using a student's prior misbehaviors to presume or "imagine" the student's future failure or engagement of special services.

202.   Notably, D.L.'s due process complaint took nearly a year to resolve. Hearings are supposed to be completed within 60 days of the due process complaint filing. Instead, many hearings are taking a year or longer to resolve, a trend that prolongs the denial of special education

services, bogs down the complaint resolution process, and deters parents from engaging it.

203.    D.L.'s experience is consistent with that observed by stakeholders in the February 2021 Review of MDE's special education operations who remarked, "Due Process Hearings are not timely when compared to other dispute resolution option;" "the length of the due process hearing process takes such a long time that parents are often discouraged and would rather seek education for their child elsewhere;" "ALJs lack specific understanding of special education," and "…Due Process Hearing Officers would benefit from basic special education knowledge."

204.    MDE failed in its responsibilities under state and federal law to ensure a free appropriate public education to Plaintiffs and failed to likewise meet its obligation to provide for the "[a]ppropriate future provision of services for all children with disabilities." 34 C.F.R. § 300.151(b)(2).

205.    MDE's failure to provide sufficient resources, training and staff, including Administrative Law Judges, to ensure the provision of special education services, identification and correction of noncompliance, and timely resolution of disputes deprives students of the education and process to which they are entitled.

## COUNT I
## IDEA

206.    Plaintiffs incorporate here all previously stated allegations.

207.    Under the IDEA, MDE repeatedly failed in its monitoring and supervising obligations. 20 U.S.C. § 1412(a), 1416; 34 C.F.R. § 300.120, 149(a), 600-602, 606-608.

208.    MDE failed to provide sufficient, trained Administrative Law Judges to ensure the timely resolution of disputes arising under IDEA.

209.    MDE failed to ensure KPS had sufficient qualified personnel able to provide a free appropriate public education to Plaintiffs.

210.    MDE failed to provide adequate funding to KPS to provide a free appropriate public

education to Plaintiffs. 34 C.F.R. § 300.114(b).

211.    MDE failed to provide technical assistance that would allow KPS to provide a free appropriate public education to Plaintiffs. 34 C.F.R. § 300.119.

212.    MDE failed to provide adequate training to KPS about provision of a free appropriate public education to Plaintiffs. 34 C.F.R. § 300.119.

213.    MDE failed to enforce the IDEA when put on notice of Plaintiffs' denial of a free appropriate public education. 20 U.S.C. sec 1413(g); 34 C.F.R. § 300.151.

214.    MDE failed in implementing corrective action when it found that Plaintiffs were being deprived of a free appropriate public education. 34 C.F.R. § 300.151.

215.    Under the MMSEA and MARSE, Mich. Admin. R. 340.1700 *et seq*., as incorporated into IDEA, MDE failed to maintain an effective complaint resolution process, resulting in the continued denial of a free appropriate public education for Plaintiffs.

216.    When KPS continued to deny Plaintiffs a free appropriate public education and restricted Plaintiffs' individualized education program to the programs and services available, in violation of MARSE, as incorporated into IDEA, MDE failed to bring KPS into compliance or utilize its sanction power, violating MARSE.

217.    MDE failed to provide a free appropriate public education to Plaintiffs when KPS was unable to do so. 20 U.S.C. § 1413(g)(1)-(2).

218.    MDE failed in its ultimate responsibility to ensure that Plaintiffs received a free appropriate public education with appropriate supports and services. 20 U.S.C. § 1412(a)(11)(A).

219.    As a direct and proximate cause of MDE's violations of the IDEA, Plaintiffs have suffered substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity.

## COUNT II
### Section 504 of the Rehabilitation Act of 1973

220.     Plaintiffs incorporate here all previously stated allegations.

221.     Pursuant to Section 504 of the Rehabilitation Act of 1973 (Section 504) and its regulations, "[n]o otherwise qualified individual with a disability … shall, solely or by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

222.     The regulations regarding preschool, elementary, and secondary education apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate or that received Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

223.     In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

224.     MDE is a recipient of federal financial assistance and operates a public elementary or secondary education program or activity and, thus, is a covered entity under Section 504. 29 U.S.C. § 794.

225.     Plaintiffs are persons with disabilities within the meaning of Section 504. 29 U.S.C.§ 794. MDE has intentionally discriminated against Plaintiffs in violation of Section 504 by failing to provide or ensure the provision of comprehensive educational evaluations resulting in a denial of a free appropriate public education to Plaintiffs.

226.     MDE's failures, including failing to provide oversight and ensure that child find deficiencies were corrected, students requiring special education services were identified, and

those services were actually provided, had a disparate adverse impact on students with disabilities, including Plaintiffs.

227.    As a direct and proximate cause of MDE's violation of Section 504, Plaintiffs have suffered substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity.

<div align="center">

**COUNT III**
**<u>Americans with Disabilities Act</u>**

</div>

228.    Plaintiffs incorporate here all previously stated allegations.

229.    Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.

230.    MDE is a public entity subject to Title II.

231.    Plaintiffs are persons with disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

232.    MDE intentionally violated Plaintiffs' rights under the ADA and its regulations by denying them access to equal educational opportunities afforded to students with disabilities, by excluding Plaintiffs from participation in and denying them the benefits of the district's and State's services, programs and activities, and by subjecting them to discrimination. 42 U.S.C. § 12132.

233.    MDE otherwise intentionally discriminated against Plaintiffs in violation of 42 U.S.C. § 12132.

234.    As a direct and proximate cause of MDE's violations of the ADA, Plaintiffs have suffered substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity. 42 U.S.C. § 12132, 12182.

## RELIEF REQUESTED

Plaintiffs request that the Court:

1.      Issue a declaratory Judgment on behalf of Plaintiffs declaring that the MDE's actions, policies, and practices as alleged herein violate the IDEA; Section 504; and Title II of ADA;

2.      Issue a permanent injunction directing MDE to implement appropriate policies, procedures and protocols to remedy the failures alleged herein with respect to the Plaintiffs;

3.      Issue a final Order and Judgment awarding Plaintiffs:

  a.   equitable relief and compensatory education or a compensatory education fund given the length of deprivation;

  b.   reimbursement for all out of pocket expenses and services;

  c.   compensatory related services and transition services as needed;

  d.   compensatory damages  in a supplemental needs trust for:

    i.   exclusion due to segregation, loss of friendship and society of typical peers and isolation in the amount of $1,000 per school day for the entire period of the educational loss until such time as the exclusion is cured; and

    ii.   loss of general education time/exclusion from activities and curricula due to Plaintiffs' disabilities in the amount of $1,000.00 per school day for the entire period of the educational loss; and

  f.   appoint an independent monitor or ombudsperson to oversee and administer the compensatory education award;

4.      Implement a state-wide, pro-active enforcement protocol for ensuring compliance with corrective action plans that includes, but is not limited to, a determination of whether the corrective action plan has resulted in providing an educational program more "reasonably

calculated to enable a child to make progress appropriate in light of the child's circumstances,"
*Endrew F.*, 137 S.Ct. 988, 999 (2017);

5.     Hire and/or allocate the appropriate number of staff to ensure that corrective action plans (CAP) are enforced and result in the correction of identified noncompliance;

6.     Engage in pro-active CAP monitoring, including substantive review of the facts and follow-up with parents to review the child's current circumstances, to ensure continued compliance with federal and state law as incorporated into IDEA;

7.     Order MDE to exercise its authority under MARSE R. 340.1855 as incorporated into IDEA;

8.     Provide funding to the local school district, as needed, to comply with this order;

9.     Award Plaintiffs their costs and reasonable attorneys' fees; and

10.     Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

<div style="margin-left: 40%;">

Respectfully Submitted,
Attorneys for Plaintiffs

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
**Salvatore Prescott Porter & Porter PLLC**
105 E. Main Street
Northville, Michigan 48167
248-679-8711
salvatore@spplaw.com

Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
**Disability Rights Michigan**
4095 Legacy Parkway
Lansing, Michigan 48911
517-487-1755
ediaz@drmich.org
msickon@drmich.org

Elizabeth K. Abdnour (P78203)
**Elizabeth Abdnour Law, PLLC**

</div>

1100 W. Saginaw Street, Ste. 4A-2
Lansing, Michigan 48915
517-292-0067
elizabeth@abdnour.com

Jacquelyn N. Babinski (P83575)
**MI AECRES**
PO Box 705
Ludington, Michigan 49431
231-794-2379
jbabinski@miaecres.org


Dated: December 5, 2022

## JURY DEMAND

Plaintiffs demand a jury trial in the above-captioned matter.

Respectfully Submitted,
Attorneys for Plaintiffs

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
**Salvatore Prescott Porter & Porter PLLC**
105 E. Main Street
Northville, Michigan 48167
248-679-8711
salvatore@sppplaw.com

Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
**Disability Rights Michigan**
4095 Legacy Parkway
Lansing, Michigan 48911
517-487-1755
MSickon@drmich.org

Elizabeth K. Abdnour (P78203)
**Elizabeth Abdnour Law, PLLC**
1100 W. Saginaw Street, Ste. 4A-2
Lansing, Michigan 48915
517-292-0067
elizabeth@abdnour.com

Jacquelyn N. Babinski (P83575)
**MI AECRES**
PO Box 705
Ludington, Michigan 49431
231-794-2379
jbabinski@miaecres.org

Dated: December 5, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically filed the foregoing document and this Certificate of Service with the Clerk of the Court using the Court's ECF system, which will send notification of such filing to counsel of record.

Dated:  December 5, 2022                                /s/ Tara Lank
                                                        Tara Lank, Paralegal