# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

D.L., K.S.F., and K.B., by and through her
parent and next friend, H.B.,

      Plaintiffs,

v

MICHIGAN DEPARTMENT OF
EDUCATION, a governmental agency,

      Defendant.

No. 1:22-cv-00838

HON. ROBERT J. JONKER

MAG. PHILLIP J. GREEN

**ANSWER TO PLAINTIFFS'
FIRST AMENDED
COMPLAINT AND
AFFIRMATIVE DEFENSES**

---

Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
Disability Rights Michigan
Attorneys for Plaintiffs
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755
ediaz@drmich.org
msickon@drmich.org

Elizabeth K. Abdnour (P78203)
Elizabeth Abdnour Law, PLLC
Attorney for Plaintiffs
1100 W. Saginaw Street, Ste. 4A-2
Lansing, Michigan 48915
517-292-0067
elizabeth@abdnour.com

Jacquelyn N. Babinski (P83575)
MI AECRES
Attorney for Plaintiffs
PO Box 705
Ludington, Michigan 49431
231-794-2379
jbabinski@miaecres.org

Jennifer B. Salvatore (P66640)
Salvatore Prescott Porter &
Porter
Attorney for Plaintiffs
105 E. Main Street
Northville, Michigan 48167
248-679-8711
salvatore@sppplaw.com

---

Charles A. Cavanagh (P79171)
Kathleen A. Halloran (P76453)
Attorney for Defendants
Michigan Department of Attorney General
Health, Education & Family Services Division
P.O. Box 30758
Lansing, Michigan 48909
(517) 335-7603
cavanaghc2@michigan.gov
HalloranK1@michigan.gov

---/

## ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT AND AFFIRMATIVE DEFENSES

NOW COMES the Defendant, the Michigan Department of Education (MDE), by and through the undersigned attorneys, and for its response to Plaintiffs' First Amended Complaint state as follows:

### PRELIMINARY STATEMENT

1.      Plaintiffs are former students with disabilities in Kalamazoo Public School (KPS) who suffered substantial academic harm and lost educational experience and opportunity due to MDE's systemic failure to monitor and remedy KPS's known and continuous violations of state and federal laws regarding the identification and education of students with disabilities.

**ANSWER:**   MDE admits that Plaintiffs are former students in Kalamazoo Public Schools (KPS) who at certain time periods an IEP Team has determined to meet educational criteria as a student with a disability.  MDE denies as untrue the remaining allegations in this paragraph.

2.      During the 2020-2021 school year, 203,585 students with disabilities were identified as eligible for special education services in the State of Michigan. "Child Find" is the process that requires the State to ensure that "[a]ll children with disabilities residing in the State…who are in need of special education and related services, are identified, located, and evaluated." 34 C.F.R. § 300.111.  Due to the ongoing nature of the Child Find responsibility, the actual number of students with disabilities eligible for special education services always exceeds the number identified as eligible.

**ANSWER:**  MDE denies as untrue the allegation that during the 2020–2021 school year, 203,585 students with disabilities were identified as eligible for special education services in Michigan.  MDE has insufficient knowledge or information to form a belief as to the truth of the allegation that the actual number of students with disabilities for special education always exceeds the number identified as eligible, and therefore, neither admits nor denies this allegation.  The remaining allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that 34 C.F.R. § 300.111 requires the State to ensure that "[a]ll children with disabilities residing in the State…who are in need of special education and related services, are identified, located, and evaluated."

3.     Disability Rights Michigan (DRM) is the agency designated by the State of Michigan, pursuant to state and federal laws, to protect and advocate for the rights of individuals with disabilities.  The authority and responsibility of DRM as a federally mandated, state designated Protection and Advocacy organization is outlined in both state and federal law, including:

- 42 U.S.C. § 15043, the Developmental Disability Assistance and Bill of Rights Act;

- 42 U.S.C. § 10801, the Protection and Advocacy for Individuals with Mental Illness Act;

- 29 U.S.C. § 794e, the Protection and Advocacy for Individual Rights Act; and

- M.C.L. § 330.1748, of the Mental Health Code.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE

3

admits that Disability Rights Michigan (DRM) is an advocacy group funded by the federal and state government and authorized to advise and represent certain individuals with disabilities.

4.      Pursuant to this authority, DRM advises and represents parents and students regarding their rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.§1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794 *et seq.*, and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that DRM advises and represents certain parents and students regarding their rights under federal law.

5.      Over the past four years, on average, DRM has received over eight hundred calls each year requesting assistance regarding actual or alleged violations of disability antidiscrimination and special education laws.  This need far exceeds DRM's capacity for individual representation.  DRM must carefully steward its limited resources to achieve the greatest impact for the greatest number of students with disabilities.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

6.      DRM is not responsible for ensuring that each eligible child in the state receives a free appropriate public education (FAPE). That responsibility,

4

under state and federal law, lies with the Michigan Department of Education
(MDE) as a state educational agency (SEA).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
admits that DRM is not responsible for ensuring that each eligible child in the state
receives a free and appropriate public education (FAPE).  With respect to the
remaining allegations, MDE admits that federal and state law govern MDE's
responsibilities for the general supervision of implementation of the IDEA.  MDE
denies as untrue any remaining allegations that are inconsistent with those federal
and state laws.

7.     The IDEA clearly outlines MDE's role.  "The SEA is responsible for
ensuring…[t]hat the requirements of [the IDEA] are carried out."  34 C.F.R. §
300.149(a)(1).  The IDEA provides SEAs with mechanisms for meeting this
responsibility.  The SEA must "have in effect policies and procedures to ensure that
it complies with [] monitoring and enforcement requirements."  *See* 34 C.F.R. §§
300.600-02 and §§ 300.606-08.  The SEA must "have procedural safeguards in effect
to ensure that" due process complaints can be filed and heard compliant with
the IDEA. 34 C.F.R. § 300.121.  Further, pursuant to IDEA's implementing
regulations, every SEA must also adopt state complaint procedures. 34 C.F.R. §§
300.151-53.  An SEA's state complaint system is "critical to each State's exercise of
its general supervision responsibilities" as it is a "powerful tool to identify and
correct noncompliance" with IDEA. 71 Fed. Reg. 46601, Aug. 14, 2006.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that the regulations cited in this paragraph outline MDE's responsibilities under the IDEA.  To the extent the allegations in this paragraph are inconsistent with these regulations, MDE denies the allegations as untrue.

8.    State complaints play a unique role in an SEA's responsibility to ensure compliance with IDEA.  State complaints provide the SEA with first-hand examples of noncompliance with IDEA by school districts (or local educational agencies (LEAs), as they are referenced in the IDEA).

**ANSWER:**   MDE admits that state complaints serve an important role in the MDE's general supervision of the implementation of the IDEA.  MDE denies as untrue the allegation that state complaints provide MDE with first-hand examples of noncompliance with the IDEA by school districts as state complaints can be filed by any individual, and therefore, may not be first-hand examples.

9.    In 2010, DRM began filing state complaints to bring noncompliance to MDE's attention, with the expectation that MDE would, in its oversight role, ensure correction.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

10.    Ensuring the correction of identified noncompliance is a fundamental component of a legally-sufficient state complaint system.  IDEA requires that, in correction, the SEA must address both the educational loss of the individual child

and ensure the "[a]ppropriate future provision of services for all children with disabilities." 34 C.F.R. § 300.151(b)(2) (emphasis added).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that, in resolving a complaint in which MDE has found a failure to provide appropriate services under the IDEA, MDE must address the failure to provide appropriate services, including corrective action appropriate to address the needs of the child, as well as "appropriate future provision of services for all children with disabilities.  MDE denies as untrue any allegations inconsistent with the federal regulation cited in this paragraph.

11.    MDE's mandate to ensure that every student with a disability is identified, located, evaluated, and provided with a FAPE is neither permissive nor discretionary. Rather, it is an imperative requiring the MDE's affirmative oversight, supervision, evaluation, and correction of LEAs in the identification of students with disabilities requiring special education and the provision of a FAPE to those students.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that federal law and regulations provide MDE with general supervision of the implementation of the IDEA.  MDE denies as untrue the remaining allegations in this paragraph.

12.    The MDE's oversight and enforcement are critical to ensuring students with disabilities have access to the education to which they are entitled,

particularly in those districts in which the MDE has found repeated noncompliance with IDEA.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that federal law and regulations provide MDE with general supervision of the implementation of the IDEA.  MDE denies as untrue the remaining allegations in this paragraph.

13.    When MDE fails its oversight and enforcement duties, as it did in this and other cases, students and families suffer.  They lose access to essential and basic resources, are subjected to punitive rather than rehabilitative or educational processes, fall farther behind in their educational development, and are involuntarily placed in harmful environments that worsen their disabilities, circumstances, and educational outcomes.

**ANSWER:**   MDE denies as untrue the remaining allegations in this paragraph.

14.    MDE's charge is to provide general supervision; that is, to oversee, supervise and enforce the provision of FAPE to Michigan's students with disabilities.  With Plaintiffs and many other students, MDE has failed to do so, resulting in substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE

admits that federal law and regulations provide MDE with general supervision of the implementation of the IDEA.  MDE denies as untrue the remaining allegations in this paragraph.

15.    DRM cannot enforce the rights of the more than 203,585 students identified as having disabilities in Michigan, and the countless students needing special education or disability accommodations who are unidentified due to deficient Child Find processes, by acting on behalf of one student at a time.  Through this action, however, Plaintiffs seek to vindicate their rights and make systemic change.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

16.    This action, therefore, brings claims against the MDE for violations of the IDEA, Section 504, and the ADA.  The experiences of the Plaintiffs in this action are, upon information and belief, representative of the experiences of students throughout the State whose districts are failing to provide appropriate special education services or otherwise comply with Child Find obligations often due to inadequate oversight, support from, and corrective action by the MDE.

**ANSWER:**   MDE admits that Plaintiffs bring this action against the MDE for violations of the IDEA, Section 504, and the ADA.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

## PARTIES, JURISDICTION AND VENUE

17.    Plaintiff D.L. is a 20-year-old young adult with specific learning disabilities who attended the Kalamazoo Public Schools (KPS) from 2007 until his graduation in 2021.  D.L. was eligible for special education and entitled to receive a free appropriate public education at all relevant times.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that D.L. was a student with a disability as of the filing of a due process complaint on January 27, 2021.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

18.    Plaintiff K.S.F. is a 20-year-old young adult who attended KPS beginning in kindergarten.  Since 2020, K.S.F. was eligible for special education services and, for her full KPS tenure, was entitled to receive a free appropriate public education under Section 504.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that K.S.F. was eligible for special education services since 2020.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

19.     Plaintiff K.B. is a 16-year-old student who attends KPS.  K.B. was, at all relevant times, and remains as of this filing, eligible for special education services and entitled to receive a free appropriate public education.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies that K.B. was eligible for special education "at all relevant times."  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

20.     Defendant MDE is the state educational agency (SEA) primarily responsible for the supervision of the provision of special education in Michigan's public elementary and secondary schools, or local educational agencies (LEAs).  20 U.S.C. § 1401(19), (32).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that it is a state education agency.  MDE denies as untrue the remaining allegations in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

21.     MDE receives IDEA funding by submitting to the Secretary of the U.S. Department of Education "assurances … that the State has in effect policies and procedures to ensure that …[a] free appropriate public education is available to all children with disabilities residing in the State."  20 U.S.C. § 1412.

**ANSWER:** The allegations in this paragraph contain legal conclusions for which no response is required. To the extent that an answer is required, MDE admits that it receives federal IDEA funding.

22. MDE also receives federal assistance and qualifies as a program under Section 504, 29 U.S.C. § 794.

**ANSWER:** The allegations in this paragraph contain legal conclusions for which no response is required. To the extent that an answer is required, MDE admits that it receives federal funds.

23. As an SEA, MDE is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131.

**ANSWER:** The allegations in this paragraph contain legal conclusions for which no response is required. To the extent that an answer is required, MDE admits that it is a public entity subject to Title II of the ADA.

24. Jurisdiction is conferred upon this Court by the IDEA, 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provides U.S. district courts with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

**ANSWER:** The allegations in this paragraph contain legal conclusions for which no response is required. To the extent that an answer is required, MDE states that it is not disputing jurisdiction at this time.

25. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, based upon the federal question raised herein, and 28 U.S.C. § 1343, because this action is brought to vindicate Plaintiffs' civil rights.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE states that it is not disputing jurisdiction at this time.

26.     This Court also has jurisdiction pursuant to the ADA, as amended, 42 U.S.C. §12101 et seq., and Section 504, 29 U.S.C. § 794.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE states that it is not disputing jurisdiction at this time.

27.     This Court has supplemental jurisdiction over claims arising under the Michigan Mandatory Special Education Act (MMSEA), M.C.L. § 380.1701 *et seq*., and Michigan Administrative Rules for Special Education (MARSE), Mich. Admin. R. 340.1701 *et seq*., pursuant to 28 U.S.C. § 1367(a).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as untrue.

28.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Western District of Michigan, and all events and omissions giving rise to this Complaint occurred in this district. Additionally, Defendant operates within the Western District of Michigan.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE states that is not disputing venue at this time.

29.     To the extent that administrative exhaustion is required against the MDE, Plaintiffs have each exhausted their remedies by filing individual due process actions against MDE, all of which have been dismissed.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations in this paragraph.

30.     On February 11, 2022, K.B. filed a due process complaint against KPS, the Kalamazoo Regional Educational Services Agency (KRESA), MDE and Michael Rice in his official capacity as State Superintendent.

**ANSWER:**   MDE admits the allegations in this paragraph.

31.     On March 16, 2022, the administrative law judge (ALJ) granted the motions to dismiss MDE, Superintendent Rice, and KRESA.  Upon settlement between the remaining parties, on August 17, 2022, the ALJ dismissed K.B.'s complaint against the remaining defendant, KPS.

**ANSWER:**   MDE admits the allegations in this paragraph.

32.     On February 18, 2022, K.S.F. filed a due process complaint against KPS, KRESA, Comstock Public Schools, MDE, and Michael Rice in his official capacity as State Superintendent.

**ANSWER:**   MDE admits the allegations in this paragraph.

33.     On April 6, 2022, the ALJ granted the MDE's motion for summary disposition and dismissed the case against MDE.  On April 15, 2022, the ALJ granted motions to dismiss KRESA and KPS.  Upon settlement between the

14

remaining parties, on June 17, 2022, the ALJ dismissed K.S.F.'s complaint against the remaining defendant, Comstock Public Schools.

**ANSWER:**   MDE admits the allegations in this paragraph.

34.     On October 21, 2021, D.L. filed a due process complaint against KPS, KRESA, MDE and Michael Rice in his official capacity as State Superintendent.

**ANSWER:**   MDE admits the allegations in this paragraph.

35.     On December 20, 2021, the ALJ granted the motions to dismiss MDE, Superintendent Rice and KRESA. As to the remaining defendant, KPS, the hearing on D.L.'s complaint began January 10, 2022, and concluded January 13, 2022. Pursuant to an ALJ order issued on March 28, 2022, the ALJ's decision with respect to D.L.'s complaint was due on August 1, 2022. On July 28, 2022, the ALJ extended the decision date to August 31, 2022.  On September 6, 2022, the ALJ's office notified Plaintiffs that the decision would be forthcoming although no decision date was provided.  On October 13, 2022, the ALJ issued a Decision and Order denying D.L.'s complaint and dismissing all claims with prejudice.

**ANSWER:**   Upon information and belief, MDE admits that on or about December 20, 2021 the Administrative Law Judge issued a Decision and Order that, among other things, granted the MDE, Dr. Rice, and KRESA's motions for summary disposition and dismissed those parties with prejudice.  Upon information and belief, MDE also admits that the Administrative Law Judge issued a Decision and Order on or about October 13, 2022 denying D.L.'s complaint and dismissing all claims with prejudice.  For the remaining allegations in this paragraph, MDE has insufficient knowledge or information to form a belief as to the truth of the

15

allegations in this paragraph, and therefore, neither admits nor denies the allegations.

36.     As it pertains to this Complaint against MDE, D.L. has fully complied with all due process complaint requirements.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations in this paragraph.

37.     There remains no other forum in which Plaintiffs' claims against MDE can be vindicated.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations in this paragraph.

## GENERAL ALLEGATIONS

**IDEA and FAPE: The Obligation to Provide a Free and Appropriate Public Education in the Least Restrictive Environment.**

38.     Congress passed the IDEA to ensure "that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(1)(A), (B).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

16

Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

39.     Under the IDEA, each state must "ensure that … [a] free appropriate public education [FAPE] is available to all children with disabilities residing in the state aged 3 to 21, inclusive, including children with disabilities who have been suspended or expelled from school."  20 U.S.C. § 1412(a)(1)(A).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

40.     "Special education" means specially designed instruction that meets the unique needs of a child with a disability.  See 20 U.S.C. § 1401(29).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

41.     "Related services" mean the supportive services required to assist a child with a disability to benefit from special education and related services to each eligible student with a disability by implementing an "individualized education program" (IEP).  20 U.S.C. § 1401(26).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

42.     An IEP is an individually-tailored plan of action that is developed, reviewed and revised by an IEP team that includes the child's parent and academic and therapeutic professionals.  See 20 U.S.C. § 1414(d).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

43.     The IDEA further requires that the states "ensure," through the "least restrictive environment" mandate, that:

> [t]o the maximum extent appropriate, children with disabilities … are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes … cannot be achieved satisfactorily.  20 U.S.C. § 1412(a)(5).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

44.    The IDEA requires that qualifying children with disabilities receive a FAPE.  20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a).  To achieve this goal, the IDEA requires that LEAs, or any other educational agency responsible for providing special education services to the child, design and develop an IEP for each qualifying child with a disability in their district.  20 U.S.C. § 1412(a)(4), § 1414(d); 34 C.F.R. § 300.112, §§ 300.320-24.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statutes and regulations referenced therein for a complete and accurate statement of their contents and legal import.

45.    An IEP must contain several key pieces of information to ensure that the education program provided is "appropriately ambitious in light of [a student's] circumstances," and afford the student the opportunity to "meet challenging objectives." *Endrew F. v. Douglas Cnty. Sch. Dist. Re-1*, 137 S. Ct. 988, 1000 (2017).  Such pieces of information include: (1) a statement of the student's present levels of academic achievement and functional performance; (2) a statement of measurable annual academic and functional goals; (3) a statement of the special education and related services that will be provided to the student; (4) an explanation of the extent, if any, to which the student will not participate with nondisabled students in regular classes; (5) a statement of any individual appropriate accommodations necessary to measure the academic achievement and functional performance of the

19

student; (6) the projected start date for any related services; and (7) transition services for students who have reached the age of 16.  20 U.S.C. § 1414(d)(3).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the case referenced therein for a complete and accurate statement of its contents and legal import.

46.     The IDEA requires, to the maximum extent possible, that children with disabilities be educated with children who are not disabled, and that removal from the regular education environment occurs only when education in traditional classes with the use of supplementary aids and services cannot be satisfactorily achieved.  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2).  Districts must have available a continuum of alternative placements for children with disabilities.  34 C.F.R. § 300.115.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulations referenced therein for a complete and accurate statement of its contents and legal import.

**The IDEA's "Child Find" Requirements**

47.     Pursuant to the IDEA's Child Find mandate, the MDE must have in effect policies and procedures to ensure that all children with disabilities residing in the State who need special education and related services are identified, located,

and evaluated, regardless of the severity of their disabilities.  20 U.S.C. §

1412(a)(3)(A); 34 C.F.R. § 300.111(a)(1)(i).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for

which no response is required.  To the extent that an answer is required, MDE

denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the statute and regulation referenced therein for a complete and accurate

statement of their contents and legal import.

48.    The IDEA and its implementing regulations define a "child with a

disability" as a child with intellectual disabilities, a hearing impairment (including

deafness), a speech or language impairment, visual impairment (including

blindness), a serious emotional disturbance, an orthopedic impairment, autism,

traumatic brain injury, other health impairment, a specific learning disability, deaf-

blindness, or multiple disabilities, and who, by reason thereof, needs special

education and related services.  20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for

which no response is required.  To the extent that an answer is required, MDE

denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the statute and regulation referenced therein for a complete and accurate

statement of their contents and legal import.

49.    The categories under which K.B., K.S.F. and D.L. qualify for special

education services are "other health impairment" (for K.B. and K.S.F.) and "specific

learning disability" (for D.L.).

**ANSWER:**   MDE admits that for certain time periods, K.B. and K.S.F. were eligible for special education services because of "other health impairment," and D.L. was eligible for special education services for a "specific learning disability."

50.    An "other health impairment" means having

> limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that – (i) [i]s due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) [a]adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9)(i-ii).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

51.    A "specific learning disability" means a

> disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. . . . Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of intellectual disability, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

34 C.F.R. § 300.8(c)(10).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

52.     Under the IDEA, a state or local educational agency must conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability.  20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. § 300.301(a).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

53.     The initial evaluation shall consist of procedures to determine whether a child is a child with a disability and to determine the educational needs of that child.  20 U.S.C. §1414(a)(1)(C)(i); 34 C.F.R. § 300.301(c)(2). The parent, SEA, other State agency, or LEA may initiate a request for an initial evaluation.  20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

23

Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

54.    The initial evaluation must be conducted within 60 days of receiving parental consent, or within the timeframe established by the State, if the State establishes such a timeframe. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. §300.301(c)(1).  Under Michigan law, the initial evaluation must be conducted, and an eligibility determination must be made, within 30 school days of receiving parental consent.  Mich. Admin. R. 340.1721b(1).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulations referenced therein for a complete and accurate statement of their contents and legal import.

55.    The SEA (MDE in this case) and the LEA must ensure that a reevaluation of each child with a disability is conducted if the educational or related services needs of the child warrant a reevaluation.  20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. §§ 300.33; 300.303(a)(1).  An LEA is also responsible for ensuring that a reevaluation is conducted if the child's parent or teacher requests one.  20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. § 300.303(a)(2).  At a minimum, a reevaluation must occur on a triennial basis, even in the absence of an explicit request or qualifying circumstance, unless the parent and the LEA agree that a reevaluation is unnecessary.  20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulations referenced therein for a complete and accurate statement of their contents and legal import.

56.    The IDEA outlines detailed and comprehensive procedures for the conduct of evaluations, requiring the SEA and LEA to

> use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining— (i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum.

20 U.S.C. § 1414(b)(2)(A); see also 34 C.F.R. § 300.304(b)(1).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

57.    While MDE is responsible for ensuring that the Child Find mandate is carried out, the IDEA directs that each LEA "shall ensure that the child is assessed in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B).  Areas related to the suspected disability include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.  34 C.F.R. § 300.304(c)(4).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

58.     The Child Find mandate expressly includes all children with a suspected disability, even if they are advancing from grade to grade. 34 C.F.R. § 300.111(c)(1).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

59.     LEAs must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2)(C); 34 C.F.R. § 300.304(b)(3).  LEAs must also ensure that "assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient." 34 C.F.R. § 300.304(c)(2).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

26

Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

60.     The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  34 C.F.R. § 300.304(c)(6).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

61.     As part of an initial evaluation, if appropriate, and as part of any reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers."  20 U.S.C. § 1414(c)(1)(A); 34 C.F.R. § 300.305(a)(1).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

27

62.     On the basis of that review, and input from the child's parents, the IEP
Team and other qualified professionals, as appropriate, must identify what
additional data, if any, is needed to fulfill the Child Find obligations under the
IDEA.  20 U.S.C. § 1414(c)(1)(B); 34 C.F.R. § 300.305(a)(2).  The LEA must
administer the assessments and evaluation measures needed to produce such
additional data. 20 U.S.C. § 1414(c)(2); 34 C.F.R. § 300.305(c).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
denies the allegations as set forth in this paragraph, and respectfully refers the
Court to the statute and regulation referenced therein for a complete and accurate
statement of their contents and legal import.

63.     In addition, LEAs are charged with ensuring that assessments "are
administered by trained and knowledgeable personnel."  20 U.S.C. §
1414(b)(3)(A)(iv); 34 C.F.R. § 300.304(c)(1)(iv).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
denies the allegations as set forth in this paragraph, and respectfully refers the
Court to the statute and regulation referenced therein for a complete and accurate
statement of their contents and legal import.

64.     Finally, in interpreting the evaluation data for the purpose of
determining whether a child qualifies as a child with a disability under the IDEA
and the educational needs of the child, LEAs must "[d]raw upon information from a
variety of sources, including aptitude and achievement tests, parent input, and

teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior."  34 C.F.R. § 300.306(c)(1)(i).  LEAs must "[e]nsure that information obtained from all of these sources is documented and carefully considered.  34 C.F.R. § 300.306(c)(1)(ii).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

65.    MDE is ultimately responsible for ensuring a functioning Child Find process for all students with disabilities in Michigan, as a part of its supervisory duties.  20 U.S.C. § 1412(a)(11); 34 C.F.R. §§ 300.100; 300.111.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulations referenced therein for a complete and accurate statement of their contents and legal import.

**The IDEA and Procedural Safeguards in the Disciplinary Process**

66.    In order to ensure that each child with a disability is provided with a free appropriate public education (FAPE), the IDEA has established a number of procedural safeguards that must be provided to a student with a disability who is subject to disciplinary removals.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that the IDEA contains provisions regarding procedural safeguards.

67.   IDEA requires that students with disabilities be granted certain procedural safeguards with respect to the disciplinary process to ensure that they are not removed from the learning environment on account of their disabilities.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that the IDEA contains provisions regarding procedural safeguard for the disciplinary process relating to removal from the learning environment.  MDE denies as untrue any allegations to the extent they are inconsistent with the IDEA.

68.   Under IDEA, when a child with a disability is removed from his or her original educational placement for more than ten cumulative school days in an academic school year, procedural protections and services must be provided to the student.  20 U.S.C. § 1415(k).  One such procedural protection is a manifestation determination review (MDR) to determine whether the student's behaviors are a manifestation of his or her disabilities.  20 U.S.C. § 1415(k)(1)(E).  This requirement helps ensure that a school does not impose a long-term suspension, series of suspensions, or expulsion on a special education student on account of a behavior that is merely a "manifestation" of his or her disability.  20 U.S.C. § 1415(k)(1)(E).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

30

Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

69.     The IDEA mandates that if a child's behavior is a manifestation of that student's disability, the child must be permitted to return to, or remain at, their current school placement and be provided with all of the behavioral services necessary to support and reinforce the child's positive behavior.  20 U.S.C. § 1415(k)(1)(F).  These behavioral supports include a functional behavioral assessment to determine the function or cause of the child's disability and an accompanying behavioral intervention plan to adequately accommodate the student's educational and behavioral needs.  20 U.S.C. § 1415(k)(1)(F)(i)-(ii).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

70.     An MDR is triggered after ten cumulative days of suspensions or expulsions.  Additionally, the IDEA and its implementing regulations state that a series of removals totaling more than 10 school days can form a "pattern" of behavior (e.g. "because the child's [disciplined] behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals") that also triggers a mandatory MDR.  34 C.F.R. § 300.536(a)(2).  The scope of the MDR is not limited to determining whether the behavior at issue is a byproduct of the child's disability but must additionally inquire into whether it may be the

31

consequence of the district's failure to adequately implement the child's IEP.  20

U.S.C. § 1415(k)(1)(E)(i).

      **ANSWER:**  The allegations in this paragraph contain legal conclusions for

which no response is required.  To the extent that an answer is required, MDE

denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the statute and regulation referenced therein for a complete and accurate

statement of their contents and legal import.

      71.    There are, however, certain specific behaviors that permit a school

district to alter a student's prescribed placement in favor of an "interim alternative

educational setting" for up to 45 days.  20 U.S.C. § 1415(k)(1)(G).  This exception is

restricted to the following three behaviors: (1) carrying a weapon to school; (2)

knowingly possessing or using illegal drugs, or selling or soliciting the sale of a

controlled substance, at school; or (3) inflicting serious bodily injury on another

individual at school.  *Id*.

      **ANSWER:**  The allegations in this paragraph contain legal conclusions for

which no response is required.  To the extent that an answer is required, MDE

denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the statute referenced therein for a complete and accurate statement of its

contents and legal import.

      72.    Nevertheless, the interim alternative educational setting must still

provide the child a free and appropriate public education.  The placement must also

include services designed to adequately address the behavior for which the student

is being suspended.  20 U.S.C. § 1415(k)(1)(D).

**ANSWER**:  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

73.  Under the IDEA, even students with disabilities who do not already have an IEP in place are equally entitled to the same procedural safeguards afforded to their special education peers.  Indeed, disciplinary protections extend to students who the educational agency knew or should have known are students with disabilities.  20 U.S.C. § 1415(k)(5).

**ANSWER**:  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

74.  In order to vindicate these rights, students with disabilities and their parents are afforded two separate avenues to allege violations of the special education laws by educational agencies.  They are (1) the due process complaint, 20 U.S.C. § 1415(b)(6); 34 C.F.R. §§ 300.507- 16, and (2) the state administrative complaint.  34 C.F.R. § 300.151-53.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

33

Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

75.    The due process complaint is a formal legal proceeding that takes place in an administrative forum. The Supreme Court of the United States has repeatedly described the administrative and judicial review of IDEA special education claims as "ponderous." *Honig v. Doe*, 484 U.S. 305, 322, 108 S. Ct. 592, 603, 98 L. Ed. 2d 686 (1988) (citing *Burlington School Committee v. Massachusetts Dept. of Education*, 471 U.S. 359, 370, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985)).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the case referenced therein for a complete and accurate statement of its contents and legal import.

76.    In comparison, the state administrative complaint process is relatively easier for students with disabilities and their families to pursue remedy for alleged violations of the special education laws. This state administrative process relies upon the investigation of allegations of violations by MDE, pursuant to Mich. Admin. R. 340.1853, and should noncompliance be found, MDE is responsible for correcting the noncompliance for the student at issue and "for all children with disabilities" statewide.  34 C.F.R. § 300.151(b).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the regulations referenced therein for a complete and accurate statement of their contents and legal import.

**Michigan Department of Education's Duties and Obligations**

77. MDE is the state educational agency that is responsible for administering and enforcing laws related to public education. M.C.L. § 16.400–16.402.

**ANSWER:** The allegations in this paragraph contain legal conclusions for which no response is required. To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statutes referenced therein for a complete and accurate statement of their contents and legal import.

78. As an SEA, MDE is responsible for the State supervision of public elementary and secondary schools and is specifically "responsible for ensuring" all eligible Michigan children with disabilities receive a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(11)(A), (a)(1), (a)(5).

**ANSWER:** The allegations in this paragraph contain legal conclusions for which no response is required. To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

79. As an SEA, MDE also has general supervisory responsibility for implementing IDEA's requirements. 20 U.S.C. § 1412(a)(11)(A).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

80.    MDE is specifically "responsible for ensuring" that IDEA's regulations are carried out and is responsible for its general supervision over each educational program for children with disabilities to ensure the programs meet MDE's educational standards, which include IDEA's regulatory requirements.  34 C.F.R. § 300.149(a).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

81.    Such responsibility includes coordinating with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under IDEA.  20 U.S.C. § 1412(a)(12).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

82.    Under the IDEA, MDE, as the SEA, also has additional responsibilities when it comes to resolving administrative complaints.  The IDEA provides that in resolving an administrative complaint:

> In which the SEA has found a failure to provide appropriate services, and SEA, pursuant to its general supervisory authority under Part B of the [IDEA], must address - 1. The failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and 2. Appropriate future provision of services for all children with disabilities.

34 C.F.R § 300.151(b).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

83.    MDE's duties are similarly codified in state law.

**ANSWER:**  MDE admits that certain duties it is required to perform are codified in state law.

84.    For example, the Michigan Mandatory Special Education Act (MMSEA) is a state law, enacted to meet the requirements of IDEA,[2] that ensures special education to Michigan's children with disabilities from birth to age 26. M.C.L. § 380.1701 et seq.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

85.     The Michigan Administrative Rules for Special Education (MARSE) set forth the requirements for special education and related services for the State of Michigan, providing how special education is to be implemented in Michigan.  Mich. Admin. R. 340.1701c(c).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

86.     MARSE defines special education as "specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential."  Special education includes instructional services defined in Mich. Admin. R. 340.1721a.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

87.     Pursuant to MARSE, "[t]he individualized education program team shall determine the programs and services for a student with a disability in accordance with 34 C.F.R. part 300. The individualized education program shall not

be restricted to the programs and services available."  Mich. Admin. R.

340.1721e(4).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for

which no response is required.  To the extent that an answer is required, MDE

denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the regulation referenced therein for a complete and accurate statement of

its contents and legal import.

88.    MARSE charges MDE to maintain an effective complaint resolution

process for claims of denied education or failure of the district to provide

evaluations, programs and services in accordance with MARSE.  Mich. Admin. R.

340.1851-55.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for

which no response is required.  To the extent that an answer is required, MDE

denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the regulation referenced therein for a complete and accurate statement of

its contents and legal import.

89.    The IDEA incorporates the standards of the MMSEA and MARSE.

*Doe By and Through Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d

455, 457 (6th Cir. 1993) (stating, in the 6th Circuit, it is "settled" that violations of

any state law that enlarges the scope of an educational agency's obligations are still

enforceable under IDEA, even if federal law is satisfied) (citing *Thomas v.*

*Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990) (It is "beyond cavil that

the federal [IDEA] standard explicitly incorporates some of a state's substantive law.")).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the case referenced therein for a complete and accurate statement of its contents and legal import.

90.    As Michigan's SEA, MDE bears the ultimate responsibility for ensuring that all public schools in Michigan comply with the IDEA, including, by extension, the MMSEA and MARSE.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations as set forth in this paragraph.

91.    To fulfill its responsibilities, MDE, among other things, must engage in "effective monitoring" to ensure that the local school districts provide a FAPE in the least restrictive environment (LRE) to all eligible children.  *See* 20 U.S.C. § 1416(a)(1)(C), (a)(3)(A), (a)(3)(B).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

92.     While the MDE must use data to measure school districts'
performance, maintain an administrative complaint process, and take corrective
action upon finding any violation of the act, its duties require far more.  20 U.S.C. §
1411(e)(2)(B)(i), 1415, 1416(a)(3).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
denies the allegations as set forth in this paragraph, and respectfully refers the
Court to the statutes referenced therein for a complete and accurate statement of
their contents and legal import.

93.     Rather than focusing on technical compliance, the MDE's "primary
focus" must be on "improving education results and functional outcomes for all
children with disabilities."  20 U.S.C. § 1416(a)(2)(A).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
denies the allegations as set forth in this paragraph, and respectfully refers the
Court to the statute referenced therein for a complete and accurate statement of its
contents and legal import.

94.     The State must ensure that students actually receive a FAPE in the
LRE.  *See* 20 U.S.C. § 1412(a)(1), (a)(5); 1416(a)(1)(C), (a)(3)(A).

**ANSWER:**  The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
denies the allegations as set forth in this paragraph, and respectfully refers the

Court to the statutes referenced therein for a complete and accurate statement of their contents and legal import.

95.    Accordingly, the State must guarantee that districts meet the "markedly more demanding" standard for a free appropriate public education as clarified by the Supreme Court in *Endrew F.*, which explicitly demands that every child with a disability receive an "ambitious" education, with the chance to meet "challenging objectives," and anticipates that most children can do so in the general education classroom. *Endrew F. v. Douglas Cnty. Sch. Dist. Re-1*, 137 S. Ct. 988, 1000 (2017).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the case referenced therein for a complete and accurate statement of its contents and legal import.

96.    To this end, the IDEA requires states receiving IDEA funds to have "in effect policies and procedures to ensure that the State meets each of the following conditions": (1) "A free appropriate public education is available to all children with disabilities …"; (2) "An individualized education program . . . developed, reviewed, and revised for each child with a disability in accordance with section 1414(d) of this title;" and (3) "Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title," among others.  20 U.S.C. § 1412.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

97.   The IDEA requires local educational agencies receiving IDEA funding to "submit[] a plan that provides assurances to the State educational agency that … [t]he local educational agency, in providing for the education of children with disabilities within its jurisdiction, has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412 of this title."  20 U.S.C. § 1413(a).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute referenced therein for a complete and accurate statement of its contents and legal import.

98.   As the Supreme Court has held, "[t]o meet its substantive obligation under IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.* at 999.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the

43

Court to the case referenced therein for a complete and accurate statement of its contents and legal import.

99.     In some instances, the MDE partners with an intermediate school district (ISD) to monitor and ensure local compliance with special education requirements and to implement corrective measures within the ISD's constituent local school districts.

**ANSWER:**   MDE admits that it conducts various types of focused monitoring activities, including OSE directed and OSE led activities.  OSE directed activities are issued to ISDs, which are to conduct focused monitoring visits and use OSE material in the monitoring activity, with OSE staff present during the visit to assist ISD personnel in learning the monitoring process to ensure interrater reliability.  OSE led focused monitoring activities are conducted by OSE staff, with ISD personnel present to hear what findings of noncompliance will be issued at the conclusion of the visit.  Each type of focused monitoring activity is designed by OSE, uses OSE business rules and materials, and OSE personnel ensure reliability of findings or no findings of noncompliance and subsequent verification of corrections of noncompliance.  MDE denies as untrue the remaining allegations in this paragraph.

100.    The relevant ISD in this case is KRESA, the Kalamazoo Regional Educational Services Agency.

**ANSWER:**   MDE admits the allegation in this paragraph.

101.    KRESA, as the ISD in Kalamazoo County, is an educational service provider as is any other local education agency.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that KRESA is an educational service provider that is a subrecipient of IDEA grant funds and, therefore, has a general supervision obligation.  MDE denies as untrue any allegation inconsistent with the preceding sentence.

102.    KRESA, therefore, is responsible for having a district-wide plan in place that complies with the IDEA.  Mich. Admin. R. 340.1837.  KRESA is also responsible for maintaining a database with up-to-date information on each student with a disability within its jurisdiction.  Mich. Admin. R. 340.1861.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulations referenced therein for a complete and accurate statement of their contents and legal import.

103.    KPS, the local district Plaintiffs attend(ed), is within the KRESA intermediate school district.

**ANSWER:**   MDE admits the allegations in this paragraph.

104.    In partnering with KRESA, MDE neither relinquished, nor was it absolved of, its own statutory duties to oversee and ensure the identification and education of students requiring special education services.  Rather, the MDE retained its oversight and enforcement obligations, not only over the local districts, including KPS, but also over the processes and deficiencies of the ISDs, including KRESA.

45

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that it is responsible for general supervision over the implementation of the IDEA.  MDE denies as untrue the remaining allegations in this paragraph.

**MDE's Failures**

105.   Whereas under the IDEA, MMSEA and MARSE, MDE should be recognizing and addressing KPS's systemic problems with identifying students requiring services and ensuring the provision of such services, MDE has instead exacerbated the problem by rubber-stamping clearly deficient practices, or failing to monitor those that were identified for correction, thereby depriving Plaintiffs and others of a FAPE.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

106.   MDE's failure to properly monitor for compliance was not an isolated or new event.  In February 2021, the Michigan Department of Education Office of Special Education released the Dispute Resolution Program Review ("Review").  The Review examined prior recommendations to MDE to inform its general supervision of compliance with special education law, including that MDE "[t]rack the issues investigated in state complaints and issues heard by a due process hearing officer[] in order to identify critical areas of potential noncompliance across the state;" [d]evelop a system of targeted program or district monitoring in the event of systemic noncompliance;" "[u]se the number, frequency, and severity of complaints as part of the risk rubric or monitoring selection process utilized by MDE OSE to identify the districts that should be monitored;" "[u]se monitoring to follow long

46

term corrective action to ensure appropriate future provision of services for all children with disabilities;" and "[c]onsider including findings of noncompliance resulting from dispute resolution as part of the local determination process."

**ANSWER:**   MDE admits that on or about February 21, 2021, it released a Dispute Resolution Program Review (Review) prepared by its consultants, Pingora Consulting, LLC.  The purpose of the Review was to examine MDE's current dispute resolution system as a component of a general supervisory system, including evaluating changes since a 2016 review, assessing the current system effectiveness, and receiving recommendations to facilitate ongoing improvement.  With respect to this paragraph's allegations about the contents of the Review, MDE states that the Review speaks for itself.  MDE denies as untrue the allegation that it failed to properly monitor for compliance.

107.   Per the Review, in addressing the progress that MDE made on these recommendations to shore up its monitoring for noncompliance as of 2020, "Stakeholders stated concerns with the consistency and enforcement of corrective action.  Specifically, stating some corrective action was inadequate to address long standing and continued noncompliance."  The Review also observed, "Many stakeholders felt like the development of dispute resolution corrective action was disconnected from other monitoring activities, including graduated sanctions for similar noncompliance."  "Some Stakeholders voiced concern regarding the accountability and verification of corrective action implementation."

**ANSWER:**   For the allegations contained in this paragraph, the document referenced speaks for itself.  MDE denies any allegations inconsistent with the written document.

108.   In its repeated failure to effectively correct KPS's noncompliance through the administrative complaint process and through its reliance on KRESA knowing that KRESA itself violated laws regarding the identification of and provision of services to children needing special education services, MDE has failed in its responsibilities under federal law to "address" KPS's "failure to provide appropriate services" and has failed to "address" the "[a]ppropriate future provision of services for all children with disabilities," including Plaintiffs.  34 C.F.R. § 300.151(b).

**ANSWER**:   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations in this paragraph.

109.   MDE's failure to address the appropriate future provision of services in attempting to resolve state complaints has resulted in continued denial of FAPE to students, including Plaintiffs, in violation of 34 C.F.R. § 300.151.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations in this paragraph.

**K.B.**

110.   Plaintiff K.B. is a sixteen-year-old student who resides in Kalamazoo, Michigan, and K.B. is African American.  When K.B. was in the fifth grade, her

48

mother (a single mom) became legally blind and now cannot drive.  This became a challenge for the family to manage.  K.B. began Hillside Middle School in 2017 and was repeatedly sent home for disciplinary issues.  Her mother, H.B., would struggle to find transportation to pick K.B. up and K.B. slowly began to disengage from school.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

111.   K.B. was unilaterally placed in KPS's Alternative Learning Program (ALP) in October 2017, where she was around many other students with behavior problems, resulting in her behaviors escalating.  K.B. was assigned to attend ALP for the entire 2017-2018 and 2018-2019 school years.  She was there for the entirety of 6th grade and 7th grade, where she was repeatedly suspended for disrespect and not following directions.

**ANSWER:**   MDE admits that K.B. attended ALP for the 2017–2018 and 2018–2019 school years.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

112.   During one of her suspensions, K.B. went to the local elementary school to play, went inside to get a drink, and while there fought another student. She got removed from ALP in April 2019 for the rest of the school year.  H.B. was told that K.B. could return to ALP in September 2019 after she had completed five

therapy sessions and engaged with services from Integrated Services of Kalamazoo (ISK).

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

113.   In the summer of 2019, ISK identified K.B. as having Attention Deficit/Hyperactivity Disorder (ADHD), Adjustment Disorder, and Oppositional Defiant Disorder. Despite two years of significant behavioral issues, she had not previously been identified by KPS as a student with any disabilities.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

114.   On August 23, 2019, the Michigan Department of Health and Human Services found K.B. clinically eligible to receive services through the Special Targeted Home and Community-Based Services Waiver program as a child with a serious emotional disability.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

115.   On September 9, 2019, K.B.'s advocate filed a special education state complaint with MDE alleging that KPS had failed to properly evaluate and identify K.B. as a student with a disability.

**ANSWER:**   MDE admits the allegations in this paragraph.

116.    Millwood Middle School performed an evaluation resulting in a Multidisciplinary Evaluation Team (MET) Report of K.B. in October 2019.  KPS's MET team found K.B. ineligible for special education services even though her scores reflected a need for interventions through IEP eligibility.

**ANSWER:**   Upon information and belief, MDE admits that KPS, in an eligibility recommendation dated October 23, 2019, found that K.B. was not eligible for services.

117.    On November 8, 2019, MDE issued a finding and corrective action plan in response to the state complaint the family had filed in September.

**ANSWER:**   MDE admits it issued a finding and corrective action plan in response to the state complaint the advocate had filed.

118.    MDE found KPS in violation of IDEA and MARSE for failing to properly identify and evaluate K.B. as a student with a disability.

**ANSWER:**   MDE admits that the November 8, 2019 Complaint Decision and Plan for Corrective Action found KPS in violation of federal regulations for failing to meet its Child Find obligation and failing to provide procedural safeguards for students not determined eligible for special education.  MDE denies as untrue any allegations inconsistent with the November 8, 2019 Complaint Decision and Plan for Corrective Action.

119.    MDE ordered KPS to do the following:

    a.  conduct a Review of Existing Educational Data and comprehensive evaluation of K.B., prepare a MET report, and conduct an IEP team

51

meeting to determine K.B.'s eligibility for special education services
by January 15, 2020;

b.  if K.B. was found eligible for special education services, by January
22, 2020, develop a plan for 37 hours of compensatory education to
be provided to K.B. before September 1, 2020;

c.  develop and revise the KPS Child Find proceedings by June 15,
2020, to ensure that KPS was in compliance with the requirements
of the IDEA and MARSE; and

d.  provide appropriate professional development to KPS staff by June
15, 2020.

**ANSWER:**   MDE admits that the November 8, 2019 Complaint Decision and
Plan for Corrective Action included corrective actions that required KPS to, among
other things, review relevant student data from K.B.'s educational file; conduct a
MET team meeting; conduct an IEP team meeting to determine eligibility; provide
compensatory services if K.B. was deemed eligible; review, revise, and/or develop
procedures regarding child find; and provide professional development to relevant
staff regarding new procedures.  MDE denies as untrue any allegation inconsistent
with the November 8, 2019 Complaint Decision and Plan for Corrective Action.

120.   Remarkably, MDE's decision specifically stated that if K.B. was found
eligible for special education services, then MDE would find KPS further in
violation of MARSE for failing to provide services to an eligible student under
MARSE.

**ANSWER:**  MDE denies as untrue the allegations as stated in this paragraph.

121.  KPS failed to conduct the required evaluation and simply notified H.B. that it was relying on prior evaluations of K.B. conducted in January 2018 and October 2019 to again find her ineligible for special education services.

**ANSWER:**  MDE denies as untrue the allegation that KPS failed to conduct required corrective actions.

122.  With regard to the January 2018 MET, H.B. was never notified that it had occurred and was never asked to provide information for the evaluation process, in violation of the IDEA.

**ANSWER:**  MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

123.  To date, KPS has failed to comply with MDE's November 2019 finding and corrective action plan.

**ANSWER:**  MDE denies as untrue the allegations in this paragraph.

124.  Upon information and belief, MDE has failed to enforce its own corrective action plan against KPS.

**ANSWER:**  MDE denies as untrue the allegations in this paragraph.

125.  In November 2019, K.B. was involved in a behavioral incident at school involving a fight with another student.  Barry Smith, Assistant Director of Student Services for KPS, told K.B. that she was either going to be expelled or she could go to the Youth Advancement Academy (YAA), a "strict discipline charter school" that

serves middle and high school students who have been expelled or placed by court order.  She was then sent to YAA purportedly through February 2020.

**ANSWER:**  MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

126.   In February 2020, however, K.B. had a hearing in Juvenile Court and was ordered to write an apology to the family of the student she fought with at the elementary school.  She was placed in Juvenile Detention until she completed the letter.  Because K.B. struggles with reading and writing, she remained there for three to four weeks as versions of her letter were rejected by officers of the Court.

**ANSWER:**  MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

127.   During her time in Juvenile Detention, K.B. attended the school there, in the Intensive Learning Center (ILC), where she received instruction from certified special education teachers but without an IEP.  H.B. asked for an evaluation of K.B. from ILC.  H.B. asked verbally, because she is blind, and was told that it was in the file, but upon review her advocate learned that it was not contained in the file.

**ANSWER:**  MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

128.   On December 14, 2020, KPS notified H.B. that it was not going to provide an IEP to K.B. because it had previously found her ineligible for special education services.

**ANSWER:**   MDE admits that KPS notified H.B. that it was not going to provide an IEP.  MDE denies as untrue any allegation inconsistent with the March 23, 2021 Complaint Decision and Plan for Corrective Action.

129.   During the 2020-2021 school year, K.B. was suspended for a total of 12 days through four separate behavior incidents.

**ANSWER:**   MDE admits that K.B. was suspended for a total of 12 days through four separate behavior incidents and included such facts in the state complaint final report.

130.   On January 25, 2021, K.B.'s advocate filed a complaint against KRESA with MDE.

**ANSWER:**   MDE admits that on or about January 27, 2021 it received a state complaint filed on behalf of K.B. against KRESA.

131.   On March 23, 2021, the MDE found that KRESA "did not meet its child find obligation to identify, locate, and evaluate [K.B.] with a suspected disability," in violation of 34 C.F.R. §§ 300.111 and 300.301 and Mich. Admin. R. 340.1721, R. 340.1721a and R. 340.1721.

**ANSWER:**   MDE admits that a March 23, 2021 Complaint Decision and Plan for Corrective Action found that KRESA violated federal and state regulations by failing to meet its Child Find obligation and for failing to follow requirements for providing educational services in a juvenile detention facility.  MDE denies as

untrue any allegation inconsistent with the March 23, 2021 Complaint Decision and
Plan for Corrective Action.

132.   MDE ordered a multi-step student-level corrective action plan and a
district-wide corrective action plan.

**ANSWER:**   MDE admits that the March 23, 2021 Complaint Decision and
Plan for Corrective Action ordered student-level and district-level corrective actions.
MDE denies as untrue any allegation inconsistent with the March 23, 2021
Complaint Decision and Plan for Corrective Action.

133.   The district-wide plan demonstrates MDE's knowledge that KPS had
system deficiencies, requiring KPS to "revise or develop regarding child find" to
document and ensure" for all students that "[t]he District has a consistent system to
identify, locate and evaluate students with disabilities who may require special
education and related services while in the juvenile detention facility" and that
[t]he special education referral/evaluation process is initiated for students with a
suspected disability who may require special education and related services while in
the juvenile detention facility, ensuring the child find procedure includes staff
referrals and parent requests."

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.  The
corrective action was issued to KRESA, not KPS, and was specific to the juvenile
detention facility, not the entire KRESA system.  MDE identified KRESA did not
have a consistent system to identify, locate, and evaluate students with disabilities
who may require special education and relates services while in the juvenile
detention facility.  MDE also identified KRESA's special education

56

referral/evaluation process was not initiated for students with a suspected disability while in the juvenile detention facility.

134. MDE required the district to provide professional development by October 15, 2021, and to submit evidence of change in the district's practices to the Office of Special Education for verification.

**ANSWER:** MDE admits that the March 23, 2021 Complaint Decision and Plan for Corrective Action required KRESA to provide professional development by October 15, 2021 for all relevant staff regarding new procedures and to upload evidence of timely compliance in Catamaran.

135. MDE failed to oversee, ensure and enforce the March 2021 corrective action plan.

**ANSWER:** MDE denies as untrue the allegation in this paragraph.

136. On April 12, 2021, an initial Review of Existing Evaluation Data (REED) meeting for K.B. was conducted.

**ANSWER:** Upon information and belief, MDE admits the allegation in this paragraph.

137. The REED was signed on April 19, 2021.

**ANSWER:** Upon information and belief, MDE admits the allegation in this paragraph.

138. An evaluation plan for K.B. was developed in the areas of social/emotional/behavioral, achievement, and medical and mental health.

**ANSWER:** Upon information and belief, MDE admits the allegation in this paragraph.

139.    On April 20, 2021, KPS issued another behavioral incident report to K.B.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

140.    On May 17, 2021, K.B.'s physician verified K.B.'s ADHD diagnosis and found that K.B.'s health was deteriorating and that she had trouble completing work and getting along with other students due to her diagnoses.

**ANSWER:**   MDE denies as untrue the allegation as stated in this paragraph.  K.B.'s physician indicated that the condition, meaning ADHD, was deteriorating, not her health.

141.    On May 26, 2021, the KPS evaluation team recommended that K.B. be found eligible for special education services under the Other Health Impairment (OHI) disability category.

**ANSWER:**   Upon information and belief, MDE admits the KRESA evaluation team recommended K.B. be found eligible for special education services under the Other Health Impairment (OHI) disability category.

142.    The same day, an IEP meeting was held, and an IEP was finally created for K.B.  However, the services and accommodations under the IEP failed to appropriately meet K.B.'s educational needs.

**ANSWER:**   MDE admits that an IEP was created on May 26, 2021.  MDE denies as untrue the remaining allegations in this paragraph.

143.   Through 2021 and into 2022, KPS continued to punish K.B. for behaviors stemming from her disability, resulting in K.B.'s frequent suspension from school and deprivation of educational services.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

144.   Eventually, K.B. simply stopped attending school because she was being disciplined constantly and was unable to learn. K.B.'s self-esteem and motivation to learn were very low during this time.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

145.   As detailed above, K.B. filed a due process complaint against KPS, KRESA, and MDE to vindicate her special education rights on February 11, 2022. *See supra*, paragraph 30.

**ANSWER:**   MDE admits that K.B. filed a due process complaint on or about February 11, 2022 against KPS, KRESA, MDE, and Michael Rice.

146.   K.B. returned to KPS for the fall 2022 semester, and she is currently enrolled at Loy Norrix High School.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

147.    K.B. is in the process of being (re)evaluated for special education services.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

148.    Per KPS's May 2021 evaluation, K.B.'s academic performance was below the 5th percentile in all areas except word recognition, which was at the 25th percentile.  She only did schoolwork about 50% of the time and only then with staff prompting support; was failing half of her classes; and experienced significant behavioral challenges which interfered with her ability to learn.  Other tests placed her math mastery and reading levels at around the 2nd grade level.

**ANSWER:**   MDE admits that the May 26, 2021 IEP states that K.B.'s academic performance for Reading Comp, Math computation, and Math Concepts and application were below the 5th percentile.  MDE denies as untrue any remaining allegation that is inconsistent with the IEP.

149.    Because of MDE's failure to properly oversee KPS, which failed to properly evaluate and accommodate K.B., she has suffered educational, social, and behavioral impacts and other damages.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

**K.S.F.**

150.    Plaintiff K.S.F, is a 20-year-old student who resides in Kalamazoo, Michigan, and is African American. After being placed at ALP by KPS without her mother's consent, her mother transferred K.S.F. out of KPS in 2020.  K.S.F. began

11th grade in the fall of 2020 at Compass Alternative High School in Comstock Public Schools.

**ANSWER:** MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

151.    K.S.F. is diagnosed with sickle cell anemia, borderline intellectual functioning, major depressive disorder, major neurocognitive disorder, generalized anxiety disorder, trichotillomania (hair-pulling disorder), and ADHD, and experiences severe pain which interferes with her ability to obtain an education.

**ANSWER:** MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

152.    Due to her sickle cell anemia, K.S.F. has to miss school frequently for blood transfusions and due to severe pain. K.S.F.'s pain can get so severe that it can cause her to have to spend up to a week in the hospital.

**ANSWER:** MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

153.    K.S.F. is also severely negatively affected by stress and cold temperatures.

**ANSWER:** MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

154.   K.S.F. received accommodations for her sickle cell anemia via a 504 plan while enrolled in KPS schools.

**ANSWER:**   MDE admits K.S.F. received accommodations for her sickle cell anemia via a 504 plan while enrolled in KPS schools.

155.   K.S.F.'s mother had also requested of KPS that K.S.F. be evaluated for special education services, as her mother felt that K.S.F. needed additional supports and accommodations that her 504 plan could not provide in order to fully access her education.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

156.   K.S.F. repeatedly experienced severe bullying by other female students at KPS.  Online, students attacked K.S.F. for her physical appearance as well as her disability, punctuating those comments with emojis of weapons and coffins.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

157.   Though K.S.F.'s mother reported the online harassment, upon information and belief, KPS did nothing to address the bullying K.S.F. experienced.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

158.   During one incident on January 15, 2018, rather than protecting K.S.F., a KPS staff member put K.S.F. in a headlock, exacerbating her sickle cell symptoms and causing her physical trauma.

**ANSWER**:   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

159.   On October 4, 2019, K.S.F., through an advocate, filed a state complaint with MDE alleging that KPS had failed to properly identify and evaluate K.S.F. as a student with a disability.

**ANSWER:**   MDE admits that K.S.F. filed a state complaint against KPS on or about October 4, 2019.  MDE denies as untrue any allegation inconsistent with said state complaint.

160.   On November 22, 2019, KPS filed an IDEA due process complaint against K.S.F. with the Michigan Office of Administrative Hearings and Rules ("MOAHR"), presumably to avoid having to go through the process of the state complaint and having a finding made against them by KPS.

**ANSWER:**   MDE admits that KPS filed a due process complaint with MDE with respect to K.S.F.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

161.   K.S.F.'s mother was able to obtain pro bono legal representation for the due process proceeding that was filed against K.S.F., and her attorneys were able to

successfully get the due process complaint against K.S.F. dismissed and the state
complaint proceeding reinstated.

**ANSWER:** MDE admits that an Order of Dismissal was entered dismissing
KPS's due process complaint on or about April 6, 2020.  MDE has insufficient
knowledge or information to form a belief as to the truth of the remaining
allegations in this paragraph, and therefore, neither admits nor denies the
allegations.

162.   While the proceeding was ongoing, K.S.F.'s mother decided to disenroll
K.S.F. from KPS and enroll her in a different district in order to protect her.

**ANSWER:** MDE has insufficient knowledge or information to form a belief
as to the truth of the allegations in this paragraph, and therefore, neither admits
nor denies the allegations.

163.   On April 18, 2020, MDE issued a decision finding KPS in violation of
the IDEA and MARSE for failing to have appropriate procedures in place to identify
children under Child Find.

**ANSWER:** MDE admits that it issued an April 18, 2020 Complaint Decision
and Plan for Corrective Action that found that KPS violated federal regulations by
failing to take affirmative action to fulfill its Child Find obligation.  MDE denies as
untrue any allegation inconsistent with the April 18, 2020 Complaint Decision and
Plan for Corrective Action.

164.   MDE ordered KPS to do the following:

a.      develop and revise the KPS Child Find proceedings by November 15,

2020, to ensure that it was in compliance with the requirements of the IDEA and

MARSE; and

b.      provide appropriate professional development to KPS staff by

November 15, 2020.

**ANSWER:**   MDE admits that the April 18, 2020 Complaint Decision and

Plan for Corrective Action required KPS to, among other things, review, revise,

and/or develop procedures regarding child find; and provide professional

development for all relevant staff regarding the new procedures.  MDE denies as

untrue any allegation inconsistent with the April 18, 2020 Complaint Decision and

Plan for Corrective Action.

165.    KPS did not comply with the requirements of MDE's corrective action

plan.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

166.    Upon information and belief, MDE did not enforce its own corrective

action plan against KPS.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

167.    As of March 2021, KPS's evaluations of K.S.F. indicated that her levels

of academic mastery ranged from 4th to 11th grade reflecting weaknesses in

attention/concentration and higher cognitive processes needed for math

computation and reading comprehension, respectively.  Evaluation results further

indicated K.S.F.'s despondency about her health challenges, past academic

experiences, concerns about her future and her self-worth, and oppressive feelings

about being underestimated.  Because of MDE's failure to properly evaluate and accommodate K.S.F. and MDE's failure to properly oversee KPS, K.S.F. has suffered educational, social, and behavioral impacts and other damages.

**ANSWER:**  MDE denies as untrue the allegations in this paragraph.

168.   As detailed above, K.S.F. filed a due process complaint against KPS, Comstock Public Schools, KRESA, and MDE to vindicate her special education rights on February 18, 2022. *See supra*, paragraph 32.

**ANSWER:**  MDE admits that K.S.F. filed a due process complaint against KPS, KRESA, MDE, Michael Rice, and Comstock Public Schools in February 2022.

**D.L.**

169.   D.L. is a 20-year-old young man who resides in the KPS district and has been eligible for special education services since 2012.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

170.   At all relevant times, D.L. was a student with a disability as defined by IDEA and MARSE under the primary category of Specific Learning Disability.  He is also an individual with a disability within the meaning of Section 504 and the ADA, as he has been diagnosed with a severe specific reading disorder, a severe mathematics disorder, ADHD combined-type, posttraumatic stress disorder, complicated grief, major depressive disorder in remission, panic disorder in remission, and rule-out diagnoses of Disruptive Mood Dysregulation Disorder, Mild neurocognitive/post concussive effects affecting cognitive and fine motor

66

functioning, and Central Auditory Processing Disorder, which substantially limit one or more major life activities, including reading, learning, communicating and interacting with others.  28 C.F.R. § 35.108.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that D.L. was a student with a disability who received special education services.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

171.    In 2012, KPS held an initial IEP meeting, finding D.L. eligible for special education under its Specific Learning Disability category.  However, KPS failed to conduct any comprehensive evaluations at that time.

**ANSWER:**  MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

172.    During his time in KPS, D.L participated in reading interventions, including System 44 and Read 180.

**ANSWER:**  MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

173.    Per KPS's own records, D.L. failed to make progress under System 44, and, according to What Works Clearinghouse (WWC), as of July 2010, there were no studies on Read 180 that met WWC's criteria for students with disabilities,

67

meaning WWC3 could not determine the effectiveness of the intervention for students with disabilities.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

174.   D.L's NWEA Reading scores ranged from second (2.0) to fourth (3.0) grade equivalents and back to third (3.0) grade.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

175.   D.L.'s most recent standardized test data documented by KPS, from the Fall of 2017, placed him at a third-grade reading proficiency.

**ANSWER:**   MDE admits that D.L.'s most recent reading assessment conducted in November 2017 placed him at a third-grade reading proficiency.

176.   There are no standardized test scores or reading data recorded on D.L.s IEP or supporting documents after Fall 2017.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

177.   Though D.L. did not make sufficient progress in reading, KPS continued to use a reading intervention program that was not shown to be effective by WWC.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

178.   KPS also did not amend D.L.'s IEP to provide more supports.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

179.   In 2017, D.L.'s cousin died, an event that significantly impacted D.L. emotionally.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

180.   Special education covers both academic and functional performance. Therefore, trauma that may affect a student's functional performance must be evaluated and supported if it impairs that student's ability to make progress. Subsequently, KPS began documenting increased behavior incidents; however, social work services were never added or contemplated according to the subsequent IEPs.

**ANSWER:**   MDE admits that special education covers both academic and functional performance and that trauma has the potential to affect a student's performance.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

181.    In 2018, KPS declined to conduct comprehensive evaluations to determine D.L.'s lack of progress.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

182.    In the fall of 2018, D.L. suffered a head injury while playing football for KPS, which may have negatively affected D.L. academically or functionally. KPS failed to hold an IEP meeting to determine whether D.L. needed any additional special education services or supports based on the head injury.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

183.    In 2019, KPS held IEP meetings on April 16 and October 16.  In both meetings, KPS wrote identical math and transition goals for D.L.  Alarmingly, the onus for ensuring that KPS met its legal obligation under IDEA was placed on D.L. as the transition goal was that D.L. will "ask[] his teacher to ensure he is receiving those accommodations when needed 85% of the time as measured by teacher documentation and informal teacher observation."  The language of this transition goal is directly contrary to the language and spirit of the IDEA, which requires LEAs to identify and provide appropriate services to students.

**ANSWER:**   MDE admits that KPS held an IEP meeting on October 16, 2019.  MDE has insufficient knowledge or information to form a belief as to the

70

truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

184.    In 2020, KPS held an IEP meeting on October 12.  The same year, it held a REED, that is, a Review of Existing Evaluation Data, meeting to determine whether D.L. is a student with a disability, whether he required special education and whether his IEP needed modification.  However, rather than conduct comprehensive evaluations to determine these needs, KPS relied on the incomplete and then five-year-old 2015 data.

**ANSWER:**   MDE admits that KPS held an IEP meeting on October 12, 2020 and that KPS held a REED on September 28, 2020.  MDE further admits that the REED state that KPS determined that no additional data was needed to determine whether D.L. continued to be a student with a disability or to determine his educational needs.  MDE denies any allegation inconsistent with the aforementioned documents.

185.    In each of these three IEP meetings over a two-year period, in 2019 and 2020, KPS repeated the identical reading goal: D.L. "will progress from reading a grade appropriate text and providing a summary that includes 2 details to reading various genres of classic, contemporary narrative, and informational texts grade level and use comprehension strategies to identify 4-6 important key details, make connections, and inference with 85% accuracy as measured by grade level assessments and student work samples," except that it change the accuracy target from 85% to 80% from October 2019 to October 2020.

**ANSWER:**   MDE denies that the quoted text appears identically in the October 2019 and October 2020 IEPs.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

186.   Despite D.L.'s lack of meaningful progress, KPS did not add any supplementary aids or services or increase D.L.'s resource room time from 50 minutes per week.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

187.   In 2020, D.L.'s uncle, who was like a father to him, was murdered. This was a traumatic event for D.L., and his behaviors in school again began to escalate.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

188.   From fall 2017 through early spring of 2020, KPS documented 32 behavior incidents involving D.L.  In March 2019, KPS "excluded" D.L. for the remainder of the school year, 51 days, without convening a manifestation determination review (MDR).  The district issued him five suspensions before ever creating a behavior intervention plan.  In doing so KPS neither determined the root-cause nor modified D.L.'s IEP to add a behavior-related goal.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

189.   When KPS finally held an MDR, on October 16, 2019, the district noted that D.L. was "struggling to make any progress toward his academic goals and objectives," and "can struggle with adult interactions, which can lead to altercations."

**ANSWER:**   MDE admits that KPS held an MDR on October 16, 2019 and that the MDR contains the following statement "Mr. Sachse reports that DQ is struggling to make any progress toward his academic goals and objectives."  MDE denies as untrue any allegation inconsistent with the October 16, 2019 MDR.

190.   Inexplicably, KPS failed to find that D.L.'s behavior was a manifestation of his disability, nor did it initiate further evaluations to determine the cause of the behavior.

**ANSWER:**   MDE admits that the October 16, 2019 MDR found that the conduct subject to discipline was not a manifestation of D.L.'s disability.  MDE has insufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore, neither admits nor denies the allegations.

191.   D.L.'s trauma-based behavioral incidents should have triggered KPS's intervention.  KPS, however, failed to convene an IEP meeting, failed to provide social work supports to assist him, and failed to establish behavior-related goals.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

73

192.    In January 2021, D.L.'s advocate filed an MDE state complaint on D.L.'s behalf asserting that KPS was violating special education law and that D.L. was graduating while functionally illiterate.

**ANSWER:**   MDE admits that on or about January 25, 2021, D.L. filed a state complaint with the MDE against KPS.  MDE denies as untrue any allegation inconsistent with this state complaint.

193.    Despite D.L.'s obvious lack of significant progress and reports that clearly showed that D.L. made only very limited progress toward his reading goal and failed English, MDE relied on the 2018 and 2020 REEDs, which relied on outdated 2015 data, to determine that KPS complied with the law.

**ANSWER:**   MDE admits that it considered, among other things, 2018 and 2020 REEDs, which included 2017, 2018 district reading and math scores, grades from September 2020, and current classroom observations.  MDE denies as untrue the allegation that its review was inappropriate or unlawful.

194.    Thus, despite the fact that KPS's REED evaluations were based on outdated 2015 data, despite the fact that there were significant traumatic post-2015 events affecting D.L.'s emotional health, despite the fact that D.L. exhibited concerning post-2015 behaviors that should have been evaluated, and despite the fact that D.L. still read at an elementary grade level, MDE determined that KPS provided a "free appropriate public education."

**ANSWER:**   MDE admits that it issued a March 23, 2021 Complaint Decision that determined that KPS did not violate law.  MDE denies as untrue any inference that its review or decision of the state complaint was unlawful.

195.    MDE's inexplicable sanction of KPS's failures are made more egregious given MDE's knowledge, through other cases, that KPS had systemic deficiencies in its child find process and was frequently out-of-compliance with laws governing the identification of students with disabilities or needing services (Child Find activities), including in 2017-2020. *See e.g.*, MDE State Complaints 17-0159, 18-0085, 19-0088, 19-0188, 19-0213 and 19-0220.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

196.    At all times subsequent to, at the latest, August 29, 2017, MDE was fully aware that KPS was failing to conduct comprehensive educational evaluations of students in violation of IDEA, MARSE and Section 504.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

197.    On June 9, 2021, KPS held an IEP meeting.  KPS claimed that D.L. attended.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

198.    However, in fact, D.L. graduated high school five days earlier, on June 4, and he has not been in contact with KPS since his graduation.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

199.    In August 2021, D.L. learned the magnitude of his disabilities once he completed comprehensive neuropsychological evaluations.  According to his

evaluation, D.L.'s atypical neurological profile, while notable for large discrepancies between his verbal and perceptual abilities and significant working memory deficits, did not limit him from understanding and retaining information.  D.L. could learn English and math and other school subjects.  Though his academic testing showed mastery of concepts in English and math in the third- and fourth-grade range, he was capable of much more.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

200.    KPS never evaluated D.L.'s reading abilities after 2017, outside of classroom assignments and tests.  A KPS school psychologist estimated that about six months before graduation, D.L.'s reading ability was that of a third grader, consistent with the last tests performed in his ninth grade. KPS likewise never evaluated his math abilities after 2018, outside of classroom assignments and tests. During his due process hearing, D.L. testified that he understood addition and subtraction but not division, and he could only reliably multiply by factors of 2, 5, and 10.  Nevertheless, during his high school career, KPS gave D.L. passing marks in seven different algebra classes.

**ANSWER:**   MDE has insufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore, neither admits nor denies the allegations.

201.    As detailed above, D.L. filed a due process complaint against KPS, KRESA, and MDE to vindicate his special education rights on October 21, 2021.

*See supra*, paragraph 34.  Nearly a year later, on October 13, 2022, the ALJ issued a Decision and Order denying D.L.'s remaining claims against KPS.  The ALJ's decision demonstrates the systemic hurdles faced by students with disabilities like D.L. through all phases of the special education process.  Such barriers include decisionmakers determining a student's entitlement to education without reference to, or application of, the actual law; relying on the students' behaviors or failures, which are often manifestations of their disabilities or tactics to navigate difficult academic and social environments for which they are not fully equipped, to excuse or justify the LEA's or SEA's noncompliance with special education law; attributing a student's lack of progress to laziness; and using a student's prior misbehaviors to presume or "imagine" the student's future failure or engagement of special services.

**ANSWER:**   MDE admits that D.L. filed a due process complaint on or about October 21, 2021 against KPS, KRESA, MDE, and Michael Rice.  MDE further admits that a Decision and Order denying the due process complaint was entered on October 13, 2022.  MDE denies as untrue the remaining allegations in this paragraph.

202.    Notably, D.L.'s due process complaint took nearly a year to resolve.  Hearings are supposed to be completed within 60 days of the due process complaint filing.  Instead, many hearings are taking a year or longer to resolve, a trend that prolongs the denial of special education services, bogs down the complaint resolution process, and deters parents from engaging it.

**ANSWER:**   MDE admits that D.L.'s due process complaint was filed on or about October 21, 2022 and that the Decision and Order was issued on October 13,

2022.  MDE denies as untrue the allegation that many due process hearings are unlawfully delayed or that special education services are denied.

203.    D.L.'s experience is consistent with that observed by stakeholders in the February 2021 Review of MDE's special education operations who remarked, Due Process Hearings are not timely when compared to other dispute resolution option;" "the length of the due process hearing process takes such a long time that parents are often discouraged and would rather seek education for their child elsewhere;" "ALJs lack specific understanding of special education," and "…Due Process Hearing Officers would benefit from basic special education knowledge.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

204.    MDE failed in its responsibilities under state and federal law to ensure a free appropriate public education to Plaintiffs and failed to likewise meet its obligation to provide for the "[a]ppropriate future provision of services for all children with disabilities." 34 C.F.R. § 300.151(b)(2).

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

205.    MDE's failure to provide sufficient resources, training and staff, including Administrative Law Judges, to ensure the provision of special education services, identification and correction of noncompliance, and timely resolution of disputes deprives students of the education and process to which they are entitled.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

## COUNT I
## IDEA

206.   Plaintiffs incorporate here all previously stated allegations.

**ANSWER:**   MDE incorporates all previous answers as though fully stated herein.

207.   Under the IDEA, MDE repeatedly failed in its monitoring and supervising obligations. 20 U.S.C. § 1412(a), 1416; 34 C.F.R. § 300.120, 149(a), 600-602, 606-608.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

208.   MDE failed to provide sufficient, trained Administrative Law Judges to ensure the timely resolution of disputes arising under IDEA.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

209.   MDE failed to ensure KPS had sufficient qualified personnel able to provide a free appropriate public education to Plaintiffs.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

210.   MDE failed to provide adequate funding to KPS to provide a free appropriate public education to Plaintiffs.  34 C.F.R. § 300.114(b).

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

211.   MDE failed to provide technical assistance that would allow KPS to provide a free appropriate public education to Plaintiffs.  34 C.F.R. § 300.119.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

212.   MDE failed to provide adequate training to KPS about provision of a free appropriate public education to Plaintiffs.  34 C.F.R. § 300.119.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

213.   MDE failed to enforce the IDEA when put on notice of Plaintiffs' denial of a free appropriate public education.  20 U.S.C. sec 1413(g); 34 C.F.R. § 300.151.

79

**ANSWER:** MDE denies as untrue the allegations in this paragraph.

214. MDE failed in implementing corrective action when it found that Plaintiffs were being deprived of a free appropriate public education.  34 C.F.R. § 300.151.

**ANSWER:** MDE denies as untrue the allegations in this paragraph.

215. Under the MMSEA and MARSE, Mich. Admin. R. 340.1700 *et seq*., as incorporated into IDEA, MDE failed to maintain an effective complaint resolution process, resulting in the continued denial of a free appropriate public education for Plaintiffs.

**ANSWER:** MDE denies as untrue the allegations in this paragraph.

216. When KPS continued to deny Plaintiffs a free appropriate public education and restricted Plaintiffs' individualized education program to the programs and services available, in violation of MARSE, as incorporated into IDEA, MDE failed to bring KPS into compliance or utilize its sanction power, violating MARSE.

**ANSWER:** MDE denies as untrue the allegations in this paragraph.

217. MDE failed to provide a free appropriate public education to Plaintiffs when KPS was unable to do so.  20 U.S.C. § 1413(g)(1)-(2).

**ANSWER:** MDE denies as untrue the allegations in this paragraph.

218. MDE failed in its ultimate responsibility to ensure that Plaintiffs received a free appropriate public education with appropriate supports and services. 20 U.S.C. § 1412(a)(11)(A).

**ANSWER:** MDE denies as untrue the allegations in this paragraph.

219.   As a direct and proximate cause of MDE's violations of the IDEA,
Plaintiffs have suffered substantial harm to, among other things, Plaintiffs'
educational experience and opportunity, academic and intellectual progress, and
future earning capacity.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

## COUNT II
## Section 504 of the Rehabilitation Act of 1973

220.   Plaintiffs incorporate here all previously stated allegations.

**ANSWER:**   MDE incorporates all previous answers as though fully stated
herein.

221.   Pursuant to Section 504 of the Rehabilitation Act of 1973 (Section 504)
and its regulations, "[n]o otherwise qualified individual with a disability … shall,
solely or by reason of her or his disability, be excluded from the participation in, be
denied the benefits of, or be subjected to discrimination under any program or
activity receiving federal financial assistance." 29 U.S.C.§ 794.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for
which no response is required.  To the extent that an answer is required, MDE
denies the allegations as set forth in this paragraph, and respectfully refers the
Court to the statute referenced therein for a complete and accurate statement of its
contents and legal import.

222.   The regulations regarding preschool, elementary, and secondary
education apply to "preschool, elementary, secondary, and adult education programs
or activities that receive Federal financial assistance and to recipients that operate

or that received Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

223.   In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the regulation referenced therein for a complete and accurate statement of its contents and legal import.

224.   MDE is a recipient of federal financial assistance and operates a public elementary or secondary education program or activity and, thus, is a covered entity under Section 504. 29 U.S.C. § 794.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE

admits the that it is a recipient of financial assistance and operates a public elementary or secondary education program or activity.

225.    Plaintiffs are persons with disabilities within the meaning of Section 504. 29 U.S.C.§ 794.  MDE has intentionally discriminated against Plaintiffs in violation of Section 504 by failing to provide or ensure the provision of comprehensive educational evaluations resulting in a denial of a free appropriate public education to Plaintiffs.

**ANSWER:**   The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegation that it has intentionally discriminated against Plaintiffs in violation of any law.

226.    MDE's failures, including failing to provide oversight and ensure that child find deficiencies were corrected, students requiring special education services were identified, and those services were actually provided, had a disparate adverse impact on students with disabilities, including Plaintiffs.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

227.    As a direct and proximate cause of MDE's violation of Section 504, Plaintiffs have suffered substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

## COUNT III
## Americans with Disabilities Act

228.   Plaintiffs incorporate here all previously stated allegations.

ANSWER:   MDE incorporates all previous answers as though fully stated herein.

229.   Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; see also 28 C.F.R. § 35.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies the allegations as set forth in this paragraph, and respectfully refers the Court to the statute and regulation referenced therein for a complete and accurate statement of their contents and legal import.

230.   MDE is a public entity subject to Title II.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE admits that it is a public entity that receives federal funds.

231.   Plaintiffs are persons with disabilities within the meaning of the ADA. 42 U.S.C. §12102.

**ANSWER:**  The allegations in this paragraph contain legal conclusions for which no response is required.  To the extent that an answer is required, MDE denies as untrue the allegations in this paragraph.

84

232.    MDE intentionally violated Plaintiffs' rights under the ADA and its regulations by denying them access to equal educational opportunities afforded to students with disabilities, by excluding Plaintiffs from participation in and denying them the benefits of the district's and State's services, programs and activities, and by subjecting them to discrimination.  42 U.S.C. § 12132.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

233.    MDE otherwise intentionally discriminated against Plaintiffs in violation of 42 U.S.C. § 12132.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

234.    As a direct and proximate cause of MDE's violations of the ADA, Plaintiffs have suffered substantial harm to, among other things, Plaintiffs' educational experience and opportunity, academic and intellectual progress, and future earning capacity.  42 U.S.C. § 12132, 12182.

**ANSWER:**   MDE denies as untrue the allegations in this paragraph.

**RELIEF REQUESTED**

Plaintiffs request that the Court:

1.      Issue a declaratory Judgment on behalf of Plaintiffs declaring that the MDE's actions, policies, and practices as alleged herein violate the IDEA; Section 504; and Title II of ADA;

2.      Issue a permanent injunction directing MDE to implement appropriate policies, procedures and protocols to remedy the failures alleged herein with respect to the Plaintiffs;

3.      Issue a final Order and Judgment awarding Plaintiffs:

    a.   equitable relief and compensatory education or a compensatory education fund given the length of deprivation;

    b.   reimbursement for all out of pocket expenses and services;

    c.   compensatory related services and transition services as needed;

    d.   compensatory damages in a supplemental needs trust for:

        i.   exclusion due to segregation, loss of friendship and society of typical peers and isolation in the amount of $1,000 per school day for the entire period of the educational loss until such time as the exclusion is cured; and

        ii.   loss of general education time/exclusion from activities and curricula due to Plaintiffs' disabilities in the amount of $1,000.00 per school day for the entire period of the educational loss; and

    e.   appoint an independent monitor or ombudsperson to oversee and administer the compensatory education award;

4.     Implement a state-wide, pro-active enforcement protocol for ensuring compliance with corrective action plans that includes, but is not limited to, a determination of whether the corrective action plan has resulted in providing an educational program more "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*, 137 S.Ct. 988, 999 (2017);

5.      Hire and/or allocate the appropriate number of staff to ensure that corrective action plans (CAP) are enforced and result in the correction of identified noncompliance;

6.      Engage in pro-active CAP monitoring, including substantive review of the facts and follow-up with parents to review the child's current circumstances, to ensure continued compliance with federal and state law as incorporated into IDEA;

7.      Order MDE to exercise its authority under MARSE R. 340.1855 as incorporated into IDEA;

8.      Provide funding to the local school district, as needed, to comply with this order;

9.      Award Plaintiffs their costs and reasonable attorneys' fees; and

10.     Order any other and further relief, both legal and equitable, that this Court may deem just and proper.

**ANSWER:**   MDE denies that Plaintiffs are entitled to the relief set forth in the Relief Requested paragraphs of this First Amended Complaint.


## AFFIRMATIVE DEFENSES

1.      Plaintiffs have failed to state a claim upon which relief may be granted.

2.      Defendant is entitled to sovereign immunity under the Eleventh Amendment and governmental immunity under MCL 691.1407 from some or all of Plaintiffs' claims.

3.      Some or all of Plaintiffs' injuries, losses, and damages, if any, were caused by Plaintiffs' own conduct or the conduct of third parties and not attributable to Defendants.

4.      Some or all of Plaintiffs' injuries, losses, and damages, if any, have been mitigated, remedied, and/or resolved through Plaintiffs' settlement with the other parties.

5.      Plaintiffs lack standing to pursue their claims individually.

6.      Some or all of Plaintiffs' claims may be barred because they are moot.

7.      Some or all of Plaintiffs' claims may be barred by res judicata/claim preclusion.

8.      Some or all of Plaintiffs' claims may be barred by collateral estoppel/issue preclusion.

9.      Some or all of Plaintiffs' claims may be barred by the applicable statute of limitations.

10.     Plaintiffs may have failed to exhaust all available administrative remedies for some or all of their claims as required under the IDEA.

11.     Defendant reserves the right to claim some or all of Plaintiffs' claims may be barred by the failure to mitigate damages, if discovery reveals appropriate evidence.

12.     Defendant reserves its right to amend this answer to add additional

affirmative defenses as may arise through the course of this litigation.


                                        Respectfully submitted,

                                        /s/ *Charlie A. Cavanagh*
                                        Charles A. Cavanagh (P79171)
                                        Kathleen A. Halloran (P76453)
                                        Attorneys for Defendants
                                        Michigan Department of Attorney General
                                        Health, Education & Family Services
                                        Division
                                        P.O. Box 30758
                                        Lansing, Michigan 48909
                                        (517) 335-7603
                                        cavanaghc2@michigan.gov
Dated:  February 3, 2023                hallorank1@michigan.gov