UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONQUARION LEWIS; KE'AUJANAA
SHEPHERD-FRIDAY; and K.B., by and
through her parent and next friend H.B.,

       Plaintiffs,

v

MICHIGAN DEPARTMENT OF
EDUCATION,

       Defendant.

_____

Case No. 22-cv-00838-RJJ PJG

Hon. ROBERT J. JONKER

MAG. PHILLIP J. GREEN

**DEFENDANT'S BRIEF IN
SUPPORT OF MOTION
FOR SUMMARY
JUDGMENT**

Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
Disability Rights Michigan
Attorneys for Plaintiffs
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755
ediaz@drmich.org
msickon@drmich.org

Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Salvatore Prescott Porter & Porter
Attorneys for Plaintiffs
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@sppplaw.com
fegley@sppplaw.com

Jacquelyn N. Kmetz (P83575)
MI AECRES
Attorney for Plaintiffs
P.O. Box 705
Ludington, Michigan 49431
(231) 794-2379
jkmetz@miaecres.org

Kathleen A. Halloran (P76453)
Neil Giovanatti (P82305)
Ticara D. Hendley (P81166)
Attorneys for Defendant
Michigan Department of
Attorney General
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
hallorank1@michigan.gov
giovanattin@michigan.gov
hendleyt1@michigan.gov

Elizabeth K. Abdnour (P78203)
Abdnour Weiker LLP
Attorney for Plaintiffs
325 E. Grand River Ave., Suite 250
Lansing, MI 48823
(517) 994-1776
liz@education-rights.com

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents.................................................................................................iii

Index of Authorities............................................................................................. v

Introduction ........................................................................................................ 1

Statement of Facts .............................................................................................. 3

I.      Special Education Law Background................................................... 3

a.      The SEA's Role. ................................................................................ 3

b.      The LEA's Role. ................................................................................ 4

II.     Plaintiffs' Amended Complaint ........................................................ 5

III.    Factual Background .......................................................................... 5

        A.      Plaintiff Lewis .................................................................. 5

        B.      Plaintiff Shepherd-Friday ................................................. 8

        C.      Plaintiff K.B........................................................................ 14

Standard of Review ........................................................................................... 21

Argument .......................................................................................................... 21

I.      Plaintiffs' IDEA claims are moot and should be dismissed............. 21

II.     Plaintiffs cannot establish an IDEA, ADA, or § 504 claim. ........... 25

        A.      Plaintiffs' IDEA claim fails. ............................................ 25

        1.      Plaintiffs cannot establish that MDE's action in any way led to a
                denial of FAPE.................................................................... 25

        i.      MDE has met its statutory obligations under the IDEA and
                provides robust supervision. .............................................. 26

        ii.     MDE met its statutory obligations under the IDEA as to
                Plaintiffs. ........................................................................... 33

2.    The IDEA does not provide for a cause of action based on alleged technical violations of the IDEA that do not seek to remedy a denial of FAPE..................................................................... 38

i.    There is no private right of action for IDEA claims not raised in a due process complaint and not tied to a denial of FAPE. .................. 38

ii.    Even if there was a cause of action to support the alleged technical IDEA violations, there is no evidence to support these claims. ................................................................................. 44

B.    Plaintiffs cannot establish claims under the ADA and Section 504. ................................................................................. 45

III.    Plaintiffs' ADA claims are barred by the Eleventh Amendment. ................... 49

IV.    Plaintiffs are not entitled to the requested relief. ........................................... 52

A.    No money damages are available to Plaintiffs under the IDEA. ......... 52

B.    To the extent Plaintiffs seek emotional distress or punitive damages, they are not available under the ADA or § 504. .................. 53

C.    Plaintiffs are not entitled to declaratory or injunctive relief. ............. 53

D.    To the extent Plaintiffs request state-wide relief and systemic policy changes, those requests for relief fail. ....................... 55

Conclusion and Relief Requested ................................................................................. 57

# INDEX OF AUTHORITIES

Page

## Cases

*A.J.T. v. Osseo Area Sch.,*
  Dkt. No. 24-249, cert. granted January 17, 2025, appeal from 94 F.4th 1058 (8th
  Cir. 2024) ................................................................................................................ 49

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) ................................................................................................ 22

*Aluminum Workers Int'l Union Local Union No. 215 v. Consol. Aluminum Corp.,*
  696 F.2d 437 (6th Cir. 1982) ................................................................................ 56

*Am. Rd. Serv. Co. v. Conrail,*
  348 F.3d 565 (6th Cir. 2003) ................................................................................ 21

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1985) .............................................................................................. 21

*Babcock v. Michigan,*
  812 F.3d 531 (6th Cir. 2016) .......................................................................... 50, 51

*Barnes v. Gorman,*
  536 U.S. 181 (2002) .............................................................................................. 53

*Bd. of Educ. v. L.M.,*
  478 F.3d 307 (6th Cir. 2007) ................................................................................ 22

*Bd. of Sch. Comm'rs of Indianapolis v. Jacobs,*
  420 U.S. 128 (1975) .............................................................................................. 54

*Bd. of Trs. v. Garrett,*
  531 U.S. 356 (2001) .............................................................................................. 50

*Bradley v. Jefferson Cty. Pub. Sch.,*
  88 F.4th 1190 (6th Cir. 2023) .................................................................... 25, 39, 47

*Bradley v. Wal-Mart Stores East, LP,*
  587 F. App'x 863 (6th Cir. 2014) .......................................................................... 21

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ................................................................. 56

*Campbell v. Bd. of Educ. of the Centerline Sch. Dist.,*
    58 F. App'x 162 (6th Cir. 2003) ............................................. 48

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................. 21

*Chafin v. Chafin,*
    568 U.S. 165 (2013) ................................................................. 22

*Cole v. Oroville Union High Sch. Dist.,*
    228 F.3d 1092 (9th Cir. 2000) ............................................... 54

*Columbia MHC E., LLC v. Stewart,*
    815 F. App'x 887 (6th Cir. 2020) ........................................... 23

*County of Westchester v. New York,*
    286 F.3d 150 (2d Cir. 2002) ................................................... 41

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    142 U.S. 1562 (2022) ............................................................... 53

*Curry v. Hensiner,*
    513 F.3d 570 (6th Cir. 2008) ................................................. 55

*Curry v. Sch. Dist. of the City of Saginaw,*
    452 F. Supp. 2d 723 (E.D. Mich. 2006) ............................... 55

*Denise H. v. Texas Education Agency,*
    No. 23-50287, 2024 U.S. App. LEXIS 5786 (5th Cir. Mar. 24, 2024) ............ 24, 55

*Doe v. BlueCross BlueShield of Tenn., Inc.,*
    926 F.3d 235 (6th Cir. 2019) ................................................. 48

*Estate of Cornell v. Bayview Loan Servicing, LLC,*
    908 F.3d 1008 (6th Cir. 2018) ............................................... 39

*Ex parte Young,*
    209 U.S. 123 (1908) ................................................................. 49

vi

*G.C. v. Owensboro Pub. Sch.,*
  711 F.3d 623 (6th Cir. 2013) ................................................................ 48

*Horen v. Bd. of Educ.,*
  594 F. Supp. 2d 833 (N.D. Ohio 2009) ................................................ 53

*J.M. v. Tenn. Dep't of Educ.,*
  358 F. Supp. 3d 736 (M.D. Tenn. 2018) ........................................ 24, 55

*Knox Cnty. v. M.Q.,*
  62 F.4th 978 (6th Cir. 2023) ................................................ 46, 48, 49

*Lawson v. Shelby Cnty., Tenn.,*
  211 F.3d 331 (6th Cir. 2000) ................................................................ 49

*Long v. Dawson Springs Indep. Sch. Dist.,*
  197 F. App'x 427 (6th Cir. 2006) .................................................... 23, 52

*M.G. v. Williamson Cty. Sch.,*
  720 F. App'x 280 (6th Cir. 2018) ......................................................... 46

*M.M. v. Lafayette Sch. Dist.,*
  767 F.3d 842 (9th Cir. 2014) ................................................................ 40

*Malkentzos v. DeBuono,*
  102 F.3d 50 (2d Cir. 1996) ................................................................... 54

*McPherson v. Mich. High Sch. Athletic Ass'n, Inc.,*
  119 F.3d 453 (6th Cir. 1997) ................................................................ 22

*Monahan v. State of Nebraska,*
  687 F.2d 1164 (8th Cir. 1982) .............................................................. 49

*Moreno v. Consolidated Rail Corp.,*
  99 F.3d 782 (6th Cir. 1996) .................................................................. 53

*Moseley v. Bd. of Educ. of Albuquerque Pub. Schs,*
  483 F.3d 689 (10th Cir. 2007) .............................................................. 54

*Ohlendorf v. United Food & Commer. Workers Int'l Union, Local 876,*
  883 F.3d 686 (2018) ............................................................................. 39

*Pennhurst State Sch. and Hosp. v. Halderman,*
  451 U.S. 1 (1981) ............................................................................ 39, 49

*Popovich v. Cuyahoga Cnty. Ct. of Common Pleas,*
  276 F.3d 808 (6th Cir. 2001) ............................................................ 52

*S.S. v. E. Ky. Univ.,*
  532 F. 3d 445 (6th Cir. 2008) .......................................................... 46

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
  411 U.S. 1 (1973) ............................................................................ 51

*Sharpe v. Cureton,*
  319 F.3d 259 (6th Cir. 2003) ............................................................ 56

*Smith v. Kalamzoo Pub. Sch.,*
  703 F. Supp. 3d 822 (W.D. Mich. 2023) .......................................... 53

*Sullivan v. Benningfield,*
  920 F.3d 401 (6th Cir. 2019) ............................................................ 22

*Suter v. Artist M.,*
  503 U.S. 347 (1992) ........................................................................ 41

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
  444 U.S. 11 (1979) .......................................................................... 41

*Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.,*
  615 F.3d 622 (6th Cir. 2010) .................................................. 39, 40, 41

*United States v. Georgia,*
  546 U.S. 151 (2006) ........................................................................ 50

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989) .......................................................................... 49

*Zdrowski v. Rieck,*
  119 F. Supp. 3d 643 (E.D. Mich. 2015) .......................................... 48

**Statutes**

20 U.S.C § 1415(f) ................................................................................................. 40

20 U.S.C. § 1411(f)(2) ........................................................................................... 45

20 U.S.C. § 1412(a) ............................................................................................... 3

20 U.S.C. § 1412(a)(1) ....................................................................................... 3, 23

20 U.S.C. § 1412(a)(11) ......................................................................................... 3

20 U.S.C. § 1412(a)(2) ........................................................................................... 3

20 U.S.C. § 1412(a)(4) ........................................................................................... 3

20 U.S.C. § 1412(a)(6) ......................................................................................... 27

20 U.S.C. § 1413 ................................................................................................. 3, 4

20 U.S.C. § 1414 ................................................................................................... 4

20 U.S.C. § 1414(a) ............................................................................................... 4

20 U.S.C. § 1414(b) ............................................................................................... 4

20 U.S.C. § 1414(c) ............................................................................................... 4

20 U.S.C. § 1414(d) ............................................................................................... 5

20 U.S.C § 1414(d)(1)(A)(i) ................................................................................... 5

20 U.S.C. § 1415(b) ............................................................................................. 40

20 U.S.C. § 1415(b)(6)(A) ................................................................................... 39

20 U.S.C. § 1415(i) ........................................................................................ passim

20 U.S.C.§ 1415(1)(a) ........................................................................................... 3

20 U.S.C.§ 1415(1)(b) ........................................................................................... 3

ix

29 U.S.C. § 794(a) .......................................................................................... 46

42 U.S.C. § 12132 .......................................................................................... 46

42 U.S.C. § 1983 ............................................................................................ 38

Mich. Comp. Laws § 381.1 *et seq.* ................................................................ 4

Mich. Compl. L. § 388.1651 *et seq.* ............................................................ 45

**Rules**
Fed. R. Civ. P. 56(a) ...................................................................................... 21

**Regulations**
34 C.F.R. § 300.111 *et seq.* ............................................................................ 4

34 C.F.R. § 300.149 ......................................................................................... 3

34 C.F.R. § 300.150 *et seq.* ............................................................................ 3

34 C.F.R. § 300.151 ....................................................................................... 28

34 C.F.R. § 300.300 ......................................................................................... 4

34 C.F.R. § 300.301 ......................................................................................... 4

34 C.F.R. § 300.301(b) ..................................................................................... 4

34 C.F.R. § 300.500 *et seq.* ............................................................................ 3

Mich Admin. Code. R. 340.1724f(3) ............................................................ 28

Mich. Admin. Code. R. 340.1724h ................................................................ 28

Mich. Admin Code R. 340.1851 *et seq.* ......................................................... 4

Mich. Admin. Code R. 340.1721 ..................................................................... 4

Mich. Admin. Code R. 340.1721a ............................................................... 4, 5

Mich. Admin. Code R. 340.1724f ................................................................ 4, 28

Mich. Admin. Code R. 340.1724f(4) ............................................................... 28

Mich. Admin. Code R. 340.1801 *et seq.* ...................................................... 45

Mich. Admin. Code R. 340.1853(5) ............................................................... 29

Mich. Admin. Code R. 340.1853(7) ............................................................... 29

Mich. Admin. Code. R. 340.1721b ................................................................. 4

**Constitutional Provisions**

U.S. Const. amend. XI .................................................................................... 49

# INTRODUCTION

By statute, the Michigan Department of Education (MDE) provides general supervision to the special education programs provided to eligible students in the State of Michigan under the Individuals with Disabilities Education Act (IDEA). Student eligibility determinations and the provision of special education services is obligated to local school districts.  In this case, Plaintiffs seek to impose liability on MDE for the failures of the local districts.  But the evidence does not connect any action by MDE to the local district's purported failures to provide Plaintiffs with special education services.  In contrast, the evidence demonstrates MDE's robust oversight of the applicable districts, including multiple comprehensive investigations regarding the districts' processes and provision of services to Plaintiffs, orders to the districts to correct errors, and follow up with the districts to ensure errors were resolved.

MDE now moves for summary judgment of Plaintiffs' claims, which allege violations of the IDEA, § 504 of the Rehabilitation Act (§ 504), and the Americans with Disabilities Act (ADA).  There is no genuine dispute of any material fact. Rather, the parties largely agree on the facts relevant to Plaintiffs.  The disputes here are issues of law, ripe for this Court's decision on this motion.

To start, Plaintiffs' claims under the IDEA are moot as they resolved their alleged denials of a free appropriate public education (FAPE) with the relevant districts via settlement agreements.  Plaintiffs also cannot establish a claim under the IDEA against MDE because Plaintiffs cannot establish that MDE's action led to a denial of FAPE and the IDEA does not provide for a cause of action based on

1

alleged technical violations of the IDEA that do not seek to remedy a denial of FAPE.  Likewise, Plaintiffs' § 504 and ADA claims fail due to a lack of any evidence demonstrating discrimination by MDE, and the ADA claim is also barred by Eleventh Amendment immunity.  Finally, Plaintiffs' requested relief is simply not available as a matter of law.

Accordingly, MDE should be awarded summary judgment and all claims dismissed with prejudice.

## STATEMENT OF FACTS

### I.    Special Education Law Background

The IDEA provides federal money to assist states in educating children with
disabilities.  *See* 20 U.S.C. § 1412(a).  To qualify, a State Education Agency (SEA)
establishes federally-approved policies and procedures to ensure that all eligible
children with disabilities in the state have access to a FAPE, in the least restrictive
environment, and tailored to the unique needs of each child by means of an
Individualized Education Program (IEP).  *See* 20 U.S.C. §§ 1412(a)(1), (2), (4).  As a
general matter, the SEA provides general supervision to the system, and local
education agencies (LEAs or school districts) are responsible for providing the
education directly to students.  *See* 20 U.S.C. §§ 1412(a)(11), 1413; 34 C.F.R. §
300.149.

### a.  The SEA's Role.

The SEA in Michigan is MDE.  (Ex. A, McIntyre Decl. ¶ 5.)  And within MDE,
the Office of Special Education (OSE), is responsible for the general supervision,
administration, and funding of special education programs and services under the
IDEA.  (Ex. A, McIntyre Decl. ¶ 6.)

As part of its general supervision, a SEA is required to maintain procedural
safeguards, including an impartial due process procedure and a state complaint
procedure.  *See* 20 U.S.C.§ 1415(1)(a)–(b); 34 C.F.R. §§ 300.150–153 (state complaint
procedures); 34 C.F.R. §§ 300.500–535 (due process procedures).  Michigan
implements and maintains its due process procedures in the Michigan

Administrative Rules for Special Education (MARSE), Mich. Admin. Code R.

340.1724f.  For state complaints, Michigan maintains a process set forth in Mich.

Admin Code. R. 340.1851–1855.  (See also Ex. A, McIntyre Decl. ¶¶ 17–22, 35.)

### b.  The LEA's Role.

A LEA (here, Kalamazoo Public Schools (KPS) and Comstock Public Schools

(CPS)) is eligible for funding under the IDEA if it submits a plan to the SEA (here,

MDE) consistent with 20 U.S.C. § 1413.  In Michigan, there is an entity between the

SEA and the LEAs:  the Intermediate School District (ISD) (here, Kalamazoo

Regional Educational Service Agency (KRESA)).  The ISD ensures the provision of

FAPE through their LEAs.  Mich. Comp. Laws § 381.1, *et seq.*

Each LEA must conduct an initial evaluation before providing any special

education and related services.  20 U.S.C. § 1414; 34 C.F.R. § 300.301.  Consistent

with the notice and consent requirements in § 1414(b) and § 300.300, either a

parent of a child or a public agency may request an initial evaluation to determine if

the child has a disability.  20 U.S.C. § 1414(a)–(c); 34 C.F.R. § 300.301(b).  Michigan

provides policies and procedures on Child Find under 34 C.F.R. § 300.111, *et seq.*;

the relevant procedures are in MARSE Rules 340.1721 – 340.1721b.  The LEAs

provide notice to parents of the evaluation procedures.  Mich. Admin. Code R.

340.1721.  The LEA's multidisciplinary team then conducts an initial evaluation of

a child suspected of having a disability.  *Id.* at 340.1721a.  The designated

multidisciplinary evaluation team member (who can explain the instructional

implications of the evaluation's results) then makes an eligibility determination and

prepares a written report for the IEP.  *Id.*  If a LEA determines that a child has an enumerated disability under the IDEA, the IEP team must develop an IEP for the child.  20 U.S.C. § 1414(d).  An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [§ 1414(d)]." 20 U.S.C. § 1414(d)(1)(A)(i).

## II.     Plaintiffs' Amended Complaint

On December 5, 2022, Plaintiffs Donquarion Lewis, Ke'Aujanaa Shepherd-Friday, and K.B. filed their Amended Complaint against MDE, alleging violations of the IDEA, § 504, and the ADA.  (Am. Compl., PageID.60–103.)  Plaintiffs assert that MDE failed to ensure that they received a FAPE from Kalamazoo Public School District (KPS) and, for Plaintiff Sheperd-Friday, Comstock Public Schools (CPS), both member districts of the ISD, Kalamazoo Regional Educational Service Agency (KRESA).  Plaintiffs seek declaratory relief, permanent injunctive relief, compensatory education, and monetary damages.  (*Id.* at PageID.99–100.)

## III.    Factual Background

### A.     Plaintiff Lewis

Lewis is a former KPS student who was diagnosed with a specific learning disability in 2012 and received his first IEP that same year.  (Ex. B, Multidisciplinary Evaluation 4/17/12, 4–5; Ex. C, Lewis IEP 4/17/12, 1.)  Initially, Lewis qualified for special education services due to poor reading fluency skills. (Ex. C, Lewis IEP 4/17/12, 1.)  In January 2018, when he was in ninth grade, KPS

5

conducted a Review of Existing Evaluation Data (REED) for Lewis.  (Ex. D, REED and Evaluation Plan 1/23/18.)  According to the REED, Lewis continued to be eligible for special education services, but with a classification as a student with a specific learning disability in the areas of reading and mathematics.  (*Id*. at 1.)[1]

From approximately 2013 to the time he graduated in 2021, Lewis performed below proficiency levels in reading, math, and science.  (Ex. E, Multidisciplinary Evaluation 2/10/15, 2; Ex. F, Lewis IEP 6/9/21, 1.)  As a fourth-year high school student, Lewis had an overall grade point average of 1.29.  (Ex. G, REED and Evaluation Plan 9/28/20, 2.)  Lewis's teachers reported that his performance was impacted by a lack of attendance, missing assignments, and failing to complete classwork.  (*Id.*)  The academic progress Lewis did make was due to his desire to be eligible to play on his high school's football team.  (*Id.*; Ex. H, Lewis Dep. at 40:4–23, 42:17–43:5.)

At the start of the 2020–2021 school year, Lewis reached the age of majority and was on track to go onto transition services at the end of the school year unless he earned enough credits to graduate.  (Ex. G, REED and Evaluation Plan 9/28/20, 2.)  Lewis completed minimal classwork, and his efforts lagged as he struggled to consistently complete assignments in a timely manner and attend virtual classes. (Ex. I, Lewis IEP 10/12/20, 7.)  In his IEP, Lewis was provided with positive behavioral interventions and supports including, but not limited to, additional time

---

[1] Notably, as Lewis had an IEP since at least 2012, Lewis's complaints are not relevant to Child Find.  Rather, Lewis's claims are premised on his general disagreement that KPS offered FAPE.

to complete classroom and homework assignments, small group setting for tests and quizzes, tests and quizzes being read out loud in all classes, and programs and services through a secondary resource program for 50 minutes per week.  (*Id*. at 12.)

During Lewis's senior year (2020–2021), KPS offered remedial assistance, including a summer school program and remedial reading program, in lieu of graduating on time with his class.  (Ex. J, KPS Graduation Requirement Letters.)  KPS also offered an additional fifth year of schooling.  (*Id*. at 1.)  Lewis declined to participate in those offered programs and chose to graduate on time with his cohorts.  (Ex. H, Lewis Dep. at 63:10–13, 64:21–23).  Lewis graduated with his high school diploma in June 2021.  (Ex. K, Graduation Email and Audit 6/3/21.)

Lewis's State Complaint (21-0004)

On January 25, 2021, Lewis's advocate filed a state complaint against KPS alleging that his IEPs were insufficient, resulting in denial of a FAPE.  (Ex. L, Lewis State Complaint 1/25/21.)  On March 23, 2021, after thoroughly investigating the complaint, MDE issued a decision finding that KPS offered Lewis a FAPE.  (Ex. M, Complaint Decision 21-0004, 10.)  MDE concluded that the October 12, 2020 IEP was developed to address Lewis's needs because Lewis demonstrated he was making progress as evidenced by his progress reports, grades, and credits earned.  (*Id*. at 9–10.)  MDE found that because KPS offered FAPE to Lewis, compensatory education was not needed.  (*Id*.)

<u>Lewis's Due Process Complaint</u>

On October 22, 2021, Lewis filed a due process complaint.  (Ex. N, Lewis Due Process Complaint 10/22/21.)  On October 13, 2022, following a hearing, Lewis's due process complaint was denied as the ALJ found KPS had offered a FAPE.  (Ex. O, Lewis Due Process Decision and Order 10/13/22.)

On December 20, 2022, Lewis appealed the administrative hearing decision in the U.S. District Court for the Western District of Michigan.  (1:22-cv-01208 PageID.1-23.)  On March 26, 2024, Lewis and KPS entered a settlement agreement to resolve his claims that KPS denied him FAPE.  (Ex. P, Lewis Settlement Agreement.)  Per the terms of the settlement agreement, KPS agreed to provide Lewis compensatory education, attorney fees, and a cash settlement.  (*Id.* at 3–4.)

## B.    Plaintiff Shepherd-Friday

Shepherd-Friday was born with sickle cell anemia.  (Ex. Q, Section 504 Plan 5/5/17, 1.)  Shepherd-Friday enrolled in the KPS district as a student in December 2011.  (Ex. R, Complaint Decision 19-0213, 2.)  On May 5, 2017, KPS held an initial Section 504 Plan meeting for Shepherd-Friday.  (Ex. Q, Section 504 Plan 5/5/17.)  During this meeting, it was determined that Shepherd-Friday's sickle cell anemia was a physical impairment that substantially limited one or more major life activities because her ongoing medical monitoring and treatment of the disease resulted in missed instruction in the classroom and in some situations, required Shepherd-Friday to leave the classroom.  (*Id.* at 1–2.)  Given this physical impairment, Shepherd-Friday was deemed eligible under Section 504, and an

accommodation plan providing excused medical absences, extended assessment time and breaks, among other things, were in put in place.  (*Id.* at 2–4.)  Shepherd-Friday was provided a Section 504 plan for all years of high school attended in KPS. (*Id.*; Ex. S, Section 504 Plan 6/6/18; Ex. T, Section 504 Plan 3/15/19.)

In January 2018, Shepherd-Friday was involved in a physical altercation at school which resulted in a two-week suspension.  (Ex. U, Shepherd-Friday State Complaint 10/3/19, 1; Ex. V, Manifestation Determination, 1–2.)  Ultimately, KPS determined that Shepherd-Friday could not return to school following the incident and transferred Shepherd-Friday to an alternative learning institution, Phoenix Alternative School.  (Ex. U, Shepherd-Friday State Complaint 10/3/19, 1; Ex. W, Shepherd-Friday Dep. at 30:13–31:10.)  Shepherd-Friday attended Phoenix from March 2018 to June 2019.  (*Id.*)  Shepherd-Friday earned four credits during the 2016–2017 and 2017–2018 school years, and 3.5 credits from Phoenix for the 2018–2019 school year.  (Ex. X, Eligibility Recommendation 2/27/20, 2.)

On September 18, 2019, Shepherd-Friday enrolled at Comstock Public Schools (CPS) for the 2019–2020 school year.  (Ex. Y, CPS Registration.)  In January of 2020, a physician applied for Shepherd-Friday to receive homebound services, indicating that Shepherd-Friday was currently hospitalized or confined to the home during regular school hours and required homebound instruction.  (Ex. Z, Homebound Application.)  The physician estimated that Shepherd-Friday would be absent from school for six months.  (*Id.* at 1.)

9

A psychoeducational evaluation report, dated February 20, 2020, was completed in advance of Shepherd-Friday's initial evaluation for special education services.  (Ex. AA, Psychoeducational Evaluation Report.)  An educational achievement assessment demonstrated that Shepherd-Friday had good basic reading skills but had a low average in letter and word recognition, below average in reading vocabulary, and very low in math concepts and applications.  (*Id.* at 4, 7.) In addition, a behavior assessment revealed clinically significant scores in the areas of internalizing problems, anxiety, somatization, and sense of inadequacy, which are in line with children who experience chronic illness.  (*Id.* at 4, 5, 7.)

On February 27, 2020, CPS' evaluation team reviewed Shepherd-Friday for special education programs/services.  (Ex. X, Eligibility Recommendation 2/27/20.) Shepherd-Friday was deemed eligible for an IEP based on her health impairment. (*Id.* at 4.)  It was noted that Shepherd-Friday had missed 22 full days of school during the first quarter of the 2019–2020 school year.  (*Id.* at 2.)  On April 20, 2020, an individual learning plan was developed for Shepherd-Friday consistent with her IEP to address remote learning during the COVID-19 school closure.  (Ex. AB, CPS COVID-19 Learning Plan.)

Shepherd-Friday reached the age of majority during the summer of 2020. (Ex. AC, Shepherd-Friday IEP 9/24/20, 6.)  On September 24, 2020, CPS conducted an IEP Team meeting during which it was reported that Shepherd-Friday's transcripts showed that she had done a minimal amount of work, rarely showed up for online classes, and is often slow at responding to communications from the

10

school and teachers.  (*Id.* at 2.)  There was concern about how and when Shepherd-Friday would complete high school due to her illness creating attendance issues. (*Id.* at 1.)  Shepherd-Friday was on the Michigan merit curriculum leading to a high school diploma if Shepherd-Friday obtained requisite credits in English, math, physical education, and history.  (*Id.* at 5.)  The IEP also included post-secondary vision and transition activity goals, including Shepherd-Friday attending a community college, working to become a respiratory therapist, and participating in activities such as obtaining a driver's license.  (*Id.* at 3–5.)

Shepherd-Friday's First State Complaint (19-0213)

On October 3, 2019, Shepherd-Friday's advocate filed a state complaint against KPS alleging that it failed to comply with the IDEA, which resulted in a denial of a FAPE.  (Ex. U, Shepherd-Friday State Complaint 10/3/19.)  On April 18, 2020, MDE issued a decision finding that KPS did not take affirmative action to fulfill the Child Find obligation.  (Ex. R, Complaint Decision 19-0213, 9.)

In addition to its findings, MDE issued district-level corrective action plans (CAP).  (*Id.*)  MDE ordered KPS to revise or develop procedures regarding Child Find, as needed, and provide professional development for all relevant staff regarding the new procedures by November 15, 2020.  (*Id.*)  MDE did not issue a student-level CAP because Shepherd-Friday was no longer a KPS student.  (*Id.*) MDE verified that all requirements were completed, and this CAP was closed on February 26, 2021.  (Ex. AD, CAP Closeout 19-0213.)

<u>Shepherd-Friday's Second State Complaint (21-0005)</u>

On January 25, 2021, Shepherd-Friday's advocate filed a state complaint against CPS alleging her IEP was insufficient to meet her needs.  (Ex. AE, Shepherd-Friday State Complaint 1/25/21.)[2]  On March 26, 2021, MDE issued a decision finding that CPS failed to develop, review, or revise Shepherd-Friday's initial February 27, 2020 IEP and the September 24, 2020 annual review IEP to address Shepherd-Friday's unique educational needs.  (Ex. AF, Complaint Decision 21-0005, 13.)

MDE's decision identified two areas in which CPS failed to provide Shepherd-Friday a FAPE.  (*Id.* at 12, 13.)  First, Shepherd-Friday's IEPs did not describe the programs, supports, and services required to address Shepherd-Friday's unique educational needs.  (*Id.* at 13.)  For instance, goals were included for post-secondary school transition, reading, and math, but Shepherd-Friday's credit summary generated on February 14, 2021 and report cards for the 2020-2021 school year indicated that Shepherd-Friday failed every class taken as a fifth-year student.  (*Id.* at 7, 10, 13.)  Second, homebound/hospitalized services were discontinued by the IEP Team due to Shepherd-Friday not providing CPS with a physician's statement that demonstrated her need for such services.  (*Id.* at 12.)  In determining that Shepherd-Friday required homebound/hospitalized services as a component of the offer of FAPE, CPS had an obligation to obtain that information from a physician if

---

[2] Notably, this second state complaint against CPS is not related to Child Find obligations.

Shepherd-Friday and/or her parent is unable to the provide the information.  (*Id*.)

As a result of these violations, MDE concluded that CPS denied Shepherd-Friday a

FAPE.  (*Id*. at 13.)

In addition to its findings, MDE issued student-level and district-level CAPs.

(*Id*. at 14.)  With respect to student-level CAPs, MDE ordered CPS to:  (1) provide

15 hours of compensatory education services to address Shepherd-Friday's

social/emotional needs; and (2) conduct an IEP Team meeting to develop an IEP.

(*Id*.)

With respect to the district-level CAP, MDE ordered CPS to:  (1) revise or

develop procedures regarding IEP development; (2) provide a professional learning

opportunity, regarding social-emotional and behavioral needs of students; (3) create

and provide a document for all staff working with Shepherd-Friday that provides

information about sickle cell anemia and educational recommendations and

strategies to address her needs related to this disability; and (4) provide

professional development for relevant staff.  (*Id*. at 14–15.)

MDE verified that all requirements were completed, and this CAP was

closed.  (Ex. AG, CAP Status History 21-0005.)

<u>Shepherd-Friday's Due Process Complaint</u>

On February 18, 2022, Shepherd-Friday filed a due process complaint.  (Ex.

AH, Shepherd-Friday Due Process Complaint 2/18/22.)  In June 2022, Shepherd-

Friday and CPS entered a settlement agreement following mediation.  (Ex. AI,

Shepherd-Friday Settlement Agreement.)  Per the terms of the settlement

agreement, CPS agreed to provide Shepherd-Friday compensatory education, access to summer 2021–2022 programming for purposes of credit recovery, various assessments and funding for evaluations, and attorney fees.  (*Id.* at 2–3.)

At her deposition, Shepherd-Friday testified that she has not been enrolled in high school since attending CPS for the 2021–2022 school year.  (Ex. W, Shepherd-Friday Dep. at 41:10–17.)  There is no evidence Shepherd-Friday has attempted to re-enroll in any education program. (*Id.* at 42:19–22.)

### C.    Plaintiff K.B.

According to the Amended Complaint, Plaintiff K.B. began exhibiting disciplinary issues while attending Hillside Middle School in 2017.  (Am. Compl. ¶ 110, PageID.81.)  K.B. was raised by her mother, H.B, who became legally blind when K.B. was in the fifth grade.  (*Id.*)  H.B. cannot drive and struggled to find transportation to take K.B. to school and, as a result, K.B. slowly began to disengage from school.  (*Id.*)  K.B.'s behaviors consisted of fighting, defiance, being consistently disruptive, and refusing to follow school rules.  (Ex. AJ, Complaint Decision 19-0188, 7–8.)

K.B. was placed in KPS' Alternative Learning Program (ALP), as a sixth grader for the 2017–2018 school year and as a seventh grader for the 2018–2019 school years.  (*Id.* at 2, 4.)  ALP was a short-term behavior modification program for middle school youth who have experienced behavior problems at their home middle school.  (*Id.* at 2–3.)  The program was a three-phase general education intervention

program designed to have its students transferred back to their original or home middle school.  (*Id.* at 3–4.)

In January 2018, K.B. was evaluated and found ineligible for  special education programs and services.  (Ex. AK, Eligibility Recommendation 1/16/18; Ex. AJ, Complaint Decision 19-0188, 5.)  On October 26, 2018, K.B. was referred to a child study team, and an intervention plan was created.  (Ex. AJ, Complaint Decision 19-0188, 5.)  K.B. was also assigned a KPS clinical social worker during the 2018–2019 school year.  (*Id.*)  For the 2018–2019 school year, K.B. had a total of 52 days of suspension, 21 days of "homebound," and 28 days of unexcused absences.  (*Id.* at 6–7.)  K.B. was suspended from ALP in April 2019 for assaulting a student and staff member and it was advised she could return in September 2019 after she completed five therapy sessions and engaged with services from Integrated Services of Kalamazoo (ISK).  (Ex. AL, Suspension Letter 5/14/19.)

On May 23, 2019, K.B. violated KPS' student code of conduct by trespassing and assaulting another student.  (Ex. AM, Suspension Letter 6/27/19.)  According to an exclusion recommendation letter from KPS dated June 11, 2019:  (1) K.B. was to be excluded from KPS for 29 school days beginning September 3, 2019; (2) at the time of this May 2019 incident, K.B. was already excluded from KPS for the remainder of the 2018–2019 school year due to a prior incident; (3) K.B. had been involved in 40 incidents during the school year and was passing one of six classes via homebound instruction; and (4) K.B. would receive homebound instruction during the exclusionary period.  (Ex. AJ, Complaint Decision 19-0188, 7.)  KPS

15

issued a letter to K.B.'s mother, dated June 27, 2019, confirming the decision to exclude K.B. and included an advisement that K.B. needed to complete five counseling sessions and provide verification of same prior to returning to school on October 14, 2019.  (Ex. AM, Suspension Letter 6/27/19.)  Based on information from the Michigan Student Data System (MSDS), KPS reported that K.B. incurred 21 unique incidences of discipline and consequences, totaling 92 days of suspension during the 2018–2019 school year.  (Ex. AJ, Complaint Decision 19-0188, 8.)

In July 2019, K.B. was diagnosed with attention deficit/hyperactivity disorder (ADHD) and oppositional defiant disorder.  (Ex. AN, KCMHSA Services Assessment, 6–7.)  K.B. was transitioned back to a KPS middle school as an eighth grader for the 2019–2020 school year.  (Ex. AO, K.B. Dep. at 21:1–9.)

On November 15, 2019, K.B. was expelled and subsequently enrolled in a strict discipline academy within KPS on November 20, 2019.  (Ex. AP, Complaint Decision 21-0007, 5.)  From February 14, 2020 to March 5, 2020, K.B. was court ordered to enroll in and attend a KPS residential home school.  (*Id*.)  K.B. moved to KPS' juvenile onsite day school and remained at that location through the date of the filing of this lawsuit.  (*Id*.)  During her admittance to the juvenile detention center, K.B. attended the Intensive Learning Center where she received instruction from certified special education teachers.  (*Id*. at 8.)

K.B.'s First State Complaint (19-0188)

On September 9, 2019, K.B.'s advocate filed a state complaint against KPS alleging that KPS violated its Child Find obligations to assess K.B.  (Ex. AQ, K.B.

16

State Complaint 9/8/19.)  On November 8, 2019, MDE issued a decision that found that KPS:  (1) failed to meet its ongoing Child Find obligations to seek out IDEA-eligible students; (2) failed to express concerns about K.B.'s repeated pattern of behavior to the director of special education or supervisory personnel following its Child Find study team referral; (3) had reason to suspect K.B. may have a disability at the end of November 2018 when, after conducting a child study team meeting and implementing an intervention plan, K.B.'s discipline removal increased in intensity and length prompting the addition of a clinical social worker; and (4) improperly kept attendance records that indicated K.B. had 73 cumulative days of removal due to behavior whereas MSDS demonstrated 93 cumulative days.  (Ex. AJ, Complaint Decision 19-0188, 13–14.)  As a result of these violations, MDE concluded that KPS did not meet their Child Find obligation and denied K.B. a FAPE.  (*Id*. at 14.)

MDE issued student-level and district-level CAPs.  (*Id*. at 14–16.)  For student-level CAPs, MDE ordered KPS to conduct a review of existing evaluation data for K.B.'s potential special education and related service needs, conduct an individual initial evaluation to gather current relevant social-emotional, functional, developmental, and academic information about K.B., and conduct a multidisciplinary evaluation team meeting to make a recommendation to the IEP team regarding eligibility.  (*Id*. at 14–15.)  For district-level CAPs, MDE ordered KPS to revise or develop procedures regarding Child Find and discipline and to provide professional development for all relevant staff.  (*Id*. at 16.)

17

Regarding the student-level CAPs, K.B. refused or did not actively participate in assessments, which resulted in KPS relying on K.B.'s January 2018 IEP evaluation.  (Ex. AR, Multidisciplinary Evaluation 10/23/19, 8, 16–17.)  On October 23, 2019, KPS's multidisciplinary evaluation team completed an additional initial evaluation of K.B., including completion of surveys by H.B. and teachers. (*Id*. at 1–21.)  The survey results showed social maladjustment as an explanation for K.B.'s behavior.  (*Id*. at 20.)  Based on the results of the 2018 IEP evaluation and the information obtained by the multidisciplinary evaluation team, KPS found K.B. ineligible for special education services.  (*Id*. at 20; Ex. AS, Notice of Ineligibility.) Relying on KPS's documentation, MDE closed the student-level CAP on February 10, 2020.  (Ex. AT, SLCAP Status History 19-0188.)

On October 26, 2020, MDE verified that KPS revised or developed its Child Find and discipline procedures, a district special education handbook, and held a Child Find orientation for all relevant staff.  (Ex. AU, Cap Closeout 19-0188, 2.) Accordingly, MDE found that KPS had corrected all areas of noncompliance and closed out the district-level CAP. (*Id*.)

K.B.'s Second State Complaint (21-0007)

On January 25, 2021, K.B.'s advocate filed a second state complaint against KRESA alleging that it failed to comply with its Child Find obligations, which resulted in a denial of a FAPE.  (Ex. AV, K.B. State Complaint 1/25/21.) Specifically, the state complaint alleged that: (1) KRESA refused to provide K.B. services and that K.B. had not been properly tested for a specific learning disability;

18

and (2) K.B.'s juvenile home psychological evaluation recommended that an evaluation be done in the educational setting.  (*Id*. at 2–3.)

On March 23, 2021, MDE issued a decision that found KRESA violations for one of the two issues raised in the complaint.  (Ex. AP, Complaint Decision 21-0007.)  MDE found that KRESA failed to seek consent to complete a full initial evaluation for K.B. and the delay was due to the inconsistency of staff training, a misunderstanding of who is allowed to request an evaluation for special education services, and a lack of organization of the IEP process for K.B.  (*Id*. at 14.)  However, MDE determined that KRESA followed specific requirements for providing educational services in a juvenile detention facility.  (*Id*. at 15.)

With respect to student-level CAPs, MDE ordered KRESA to conduct a review of existing evaluation data for K.B., conduct an individual initial evaluation to determine if K.B. is IDEA eligible and her educational needs, and have its multidisciplinary evaluation team make a recommendation to the IEP team regarding eligibility and prepare a written report regarding K.B.'s unique educational and/or behavioral needs.  (*Id*. at 16.)

For district-level CAPs, KRESA was ordered to revise procedures regarding Child Find to document and ensure:  (i) KRESA has a consistent system to identify, locate, and evaluate IDEA-eligible students while in juvenile detention facility, and (ii) special education referral/evaluation process is initiated for students with a suspected disability while in the juvenile detention facility.  (*Id*.)  Additionally,

KRESA was ordered to provide professional development for all relevant staff regarding new procedures by October 15, 2021.  (*Id*. at 17.)

On April 12, 2021, a REED meeting was conducted regarding K.B.  (Ex. AW, REED and Evaluation Plan 4/12/21.)  On May 17, 2021, K.B.'s physician diagnosed her with ADHD.  (Ex. AX, Physician's Verification; Ex. AY, Multidisciplinary Evaluation 5/26/21, 19.)  On May 26, 2021, KRESA's multidisciplinary evaluation team issued a report for K.B., recommending that an IEP Team be convened.  (Ex. AY, Multidisciplinary Evaluation 5/26/21, 1, 20.)  That same day, an IEP Team met and developed an IEP.  (Ex. AZ, K.B. IEP 5/26/21.)

MDE verified that all requirements were completed, and this CAP was closed on February 2, 2022.  (Ex. BA, Complaint Closure Letter 21-0007.)

K.B.'s Due Process Complaint

In February 2022, K.B.'s mother filed a due process complaint on behalf of K.B.  (Ex. BB, K.B. Due Process Complaint 2/11/22.)  On August 10, 2022, K.B.'s mother, on behalf of K.B., and KPS entered into a settlement agreement and release of claims.  (Ex. BC, K.B. Settlement Agreement.)   Per the terms of the settlement agreement, KPS agreed to provide compensatory education, various comprehensive evaluations and behavioral assessments, and monetary damages.  (*Id*. at 2–3.) At her deposition, K.B. testified that she stopped attending school, against her mother's wishes, because she did not "feel like going" anymore.  (Ex. AO, K.B. Dep. at 25:7–14.)  There is no evidence to indicate K.B. has attempted to re-enroll in any education program.

## STANDARD OF REVIEW

A court shall grant summary judgment upon a showing that there is no genuine dispute with respect to any material fact and that judgment is available as a matter of law.  Fed. R. Civ. P. 56(a).  Such a judgment is "mandate[d]" after "adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A party cannot withstand summary judgment by presenting any disputed fact, but rather, the party must show that there is a *genuine* dispute related to a material fact, i.e., a fact that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49 (1985).  Put another way, "[s]peculation, unsupported by facts in the record, is insufficient to create a genuine issue of material fact and falls short of what is required to survive summary judgment."  *Am. Rd. Serv. Co. v. Conrail*, 348 F.3d 565, 569 (6th Cir. 2003); *see also Bradley v. Wal-Mart Stores East, LP*, 587 F. App'x 863, 866 (6th Cir. 2014) ("A properly supported motion for summary judgment will not be defeated by conclusory allegations, speculation, and unsubstantiated assertions.").

## ARGUMENT

I.    **Plaintiffs' IDEA claims are moot and should be dismissed.**

Plaintiffs' IDEA claims are moot because Plaintiffs already received relief for their IDEA claims from settlements with Plaintiffs' local school districts.  "Article

21

III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 568 U.S. 165, 171 (2013).  A claim becomes "moot—and therefore no longer a Case or Controversy for purposes of Article III— when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotes omitted).  If there are qualifying events that "deprive the court of the ability to give meaningful relief" on a particular claim, then it is moot, and must be dismissed.  *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019).

"[The] test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Sullivan*, 920 F.3d at 410 (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc)).  "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit," the claim for relief is moot if the dispute "is no longer embedded in any actual controversy about the Plaintiffs' particular legal rights." *Id.*

Here, Plaintiffs' IDEA claims are centrally based on the purported deprivation of FAPE.  (See Am. Compl. ¶¶ 204, 209–218, PageID.95–96.)  As explained more fully below, the appropriate compensatory relief for a denial of FAPE in the contexts alleged by Plaintiffs is compensatory education, not money damages.  *See Bd. of Educ. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007) ("An appropriate award of compensatory education is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.") (internal

quotations omitted); *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427,

432 (6th Cir. 2006) (money damages are not available under the IDEA).  All three

Plaintiffs filed due process complaints against the local school districts, KPS and/or

CPS, alleging they were denied FAPE.  And all three Plaintiffs settled those due

process complaints and received compensatory education, among other relief, for

their alleged injury.  (Ex. P, Lewis Settlement Agreement; Ex. AI, Shepherd-Friday

Settlement Agreement; Ex. BC, K.B. Settlement Agreement.)[3]

The IDEA makes FAPE available to all students with disabilities.  *See* 20

U.S.C § 1412(a)(1).  The IDEA does not guarantee students with disabilities

multiple opportunities for FAPE from multiple sources—they are guaranteed *a*

FAPE.  Here, Plaintiffs' claims under the IDEA are an attempt to double-dip and to

obtain the same relief from MDE that they already received from KPS and CPS in

their due process settlement agreements.  "Settlement agreements qualify as the

types of interim relief or events that may deprive the court of the ability to give

meaningful relief and render a case moot."  *Columbia MHC E., LLC v. Stewart*, 815

F. App'x 887, 890 (6th Cir. 2020).  Since all three Plaintiffs already received a

remedy for their alleged FAPE injury through their settlement agreements with the

local districts, there is no meaningful relief or remedy this Court can provide to

Plaintiffs under the IDEA.

---

[3] Further mooting Plaintiffs' claims, in response to the Plaintiffs' state complaints,
MDE ordered the districts to provide Plaintiffs compensatory education and related
relief.  (Ex. R, Complaint Decision 19-0213; Ex. AF, Complaint Decision 21-0005;
Ex. AP, Complaint Decision 21-0007; Ex. AJ, Complaint Decision 19-0188.)

The Fifth Circuit recently addressed a nearly identical fact pattern in *Denise H. v. Texas Education Agency*, No. 23-50287, 2024 U.S. App. LEXIS 5786 (5th Cir. Mar. 24, 2024) (attached as Ex. BI).  In that case, the plaintiff sued the SEA for a denial of FAPE but settled with the LEA during the litigation, receiving compensatory education, and attorney fees.  *Id.* at *2.  The SEA moved for summary judgment, arguing the claims against the SEA were moot because the plaintiff had received the relief sought for the purported denial of FAPE through the settlement. *Id.*  The Fifth Circuit affirmed the district court's dismissal of the plaintiff's claims against the SEA as moot.  *Id.* at *3–4.  Specifically, the Fifth Circuit held that, "[i]nsofar as the plaintiffs now seek compensatory education from [the SEA], they have not shown that the services provided by the District are inadequate or that any requested services have yet to be provided."  *Id.* at *3; *see also Denise H. v. Tex. Educ. Agency*, No. 1:20-cv-816, 2023 U.S. Dist. LEXIS 74677, at *8–14 (W.D. Tex. Mar. 23, 2023) (attached as Ex. BI) ("all of Plaintiffs' requested relief has either already been provided via the settlement or [wa]s inappropriate under the IDEA").

The same holds true here.  Plaintiffs received compensatory education and other relief from the LEAs through their settlement, providing the relief available under the IDEA for the purported denials of FAPE.  Accordingly, this Court cannot offer them meaningful relief for their IDEA claims, and the IDEA claims (Count I) should be dismissed as moot.  *See also, e.g., J.M. v. Tenn. Dep't of Educ.*, 358 F. Supp. 3d 736, 748–50 (M.D. Tenn. 2018) (dismissing a plaintiff's IDEA claims for

the denial of FAPE against an SEA as moot where the local district had remedied the concerns giving rise to the purported denial of FAPE).[4]

## II.    Plaintiffs cannot establish an IDEA, ADA, or § 504 claim.

### A.    Plaintiffs' IDEA claim fails.

#### 1.    Plaintiffs cannot establish that MDE's action in any way led to a denial of FAPE.

Plaintiffs' IDEA claim (Count 1) contends that MDE has not met certain statutory general supervisory obligations[5] leading to a denial of FAPE for Plaintiffs. (See Am. Compl. ¶¶ 14, 105, 108–109, 149, 167, 205, 219, PageID.64, 80–81, 86, 89, 95, 96.)  But, even if these claims are not moot (*see infra* Point I), the evidence does not support these claims for two reasons:  (1) MDE properly exercises its general supervisory role through a robust oversight system with multiple review mechanisms and (2) MDE properly addressed all issues specific to Plaintiffs.

---

[4] Plaintiffs Lewis and K.B. also received monetary damages from the settlements with KPS.  (Ex. P, Lewis Settlement Agreement; (Ex. BC, K.B. Settlement Agreement.)

[5] To the extent any of Plaintiffs' claims are not related to specific statutory or regulatory obligations, those claims must fail.  Any claim against an SEA must be tied to the SEA's failure to comply with its statutory or regulatory obligations.  To hold otherwise would create liability for the State based on "uncertain or ambiguous" obligations not contained in law and not agreed to by the State when it accepted federal funding.  *Bradley v. Jefferson Cty. Pub. Sch.*, 88 F.4th 1190, 1195 (6th Cir. 2023) ("In return for federal funds, each State agrees to satisfy the requirements of the [IDEA] when it comes to providing a free appropriate public education and other services.  States must comply only with clearly written terms in the [IDEA], not uncertain or ambiguous ones.").

### i. MDE has met its statutory obligations under the IDEA and provides robust supervision.

Plaintiffs lack evidence that MDE failed to met its statutory obligations under the IDEA.  In fact, the evidence shows the complete opposite of Plaintiffs' allegations—MDE maintains a robust general supervision system, procedural safeguards for students, and a system to follow-up on any CAPs.  The evidence further supports that MDE continues to proactively improve its supervision system.

MDE actively monitors the provision of special education using a framework that has eight components that include:  (1) state performance plan and annual performance report, (2) data on results and process, (3) integrated monitoring activities, (4) policies, procedures, and effective implementation of evidence based practices, (5) professional learning and technical assistance, (6) fiscal accountability and management, (7) effective dispute resolution, and (8) improvement, correction, incentives, and sanctions[6].  (Ex. A, McIntyre Decl. ¶ 8.)

One of the ways that MDE specifically monitors special education is through its Performance Reporting Unit.  The unit consists of four groups: monitoring and technical assistance, information management, planning and reporting, and data quality.  (Ex. BD, Brady Dep. at 18:8–18, 21:11–14, 22:18–21.)  This unit continuously monitors data related to special education services from the ISDs.  If the Performance Reporting Unit identifies an area of concern in the data, MDE will

---

[6] MDE's General Accountability System Plan can be found at:
https://www.michigan.gov/mde/-/media/Project/Websites/mde/specialeducation/gs/MI-OSE-SystemGenSupervision.pdf.  (Last visited 02/06/2025.)

26

direct the ISD to conduct monitoring of specific districts, with assistance of MDE as needed.  (Ex. A, McIntyre Decl. ¶ 9; Ex. BE, McIntyre Dep. at 22:22–25, 23:1–7; Ex. BD, Brady Dep. at 110:14–25, 111:1–4.)  If MDE notices a pattern of specific complaints or determines there is an area of concern, and is not satisfied with the ISD response, MDE has completed on-site monitoring to address the issues.  (Ex. BE, McIntyre Dep. at 20:3–8, 23:14–25, 24:1–15; Ex. BD, Brady Dep. at 182:16–18.) On site-monitoring can include technical assistance.  (Ex. A, McIntyre Decl. ¶ 10; Ex. BE, McIntyre Dep. at 33:20–25, 34:1–20.)

In order to continue system oversight and to monitor systemic patters or issues, as of 2024, MDE conducts monthly in-person scheduled visits with ISDs for general oversight purposes.  (Ex. A, McIntyre Decl.at ¶ 12; Ex. BE, McIntyre Dep. at 20:9-24.)  The visits include, but are not limited to, an assessment of policy, review of student files, meetings with ISD staff, interviews of local school district staff, conversations with parents in the district, and technical assistance.  (Ex. A, McIntyre Decl. ¶ 12.)  Once an on-site is complete, MDE issues a report.  (*Id.*)

Not only does MDE conduct broad system oversight, MDE created and maintains procedures to ensure that students with disabilities and their parents or guardians have access to procedural safeguards with respect to the provision of a FAPE for students with disabilities.  *See* 20 U.S.C. § 1412(a)(6).  (See also Ex. A, McIntyre Decl. ¶ 13.)  MDE created and maintains the required procedures as outlined in the IDEA by supporting both a due process requirement and an extensive state complaint process.

MDE implements and maintains the due process requirement of the IDEA through the Administrative Code Rule 340.1724f.  (See also Ex. A, McIntyre Decl. ¶¶ 14–15.)  A due process complaint that is filed with MDE is referred to the Michigan Office of Administrative Hearings and Rules (MOAHR)w, and the case is decided by an independent ALJ.  Mich Admin. Code. R. 340.1724f(3).  (See also Ex. A, McIntyre Decl. ¶ 15.)  MDE provides training to the ALJs.  *See* Mich Admin. Code. R. 340.1724h.  (See also Ex. A, McIntyre Decl. ¶ 15.)  Complainants can appeal to the appropriate federal district court if they do not agree with the ALJ's decision.  Mich. Admin. Code R. 340.1724f(4).

Plaintiffs' actions when it comes to due process complaints demonstrate that MDE's oversight process is working—Plaintiffs filed due process complaints against the local school districts.  (Ex. N, Lewis Due Process Complaint 10/22/21; Ex. AH, Shepherd-Friday Due Process Complaint 2/18/22; Ex. BB, K.B. Due Process Complaint 2/11/22.)  Plaintiffs were provided an opportunity to have a hearing with an ALJ regarding their complaints; and, as a result of their hearing requests, they each entered into settlement agreements with the local school districts to address their complaints.  (Ex. P, Lewis Settlement Agreement; Ex. AI, Shepherd-Friday Settlement Agreement; Ex. BC, K.B. Settlement Agreement.)

MDE's other procedural safeguard is the state complaint system that allows individuals to file a state complaint with MDE if they believe a public agency, such as an LEA, has not followed the requirements of the IDEA.  34 C.F.R. § 300.151.  (See also Ex. A, McIntyre Decl. ¶16.)  MDE investigates state complaints

28

thoroughly.  (Ex. A, McIntyre Decl. ¶ 17; see also, e.g., Ex. M, Complaint Decision 21-0004; Ex. R, Complaint Decision 19-0213; Ex. AF, Complaint Decision 21-0005; Ex. AP, Complaint Decision 21-0007; Ex. AJ, Complaint Decision 19-0188.) Depending on the allegations in the state complaint, MDE uses an array of different tools and techniques, including interviews of the complainant, the child, the parents or guardians of the child, and school personnel; review of student records; review of school policy; and/or on-site visits.  (Ex. A, McIntyre Decl. ¶ 17.)  MDE provides a written report within 60 days for each investigation containing the facts, applicable laws, findings, and conclusions.  Mich. Admin. Code R. 340.1853(5),(7) (See also Ex. A, McIntyre Decl. ¶ 18; Ex. BE, McIntyre Dep. at 116:9–10.)

If MDE determines that an LEA has violated the IDEA, MDE issues a CAP to address the complaint.  (Ex. A, McIntyre Decl. ¶ 19; Ex. BE, McIntyre Dep. at 15:7–21.)  The Performance Reporting Unit supervises the LEAs compliance with a CAP, among other methods, through an online system called Catamaran where the LEAs are required to upload documents and reports to show compliance.  (Ex. A, McIntyre Decl. ¶ 21: Ex. BE, McIntyre Dep. at 157:17–25, 158:1–25, 159:1–13.) MDE only closes the monitoring of a CAP once the LEA documents that they have fully complied with all instruction from MDE.  (Ex. A, McIntyre Decl. ¶ 22.) Collectively, the evidence makes clear that MDE's complaint systems comply with the IDEA.

Moreover, MDE proactively improves their general supervision system on a regular basis.  In 2016, MDE voluntarily commissioned an independent evaluation

on the functioning of the state's dispute resolution system.  (*Id.* at ¶ 24.)  MDE

hired a consulting firm that specializes in state-level dispute resolution to conduct

the evaluation.  (*Id.*)  By 2019, MDE made several changes and improvements to

the state complaint system after the commissioned consulting work was complete.

(*Id.* at ¶ 25.)   System level improvements include, but are not limited to, (1)

investigator training to ensure consistency in report writing and CAP plan

development, (2) modifying the scope of the investigations to include both

procedural and substantive FAPE issues, (3) adding mediation options, and (4)

changing who conducted the investigations, from the Intermediate School Districts

(ISDs), to MDE.  (*Id.* at ¶ 25.)  The ISDs now play a minor supporting role in state

complaint investigations and if the state complaint is against an ISD, then the ISD

is not included in the investigation.  (*Id.*)  In 2020, MDE re-hired the consulting

firm to do a follow-up evaluation that looked at the progress being made by MDE

and areas for continued improvement.  (*Id.* at ¶ 26; Ex. BF, Dispute Resolution

Program Review.)  The consulting firm continues to work with MDE, meeting

almost weekly, to implement the feedback from the report and to make intentional

improvements to the state's dispute resolution system, including the state

complaint system.  (Ex. A, McIntyre Decl. ¶ 27.)

    Finally, the U.S. Department of Education through its Office of Special

Education (OSEP) monitors MDE's general supervision requirements and has found

that MDE is complaint.  (*Id.* at ¶¶ 28–29.)  In 2020, during the time relevant to

Plaintiffs' allegations, OSEP completed monitoring of MDE's general supervision

requirements, including its dispute resolution systems. (*Id.* at ¶ 28.)  OSEP found, "The state implements complaint procedures that address districts' failure to provide appropriate services, including reasonable guidelines for corrective actions appropriate to address the needs of the child such as compensatory education services, consistent with 34 C.F.R. § 300.151." (Ex. BG, *OSEP DMS Report* (2020); Ex. A, McIntyre Decl. ¶ 29.)

These extensive oversight efforts are reflected in MDE's effort to address Plaintiffs' allegation of KPS' alleged systemic problem with Child Find.  (Am. Compl. ¶ 105, PageID.95.)  To start, Plaintiffs' allegation of a systemic Child Find issue at KPS simplifies a more nuanced issue.  For Plaintiffs Shepherd-Friday and K.B.,[7] their allegations that KPS failed to abide by its Child Find obligations are distinct given their unique circumstance:  Shepherd-Friday' basis for IDEA eligibility arose from her medical diagnosis, whereas K.B.'s basis related to her lengthy disciplinary history for behavioral issues.  (Ex. R, Complaint Decision 19-0213; Ex. AP, Complaint Decision 21-0007; Ex. AJ, Complaint Decision 19-0188.) Thus, each of these Plaintiffs had a unique complaint and presented unique circumstances to KPS.  And these unique circumstances for two students out an entire school district are not emblematic of a general systemic failure by KPS regarding Child Find.

---

[7] Plaintiff Lewis's claims are not related to Child Find.  (Ex. M, Complaint Decision 21-0004, 2, 10; see also Ex. O, Lewis Due Process Decision and Order 10/13/22.)

But even if there was such a general systemic failure regarding Child Find at KPS, MDE addressed it.  In 2019, MDE noticed a pattern of state complaints filed by the same individual against KPS all arising out of one program.  (Ex. A, McIntyreA, McIntyrrye Decl. ¶ 30; Ex. BE, McIntyre Dep. at 163:16–25.)  As a result, MDE conducted an on-site investigation, even though MDE is not required to conduct an on-site investigation when it notices a trend.  (Ex. A, McIntyre Decl. ¶ 32.)  MDE conducted staff interviews, reviewed student records and KPS's policies and procedures, and toured the program building that was the subject of the state complaints.  (*Id.* at ¶ 33; Ex. BE, McIntyre Dep. at 169:12–24.)  Due to this on-site investigation, MDE imposed significant CAPs on KPS, including a file review for *every single* student attending the program building utilizing a mandatory checklist that was required to be completed and provided to MDE.  (Ex. A, McIntyre Decl. ¶ 34; Ex. BE, McIntyre Dep. at 171:10–25, 172:14, 173:3–6.)  This process involved the review of over a hundred students' files.  (Ex. A, McIntyre Decl. ¶ 34.)  After the file review, KPS was required to locate documents and make complete the file of every single student.  (*Id.*)  The purpose of creating a complete file that included attendance records, report cards, evaluations, and discipline records is so that KPS would have a comprehensive view of each student in one location.  (*Id.*)  KPS was then directed to use the complete information to determine the need for evaluations for each student.  (*Id.*)  KPS was also instructed to review and update its current policies, procedures, and practices for ensuring comprehensive records and files and

using the information to inform its Child Find obligations.  (*Id.*)  MDE closely monitored KPS's completing of these required CAPs.  (*Id.* at ¶ 35.)

Furthermore, MDE conducted a statewide, comprehensive review of districts' Child Find compliance.  (*Id.* at ¶ 11.)  As a result of this review, MDE issued a new policy in 2022, that included:  (1) the district's responsibilities regarding Child Find, (2) activities that are needed to identify and locate children who may need services, (3) identifying triggers that should lead a district to identifying children who may need services, and (4) timelines for evaluations to comply with Child Find.[8]  (*Id.*)

In sum, given the undisputed facts that MDE maintains a general oversight system, the extensive procedural safeguards that MDE created and maintains, the work that MDE continues to do to improve the system, that federal oversight of MDE has determined that MDE is complaint with federal regulations, and that MDE proactively addressed the nuanced Child Find issues at KPS, Plaintiffs' claim that MDE has violated its statutory obligations under the IDEA fail.

### ii.  MDE met its statutory obligations under the IDEA as to Plaintiffs.

Plaintiffs contend MDE's actions led to the denial of Plaintiffs' FAPE, claiming that MDE did not adequately address FAPE violations identified in state complaint investigations by follow up on CAPs.  (Am. Compl. ¶¶ 105, 108–109, 216–

---

[8] A copy of MDE's Child Find Policy can be found at https://www.michigan.gov/mde/-/media/Project/Websites/mde/specialeducation/eval-eligibility/ChildFind.pdf?rev=b0006793dfd748b09769a425b80bbc77.  (Last visited 02/06/2025.)

218, PageID.80–81, 96).  But the evidence adduced in discovery demonstrates that MDE appropriately responded to and addressed each state complaint levied by Plaintiffs in compliance with the IDEA.  When it was determined that the local school district failed to provide a FAPE, MDE issued CAPs to ensure that such violation was cured and monitored to ensure the CAP was implemented.

In his 2021 special education state complaint against KPS, Plaintiff Lewis alleged that he was denied a FAPE because his IEP was insufficient.  (Ex. L, Lewis State Complaint 1/25/21.)  MDE's investigation revealed that Plaintiff Lewis was making progress in the general curriculum evidenced by school progress reports, credits achieved, and grades and since he was making progress, MDE determined he was afforded a FAPE.  (Ex. M, Complaint Decision 21-0004, 8–9.)  Of note, consistent with MDE's finding, the ALJ who heard Lewis's due process complaint agreed that KPS did not deny Lewis a FAPE.  (Ex. O, Lewis Due Process Decision and Order 10/13/22, 39–41.)  Since there was no finding that Plaintiff Lewis was denied a FAPE, MDE did not issue a CAP to KPS.  Without any CAPs, Plaintiff Lewis cannot demonstrate that MDE failed to monitor and ensure KPS implemented a nonexistent CAP.[9]

With respect to Plaintiff Shepherd-Friday, MDE investigated two state complaints filed on her behalf.  (Ex. U, Shepherd-Friday State Complaint 10/3/19;

---

[9] Moreover, Plaintiff Lewis's contention that KPS failed to offer a FAPE based on his lack of academic progress —a purported violation appropriately levied at KPS, not MDE—fails to acknowledge the ample evidence that a FAPE was offered— Lewis simply did not engage with the offered program.

Ex. AE, Shepherd-Friday State Complaint 1/25/21.)  During the first investigation in 2019, MDE determined that KPS did not fulfill its Child Find obligation and issued district-level CAPs.  (Ex. R, Complaint Decision 19-0213, 9.)  MDE ordered KPS to revise or develop procedures regarding Child Find and provide professional development for all relevant staff regarding the new Child Find procedures.  (*Id.*)  MDE did not issue a student-level CAP because Shepherd-Friday was no longer a KPS student.  (*Id.*)  MDE verified that all requirements were completed, and this CAP was closed on February 26, 2021.  (Ex. AD, CAP Closeout 19-0213, 3.)

MDE's investigation of Plaintiff Shepherd-Friday's second, 2021 state complaint revealed that a different school district, CPS, did not develop, review, or revise Shepherd-Friday's initial February 2020 IEP and CPS' September 2020 review of this IEP did not address Shepherd-Friday's unique educational needs. (Ex. AF, Complaint Decision 21-0005, 13.)  Based on these findings, MDE identified two areas in which CPS failed to offer Shepherd-Friday a FAPE and issued both student- and district-level CAPs.  (*Id.* at 14–15.)  MDE further ordered CPS to provide Shepherd-Friday 15 hours of compensatory education services.  (*Id.* at 14.)  For both the 2019 and 2021 CAPs plans, MDE monitored the progress of the CAPs and verified that all CAP requirements were met.  (Ex. AD, CAP Closeout 19-0213; Ex. AG, CAP Status History 21-0005.)  Therefore, Plaintiff Shepherd-Friday cannot demonstrate that MDE did not adequately address FAPE violations or follow up on CAPs issued by MDE.

Likewise, MDE investigated two state complaint for K.B. in 2019 and 2021. (See Ex. AQ, K.B. State Complaint 9/8/19; Ex. AV, K.B. State Complaint 1/25/21.) Following its investigation of the 2019 state complaint, MDE determined that KPS failed to meet its Child Find obligation and failed to provide K.B. a FAPE.  (Ex. AJ, Complaint Decision 19-0188, 14.)  Specifically, MDE found that KPS had reason to suspect K.B. may have a disability because of her behavioral issues.  (*Id*.)  MDE issued student-level and district-level CAPs designed to gather relevant social-emotional, functional, developmental, and academic information about K.B., so that respective evaluation teams can ascertain whether K.B. is eligible for an IEP.  (*Id*. at 14–16.)  MDE found that KPS had corrected all areas of noncompliance for the district-level CAPs—such updates to policy at KPS—based on evidence submitted of the corrections for the targeted areas.  (Ex. AU, CAP Closeout 19-0188.)  MDE also verified that KPS completed the student-level directives, in that KPS attempted to complete the required evaluations.  (Ex. BH, Catamaran SLCAP 19-0188.)  But due to K.B.'s lack of participation in the evaluations, KPS found K.B. ineligible for special education services.  (Ex. AR, Multidisciplinary Evaluation 10/23/19, 8, 16-17.)   Notably, MDE has authority to order the evaluation of a student for special education services, but does not have the authority to order that a student be deemed eligible for and IEP.  (Ex. A, McIntyre Decl. ¶ 36.)

K.B.'s second state complaint was filed against KRESA in 2021.  (Ex. AV, K.B. State Complaint 1/25/21.)  MDE investigated the allegations contained therein and determined that KRESA failed to consent to complete a full evaluation for K.B.

36

and have a consistent system for staff to conduct student evaluations for special education services.  (Ex. AP, Complaint Decision 21-0007, 14.)  MDE ordered student-level and district-level CAP which included KRESA evaluating K.B. to ascertain whether she is a student with a disability.  (*Id.* at 16–17.)  KRESA was also ordered to revise or develop procedures regarding Child Find and provide professional development for relevant staff regarding new Child Find procedures. (*Id.* at 16.)  As a result of MDE's CAPs, K.B. was evaluated by KRESA's multidisciplinary team who recommended that an IEP team be convened.  (Ex. AY, Multidisciplinary Evaluation 5/26/21, 20.)  Subsequently, the IEP team found K.B. eligible for special education services.  (Ex. AZ, K.B. IEP 5/26/21, 3.)  MDE verified that all requirements were completed, and this CAP was closed on February 2, 2022.  (Ex. BA, Complaint Closure Letter 21-0007.)

In sum, the record is replete with evidence that MDE did not violate the IDEA.  MDE investigated each of Plaintiffs' state complaints, issued findings, and ordered CAPs as warranted.  The evidence shows MDE followed-up to ensure the CAPs were implemented.  Accordingly, Plaintiffs can proffer no evidence that MDE violated the IDEA and that its actions related to the state complaints cause a denial of FAPE for any plaintiff.  Therefore, Plaintiffs cannot establish an IDEA claim, and Count 1 must be dismissed.

### 2. The IDEA does not provide for a cause of action based on alleged technical violations of the IDEA that do not seek to remedy a denial of FAPE.

Plaintiffs' IDEA claim is expansive, listing numerous statutes and regulations.  (See Am. Compl. ¶¶ 207–19, PageID.95–96.)  The central premise of the claim seeks to tie MDE's actions to a denial of FAPE (address above in Point II.A.1), while other allegations seek to assert purported technical violations of statutory or regulatory provisions apparently unrelated to the alleged denial of FAPE.   For example, Plaintiffs argue MDE failed to sufficiently train ALJs, and failed to provide KPS with adequate staffing, funding, training, and technical assistances.  (Am. Compl. ¶¶ 205, 208–212, PageID.95, 97–98.)  None of these allegations are tied to allegations of a denial of FAPE.  Without such tie, Plaintiffs lack a private right of action and cannot support the allegations in any event.

### i. There is no private right of action for IDEA claims not raised in a due process complaint and not tied to a denial of FAPE.

The IDEA is notably silent regarding any cause of action an individual could bring against a SEA.  Nor is there any definitive ruling within the Sixth Circuit addressing if an individual has a private right of action under the IDEA to bring a claim against a SEA.  Applying the applicable caselaw, there is no valid right of action against a SEA under the IDEA unless the claim falls within the express cause of action provided in 20 U.S.C. § 1415(i).

A private right of action under a federal statute may be expressly provided in the text of the statute, or it may be implied and enforced through 42 U.S.C. § 1983

38

in limited circumstances.  *See Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1013 (6th Cir. 2018).  "An express federal cause of action states, in so many words, that the law permits a claimant to bring a claim in federal court." *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010).  An implied cause of action "is an increasingly rare creature, one that requires us to infer that Congress created a private right and provided for a private remedy, all without taking the conventional route of doing so expressly." *Ohlendorf v. United Food & Commer. Workers Int'l Union, Local 876*, 883 F.3d 686, 640 (2018).  For Spending Clause legislation, like the IDEA, the Supreme Court has been particularly reluctant to create an implied cause of action to avoid creating a condition on federal grant funding that was not "unambiguously" expressed in the statute.  *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Bradley v. Jefferson Cty. Pub. Sch.*, 88 F.4th 1190, 1195 (6th Cir. 2023) (IDEA is Spending Clause legislation and addressing that "States must comply only with clearly written terms in the Act, not uncertain or ambiguous ones").

Here, the IDEA provides only one express cause of action in 20 U.S.C. § 1415(i).  This provision provides that a party "aggrieved" by the administrative decision in a due process complaint "shall have the right to bring a civil action with respect to the complaint."  20 U.S.C. § 1415(i).  The "complaint" must be based on an alleged violation of "any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE]."  20 U.S.C. § 1415(b)(6)(A).  Thus, the express cause of action under § 1415(i) is limited to actions

by students or parents appealing due process complaint decisions related to a district's identification, evaluation, placement, and FAPE.

The Sixth Circuit has specifically held that the cause of action under § 1415(i) is limited. *See Traverse Bay*, 615 F.3d at 627. In *Traverse Bay*, an LEA sued a SEA for purportedly failing to monitor and enforce the procedural safeguards as required under 20 U.S.C. § 1415(b). *Id.* at 626. The Sixth Circuit held that the express cause of action provided in § 1415(i) was limited to a "complaint" that "relat[es] to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," and thus did not include an express right of action to enforce purported violations of § 1415(b). *Id.* at 628.

Similarly, the Ninth Circuit—the only circuit that appears to have specifically addressed whether there is an express private right of action regarding a SEA's general supervisory obligations independent of an alleged FAPE violation— concluded that there was not. *See M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 860–61 (9th Cir. 2014). In *M.M.*, the Ninth Circuit found that

> Section 1412 discusses the policies and procedures that a state is required to have in place in order for the state to be eligible for assistance under the IDEA, and § 1415 is a mandate for a state to establish procedural safeguards. Neither section contains a private right of action, and indeed § 1415(f) specifically requires complaints to be heard in an impartial due process hearing and then provides an express right of appeal for review of any administrative decision.

*Id.* at 860. Like the Sixth Circuit in *Traverse Bay*, the Ninth Circuit accordingly limited the right of action under § 1415(i) to the complaints that may be heard under § 1415(f).

40

There is also not an implied cause of action against SEAs regarding individual statutory provisions not tied to FAPE under the IDEA.  The Supreme Court has dictated that the "dispositive" consideration when determining if there is an implied cause of action is congressional intent.  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 23–24 (1979).  And the burden of demonstrating that such congressional intent exists rests with the plaintiffs.  *Suter v. Artist M.*, 503 U.S. 347, 363–64 (1992).  Plaintiffs cannot meet this burden here.  As the Sixth Circuit held in *Traverse Bay*, congressional intent is demonstrated by § 1415(i)'s focused cause of action, limited to "right to appeal an unfavorable state agency administrative decision, but only if that decision directly involves a disabled child's right to a FAPE."  *Traverse Bay*, 615 F.3d at 629.  Additional causes of action are not implied.  And particularly for the SEA's obligations, the congressional intent suggests through the language of the statute that the delegation of enforcement and oversight to the U.S. Department of Education over the SEA's action "weighs heavily against imply[ing] a private right of action."  *Id.* at 629–30 (quoting *County of Westchester v. New York*, 286 F.3d 150, 152 (2d Cir. 2002) (holding no implied cause of action for school districts to sue a SEA because such actions were not within the scope of § 1415(i))).

Accordingly, there is no cause of action to enforce IDEA provisions outside of the scope of claims permitted under § 1415(i).

Here, Plaintiffs' IDEA claims, in part, fall outside of the scope of claims permitted by § 1415(i) as the claims do not appear in Plaintiffs' due process

41

complaints and allege technical violations not tied to purported denial of FAPE.

Specifically,

- *Training of ALJs* (Am. Compl. ¶ 208, PageID.95) – None of the due
  process complaints filed by Plaintiffs allege that MDE failed to provide
  training to ALJs.  (See Ex. N, Lewis Due Process Complaint 10/22/21;
  Ex. AH, Shepherd-Friday Due Process Complaint 2/18/22; Ex. BB, K.B.
  Due Process Complaint 2/11/22).  There are also no allegations in the
  Amended Complaint supporting that a lack of training for the assigned
  ALJs led to a denial of FAPE for Plaintiffs.  Plaintiff D.L.—the only
  plaintiff whose claims were adjudicated by an ALJ—alleges the ALJ
  reached an incorrect decision, but there is no allegation that the ALJ's
  training—even if the decision was incorrect (it was not)—somehow led
  to a denial of FAPE.  (Am. Compl. ¶¶ 201–203, PageID.94; Ex. O,
  Lewis Due Process Decision and Order 10/13/22.)

- *Qualified staff and training for staff* (Am. Compl. ¶¶ 209, 212,
  PageID.95–96) – While the due process complaints for each Plaintiff
  contain form requests for relief seeking additional training for district
  staff and additional staff (see Ex. N, Lewis Due Process Complaint
  10/22/21, at 00004995–96; Ex. AH, Shepherd-Friday Due Process
  Complaint 2/18/22, at 00003154; Ex. BB, K.B. Due Process Complaint
  2/11/22 at 00002542), there are no allegations that a lack of staff or
  training led to the purported denials of FAPE.  Rather, the Amended

42

Complaint relies on a single unsupported allegation that simply lists "resources, training and staff" as purported failures of MDE.  (Am. Compl. ¶ 205, PageID.95.)  No evidence supports this conclusory assertion.

- *Adequate funding* (Am. Compl. ¶ 210, PageID.95–96) – None of the due process complaints filed by Plaintiffs allege that MDE failed to provide adequate funding to KPS (see Ex. N, Lewis Due Process Complaint 10/22/21; Ex. AH, Shepherd-Friday Due Process Complaint 2/18/22; Ex. BB, K.B. Due Process Complaint 2/11/22); nor are there any allegations in the Amended Complaint supporting that KPS lacked adequate funding to provide Plaintiffs a FAPE.

- *Technical assistance* (Am. Compl. ¶ 211, PageID.96) – There are no allegations in the Amended Complaint to support that a lack of technical assistance from MDE somehow led to a denial of FAPE.

For these reasons, Plaintiffs' IDEA claim, in part, cannot support a valid cause of action as it falls outside of the express cause of action permitted under 20 U.S.C. § 1415(i).  Accordingly, the claim—based on allegations ¶¶ 208–212 in the Amended Complaint—must fail.

      **ii.  Even if there was a cause of action to support the alleged technical IDEA violations, there is no evidence to support these claims.**

For Plaintiffs' IDEA claims as described in paragraphs 208–212 of the Amended Complaint, even if there was a valid cause of action under the IDEA for these claims, Plaintiffs lack evidence to support these claims.

For ALJ training, MDE undisputedly provides training to ALJs.  (Ex. A, McInture Decl. ¶ 15; Ex. BE, McIntyre Dep. at 186:15–187:19.)  And there is no evidence to suggest that the training is so inadequate as to violate the IDEA.  The only plaintiff whose due process complaint was heard by an ALJ was Plaintiff Lewis.  And, though Lewis disagrees with the ALJ's conclusions, his personal disagreement with the ALJ's decision alone cannot support that the ALJ's were inadequately trained.

Regarding KPS's staffing and the staff's training, Plaintiffs cannot point to any statute or regulation requiring a SEA to fund a specific level of staff at an LEA. If a LEA is accepting IDEA funds, it must meet its obligations to provide direct services to eligible students, which would include ensuring adequate staffing and that the staff is trained.  Plaintiffs cannot hold MDE liable for a purported failure by KPS.  Further, Plaintiffs do not plead, and there is no evidence to suggest, that any injury to Plaintiffs flowed from a lack of staffing or training for staff at KPS.

For funding, there are no allegations in the Amended Complaint, or evidence developed in discovery, supporting that KPS lacked adequate funding to provide Plaintiffs a FAPE.  Moreover, the IDEA specifies that funding to the states must be distributed to LEAs based on a formula that incorporates the number of students

44

enrolled within the district's jurisdiction and the percentage of children in the district living in poverty.  20 U.S.C. § 1411(f)(2).  The Michigan Legislature similarly allocates general education and special education funding based on a per-student formula.  *See* Mich. Compl. L. §§ 388.1651–1651g; *see also* Mich. Admin. Code R. 340.1801–1812.  There is no dispute that KPS received the funds it was entitled to under these formula allocations.  Thus, though Plaintiffs may have desired that additional funding be sent to KPS, MDE is not legally permitted—let alone required—to allocate additional funds to KPS, and MDE is certainly not in violation of any law by following the statutorily-obligated funding formulas.

Finally, as to technical assistance, as noted above, there are no allegations in the Amended Complaint to support that a lack of technical assistance from MDE somehow led to a denial of FAPE for the Plaintiffs.  And, as addressed at length above, MDE conducted extensive oversight over KPS, through the state complaint process and other mechanisms, and provided direction to KPS to resolve district-level inadequacies.

Accordingly, there is no evidence to support the bases for Plaintiffs' IDEA claims as described in paragraphs 208–212.

## B.    Plaintiffs cannot establish claims under the ADA and Section 504.

In Counts II and III, Plaintiffs assert ADA and § 504 claims alleging disability discrimination.  Broadly speaking, these statutes bar a public entity from excluding an individual with a disability from participation in a public

accommodation or service.  *See* 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794(a) (§ 504).

"Claims brought under the ADA and § 504 generally are evaluated together." *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1000 (6th Cir. 2023) (internal quotations omitted); *see also S.S. v. E. Ky. Univ.*, 532 F. 3d 445, 452–53 (6th Cir. 2008).  Thus, Counts II and III are analyzed together here.

To establish a valid claim under both statutes, Plaintiffs must show that:  (1) they are disabled under the relevant statutes; (2) they are "otherwise qualified" for participation in the program; (3) they are being "excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program by reason of his or her handicap"; and (4) the relevant program or activity is receiving federal financial assistance. *Knox Cnty.*, 62 F.4th at 1000; *M.G. v. Williamson Cty. Sch.*, 720 F. App'x 280, 287 (6th Cir. 2018).  MDE does not dispute that Plaintiffs are disabled, qualified for the applicable programs, and that MDE receives federal financial assistance.  But for the third element, Plaintiffs lack evidence to establish discrimination.

Plaintiffs proceed under an "intentional discrimination" theory.  (Am. Compl. ¶¶ 225, 232, PageID.97–98.)  To establish discrimination under this theory, the plaintiff must demonstrate "the defendant treated [him] less favorably on account of his disability" and "proof of discriminatory motive is critical." *Knox Cnty.*, 62 F.4th at 1000 (internal quotations omitted).  And, "[i]n the education context, a showing of discrimination requires evidence of something more than a school district's failure to provide a FAPE." *Id.*; *Bradley v. Jefferson Cnty. Pub. Sch.*, 88 F.4th 1190, 1198

46

(6th Cir. 2023) ("As we have said before, a claim under the [ADA] or Rehabilitation Act will not gain traction if it turns solely on an alleged denial of a [FAPE].").
Plaintiff cannot meet any of these requirements to demonstrate intentional discrimination.

First, Plaintiffs lack evidence to establish that MDE acted with a discriminatory motive.  The evidence demonstrates that MDE proactively assessed school districts' compliance with IDEA requirements, including Child Find obligations (Ex. BD, Brady Dep. at 128:11–129:1; Ex. A, McIntyre Decl. ¶¶ 8–12), and investigated each of the state complaints levied at KPS (Ex. R, Complaint Decision 19-0213; Ex. AJ, Complaint Decision 19-0188; Ex. A, McIntyre Decl. ¶¶ 30–33.)  There is simply no evidence that MDE had a discriminatory motive; all the evidence demonstrates MDE acted to ensure KPS met its obligations under the IDEA for Plaintiffs.

For the same reasons, Plaintiffs also cannot evidence that they were treated any differently than other students.  Again, MDE's actions show proactive measures to assist Plaintiffs—even if Plaintiffs claim these efforts were insufficient in their view.   And there is no evidence to suggest MDE took some greater actions to assist non-disabled students.

And finally, Plaintiffs' ADA and § 504 claims rest on nothing more than the purported denial of FAPE.  (See Am. Compl. ¶¶ 225–226, 232, PageID.97–98.)  Paragraph 225 specifically states that these claims are based on a "denial of [FAPE]."  (*Id.* at ¶ 225, PageID.97.)  The Sixth Circuit has made clear this is

47

insufficient for ADA and § 504 claims; plaintiffs must show how the defendant, alleged to have denied FAPE, "separately violated the provisions of these distinct Acts." *Brady*, 88 F.4th at 1198.

For these reasons, the ADA and § 504 claims must fail.

MDE also notes two additional concerns with Plaintiffs' ADA and § 504 claims. First, Plaintiffs claim that "MDE's failures" caused a "disparate adverse impact on students with disabilities." (Am. Compl. ¶ 226, PageID.98–99.) But the Sixth Circuit has made clear disparate impact theories are not viable for disability discrimination claims. *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 242–43 (6th Cir. 2019). And, even if disparate impact theories were viable, Plaintiffs lack any evidence to establish a disparate impact from MDE action on students with disabilities. Second, in some instances, plaintiffs in special education cases have sought to apply a "bad faith or gross misjudgment" standard for ADA and § 504 claims, in lieu of intentionality. *See G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013); *Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 666 (E.D. Mich. 2015).[10] But the Sixth Circuit recently clarified that intentionality remains an element of a discrimination claim. *See Knox Cnty.*, 62 F.4th at 1000. And, the Sixth Circuit highly questioned, without explicitly deciding, whether, as the Eighth

---

[10] In some instances, the "bad faith or gross misjudgment" requirement is framed as an additional requirement when the plaintiff proceeds on a "reasonable accommodation" ADA or § 504 theory. *See, e.g.*, *Campbell v. Bd. of Educ. of the Centerline Sch. Dist.*, 58 F. App'x 162, 168 (6th Cir. 2003). As Plaintiffs do not proceed under such theory here, Defendant express no opinion on the necessity to demonstrate "bad faith or gross misjudgment" under a reasonable accommodation theory.

Circuit has held, "bad faith or gross misjudgment" should be an additional element for education-related disability discrimination claims.  *Id.* at 1001–02 (citing *Monahan v. State of Nebraska*, 687 F.2d 1164 (8th Cir. 1982)).[11]  But, like in *Knox County*, the Court need not reach this issue because Plaintiffs' claims fail as they cannot show any form of discrimination.

## III.    Plaintiffs' ADA claims are barred by the Eleventh Amendment.

The Eleventh Amendment provides states and their agencies immunity from suit by private citizens in federal courts.  U.S. Const. amend. XI; *Lawson v. Shelby Cnty., Tenn.*, 211 F.3d 331, 334 (6th Cir. 2000).  The Supreme Court has recognized only three exceptions to this rule:  (1) congressional abrogation, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); (2) express consent or waiver by the state, *Pennhurst*, 465 U.S. at 99–101; and (3) official capacity suits for prospective equitable relief based on ongoing violations of federal law, *Ex parte Young*, 209 U.S. 123, 159–60 (1908).  *See also Lawson*, 211 F.3d at 334–35.  Here, MDE has not waived sovereign immunity for Plaintiffs' claims under the ADA and there is no official capacity defendant that could implicate the *Ex parte Young* exception.  Accordingly, to the extent Plaintiffs seek to overcome Eleventh Amendment

---

[11] The Supreme Court recently granted certiorari on the question:  "Whether the ADA and Rehabilitation Act require children with disabilities to satisfy a uniquely stringent 'bad faith or gross misjudgment' standard when seeking relief for discrimination relating to their education."  *See A.J.T. v. Osseo Area Sch.*, Dkt. No. 24-249, cert. granted January 17, 2025, appeal from 94 F.4th 1058 (8th Cir. 2024).

immunity for their ADA claims, they must rely on the congressional abrogation
exception.

Congress may abrogate the states' Eleventh Amendment sovereign immunity
pursuant to the enforcement provisions of Section 5 of the Fourteenth Amendment
when Congress both "unequivocally intends to do so and 'act[s] pursuant to a valid
grant of constitutional authority.'" *Bd. of Trs. v. Garrett*, 531 U.S. 356, 363 (2001)
(internal citations omitted).  While Congress has expressed a desire to abrogate
Eleventh Amendment immunity for violations of the ADA, the Supreme Court has
held that such abrogation is only valid in limited circumstances, depending upon
the nature of the ADA claim.  *Id.* at 374.

For claims brought under Title II of the ADA, the Supreme Court has held
that Congress validly abrogated states' sovereign immunity for Title II claims only
in limited circumstances where the state's conduct "actually violates the Fourteenth
Amendment."  *United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Babcock
v. Michigan*, 812 F.3d 531, 534 (6th Cir. 2016).  As articulated by the Supreme
Court, courts must determine on a case-by-case basis, (1) which aspects of the
state's alleged conduct violated Title II; (2) to what extent such misconduct also
violated the Fourteenth Amendment; and (3) insofar as such misconduct violated
Title II but did not violate the Fourteenth Amendment, whether Congress'
purported abrogation of sovereign immunity as to that class of conduct is
nevertheless valid.  Plaintiffs do not meet any of these prongs and thus immunity is
not abrogated for the ADA claim (Count III) here.

50

To start, Plaintiffs cannot establish an ADA claim for the reasons addressed in Point II.B above.  Without a viable ADA claim, abrogation is not permitted.  *See, e.g.*, *Babcock*, 812 F.3d at 539 ("Without identifying ADA-violating conduct, we cannot hold that Congress abrogated the states' sovereign immunity by a valid exercise of its power under § 5 of the Fourteenth Amendment.").

Even if Plaintiffs had identified which aspects of MDE's alleged conduct violated Title II (they did not), they have not pled, nor are able to prove, how or why MDE's alleged misconduct also violated the Fourteenth Amendment.  Plaintiffs' Amended Complaint does not make a single reference to the Fourteenth Amendment.  (See Am. Compl., PageID.60–103.)  Further, mirroring the analysis in Point II.B, the record evidence does not demonstrate that Plaintiffs were denied equal protection under the law.  Moreover, public education historically is not a protected due process right that would implicate the Fourteenth Amendment.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) (holding that public education is not a "right" granted to individuals by the Constitution).  Accordingly, simply because a case involves public education does not mean that the Fourteenth Amendment is implicated.  Without demonstrating a Fourteenth Amendment violation, Plaintiffs' Title II claims cannot abrogate MDE's sovereign immunity under the Eleventh Amendment.  *See Babcock*, 812 F.3d at 539.

Finally, even assuming arguendo Plaintiffs established a Title II claim, MDE's alleged conduct is not within a class of conduct that validly abrogates Eleventh Amendment immunity under the third element of the *Georgia* test.  The

51

Sixth Circuit previously determined, en banc, that Title II claims sounding in equal protection—as opposed to due process rights—do not abrogate Eleventh Amendment immunity. *See Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*, 276 F.3d 808, 816 (6th Cir. 2001) (en banc). In the instant case, Plaintiffs' ADA claims are clearly based on equal protection principles. The Amended Complaint alleges that they were denied access to equal educational opportunities afforded to other students. (Am. Compl. ¶ 232, PageID.98.) In other words, Plaintiffs alleged that MDE treated them differently, or unequally, compared to non-disabled students. Thus, Plaintiffs' ADA claim sounds in an equal protection-type discrimination rather than in due process, and, consistent with *Popovich*, Eleventh Amendment immunity is not abrogated. *Popovich*, 276 F.3d at 811.

Accordingly, Count III is barred by Eleventh Amendment immunity.

## IV.    Plaintiffs are not entitled to the requested relief.

### A.    No money damages are available to Plaintiffs under the IDEA.

Plaintiffs' request for money damages under the IDEA must be dismissed. Plaintiffs' requested relief in the Amended Complaint seeks "a compensatory education fund," "reimbursement for all out of pocket expenses and services," and "compensatory damages in a supplemental needs trust" for emotional damages and loss of education. (Am. Compl. ¶¶ 3.a, 3.b, 3.d, PageID.99.) But monetary relief is not available under the IDEA. *Long v. Dawson Springs Indep. Sch. Dist.*, 197 F. App'x 427, 432 (6th Cir. 2006) ("No monetary damages may be awarded to the plaintiff in [a] case under the IDEA."); *see also Horen v. Bd. of Educ.*, 594 F. Supp.

2d 833, 845 (N.D. Ohio 2009) ("[R]equest for general compensatory and punitive damages is untenable because such damages are not available under the IDEA.") (internal quotation marks omitted).  As stated above, Plaintiffs have failed to state a claim under the IDEA, but even if there is a determination of a violation under the IDEA, then all claims for money damages under the IDEA must be dismissed.

### B.    To the extent Plaintiffs seek emotional distress or punitive damages, they are not available under the ADA or § 504.

In the Amended Complaint, Plaintiffs request emotional distress damages and punitive damages.  (Am. Compl., PageID.99.)  Such damages are not available as a matter of law for ADA and § 504 claims.  *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 U.S. 1562, 1568, 1574 (2022) (punitive and emotional distress damages are not available for § 504 claims); *Barnes v. Gorman*, 536 U.S. 181, 189 (2002) (punitive damages are not available for claims under Title II of ADA or § 504); *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782 (6th Cir. 1996) (en banc) (punitive damages not available for Title II ADA claims); *Smith v. Kalamzoo Pub. Sch.*, 703 F. Supp. 3d 822, 829 (W.D. Mich. 2023) (barring emotional distress damages for ADA Title II claims).  Accordingly, any such request for damages for Counts II and III should be dismissed.

### C.    Plaintiffs are not entitled to declaratory or injunctive relief.

As addressed above, the evidence does not support a viable claim and thus the case must be dismissed in its entirety.  But even if Plaintiffs could establish a claim, declaratory and injunctive relief is not appropriate here as a matter of law

because all Plaintiffs have matriculated out of school and have been compensated for any lose through the settlements with the LEAs.  Thus, Plaintiffs' requests for equitable relief are now moot.

Plaintiff Lewis elected to graduate, and Plaintiffs K.B. and Shepherd-Friday both elected to drop out of school and have not made any affirmative act to re-enroll or finish their high school educations.  (Ex. H, Lewis Dep. at 63:10–13, 64:21–23; Ex. AO, K.B. Dep. at 24:12, 25:7–14; Ex. W, Shepherd-Friday Dep. at 41:10–11, 42:19–22.)

Caselaw is clear that claims for injunctive and declaratory relief are barred in cases where the student matriculates out of school.  *See, e.g., Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129–30 (1975) (per curiam) (finding moot a suit for injunctive relief where all plaintiffs had graduated); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000) ("It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory or injunctive relief against a school's action or policy."); *Moseley v. Bd. of Educ. of Albuquerque Pub. Schs*, 483 F.3d 689, 692–93 (10th Cir. 2007) (holding a student's graduation mooted IDEA claims for declaratory and injunctive relief); *Malkentzos v. DeBuono*, 102 F.3d 50, 55 (2d Cir. 1996) ("The fact that [appellant] is no longer eligible to receive early intervention services renders moot the appellants' challenge" to lower court order requiring provision of weekly educational services and reimbursement of "prospective expenditures" incurred in providing those services.); *Curry v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 743 (E.D.

Mich. 2006) *aff'd sub nom.*, *Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008) (finding that the request for declaratory relief moot because the student matriculated out of the school he was enrolled at during the time of the controversy and therefore an injunction would provide no meaningful relief).

In addition, the settlements with the LEAs render Plaintiffs' requests for equitable relief moot.  The settlement agreement resolved their alleged FAPE denials.  And, like the Fifth Circuit held in *Denise H.*, Plaintiffs cannot demonstrate how equitable relief would affect their rights after settling their IDEA claims. *Denise H.*, 2024 U.S. App. LEXIS 5786, at *4 (attached as Ex. BI).

Put simply, Plaintiff would not benefit from any change to policy or procedure demanded in Plaintiffs' requests for declaratory and injunctive relief.  *See, e.g.*, *J.M.*, 358 F. Supp. 3d at 749 (dismissing "injunctive and declaratory relief against the [SEA], requiring them to fulfill their oversight requirements under the IDEA" because the plaintiff could "not explain how that relief would remedy any injury suffered by" the plaintiff when he no long faced the purport FAPE deprivation). Therefore, Plaintiffs' requests for declaratory and injunctive relief cannot survive.

### D.   To the extent Plaintiffs request state-wide relief and systemic policy changes, those requests for relief fail.

Even if Plaintiffs could seek injunctive relief, Plaintiffs' requests for state-wide enforcement protocol and systemic changes throughout Michigan (Am. Compl. ¶¶ 4–8, PageID.99–100) fail because such relief is unavailable to them as a matter of law.  This is not a class action lawsuit.  Such broad state-wide relief is rarely

justified because the relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.  *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003), citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Aluminum Workers Int'l Union Local Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982) ("Precisely because equitable relief is an extraordinary remedy to be cautiously granted, it follows that the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires and which cannot be attained through legal remedy.").

Moreover, the request for state-wide relief reaches far beyond the circumstances of the educational issues presented by these specific Plaintiffs.  All of Plaintiffs' claims stem from the purported lack of services provided by one of hundreds of school districts in the State years ago.  Plaintiffs cannot plausibly support state-wide failures based on individual circumstances at one school district, particularly without evidence regarding MDE's current state complaint process, KPS's current Child Find procedures, among other evidence.

Furthermore, all public school students in Michigan can avail themselves to MDE's complaint process as outlined above to remedy any potential harm from the LEAs.  Thus, there is already a state-wide remedy available to students.  *See Sharpe*, 319 F.3d at 273 (dismissing request for relief to other individuals other than Plaintiffs because there was already a grievance process in place.)

For these reasons, Plaintiffs' state-wide systemic requests fail and must be dismissed as a matter of law.

56

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Defendant requests that this Court issue an order granting Defendant summary judgment under Federal Rule of Civil Procedure 56, dismissing all claims with prejudice, and granting Defendant such further relief as the Court deems just and appropriate.

Respectfully submitted,


/s/ *Kathleen A. Halloran*
Kathleen A. Halloran (P76453)
Neil Giovanatti (P82305)
Ticara D. Hendley (P81166)
Attorneys for Defendant
Michigan Department of Attorney General
Health, Education & Family Services Division
P.O. Box 30758
Lansing, MI  48909
(517) 335-7603
hallorank1@michigan.gov
giovanattin@michigan.gov
hendleyt1@michigan.gov


Dated:  February 7, 2025

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.2(b)(ii), Defendants certify that this brief complies with Local Rule 7.2(b)(i)—as modified by the Court's Stipulated Order (ECF No. 76, PageID.389) permitted up to 15,000 words—as this brief includes **14,310** words.  Microsoft Word Office 365 is the word processing software used to generate the word count in the above brief.

/s/ *Kathleen A. Halloran*
Kathleen A. Halloran (P76453)
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, I electronically filed the above document and Defendant's Motion for Summary Judgment and accompanying documents using the ECF System which will send notification of such to all represented parties.

/s/ *Kathleen A. Halloran*
Kathleen A. Halloran (P76453)
Assistant Attorney General
