# EXHIBIT AF

CONFIDENTIAL



OFFICE OF SPECIAL EDUCATION
SPECIAL EDUCATION COMPLAINT INVESTIGATION REPORT

**Complainant:**
George White
4022 Rockwood Dr.
Kalamazoo, MI 49004

**Case Number:** 21-0005

**Public Agency:**
Michigan Department of Education
Office of Special Education
Rebecca McIntyre, Supervisor
Program Accountability
608 West Allegan
PO Box 30008
Lansing, MI 48909

**COMPLAINT DECISION
AND
PLAN FOR
CORRECTIVE ACTION**

**District:**
Jeffrey Thoenes, District Superintendent
Comstock Public Schools
3010 Gull Rd
Kalamazoo, MI 49048-1226

**Case Manager:**
Jessica Corliss

**Date of Decision:**
March 26, 2021

On January 27, 2021, the Michigan Department of Education, Office of Special Education (OSE) received a special education complaint filed by George White (Complainant) on behalf of KeAujanaa Janielle Shepherd-Friday. The complaint alleged that the Comstock Public Schools (District), which is under the jurisdiction of the Michigan Department of Education (MDE), violated the Individuals with Disabilities Education Act (IDEA) and the Michigan Administrative Rules for Special Education (MARSE).

Complaints may be filed by any individual or organization, in accordance with 34 CFR §300.153. The Complainant in this matter is a third party. A release of information from the Student's parent was submitted; therefore, the OSE was able to communicate directly with the third party during the investigation of this complaint.

Pursuant to the Code of Federal Regulations 34 CFR §§300.151 through 300.153 implementing the IDEA, the OSE conducted an investigation into the allegations in this complaint. Consistent with the IDEA and Federal Regulations, and the MARSE, the MDE issues the following Findings of Fact, Conclusions and Decision.

CONFIDENTIAL
PLAINTIFFS 00003100

**Complaint Issues:**
1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:
   i. Whether the District developed, reviewed and revised an individualized education program (IEP) to address the Student's unique educational needs and enable the Student to be involved in and make progress in the general curriculum, pursuant to 34 CFR §§300.320, 300.324, and R 340.1721e.

**Investigatory Process:**
Documents reviewed include:
   The original state complaint document
   Documentation provided by the Complainant
   The District's response to the complaint
   Documentation and educational records submitted by the District

The following provided information via an interview or questionnaire:
   Complainant
   Student with Parent on the line
   District special education director
   Two special education case managers

The OSE provided the District and Complainant the opportunity to submit additional information for consideration during the investigation of this complaint.

**Applicable Federal Regulations or State Rules:**

| | |
|---|---|
| 34 CFR §300.17 | Free appropriate public education |
| 34 CFR §300.101 | Free appropriate public education (FAPE) |
| 34 CFR §300.320 | Definition of Individualized Education Program |
| 34 CFR §300.324 | Development, review, revision of Individualized Education Programs |
| R 340.1721e | Individualized education program |

**Relevant Time Period:**
Pursuant to 34 CFR §300.153(c), the OSE has the authority to investigate allegations of violations that occurred not more than one year from the date the complaint was received. In light of this limitation, the investigation will be limited to the period of time from January 28, 2020 to January 27, 2021 for the purpose of determining if a violation of the IDEA and/or the MARSE occurred. However, records beyond this timeframe may be reviewed for the purpose of developing a complete record for the student.

**Findings of Fact:**
1. As of the filing of this complaint, the Student was an 18-year-old twelfth grader who was eligible for special education and related services as a student with an other health impairment.
2. The Complainant provided a release of information signed by the Student, dated January 30, 2021.
3. The state complaint included the following allegations:
   i. The Student was not certified as needing academic multi-tiered systems and

      supports.
   ii. The IEP was not amended to be a standards-based IEP.
   iii. Extended grade level content expectations were not utilized to address reading and math weaknesses.
   iv. The Student did not have a compensatory education plan.
   v. The Student was not provided academic interventions.
   vi. The Student was denied a FAPE.
4. An application for homebound services was completed and signed by a physician, January 28, 2020.
   i. The physician indicated the Student was currently hospitalized or confined to the home during regular school hours and recommended homebound instruction.
   ii. The physician indicated the Student had diagnoses of sickle cell disease and pulmonary hypertension. The student was receiving medications, IV pain medication, and oxygen as treatment. Strength, vitality, and alertness were listed as impacted areas. Tolerated activities and requiring oxygen supplementation were listed as restrictions.
   iii. The physician completed a homebound request which indicated the Student's estimated length of absence from school was six months.
5. A psychoeducational evaluation report, dated February 20, 2020, was composed as part of the Student's initial evaluation and contained the following information, in relevant part:
   i. The Student was referred for an individual evaluation based on needs due to a diagnosis of sickle cell anemia.
   ii. The Student's section 504 plan contained the following accommodations:
      a. Academic:
         1. Extended time to complete assignments, without penalty.
         2. Excused medical absences.
         3. Exempt from physical education.
         4. Early passing time to allow access to school locker since the Student would become easily fatigued and carrying a backpack was burdensome.
         5. Copy of textbooks to keep at home.
         6. Adequate access to water to prevent dehydration.
         7. Frequent bathroom breaks.
         8. Upon Student request, report to counseling office to rest.
         9. Breaks during testing, as needed, to manage medical needs.
      b. Medical:
         1. School locker assigned close to classes.
         2. Upon Student request, leave classroom to take medication for pain in office.
         3. Be alert for signs of pain, fever, pain in chest area/ribs, coughing, and/or difficulty breathing, severe headache, paleness, sudden dizziness, blurred vision, inability to speak, weakness on either side of body. These are signs of a medical emergency requiring a 911 call. Do not leave Student unattended until emergency medical services arrive.
   iii. Grades as of January 13, 2020:
      a. 20th century history: E (19.07%)
      b. Algebra 1: E (16.81%)
      c. Odyssey lab PH: N/A
      d. Odyssey lab SS: N/A

    iv. The Student had been in attendance since October 31, 2019 and missed 22 full days of school in the first quarter of the 2019–2020 school year.
    v. Parent input: The Student was born with sickle cell disease which is an inherited form of anemia. The Student was receiving ongoing medical treatment. The illness created attendance issues. The District offered online schooling.
    vi. Teacher input: The symptoms associated with sickle cell anemia will require ongoing medical monitoring/treatment which could result in missed time attending school, and therefore, missed instruction in the classroom. Some situations may require the Student to leave the classroom.
    vii. An educational achievement assessment demonstrated scores in the low average in letter and word recognition, below average in reading vocabulary, and very low in math concepts and applications.
        a. Reading: The Student had good basic reading abilities and could utilize skills to appropriately comprehend what was being read. The Student lacked some understanding of higher level vocabulary, but this was not shown to impede reading abilities.
        b. Mathematics: The Student's math skills were a bit more challenging. The Student could do appropriate calculation but had a much harder time when it came to the conceptual skills related to math. The Student struggled with multi-step problems, algebraic and fraction concepts, and word problems.
    viii. The Student completed a behavior assessment rating scale which indicated clinically significant scores in the areas of internalizing problems, anxiety, somatization, and sense of inadequacy. The Student exhibited an elevated L Index which is designed to detect a response set that may be characterized as one of social desirability or "faking good". An elevated L Index score can indicate a strong tendency toward the denial of everyday common problems in an effort to present oneself in an overly positive light. The Student's responses to the L Index items resulted in a score with the caution range. Given the Student's extensive health history, these results are in line with children who experience chronic illness.
    ix. The Parent and Student completed an adaptive behavior assessment which indicated skills were average in all areas and no deficits were seen. The psychologist agreed the Student's adaptive skills were appropriate.
6. An initial IEP, dated February 27, 2020, indicated the Student was eligible for special education with a primary disability of other health impairment, and qualifying criteria of limited alertness to education, limited vitality, and limited strength due to a medical diagnosis of sickle cell disease. The IEP included the following relevant information:
    i. Current evaluations: Data was not provided from any of the assessments listed on the psychoeducational evaluation report.
    ii. Post-secondary vision and transition activities:
        a. Career/employment: The Student would work as a respiratory therapist. There was no need for activities or services.
        b. Post-secondary education/training: The Student would work full time and attend a four-year college. There was a need for activities or services. The activity included exploring three different college plans.
        c. Adult living: At the age of 24, the Student would move into a condominium and live alone. There was no need for activities or services.
        d. Community participation: The Student would drive, ride the city bus, go to banks, public libraries, grocery stores, restaurants, work, movie theaters, church, friends' houses, and shopping malls. There was no need for

        activities or services.
- iii. The Student was being instructed with the Michigan merit curriculum leading to a high school diploma but was not expected to graduate during the duration of this IEP. The IEP also stated the Student was on track to receive a high school diploma.
- iv. The present levels of academic achievement and functional performance section included the following areas of need:
    - a. Transition:
        1. The Student was given the Enderle-Severson Transition Rating Scale – Form J-Revised in February 2020, and scored 77% in employment, 75% on recreation and leisure, 87% on home living, 43% on community participation, 12% on post-secondary education, with an overall score of 58% proficient.
        2. The Student required assistance to prepare for post-secondary living and the assistance of a special education teacher, and were listed as adverse impacts.
    - b. Mathematics – math concepts:
        1. Math skills were challenging for the Student. The Student could do appropriate calculation but had a much harder time when it came to the conceptual skills related to math. Multi-step problems, algebraic concepts, fraction concepts, and word problems were identified as below average skills.
        2. The ability to understand grade level material in the general education classroom without additional supports was listed as an adverse impact.
- v. The supplementary aids and services section included small group instruction (one-on-one when possible), extended time on assignments, and directions clarified.
- vi. Goals were included for transition and math:
    - a. In order to obtain the Student's post-secondary goal of becoming a respiratory therapist, by February 26, 2021, the Student would increase self-confidence skills by researching three post-secondary options (including schools, programs, housing, and student loans). Goal would be measured by teacher observations and the ESTR-J assessment, to increase the overall post-secondary education score from 12% to 50%.
    - b. In order to meet the Student's post-secondary goal of becoming a respiratory therapist, the Student would improve home living skills, by being able to develop and manage a personal budget, as seen by teacher observations, by February 26, 2021.
- vii. Programs and related services:
    - a. Homebound/hospitalized: 60 to 120 minutes, one to two times per week in the home.
    - b. Teacher consultant: 60 to 120 minutes, one to two times per week in the home.
- viii. The Student required a reduced day for medical or psychological reasons.
- ix. Notice regarding provision of special education document: Options considered but not selected included communication needs and the need for assistive technology devices and services.

7. An individual learning plan, dated April 20, 2020, was developed to address remote learning during the COVID-19 mandated statewide school closure. The services included in the plan were consistent with the IEP.

8. June 8, 2020 progress reports indicated the Student made limited to no progress on five of six objectives and was progressing as expected on one objective. A comment reflected, "COVID-19 gave no time to meet with [Student] to complete this goal."
9. The District reported homebound services were discontinued at the beginning of the 2020–2021 school year because the previous physician certification for homebound had expired. New certification was not provided to the District, despite District efforts to obtain necessary documentation. The District special education director attempted to contact the Student via email to obtain the physician verification form on September 24, 2020. The form was completed, in part, by the special education director for the Student to take to the physician to sign. The form was never completed.
10. Due to the COVID-19 pandemic, all students were scheduled for virtual learning for the 2020–2021 school year.
11. Thirteen contacts were made to notify the Student of the IEP team meeting, September 14, 2020, as the Student turned 18 over the summer, and therefore had met age of consent. The Student attended the meeting.
12. An IEP, dated September 24, 2020, indicated the following relevant information:
    i. Student strengths: Due to health, the Student had a difficult time in school in the past but was determined to complete high school and become a respiratory therapist.
    ii. Parent concerns: The Student was born with sickle cell disease, which was an inherited form of anemia. The Student received ongoing medical treatment. Due to the Student's sickle cell anemia and frequent hospital visits, the Parent expressed concern about how and when the Student would complete high school. The illness had created attendance issues since enrolling in the District.
    iii. The Student's current evaluation scores included state test scores from third through seventh grade. The Student was not proficient in reading or math from fourth though seventh grade.
    iv. Post-secondary vision and transition activities:
        a. Career/employment: The Student would attend a community college and become a respiratory therapist. There was a need for activities or services. Activities included researching chosen career and a vocational interest survey.
        b. Post-secondary education/training: The Student would attend a community college. There was a need for activities or services. The activity included the Student attending a virtual tour of a community college.
        c. Adult living: The Student would move to a warmer climate and live in a condominium. There was a need for activities or services. The activity included practicing budgeting and money management, using the salary of a respiratory therapist.
        d. Community participation: The Student would get around the community, including going to restaurants and stores. There was a need for activities or services. Activities included obtaining a driver's license and completing an assessment that showed understanding of housing options, insurance, and basic insurance needs.
    v. The Student was on the Michigan merit curriculum leading to a high school diploma but was not expected to graduate with a regular diploma during this IEP. The Student needed to complete the following credits: three English classes, five math classes, two physical education classes, and four history classes.
    vi. Progress on most recent goals:
        a. Grades as of January 13, 2020:

    1. 20th century history: E (19.07%)
    2. Algebra 1: E (16.81%)
    3. Odyssey lab PH: N/A
    4. Odyssey lab SS: N/A
   b. No credits had been earned since enrolling in the District September 18, 2019.
   c. The Student had been in attendance since October 31, 2019 and missed 22 full days of school in the first quarter of the 2019–2020 school year.
  vii. The present levels of academic achievement and functional performance section included the following areas of need:
   a. Transition:
    1. Grades and report cards, progress reporting, teacher observations, work completion, and missing assignment reporting were listed as sources of data. No data was provided from any of the sources.
    2. The Student was given the Enderle-Severson Transition Rating Scale – Form J-Revised in September 2020 and scored 38% on the "Post-Secondary Education" subsection with three out of eight positive answers.
    3. Areas of strength included self-awareness and self-confidence.
    4. Areas of growth included making plans for post-secondary housing options, identifying post-secondary options, and learning how to arrange for training, housing, financial assistance, and employment after completing training.
    5. Failure to complete and turn in work was listed as an adverse impact.
   b. Reading comprehension:
    1. Grades and report cards, progress reporting, teacher observations, work completion, and missing assignment reporting were listed as sources of data. No data was provided from any of the sources.
    2. The inability to complete and turn in classwork, lower grades, earning high school credit, achieving post-secondary goals, and completing grade level work were listed as adverse impacts.
   c. Mathematics – numbers and operations:
    1. Grades and report cards, progress reporting, teacher observations, work completion, and missing assignment reporting were listed as sources of data. No data was provided from any of the sources.
    2. The inability to solve grade level math problems was listed as an adverse impact.
  viii. The supplementary aids and services section included tests read out loud, frequent breaks, modified tests/quizzes, extended time on assignments per teacher/student agreement, and deadlines/tests/assignments following a timeline discussed between administrators/teachers/and the Student when receiving medical treatments.
  ix. Goals were included for transition, reading, and math:
   a. By September 2021, in order to meet the postsecondary goal of attending a community college to become a respiratory therapist, the Student would improve organizational skills as evidenced by being able to create and follow through with a three to five step plan for completing work, within the time period allowed by staff, 70% of the time, as measured by grades on assignments.
   b. By September 2021, after reading a passage, the Student would answer

    comprehension questions at 66% accuracy in two out of three trials.
   c. By September 2021, the Student would solve equations involving, but not limited to, combining like terms and distributive property with 66% accuracy.
  x. Programs and related services:
   a. School social work: 15 to 30 minutes, two to four times per month in the home.
   b. Resource program: 30 to 400 minutes per week at the District's alternative high school.
   c. The Student did not require a reduced day.
  xi. Notice regarding provision of special education: Options considered but not selected included communication needs, need for programming in a self-contained program, need for assistive technology devices and services, and face-to-face in school learning. The option of face-to-face learning was rejected based on the Student's medical condition.
13. During an interview, the Student's special education case manager shared that the IEP Team meeting was held soon after the teacher was hired. When asked what data was used to write the IEP, the teacher stated previous data in the student information system and information from a previous IEP were used. The teacher stated the biggest concern was the Student's health. There was no remembrance of discussing homebound or in-person learning at the IEP Team meeting.
14. The Complainant emailed the school psychologist and expressed concern regarding phonemic awareness. The school psychologist stated, "Given [Student] age and future goals, focusing on phonemic awareness is highly inappropriate, in my professional opinion."
15. An IEP Team meeting and agenda notes document, dated September 24, 2020, included the following relevant information:
  i. The school psychologist worked with the Student in the hospital to obtain evaluation information. Three subtests were conducted: two reading and one math. Math was an area of need.
  ii. The review of current credits earned, and credits needed, indicated the Student needed to complete 17 classes; however, the Student could possibly graduate in the spring if the Student passed all classes.
  iii. The District discussed the Student not attending the credit recovery offered by the District for the summer of 2020.
  iv. The Student indicated concerns for attending classes in the fall and winter.
  v. The Student stated a preference of not wanting to attend the virtual academy.
  vi. The document indicated school social work services would be added to the IEP.
16. When interviewed, the Complainant reported the Student did not have all skills to function academically, was not reading at grade level, and had deficits in decoding and comprehension. The Complainant also stated the Student was functioning at the fourth or fifth grade level.
17. An IEP meeting and agenda notes document, dated December 15, 2020, indicated the following relevant information:
  i. The Student and Parent were invited but did not attend the meeting.
  ii. The school social worker attempted to contact the family three times and had not received communication back regarding medical updates. The school social worker also attempted to contact the Student regarding journals and independent living with no response.
  iii. The general education teacher noted that no work had been completed in current

CONFIDENTIAL

PLAINTIFFS 00003107

        classes and that no progress was made so far due to inconsistent attendance.
- iv. The District schedules two classes every four weeks for each student.
- v. When discussing a return to learn option, the District presented a virtual option for the Student which included statistics and US history. The Student accepted one of the links and not the other.
- vi. The District reached out two times per week for attendance and progress monitoring with limited communication from the Student.
- vii. One provider used an app to reach out to the Student via text with the Student not responding since October 16, 2020.
- viii. The case manager had been frequently communicating though email, text, and phone calls with limited responses.
- ix. Phonics workbooks were purchased based on a recommendation from the Complainant. Staff reported the Student had not responded to requests to pick up the books.
- x. The school psychologist shared information about a subtest which showed sounds and letters the Student could read. The group felt that based on this information, phonics was not a priority that needed to be addressed through a plan, but that phonics would be worked on outside of the school day by the family and Student. The school psychologist pulled a list of authors that would be more appropriate for reading comprehension and more interesting for the Student.
- xi. The school social worker indicated the Student could enroll in a program called "Expressways to Success" where the Student could participate in credit recovery. A writing group was to start in January. The program provided testing, assessment, and determined career opportunities based on abilities and interests.
- xii. The general education teacher and the school social worker would conduct a home visit, the general education teacher would deliver phonics books, a personal curriculum would be established in January to support graduation, and notes from the meeting would be shared with the individuals who did not participate.

18. Prior written notice, dated January 4, 2021, indicated the following relevant information:
    - i. The District submitted multiple attempts at getting the Student to attend meetings and participate in educational activities.
    - ii. The District wanted to set up a meeting to discuss the need for the Student to be in class daily.
    - iii. A meeting was held December 15, 2020, and the Student was not in attendance. At a November 5, 2020 meeting with the Student, phonics, attendance, and participation were discussed.
    - iv. The Student's case manager frequently reached out yet received minimal to no communication back from the Student.
19. During an interview, the District special education director stated that during meetings held in November and December 2020, the IEP was discussed. The Complainant reported concerns with needing to teach specific reading skills regarding phonics, assessments, and accommodations enabling the Student. The school social worker discussed not wanting to take away general curriculum to work on phonics and that the Student was reading at the eighth-grade level. The IEP Team developed a plan to continue towards graduation credits.
20. The Student's official transcript contained the following information, in relevant part:
    - i. The Student had earned a total of seven credits from 2016 to present.
    - ii. The Student's cumulative grade point average was listed as 0.0.
    - iii. The Student was in ninth grade for the 2016–2017, 2017–2018, and 2018–2019

    school years.
- iv. The Student was in twelfth grade for the 2019–2020 and 2020–2021 school years.
- v. The Student failed or did not earn credit in eight of the math classes listed.

21. The Student's credit summary document, generated February 14, 2021, indicated the Student currently had 0.5 credits in art, 0.5 credits in character leader, one credit in career and technical education, two credits in English, 0.5 credits in algebra 1, 0.5 credits in biology, 0.5 credits in economics, 0.5 credits in world history, and one credit in world language.
22. No progress reports were provided from the District for the 2020–2021 school year.
23. Four separate report cards were provided by the District for the 2020–2021 school year. All reports cards indicated the Student failed every class taken.
24. The case manager, school social worker, and general education teacher made consistent contacts with the Student with inconsistent responses during the 2020–2021 school year.

**Conclusions:**

Issue #1i:
1. The term IEP means a written statement for each child with a disability that is developed, review, and revised in a meeting in accordance with §§300.320 through 300.324, and that must include:
    - i. A statement of the present levels of academic achievement and functional performance, including how the child's disability affects involvement and progress in the general education curriculum. 34 CFR §300.320(a)(1)(i).
    - ii. A statement of measurable annual goals, including academic and functional goals. 34 CFR §300.320(a)(2)(i).
    - iii. A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals and to be involved in and make progress in the general education curriculum and to participate in extracurricular and other nonacademic activities. 34 CFR §300.320 (a)(4).
2. Each public agency must ensure that the IEP Team reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and revises the IEP, as appropriate, to address:
    - i. Any lack of expected progress toward the annual goals described in §300.320(a)(2), and in the general education curriculum, if appropriate.
    - ii. The child's anticipated needs.
    - iii. Other matters. 34 CFR §300.324(b)(1)(ii)(A)(D)(E).
3. An IEP shall be developed in accordance with 34 CFR 300 and shall include a statement of measurable annual goals, including measurable short-term objectives. R 340.1721e (1)(a).
4. The IDEA requires that IEPs include a statement of present levels of academic achievement and functional performance. This statement is the foundation upon which the IEP team builds the remainder of the IEP. US Dept. of Educ., Analysis and Comments, 71 Fed. Reg. 46,662 (2006).
5. As described by the U.S. Supreme Court, the IEP is a comprehensive statement of the

unique educational needs of a child with a disability and the specially designed instruction and related services a district will employ to meet those needs. Burlington Sch. Comm. v. Massachusetts Dept. of Educ., 471 U.S. 359, 84-433, 105 S. Ct. 1996 (U.S. Supreme Court 1985).

6. "There is nothing in the Act that requires an IEP to include specific instructional methodologies…. The Department's longstanding position on including instructional methodologies in a child's IEP is that it is an IEP Team's decision. Therefore, if an IEP Team determines that specific instructional methods are necessary for the child to receive FAPE, the instructional methods may be addressed in the IEP." US Dept. of Educ., Analysis and Comments, 71 Fed. Reg. 46665 (2006).
7. An IEP must be amended if its objectives are not met. Loren F. by Fisher v. Atlanta Indep. Sch. Dist., 349 F.3d 1309 (11th Cir. 2003) (citing, Kings Local Sch. Dist., Bd. of Educ. v. Zelazny, 325 F.3d 724, 731 (6th Cir. 2003)).
8. Congress has determined that the term "unique educational needs" is to be broadly construed and includes the student's academic, social, emotional, communicative, physical and vocational needs." H. R. Rep. No. 410, 98th Cong., 1st Sess. 19 (1983), reprinted in 1983 U.S. Code Cong. & Admin. News 2088, 2106 (emphasis added) (cited in Brown v. Wilson County Sch. Bd., 747 F. Supp. 436, 3-89-0740 (USDCMD Tennessee, 1990)).
9. The United States Department of Education has stated that a school district "must ensure" that a medical evaluation by a licensed physician is conducted, if necessary to determine whether a child has a disability. Letter to Parker, (OSEP 1992); Letter to Anonymous, (OSEP 2000).
10. The February 20, 2020 psychoeducational evaluation report stated the Student scored low average in letter and word recognition, below average in reading vocabulary, and very low in math concepts and applications on an educational achievement assessment. The report also stated the Student completed a behavior assessment rating scale which indicated clinically significant scores in the areas of internalizing problems, anxiety, somatization, and sense of inadequacy. Additionally, the physician's statement indicated educational needs related to the medical diagnoses.
11. The February 27, 2020 and September 24, 2020 IEPs both lack sufficient data and information to describe the Student's needs. Neither IEP includes medical or socio-emotional/behavioral as areas of need, despite the initial evaluation depicting deficits in those areas. Strategies to support the Student in the previous 504 plan were not considered. The present level information that was included was minimal and did not result in a comprehensive description of the Student's needs in either IEP. The lack of present level information results in annual goals, supplementary aids and services, and programs and related services which are not developed based on Student need.
12. Regarding the February 27, 2020 initial IEP:
    i. The Student's primary disability of other health impairment, including limited strength, vitality, and alertness to education due to sickle cell disease, was not supported throughout the IEP, with exception of homebound/hospitalized services due to medical or psychological reasons. The IEP did not include information to support the need for homebound services or a reduced day.
    ii. Specific skills were listed as areas of need in mathematics, but no data was included to reflect this information.
    iii. The IEP states the Student is on the Michigan merit curriculum leading to a high school diploma but was not expected to graduate with a regular diploma during this IEP. The IEP course of study states the Student is on track to receive a Michigan merit diploma. The Student's report cards and grade information did not

reflect being on track to graduate with a Michigan merit diploma. There is no clear plan established for the Student to graduate or meet transition goals.

13. Regarding the September 24, 2020 annual review IEP:
    i. Data was limited to state assessment scores from third through seventh grade and a transition assessment. Despite reading and math being listed as areas of need, there was no current data included to indicate strengths or weaknesses within those areas.
    ii. Reading was added as a supplemental area of need and annual goal, yet the description of need and adverse impact were specific to work completion that resulted in lower grades and inability to earn credit. There was a statement lower comprehension levels made it difficult to complete work, but no data to support the statement. The initial evaluation, dated February 27, 2020, reported the Student's reading abilities were not impacted; therefore, with no description of need in the IEP, there is no data to support the need for a reading goal.
    iii. School social work services were added as a related service; however, there is no description of need for why school social work services are required. The addition of school social work services is supported by the socio-emotional behavioral needs that were identified in the initial evaluation and may have been included in the September 2020 IEP as a result of the District neglecting to include this related service in the initial IEP.
    iv. Homebound/hospitalized services were discontinued by the IEP Team due to the fact the Student had not provided the District with a physician's statement that demonstrated the Student continued to be unable to leave the home during school hours and was in need for homebound/hospitalized services. When the District determines a student requires homebound/hospitalized services as a component of the offer of a FAPE, the District has an obligation to obtain that information from a physician if the student and/or parent is unable to provide the information.
    v. Instead, new special education programming was listed as 30 to 400 minutes of resource program per week, which does not provide a clear description of the special education programs and services the Student requires. When a District defines special education programs and services using a range, the amount of service being committed by the District must be clear. For this Student, the District may need to consider a combination of resource programing and homebound/hospitalized for when the Student is not able to attend for medical reasons.
    vi. The math annual goal from the initial IEP was discontinued in the September 24, 2020 IEP, despite no data reported on progress of the goal or rationale to discontinue the goal. The new math and reading goals are aligned with state academic standards, however, are written to address skills which are not included in the description of need. A lack of baseline data, for both the reading and math goals, results in goals that are not measurable.
14. The Complainant questioned the need for using the extended grade level content expectations to strengthen reading and math weaknesses. The alternate content expectations serve as the foundation for instruction for students with the most significant cognitive disabilities. Alternate content expectations are not appropriate for this Student, as the Student does not have or function as having a most significant cognitive disability.
15. Based on progress reports and report cards, the Student was not making progress in classes and had not earned any credits. The IEP Team reviewed the IEP in November and December of 2020 to discuss the Student's lack of credits and poor attendance.

Although the notes from the December meeting reflected potential strategies and programs to address the Student's lack of progress, the IEP was not revised to include these supports or address the Student's unique needs.

16. Services provided through a multi-tiered system of support are determined at a district level and are not addressed through the IDEA or the MARSE, and therefore, are not investigated as part of a special education state complaint.
17. Compensatory services are ordered when a district fails to provide a FAPE to a student and, as a result, the student suffers a loss of educational benefit. For this Student, there was no requirement for the District to develop a compensatory education plan.

Overall FAPE:

1. A FAPE means special education and related services that are provided in conformity with an individualized education program (IEP) that meets the requirements of §§ 300.320 through 300.324. 34 CFR § 300.17(d).
2. A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school, as provided for in § 300.530(d). 34 CFR § 300.101(a).
3. For a school district's IEP to offer a student a substantive FAPE, the proposed program must be specially designed to address the student's unique needs, must be reasonably calculated to provide the student with educational benefit, and must comport with the student's IEP. 20 USC §1401(9) (cited in P.G. by R.G. and A.G. v. Rutherford County Bd. of Educ, 313 F. Supp. 3d 891, 3:17-cv-01115 (USDCMD, Tennessee 2015)).
4. Overall FAPE for this Student:
   i. The lack of description of need in both IEPs led to the development of supports and services which do not meet the Student's needs. The Student is in the fifth year of high school, yet there is no clear plan on how the IEP is going to support the Student in graduating with a diploma and achieving post-secondary goals. Therefore, there was a denial of a FAPE for the Student.

**Decision:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:
   i. Whether the District developed, reviewed and revised an individualized education program (IEP) to address the Student's unique educational needs and enable the Student to be involved in and make progress in the general curriculum, pursuant to 34 CFR §§300.320, 300.324, and R 340.1721e.

**The District did not develop, review, or revise the IEP to address the Student's unique educational needs. The MDE determines a violation.**

**Student Level Corrective Action Plan:**

1. By May 20, 2021, with Student and IEP Team input, the District must develop a plan for providing 15 hours of compensatory education to address the Student's social/emotional needs. The plan must provide the Student the opportunity to build relationships with staff members with the intent of increasing engagement and coping skills in educational endeavors. Services provided are to be in addition to the regular school day and the requirements of the current IEP. Compensatory education services are to be delivered no later than January 1, 2022.
2. By May 20, 2021, conduct an IEP Team meeting for the purpose of developing an IEP to include:
    i. A comprehensive present level statement which accurately reflects the Student's academic achievement and functional performance needs, including medical information and updated academic data.
    ii. A transition plan that identifies appropriate transition services and post-secondary goals that relate to the Student's needs.
    iii. Measurable annual goals and short-term objectives aligned with the Student's post-secondary goals and designed to meet the Student's needs, including current level of performance, a specific skill or set of skills, target and/or outcome, and method of measurement.
    iv. A clear description of the frequency, location, and duration of the supplementary aids and services, related to the Student's updated present level statement.
    v. Identification of the special education and related services to be provided to the Student, related to the Student's needs and to support the Student's goal of earning a high school diploma. If the Student requires homebound instruction, the District must obtain the required information.

Evidence of the compensatory services ordered in the student level corrective action plan will be reviewed during the district corrective action verification process. See below for compensatory education requirements.

**Corrective Action Plan:**

The district must revise or develop procedures regarding IEP development, as needed, by October 15, 2021 to document and ensure for this and all students:

1. IEPs, specifically transition plans, goals, supplementary aids and services, related services, programs, determinations for homebound, and determinations for reduced day, are developed based on comprehensive present levels of academic achievement and functional performance information to address each student's unique educational needs.

The district must complete the following by October 15, 2021:

1. Provide a professional learning opportunity, regarding social-emotional/behavioral needs of students, including strategies and supports to increase educational engagement and attendance.
2. The District must create and provide a document to all staff working with the Student, which provides information about Sickle Cell Anemia and educational recommendations and strategies to address the needs of the Student related to this disability.

The district must provide professional development by October 15, 2021 for all relevant staff regarding the new procedures.

Evidence of change in the district's practices must be provided and verified by the OSE.

The ISD must upload evidence of the implementation of the compensatory services plan into the technical assistance notes in the district's corrective action plan to be reviewed during the verification process. Documentation must include:
1. Services must be delivered outside the regular school day.
2. A copy of the receipt(s) for services provided if a contractor is used.
3. Service provider logs for the compensatory services indicating the dates, starting and ending times, length of sessions, student absences, make up sessions and a short summary of instruction completed for each session by upload into Catamaran.
4. If the Student is absent on a scheduled day, this session does not need to be made up. Any staff absences require a make-up session.
5. Transportation logs or reimbursement receipts (if applicable).

Evidence of timely compliance and required submissions for Corrective Action Plans and Student Level Corrective Action Plans must be documented in Catamaran. Please direct questions regarding the complaint investigation to Rebecca McIntyre at (517) 335-0457 or mcintyrer1@michigan.gov, and any questions regarding the student level corrective action to Jessica Corliss at (517) 335-0461 or corlissj@michigan.gov. All correspondence should be clearly marked as pertaining to case 21-0005.

Rebecca McIntyre, Supervisor
Program Accountability
Office of Special Education

cc:  Brian Deller
     Mindy Miller
     David Campbell
     Tori Wentela