# EXHIBIT AH

CONFIDENTIAL

**STATE OF MICHIGAN**
**MICHIGAN ADMINISTRATIVE HEARING SYSTEM**

| | |
|---|---|
| **In the matter of:** | **: Docket No.** |
| **Ke'Aujanaa Shepherd-Friday** | **: Case No.** |
| **Petitioner,** | **: Agency: Department of Education** |
| | **: Case Type: ED Sp Ed Regular** |
| **v.** | |
| | **: Administrative Law Judge:** |
| **Kalamazoo Public Schools, Comstock Public Schools, Kalamazoo Regional Educational Service Agency, Michigan Department of Education, and Michael Rice in his official capacity as State Superintendent** | **: REQUEST FOR A DUE PROCESS HEARING UNDER THE IDEA AND SECTION 504 OF THE REHABILITATION ACT** |
| **Respondents.** | |

Jacquelyn Babinski (P83575)
MI AECRES
Attorney for Petitioner
PO Box 705
Ludington, MI 49431
(231) 794-2379
jbabinski@miaecres.org

Elizabeth K. Abdnour (P78203)
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw Street, Suite 4A-2
Lansing, MI 48915
(517) 292-0067
elizabeth@abdnour.com

*Attorneys for Petitioner*

<u>**COMPLAINT AND REQUEST FOR**</u>
<u>**SPECIAL EDUCATION DUE PROCESS HEARING**</u>

## I.    INTRODUCTION

1.    The Supreme Court has repeatedly recognized the importance of education and

literacy, explaining, "education prepares individuals to be self-reliant and self-sufficient

CONFIDENTIAL

participants in society." *Wisconsin v Yoder*, 406 US 205, 221 (1972). "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown v Board of Education*, 347 US 483, 493 (1954). But that is exactly what defendants have denied Petitioner, Ke'Aujanaa Shepherd-Friday.

2.    Ke'Aujanaa, by and through her undersigned counsel, hereby submits the following Complaint and Request for Special Education Due Process Hearing against the Kalamazoo Public Schools ("KPS"), Comstock Public Schools ("CPS") (collectively, "the Districts"), Kalamazoo Regional Education Service Agency ("KRESA"), Michigan Department of Education ("MDE"), and Superintendent Rice in his official capacity (collectively "Respondents"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 USC §§ 1400 *et seq*.; the Michigan Administrative Rules for Special Education ("MARSE"), MCL 380.1701 *et seq*.; Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 USC § 794; and the Title II of the Americans with Disabilities Act ("ADA") 42 USC §§ 12131 *et sec*,; and the Persons with Disabilities Civil Rights Act ("PDCRA") MCL 37.1101 *et seq*.

3.    Ke'Aujanaa is a 19-year-old young woman who has been eligible for special education services since 2020. Throughout Ke'Aujanaa's educational career, the Districts have *failed* to perform comprehensive evaluations to accurately identify her present levels of academic and functional performance. As a result, the Districts have *failed* to subsequently develop an education plan and provide services reasonably calculated to allow her to access the general educational curriculum and make appropriate progress in light of her unique circumstances, denying her FAPE. Moreover, the Respondents have *failed* to provide Ke'Aujanaa with an equal educational opportunity and have discriminated against her on the basis of her disability, in violation of Section 504 and the ADA. MDE Respondents have also *failed* to monitor and

CONFIDENTIAL

CONFIDENTIAL

supervise the provision of educational services and equal educational opportunity to Ke'Aujanaa; to ensure compliance by the Districts with all relevant State and Federal laws in the provision of those educational services; to administer an effective complaint resolution process; and to provide appropriate technical assistance to the Districts to ensure that Ke'Aujanaa is afforded a FAPE and an educational opportunity without discrimination.

## II.   JURISDICTION

4.       The MDE and the Michigan Office of Administrative Hearings and Rules ("MOAHR") have jurisdiction over this due process hearing request under 20 USC § 1415(b)(6) because this request concerns the legal obligations of Respondents under the IDEA regarding the identification, evaluation, educational placement, and provision of a FAPE to a student with a disability. This Tribunal has the authority to determine, based on the individual facts and circumstances of the case, whether the educational agency ("SEA") should be a party to the hearing. Letter to Anonymous (OSEP January 2, 2017) ("[T]he hearing officer has the authority to determine, based on the individual facts of the case, whether the SEA is a proper party to the due process hearing."). *See also, RV v Rivera*, 220 F Supp 3d 588, (ED Pa 2016) (SEA found proper party to DPH when charter school dissolved, leaving SEA to provide services.); *Corey H v Bd of ed of Chicago*, 995 F Supp 900 (ED Ill 1998) (uncontested evidence that SEA failure to take corrective action with respect to LEA's LRE rules and regulations was sufficient to establish violation of statutory requirement that it ensure compliance with LRE mandate).

5.       For Petitioners' claims under Section 504 and the ADA that seek educational relief, they shall be heard by this tribunal for purposes of administrative exhaustion. 20 USC § 1415(*l*); *Fry v Napoleon Cmty Sch*, 137 S Ct 743 (US 2017).

CONFIDENTIAL

CONFIDENTIAL

6.      The Districts, KRESA, and MDE receive federal financial assistance within the meaning Section 504, 29 USC § 794, and are public entities as defined in by Title II of the ADA, 42 USC § 12131(1). Accordingly, they are responsible for upholding the rights of students under Section 504 and the ADA.

### III.      PARTIES

#### *The Student*

7.      Ke'Aujanaa is a nineteen-year-old young woman with a disability who resides in Kalamazoo, MI. Her address is ▮▮▮▮▮▮▮▮▮▮▮▮, Kalamazoo, MI 49007. Ke'Aujanaa is a student with a disability, as defined by the IDEA and the MARSE under the primary category of Other Health Impairment. *See* MARSE R 340.1709a. She is also an individual with a disability within the meaning of Section 504 and the ADA, as she has been diagnosed with sickle cell disease, acute chest syndrome, asthma, borderline intellectual functioning, major depressive disorder, major neurocognitive disorder, generalized anxiety disorder, trichotillomania, other specified trauma and stressor related disorder, and attention-deficit/hyperactivity disorder, all of which substantially limit one or more major life activities, including performing manual tasks, sleeping, learning, concentrating, thinking, reading, writing, communicating, interacting with others, and the operation of a major bodily function. 28 C.F.R. § 35.108.

#### *The Respondents*

8.      KPS is Ke'Aujanaa's resident district, where she attended from kindergarten until the beginning of the 2019-2020 school year (chronologically Ke'Aujanaa's 11th grade year), and as such, is the local education agency ("LEA") responsible for providing her with a FAPE and the procedural protections required under the IDEA. 20 USC § 1413. As the resident district, KPS is "responsible for conducting the initial [IEP] team meeting involving a student in its

PLAINTIFFS 00003125

CONFIDENTIAL

district and shall conduct, or authorize the operating district to conduct, each subsequent [IEP] team meeting." MARSE R 340.1721e(6). KPS is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 CFR § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 USC §§ 12132, 12131(1)(A),(B) and the Persons with Disabilities Civil Rights Act ("PDCRA") MCL 37.1101 *et seq.*

9.      CPS is Ke'Aujanaa's operating district, where she has attended since October 2019 until present, and as such, is the LEA responsible for providing her with a FAPE and the procedural protections required under the IDEA. 20 USC § 1413. CPS is a recipient of federal financial assistance, subject to the requirements of Section 504, 34 CFR § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 USC §§ 12132, 12131(1)(A),(B) and the PDCRA, MCL 37.1101 *et seq.*

10.     KRESA is the regional educational service agency, also known as an intermediate school district as defined in MCL 380.4(3), of which KPS is a constituent school district. KRESA must submit a plan for special education, which sets forth the special education programs and related services to be delivered. MARSE R. 340.1832. Additionally, KRESA receives federal funding to provide special education services. MARSE R. 340.1801. Under MARSE, KRESA is involved in both investigating LEA noncompliance and assisting the MDE in monitoring the LEA's compliant with SEA-issued corrective action. MARSE R 1853-54. KRESA is an educational institution, subject to the PDCRA, MCL 37.1101 *et seq.* KRESA is also a "program or activity" covered by Section 504, 20 USC §794(b), and a "public entity" under Title II of the ADA, 42 USC § 12131(1)(A).

PLAINTIFFS 00003126

CONFIDENTIAL

11.     The MDE Respondents – MDE and Superintendent Rice – collectively and individually qualify as an SEA under 20 USC § 1401(32) ("The term [SEA] means supervision of public elementary and secondary schools….").

12.     The MDE Respondents have consistently received IDEA funding by submitting plans to the Secretary of the U.S. Department of Education that "provide [] assurances… that the State has in effect policies and procedures to ensure that… [a] free appropriate public education is available to all children with disabilities residing in the State." 20 USC § 1412.

13.     As SEA, MDE Respondents have general supervisory responsibility for implementing the IDEA's requirements. MDE Respondents are specifically "responsible for ensuring" that IDEA's regulations are carried out and for its general supervision over each educational program for children with disabilities to ensure the programs meet MDE's educational standards, which include IDEA's regulatory requirements. 34 CFR § 300.149(a).

14.     Under the IDEA, MDE Respondents, as SEA, have additional responsibilities when it comes to resolving administrative complaints. The IDEA provides that in resolving an administrative complaint:

> In which the SEA has found a failure to provide appropriate services, an SEA, pursuant to its general supervisory authority under Part B of the [IDEA], must address –1. The failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and 2. Appropriate future provision of services for children with disabilities.
>
> 34 CFR § 300.151(b).

15.     MDE is the department of the State of Michigan that is responsible for administering and enforcing laws related to public education. MCL § 16.400–16.402. As Michigan's state educational agency, MDE bears the ultimate responsibility for ensuring that all public schools in Michigan comply with the IDEA. MDE is also a "program or activity" covered

PLAINTIFFS 00003127

by Section 504, 20 USC § 794(b), and a "public entity" under Title II of the ADA, 42 USC § 12131(1)(A).

## IV.    STATEMENT OF FACTS

16.    Ke'Aujanaa is a nineteen-year-old African American young woman who resides in Kalamazoo, Michigan.

17.    Ke'Aujanaa started attending Kalamazoo Public Schools in kindergarten.

18.    Since at least first grade, Ke'Aujanaa exhibited difficulty meeting grade level expectations in reading, writing, and math. Yet at no time did KPS seek parent consent to evaluate Ke'Aujanaa for a specific learning disability and eligibility for special education services.

19.    While in ninth grade, KPS provided Ke'Aujanaa with supports and services for her sickle cell anemia under a Section 504 Plan, which included accommodations for extended time to complete assignments without penalty, excused medical absences early passing time, extended time for tests, quizzes and other assessments, and breaks from class to take prescribed pain medication.

20.    KPS never conducted evaluations, nor requested parent consent to conduct evaluations, prior to developing the Section 504 Plan.

21.    Despite the accommodations provided to Ke'Aujanaa through her Section 504 Plan, Ke'Aujanaa ended the 2016-2017 school year with only a 0.4667 GPA and 1.5 credits. At no time during the school year did KPS make any efforts to review or revise Ke'Aujanaa's Section 504 Plan to address her ongoing academic struggles, nor did they request parent consent to conduct any additional evaluations to accurately determine Ke'Aujanaa's educational needs related to her disability.

PLAINTIFFS 00003128

CONFIDENTIAL

22.      In early 2018, due to the behavioral challenges associated with her disability, Ke'Aujanaa was involved in an altercation with another student. Ke'Aujanaa was suspended for two weeks. A Manifestation Determination Review ("MDR") was held, and it was determined that the altercation was caused by Ke'Aujanaa's disability because the other student was bullying her about her disability.

23.      In spring 2018, KPS transferred Ke'Aujanaa to Phoenix Alternative High School in Kalamazoo, MI, stating that the transfer was due to the earlier altercation and her nonproficient Michigan Educational Assessment Program scores.

24.      There is no record of KPS performing any evaluations prior to Ke'Aujanaa's change in placement from KPS to Phoenix.

25.      Ke'Aujanaa ended the 2017-2018 school year with only a marginally better GPA of 1.0917 and only 2.5 credits.

26.      KPS reviewed Ke'Aujanaa's Section 504 Plan towards the end of her 2017-2018 school year. Despite her low GPA and minimal credits earned, no changes were made to the accommodations received nor were any evaluations conducted to determine Ke'Aujanaa's educational needs or if she was eligible for additional services under IDEA.

27.      While at Phoenix High School, during the 2018-2019 school year, KPS cited Ke'Aujanaa for four additional behavior incidents, with the last behavior incident occurring in spring 2019. KPS subsequently held an MDR as a result.

28.      Additionally, while at Phoenix High School for the 2018-2019 school year, Ke'Aujanaa was *still* listed as a freshman, despite this being her third year in high school, and she obtained only three credits, ending the school year with a 1.0 GPA.

CONFIDENTIAL
PLAINTIFFS 00003129

CONFIDENTIAL

29.     Despite the lack of progress throughout the school year, KPS did not review Ke'Aujanaa's Section 504 Plan until March. Further, despite Ke'Aujanaa's minimal academic progress and continued behavior concerns, KPS failed to request parent consent for additional evaluations or to make any changes to Ke'Aujanaa's Section 504 Plan accommodations and the academic instruction she received.

*School Year 2019-2020*

30.     Early in the 2019-2020 school year, George White, an educational advocate, filed an MDE state complaint against KPS on Ke'Aujanaa's behalf alleging that KPS failed to comply with IDEA's child find requirements and failed to implement discipline protections for a student suspected of having a disability when KPS unilaterally removed Ke'Aujanaa to Phoenix High School without conducting any evaluations.

31.     Shortly after the complaint was filed, KPS reviewed Ke'Aujanaa's Section 504 Plan, but made no changes to her accommodations, despite Ke'Aujanaa's continued lack of progress in the general education curriculum. Further, KPS failed to seek consent to evaluate to determine if Ke'Aujanaa qualified for additional services or to ensure that her Section 504 Plan was appropriate to meet her educational needs.

32.     Ke'Aujanaa's mother then enrolled Ke'Aujanaa at Comstock Compass High School, an alternative high school, in the Comstock Public Schools ("CPS") district in Kalamazoo, MI, due to KPS's failure to appropriately instruct Ke'Aujanaa and accommodate her disability. CPS, like KPS, is within KRESA's service area.

33.     In January 2020 CPS conducted two REED meetings for Ke'Aujanaa.

CONFIDENTIAL

CONFIDENTIAL

a.      At the initial REED meeting, CPS determined that an evaluation was not needed because there was sufficient information to make academic decisions, despite no evaluations for special education services having ever been completed by KPS.

b.      However, at the subsequent REED meeting held a few days later, CPS decided Ke'Aujanaa would be administered the Norm Referenced Achievement Assessment and the Behavior Rating(s) Checklist to determine whether she qualified as having a disability under IDEA.

34.     The REED shows that CPS continued to focus only on Ke'Aujanaa's sickle cell anemia and subsequent absences, with no consideration of any other potential disabilities or related needs.

35.     On February 3, 2020, CPS's school neuropsychologist, Dr, Laura Henly, conducted an evaluation based on Ke'Aujanaa's needs due to her diagnosis of sickle cell anemia, assessing Ke'Aujanaa using the Kaufman Test of Educational Achievement - Third Edition ("KTEA-III"), Adaptive Behavior Assessment System, 3rd Edition ("ABAS-3") and the Behavior Assessment for Children, Third Edition ("BASC-3").

36.     The KTEA-III was used to determine Ke'Aujanaa's achievement scores in the areas of reading math and writing.

a.      Dr. Henly found that, while a typical student Ke'Aujanaa's age is expected to have completely fluent reading abilities and high levels of reading comprehension, Ke'Aujanaa demonstrated only good basic reading abilities and lacked understanding of higher level vocabulary. Further, Ke'Aujanaa performed below average in mathematics compared to a typical student her same age. Dr. Henly observed

CONFIDENTIAL

Ke'Aujanaa struggled with several conceptual math skills, including struggling with multi-step problems, algebraic and fraction concepts, and word problems.

b.    More specifically, regarding her reading and math performance, Ke'Aujanaa scored in the 13th percentile in Letter & Word Recognition (considered Low Average); in the 4th Percentile in Re ading Vocabulary (considered Below Average); and in the 2nd Percentile in Math Concepts & Applications (considered Very Low.

c.    The vast majority of KTEA-III scores were not reported and it is unclear if they were administered at all, despite Dr. Henly's report noting the KTEA-III was also used to assess Ke'Aujanaa's writing performance. Writing is another academic area where Ke'Aujanaa has historically performed below grade-level expectations.

37.    Ke'Aujanaa's scores on the ABAS-3 and the BASC-3 demonstrate that Ke'Aujanaa has the ability to mask her everyday adaptive problems by presenting herself in an overly positive light, which coincide with results showing that she was at-risk for depression, social stress, and other debilitating mental health symptoms. Even though Ke'Aujanaa presents as adaptive, she truly does not feel in control of her life and hopes for guidance and stability.

38.    On February 27, 2020, based on Dr. Henly's evaluation, the CPS IEP team determined that Ke'Aujanaa met eligibility criteria for special education services under the category Other Health Impairment due to her diagnosis of sickle cell anemia.

39.    Despite the KTEA-III results showing that Ke'Aujanaa was not performing at the expected level for her age in both math and reading, eligibility under Specific Learning Disability wasn't considered, nor were any additional evaluations conducted to inform the provision of appropriate services based on her educational needs.

40.    The initial IEP developed for Ke'Aujanaa presented several concerns:

CONFIDENTIAL

CONFIDENTIAL

a.      The transition plan failed to provide reasonable goals or supporting activities to assist Ke'Aujanaa in meeting her post-secondary goals, including attending a 4-year college and working as a respiratory therapist, in consideration of Ke'Aujanaa's present level of academic performance and attendance.

b.      Only transition and math were listed as areas of need, despite the evaluation specifically noting Ke'Aujanaa performed below grade-level in reading and Ke'Aujanaa's history of also performing below-grade level in writing and difficulty attending class due to medical needs.

c.      Similarly, goals were only provided for transition and math. Further, the math goal failed to specifically target Ke'Aujanaa's math deficits identified by the evaluation.

d.      Despite Ke'Aujanaa's significant lack of progress toward the general educational curriculum and related academic and functional needs, only 60-120 minutes of homebound services and 60-120 minutes of teacher consultant services were offered.

e.      There was no reference to Ke'Aujanaa's socio-emotional needs in the IEP, despite Dr. Henly's evaluation identifying this as a concern, with Ke'Aujanaa being at-risk for depression and masking her real feelings.

41.     On April 18, 2020, MDE's Office of Special Education ("OSE") issued a final decision based on the October 2019 complaint, finding KPS out of compliance for failure to take affirmative action to fulfill its child find obligations. MDE ordered the district to revise or develop procedures regarding child find by November 15, 2020. KPS was to address: (1) its responsibility to initiate a special education evaluation for a student who is suspected of being a student with a disability and in need of special education, even when a parent has not made a

PLAINTIFFS 00003133

CONFIDENTIAL

request; (2) identification of factors or signs which may prompt KPS staff to consider a special education referral; and (3) assurance general education staff are informed of their role and responsibility in implementing KPS's child find obligation. MDE also ordered KPS to provide professional development for all relevant staff regarding the new child find procedures by November 15, 2020.

42.     Ke'Aujanaa ended the 2019-2020 school year with zero credits and a GPA of 0.00.

*School Year 2020-2021*

43.     In September 2020, Ke'Aujanaa completed the Enderle-Severson Transition Rating Scale ("ESTR-J"). The ESTR-J is a transition assessment for students with mild disabilities. Notably, Ke'Aujanaa's lowest scores were in Post-Secondary Education (3/8, 38%) and Community Participation (2/7, 29%). Further, the evaluation found several areas of need in her basic independent living skills: identifying goals; learning about checking and savings; learning how to use local resources; and how to do comparison grocery shopping.

44.     On September 24, 2020, CPS held another IEP meeting.

a.      Despite Ke'Aujanaa's ongoing, documented, significant difficulties in attending class and completing coursework to make progress in the general education curriculum, the only areas of need listed for Ke'Aujanaa were transition, reading comprehension, and math (specifically, numbers and operations). There continued to be no reference to Ke'Aujanaa's socio-emotional needs.

b.      This IEP contained three goals related to transition, reading comprehension, and math problem-solving skills. The transition goal focused only on

CONFIDENTIAL

CONFIDENTIAL

Ke'Aujanaa's organizational skills, with no goals to address Ke'Aujanaa's underlying attendance issues or related socio-emotional issues.

      c.     The supplementary aids and services to be provided included: tests read out loud, frequent breaks, modified tests/quizzes, extended time on assignments, and when receiving medical treatments, deadlines for tests and assignments will follow a timeline discussed between the administrators, teachers, and the student.

      d.     Despite not identifying socio-emotional behavior as an area of need, this IEP did provide Ke'Aujanaa with some social work services, but only 15-30 minutes, 2-4x monthly.

      e.     Despite continued lack of consistent attendance and engagement in coursework, the IEP team removed direct homebound services citing lack of physician verification, but failed to provide an appropriate alternative. Instead, the IEP provided just access to the secondary-level resource program 30-400 minutes a week.

45.     On October 13, 2020, Ke'Aujanaa disclosed to her teacher she felt she was suffering from depression, yet there was no request to review and revise the IEP, or to conduct additional evaluations, to address any new or additional educational needs related to this new area of concern.

46.     On November 4, 2020, CPS issued an IEP goal progress report indicated a lack of progress due to a lack of attendance due to medical issues.

47.     On November 5, 2020, a meeting was held to discuss Ke'Aujanaa's academic deficits. Despite Ke'Aujanaa's documented elementary-level performance in math and reading, school staff dismissed this as not being a concern. However, the team ultimately agreed to develop a plan to address Ke'Aujanaa's deficits in phonics. Despite this, no revisions were made

CONFIDENTIAL
PLAINTIFFS 00003135

CONFIDENTIAL

to Ke'Aujanaa's IEP to reflect a phonemic awareness goal or new services related to phonemic awareness.

48.     In emails from early December 2020, Ke'Aujanaa's advocate reported that her phonics plan had never been implemented, but CPS made no response. Instead, conversations between CPS and the KRESA Director of Special Education indicated concern over defending the advocate's suggested phonics materials if there was ever a state complaint, with no mention of what would be more appropriate to actually address Ke'Aujanaa's academic needs..

49.     The school held an IEP meeting on December 15, 2021, but neither Ke'Aujanaa, her mother, nor her advocate appeared. At the meeting, the team documented Ke'Aujanaa's lack of engagement and attendance in coursework, lack of progress, and failure to pick up the ordered phonics workbooks. It was also determined the requested phonics workbooks would be delivered, but this did not actually occur until May 7, 2021, almost five months later.

50.     On January 22, 2021, CPS issued an IEP goal progress report noting a lack of progress due to a lack of attendance, communication, and participation.

51.     Despite CPS's progress reports from both November 4, 2021 and January 22, 2021 indicating a lack of progress due to attendance issues, no investigation was made to understand the motivation behind Ke'Aujanaa's behavior (specifically her lack of attendance), no additional evaluations were conducted to that end, and her IEP remained the same.

52.     From September 2020 until April 2021, CPS personnel sent numerous messages to Ke'Aujanaa via email, text, and google meet, yet despite Ke'Aujanaa's consistent lack of response, no formal investigation was made to understand the motivation behind Ke'Aujanaa's behavior in disengaging, no functional behavior assessment was conducted, no efforts were made to conduct any additional evaluations or revise Ke'Aujanaa's IEP to ensure the services and

CONFIDENTIAL
PLAINTIFFS 00003136

CONFIDENTIAL

supports provided to Ke'Aujanaa were reasonably calculated to allow her to access her education and make progress toward her IEP goals until forced to per the State Complaint Decision. Rather, the burden continued to be placed on Ke'Aujanaa, who repeatedly communicated she needed additional help and performed better with hands-on learning in the times she did respond to CPS staff messages.

53.     On January 27, 2021, George White, an educational advocate, filed a second MDE state complaint on Ke'Aujanaa's behalf, this time against CPS, alleging they violated IDEA by failing to review and revise Ke'Aujanaa's IEP.

54.     On March 26, 2021, the final decision that MDE-OSE issued determined a violation in that CPS did not develop, review, or revise the IEP to address Ke'Aujanaa's unique educational needs. MDE ordered that by May 20, 2021, CPS must develop a plan for providing 15 hours of compensatory education to address Ke'Aujanaa's social/emotional needs. MDE also ordered that by May 20, 2021, CPS must conduct an IEP Team meeting for the purpose of developing an IEP to include: (1) a comprehensive present level statement which accurately reflects the Student's academic achievement and functional performance needs, including medical information and updated academic data; (2) a transition plan that identifies appropriate transition services and post-secondary goals and designed to meet the Student's needs, including current level of performance, a specific skill or set of skills, target and/or outcome, and method of measurement; (3) a clear description of the frequency, location, and duration of the supplementary aids and services, related to the Student's updated present level statement; (4) identification of the special education and related services to be provided to the Student, related to the Student's needs and to support the Student's goal of earning a high school diploma. If the student requires homebound instruction, CPS must obtain the required information.

CONFIDENTIAL

55.     Further, MDE ordered that by October 15, 2021, CPS must revise and develop procedures regarding IEP development, as needed, to document and ensure for this and all students: (1) IEPs, specifically transition plans, goals, supplementary aids and services, related services, programs, determinations for homebound, and determinations for reduced day, are developed based on comprehensive present levels of academic achievement and functional performance information to address each student's unique educational needs.

56.     MDE also ordered that by October 15, 2021, CPS must complete the following: (1) provide a professional learning opportunity, regarding social-emotional/behavioral needs of students, including strategies and supports to increase educational engagement and attendance and (2) CPS must create and provide a document to all staff working with the Student, which provides information about sickle cell anemia and strategies to address any related educational needs.

57.     In response to the State Complaint Decision, CPS held an IEP meeting on May 13, 2021. However, while technically complying with MDE's order to review and revise the IEP, the actual revisions made failed to substantively address Ke'Aujanaa's actually needs.

a.      The IEP continued to provide only 15-30 minutes (2-4 sessions per month) of Social Work Services. Further, despite school assessments indicating significant emotional concerns, Ke'Aujanaa has not received even this minimal amount of mental health services at school.

b.      In addition, the IEP goals were changed to specify that reading comprehension was to be improved to a 7th grade reading level and that solving math equations would be geared toward creating a budget related to estimating college

PLAINTIFFS 00003138

CONFIDENTIAL

costs/expenses, without any evaluations or data to support whether college attendance was a realistic goal for Ke'Aujanaa based on her current academic performance levels.

      c.      This IEP also added in three new goals related to increasing self-advocacy skills, defining a variety of calming strategies when presented with a multiple choice activity, and partnering with a peer in order to use comparison shopping techniques.

      d.      The September 2020 goal of improving organizational skills was removed.

      e.      Further, although the most recent IEP added supplementary aids and services of access to water, access to restroom, and ability to change location during extreme temperatures and conditions, the modification of tests/quizzes as a supplementary aid was removed.

      f.      The transition plan also continued to provide only minimal activities, without clearly identifying how the activities would be implemented and ensuring the transition plan was appropriately developed and supported based on Ke'Aujanaa's unique needs. Further, the only reason given for not inviting an outside community agency was the failure to engage the student, not whether an outside community agency would be beneficial in developing an appropriate transition plan.

58.      KRESA, as an intermediate school district, plays a critical role in Michigan's scheme of general supervision of the delivery of special education by ensuring that local districts comply with the IDEA.

59.      Ke'Aujanaa timely filed this due process complaint within two years of her knowledge of the Districts', the KRESA's, and the MDE Respondents' violations of her rights.[1]

---

[1] The statute of limitations added to IDEA, goes to filing, not to limiting the remedy as explained by the legislative history of the statute.

60.     Respondents' acts have deprived Ke'Aujanaa of a FAPE she is entitled to by law.

61.     Respondents' acts have deprived Ke'Aujanaa of her equal opportunity to receive the benefits that other participants in Respondents' programs and services enjoy.

62.     Respondents' acts were knowing and intentional.

63.     Respondents acted in bad faith and/or exercised gross misjudgment by failing to ensure that both initial evaluations and re-evaluations were comprehensive and that the test results accurately reflected Ke'Aujanaa's emotional, behavioral, or achievement levels to ensure that she had necessary services and support, so that she could make progress appropriate in light of her circumstances.

64.     As a result of Respondents' conduct, Ke'Aujanaa has experienced a delay in graduation from high school, and has suffered educational, social, and behavioral impacts and other damages.

## V.    ALLEGATIONS

### A.    RESPONDENTS VIOLATED THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 USC 1400 et seq.

65.     Petitions incorporate by reference all previous paragraphs of the Complaint herein.

---

In this reauthorization, we also include a 2-year statute of limitations on claim. However, it should be noted that this limitation is not designed to have any impact on the ability of a child to receive compensatory damages for the entire period in which he or she has been deprived of services. The statute of limitations goes only to the filing of the complain, not the crafting of remedy. This is important because it is only fair that if a school district repeatedly failed to provide services to a child, they should be required to provide compensatory services to a child, they should be required to provide compensatory services to rectify this problem and help the child achieve despite the school's failings.

Therefore, compensatory education must cover the entire period and must belatedly provide all education and related services previously denied and needed to make the child whole.

*GL v Ligonier Valley Sch Dist Auth.*, 802 F 3d 601, 624 (3d Cir 2015) (quoting 50 Cong Rec S11851 (daily ed Nov. 24, 2004) (statement of Sen. Tom Harkin)).

CONFIDENTIAL

### *Respondents Failed to Follow the IDEA's "Child Find" Requirements*

66.     Pursuant to the IDEA's Child Find mandate, the State of Michigan must have in effect policies and procedures to ensure that all children with disabilities residing in the State who are in need of special education and related services are identified, located, and evaluated, regardless of the severity of their disabilities. 20 USC §1412(a)(3)(A); 34 CFR § 300.111(a)(1)(i).

67.     The IDEA and its implementing regulations define a "child with a disability" as a child with intellectual disabilities, mental retardation, a hearing impairment (including deafness), a speech or language impairment, visual impairment (including blindness), a serious emotional disturbance, an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

68.     An "other health impairment" means having "limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that – (i) [i]s due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) [a]dversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(9)(i-ii).

69.     Under the IDEA, an SEA or an LEA must "conduct a full and individual initial evaluation" before the initial provision of special education and related services to a child with a disability. 20 U.S.C. § 1414(a)(1)(A); 34 C.F.R. § 300.301(a). The initial evaluation shall consist of procedures to determine whether a child is a child with a disability and the educational needs of that child. 20 U.S.C. § 1414(a)(1)(C)(i); 34 C.F.R. § 300.301(c)(2). The parent, the SEA, or the

CONFIDENTIAL

LEA may initiate a request for an initial evaluation. 20 U.S.C. § 1414(a)(1)(B); 34 C.F.R. § 300.301(b).

70.     The initial evaluation must be conducted within 60 days of receiving parental consent, or within the timeframe established by the State, if the State establishes such a timeframe. 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1). Under Michigan law, the initial evaluation must be conducted, and an eligibility determination made, within 30 school days of receiving parental consent. MARSE Rule 340.1721b(1).

71.     Defendants must ensure that a reevaluation of each child with a disability is conducted if the educational or related services needs of the child warrant a reevaluation. 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. §300.303(a)(1). A LEA is also responsible for ensuring that a reevaluation is conducted if the child's parent or teacher requests one. 20 U.S.C. § 1414(a)(2)(A)(ii); 34 C.F.R. §300.303(a)(2). At a minimum, a reevaluation must occur on a triennial basis, even in the absence of an explicit request or qualifying circumstances, unless the parent and the LEA agree that a reevaluation is unnecessary. 20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. §300.303(b)(2).

72.     The IDEA outlines detailed and comprehensive procedures for the conduct of evaluations, requiring the Defendants to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining – (i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum." 20 U.S.C. § 1414(b)(2)(A); see also 34 C.F.R. §300.304(b)(1).

PLAINTIFFS 00003142

CONFIDENTIAL

73.     The IDEA directs that each LEA "shall ensure that the child is assessed in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B). Areas related to the suspected disability include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 34 C.F.R. § 300.304(c)(4). The Child Find mandate expressly includes all children with a suspected disability, even if they are advancing from grade to grade. 34 C.F.R. § 300.111(c)(1).

74.     LEAs must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2)(C); 34 C.F.R. § 300.304(b)(3). LEAs must also ensure that "assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient." 34 C.F.R. § 300.304(c)(2). The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

75.     As part of an initial evaluation, if appropriate, and as part of any reevaluation, the IEP Team and other qualified professionals shall review existing evaluation data on the child, including: "(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A); 34 C.F.R. § 300.305(a)(1). On the basis of that review, and input from the child's parents, the IEP Team and other qualified professionals, as appropriate, must identify what additional data, if any, are needed to fulfill the Child Find obligations under the IDEA. 20 U.S.C. § 1414(c)(1)(B); 34 C.F.R. §

PLAINTIFFS 00003143

CONFIDENTIAL

300.305(a)(2). The LEA must administer the assessments and evaluation measures needed to produce such additional data. 20 U.S.C. § 1414(c)(2); 34 C.F.R. § 300.305(c).

76.     In addition, LEAs are charged with ensuring that assessments "are administered by trained and knowledgeable personnel." 20 U.S.C. 1414(b)(3)(A)(iv); 34 C.F.R. § 300.304(c)(1)(iv).

77.     Finally, in interpreting the evaluation data for the purpose of determining whether a child qualifies as a child with a disability under the IDEA and the educational needs of the child, LEAs must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior." 34 C.F.R. § 300.306(c)(1)(i). LEAs must "[e]nsure that information obtained from all of these sources is documented and carefully considered. 34 C.F.R. § 300.306(c)(1)(ii).

78.     At all times relevant to this complaint, Ke'Aujanaa has been a student with a disability under 20 U.S.C. § 1401(3).

79.     Respondents violated Ke'Aujanaa's rights under the IDEA by knowingly failing to conduct a full and individual initial evaluation before the initial provision of special education and related services to a child with a disability, consisting of procedures to determine whether a child is a child with a disability and the educational needs of KE'Aujanaa. 20 U.S.C. §§ 1414(a)(1)(A) and 1414(a)(1)(C)(i); 34 C.F.R. §§ 300.301(a) and 300.301(c)(2).

80.     Respondents knowingly failed to ensure that Ke'Aujanaa was assessed in all areas of suspected disability under the Child Find mandate, even though Ke'Aujanaa was advancing from grade to grade. 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. §§ 300.304(c)(1) and (4).

PLAINTIFFS 00003144

CONFIDENTIAL

81.    In their repeated failure to effectively correct the Districts' noncompliance in the administrative complaint process, the MDE failed in its responsibilities under Federal law to "address" the Districts' "failure to provide appropriate services" concerning and failed to "address" the "[a]ppropriate future provision of services for all children with disabilities," which would have included Ke'Aujanaa. 34 C.F.R. § 300.151(b).

82.    MDE has failed to address the appropriate future provision of services in attempting to resolve state complaints, resulting in the continued denial of FAPE to students in violation 34 CFR 300.151.

83.    The KRESA failed in its responsibilities under Federal law to ensure a FAPE to Ke'Aujanaa and is thus a proper party to this administrative proceeding per 20 U.S.C. § 1415(b); 34 C.F.R. § 300.2.

84.    MDE failed in its responsibilities under State and Federal law to ensure FAPE to Ke'Aujanaa and is thus a proper party to this administrative hearing per 20 U.S.C. § 1415(b); MARSE R. 340.1701, 1852-55.

85.    Respondents otherwise violated Ke'Aujanaa's right to receive a FAPE.

***Respondents Failed to Conduct Comprehensive Educational Evaluations for Ke'Aujanaa***

86.    Congress passed the Individuals with Disabilities Education Act ("IDEA") to ensure "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(1)(A), (B).

PLAINTIFFS 00003145

CONFIDENTIAL

87.    Under the IDEA, each state must "ensure" that it provides "special education" and "related services" to all children with disabilities aged 3 to 21 residing in the state. 20 U.S.C. §§ 1401(9), 1412(a)(1). Special education means specially designed instruction that meets the unique needs of a child with a disability. See 20 U.S.C. § 1401(29). Related services means the supportive services "required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26). The State directs local school districts to provide special education and related services to each eligible student with a disability by implementing an "individualized education program" ("IEP"), an individually tailored statement that is developed, reviewed, and revised by an "IEP team." See 20 U.S.C. § 1414(d).

88.    The IDEA further requires, through the least restrictive environment requirement, that states "ensure" that:

> [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5).

89.    As the state educational agency for Michigan, MDE is specifically "responsible for ensuring that" all eligible Michigan children with disabilities receive a free appropriate public education in the least restrictive environment. 20 U.S.C. §§ 1412(a)(11)(A), (a)(1), (a)(5). The MDE must coordinate with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under the IDEA. See 20 U.S.C. § 1412(12).

90.    To fulfill these responsibilities, the MDE, among other things, must engage in "effective monitoring" to ensure that local school districts provide a free appropriate public education in the least restrictive environment to all eligible children. See 20 U.S.C. §§

PLAINTIFFS 00003146

CONFIDENTIAL

1416(a)(1)(C), (a)(3)(A), (a)(3)(B). While the State must use data to measure school districts' performance, maintain an administrative complaint process, and take corrective action upon finding any violations of the Act, see 20 U.S.C. §§ 1411(e)(2)(B)(i), 1415, 1416(a)(3), its duty requires far more.

91.    Rather than focusing on technical compliance, the State's "primary focus" must be on "improving educational results and functional outcomes for all children with disabilities." 20 U.S.C. § 1416(a)(2)(A).8 The State must ensure that students actually receive a free appropriate public education in the least restrictive environment. See 20 U.S.C. §§ 1412(a)(1), (a)(5); 1416(a)(1)(C), (a)(3)(A). Accordingly, the State must now guarantee that districts meet the "markedly more demanding" standard for a free appropriate public education as clarified by the Supreme Court in *Endrew F.*, which explicitly demands that every child with a disability receive an "ambitious" education, with the chance to meet "challenging objectives," and anticipates that most children can do so in the general education classroom. 137 S. Ct. at 1000.

92.    To this end, the IDEA requires states receiving IDEA funds to have "in effect policies and procedures to ensure that the State meets each of the following conditions": (1) "A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, . . ." ; (2) "An individualized education program, or an individualized family service plan that meets the requirements of section 1436(d) of this title, is developed, reviewed, and revised for each child with a disability in accordance with section 1414(d) of this title"; and (3) "Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title," among others. 20 U.S.C. § 1412.

93.    The IDEA requires local education agencies receiving IDEA funding to "submit[] a plan that provides assurances to the State educational agency that . . . . [t]he local educational

CONFIDENTIAL

CONFIDENTIAL

agency, in providing for the education of children with disabilities within its jurisdiction, has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412 of this title." 20 U.S.C. § 1413(a).

94.     As the Supreme Court has held, "[t]o meet its substantive obligation under IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.* at 999 (2017).

95.     At all times relevant to this complaint, Ke'Aujanaa has been a student with a disability under 20 U.S.C. § 1401(3).

96.     Respondents violated Ke'Aujanaa's rights under the IDEA by knowingly failing to provide comprehensive initial evaluations and failing to utilize a variety of assessments in violation of 20 U.S.C. § 1414(a)(1)(A), § 1414(b); 34 C.F.R. § 300.301, 304, 306.

97.     Respondents knowingly failed to reevaluate Ke'Aujanaa when her educational or related service needs, including the need for emotional and behavioral supports, warranted a reevaluation in violation of 20 USC 1414(a)(2) and 34 CFR 300.303.

98.     Even as Ke'Aujanaa continued to fail to make progress in the general education curriculum and toward her IEP goals, and even after Respondent CPS was cited by MDE for failing to revise Ke'Aujanaa's IEP in part for developing an IEP based on limited data, Respondents knowingly failed to seek consent to reevaluate Ke'Aujanaa in all suspected areas of disability.

99.     In their repeated failure to effectively correct the noncompliance of the Districts in the administrative complaint process, the MDE failed in its responsibilities under Federal law to "address" the Districts' "failure to provide appropriate services" concerning and failed to "address" the "[a]ppropriate future provision of services for all children with disabilities," which would have included Ke'Aujanaa. 34 C.F.R. § 300.151(b).

100.    MDE has failed to address the appropriate future provision of services in attempting to resolve state complaints, resulting in the continued denial of FAPE to students in violation 34 CFR 300.151.

101.    The KRESA failed in its responsibilities under Federal law to ensure a FAPE to Ke'Aujanaa and is thus a proper party to this administrative proceeding per 20 U.S.C. § 1415(b); 34 C.F.R. § 300.2.

102.    MDE failed in its responsibilities under State and Federal law to ensure FAPE to Ke'Aujanaa and is thus a proper party to this administrative hearing per 20 U.S.C. § 1415(b); MARSE R. 340.1701, 1852-55.

103.    Respondents otherwise violated Ke'Aujanaa's right to receive a FAPE.

**B.    RESPONDENTS VIOLATED THE MICHIGAN ADMINISTRATIVE RULES FOR SPECIAL EDUCATION**

104.    Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

105.    The Michigan Administrative Rules for Special Education ("MARSE"), R. 340.1700 *et seq.* set the administrative rules for special education and related services in the state of Michigan.

106.    MARSE defines special education as "specially designed instruction, at no cost to the parents, to meet the unique educational needs of the student with a disability and to develop the student's maximum potential. Special education includes instructional services defined in R 340.1701b(a) and related services." R. 340.1701c(c).

107.    MARSE requires the district to "[c]omplete a *full* and individual evaluation." R. 340.1721a (emphasis added).

PLAINTIFFS 00003149

CONFIDENTIAL

108.     Pursuant to MARSE, "[t]he individualized education program team shall determine the programs and services for a student with a disability in accordance with 34 CFR part 300. The individualized education program shall not be restricted to the programs and services available." R. 340.1721e(4).

109.     Respondents are covered entities subject to MARSE.

110.     Respondents failed to conduct a "full and individual evaluation" in violation of MARSE R 340.1713.

111.     MDE failed to maintain an effective complaint resolution process, resulting in the continued denial of FAPE in violation of MARSE R. 340.1851 et seq.

112.     KRESA failed to ensure a FAPE in violation of MARSE R. 340.1701.

**C.     RESPONDENTS VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794**

113.     Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

114.     Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

115.     The regulations regarding Preschool, Elementary, and Secondary Education apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

PLAINTIFFS 00003150

116.    In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

117.    The Districts are recipients of federal financial assistance and operates a public elementary or secondary education program or activity. Therefore, it is a covered entity under Section 504. 29 U.S.C. § 794.

118.    KRESA is a recipient of federal financial assistance and operates a public elementary or secondary education program or activity. Therefore, it is a covered entity under Section 504. 29 U.S.C. § 794.

119.    MDE is a recipient of federal financial assistance and operates a public elementary or secondary education program or activity. Therefore, it is a covered entity under Section 504. 29 U.S.C. § 794.

120.    Ke'Aujanaa is a person with a disability within the meaning of Section 504. 29 U.S.C. § 794.

121.    The Districts failed to engage in evaluations and reevaluations as specified and required, thus violating Section 504. 34 CFR § 104.35.

122.    Respondents have intentionally discriminated against Ke'Aujanaa in violation of Section 504 by failing to provide comprehensive educational evaluations resulting in a denial of a FAPE to Ke'Aujanaa.

123.    Respondents have otherwise intentionally discriminated against in violation of Section 504. As a direct and proximate cause of Respondents' violation of Section 504,

PLAINTIFFS 00003151

Ke'Aujanaa has suffered and continues to suffer educational, social, and behavioral impacts, emotional distress, and other injuries she will continue to suffer.

**D.    RESPONDENTS VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 et seq.**

124.    Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

125.    Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.

126.    Respondents are each a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

127.    Ke'Aujanaa is a person with a disability within the meaning of the ADA. 42 U.S.C. § 12102.

128.    Respondents intentionally violated Ke'Aujanaa's rights under the ADA and the regulations promulgated hereunder by excluding her from participation in and denying her the benefits of Respondents' services, programs, and activities, and by subjecting her to discrimination in violation of 42 U.S.C. § 12132.

129.    Respondents otherwise intentionally discriminated against Ke'Aujanaa, in violation of 42 U.S.C. § 12132.

130.    As a direct and proximate cause of Respondents' violation of the ADA, Ke'Aujanaa has suffered and continues to suffer educational, social, and behavioral impacts, and other injuries she will continue to suffer.

CONFIDENTIAL

**E.     RESPONDENTS VIOLATED THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, M.C.L. 37.1101 et seq.**

131.     Petitioners incorporate by reference all previous paragraphs of the Complaint herein.

132.     The Persons with Disabilities Civil Rights Act guarantees, as a civil right, the full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability. M.C.L. 37.1102.

133.     The PDCRA further prohibits educational institutions from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution or its services, or because of the use by an individual of adaptive devices or aids." M.C.L. 37.1402.

134.     Respondents are each an educational facility within the meaning of M.C.L. 37.1102 and an educational institution within the meaning of M.C.L. 37.1401.

135.     Ke'Aujanaa has a disability as defined in M.C.L. 37.1103.

136.     Ke'Aujanaa's disabilities are unrelated to her ability to utilize and benefit from Respondents' services.

137.     Respondents discriminated against Ke'Aujanaa in the full utilization of or benefit from the services provided and rendered by Respondents due to Ke'Aujanaa's disability.

138.     Respondents otherwise violated Ke'Aujanaa's rights under the PDCRA.

## VI.     PRAYER FOR RELIEF

WHEREFORE, as a "proposed resolution of the problem" under 20 USC § 1415(b)(7)(A)(ii)(IV) and 34 CFR § 300.508(b)(6), Petitioners request the following relief:

A.  Find that Respondents violated state and federal law;

PLAINTIFFS 00003153

CONFIDENTIAL

B.  Order compensatory education for Petitioner;

C.  Order compensatory related services, such as social work services, for Petitioner;

D.  Order both Districts to ensure that comprehensive education evaluations are conducted for students in all suspected areas of eligibility and that information is obtained to all the IEP team to determine all special education services and supports necessary for the student to make progress in light of her or his circumstances;

E.  Order training for both Districts and KRESA staff regarding comprehensive educational evaluations;

F.  Order KRESA to ensure that its constituent districts engage in comprehensive educational evaluations and provide eligible students with a FAPE;

G.  Enjoin the Respondents from implementing all policies and practices that violate or have the effect of violating Petitioner's federal protected rights;

H.  Order MDE to implement a state-wide, pro-active enforcement protocol for ensuring compliance with MDE-OSE corrective action plans that includes, but is not limited to, a determination of whether the corrective action plan has resulted in providing the student with an educational program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F*, 137 S Ct 988, 999 (2017).

I.  Order MDE to hire and/or reallocate the appropriate number of staff to ensure that corrective action plans are enforced and result in the changes prescribed;

J.  Order MDE to engage in pro-active monitoring, including substantive review of the facts and follow-up with parents to review the child's current circumstances, to ensure compliance with federal and state law;

K.  Order MDE to exercise its authority under MARSE R 340.1855;

CONFIDENTIAL

CONFIDENTIAL

L.  Find that Petitioner is the prevailing party;

M.  Award Petitioner damages;

N.  Award Petitioner reasonable attorneys' fees and costs under 42 USC § 1988 and/or other

applicable statutes; and

O.  Any other relief deemed necessary.

PLAINTIFFS 00003155

CONFIDENTIAL

DocuSign Envelope ID: 372D218A-464D-4D7C-831B-AE57134CC25C

Respectfully submitted,

Dated: 2/17/2022 _____

Ke'Aujanaa Shepherd-Friday
Petitioner

Dated: 2/18/2022 _____

Jacquelyn Babinski (P83575)
MI AECRES
PO Box 705
Ludington, MI 49431

Dated: 2/18/2022 _____

Elizabeth K. Abdnour (P78203)
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw Street, Suite 4A-2
Lansing, MI 48915
(517) 292-0067
elizabeth@abdnour.com