# EXHIBIT AJ



OFFICE OF SPECIAL EDUCATION
SPECIAL EDUCATION COMPLAINT INVESTIGATION REPORT

**Complainant:**
George White
4022 Rockwood Drive
Kalamazoo, MI 49004

**Case Number:** 19-0188

**Public Agency:**
Michigan Department of Education
Office of Special Education
Rebecca McIntyre, Supervisor
Program Accountability
608 West Allegan
PO Box 30008
Lansing, MI 48909

**COMPLAINT DECISION
AND
PLAN FOR
CORRECTIVE ACTION**

**District:**
Gary Start, District Superintendent
Kalamazoo Public Schools
1220 Howard St
Kalamazoo, MI 49008-1882

**Case Manager:**
Gina Alexander

**Date of Decision:**
November 8, 2019

On September 9, 2019, the Michigan Department of Education, Office of Special Education (OSE) received a special education complaint filed by George White (Complainant) on behalf of K███ B███. The complaint alleged that the Kalamazoo Public Schools (District), which is under the jurisdiction of the Michigan Department of Education (MDE), violated the Individuals with Disabilities Education Act (IDEA). Complaints may be filed by any individual or organization, in accordance with 34 CFR § 300.153. The Complainant in this matter is a third party. A release of information from the Student's parent was submitted; therefore, the OSE was able to communicate directly with the third party during the investigation of this complaint. Pursuant to the Code of Federal Regulations 34 CFR §§ 300.151 through 300.153 implementing the IDEA, the OSE conducted an investigation into the allegations in this complaint. Consistent with the IDEA and Federal Regulations, the MDE issues the following Findings of Fact, Conclusions and Decision.

**Complaint Issues:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§ 300.17 and 300.101. Specifically:

    i.  Whether the District met its Child Find obligation to identify, locate and evaluate a student with a disability pursuant to 34 CFR §§ 300.111 and 300.301.

Case Number: 19-0188

Page 1 of 17

    ii.   Whether the District afforded the Student the procedural safeguards contained in the IDEA's discipline provisions for students not determined eligible for special education consistent with 34 CFR § 300.534.

**Investigatory Process:**

Documents reviewed include:

    Original state complaint document; and
    Educational records submitted by the District.

Interviews were conducted with the following:

    Complainant (Advocate);
    Parent;
    General education teacher;
    Clinical social worker;
    Counselor;
    Administrator of student services; and
    Special education director.

The OSE provided the District and Complainant the opportunity to submit additional information for consideration during the investigation of this complaint.

**Applicable Federal Regulations or State Rules:**

34 CFR § 300.111  Child find

34 CFR § 300.301  Initial evaluations

34 CFR § 300.534  Protections for children not determined eligible for special education and related services

**Relevant Time Period:**

Pursuant to 34 CFR § 300.153(c), the OSE has the authority to investigate allegations of violations that occurred not more than one year from the date the complaint was received. In light of this limitation, the investigation will be limited to the period of time from September 10, 2018 to September 9, 2019 for the purpose of determining if a violation of the IDEA or the MARSE occurred. However, records beyond this timeframe may be reviewed for the purpose of developing a complete record for the student.

**Findings of Fact:**

1. The Student was enrolled in the District's alternative middle school as a 12-year-old seventh grader for the 2018 - 2019 school year and in the District's middle school, as a 13-year-old eighth grader for the 2019 - 2020 school year. The Student was not eligible for special education services at the time of enrollment for either school year.
2. District staff reported the Student was referred to the alternative middle school by staff from the Student's "home school." The "home school" was a school in the District which the Student previously attended.
3. Written procedures provided by the District regarding the alternative middle school, which is a tier three general education intervention/program, indicated in salient part:
    i.   Overview –
        a.   The alternative middle school "is a short-term behavior modification program for middle school youth who have experienced behavior difficulty at

        their home middle school. Students are expected to progress through three phases before being recommended for transition back to their home middle school."
- b. The alternative middle school "is available to middle school students who attend a school in the District. The alternative middle school exists to better prepare students for middle school and high school. Students may arrive at the alternative middle school at the beginning of any of the three marking periods throughout the academic year. However, the goal at the alternative middle school is to have each student transferred back to their original school (or home school) before the school year finishes. Students may be transferred back to their home school at the beginning of each marking period should they do well at the alternative middle school. The alternative middle school gives students an opportunity to better themselves as students in the areas of reading, writing, and mathematics. In addition to improving each student's learning skills, the alternative middle school works to promote good social skills in both classroom settings and real-life settings. In order to successfully prepare students for the real world, the alternative middle school works to improve the literacy skills, math skills and social skills of each student. The alternative middle school educators work hard to help each student discover how he or she learns best as an individual. Every alternative middle school educator wants to see each student improve and succeed. Upon the student's return, each home school will be able to see a clear improvement in the student's social skills and scholastic skills."

ii. Pre-referral – A pre-referral was the first step in recommending a student to the alternative middle school. The pre-referral was an additional intervention and did not automatically result in placement at the alternative middle school. An intervention plan must be developed during the pre-referral meeting (at the home middle school) and must be implemented for a minimum of three weeks before a referral could be submitted to the alternative middle school.

iii. Entrance procedure –
- a. "Entrance of students every six weeks at the beginning of a new marking period. Pre-referral process should begin three weeks prior to making a referral. Home schools need to make the appropriate contact with families and the alternative middle school. The pre-referral documentation should be sent to student services as well as the director of secondary education to remove any opportunity for families to circumvent the process."
- b. "Students referred by student services will be able to enter the program at any time with consideration being that there is an attempt to be as close to the six-week dates as possible without violating their Free and Appropriate Public Education rights (FAPE). Alternative middle school intake meetings will be held over two days to ensure students understand all expectations and to ascertain baseline reading and mathematics data. These meetings will be facilitated by the principal, behavior specialist and paraprofessional."
- c. "Middle school teams may continue to pre-refer students to the alternative middle school through the Friday before Memorial Day. After this date, student behavior will be monitored through the pre-referral process and if they continue to make negative choices, they will be referred to begin the upcoming school year at the alternative middle school. Staff will work with

      the families between that date and the beginning of the year to ensure a smooth transition."
- iv. Guidelines for success – All students were encouraged to be a S.T.A.R.:
  - a. S – Strive for excellence;
  - b. T - Take learning seriously;
  - c. A - Always follow the rules; and
  - d. R - Respect and care for people and belongings.
- v. Phases – The three phases were:
  - a. Orientation (phase O) - Students were learning the rules and expectations of the program. Orientation students would often have difficulty remaining in the classroom, completing class work/homework, respecting authority, using appropriate behaviors in areas outside the classroom and interacting appropriately with peers. A student must show improvement in these areas to move to the next level.
    1. Grades – All passing grades.
    2. Days of credit – Less than ten.
    3. Referrals – No information was indicated in this section of the document.
    4. Behavioral reflections – No information was indicated in this section of the document.
  - b. Phase I - Students had learned the rules and expectations of the program and were able to remain in the classroom for periods of time that would allow for completion of classwork. Phase I students would be expected to complete and return homework. Phase I students would begin to display improvement and resilience in all areas of behavior.
    1. Grades – All passing grades.
    2. Days of credit – Ten or more.
    3. Referrals – No more than five including the bus.
    4. Behavioral reflections – No more than 12 behavioral reflections.
  - c. Phase II - Students had progressed academically and behaviorally and showed consistent resilience to challenges in behavior. Students completed classwork and homework on time. Phase II students were ready to begin the transition back to their home school.
    1. Grades – All passing grades with C's in three or more classes.
    2. Days of credit – 12 or more.
    3. Referrals – No more than three including the bus. No violent (behavior) referrals.
    4. Behavioral reflections – No more than eight behavioral reflections.
- vi. Point system –
  - a. Every day each student began each class period with 20 points which meant 120 points total were available to earn throughout the day. If students completed homework and behaved well throughout the day, the points were kept. If students participated well in class, were respectful towards educators and classmates, the points could be used to buy prizes. Prizes included snacks, pencil toppers, and time during genius hour to play in the gymnasium.
  - b. Points could be lost in several different ways which included causing distractions in class, bullying, not completing homework, not paying attention in class, or coming to class unprepared. If points were taken away

      often enough, students may get moved down a phase. Losing points was not a guarantee that students would get moved down a phase. However, the alternative middle school teachers used the loss of points on a consistent basis as a sign that a student was not trying very hard. Points were a good way to see the behavior or habits of each student. Habits and behaviors that kept students and fellow classmates from learning should be corrected for everyone to be able to learn well. In the event of an incident with any student where a rule was broken, consequences would be given accordingly. Depending on the severity of the situation, a student may lose all of the points for the day, be sent to the hall or principal's office, made to write an apology letter or have a parent/guardian called.

  vii. Exit procedures –
     a. "Exit of students that have completed the phase program will occur every 12 weeks (trimester). Successful completion of the phases ensures the students have the skills and tools necessary to re-enter their home school and be successful."
     b. "There will be a transition meeting held for students returning to their home schools or anticipated high school three weeks before they are to return. This ensures the school is properly informed of strategies, achievements and any changes to plans and can properly support the child's re-entry. Parents, teachers, students and administrators will be involved in this conversation."
        1. Summer school – "Students currently enrolled in the alternative middle school who attend and successfully complete summer school may be "credited" six weeks progress toward advancing to the next phase. This acts as an incentive to encourage students to be fully invested in this support."

4. The investigatory timeframe for this complaint was September 10, 2018 to September 9, 2019. For the purpose of providing context, some facts are included which fall outside this window.
5. The Student began attending the alternative middle school during the 2017 – 2018 school year.
6. On January 16, 2018, the Student was evaluated and found ineligible for a specific learning disability. Evaluation information was requested but not provided.
7. The District's response indicated on or about October 26, 2018, the Student was referred to a child study team and an intervention plan was created. A copy of the intervention plan was requested but not provided.
8. The Student met with the District's clinical social worker during the 2018 – 2019 school year. Contact logs provided by the District indicated in summarized part:
  i. The Student did not have an IEP, section 504 or behavioral plan.
  ii. On November 27, 2018, the clinical social worker obtained permission to provide services to the Student from the Parent.
  iii. The Student met one-on-one with the clinical social worker for services on -
     a. December 3, 2018 – Completed intake interview, discussed interests, school, favorite subjects and set goals.
        1. Notes indicated: The Student appeared open to meeting. The clinical social worker informed the Student the Parent requested the Student meet for about a half hour weekly to address current issues or to talk. When asked how the Student became a part of the alternative middle school, the Student reported hitting a student with a bathroom stall

**CONFIDENTIAL**

        door. When asked about the Student's attitude towards school, the Student replied, "gotta do it." The Student planned to attend another middle school.
- b. December 10, 2018 – Discussed the Student's week/weekend and peer relationships. The Student was very short with answers and did not offer a lot of information.
- c. January 7, 2019 – Briefly checked in with Student, discussed interests and revisited goals.
    1. Notes indicated in salient part: There was a discussion about Christmas and how the Student did not receive presents. The Parent required the Student earn presents by exhibiting good behaviors. The conversation shifted to the Student's goal to leave the alternative middle school. The Student happily reported receiving all of the points in classes and had received credit for the day. The Student was leaving the program on March 15, 2019. The Student was clear on what was needed to do to move to phase one. The Student was encouraged to keep up the good work and reassured of being capable of having good days at school by not exhibiting behaviors which affected the Student moving toward leaving the program.
- d. February 14, 2019 - Brief meeting to discuss journal. The Student had lost the journal.
- e. March 4, 2019 - Discussed the Student's incident-free weekend and making poor choices.
    - iv. Additional attempts were made by the clinical social worker to provide service to the Student on December 19, 2018, January 14 and March 11, 2019. The Student was absent December 19, 2018 and suspended January 14 and March 11, 2019.
9. A color-coded Student attendance calendar for the 2018 – 2019 school year, provided by the District, reflected:
    - i. 52 days of suspension and 21 days of "homebound" –
        - a. September 27, 2018 (one day);
        - b. October 25 - 26, 2018 (two days);
        - c. November 2018 -
            1. 6th through 19th (ten consecutive days); and
            2. 28th and 29th (two days).
        - d. December 2018 -
            1. 6th and 7th (two days);
            2. 17th and 18th (two days); and
            3. 21st (one day).
        - e. January 14 - 15, 2019 (two days);
        - f. February 15, 18 and 20, 2019 (three days);
        - g. March 8, 14, 18, 25 and 26, 2019 (five days);
        - h. April 2019 -
            1. 8th and 9th (two days); and
            2. 17th through 30th (ten days).
        - i. May 2019 -
            1. 1st through 24th (18 days identified as "homebound"); and
            2. 28th through 31st (four days).
        - j. June –
            1. 3rd through 10th (six days); and

Case Number: 19-0188      Page 6 of 17

        2. 11th through 13th (three days identified as "homebound").
    ii. 28 days of unexcused absences.
10. On May 23, 2019, the Student violated the District's student code of conduct by trespassing and assaulting another student.
11. An exclusion recommendation letter from the District, dated June 11, 2019, to the Parent indicated in salient part:
    i. The Student was recommended for exclusion from the District for 29 school days (until the end of the first six week marking period in the 2019 - 2020 school year) for trespassing and assaulting another student.
    ii. The incident occurred on May 23, 2019 and was a category III violation of the District's student code of conduct. At the time of May 23, 2019 incident, the Student was already excluded from the District for the remainder of the 2018 – 2019 school year due to a prior incident.
    iii. A due process hearing was held on June 5, 2019.
    iv. The Student had been involved in 40 incidents during the school year and was passing one of the Student's six classes via homebound instruction.
    v. The exclusion would begin September 3, 2019.
    vi. The Student would be required to satisfactorily complete five counseling sessions prior to returning to school.
    vii. The Student would receive homebound services during the exclusion period.
12. The Student received F's as final grades for the 2018 - 2019 school year in language arts, mathematics, strategic mathematics and reading 180. The Student received an A as the final grade for social studies.
13. A letter from the District to the Parent, dated June 27, 2019, confirmed the decision to exclude the Student for trespassing and assaulting another student. The letter reiterated information from the June 11, 2019 letter to the Parent and added the following in salient part:
    i. During the exclusion period, the Student was not allowed to be on any District property or attend any school-related activities.
    ii. The Student would need to complete five counseling sessions and provide verification of counseling prior to returning to school on October 14, 2019.
14. District staff reported a relative of the Student encouraged the District to require the Student to complete counseling sessions to assist with the Student's anger management. The District connected the Student and Parent with counseling agencies and provided the Student with homebound services which included providing assignments via a certified paraprofessional or teacher consultant.
15. A Student detail form, provided by the District, identified cumulative offenses and disciplinary action totals for the 2018 – 2019 school year. The form indicated in salient part:
    i. Offenses -
        a. Refusing to follow school and classroom rules – two;
        b. Potentially harmful behavior to oneself or others – one;
        c. Intentional damage, destruction of property – one;
        d. Inciting others to break school rules – five;
        e. Fighting – four;
        f. Repeated disruptive behavior – 24;
        g. Intimidation – nine;
        h. Inappropriate physical contact – three;
        i. Inappropriate sexual comments/gestures – five;

      j. Defiance of school personnel – 11; and
      k. Assault – four.
      l. Total – 69.
  ii. Disciplinary action totals identified with "total duration" in days and "total actions" respectively-
      a. Parent/guardian phone call – one and 56;
      b. Parent/guardian conference – zero and three;
      c. Counselor/staff conference – zero and one;
      d. Bus suspension – three and one;
      e. Lunch detention – one and 20;
      f. Conference with administrator – one and one;
      g. Apology letter – zero and two;
      h. Conference with the behavior interventionist – zero and one;
      i. Detention – one and one;
      j. Exclusion – 64 and two;
      k. Parent/guardian email - zero and three;
      l. Peer mediation - zero and two;
      m. Removal from class - zero and three;
      n. Restraint (physical) – one and one;
      o. Suspension combined with another incident – zero and six;
      p. Suspension – 55 and 20; and
      q. Switched to another class - zero and one.
        1. Totals: duration – 127 days and actions – 124.
16. Based on suspension information from the Michigan Student Data System (MSDS), the District reported the following regarding the Student's number of suspensions during the 2018 – 2019 school year:
  i. Fall 2018 general collection (July 1, 2018 to October 3, 2018) – one incident totaling one day;
  ii. Spring 2019 general collection (October 4, 2018 to February 13, 2019) - eight unique incidences totaling 23 days;
  iii. End-of-year general collection (February 14, 2019 to June 30, 2019) – 12 unique incidences totaling 103 days;
  iv. Student record maintenance – corrected one disciplinary incident, dated May 28, 2019, by removing 35 days, which was originally reported in the end of year general collection as a ten-day initial consequence and a 35-day secondary consequence; and
  v. MSDS discipline and consequence summary for 2018 - 2019 included 21 unique incidences, totaling 92 days of suspension.
17. Days of suspension indicated on the Student's attendance calendar did not match the number of suspension days identified on the Student detail document or data reported to the Michigan Student Data System.
18. District staff reported the following regarding the Student:
  i. An initial special education evaluation was previously completed during the 2017 – 2018 school year for a specific learning disability and the Student did not qualify for special education services.
  ii. The Parent's health was declining and the Student was struggling with the change.
  iii. District staff provided academic and behavioral support to the Student in various ways, which included:

      a. Placement in strategic classes including mathematics and reading;
      b. Participation in genius hour with tiered interventions in reading and mathematics groups with a focus on the Student's areas of need;
      c. Tutorial supports during and after school;
      d. Service from a clinical social worker;
      e. Utilizing comfortable learning zones;
      f. Smaller class size settings;
      g. Placement in classes with different combinations of students (e.g. boys and girls and all girls);
      h. Separating Student from sibling;
      i. Preferential seating;
      j. Utilizing a behavior room with support of a behavior specialist;
      k. Lunch and/or after school detentions;
      l. Alternative (class) passing times;
      m. Use of incentives to earn rewards;
      n. Taking breaks to calm down;
      o. Verbal encouragement;
      p. Connecting the family with wraparound services/outside agencies;
      q. Utilizing a point system which transferred into credits; and
      r. Working with a paraprofessional to assist with completing assignments.
- iv. The Student's behaviors consisted of making verbal threats, defiance, being consistently disruptive and refusing to attend class.
- v. Staff did not discuss a special education evaluation for the Student.
- vi. Staff wanted to see if different interventions and wrap-around services would be beneficial for the Student and family.
- vii. District staff did not approach administration with concerns regarding the Student requiring a special education evaluation due to suspecting a disability.
- viii. The Parent did not make a request for a special education evaluation for the Student, in writing or verbally, to any District staff member.

19. Per contact logs, on August 28, 2019, the clinical social worker followed up with the Parent via phone. The Parent reported the Student and sibling were in counseling, doing well and had almost completed the required 16 sessions. The family would be moving into a home on the southside but were excited and ready for a "change of pace." The Parent also reported the Student was getting set up for an IEP through community mental health and would possibly go to another school.
20. The Parent reported during an interview:
    - i. Not requesting a special education evaluation during the 2018 – 2019 school year.
    - ii. Having medical concerns and receiving support from outside agencies for self and the Student.
    - iii. Wanting to know how and when the Student would be able to attend a "regular school."
    - iv. Being concerned about the Student's education and how the Student was "not doing well."
    - v. Sharing concerns about the Student's multiple suspensions with District and community mental health staff.
    - vi. The Student's behaviors developed, increased and intensified due to enrollment in the alternative middle school.
    - vii. Due to the frequent suspensions throughout the year, the Student was "behind"

       academically and could not "catch up" because learning had not taken place.
- viii. The Student received support from a clinical social worker throughout the school year and "homebound" services (at the end of the school year).

21. During interviews, District staff reported:
    i. The Student would verbalize to staff what the Student had done wrong and often refused to complete requests made by staff.
    ii. Tiered interventions were not successful with the Student.
    iii. The Student was not responding to interventions; however, staff did not suspect the Student had a disability.
    iv. Some of the Student's behaviors were attributed to the change in the Parent's health, housing issues, changes in schools and interactions with the sibling who also attends the alternative middle school.
    v. The Student's negative behaviors increased when interacting with the sibling.
    vi. The Student could be successful if the Student's "mindset" was "focused" and "buying in" to the program's point system.
    vii. Concerns of the Student not being "invested" in the program.
    viii. Having on-going communication with the Parent via phone and in person.
    ix. The Student's interactions with the clinical social worker were sporadic as the Student refused service or was suspended.

22. District staff from the alternative middle school utilized a child study team process to address concerns regarding students attending the alternative middle school. Multiple District staff reported:
    i. Meetings occurred once a month to discuss students who had academic and behavioral concerns. District staff would refer students to the team and work together to determine the best resources and supports for individual students.
    ii. Members of the child study team included the building principal, counselor, school psychologist, school social worker, clinical social worker, behavior specialist and a representative from community mental health.
    iii. Data, from students referred to the child study team, was analyzed by District staff to determine if students were meeting academic growth standards and/or in need of additional behavioral supports.

23. The District's staff handbook included a section on Child Find which indicated: "As part of IDEA and the Michigan Revised School Code, if a staff member receives a written request from a parent or guardian to evaluate their child for special education eligibility, then the school psychologist, speech therapist, or Student Services must be notified within 24 hours. The school psychologist or speech therapist need to meet with the parent/guardian within 10 school days to conduct a review of existing evaluation data. The parent/guardian must sign for the evaluation being proposed. This includes Child Find efforts involving any student suspected of having a disability or having a disability who is in need for special education and related services. The consent for evaluation must be signed from the parent to proceed with conducting the evaluation. If staff members determine that an evaluation is not needed, then written support for refusing the evaluation must be made. Staff members need to notify a Student Services administrator if this occurs to review the written notice before it is sent to the parent/guardian."

24. A written request for an evaluation, dated September 7, 2019, was provided to District staff by the Student's Parent. The request asked the District to perform academic, emotional, cognitive and other health impairment evaluations.

**Conclusions:**

**Issue 1i:**

1. "Child find" is the affirmative, ongoing obligation of states and local districts to identify, locate, and evaluate all children with disabilities residing within the jurisdiction who are in need of special education and related services. 34 CFR § 300.111(a)(1)(i).
2. Child find must include:
    i. Children who are suspected of being children with disabilities under 34 CFR §300.8 and in need of special education, even if they are advancing from grade to grade; and
    ii. Highly mobile children, including migrant children. 34 CFR § 300.111(c).
3. The IDEA requires that a State (i.e., public agency) have in effect policies and procedures to ensure that the State (i.e., public agency) identifies, locates and evaluates all children with disabilities residing in the State, regardless of the severity of their disability, and who are in need of special education and related services. It is critical that this identification occur in a timely manner and that no procedures or practices result in delaying or denying this identification. Letter to State Directors of Special Education, (OSEP 2013).
4. States and LEAs have an obligation to ensure that evaluations of children suspected of having a disability are not delayed or denied because of implementation of an RTI strategy. The use of RTI strategies cannot be used to delay or deny the provision of a full and individual evaluation. It would be inconsistent with the evaluation provision of the IDEA for an LEA to reject a referral and delay an initial evaluation on the basis that a child has not participated in an RTI framework. Memo to State Directors of Special Education, January 21, 2011 (OSEP).
5. Consistent with the consent requirements in § 300.300, either a parent of a child or a public agency may initiate a request for an initial evaluation to determine if the child is a child with a disability. 34 CFR § 300.301(b).
6. A district may not take a passive approach and wait for others to refer the student for special education services; the district must seek out IDEA-eligible students. *Compton Unified Sch. Dist. v. Addison*, (9th Cir. 2010), cert. denied, , 132 S. Ct. 996 (2012).
7. Districts are responsible for conducting child find and identifying all IDEA-eligible students that reside in their jurisdiction. Because the child find obligation is an affirmative one, a parent is not required to request that a district identify and evaluate a child. Robertson County Sch. Sys. v. King, 99 F.3d 1139, 95-5526 (6th Cir. 1996, unpublished).
8. According to the Sixth Circuit, a petitioner needs to prove that the school district "overlooked clear signs of disability" and were negligent in failing to order testing, or that there was "no rational justification for failing to evaluate." Bd. of Educ. of Fayette County, Kentucky v. L.M., 47 IDELR 20122 (6th Cir. 2007), at para. 1, cert. denied, 110 LRP 48155, 128 S. Ct. 693 (2007) (citing Clay T. v. Walton County Sch. Dist., 952 F.Supp. 817, 823 (M.D.Ga.1997)).
9. The Student was referred to the building's child study team in October 2018, after receiving three cumulative days of suspension, which resulted in the reported development of an intervention plan.
10. After a ten-day consecutive suspension issued in November 2018 and Parent request, a clinical social worker gained consent from the Parent to provide services to the Student. The Student received services in December 2018, January, February and March 2019 yet continued to be suspended at progressively higher frequency rates, until being placed on homebound services in May 2019, due to a code of conduct

violation.
11. Based on documentation provided by the District, the Student did not successfully meet requirements or move out of the orientation phase at the alternative middle school.
12. Although the District did not receive a written request from the Parent to evaluate, this does not negate the District's ongoing Child Find obligations to seek out IDEA-eligible students. The Student was placed in a short-term, tier-three behavior modification program at an alternative middle school as an intervention to address the Student's behavioral needs and was enrolled for over a year. During this intervention time, the District reported the Student was not responding to interventions, and as a result, the Student's behaviors increased in frequency and intensity, as well as the Student's academic concerns persisted.
13. Despite the District's attempts to provide multiple supports through interventions, the Student reportedly failed to respond to interventions and continued to accrue numerous suspensions and failing grades resulting in a lack of progress in general education and ongoing behavioral concerns which increased in frequency and intensity. The District had reason to suspect a disability and pursue an evaluation consistent with their Child Find obligation.

Issue 1ii:
1. A child who has not been determined to be eligible for special education and related services under this part and who has engaged in behavior that violated a code of student conduct, may assert any of the protections provided for in this part if the public agency had knowledge (as determined in accordance with paragraph (b) of this section) that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred. 34 CFR § 300.534(a).
2. A student is determined to be eligible for special education and related services under IDEA and MARSE if, it has been determined by a group of qualified professionals and the Parent of the student, that the student has a disability as defined under 34 CFR § 300.8 and is in need of special education and related services consistent with 34 CFR §§ 300.111(c)(1) and 300.306(a)(1).
3. As a learner with a disability eligible under the IDEA, a student is entitled to receive a FAPE according to an individualized education program (IEP), which includes discipline protections, special education, related services, and supplementary aids and services designed to meet the Student's unique educational needs. 34 CFR § 300.17.
4. A public agency must be deemed to have knowledge that a child is a child with a disability if before the behavior that precipitated the disciplinary action occurred—
   i. The parent of the child expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;
   ii. The parent of the child requested an evaluation of the child pursuant to 34 CFR §§ 300.300 through 300.311; or
   iii. The teacher of the child, or other personnel of the LEA, expressed specific concerns about a pattern of behavior demonstrated by the child directly to the director of special education of the agency or to other supervisory personnel of the agency. 34 CFR § 300.534(b).
5. If the district does not have knowledge, no IDEA disciplinary protections are available and the district may discipline the student with a disability the same way it would

    discipline a nondisabled student for similar misconduct. 34 CFR § 300.534(d).

6. According to the Office of Special Education and Rehabilitative Services (OSERS), "If a child engages in behavior that violates the code of student conduct prior to a determination of his or her eligibility for special education and related services and the public agency is deemed to have knowledge of the child's disability, the child is entitled to all of the IDEA protections afforded to a child with a disability, unless a specific exception applies. In general, once the student is properly referred for an evaluation under Part B of the IDEA, the public agency would be deemed to have knowledge that the child is a child with a disability for purposes of the IDEA's disciplinary provision." OSERS, Questions and Answers on Discipline Procedures, (June 1, 2009).
7. The Student was placed in a short-term, tier-three behavior modification program at an alternative middle school as an intervention to address behavioral needs and was enrolled for over a year. During this intervention time, the Student's behaviors increased in frequency and intensity, as well as the Student's academic concerns persisted.
8. The Parent did not express concerns in writing to District staff indicating a need for special education and related services or request an evaluation of the Student.
9. The teacher of the Student or personnel from the District did not express concerns about the Student's repeated pattern of behavior to the director of special education or supervisory personnel in the District; however, a referral was made to the child study team.
10. Although District staff did not express concerns regarding the Student to administrative staff, the standards regarding when to suspect a disability require reconsideration, as there was originally enough staff concern to initiate the child study team process and develop an intervention plan. Intervention and supports provided to the Student were clearly not achieving the intended results and behaviors increased and academic concerns persisted.
11. At the very least, the District had reason to suspect the Student may have a disability at the end of November 2018 when after conducting a child study team meeting and implementing an intervention plan, the Student's discipline removals increased in intensity and length and resulted in removals of more than ten cumulative school days, which prompted the addition of a clinical social worker.
12. The District continued to suspend the Student throughout the remainder of the 2018 – 2019 school year. Attendance records provided by the District demonstrate 73 cumulative days of removal due to behavior; whereas the Michigan Student Data System demonstrates 92 cumulative days of removal due to behavior.
13. Therefore, the District did not provide the Student the procedural safeguards contained in the IDEA's discipline provisions for students not determined eligible.

Overall FAPE:
1. The IDEA requires that a State (i.e., public agency) have in effect policies and procedures to ensure that the State (i.e., public agency) identifies, locates and evaluates all children with disabilities residing in the State, regardless of the severity of their disability, and who are in need of special education and related services. It is critical that this identification occur in a timely manner and that no procedures or practices result in delaying or denying this identification. Letter to State Directors of Special Education, July 19, 2013 (OSEP).
2. The IDEA seeks to ensure that children with disabilities have access to a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of children with

    disabilities and their parents or guardians are protected. 20 U.S.C. § 1400. Further, the IDEA "provides federal funds to assist state and local educational agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures. One of those goals/procedures is the affirmative duty of the state (i.e., the local educational agency) to assure that "all children residing in the State (i.e., local educational agency) who are disabled . . . and who are in need of special education and related services are identified, located, and evaluated." 20 U.S.C. § 1412(2)(C); *Robertson County Sch. Sys. v. King*, 99 F.3d 1139, 95-5526, October 15, 1996 (6th Cir., unpublished) (citing *Wise v. Ohio Dept. of Educ.*, 80 F.3d 177, 181 (6th Cir. 1996)).

3. A FAPE means special education and related services that are provided in conformity with an IEP. 34 CFR § 300.17(d).
4. Failing to meet Child Find requirements is a matter of serious concern that can deny FAPE to a student whom a district should have identified. This failure to identify may entitle the student to compensatory education or tuition reimbursement accruing from the time the district first should have suspected the disability. *T.B. v. Prince George's County Bd. of Educ.*,17-1877, July 26, 2018 (4th Cir.); *Robertson County Sch. Sys. v. King*, 95-5526, October 15, 1996 (6th Cir., *unpublished*); *Lakin v. Birmingham Pub. Schs.*, 70 F. App'x 295, 02-1137 (6th Cir. 2003); and *Department of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, August 3, 2001 (D. Hawaii).
5. In reviewing the violations above regarding Child Find, the Student's lack of academic and behavior progress, even with interventions, affected the Student's substantive rights. The Student's learning and educational benefit was negatively impacted.
6. If the Student is found eligible for special education services, the violation rises to a denial of a FAPE.

**Decision:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§ 300.17 and 300.101. Specifically:
   i. Whether the District met its Child Find obligation to identify, locate and evaluate a student with a disability pursuant to 34 CFR §§ 300.111 and 300.301.

   **The District had reason to suspect that the Student might be a student with a disability and in need of special education. The District did not meet their Child Find obligation. The MDE determines a violation.**

   ii. Whether the District afforded the Student the procedural safeguards contained in the IDEA's discipline provisions for students not determined eligible for special education consistent with 34 CFR § 300.534.

   **The District did not afford the Student the procedural safeguards contained in the IDEA's discipline provisions for students not determined eligible for special education. The MDE determines a violation.**

**Student Level Corrective Action Plan:**

If the District has not already done so, within 30 school days or no later than the dates indicated below, the District must provide student level corrective action as follows:

1. By January 15, 2020, consistent with the conclusions outlined in this final decision, conduct a review of existing evaluation data to:
   i. Review all relevant Student data from the Student's educational file, including input from the teacher and the Parent(s);

    ii. Identify all of the Student's potential special education and related service needs;
    iii. On the basis of the review, determine the evaluations that need to be conducted to consider all areas of suspected disabilities, consistent with 34 CFR § 300.304 through 300.311, if any;
    iv. If evaluations were identified, seek consent from the Parent to conduct the evaluation(s) as determined at the review of existing evaluation data; and
    v. Provide prior written notice to the Parent for the evaluation(s) or for a determination that no additional evaluations were needed, including the reasons for the determination.

2. By January 15, 2020, consistent with the conclusions outlined in this final decision, conduct a full and individual initial evaluation that is sufficiently comprehensive and utilizes a variety of assessment tools and strategies to gather current relevant social-emotional, functional, developmental, and academic information about the Student, including information provided by the Parent, to identify all of the Student's special education and related service needs as outlined in the review of existing evaluation data after consent is provided by the Parent, in the following areas of need, as appropriate:
    i. Achievement, social/emotional/behavioral, adaptive skills, cognitive ability, and any other relevant areas of need; and
    ii. A functional behavioral assessment and behavior intervention plan, as appropriate.

3. By January 15, 2020, conduct a multidisciplinary evaluation team meeting to make a recommendation to the IEP team regarding eligibility, and if eligible, identify the educational needs of the Student consistent with the MARSE and the IDEA requirements.

4. By January 15, 2020, conduct an IEP team meeting to determine eligibility. If eligible, develop an IEP that includes:
    i. A present level statement that accurately reflects the Student's academic achievement and functional performance, including how the Student's disability affects the Student's involvement and progress in the general education curriculum.
    ii. Measurable annual goals and short-term objectives designed to meet the Student's needs that result from the disability to enable the Student to be involved in and make progress in the general education curriculum. The goals/objectives must contain the following components:
        a. Baseline data;
        b. Time frame or date;
        c. Skill(s) or a set of skills that can be counted or observed (skill/behavior);
        d. A measurement or assessment strategy (measurement/conditions); and
        e. Level of attainment to show mastery (accuracy rate/criteria).
    iii. Identification of the special education and related services and supplementary aids and services to be provided to the Student.
    iv. A clear description of the frequency, location and duration of the supplementary aids and services.

5. If the Student is found eligible, by January 22, 2020, in collaboration with the Parent and the members of the IEP team, the District must develop a plan for providing a total of 37 hours of compensatory service to address the Student's social-emotional/behavioral and academic needs. The plan must include 30 hours to address the Student's academic needs and seven hours to address social-emotional/behavioral

needs. Services provided are to be in addition to the regular school day and the requirements of the current IEP. The plan could include participation in supervised group programs and/or activities with same age peers that provide the Student with the opportunity to work on social-emotional/behavioral and/or academic skills. Services must be delivered no later than September 1, 2020.

Evidence of the compensatory services ordered in the student level corrective action plan will be reviewed during the district corrective action verification process. See below for compensatory education requirements.

**Corrective Action Plan:**

The district must revise or develop procedures regarding child find, as needed, by June 15, 2020 to document and ensure that:
1. The District fulfills its ongoing Child Find obligation to identify, locate and evaluate students who are suspected of having a disability and in need of special education services.

The district must revise or develop procedures regarding discipline, as needed, by June 15, 2020 to document and ensure that:
1. The District affords students the procedural safeguards contained in the IDEA's discipline provisions for students not determined eligible for special education.

The district must provide professional development by June 15, 2020 for all relevant staff regarding the new procedures.

Evidence of change in the district's practices must be provided and verified by the OSE.

The ISD must upload evidence of the implementation of the compensatory services plan into the technical assistance notes in the district's corrective action plan to be reviewed during the verification process. Documentation must include:
1. Services must be delivered outside the regular school day.
2. A copy of the receipt(s) for services provided if a contractor is used.
3. Service provider logs for the compensatory services indicating the dates, starting and ending times, length of sessions, student absences, make up sessions and a short summary of instruction completed for each session by upload into Catamaran.
4. If the Student is absent on a scheduled day, this session does not need to be made up. Any staff absences require a make-up session.
5. Transportation logs or reimbursement receipts (if applicable).

Evidence of timely compliance and required submissions for Corrective Action Plans and Student Level Corrective Action Plans must be documented in Catamaran. Please direct questions regarding the complaint investigation to Rebecca McIntyre at (517) 335-0457 or mcintyrer1@michigan.gov, and any questions regarding the student level corrective action to Gina Alexander at (517) 335-0461 or alexanderg3@michigan.gov. All correspondence should be clearly marked as pertaining to case 19-0188.

Rebecca McIntyre, Supervisor
Program Accountability
Office of Special Education

cc:     H█████ B███
        Reuquiyah Saunders
        Mindy Miller
        David Campbell
        Tori Wentela
        Jordan M. Bullinger

Case Number: 19-0188

Page 17 of 17