# EXHIBIT AP

CONFIDENTIAL



OFFICE OF SPECIAL EDUCATION
SPECIAL EDUCATION COMPLAINT INVESTIGATION REPORT

| | |
|---|---|
| **Complainant:**<br>George White | **Case Number:** 21-0007 |
| **Public Agency:**<br>Michigan Department of Education<br>Office of Special Education<br>Rebecca McIntyre, Supervisor<br>Program Accountability<br>608 West Allegan<br>PO Box 30008<br>Lansing, MI 48909 | **COMPLAINT DECISION**<br>**AND**<br>**PLAN FOR**<br>**CORRECTIVE ACTION** |

**District:**
David Campbell, ISD Superintendent
Kalamazoo RESA
1819 East Milham Ave
Kalamazoo, MI 49002-3035

**Case Manager:**
Sarah Radu

**Date of Decision:**
March 23, 2021

On January 27, 2021, the Michigan Department of Education, Office of Special Education (OSE) received a special education complaint filed by George White (Complainant) on behalf of K▉▉ B▉▉. The complaint alleged that the Kalamazoo RESA (District), which is under the jurisdiction of the Michigan Department of Education (MDE), violated the Individuals with Disabilities Education Act (IDEA) and the Michigan Administrative Rules for Special Education (MARSE).

Complaints may be filed by any individual or organization, in accordance with to 34 CFR §300.153. The Complainant in this matter is a third party. A release of information from the Student's parent was not submitted; therefore, the OSE was not able to communicate directly with the third party during the investigation of this complaint. The third party Complainant will not receive a copy of this report but will be notified when the investigation has been concluded.

Pursuant to the Code of Federal Regulations 34 CFR §§300.151 through 300.153 implementing the Individuals with Disabilities Education Act (IDEA), the OSE conducted an investigation into the allegations in this complaint. In compliance with the IDEA and Federal Regulations, and the MARSE, the MDE issues the following Findings of Fact, Conclusions and Decision.

**Complaint Issues:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:
    i. Whether the District met its child find obligation to identify, locate and evaluate children with disabilities, required by 34 CFR §§300.111, 300.301, R 340.1721, R 340.1721a and R 340.1721b.
2. Whether the District followed the procedures and processes required by the IDEA and the MARSE. Specifically:
    i. Whether the District followed specific requirements for educational services conducted for the Student placed in a juvenile detention facility, pursuant to R 340.1757d.

**Investigatory Process:**

Documents reviewed include:
   The original state complaint document;
   Documentation provided by the Complainant;
   The District's response to the complaint; and
   Documentation and educational records submitted by the District.

The following provided information via an interview or questionnaire:
   Multiple District staff, including the principal and classroom teachers.

The OSE provided the District and Complainant the opportunity to submit additional information for consideration during the investigation of this complaint.

**Applicable Federal Regulations or State Rules:**

| | |
|---|---|
| 34 CFR §300.17 | Free appropriate public education |
| 34 CFR §300.101 | Free appropriate public education (FAPE) |
| 34 CFR §300.111 | Child find |
| 34 CFR §300.301 | Initial evaluations |
| R 340.1721 | Request for initial evaluation |
| R 340.1721a | Initial evaluation |
| R 340.1721b | Time lines |
| R 340.1757 | Students placed in juvenile detention facilities; other educational services |

**Relevant Time Period:**

Pursuant to 34 CFR §300.153(c), the OSE has the authority to investigate allegations of violations that occurred not more than one year from the date the complaint was received. In light of this limitation, the investigation will be limited to the period of time from January 28, 2020 to January 27, 2021 for the purpose of determining if a violation of the IDEA and/or the MARSE occurred. However, records beyond this timeframe may be reviewed for the purpose of developing a complete record for the student.

**Findings of Fact:**

1. As of the filing of this complaint, the Student was a 14-year-old ninth grader who

was not eligible for special education services.
2. The Student began the 2019–2020 school year enrolled in the Student's resident district.
3. October 23, 2019, the Student's resident district conducted a multidisciplinary evaluation team report, which included the following information in relevant part:
    i. Reason for referral: Parent request.
    ii. Sources of information: School records, teacher interview, individual testing, and observations.
    iii. Medical information: The Parent reported the Student had been in "great" health. And indicated no diagnoses or medications were prescribed at the time. Records received from an outside health agency, September 20, 2019, indicated the Student had been seen last at the clinic on August 2, 2017, and there was no medical diagnosis on file. The local community mental health agency provided the District with a diagnosis document, dated July 15, 2019, which indicated the Student was diagnosed with oppositional defiant disorder and a rule-out of attention deficit hyperactivity disorder at the intake interview, which led to a referral for wraparound and home-based therapy services.
    iv. Tests administered:
        a. Behavior Evaluation Scale-Fourth Edition (BES-4:L) – A Parent and teacher assessment were each focused on behaviors in five subscale areas, including learning problems, interpersonal difficulties, inappropriate behavior, unhappiness/depression, and physical symptoms/fears. The Parent assessment resulted in a standard score of 81 and in the tenth percentile. The teacher assessment resulted in a standard score of 78 and was in the seventh percentile.
        b. Survey of Common Characteristics – The District developed an instrument, the Survey of Common Characteristics, to assist multi-disciplinary teams in assessing if a student's challenging behavior stems more from social maladjustment or an emotional impairment. The survey was comprised of 56 true/false statements and was completed by the Student's teacher and the Student's Parent and results were as follows:
            1. Parent: Completed September 2019. Out of 28 possible responses in the common characteristics of emotional impairment, 13 were scored as true for the Student. Out of 28 possible responses for the common characteristics of social maladjustment, 19 were scored as true for the Student.
            2. Teacher: Completed October 2019. Out of 28 possible responses in the common characteristics of emotional impairment, 9 were scored as true for the Student. Out of 28 possible responses for the common characteristics of social maladjustment, 14 were scored as true for the Student.
            3. The results of the survey, from both the teacher's and Parent's ratings, point to social maladjustment as a potential explanation for the Student's behavior.
        c. Northwest Evaluation Association:
            1. Spring 2018, Math – first percentile.
            2. Fall 2109, Reading – sixth percentile.
            3. Fall 2017, Science – 16th percentile.
    v. Tests attempted to be administered:
        a. Kaufman Test of Educational Achievement – Third Edition (KTEA-III).

      b. Weschler Intelligence Scales for Children – Fifth Edition (WISC-V).
- vi. Due to the Student's refusal to participate in assessments, the team reviewed and considered the assessment results from the Student's January 2018 evaluation for special education services, which included the following in salient part:
  - a. Weschler Intelligence Scales for Children – Fifth Edition: Full scale intelligence quotient – **82.**
  - b. Kaufman Test of Educational Achievement – Third Edition:
    1. Word recognition: 14th percentile.
    2. Reading comprehension: 10th percentile.
    3. Reading composite: 10th percentile.
    4. Math concepts and applications: eighth percentile.
    5. Math computation: sixth percentile.
       - i. The report noted a history of absenteeism and reported, at the time of the report, the Student missed 67% of the school days in the sixth grade.
       - ii. No additional assessment was able to be conducted as the Student refused to work with the school psychologist and went to considerable effort to avoid testing.
- vii. Guidelines and eligibility:
  - a. Specific learning disability: The Student's multidisciplinary evaluation report did not show a pattern of strengths and weaknesses. The Student refused to participate in the evaluation that year. There was no new data which suggested a pattern of strengths and weaknesses existed. The Student was not eligible for special education services under specific learning disability.
  - b. Other health impairment: Data and observations of the Student's behavior were not consistent with a lack of impulse control or hyperactivity. The Student behaviors at school appeared to be more intentional and willful, consistent with the diagnosis of oppositional defiance disorder received from the community mental health agency. Records from the local health center reported no diagnosis by any medical professionals. The Student was not eligible for special education services under other health impairment label.
  - c. Emotional impairment: While the Student exhibited inappropriate behaviors within the school environment, behaviors were more consistent with social maladjustment than an emotional impairment. The Student was not eligible for special education services under emotional impairment label.
- viii. Summary and recommendations: The multidisciplinary evaluation team recommends an IEP meeting be held to share the report and make an appropriate plan for the Student. The multidisciplinary evaluation team recommended the Student did not qualify for special education services.

4. An IEP Team report, which was dated October 23, 2019, and developed by the Student's resident district, contained the following relevant information:
   - i. Participants: The Parent, a general education teacher, two special education teachers, an evaluation team representative, a school social worker, and a school District representative.
   - ii. Parent concerns: The Parent felt the Student had taken advantage of the Parent's visual impairment, wanted the Student to be successful in school, and wanted help in school. The Parent felt the Student's behavior became worse after attending the district and did not see the same behaviors at home.
   - iii. Current evaluations:
     - a. Northwest Evaluation Associations measures of academic progress:

- 
  - 
    - 
      1. Previous scores at first percentile.
    - b. The Student refused to participate in additional assessment.
  - iv. The Student was not eligible for special education due to no data to suggest pattern of strengths/weaknesses.
  - v. Notice: Indicated the option of providing special education services was **considered, however, not selected because the Student was not eligible.**
5. The Student was expelled from the resident district school, with an exit date in the **state student history data base system listed as November 15, 2019.**
6. November 20, 2019, the Student was enrolled in a strict discipline academy, within the Student's resident district.
7. **January 2020, while the Student was enrolled in the resident district, the Parent requested an additional evaluation suggesting an additional diagnosis from an outside agency. The district provided notice indicating refusal to evaluate as the documentation from the outside agency was already considered in the October 2019 evaluation.**
8. February 7, 2020, the resident district's strict disciplinary academy provided the Parent with prior written notice, which reported the following relevant information:
   - i. Purpose: On January 30, 2020, the Parent submitted a request for an initial special education evaluation for the Student. The Student was evaluated in January 2018 and October 2019 and found ineligible for special education services. The Parent submitted information from a community mental health screener, completed in July 2019, which had been considered during the October 2019 evaluation.
   - ii. The district refused the following regarding the request described above:
     - a. The district had evaluated the Student and found the Student to be ineligible in all disability areas. The Parent and advocate continued to submit information based in a community mental health screener and forms to **qualify the Student for a subsidy for social security.**
     - b. The notice included the Michigan Administrative Rules for Special Education's definition for other health impairment and definition for emotional impairment.
     - c. The notice reported the Student's data from the initial evaluation, determined the Student was not eligible for services in the areas of cognitive impairment, autism, and learning disability.
   - iii. Options considered but not selected: To obtain consent for an initial evaluation for the Student based on the Parent request.
   - iv. Reason not selected: The Student was evaluated for special education services in January of 2018 and October 2019 and was found ineligible. The district reviewed and considered all of the relevant, submitted documentation and conducted comprehensive evaluations to determine ineligibility.
   - v. Other factors considered: The information submitted January 31, 2020 was already considered during the initial evaluation requested in September 2019. There was no new diagnosis or documentation from a physician, pediatrician, neurologist, or family physician to consider conducting a third evaluation.
9. **February 14, 2020 to March 5, 2020, the Student was court ordered to enroll in and** attend the residential juvenile home school within the District.
10. March 6, 2020, the Student moved to the District's juvenile onsite day school and remained enrolled at that location through the date of the filing of this complaint.
    - i. A written description of the school stated the juvenile home school had many **supports to address the needs of enrolled students including social-emotional** learning, positive behavior interventions and

      support, Northwest Evaluation Association assessments, Devereux student strengths assessment, behavior plans, and data collection and analysis.
    ii. During interviews, the District principal stated typically receiving little information about students from their resident district upon enrollment. The District would not receive the student's educational records. The principal did share an ability to look at a student management system to see if students had IEPs upon enrollment. The principal noted seeing the Student was evaluated but found ineligible by the resident district.

11. The District report card for the Student for the 2019-2020 school year, while enrolled in the District's residential juvenile home school, reported the Student's grades were a C in Michigan history, a B+ in essential living skills, an A+ in work-based skills, a C- in Algebra, and an A in English.
12. The District report card for the Student for the 2019-2020 school year, while enrolled in the District's juvenile day school, reported the Student's grades were a D in US history, an E in strategic math, a B in earth science, an E in English, and an E in careers.
13. The Student began the 2020-2021 school year continuing in the District's juvenile day school building.
14. During the fall semester of 2020, all teachers in the Student's schedule had teaching certificate endorsements for emotional impairments.
15. During interviews, District staff stated enrollment in the classes in the juvenile home school are capped at eight students, but the numbers were decreased for the 2020–2021 school year due to COVID-19. During the spring 2021 semester, the Student's cohort contained six total students. A paraprofessional was also assigned in every classroom.
16. During the 2020-2021 school year, up to the date of the filing of this complaint, the Student was suspended for a total of 12 days through four separate behavior incidents. The incidents occurred between October 29, 2020 through January 18, 2021.
17. October 29, 2020, the District principal of the juvenile home school provided the Parent with a letter regarding the Student's behaviors and the District's action. The letter contained the following relevant information:
    i. An incident occurred October 29, 2020.
    ii. The Student had continually and severely disrupted the educational environment several times by refusing to successfully follow the rules and expectations of the school.
    iii. The Student had participated in at least two alternatives to suspension, including restorative mediation and detention, with mixed results. The Student was notified further severe disruptions would result in suspension.
    iv. Due to continued disruptive and disrespectful behavior, the Student would be suspended for three school days, from October 29, 2020 through November 2, 2020.
    v. The Student would be able to return to school on November 3, 2020.
    vi. The principal thanked the Parent for cooperation with the school community as they worked with the Student. The principal communicated the Student was capable of great things and the District would continue intervention strategies, upon return.
18. November 17, 2020, the District principal of the juvenile home school provided the Parent with a letter regarding the Student's behaviors and the District's action. The letter contained the following relevant information:
    i. An incident occurred November 17, 2020.

      ii. The Student entered the school building completely disruptive and defiant, refusing to go to class, telling staff the Student would not stop until suspended. Due to this behavior, the Student was suspended from school for one day, November 17, 2020.

      iii. The Student would be able to return to remote school on November 18, 2020. If the Student refused to conduct self appropriately during online instruction, the Student would be immediately removed from the virtual classroom. The ramifications of continued disruptive behavior would likely have an impact on final grades, as final exams would be conducted November 20, 2020, and again the following week.

      iv. The principal communicated hope the Student would take some time that day to make a plan for how to conduct self appropriately for the rest of the school year.

19. November 23, 2020, the Student's probation officer emailed the District indicating the Complainant had requested a copy of a court-ordered neuropsychological evaluation. **The officer discussed the request for the assessment with the Parent. The officer stated the Complainant may reach out to the District, but the District was informed not to** provide the Complainant with information unless the Parent consented.

20. December 3, 2020, the Complainant sent an email to the District, including three attachments, which included the following information:

    i. Attachment one: A letter, signed by the Parent, stating the following:
       a. **The District and court could share all educational information with the Complainant.**
       b. **The District should have a copy of the Student**'s other health impairment determinations which interfere with the Student's ability to learn.
       c. The Parent was including the Student's assessment and evaluation data **from the Student**'s resident district.
       d. The Parent was requesting all academic and other assessment data from when the Student was living in the juvenile home.
       e. **The Parent requested a virtual IEP meeting to discuss the positive behavior** intervention and supports necessary to help the Student succeed as the Student transitioned into adulthood.
       f. The Student's reading and math scores were "disturbing", and the Student would require evidence-based intervention to bring the Student up to the grade level.
       g. **The Parent was requesting any documentation from trauma assessments. If trauma assessments had not been conducted, the Parent was requesting** one be initiated.
       h. The Parent believed the previous district did not make the right decision when determining the Student to be ineligible.
          1. The District response to the complaint reflected the District's **concerns about the validity of the Parent letter due to the small font** size and the Parent's visual impairment.

    ii. Attachment two: A copy of the state's criteria for determining the existence of a specific learning disability.

    iii. Attachment three: A copy of a PowerPoint from the District about IEPs.

21. **December 12, 2020, the Complainant sent an email to the principal of the juvenile home in the District, requesting all neuropsychological exams which were completed** while the Student was incarcerated. The email also contained the same **documents attached to the December 3, 2020 email.**

22. District administrative staff indicated discussing the email and requests from the

      Complainant, and based on previous concerns, they had determined to communicate with the Parent rather than the Complainant, in regard to the raised concerns.
23. December 14, 2020, the District responded to the Complainant's December 13, 2020 email, stating the following:
    i. An IEP meeting could not be held for the Student because the Student was not currently eligible for services per the resident district.
    ii. If the Parent was requesting an additional evaluation, the resident district would conduct the evaluation. The District offered to notify the resident district of the Parent's continued concerns if the Parent wanted to revisit an evaluation.
    iii. The neuropsychological exam was given by the psychologist of the juvenile home, not the District's psychologist. The District believed the probation officer had given the results to the Parent. The District did not have access to the results of the assessment.
    iv. The District would send the Parent the results of school-based assessments.
    v. All Students at the school receive positive behavior intervention supports and all of the teachers are special education teachers certified in emotional impairments.
24. December 14, 2020, an entry regarding a phone call with the Parent was documented. The entry indicated the principal from the District's juvenile home spoke to the Parent on the phone. The Parent informed the principal to disregard the email from the advocate. The principal informed a follow-up would be made to the Parent to ensure the Parent's potential concerns were addressed.
25. The Complainant provided a copy of the court-ordered evaluation for the purposes of this complaint investigation. The District had not received a copy of the evaluation; therefore, was not able to consider any data from the report.
26. December 14, 2020, the District principal of the juvenile home school provided the Parent with a letter regarding the Student's behaviors and the District's action. The letter contained the following relevant information:
    i. An incident occurred December 14, 2020.
    ii. The Student had continually and severely disrupted the educational environment several times by refusing to successfully follow the rules and expectations of the school. The Student had used foul language toward multiple staff, while refusing to follow any directions.
    iii. The Student had participated in at least two alternatives to suspension, including restorative mediation and detention, with mixed results. The Student was notified further severe disruptions would result in suspension.
    iv. Due to continued disruptive and disrespectful behavior, the Student would be suspended for five school days, from December 14, 2020 through December 18, 2020.
    v. The Student would be able to return to school (remote learning) on January 4, 2021.
    vi. The principal thanked the Parent for cooperation with the school community as they worked with the Student. The principal communicated the Student was capable of great things and the District would continue intervention strategies upon return.
27. December 15, 2020, the Complainant responded to the December 14, 2020 email from the District, stating the following relevant information:
    i. Expressed concern of the District's child find policies, including the District's special education teachers not being liable to refer students for evaluations based on their knowledge of students' academic struggles.
    ii. The serving school was responsible for making sure the Student received a

  FAPE.
  iii. The Complainant alleged the District intended to deprive the Student of a FAPE by not teaching the Student phonemic awareness.
28. December 16, 2020, in response to the juvenile home school principal request of the court-ordered neuropsychological evaluation, the psychologist responded in an email stating the defense attorney would need to request the evaluation for the parent/guardian to view, since the evaluation was a court-ordered document.
29. December 17, 2020, an email from the Student's probation office to the District's juvenile homes school principal, carbon copying the Parent, contained the following information:
  i. The Parent informed of not being aware of the Complainant's communication with the probation officer. The Parent did not want the probation officer to have communication with the Complainant.
  ii. The Parent requested the probation officer advise the juvenile homes principal not to have any contact with the Complainant.
  iii. The probation officer recommended the Parent write a letter or email to the District indicating the District not contact the Complainant. The Parent indicated wanting to write a letter and was going to have the Student help her compose the email.
30. January 18, 2021, the District principal of the juvenile home school provided the Parent with a letter regarding the Student's behaviors and the District's action. The letter contained the following relevant information:
  i. An incident occurred January 18, 2021.
  ii. The Student had continually and severely disrupted the educational environment several times by refusing to successfully follow the rules and expectations of the school. The Student had used foul language toward multiple staff, while refusing to follow any directions.
  iii. The Student had participated in at least two alternatives to suspension, including restorative mediation and detention, with mixed results. The Student was notified further severe disruptions would result in suspension.
  iv. Due to continued disruptive and disrespectful behavior, the Student would be suspended for three school days, from January 18, 2021 through January 20, 2021.
  v. The Student would be able to return to school (remote learning) on January 22, 2021.
  vi. The principal thanked the Parent for cooperation with the school community as they worked with the Student. The principal communicated the Student was capable of great things and the District would continue intervention strategies upon return.
31. Following the date of the filing of this complaint, the Student was suspended for 10 days. Details are included below in this section of this report.
32. Based on progress reports from the 2020–2021 school year, the Student had an E in family, career and community, an E in English, an E in strategic math, an E in yearbook, an E in literature through film, and an E in biology.
33. The District attendance record during the 2020-2021 school year reflected the Student was in a cohort of six total students in academic classes.
34. During the spring semester of 2021, all teachers in the Student's schedule had endorsements on their teaching certificates for emotional impairments.
35. During the 2020–2021 school year, documentation for the school's behavior tracking system contained the following relevant information:

    i. Most common positive behaviors included actively engaging, ignoring distractions from other students, and making improvements.
    ii. Most common negative behaviors documented were refused medication, inappropriate language, disrespect, being off task, refusal to complete work assigned, off-task and not following directions. Many instances of off-task behavior were attributed to Student sleeping during class.

36. During interviews, the District shared the following information about the Student's educational and behavioral performance:
    i. Both the Student's math and English teachers indicated it was difficult to evaluate the Student's academic performance due to the Student's regular absences, frequent suspensions, and falling asleep during class.
    ii. All District staff members acknowledged the Student required tier three behavior interventions within a tier three behavior intervention program setting and the Student had significant behavioral concerns. Comments included, "[Student's] blow ups and shutdowns are more over the top than most students.", and "After the initial explosion, [Student] appears to have a blackout, talking so fast you can't understand what is being said. After it is all over, [Student] acts like nothing happened and later in the hallways, will be over the top nice to the person who had previously been verbally attacked."
    iii. Following the Student's enrollment, staff reported during student assistance team meetings they were surprised the Student did not have an IEP, being surprised the resident district found the Student ineligible, and having regular discussions about the Student's behaviors.
    iv. The District principal and multiple teachers indicated the Parent had concerns about the Student's behavior, but never communicated a desire for the Student to be evaluated for special education.

37. Child find policies and procedures provided by the District contained the following:
    i. Districts are required to have procedures in place for identifying children who have or are suspected of having a disability and needing special education and related services.
    ii. The District's responsibilities for child find apply to the families and students attending and enrolling in the school.
    iii. Special education evaluations are coordinated with students' resident districts.
    iv. If a student is suspected of having a disability, arrangements are made to address these concerns.
    v. If a parent/guardian requests an evaluation for a student, the team responds to these requests and coordinates the appropriate activities.

38. During interviews, when asked about child find policies, District staff stated the following:
    i. If a parent requested an evaluation for special education, the District would coordinate with the resident district to conduct the evaluation.
    ii. Having an understanding the staff were not allowed to make a referral for special education evaluation and the referral must be a request from the Parent before any action would be taken.
    iii. Unsure if it was District policy or the local school policy, staff in the building were not allowed to start the evaluation process without the local district.
    iv. Since the District was thought to be a temporary placement, the resident district was responsible for leading the evaluation with assistance and cooperation from the District, as necessary.
    v. In the vast majority of cases, the resident district would provide the evaluative

staff to conduct the special education evaluation. In rare instances, the District would provide the staff to conduct the evaluation.

vi. District practice had been to not question resident district's previous findings of eligibility or ineligibility for students.

vii. If there was a request made to the resident district to complete an evaluation for special education and services, it was the District's practice to accept the resident district's acceptance or denial of the request without questioning the resident district's rationale for the decision.

39. Following the date of the filing of this complaint, February 1, 2021, the District principal of the juvenile home school provided the Parent with a letter regarding the Student's behaviors and the District's action. The letter contained the following relevant information:

   i. An incident occurred February 1, 2021.
   ii. The Student had continually and severely disrupted the educational environment several times by refusing to successfully follow the rules and expectations of the school. The Student shoved past a staff and attempted to shove past two additional staff when attempting to leave the classroom without permission. The incident followed the Student's refusal to take medication twice in the morning. Additionally, the Student stood on the table in the cafeteria and used foul language to anyone who walked past, including staff and students.
   iii. The Student had participated in at least two alternatives to suspension, including restorative mediation and detention, with mixed results. The Student was notified further severe disruptions would result in suspension.
   iv. Due to continued disruptive and disrespectful behavior, the Student would be **suspended for 10 school days,** from February 1, 2021 through February 12, 2021.
   v. The Student would be able to return to school (remote learning) on February 15, 2021, with a planned meeting of return between school staff, probation officers, guardian, and other appropriate individuals.
   vi. The principal thanked the Parent for cooperation with the school community as they worked with the Student. The principal communicated, the Student was capable of great things and the District would continue intervention strategies upon return.

40. Following the date of the filing of this complaint, February 11, 2021, the District developed an individualized behavior support plan for the Student. The plan included the following relevant details:

   i. Targeted behaviors of verbal aggression, non-verbal aggression, and physical aggression.
   ii. **Lagging skills were listed as academics, self-regulation, and low self-esteem.**
   iii. **Warning signs, triggers and antecedents were listed as refused or forgot to take** morning medications, when demands were not met in a "timely" manner, and loss of control.
   iv. Accommodations to the environment included space and proximity, a safe place **to take a break and check-ins and check-outs.**
   v. **Teaching strategies and skill building included emotional regulation, breaks, self-**regulation, and meeting with a teacher one to two times per week.
   vi. Interaction strategies included relationship building and choices.
   vii. **Response strategies included prompting "to do" strategies, planned incentives,** redirection, review of expectations, and loss of points.

41. Upon interview, District staff indicated the following in regard to the Student's

individualized behavior plan:
  i. The District's student assistance team had been discussing the behavioral concerns of the Student since September 2020 and an individualized plan had not been developed until February 2021;
  ii. A lack of team involvement in the development of the plan;
  iii. A lack of explanation to the behavior plan to teachers who were to implement the plan; and
  iv. A failure to provide the response "to do" strategies to the teachers who were to implement the plan.
  v. Additionally, the newly developed individualized plan had not been effective yet in addressing the Student's behavioral concerns.

**Conclusions:**

Issue #1i:
1. The State must have in effect policies and procedures to ensure that all children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State, and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children are currently receiving needed special education and related services. 34 CFR §300.111(a).
2. Each public agency must conduct a full and individual initial evaluation, in accordance with §§300.304 through 300.306, before the initial provision of special education and related services to a child with a disability under this part. 34 CFR §300.301.
3. Each student suspected of having a disability shall be evaluated by a multidisciplinary evaluation team as defined in R 340.1701b(b). In addition to the requirements in R 340.1705 to R 340.1717, the multidisciplinary evaluation team shall do all of the following: (a) Complete a full and individual evaluation. (b) Make a recommendation of eligibility and prepare a written report to be presented to the individualized education program team by the designated multidisciplinary evaluation team member who can explain the instructional implication of evaluation results. The report shall include information needed by the individualized education program team to determine all of the following: eligibility, a student's present level of academic achievement and functional performance, and the educational needs of the student. R 340.1721a(1).
4. Within 10 school days of receipt of a written request for any evaluation, the public agency shall provide the parent with written notice consistent with 34 CFR §300.503 and shall request written parental consent to evaluate. The time from receipt of parental consent for an evaluation to the notice of an offer of a free appropriate public education or the determination of ineligibility shall not be more than 30 school days. This timeline begins upon receipt of the signed parental consent by the public agency requesting the consent. This timeline may be extended if agreed to by the parent and public agency. Any extension to this timeline shall be both of the following: (a) In writing and (b) Measured in school days. R 340.1721b(1).
5. A public agency must be deemed to have knowledge that a child is a child with a disability if before the behavior that precipitated the disciplinary action occurred, the teacher of the child, or other personnel of the LEA, expressed specific concerns about a pattern of behavior demonstrated by the child directly to the director of special education of the agency or to other supervisory personnel of the agency. 34 CFR §300.534(b)(3).

6. Under 34 CFR §300.534(b)(3), teachers or other local educational agency (LEA) personnel are not required to submit a written statement expressing specific concerns about a pattern of behavior demonstrated by the child in order for the public agency to be deemed to have knowledge that the child is a child with a disability. Although a written statement is not necessary, the teacher of the child or other LEA personnel **must express their specific concerns directly to the special education director or other** supervisory personnel within the agency. In addition, State child find policies and procedures may provide guidelines regarding how teachers and other LEA personnel should communicate their specific concerns regarding a child's pattern of behavior. If the State's or LEA's child find or referral procedures do not specify how such communication should occur, the State or LEA is encouraged to change its guidelines to provide a method for communicating direct expressions of specific concerns regarding a **child's pattern of behavior. US Dept. of Educ., Analysis of Comments and Changes, 71** Fed. Reg 46,727 (2006); Questions and Answers on Discipline Procedures, June 1, 2009, Question A-7 (OSERS).
7. According to the Sixth Circuit, a petitioner needs to prove that the school district "overlooked clear signs of disability" and were negligent in failing to order testing, or that there was "no rational justification for failing to evaluate." Bd. of Educ. of Fayette County, Kentucky v. L.M., 47 (6th Cir. 2007), at para. 1, cert. denied, 110 LRP 48155, 128 S. Ct. 693 (2007) (citing Clay T. v. Walton County Sch. Dist., 952 F.Supp. 817, 823 (M.D.Ga.1997)).
8. Districts are responsible for conducting Child Find and identifying all IDEA-eligible students that reside in their jurisdiction. Because the Child Find obligation is an affirmative one, a parent is not required to request that a district identify and evaluate a child. Robertson County Sch. Sys. v. King, 99 F.3d 1139, 95-5526, (6th Cir. 1996, unpublished).
9. June 16, 2020, Michigan Department of Education, Office of Special Education developed a guidance document titled, Eligibility and Social Maladjustment Clarification, which states:
    i. Although the term "socially maladjusted" appears in both the IDEA and the MARSE within the emotional disturbance/impairment eligibility definition, this concept is not specifically defined. Since social maladjustment is not defined in either rule or regulation, use of tools which purport to differentiate between social maladjustment and emotional impairment should be eliminated or used with caution, and must not be used to rule out eligibility in special education determinations. Furthermore, both the IDEA and the MARSE, require evaluation teams to first consider whether a student meets the criteria of an emotional disturbance/impairment. If the student meets emotional impairment criteria, any perceived evidence of social maladjustment does not impact the eligibility determination.
    ii. An evaluation must be sufficiently comprehensive to appropriately identify all of a student's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified (IDEA 34 **CFR §300.301, §300.304 and §300.305, R340.1702 through R340.1717). Teams** must also document their consideration of other suspected disability categories for a student who does not meet the eligibility criteria for emotional impairment. For example, if a student has a medical or clinical diagnosis, the team may consider the other health impairment category and document this consideration. Social maladjustment characteristics do not impact any eligibility determination.
10. The Complainant (advocate) notified the District of the Complainant and the Parent

concerns, including the previous evaluations had not included trauma assessments. Communication also indicated the Parent was requesting an evaluation be initiated and the Parent believed the previous district did not make the right decision when determining the Student to be ineligible. While the District indicates being informed by the Parent to disregard the advocate's requests, the District did offer to notify the resident district of the Parent's continued concerns if the Parent wanted to revisit an evaluation. There is no evidence the District notified the resident district nor offered to obtain consent for evaluation from the Parent. In addition, the Student continued to be suspended following these raised concerns and District staff indicated concern the Student did not have an IEP. The District did not move forward with a special education evaluation for the Student.
11. While the District's juvenile home school is intended to be a short-term placement to plan for a successful transition of adjudicated youth back to their local school, the Student had been enrolled in the juvenile school program for approximately one year, February 14, 2020, through the date of the filing of this complaint, January 27, 2021. The extended time in the school reflects the Student had not made the required progress to transition back to the resident district.
12. District staff acknowledged reason to suspect the Student was a Student with a disability including while students within the school program typically had behavioral concerns, the Student's behaviors were more concerning than most students in the school, staff shared concerns for the Student regularly at student assistance team meetings throughout the time the Student was enrolled, and staff reported their belief the Student would benefit from special education services. The Student also had repeated suspensions due to behavioral incidents while enrolled in the school and District report cards reflect the Student's academic grades continued to decline while the Student was enrolled in the school.
13. While the District has written child find policies, the teachers' perceptions of the evaluation for special education services process included the teachers did not have the responsibility or even the option to request a special education evaluation, and the only way in which the District would move forward on an evaluation request for this Student and for all student's in the building would be under the request from the parent(s).
14. While the Student was evaluated in January 2018 and October 2019 and found ineligible for special education services from the resident district, a convergence of evidence demonstrates the District had reason to suspect the Student was a Student with a disability. The District failed to seek consent to complete a full initial evaluation for the Student. The delay was due to the inconsistency of staff training and understanding regarding who was "allowed" to request an evaluation for special education services and the lack of organization of the IEP process for the Student. As a note to the District, as the Student was found ineligible based on a rule out of social maladjustment, reconsideration of eligibility is critical.

**Issue #2i:**
1. Special education reimbursed personnel may provide educational services for students who do not have disabilities and who are placed in the facility, if the programs comply with both of the following provisions: (i) They are under the supervision of a teacher approved in the area of emotional impairment. (ii) They have not more than 10 students in a class at any 1 time. R 340.1757d.
2. During the 2019-2020 and 2020–2021 school years, while enrolled in the District, all of the Student's teachers had teaching certificate endorsements on in the areas of emotional impairment.
3. During the 2019-2020 school year, while enrolled in the District, the Student attended

all classes with eight or less students per class. In the 2020–2021 school year, while enrolled in the District, the Student attended all classes with a cohort of six total students.
4. The requirements for providing educational services to students in a juvenile detention facility were met for all students enrolled in the program.

Overall FAPE:
1. The purpose of part B is to ensure that all students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 34 CFR § 300.1(a).
2. A FAPE means special education and related services that are provided in conformity with an individualized education program (IEP) that meets the requirements of §§ 300.320 through 300.324. 34 CFR § 300.17(d).
3. A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school, as provided for in § 300.530(d). 34 CFR § 300.101(a).
4. In Board of Educ. v. Rowley, 458 U.S. 176, 206-207 (1982), the Supreme Court ruled that an IEP is sufficient if it is reasonably calculated to enable the child to receive "educational benefits." See Board of Education of the Hendrick Hudson Cent. Sch. Dist. V. Rowley, (1982). More recently, the Supreme Court explained its Rowley standard as follows: "Educational programming must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." Endrew F. v. Douglas County School District 137 S.Ct. 988, 992, RE-1, 2017 WL 1066260 (Mar. 22, 2017).
5. The violations above in the areas of child find were substantive. FAPE is afforded to students eligible for special education under IDEA. If found eligible, the Student was denied a FAPE.

**Decision:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:
    i. Whether the District met its child find obligation to identify, locate and evaluate children with disabilities, required by 34 CFR §§300.111, 300.301, R 340.1721, R 340.1721a and R 340.1721b.

    **The District did not meet its child find obligation to identify, locate, and evaluate the Student with a suspected disability. The MDE determines a violation.**

2. Whether the District followed the procedures and processes required by the IDEA and the MARSE. Specifically:
    i. Whether the District followed specific requirements for educational services conducted for the Student placed in a juvenile detention facility, pursuant to R 340.1757d.

    **The District followed the requirements for providing educational services in a juvenile detention facility. The MDE determines no violation.**

**Student Level Corrective Action Plan:**

1. By April 30, 2021, evaluative staff from the District Regional Educational Service Agency will conduct a review of existing evaluation data to:
    i. Review all relevant Student data, including attendance, declining grades, behavior referrals, discipline, teacher and Parent input, and any outside evaluations;
    ii. Determine the evaluations needing to be conducted in order to determine whether the Student is a student with a disability and/or to determine the Student's educational needs;
    iii. If evaluations are identified, seek consent from the Parent to conduct the evaluation(s); and
    iv. Provide prior written notice to the Parent.
2. **By April 30, 2021, after consent is provided by the Parent, evaluative staff from the** District Regional Educational Service Agency will conduct a full and individual initial evaluation, as outlined in the review of existing evaluation data, to determine:
    i. If the Student is a student with a disability; and
    ii. The educational needs of the Student.
3. By April 30, 2021, the multidisciplinary evaluation team will make a recommendation to the IEP Team regarding eligibility and prepare a written report which includes information regarding the Student's unique educational and/or behavioral needs, ensuring the team's considerations and recommendations are fully documented.
4. By April 30, 2021, conduct an IEP Team meeting for the purpose of developing an IEP which addresses all of the unique educational and behavioral needs of the Student as evidenced by identification of the special education and related services and supplementary aids and services to be provided to the Student to support those needs.
5. By April 30, 2021, if the Student is found eligible, the District must develop a plan for **providing 45 hours of compensatory education to address the Student**'s social, emotional, behavioral, and academic needs. Services provided are to be in addition to the regular school day and the requirements of the IEP to be developed. The plan could include participation in supervised group programs and/or activities with same-age peers to provide the Student with the opportunity to work on social-emotional/behavioral and/or academic skills. Compensatory education services are to **be delivered no later than January 1, 2022.**

Evidence of the compensatory services ordered in the student level corrective action plan will be reviewed during the district corrective action verification process. See below for compensatory education requirements.

**Corrective Action Plan:**

The district must revise or develop procedures regarding child find, as needed, by June 1, 2021 to document and ensure for this and all students:
1. The District has a consistent system to identify, locate and evaluate students with disabilities who may require special education and related services while in the juvenile detention facility.
2. The special education referral/evaluation process is initiated for students with a suspected disability who may require special education and related services while in the juvenile detention facility, ensuring the child find procedure includes staff referrals and parent requests.

The district must provide professional development by October 15, 2021 for all relevant staff regarding the new procedures.

Evidence of change in the district's practices must be provided and verified by the OSE.

The ISD must upload evidence of the implementation of the compensatory services plan into the technical assistance notes in the district's corrective action plan to be reviewed during the verification process. Documentation must include:
1. Services must be delivered outside the regular school day.
2. A copy of the receipt(s) for services provided if a contractor is used.
3. Service provider logs for the compensatory services indicating the dates, starting and ending times, length of sessions, student absences, make up sessions and a short summary of instruction completed for each session by upload into Catamaran.
4. If the Student is absent on a scheduled day, this session does not need to be made up. Any staff absences require a make-up session.
5. Transportation logs or reimbursement receipts (if applicable).

Evidence of timely compliance and required submissions for Corrective Action Plans and Student Level Corrective Action Plans must be documented in Catamaran. Please direct questions regarding the complaint investigation to Rebecca McIntyre at (517) 335-0457 or mcintyrer1@michigan.gov, and any questions regarding the student level corrective action to Sarah Radu at (517) 241-3723 or radus@michigan.gov. All correspondence should be clearly marked as pertaining to case 21-0007.

Rebecca McIntyre, Supervisor
Program Accountability
Office of Special Education

cc:     H█████ B███
        Mindy Miller
        Tori Wentela