# EXHIBIT BE

Rebecca A. Mc Intyre
July 15, 2024

U.S. DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


DONQUARION LEWIS; KE'AUJANAA

SHEPHERD-FRIDAY; and K.B.,

by and through her parent

and next friend, H.B.,        Case No. 1:22-cv-00838-RJJ-PJG

      Plaintiffs,   Hon. Robert J. Jonker

  vs.                Mag. Phillip J. Green

MICHIGAN DEPARTMENT OF

EDUCATION, a governmental

agency,

      Defendant.

_____


The Deposition of REBECCA A. MC INTYRE,

Taken at 525 West Ottawa Street,

Lansing, Michigan,

Commencing at 10:01 a.m.,

Monday, July 15, 2024,

Before Peggy S. Savage, CSR-4189, RPR.

Rebecca A. Mc Intyre
July 15, 2024

1   Lansing, Michigan

2   Monday, July 15, 2024

3   10:01 a.m.

4

5                REBECCA A. MC INTYRE,

6      was thereupon called as a witness herein, and after

7      having first been duly sworn to testify to the truth,

8      the whole truth and nothing but the truth, was

9      examined and testified as follows:

10               EXAMINATION

11  BY MS. DIAZ:

12  Q.   Good morning.  My name is Erin Diaz, and I'm here

13      with -- representing plaintiffs, Michigan

14      Protection -- Disability Rights of Michigan.  I

15      haven't done that in a while.

16               Could you please state your name for the

17      record?

18  A.   Rebecca McIntyre.

19  Q.   Okay.  Have you ever been deposed before?

20  A.   Yes.

21  Q.   Okay.  When were you deposed before?

22  A.   It was maybe a year and a half ago for the AB/KB case.

23  Q.   AB/KB case.  Okay.

24               Okay.  Have you ever testified at any other

25      points?

Rebecca A. Mc Intyre
July 15, 2024

1    complaint.

2  Q.   Okay.  And --

3  A.   In the findings of fact.  I'm sorry.

4  Q.   That's okay.

5         And how would you determine the root

6    problem?

7  A.   In the state complaint investigation process, there

8    is -- you have to start with findings of facts, which

9    are based on interviews conducted with the district

10    and relevant staff in the district with the

11    complainant and getting information from there,

12    looking at document reviews, whatever.  You know,

13    depends on what the issue was, but looking at all of

14    the documents that are relevant to the issues,

15    creating a record of all the facts in the most

16    cohesive, flowing, you know, set of events that is

17    possible, and then basing -- looking at case law and

18    rules and regulations, and determining whether there

19    was a violation in any area of those facts; and if

20    there were, what specific area, and then that would be

21    where we would assign the corrective action.

22         And I'm not talking -- it's a Child Find

23    violation, so that's -- we're just going to only look

24    at Child Find.  Within Child Find, there is a whole

25    slew of -- of steps; could be regarding students who

Rebecca A. Mc Intyre
July 15, 2024

1    correct?

2  A.  Yes.

3  Q.  What are integrated monitoring activities?

4  A.  That would be where we are utilizing state complaint

5     data or fiscal data to inform monitoring activities.

6     We could use our ISD plans in that.  So it's all the

7     different components coming together to provide

8     monitoring -- or informed monitoring.

9  Q.  Okay.  And under Integrated Monitoring Activities,

10    there are two bullet points.  The second bullet point

11    says -- and, excuse me, these are activities that

12    could include the following:  conducting interviews

13    and listening sessions with parents of children with

14    disabilities, children with disabilities, and other

15    stakeholders to learn about an LEA's or EIS program's

16    or provider's implementation of IDEA, including

17    functional outcomes and results.

18         Is that something that MDE currently

19    includes in its integrated monitoring activities?

20  A.  We have a schedule of ten monitoring activities for

21    least restrictive environment this coming year, one

22    every month that our OSE leadership team is attending.

23    And, yes, we are meeting with the parent advisory

24    committee in every ISD for each of those ten ISDs.

25  Q.  Okay.  Just so I understood what you're saying, you're

Rebecca A. Mc Intyre
July 15, 2024

1   requirements or suggest that there may be statewide

2   patterns of noncompliance.  Where such patterns are

3   present, the State, as part of its general supervision

4   system, must determine whether systemic noncompliance

5   occurred or is occurring and ensure correction ...

6           Correct?

7   A.   Yes.

8   Q.   Okay.  When we spoke earlier, you mentioned overseeing

9    the dispute resolution system and that it contained

10    state complaints as well as the due process hearing

11    system.

12           Are there any other parts of the dispute

13    resolution system?

14   A.   Mediation.

15   Q.   Okay.

16   A.   IEP facilitation.

17   Q.   Okay.  And does the State identify patterns in dispute

18    resolution in the state compliance system and all of

19    the pieces you just mentioned?

20   A.   Yes.

21   Q.   Does the state ID patterns have --

22   A.   Yes, we do.  We look at data regularly.  We utilize --

23    there are reports within Catamaran, which is where --

24    our electronic system that allows us to transfer

25    information back and forth to local districts and

Rebecca A. Mc Intyre
July 15, 2024

1    ISDs.  There are reports in there that we can pull

2    information from and look at data.  And we do have,

3    you know, charts that we keep track of any districts

4    and ISDs that are getting to the threshold to meet

5    our, you know, one to three or more than -- more than

6    three state complaints to determine whether, you know,

7    we are moving up tiers in our corrective action.

8    Q.   Moving up tiers in a corrective action, which part of

9    this dispute resolution system would that be part of?

10   A.   State complaints.

11   Q.   State complaints.  Okay.

12            Okay.  You mentioned data that you collect.

13   What kinds of data do you collect?

14   A.   We look at -- so if we're talking state complaints, we

15   are looking at who's filing, at what level are they

16   being filed.  The districts within ISD -- when I say

17   "what level," I'm talking elementary, middle school,

18   high school, transition, early childhood.  Districts

19   within an ISD.  We're looking at issues and issues

20   within issues.  You know, the big concepts like Child

21   Find, what are the issues within -- within that that

22   are happening.

23            And then we're using that information to

24   target our technical assistance to determine if there

25   is specific guidance that needs to be developed and

Rebecca A. Mc Intyre
July 15, 2024

1    who does it need to be developed for:  a family

2    matters fact sheet for parents or something -- a

3    document or a webinar for high school staff or early

4    childhood or who -- who do we do that -- you know, who

5    needs that.  It also informs whether we are going to

6    inform additional monitoring activities, which we have

7    done on a number of occasions.

8            As far as due process goes, we are looking

9    at parents that are -- when they are filing, are they

10    coming with an attorney or are they not coming with an

11    attorney, and what do the outcomes of those look like.

12    You know, is there more of an incidence of dismissals

13    or withdrawals when they're represented or not

14    represented.  We're also looking at the issues; what's

15    more likely to go to due process.

16  Q.   Okay.  You mentioned additional monitoring activities

17    that you could order.  What are you speaking to when

18    you're talking about additional monitoring activities?

19  A.   So if we are investigating a complaint where we're not

20    given enough information, whether it be -- it's

21    untimely or it is -- in our opinion, we're feeling it

22    is incomplete, we will order a monitoring activity as

23    part of the corrective action, and then our monitoring

24    team will go in, along with complaint investigators,

25    and do monitoring.

Rebecca A. Mc Intyre
July 15, 2024

1    identified noncompliance.  These considerations

2    include ensuring that the correction of noncompliance

3    addresses the extent and root cause of the identified

4    noncompliance, in addition to ensuring child-specific

5    and system correction.

6              Is that what you were referring to when you

7    talk about state complaints?

8  A.   Yes.

9  Q.   Okay.  Okay.  And then page 36.  So this is a

10    discussion of other important actions a state could

11    consider when previous enforcement actions have been

12    unsuccessful, correct?

13  A.   Yes.

14  Q.   Okay.  And you can read that answer to yourself.

15  A.   Yes.

16  Q.   Okay.  The fifth line down:  One of the suggestions

17    was a state-designated management team at the local

18    level to develop and implement the policies,

19    procedures, and practices.

20              Have you ever -- has MDE ever sent a

21    state-designated management team to the local?

22  A.   They're called technical -- the state -- state

23    monitor -- statewide monitors, technical assistance

24    providers.  Yes, we have.  And, yes, Kalamazoo does

25    have one.

Rebecca A. Mc Intyre
July 15, 2024

1   Q.  Does have one.  Okay.

2           Who's Kalamazoo's team leader?

3   A.  I believe it's Christy McKee.

4   Q.  Okay.  And what is her role as -- you said a TA

5       provider.  You're saying -- your term is different,

6       but it's the same function?

7   A.  Yes.

8   Q.  Okay.  And what did you say your term was again?

9   A.  She's a statewide monitor and technical assistance

10      provider.

11  Q.  Okay.  Okay.  And what does she do for the district?

12  A.  As a technical assistance provider, she works with

13      them whenever there is corrective action that's

14      ordered; not just from dispute resolution but also

15      from monitoring.  She will work with them to bring

16      them into compliance.  She reviews their policies,

17      procedures.  She may or may not be involved in staff

18      training.  If they are coming into compliance slowly,

19      she will -- she will meet with them on a biweekly

20      basis.  Generally, she will go on site for that.

21  Q.  Does every district have a TA provider and statewide

22      monitor?

23  A.  No.

24  Q.  Okay.  When does a statewide monitor/TA provider get

25      assigned?

Rebecca A. Mc Intyre
July 15, 2024

1    I was specific in saying that they had utilized the

2    ISD's behavior consultant, because this was a student

3    who had some extreme behaviors that the district just

4    didn't know how to deal with.

5  Q.  Okay.  When you say you re-opened a closed complaint,

6    what do you mean by it was already closed?

7  A.  It was -- it was -- a final decision was issued.

8  Q.  Oh, the final decision was already issued.

9  A.  So we had a 60-day time line to issue a final

10   decision.

11 Q.  Okay.

12 A.   It was shortly after, within days of that final

13   decision being issued, that something was brought to

14   my attention, and I reviewed the documents that were

15   present and saw that there was information that was

16   missed and should have been part of the report, which

17   would change the outcome.  And so I told Teri that

18   we're here for kids, and we need to get it right.  And

19   so I recommended opening it up, taking the hit for a

20   late state complaint, and reissuing a final decision

21   with better corrective action, so ...

22 Q.  So in that situation, who or what entity brought up

23   the information that was missing from the state

24   complaint decision?

25 A.   Well, it kind of backfired on the district.  They --

Rebecca A. Mc Intyre
July 15, 2024

1   A.   Yes.

2   Q.   Okay.

3   A.   So for some reason, she submitted it.  And the

4        progress reports don't -- the ISDs don't get those in

5        any way, so it's district to MDE.  We will get it to

6        say if we are approving what they're -- where they're

7        at right now, whether it is policy development before

8        they can move on to the next step, and we said no.

9        And then they submitted a couple weeks later, and we

10       said no.  And then it looks like the next day, they

11       resubmitted, and we accepted, so -- but I don't know

12       what the issue was.

13  Q.   For each of those times that -- when you said no,

14       would guidance have been given to the district --

15  A.   Yes.

16  Q.   -- on what the issues were?

17  A.   Yes.  That's why I'm saying, it would be in -- like

18       this, where it says -- I'm on page 443, MDE CAP

19       Clarification/Approval Comments and then MDE

20       Verification/Closeout Comments, there's one for

21       progress reports.  So they can go back and forth.  And

22       I don't know if it was just blank or where that is.

23       So I can look back.

24  Q.   Do you ever have districts who submit for review and

25       they have no idea what they're doing wrong when they

Rebecca A. Mc Intyre
July 15, 2024

1    submit the information and they get it resubmitted,

2    they have to resubmit?

3  A.   Well, we give them guide -- we let them know what

4    exactly is wrong with it, and then we also will offer

5    to set up a phone call or whatever to talk through

6    with them.

7  Q.   To clarify?

8  A.   Mmm-hmm.

9  Q.   Would the ISD be part of this process?  I know you

10    said progress reports go to the state only, but --

11    with the ISD.  When would the ISD be jumping in?

12  A.   The verification closeout.

13  Q.   Okay.

14  A.   So the district, when they believe that they have

15    completed everything, they submit a request for

16    verification, the ISD does that, and they write up a

17    report, submit it into Catamaran to the MDE, who then

18    reviews the ISD's report, the documents that the ISD

19    uploaded, and then they either accept it or don't.

20          And the expectation is that the ISD, if

21    they find issues, they send it back, and they work

22    with the district.  So that by the time it gets up to

23    MDE, there's less back and forth.

24  Q.   Okay.  And how are the ISDs doing at sending it back

25    to the district if there are issues with them?

Rebecca A. Mc Intyre
July 15, 2024

1  A.   How are they doing?  Through Catamaran.

2  Q.   No.  I mean, are they doing a good job of it?

3  A.   Oh.  For the most part, yes.  We -- we have talked

4       about -- we're still trying to figure out how to do

5       it, but we have shared the information with the ISDs

6       that when there is inter-rater reliability issues and

7       they say -- the ISD says, "This is totally ready to

8       go," and we look at it and we go, "No, it's not," then

9       that's going to impact their determinations.

10 Q.   Okay.

11 A.   So we've really been trying to really work on

12      inter- -- I can't even say it -- inter-rater

13      reliability.

14 Q.   Okay.  And -- okay.  Let's go to 58.

15           MARKED FOR IDENTIFICATION

16           DEPOSITION EXHIBIT 58

17           3:33 p.m.

18 BY MS. DIAZ:

19 Q.   And this is an email about -- well, starting with

20      about State Complaint 19-0220, right?

21 A.   Yes.

22 Q.   And the first line says that the complaint has been

23      assigned in Catamaran to Terri, but on this --

24      probably put on the spreadsheet.  Is that maybe a

25      typo?  And then in McIntyre Marauders sheet, I have

Rebecca A. Mc Intyre
July 15, 2024

1            3:39 p.m.

2  BY MS. DIAZ:

3  Q.   Okay.  So let's look at 64 then.  This still relates

4        to 19-00- -- 0220.

5  A.   I'm sorry, which number?

6  Q.   Sixty-four.

7            MS. ABDNOUR:  Is that your master set?

8            MS. DIAZ:  Yes.

9            MS. ABDNOUR:  Put this in there.

10            MS. DIAZ:  Good call.

11            THE WITNESS:  Okay.

12  BY MS. DIAZ:

13  Q.   Okay.  So 19-0220, with that state complaint, you

14        decided to do an on-site visit; is that right?

15  A.   Yes.

16  Q.   Okay.  Why did you decide to do an on-site visit for

17        this state complaint?

18  A.   Because it was systemic, because we had received a

19        number of complaints from -- from George, and we

20        wanted to see -- we kept getting different stories

21        about what the ALP program was, so we wanted to see it

22        for ourselves.  So we went and took a tour and talked

23        with the staff there so we could understand what

24        everybody's understanding is of how you get in and how

25        you get out.

Rebecca A. Mc Intyre
July 15, 2024

1   Q.  Do you usually do the -- did you usually do the

2        on-site visits, or is that something that would

3        have -- let me back up and ask it a different way.

4                Would you typically accompany the

5        investigation team to an on-site visit?

6   A.  I did as a learning --

7   Q.  Okay.

8   A.  -- and I wanted to -- I really wanted to see what they

9        did, what their process was, so that we could put

10       some -- kind of try to define it, you know, how to do

11       on-sites, so ...

12  Q.  Okay.  Okay.  What's the typical procedure for an

13       on-site investigation?

14  A.  The procedure, we'd make arrangements with the ISD

15       ahead of time, and we set up a schedule.  They have --

16       we let them know how many files we need them to pull.

17       So we might say we need 50 -- 50 files, and then we

18       randomly select out of those files.  So we'll sit and

19       do file reviews.  We walk the -- the in-question

20       program.  We talk with staff, do interviews.  We write

21       up some recommendations, and then we will kind of

22       debrief with the -- with the director before we leave,

23       and then that's kind of it.  The rest goes in our

24       final decisions.

25  Q.  Would you interview students or parents during this

Rebecca A. Mc Intyre
July 15, 2024

1          MS. DIAZ:  Yeah, let's take a break for a

2    second.  Go off the record.

3          (Off the record at 3:51 p.m.)

4          (Back on the record at 4:06 p.m.)

5          MARKED FOR IDENTIFICATION

6          DEPOSITION EXHIBIT 8

7          4:07 p.m.

8   BY MS. DIAZ:

9   Q.   Okay.  Exhibit 8 was the decision for 19-0220.

10          Okay.  And the decision is on page 37.  MDE

11    determined there was a violation for Child Find

12    obligation to locate, identify, and evaluate

13    students -- the student named in this complaint.  And

14    then in regards to similar-situated students, the

15    determinations were unclear due to the incomplete

16    nature of the students' files, and that would be

17    addressed through district-level corrective action.

18    Is that right?

19   A.   Yes.

20   Q.   Okay.  And then I think you had referred to this

21    actually earlier, that CA-60s were incomplete.  So

22    that was part of the corrective action that was

23    required?

24   A.   Yes.

25   Q.   Okay.  And that was for each student who worked -- who

Rebecca A. Mc Intyre
July 15, 2024

1  was attending the alternative middle school in

2  February of 2020 -- or by February of 2020, excuse me.

3  They had to go through and ensure that the

4  documentation was present.

5       From what you understand, did the

6  documentation exist in an e-system rather than a hard

7  copy?

8  A.  I don't know that.

9  Q.  Okay.  If the documentation existed in a different

10  format, would that have fulfilled the requirements of

11  this?  I guess would this have been ordered if the

12  documentation actually did exist, just in a different

13  format than a paper file?

14  A.  So there are requirements for CA-60s to contain

15  certain information, and that --

16  Q.  Okay.

17  A.  -- information is what would be used to look at Child

18  Find checklists and look at the history of a student.

19  So I would say no.

20  Q.  Okay.  And by definition, does the CA-60 have to be a

21  paper file?

22  A.  I believe, yes.

23  Q.  Okay.  Okay.  And then on page 38, by March of 20- --

24  March 20th of 2020, the district had utilized a Child

25  Find checklist provided by MD- -- sorry.  We're still

1    on -- still on Exhibit 8, last page.

2  A.   Okay.

3  Q.   The district was supposed to utilize a Child Find

4    checklist provided by MDE for each of the students

5    attending the middle school.

6  A.   Yes.

7  Q.   Okay.  From your understanding of the way that middle

8    school worked, did students move in and out of the

9    middle school during the school year?

10  A.   Yes.

11  Q.   Okay.  Would this requirement in using the Child Find

12    checklist have followed that child out of the middle

13    school if they had already transferred out during that

14    school year?

15  A.   Can you repeat another way?

16  Q.   Yes.  I'll rephrase it.

17        If a student had already left that

18    program -- a student was attending the program during

19    this year, during the time the eval- -- or during the

20    time the investigation was taking place, that student

21    had transferred out prior to this decision, would the

22    district have had to track that child down and utilize

23    this Child Find checklist for that student?

24  A.   We received -- I would say yes.  We had received or

25    asked for a list of all the students.  So we had a

Rebecca A. Mc Intyre
July 15, 2024

1   BY MS. DIAZ:

2   Q.   Okay.  And then let's look at 73 -- oh, I think we

3        already talked about that.  Let me check.

4              No, let's look at 73, and then 37 of it.

5              MARKED FOR IDENTIFICATION

6              DEPOSITION EXHIBIT 73

7              4:31 p.m.

8   BY MS. DIAZ:

9   Q.   This is a SEAC New Member Orientation from September

10       of 2020, slide deck, and page 37 talks about

11       administrative law judges.

12             Do you recall if you would have presented

13       this information at SEAC?

14  A.   Yes.

15  Q.   Okay.  And it says that there's certain requirements

16       for ALJs, and one of them is that they possess

17       knowledge of an ability to understand the provisions

18       of IDEA, federal and state regs pertain to IDEA, legal

19       interpretations of IDEA by federal and state courts,

20       conduct hearings in accordance with appropriate

21       standard legal practice, and render and write

22       decisions.  Correct?

23  A.   Correct.

24  Q.   Okay.  How does MDE know that the ALJs possess the

25       knowledge and ability to do those things?

Rebecca A. Mc Intyre
July 15, 2024

1   A.   We provide them training annually, and that's part of

2        looking at the final decisions, sharing final

3        decisions with SEAC, and getting input.

4   Q.   Okay.  What training do you provide to ALJs annually?

5   A.   We would have to look back at the record.  Each year

6        it's different.  They used to go to Lehigh, go to LRP.

7        Last year they received a two-day training from

8        Pingora.  They just received a two-day training again

9        from Pingora, as well as they've attended CASE -- I

10       think it was CASE and CADDRA.

11            So we're trying to provide them as much --

12       the Pingora trainings are Michigan specific, because

13       we have told them, you know, that Lehigh, LRP, CADDRA,

14       those are all from a national perspective and topic

15       specific, where we need process specific.

16  Q.   Okay.  So you provide the trainings for the ALJs.  Is

17       there any assessment done to determine what they've

18       learned through those trainings?

19  A.   Assessment, I think, plus watching the data.

20  Q.   Okay.  How does watching the data determine whether or

21       not they've learned?

22  A.   Because there's topic-specific information that they

23       are learning, and then we watch the data to see that

24       there's progress.

25  Q.   Okay.  What does it actually mean to watch the data?

Rebecca A. Mc Intyre
July 15, 2024

1                 CERTIFICATE OF NOTARY

2   STATE OF MICHIGAN )

3             ) SS

4   COUNTY OF OTTAWA  )

5

6             I, PEGGY S. SAVAGE, certify that this

7   deposition was taken before me on the date

8   hereinbefore set forth; that the foregoing questions

9   and answers were recorded by me stenographically and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to, either party nor interested in the event

14   of this cause.

15

16

17

18

19

20

21

22             PEGGY S. SAVAGE, CSR-4189, RPR

23             Notary Public,

24             Ottawa County, Michigan.

25   My Commission expires:  7-13-25