# EXHIBIT 1

I, MARK MLAWER, do hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1. I am currently employed as a national special education consultant with expertise in monitoring and compliance.

2. I have over 35 years of experience regarding general supervision under the Individuals with Disabilities Education Act (IDEA) across the United States, including presentations, consulting, and publishing.

3. I submit this declaration in support of Plaintiffs' Response in Opposition to MDE's Motion for Summary Judgment.

4. For the present case, I reviewed state complaints and related documents, concerning child find violations by Kalamazoo Public Schools (KPS) and Kalamazoo RESA, from 2017 to 2023.

5. I reviewed 11 state complaint decisions where MDE found child find and related violations against KPS (17-0159, 18-0085, 19-0088, 19-0188, 19-0189, 19-0213, 19-0220, 22-0040, 22-0135, 22-0174, 23-0052) and one against Kalamazoo RESA (21-0007) during the six-year period between 2017 and 2023 and documentation provided by MDE related to corrective actions.

6. I also reviewed the reports of Pingora Consulting; the report of Defendant's expert, Lenore Knudtson; McIntyre's Declaration; the Complaint; USDOE's State General Supervision Responsibilities under Parts B and C of the IDEA: Monitoring, Technical Assistance, and Enforcement (OSEP QA 23-01);  state complaint decisions for 21-0004, 23-0051 and corresponding documentation provided by MDE related to corrective actions; USDOE

DMS Michigan report dated June 2020; and MDE policies and procedures related to the state complaint system.

**IDEA's Requirements**

7. The IDEA requires MDE to craft two types of remedies when it finds a failure to provide appropriate services in its resolution of complaints: the first is "corrective action appropriate to address" the needs of the student, and the second is to address "[a]ppropriate future provision of services for all children with disabilities." (34 C.F.R. §300.151(b)).

8. It is evident from the documents I reviewed that as of February 2016, prior to investigating and resolving the KPS child find complaints, MDE was aware of its responsibility to ensure the future provision of services to all students in KPS through its resolution of complaints. It was also informed of its past failures to ensure the future provision of services through its resolution of complaints, and of the need to link its resolution of complaints to other components of IDEA general supervision, including monitoring.

9. States are required by the IDEA to have policies and procedures in effect to "ensure" that all children with disabilities in the state are "identified, located, and evaluated" regardless of the severity of their disabilities. Certain populations of children and youth are specifically mentioned in the regulations—those who are homeless, wards of the state, attend private schools, are advancing from grade to grade, and highly mobile children, including migrants (34 C.F.R. §300.111(a), (c)).

10. In a recent policy guidance document the U.S. Department of Education (USDOE) addressed monitoring and enforcement in general and child find specifically. In order to meet their child find responsibilities, states must analyze data and other information and conduct "robust monitoring" to ensure compliance. USDOE explains:

In carrying out their responsibilities, States should examine equity issues that can exist in the child find system, including significant racial disparities, disparities between children from low-income and high income families, and geographic disparities such as between urban and rural areas. The State's examination may include analyzing data and other information to determine if there are significant disparities in the groups or communities of children and families who are referred for evaluation or provided services. Based on the analysis of such data and information, States may determine whether targeted monitoring (i.e., a monitoring activity that occurs outside of the State's normal cycle to address emerging or new issues, and typically is limited in scope) is appropriate to ensure that the relevant IDEA requirements are properly implemented. USDOE, State General Supervision Responsibilities under Parts B and C of the IDEA: Monitoring, Technical Assistance, and Enforcement (OSEP QA 23-01), July 24, 2023 at 8-9 (https://sites.ed.gov/idea/files/Guidance_on_State_General_Supervision_Responsi bilities_under_Parts_B_and_C_of_IDEA-07-24-2023.pdf). Hereafter cited as USDOE.

11. Further, it is not permissible for states to "ignore credible allegations about potential noncompliance." Moreover, states must use state complaint decisions as an "important source of compliance information." In their review of such decisions, states may be able to "identify patterns that suggest systemic noncompliance." If so, states must ascertain whether systemic noncompliance is taking place and ensure timely correction. USDOE at ii, 7-8.

12. States must use vigorous processes to ensure child find compliance, and it is equally evident that they must use complaint decisions as an important source of compliance information.

**MDE's Efforts Regarding Correcting Noncompliance**

13. MDE investigated and ordered correction of noncompliance in the state complaints; however, MDE assigned similar corrective actions for each of these complaints over this period of time despite the repetition of child find violations by KPS, failed to take action regarding the repetition of the violations, failed to act when the district did not fully cooperate with one investigation, and closed complaints without ensuring in an effective manner that KPS was correctly implementing the child find requirements.

14. Despite MDE ordering correction of noncompliance, KPS continued to violate the child find requirements.

15. There was no evidence in documents reviewed that MDE examined its KPS complaint data for any patterns, examined data to determine whether there are any equity issues related to child find in KPS; conducted a targeted child find monitoring of KPS; or used its routine monitoring of KPS to probe child find.

**Complaint-Specific Failures by MDE**

16. While a number of the state complaints were filed by one individual, MDE still issued repeated findings of child find noncompliance in the majority of the complaints, and those findings demonstrate systemic noncompliance.

17. Complaint 17-0159 was the earliest complaint chronologically that I reviewed. It was filed 6/30/17, and the decision was dated 8/29/17. This complaint was filed on behalf of one

student and all similarly situated students. The student had behavior problems and suspensions (MDE 007659-7662, 7667, 7668, 7670, 7675, 7681, 7685). MDE reviewed the files of thirteen additional students. Nine of the thirteen had not received comprehensive child find evaluations, and six of those students were found ineligible for special education by KPS. MDE found violations of child find and comprehensive evaluations (MDE 007693-94, 7697). MDE issued a District Corrective Action Plan (CAP) that included: In collaboration with the ISD, "develop, review or revise" procedures to ensure 1) comprehensive evaluations for all students suspected of having a disability and 2) IEPs are developed based on students' unique needs by 12/1/17. Professional development for all relevant staff on the new procedures by 4/15/18 (MDE 007700).

18. Complaint 18-0085 is the second complaint chronologically that I reviewed. The complaint is dated 4/9/18, and the decision is dated 6/8/18. This complaint was filed on behalf of one student. The student had behavior problems and suspensions (PLFS 00005424). MDE found a child find violation (PLFS 00005427). MDE created a district CAP that included in relevant part: "[R]evise or develop procedures" to document and ensure that the district "fulfills its ongoing Child Find obligation to identify, locate and evaluate students who are suspected of having a disability and in need of special education services" by 9/1/18. Professional development for all relevant staff on the new procedures by 1/15/19 (PLFS 00005428). The decision does not indicate that MDE would review the procedures.

19. Complaint 19-0088 is the third complaint chronologically that I reviewed. The complaint is dated 5/3/19, and the decision is dated 7/2/19. This complaint was filed on behalf of one student. The student had behavior problems and suspensions (PLFS 00005438). MDE found a child find violation (PLFS 00005440). MDE ordered a district CAP that included

in relevant part: "[R]evise or develop procedures regarding child find, as needed" by 1/15/20. Professional development for all relevant staff on the new procedures by 1/15/20 (PLFS 00005442). The decision does not indicate that MDE would review the procedures.

20. Complaint 19-0188 is the fourth complaint chronologically that I reviewed. The complaint is dated 9/9/19, and the decision is dated 11/8/19. This complaint was filed on behalf of one student. The student had behavior problems and suspensions (MDE_00004659-4661). MDE found a child find violation (MDE_00004667) and issued a district CAP. The CAP includes in relevant part: "[R]evise or develop procedures regarding child find, as needed" to document and ensure that the district "fulfills its ongoing Child Find obligation to identify, locate and evaluate students who are suspected of having a disability and in need of special education services"; and "revise or develop" procedures regarding discipline so that students not determined eligible for special education receive procedural safeguards by 6/15/20. Professional development for all relevant staff on the new procedures by 6/15/20 (MDE_00004669). The decision does not indicate that MDE would review the procedures. An MDE closure letter dated 11/12/20 states that the district had completed the district CAP, the case was resolved and the complaint closed (MDE 00004671). The letter does not state that MDE reviewed the procedures and approved them, or that it investigated to ensure that implementation of the district CAP resulted in compliant child find implementation by KPS.

21. Complaint 19-0220 is the seventh complaint chronologically that I reviewed. The complaint was dated 10/10/19, and the decision was dated 12/9/19. This complaint was filed on behalf of one student and asserted systemic issues at KPS (PLFS 00005462). The student had behavior problems and suspensions (PLFS 00005483-84). Eleven additional

students (of 38 at the alternative middle school) were randomly selected for review; all but one had documented behavior issues (PLFS 00005482-83, 85-94). MDE found a child find violation for the named student. It did not find violations for the other eleven students due to incomplete student cumulative files (PLFS 00005497-98).

22. MDE staff members were not able to complete the child find checklists for any of the student files because the student's education records were missing so much information, including report cards and attendance and not kept up to date. MDE 00007011. Thus, MDE did not resolve the systemic aspect of this complaint by completing its review of the eleven students.

23. For this complaint the District CAP was: 1) By 7/15/20, "revise or develop procedures regarding child find, as needed" to "document and ensure" that a) required documentation is maintained in all students' cumulative files, and b) the "special education referral/evaluation process is initiated for students for whom a child find inquiry is triggered." 2) By 2/21/20, review the cumulative files for all students at the alternative middle school and ensure that all required documents are included. 3) By 3/20/20, review the cumulative file for each of these students using an MDE child find checklist and submit to MDE a) each student's checklist including a determination of whether a special education evaluation is recommended; and b) for each of the students recommended for evaluation, evidence demonstrating that parental consent has been requested and/or received. Professional development for all relevant staff on the new procedures by 7/15/20 (PLFS 00005498-99). The decision does not indicate that MDE would review the procedures.

24. An MDE closure letter dated 11/17/20 states that the district had completed the district CAP, the case was resolved and the complaint closed (PLFS 00006936). The closure letter does not state that MDE reviewed the procedures and approved them, nor that MDE investigated KPS' use of the checklist and ensured that every student at the alternative middle school who could be reasonably suspected of having disabilities was recommended for evaluation.

25. The child find checklist was reviewed (Child Find SRR.pdf, attachment to email at MDE 00007011). This two-page document has two sections and twelve probes. Although it uses some murky concepts (such as if removals "approach" ten days), the document is valuable. If one assumes that MDE oversaw KPS' use of this checklist and did so effectively, the result would likely have been the referral for evaluation of all students at this facility who could be reasonably suspected of having disabilities. Documents produced by MDE related to this complaint do not demonstrate KPS' use of the checklist and whether additional child find violations were found.

26. One email indicates that it was not MDE that would be verifying the use of the child find checklist, but a staff member of the Kalamazoo RESA. The Kalamazoo RESA is the target of the complaint that follows below. MDE 00007012-00007013.

27. The MDE documents show some pushback from KPS during the investigation, including letters from its attorneys and an attempt by a KPS administrator to insist that MDE notify the parents of students without IEPs of the complaint investigation. MDE 00006912-00006913, 00006915, 00006829-00006834. The documents also show that MDE staff discussed extending the timeline for its decision due in part to the district not being "forthcoming with documents." MDE 00007068. One response to this idea from an MDE

staff person did not support an extension, characterized KPS as uncooperative, and recommended that the final decision so state:

> First, historically, once we understood more about extensions, we do not provide extensions for systemic complaints because the District should have been cooperating from the start-and they haven't been. I think that fact alone could start a bad precedent. The only extension we usually allow now is for mediation. In the past we have allowed for extenuating circumstances-which were usually state-wide impact or massive amounts of documentation to review, however, as I stated previously, this has become a problem here because the District is not cooperating and that should be noted in the final decision. MDE 00007065-00007066.

The final decision does not include a statement to that effect.

## Conclusions

28. Despite its thorough application of the child find and evaluation requirements in its investigations of most of the complaints, MDE's resolution of those complaints fell far short: MDE's corrective actions did not effectively address the "future provision of services for all children with disabilities" in KPS.

29. As a result, in part, of ineffective systemic corrective actions, MDE failed to ensure that all children with disabilities in KPS are "identified, located, and evaluated" regardless of the severity of their disabilities, a state educational agency's clear responsibility under the IDEA.

30. One reason for this outcome is the repetitive and ineffective systemic corrective action. In each of the eleven KPS complaint resolutions MDE instructed KPS to develop, review, and/or revise its child find or evaluation procedures and train its staff. That would be a

reasonable corrective action if any of these investigations had reviewed KPS' procedures and found them faulty, but there is no evidence in the text of any of these investigations that MDE did so. Thus, MDE assigned this corrective action in the absence of any reason to believe that inadequate or noncompliant procedures were a cause of the noncompliance: procedures can comply with the statute although practices are noncompliant.

31. Despite this habitual corrective action, KPS child find noncompliance continued unabated: complaints were unrelenting, and MDE continued to find noncompliance. By mid-2019 MDE had ample evidence that its approach to systemic corrective actions in KPS—assigning the same corrective actions over and over again—had not worked. But rather than change course and develop effective corrective actions, MDE persisted in instructing KPS to develop, review, and/or revise its procedures and train its staff. This was not sensible, and it was not effective.

32. Another reason for MDE's failure to ensure child find is that KPS repeated violations and failed to cooperate without MDE responding as required by regulations. As shown above, over this six-year period KPS continued to violate the child find requirements. In addition, with respect to Complaint 19-0220, the MDE documents reveal that KPS did not fully cooperate with the MDE investigation: it failed to produce all relevant documents regarding the students selected for investigation.

33. Michigan special education regulations require such cooperation: districts "shall cooperate" with MDE during a complaint investigation "including submitting documents requested" by MDE (MARSE R 340.1853(3)).

34. As a result of its lack of cooperation KPS effectively prevented MDE from fully resolving the systemic aspect of Complaint 19-0220.

35. The state's special education regulations contemplate both a failure to cooperate and continued "repetition of similar violations." Under either of these circumstances MDE is *required* to take one or more of seven possible steps. The steps include requiring the intermediate school district to provide complying services and programs, withholding federal funds, withholding state funds, or seeking enforcement from a court (MARSE R 340.1855). This is also included in MDE's procedure "Tiered Corrective Action and Technical Assistance for Districts with Multiple State Complaint Findings," May 2023 at 3 (MDE 007478). But there is no evidence in the documents reviewed that MDE took any of these required steps.

36. An additional reason for the child find failure is MDE's closure of complaints without effectively ensuring that KPS was compliant with child find requirements. As MDE acknowledges, verification of correction involves two steps; the second of these steps is to ensure that the "district is correctly implementing the specific regulatory requirements." MDE 00000793. As MDE has stated: "Corrective action is intended to ensure future compliance, specific to the violation, for all students with disabilities within the public agency. . . ."(MDE 00000821).

37. It is not possible to determine based on these documents what steps MDE took to ensure that KPS was correctly implementing the child find requirements before closing these complaints. The three MDE closure letters reviewed by this evaluator do not address this issue, and the few available CAP closeout documents were not very enlightening as to the specific steps taken. But it is difficult to believe that the steps MDE took in this regard were meaningful. For example, if it took significant steps to ensure KPS was compliant with the child find requirements before closing Complaint 18-0085, then it becomes quite difficult

to explain why there were five child find complaints filed against KPS the very next year, in 2019. All of these resulted in findings of noncompliance, and one was systemic. It is unlikely that MDE effectively ensured that KPS was correctly implementing the requirements when it closed the 2018 complaint.

38. It also appears that the ISD, the Kalamazoo RESA, was involved in verifying corrective actions for at least some of these complaints. That same agency was found by MDE to have committed child find violations in its juvenile detention facility. The appropriateness of such an arrangement is therefore questionable.

39. MDE's failure to engage in robust child find monitoring also contributed to MDE's failure to ensure that all children with disabilities in KPS were identified, located, and evaluated.

40. USDOE instructs states to use complaint decisions as important sources of compliance information, and to examine those decisions to identify any patterns that may suggest systemic noncompliance. In addition, states should examine equity issues in child find, including racial, geographic and income disparities regarding who is, and is not, identified as having disabilities.

41. Targeted monitoring may be appropriate to determine the extent of child find noncompliance and determine root causes. As one of the documents produced by MDE puts it, "Districts experiencing systemic noncompliance require intense, systematic correction and coordination with monitoring." MDE 00000791. MDE asserts that data from dispute resolution activities, including complaints, are used "to identify priorities for monitoring." MDE 007428.

42. In response to findings of noncompliance in a KPS complaint unrelated to child find MDE uncovered systemic concerns and ordered a Part B monitoring activity. MDE 007368. Two

of the KPS child find investigations also uncovered systemic concerns, but MDE apparently did not schedule a monitoring event in response.

43. Based on the documents that were available, with respect to child find no indication was found that MDE: examined its KPS child find complaint data for any patterns; engaged in targeted child find monitoring of KPS; used its routine monitoring of KPS to probe child find; or analyzed data to determine whether there are any equity issues related to the types of students who are, and are not, identified as having disabilities by KPS.

44. Some obvious patterns emerge from this evaluator's review of the KPS child find complaints and decisions: most of the complaints concern students with behavior problems and suspensions, and some concern students placed at alternative schools. But there is no indication that MDE analyzed the complaint data for the purpose of identifying patterns.

45. MDE did review statewide child-find-related complaints for a different purpose, creating a guidance document. MDE 00001131-00001133 and 00001103-00001129.

46. While MDE understands many aspects of a robust approach to child find data analysis, and monitoring, there is no sign in these MDE documents that it conducted the "robust" child find monitoring of KPS required by USDOE.

47. MDE should analyze and drill down KPS child find data to determine whether there are any equity issues related to child find in KPS, analyze its complaint data for patterns, and conduct a targeted child find monitoring of KPS.

48. The analysis and drill down should focus on comparing the populations of students with IEPs and those without IEPs by race/ethnicity, English-learner status, geography (home school), and income to ascertain whether there are any significant differences between the two groups of students. MDE would be wise to consult with advocates for KPS students

before engaging in the analysis and drill down. Based on the results, and on individual student academic, behavioral, and attendance data, a purposeful sample of students without IEPs more likely than others to have disabilities should be created and monitored to determine whether any can be reasonably suspected of having disabilities and needing special education and related services.

49. MDE should develop a process whereby systemic corrective actions are assigned based on the causes of the noncompliance found. Relevant district procedures should be reviewed as part of the MDE investigation when noncompliance is found. If procedures are found to be nonexistent or flawed, then developing or revising procedures can be an effective corrective action. If the procedures exist and are not flawed, then corrective actions concerning them should not be assigned.

50. MDE must use the tools given to it by the Michigan regulations when faced with an uncooperative district and/or one that is repeating similar violations over a significant period of time.

51. Clear deadlines for document production in complaint investigations should be set by MDE and penalties applied, after a warning, when those are not met.

52. MDE should ensure that, when systemic allegations are made in a complaint, it conducts a systemic investigation.

53. In Complaint 19-0213 MDE's surrogate, the ISD, did not verify that KPS was correctly implementing the child find requirements: instead of verifying that KPS was taking "affirmative action" by initiating evaluations when students are suspected of having disabilities, it only looked at the timeliness of evaluations that had been initiated. MARSE

should be amended to ensure that verifications verify the precise issues identified as noncompliant in complaint decisions.

54. MDE should reconsider the role of ISDs in MDE's complaint process. While it is permissible for states to use surrogates such as ISDs in the corrective action process, these entities in Michigan may be too close to their member school districts to be able to serve objectively. A better approach would be for ISDs to provide technical assistance to districts as they correct violations, and for MDE itself to verify that 1) the violations have been corrected for the student and 2) the district is now correctly implementing the relevant requirements.

55. MDE should reevaluate and, if necessary, redesign its routine monitoring system to ensure that it is capable of monitoring child find substantively and effectively.

56. A 2020 USDOE DMS Michigan report described a probe of MDE's complaint procedures regarding determinations of the need for, and amount of, compensatory education as a result of complaints in which noncompliance had been found. USDOE's review, and its conclusion, is limited to MDE determinations of the need for, and amount of, compensatory education as a result of complaints in which noncompliance had been found. Ms. Knudtson's grossly misleading remarks about the 2020 USDOE report should be disregarded by the Court. USDOE did not bestow its blessings on MDE's complaint system as a whole.

57. The foregoing opinions and conclusions are based on my review of the materials described in paragraphs 5-6 and my extensive career in special education, including general supervision under the IDEA.

58. To the extent that there are opinions in my reports that are not included above, I am prepared to testify to those as well.

I declare under penalty of perjury that the foregoing is true and correct.

Dated    4/4/25

Mark Mlawer