# EXHIBIT 2

U.S. DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

DONQUARION LEWIS; KE'AUJANAA

SHEPHERD-FRIDAY; and K.B.,

by and through her parent

and next friend, H.B.,        Case No. 1:22-cv-00838-RJJ-PJG

            Plaintiffs,    Hon. Robert J. Jonker

     vs.                   Mag. Phillip J. Green

MICHIGAN DEPARTMENT OF

EDUCATION, a governmental

agency,

            Defendant.

_____

    The Deposition of REBECCA A. MC INTYRE,

    Taken at 525 West Ottawa Street,

    Lansing, Michigan,

    Commencing at 10:01 a.m.,

    Monday, July 15, 2024,

    Before Peggy S. Savage, CSR-4189, RPR.

Rebecca A. Mc Intyre
July 15, 2024

```
                                                    Page 14
 1      lot of complaints in Kent ISD, and so I -- every
 2      complaint was assigned to a different complaint
 3      investigator and was handled in a different way, which
 4      was frustrating being, you know, somebody at the ISD.
 5             And so when I came, I wanted to focus on
 6      consistency in the investigators.  So that anybody who
 7      is part of -- part of the state complaint
 8      investigation, like receiving a final decision or
 9      having to go through the process, they would not be
10      able to tell which investigator they were working
11      with, because everybody is doing everything the same.
12  Q.  You mentioned that you had a lot of state complaints.
13      What would you think of as a lot?
14  A.  I would say -- well, it varied by year.  I was at the
15      ISD for eight years and in that role for four years.
16      So I would say anywhere from 4 to 14 in a year.
17  Q.  Okay.  You mentioned consistency, making sure that the
18      investigators were consistent, and that the decisions
19      were just consistent.
20             Were there any other areas that you worked
21      on?
22  A.  We worked on corrective action and making sure that
23      the corrective action that was being assigned or
24      ordered was aligned with and getting to the root of
25      the problem that was identified in the state
```

```
                                                    Page 15
 1      complaint.
 2  Q.  Okay.  And --
 3  A.  In the findings of fact.  I'm sorry.
 4  Q.  That's okay.
 5             And how would you determine the root
 6      problem?
 7  A.  In the state complaint investigation process, there
 8      is -- you have to start with findings of facts, which
 9      are based on interviews conducted with the district
10      and relevant staff in the district with the
11      complainant and getting information from there,
12      looking at document reviews, whatever.  You know,
13      depends on what the issue was, but looking at all of
14      the documents that are relevant to the issues,
15      creating a record of all the facts in the most
16      cohesive, flowing, you know, set of events that is
17      possible, and then basing -- looking at case law and
18      rules and regulations, and determining whether there
19      was a violation in any area of those facts; and if
20      there were, what specific area, and then that would be
21      where we would assign the corrective action.
22             And I'm not talking -- it's a Child Find
23      violation, so that's -- we're just going to only look
24      at Child Find.  Within Child Find, there is a whole
25      slew of -- of steps; could be regarding students who
```

```
                                                    Page 16
 1      transfer in, could be based on parent referrals, you
 2      know, anything like that.  So it's whatever the
 3      specific issue is within Child Find is what we would
 4      write the corrective action for.
 5  Q.  Okay.  During the investigation process, you mentioned
 6      Child Find, for example.  If the investigator found
 7      other violations occurring, what would the investi- --
 8      that were not related to Child Find, what would the
 9      investigator do in that situation?
10  A.  So depends on how much time is left in the -- you have
11      to be able to -- IDEA says that the other party has to
12      have an opportunity to respond.  So if there are other
13      allegations that are identified and the other party
14      has an opportunity to respond, then -- then we would
15      add that allegation in and expand that search --
16  Q.  What --
17  A.  -- or investigation.
18  Q.  Sorry.  What kind of time frame would you need in
19      order to allow the other side an opportunity to
20      respond?
21  A.  That is going to be hard to -- I would say it depends
22      on the issues and -- I can say that it didn't happen
23      very often.
24  Q.  Okay.
25  A.  We really try and stick to the issues.  But in some
```

```
                                                    Page 17
 1      cases, one issue involves other -- other things that
 2      we do.  You know, we can't just turn a blind eye on
 3      things.
 4  Q.  Okay.  So in your previous role or in your current
 5      role, are you familiar with the concept of general
 6      supervision?
 7  A.  Yes.
 8  Q.  Okay.  And what is general supervision, in your own
 9      words?
10  A.  General supervision is the State's obligation and the
11      State's subrecipients, which are our ISDs, to ensure
12      that students with disabilities are receiving the
13      free, appropriate public education in the least
14      restrictive environment that they're entitled to.
15  Q.  All right.  Let's turn to tab 67 in your binder.
16             MS. DIAZ:  We're going to mark this as
17      Exhibit 67.  There's a lot of papers.  It's a little
18      clunky to get there.  Sorry.
19             MARKED FOR IDENTIFICATION
20             DEPOSITION EXHIBIT 67
21             10:15 a.m.
22  BY MS. DIAZ:
23  Q.  Are you familiar with this document?
24  A.  Yes.  It was just released in July of last year.
25  Q.  Last year.  Okay.
```

Rebecca A. Mc Intyre
July 15, 2024

```
                                                     Page 138
 1              MARKED FOR IDENTIFICATION
 2              DEPOSITION EXHIBIT 54
 3              2:53 p.m.
 4  BY MS. DIAZ:
 5  Q.  Okay.  And what is that email a response to?
 6  A.  That is an email where the district went forward with
 7      what they thought was going to be assigned corrective
 8      action, so they corrected before we issued the state
 9      complaint final decision.  And I -- I said that that
10      doesn't matter.  They're not the ones who get to
11      dictate.  So you're writing the final decision as --
12      and the corrective action as we always would.  And if
13      it happens to be the same thing, then they've
14      completed their CAP, they can send in what they -- or
15      their SL CAP.  They can send in what they have.  But
16      if it's something different, then they have to
17      complete the over and above.
18  Q.  Do you see districts often trying to remedy the
19      situation prior to the decision coming out?
20  A.  Not necessarily, no.
21  Q.  Okay.  In this situation, the district said they did
22      evaluate, and they found the student ineligible.
23      Would MDE have asked the district to then evaluate
24      again after the decision was issued?
25  A.  We would issue the decision, say they have to complete
```

```
                                                     Page 139
 1      an evaluation.  They would get that and say, "We've
 2      completed it since the state complaint."  So they
 3      would submit to us.  We would take a look at it.  And
 4      if it met all of the requirements and we agreed that
 5      it was ineligible based on them applying proper
 6      standards, we wouldn't ask for anything more and
 7      beyond that.  But if we see anything that was not done
 8      correctly, because they didn't even have the final
 9      decision yet, so if it wasn't done and correctly or
10      how we, you know, expected it to be done, then we'd
11      send it back and say, "Do it again."
12  Q.  Okay.  So if it ticked off all the boxes in the final
13      decision, even if it were prior to the issuing of the
14      final decision, you would accept it?
15  A.  Yes.  And we -- like I said, we -- in this case, we
16      didn't see what they -- they reported that they did an
17      evaluation.  We didn't see it.  So it's not like
18      our -- I mean, we were obviously going to put that as
19      an order of corrective action anyway, so ...
20  Q.  Okay.  And then 30, Exhibit 30.  And this is a string
21      of emails, so feel free to take your time and read
22      through all of them.
23              MARKED FOR IDENTIFICATION
24              DEPOSITION EXHIBIT 30
25              2:57 p.m.
```

```
                                                     Page 140
 1              THE WITNESS:  I'll start from the back
 2      here, read backwards.
 3              MS. DIAZ:  Yeah.
 4              THE WITNESS:  Okay.
 5  BY MS. DIAZ:
 6  Q.  Okay.  So this is an email string that includes Lynn
 7      Delpy, one of the monitors?
 8  A.  Maybe she was one of the statewide monitors that had
 9      Kalamazoo.
10  Q.  Okay.  And Kristina Collier, who's the coach and
11      training coordinator, is on this email string,
12      correct?
13  A.  Correct.
14  Q.  And Marcia O'Brien, who was one of the state
15      investigators -- was she the complaint coordinator,
16      actually?
17  A.  She was the complaint coordinator.
18  Q.  All right.  So on, let's see, 425 at the bottom, it's
19      an email from Ms. O'Brien to Ms. Collier and you in
20      response to Ms. Delpy's question.  The second
21      paragraph, the second line, says -- well, it starts on
22      the first line:  As we have so much history of issues
23      with Kalamazoo, I would say we need to expect more,
24      not less of the district, when reviewing Child Find
25      documents.
```

```
                                                     Page 141
 1              And then it says:  When asked the
 2      following, my gut would say if the evaluation was not
 3      comprehensive, we would not accept it as a
 4      verification that the Child Find obligations were met.
 5              What did you take that to mean, "expecting
 6      more from Kalamazoo"?
 7  A.  So in this case, she's just saying -- because taking
 8      it out of context and putting it back in context.  Up
 9      here, they're talking about the time lines and that
10      they're talking about uncorrected status and the CAP.
11      They're asking about the CAP closeout.  They're
12      talking about something else over here.  Anyway --
13  Q.  Yep.
14  A.  As far as the George White complaints, which we
15      have -- we did have a lot of; some with violations,
16      some not.  She's saying we need to expect more and not
17      ==less of the district.  Because when you review the==
18      ==Child Find documents, it's not just show us your==
19      ==procedures.  And that's what Lynn was asking is:  Are==
20      ==we just looking at their procedures and if their==
21      ==procedures are correct, or are we looking at more==
22      ==specifics?==
23              And I will say I gave a training to the
24      statewide monitors directly after this on how to do
25      corrective action plan closeouts for state complaints.
```

Rebecca A. Mc Intyre
July 15, 2024

Page 142

1   Because with monitoring, it's a check, check, check,
2   right?  They did/didn't.  It's very black and white.
3   With state complaints, it's not black and white.
4   There's -- there's a lot of integral details that you
5   have to pay attention to.  And our -- why we keep
6   saying "ugh" in here is because the statewide monitors
7   were responsible, because we only had four state
8   complaint investigators.
9   Q.   Mmm-hmm.
10  A.   And my vision, which I say in here, "I have a vision,"
11       my vision was that a state complaint investigator gets
12       this kid in the beginning.  They read the whole -- the
13       whole problem.  They are writing the comprehensive
14       report, issuing corrective action to correct it.  So
15       they are the ones who would best know if it was
16       corrected or not, but we didn't have the capacity to
17       do that.  There's just no way.  We wouldn't be able to
18       hit any of our time lines on investigations.  So our
19       statewide monitors were closing out corrective action
20       plans and -- but like I said, they needed a level of
21       training that it's not just check, check, check,
22       check, check.  We're looking at the comprehensive
23       piece of this.
24            So if -- and I had -- we had to teach them
25       how to read, just like we've done here today, don't

Page 143

1        just read the final decision.  You've got to look at
2        the conclusions, look at the facts, and that's where
3        your root cause is.  So that's what you're looking --
4        that's what you need to look for when you're doing a
5        verification closeout.
6   Q.   So on 423, Ms. O'Brien -- actually, let's look at 424
7        first.  Ms. Collier responds to your answer -- if it's
8        your answer -- yep -- and asks if there needs to be
9        more specific language in CAPs, and then she's trying
10       to figure out if it's an ISD training issue or CAP
11       writing issue.
12            So what did you ultimately determine the
13       issue was --
14  A.   Well --
15  Q.   -- for closeout?
16            And you mentioned training.  Was it just a
17       training issue or was it also a CAP-writing issue?
18  A.   We did both.
19  Q.   Okay.
20  A.   We provided a training to our internal statewide
21       monitors on how to verify, but we also did ISD monitor
22       training, the planner monitors, whatever they're
23       called these days.
24  Q.   Are those monitors different than the other monitors
25       we've been talking about today?

Page 144

1   A.   Yeah.  Those are the ISDs.
2   Q.   The ISD.
3   A.   ISD employees.
4   Q.   Okay.  Would Tori Wentela have been KRESA?
5   A.   Yes.
6   Q.   So you trained your statewide monitors and then you
7        also trained the ISD monitors at the same time?
8   A.   (Nodded head.)
9   Q.   Did you do anything regarding the way CAPs were
10       written?
11  A.   We, at -- I believe it was at MAASE Summer Institute,
12       we did a training on how to read a state complaint.
13       So that when you're developing CAPs, you're actually
14       writing to the root cause, the real root cause, and
15       not a blame-game root cause, so -- and that was part
16       of a lack of understanding that they had, that the
17       state complaints were a form of technical assistance
18       and that they are facts that are grounded in
19       conclusions with rules, regulations, and case law, and
20       that's how they had to read it, and you can't just go
21       to the last line final decision, but there's technical
22       assistance in there throughout.
23  Q.   Throughout the complaint, there's technical
24       assistance?
25  A.   Yes.

Page 145

1   Q.   Okay.  You said in MAASE Summer Institute, there was a
2        training on how to read the complaints.  Would that
3        have been May of 2021?
4   A.   Probably would have been -- no.  MAASE Summer
5        Institute is in August.  So it would have been '20,
6        August '20.  No.  '21, maybe.  I don't know.  I'd have
7        to go back and look.
8   Q.   Okay.  Would those training sites have already been
9        provided to us; do you know?
10  A.   Probably, if that was requested for trainings.
11            MS. DIAZ:  Okay.  I don't think it was.
12            MS. HENDLEY:  What are those trainings?
13            THE WITNESS:  State complaint.
14            MS. DIAZ:  State complaint training.  We
15       asked about state complaint trainings.  I'm
16       wondering -- I mean, we have one from Pingora, I know,
17       but I don't know if I've seen -- do you recall seeing
18       anything like that?
19            MS. ABDNOUR:  No.
20            MS. DIAZ:  Okay.  Yes, if you could find
21       those, we would appreciate seeing what those look
22       like.  Thank you.
23            MS. HENDLEY:  Mmm-hmm.
24  BY MS. DIAZ:
25  Q.   Okay.  And then 423, the page prior, Ms. O'Brien says:

Rebecca A. McIntyre
July 15, 2024

Page 174

1  list at the time the complaint was filed. We had a
2  list of all the students.
3  Q. Okay.
4  A. It was hard to come by, but we got it.
5  Q. Got it. Okay.
6       Do you know if any additional monitoring of
7  KPS was ordered? Was there any supervision -- general
8  supervision monitoring ordered for KPS as a result of
9  this state complaint?
10 A. This particular one?
11 Q. Correct.
12 A. I don't think so. I don't recall.
13 Q. Would the general supervision monitoring be listed as
14 part of the corrective action?
15 A. If it was ordered, it would be in here.
16 Q. Okay.
17 A. But if -- say the corrective action was -- I don't
18 want to say completed -- not completed within that
19 one-year time line or if something additional was
20 happening in there, then we may have ordered a general
21 supervision monitoring, but I don't know, because that
22 would have come out -- if it wasn't ordered in here,
23 it would have come out of Jessica's unit.
24 Q. Okay. Okay. As a result of this state complaint and
25 because the district was not cooperative during the

Page 175

1  investigation, did MDE order any other -- or did MDE
2  take any other steps?
3  A. It does not appear so.
4  Q. Okay.
5  A. And in the end, what was ordered in the corrective
6  action rectified the cooperation issue.
7  Q. Okay. How so?
8  A. It provided the information --
9  Q. All of the information?
10 A. -- requested.
11       (Nodded head.)
12       MARKED FOR IDENTIFICATION
13       DEPOSITION EXHIBIT 9
14       4:14 p.m.
15 BY MS. DIAZ:
16 Q. Okay. Okay. Let's go to Exhibit 9 really quickly.
17       This is State Complaint 21-0007. This is
18 against Kalamazoo RESA, not KPS, correct?
19 A. Correct.
20 Q. On page 15 is the decision, and the investigator --
21 OSE found the district did not meet its Child Find
22 obligation to identify, locate, and evaluate the
23 student with a suspected disability. The MDE
24 determines a violation.
25       Considering how MDE have used the ISDs or,

Page 176

1  in this case, the RESA to be responsible for ensuring
2  FAPE for students, was MDE at all concerned that the
3  ISD was not fulfilling its Child Find duties?
4  A. So this was specific to -- even though it was KRESA,
5  it was specific to the juvenile detention facility.
6  It wasn't KRESA as a whole.
7  Q. Okay.
8  A. So -- but, yes, they are -- so the KRESA operates the
9  juvenile detention facility there.
10 Q. Okay. So my question is still --
11 A. No.
12 Q. Okay. No concerns at all that the RESA was having
13 issues with Child Find as their -- one of their member
14 districts was also having issues with Child Find?
15 A. They were having -- they had Child Find for this one
16 student who actually came from that member district in
17 their juvenile detention facility, so ...
18 Q. Okay. Considering this student was found eligible in
19 this situation and there was a state complaint prior
20 for Child Find as well, would MDE ever go back to see
21 if any comp ed would be warranted for this student to
22 remedy all of the past years without special education
23 services?
24 A. That didn't happen; so, no.
25 Q. It didn't happen in this situation?

Page 177

1  A. Correct.
2  Q. Would MDE ever do that?
3  A. I don't know. We haven't -- we haven't done it.
4  Q. Okay. Could MDE do that if they wanted to?
5  A. Depends. But, potentially, I'm sure we could figure
6  something out some way.
7       MARKED FOR IDENTIFICATION
8       DEPOSITION EXHIBIT 13
9       4:16 p.m.
10 BY MS. DIAZ:
11 Q. Okay. Okay. Okay. Let's look at 13, see if we can
12 see the date of it.
13       This is 23-0052, and this decision was
14 issued on April 4th, 2023, and the decision is on
15 page 11. And the district did not file its -- did not
16 fulfill the Child Find responsibility. MDE determines
17 a violation.
18       Being that this was April 4th, 2023, when
19 would the district-level CAP have to be completed by
20 to be in compliance with IDEA?
21 A. Sorry. When was this?
22 Q. That's fine. April 4th was the decision.
23 A. So April 4th of 2024.
24 Q. Okay. Are you aware of any other Child Find
25 complaints that have been filed against KPS since