# EXHIBIT 13

U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Donquarion Lewis; Ke'Aujanaa Shepherd-Friday; and K.B., by and through her parent and Next friend, H.B.,
Plaintiffs,

vs. Case No. 1:22-cv-00838-RJJ-PJG

MICHIGAN DEPARTMENT OF EDUCATION, a governmental agency,
Defendant.
_______________________________________

Deposition of LENORE KNUDTSON
Taken via Remote Videoconference
Commencing at 10:00 a.m.
Tuesday, October 29, 2024
Before Paula S. Raskin, CSR

A P P E A R A N C E S (All Remote):

Mitchell D. Sickon, Esq.
Erin H. Diaz, Esq.
DISABILITY RIGHTS MICHIGAN
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755
msickon@drmich.org
ediaz@drmich.org
and
Jennifer B. Salvatore, Esq.
Salvatore Prescott Porter & Porter
105 East Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@sppplaw.com
Appearing on behalf of the Plaintiffs

A P P E A R A N C E S (Continued):

Ticara D. Hendley, Esq.
Michigan Department of Attorney General
Health, Education & Family Services Division
P.O. Box 30758
Lansing, Michigan 48909
(517) 335-7603
hendleyt1@michigan.gov
Appearing on behalf of the Defendant

ALSO PRESENT:
Meredith Isaac

E X A M I N A T I O N S

| WITNESS | PAGE |
|---|---|
| LENORE KNUDTSON | |
| EXAMINATION BY MR. SICKON: | 6 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 59 | Email Re Draft Letter to KPS Counsel | 132 |
| EXHIBIT 63 | Pingora Report - Feb 2016 | 24 |
| EXHIBIT 67 | OSEP General Supervision 23-01 | 57 |
| EXHIBIT 82 | Pingora Report - Feb 2021 | 95 |
| EXHIBIT 86 | 23-0051 Final Decision | 195 |
| EXHIBIT 99 | Knudtson CV | 24 |
| EXHIBIT 100 | Knudtson Expert Report | 41 |
| EXHIBIT 101 | Training March 2020 - Pingora | 62 |
| EXHIBIT 102 | Pingora Training Slides - Dec 2020 | 74 |



Page 9

question, okay?
A. Okay.
Q. If you need a break at any time, for any reason, please tell me or tell your attorney. I will finish my line of questioning if we are in the middle of it and then see to that break. Does that sound fair?
A. Yes.
Q. Now, because this is all an effort to get your full, complete, and accurate answers, I have to ask are you taking any medications or drugs of any kind that might make it difficult for you to understand and answer my questions today?
A. None.
Q. Have you taken any cough syrup or medicine or anything containing alcohol that likewise might make it hard to answer questions today?
A. No.
Q. Okay. Are you sick at all today?
A. No.
Q. Okay. Glad to hear it.
Now, is there any reason other than anything I've talked about why you can't give full, complete, and accurate testimony today?
A. I do not have any reasons.
Q. Okay. So we're going to start today talking about

Page 10

your background, and I'm going to pull up your CV.
Let me make sure it's as big as possible so that we keep that readable. How does that look?
A. I can see it.
Q. Okay. It says here that your first educational employment experience was working as a school psychologist. Is that right?
A. Yes.
Q. And in addition, you were representing students as an attorney from 1997 to 2004?
A. Yes.
Q. Have you worked representing families since that time?
A. No.
Q. After that, it looks like you started educational consultation work in 2005. Is that right?
A. Yes.
Q. Okay. And that was on your own through Utah State?
A. I'm not sure what you mean by on my own through Utah State.
Q. Before you formed Pingora with Stephanie Weaver.
A. Oh, okay. Yes, I have had a consulting relationship with Utah State University since 2005.
Q. Okay. But then you formed Pingora Consulting with Stephanie Weaver in 2012, right?

Page 11

A. Yes.
Q. Okay. Are there any other employees at Pingora Consulting other than you and Ms. Weaver?
A. No.
Q. Since you started consulting in 2005, have you done any other work in special education?
A. I'm not sure what you mean by any other work.
Q. As an attorney, have you represented any parties in special education matters?
A. No. If I could clarify my previous response, though, when you asked if I have represented families, any families, since I believe 2005, I have, in addition to my special education practice, at times maintained a small private practice here in my home community just to keep the courtroom skills sharp, and I have on occasion represented, for instance, people with mental health needs, children removed from their home by the child protection system, but not in education in any capacity.
Q. Okay. And that sounds more like abuse and neglect work? Is that fair?
A. There was some abuse and neglect work, and there was also some mental health work.
Q. So like commitments and things like that?
A. Yes.

Page 12

Q. Okay, thank you. I appreciate you adding to -- and if you need to do that in any other future questions or answers, something comes to you later, feel free to supplement in the same way, okay?
A. Yes.
Q. Okay. I'll move on to Page 2 here where we see your professional highlights, okay?
A. Yes.
Q. Now, looking through this pretty quickly, it seems like most of these are related to your work performed as an educational consultant. Is that fair?
A. Yes.
Q. Okay. Now, at the very top, we see that you are also a senior consultant at CADRE, the Center for Appropriate Dispute Resolution in Special Education, right?
A. That is correct.
Q. Okay. Was that or is that a paid position?
A. No.
Q. Okay. So that's a volunteer position?
A. It's an invited position.
Q. And so it's kind of pro bono?
A. Yes. CADRE invites what they consider to be experts --



(Reporter clarification.)
A. CADRE invites professionals from the field to become senior dispute resolution consultants for them.
Q. And how long have you done that?
A. I would say two to three years.
Q. Now I'm going to go through the rest of these professional highlights and I'm going to talk specifically about some of the connections with MDE.
First, you list national and state trainer after the presenter, and so in that trainer section, it notes that you have trained MDE in ALJ systems and complaint investigators. Is that right?
A. Yes.
Q. Okay. And you've presented repeatedly on complaint investigation to MDE, right?
A. I'm not sure what you mean by repeatedly, but I've had regular training with them.
Q. Do you know how many times you've presented a training that was intensive, maybe say involving a presentation through PowerPoint on that topic to MDE?
A. And by topic, you mean complaint investigations specifically?
Q. Yeah.
A. I would say -- this would be strictly an estimate.

I would say 15 to 20 times.
Q. Any idea how many times that's been to MDE?
A. That would be to MDE.
Q. Okay. Now, the ALJ systems that's mentioned here, is that a training for ALJs or training for SEAs about ALJs?
A. It is typically to ALJs.
Q. So ALJs are the intended audience then.
A. Yes.
Q. Are there any other special education trainings that you've provided to MDE staff on topics other than those two areas?
A. When you train on complaints investigation, or at least when I train on complaints investigation, it also involves substantive topic areas.
Q. Okay. We'll go through some of -- a couple of those presentations later.
Can you tell me what is the rate that you charge for training?
A. It has varied over the years, but training is roughly $200 an hour.
Q. Now, in the next section of the professional highlights is -- that relates to Michigan at least, is the IDEA dispute resolution consultant, slash, investigator, slash, mediator. And MDE is listed as

one of the folks that you've worked for in that capacity, right?
A. Yes.
Q. All right. Now, let's take consultant first. What's involved in that role for you when you work with MDE?
A. Ongoing professional development and technical assistance.
Q. Okay. When you say ongoing, how frequently?
A. In Michigan specifically, typically every other week barring a holiday that falls on that day or some other conflict, like staff may be attending some kind of in-house workshop or out-of-state -- or out-of-office training.
Q. Okay. So the -- twice a month, you said, thereabouts?
A. Thereabouts.
Q. And how long has that kind of ongoing technical assistance relationship been with MDE?
A. I would say roughly since 2017, '18.
Q. Okay. And would the rate that you charge for that be similar to what you charge for trainings?
A. Yes.
Q. So about 200 an hour?
A. Yes.

Q. Okay. Now let's talk about the investigator component of that role. It says IDEA dispute resolution investigator role. What do you do in that capacity for MDE?
A. On occasion I serve as the complaint investigator, so mostly in the capacity of a complaint filed against MDE directly, although they have the authority under the federal regulations to conduct their own investigation by internal staff when there is a complaint filed against MDE.
MDE has, in many instances, opted to assign that out to an investigator, and I've been one of the investigators that have been assigned state complaint investigations when a complaint's filed against MDE.
And there have been maybe two or three other times where they have requested that I conduct a complaint investigation that may not be against MDE. It may be against a district or an ISD.
Q. Okay. And about how long has -- have you been doing that work, investigating state complaints, whether against MDE or other entities?
A. I would say roughly the same time period, 2017, '18.
Q. And in terms of rate of pay, again is that similar, about $200 an hour, to do the investigation work?



Page 17

A. Yes.
Q. The last is mediator. Do you work as a mediator for MDE?
A. No.
Q. So in this block, it's primarily the consultant and investigator work that you do for MDE.
A. Yes.
Q. All right. The next section is independent court expert. It says that you also work with MDE in that capacity as well, right?
A. Yes.
Q. And we talked a little bit before about being deposed and that you were involved in the AB case, which was against MDE, right?
A. Yes.
Q. Other than the AB case, is there any other work that you've done in this capacity as an independent court expert for MDE?
A. This case.
Q. Okay. That makes sense.
All right. Now, going back just briefly to that dispute resolution consultant work you did for MDE, as a part of Pingora, you issued reports to MDE about its dispute resolution system in 2016 and 2021, right?

Page 18

A. Yes.
Q. Okay. And when you performed that work, were you paid the -- about $200 an hour type rate or was that different?
A. I suspect almost ten years ago, it was a little bit less.
Q. And the 2021, it might have been a little bit more?
A. I don't recall.
Q. Were there any other instances when your consulting with MDE produced a substantive report like the ones Pingora issued in 2016 or 2021?
A. No.
Q. Okay. Now, when we were last talking about independent court expert as we were going through this list, you had mentioned the New Mexico case, so I would assume that's what the New Mexico Department -- or Education Department reference here is.
What was your involvement with the Montana Office of Public Instruction?
A. It was in anticipation of litigation. I was not deposed in that matter.
Q. What was the case?
A. I do not recall the name.
Q. The SEA was involved in that Montana case?

Page 19

A. Yes.
Q. And that's -- OPI is the SEA Montana?
A. Yes.
Q. Okay. Do you know if that case settled before it went to Federal Court?
A. I do not. Again, my involvement was in anticipation of litigation, and I was never formally deposed and I wasn't made aware of the status of any Federal Court case.
Q. Okay. Now, the last section that references MDE is the ongoing IDEA technical assistance. Now, we already talked a little bit about this, the kind of twice a month schedule. Is that what this section refers to when it comes to MDE's relationship with you and your work?
A. Yes.
Q. Now, we've talked about a whole slew of different ways that you've worked with MDE in reviewing your CV, right?
A. I'm not sure what you mean by slew, but there were several or multiple ways, yes.
Q. Sure. Are there any other ways that you've worked for MDE that we have not talked about?
A. Not to my knowledge, no. I mean there's -- consultation or being a consultant is a broad category.

Page 20

Q. And so they might call you outside of the every, you know, two-week meeting that's scheduled for your opinion on something, just as an example?
A. Yes. I think that --
Q. Or send an -- just send an email about a question they have, something like that?
A. I think that's possible.
Q. Okay, all right. So you mentioned that consulting is a broad term, and, you know, I've just mentioned like kind of an informal kind of discussion, and we've talked about the regularly scheduled meetings.
Was there anything, you know, that you do in terms of consulting outside of those things with MDE?
A. No. I would be available to them if they had questions, and I am regularly scheduled to provide technical assistance and consultation to them.
Q. So do you have a contract with them that -- like as an independent contractor to work with them on special education matters?
A. Pingora Consulting does.
Q. How long has that relationship existed between Pingora and MDE?
A. Roughly since -- you mean the ongoing relationship?



Page 25

Q. Your expert report in this case.
A. I'm sorry, I'm not tracking.
Q. In this case, the expert report that you filed was issued under your own name and not through Pingora Consulting. Is that correct?
A. If you scroll up, it was issued under Pingora Con- -- oh, I'm sorry, you switched. Okay. I thought you were still on the other report. I'm sorry.
Q. No.
A. This is, yes, it is issued under my name. It is still work through Pingora Consulting. My business partner is not an attorney, and this would have been work that would be assigned to me as the attorney in the partnership.
Q. I see, thank you. We are going to get to this 2016 report. I just wanted to clarify some of the relationship and the work from Pingora Consulting and things like that first.
A. Sorry for the confusion, but this report was on the screen when you first asked the question, which --
Q. Yeah, that makes sense.
And we talked earlier about the work that Pingora was produced through -- or for MDE, right? There was a lot of work starting, it sounds like,

Page 26

2017, 2018 there's been an ongoing relationship. Is that right?
A. Yes.
Q. Okay. And your personal contributions were a substantial part of all that work, right?
A. Yes. Likewise would be my partners.
Q. Yes, absolutely. Would you say that you and Ms. Weaver contribute roughly equal amounts to any work produced by Pingora Consulting?
A. Roughly. She works in areas in which I don't work, and I work in areas in which she doesn't work.
Q. Okay. And you mentioned the kind of legal split; that you handle more legal matters. Is that right?
A. Yes.
Q. Okay. Would you agree that through Pingora, you express your expertise in legal matters?
A. Yes.
Q. Okay. And would you agree that through Pingora, in say presentations or trainings, the depositions and recommendations expressed are also your positions and your recommendations?
A. Yes, if I understand the question correctly.
Q. Yeah, that essentially when Pingora presents materials, that's also a representation of your position.

Page 27

A. Okay. It's a representation of our position, so meaning that my business partner, Stephanie, and I would have collaborated on that, and it represents our understanding of OSEP's interpretation and guidance of the law.
Q. Now, you had mentioned that you handle more of the legal aspect of Pingora Consulting's work. What would you say is one of Ms. Weaver's areas of expertise?
A. Finance, school district finances.
Q. Other than those two areas, do you feel like your expertise is fairly equivalent in other areas?
A. I'm not sure I understand your question.
Q. I just don't know if there's other topics where you would defer to her expertise or she would defer to yours.
A. Well, I would definitely defer to her in finance questions, and -- and I can't answer when she would exclusively defer to me.
Q. Okay, fair enough. Let's jump into the report. So on Page 2 here --
(Reporter clarification.)
Q. So this is Exhibit 63, like I had mentioned before, and here on Page 2, it notes that OSE commissioned this review in order to make improvements to its

Page 28

system of general supervision, right?
A. Yes.
Q. Did you or Ms. Weaver have any discussions with MDE personnel about why it wanted to improve its system of general supervision?
A. I'm sure that we did, but I can't recall the substance of those.
Q. Do you have any idea of who you might have talked to?
A. Teri Rink and previous assistant directors and/or supervisors, and I don't recall their names. I can recall their first names, but not their last names.
Q. Can you recall the general substance of those conversations?
A. The -- so you're talking about preceding the commissioning of this report?
Q. Yes.
A. Yes. They were interested in taking a look at their general supervision system and getting feedback on how to make improvements to it.
Q. Okay.
A. By way of more context, I had been presenting at a national conference. Teri Rink was in the audience and spoke to me afterwards about who I was and if I did work at the state level as well. So that was



Page 29

the first time the conversation started about the possibility of doing work in Michigan.

Q. You mentioned there was a national conference. Do you remember what you were presenting on?

A. No.

Q. Okay, all right. We'll head to Page 3 here. Now, this is a page that's titled "System of General Supervision," right?

A. Yes.

Q. And here in the part that we can see right now, it shows a relationship between due process hearings, state complaints, determinations, and monitoring, right?

A. Yes.

Q. That relationship seems to be that due process, state complaints, and determinations all provide information for monitoring. Is that right?

A. No.

Q. What is it showing?

A. It shows that the broken lines from due process hearings, state complaints, and monitoring all feed into and factor into the determinations that get made, and then all three of those systems -- due process hearings, state complaints, and determinations -- inform monitoring.

Page 30

Q. Okay. And in this way, is it something of a feedback loop?

A. Some might say that, yes.

Q. And what role do state complaints play in that kind of feedback loop?

A. They inform monitoring. They inform determinations.

Q. Now, in this upper half of this page, there's also mediation, which just seems to be hanging out by itself, not necessarily informing any of the other parts that we discussed. Is that right?

A. Yes.

Q. And there's SPPAPR Indicator 16, though, right?

A. Well, that indicator exists. I'm not sure what the question is.

Q. Mediation informs that indicator. Is that right?

A. Yes.

Q. So how many mediation agreements there are get reported to OSEP through that indicator.

A. Yes, so it is a numeric data point on the mediation system as opposed to a substantive one.

Q. Okay. Yeah, but seeing this kind of feedback loop, mediation doesn't really play a role. Would that be fair?

A. It's because mediation is confidential, it does not play a role.

Page 31

Q. Now, would you say the same of resolution agreements which are sent to OSEP as a part of Indicator 15?

A. No, I would not say the same.

Q. What's the difference?

A. A, it's not a confidential process, and, B, it's part of the due process hearing system.

Q. Now, moving on to the second half of this page, and this looks like there's a funnel with three bubbles in it. Is that fair?

A. Yes.

Q. One is determinations, one is monitoring, the last one is dispute resolution, right?

A. Yes.

Q. The dispute resolution one has a couple bullet points. It's complaints and due process, right?

A. Yes.

Q. I assume the complaints is state complaints?

A. Yes.

Q. Okay. And that seems to be communicating that all those components of the state system of general supervision are being fed into this funnel at the top, right?

A. Yes.

Q. And then down at the bottom, there's -- at the bottom of the funnel, there's something called TA/PD, which I assume is technical assistance, slash, professional development. Is that right?

Page 32

A. Yes.

Q. Okay. And so these three components inform how an SEA ought to craft that TA and PD. Is that fair? Is that what this is communicating?

A. These three components are not the only sources of information that would be used to craft the TA and PD, but certainly with respect to the focuses -- focus of our report on general supervision, these are three strong factors that would inform the technical assistance and professional development needs of the state.

Q. Are there other particularly important areas that also feed that system to inform SEAs about what TA to craft or what PD to provide?

A. Certainly, new or novel requirements under the law, new or novel court interpretations of a longstanding premise in the law, requests of school districts or the ISDs could also inform that and should inform that.

Q. All right. Now we're going to move to Page 4. Here there's a table of contents that show this report reviews several what it calls components of the general supervision system, right?



end of Paragraph 2 here.
This February 2016 report echoes the US DOE statement that the broad scope of the state complaint system is critical to the state's exercise of its general supervision responsibilities, right?
A. Yes.
Q. Would you agree that used with that connotation, when something is critical, it's usually considered necessary?
A. I can't say that it could equate to necessary, no.
MR. SICKON: And your report in this case, we're going to mark this as Exhibit 100.
(DEPOSITION EXHIBIT 100 MARKED FOR IDENTIFICATION at 10:51 a.m.)
BY MR. SICKON:
Q. And this is the expert report that you provided for this case, right, Ms. Knudtson?
A. Yes.
Q. Okay. Now, we're going to go to Page 3, state complaint system requirements.
Here you quote the dispute resolution procedures under Part B in an OSEP document from 2013. Is that right?
A. Yes.
Q. It's Question B-1 and its answer, right?

A. Yes.
Q. The question is: Why are states required to have complaint procedures when the IDEA statute does not contain those procedures, right?
A. Yes.
Q. And OSEP's answer, which you quote, includes the statement here towards the end: We believe that the state complaint process is fully supported by the Act and necessary for the proper implementation of the Act and these regulations.
Is that right?
A. Yes.
Q. This is language that you've included in other training documents you've presented to MDE for state complaint investigators, right?
A. Yes.
Q. As the authority for the state complaint system? Is that right?
A. At least in part, yes.
Q. Okay. And do you agree with the idea that the state complaint system is fully supported by the IDEA?
A. Absolutely.
Q. And would you agree that a compliant state complaint system is necessary for a state's exercise of its general supervision responsibilities?

A. Yes.
Q. Now, we're going to jump back to your 2016 report. We're going to go through some of the chart on the state complaint system.
On Page 6, Pingora found that OSE had some inconsistencies with federal requirements, right?
A. Yes.
Q. And those -- that federal requirement was 300.151(a), right, because the findings correspond to the regulations subpart at issue, right?
A. There's an interplay between sections here 300.151, Paragraph A, requires written procedures that the SEA must adopt, and within the adopted written procedures, there was an inconsistency with 300.153(b)4(v).
Q. Okay. And that's one of the inconsistencies listed in the findings here on Page 6, right?
A. Yes.
Q. Okay. And there's a total of six inconsistencies that carry over onto Page 7, right?
A. Yes.
Q. Okay. Now, do you believe that the procedures, considering this list, would be compliant with the requirements of the state complaint system as

contemplated by IDEA?
A. With respect to the requirements to have written procedures that are compliant with IDEA, not at that time. Not in 2016, no.
Q. Okay. We're going to move to Page 8, but we'll be in the same regulation. We're still in 151 here.
Okay. Now, scroll back up. We're in 151(b), and in Pingora's feedback concerning Regulation 151(b), it states: The complaint system does not consistently address substantive issues, right?
A. Yes.
Q. On the same page, Pingora's review of information related to 151(b)(1), it found that OSE's corrective action appears to address procedural rather than substantive issues, right?
A. Yes.
Q. Now, with both of those in mind, are those practices compliant with the requirements for a state complaint system?
A. In 2016, when they were discovered, it was not compliant.
Q. Okay. Now, we're on the same page, and we're still looking at 151(b)(1) findings, states here that Pingora found that the student level corrective



Page 45

action lacks specificity, right?
A. Yes.
Q. And that compensatory education determinations are relinquished to the IEP team, right?
A. Yes.
Q. Both of those practices would concern an appropriate remedy for the student at issue. Would you agree?
A. Yes.
Q. Would those practices be considered compliant with the requirements of a state complaint system when they were discovered in 2016?
A. The last one that you mentioned, compensatory education determinations being relinquished to the IEP team, would be, no, student-level corrective action lacks specificity is not clear enough the way it's written there in that context to be able to say it is compliant or not.
Q. Finally, moving to 151(b)(2), Pingora found that complaint decisions do not appear to address the future provision of services for all children with disabilities. Is that right?
A. Yes.
Q. Okay. And with that practice in mind, would that be compliant with the requirements of a state complaint system?

Page 46

A. In 2016, it was not compliant.
Q. Okay. I'm going to move on to Page 10, and so now we're crossing over into 34 CFR 300.152.
Now, when it comes to 152(a)(5)(i), Pingora found that violations -- I'm sorry, found that decisions are difficult and confusing to read, violations are not clear, and correction of noncompliance is not specific to the student, right?
A. Yes.
Q. And to you, would that reinforce the earlier finding that student level corrective action was unclear?
A. I'm not sure what you mean.
Q. In the earlier part of the chart, it mentioned that student level corrective action was unclear. Do you think that it's at all related to this finding that decisions are difficult and confusing to read and violations are not clear?
A. So first of all, are you referring to the section where I said they lack specificity?
Q. Yes.
A. Okay. That is -- I'm not sure. This is a different section, so I'm specifically referring to the content of the decision or the final report here, so I'm not sure how to answer that. That was a different section where the lack of specificity came

Page 47

in.
Q. Okay. We'll move to 152(b)(2) here on Page 11 where Pingora found there appears to be a lack of systemic verification of correction of noncompliance, right?
A. Yes.
Q. As a practice, would failing to verify the correction of noncompliance be compliant with state complaint system requirements?
A. Not as the practice appeared in 2016, it would not be compliant.
Q. Okay. And those findings were based on both -- I'm sorry, both on stakeholder feedback and review, right?
A. Yes.
Q. And part of the stakeholder feedback for that same requirement is that there is no system of graduated sanctions, right?
A. That's what the feedback was, yes.
Q. Do you recall if during the review that Pingora performed, you found facts that tended to affirm that stakeholder feedback?
A. I don't recall any specifics. I can tell you that, you know, based on the comments in the report, the corrective action system was described as needing to improve.

Page 48

Q. Would it surprise you if there were no system of graduated sanctions published by MDE at the time of this report?
A. It would not surprise me in 2016.
Q. Now, let's talk about the second part of this report's focus.
In the earlier table of contents, the components that were being reviewed were the state complaint -- or, sorry, the dispute resolution system and the monitoring system, right?
A. Yes.
Q. So we're going to jump right now to the section on monitoring, here on Page 16.
Here, starting in the second paragraph, it notes that OSE does not currently utilize dispute resolution data to inform local district monitoring selection. Is that right?
A. Yes.
Q. And the end of that paragraph, it states that the disconnect of dispute resolution data from the selection rubric for local monitoring may contribute to long-term or systemic noncompliance that remains unaddressed by OSE, right?
A. Yes, that's what it says.
MR. SICKON: Now, we've been going about



because we have stakeholder meetings across the state and gathered a lot of information from a lot of different groups, and they had specific questions about implementation.

They were -- it is my belief that they had commissioned the report knowing that there would be improvements that need to be made, and they set out on the path immediately of making improvements.

Q. Okay. And in our previous discussion, we talked a lot about other work that you did for MDE as well. You had mentioned that there was an ongoing relationship from 2016 or 2017 to present. Is that right?
A. No, I believe I said 2017, '18 to present.
Q. Well, I'm assuming that we would include this 2016 report, but then after this 2016 report, it picked up again in 2017? Is that what you're saying?
A. At the point of the 2016 report, I did not know it would be an ongoing relationship.
Q. So that picked up the year after.
A. It was I think through the process of MDE developing a plan to be able to implement some of these that it became an ongoing relationship.
Q. Okay. And so you mentioned them getting to work right away, but then you came on through Pingora to

advise them with carrying out some of these recommendations later in 2017 or thereabouts. Is that what you're saying?
A. Yes, in addition to other activities. I mean it wasn't just the report. It was systems improvement in general.
Q. Okay. I'd like to talk about a training that you provided to MDE in March of 2020.

MR. SICKON: I've pulled up what we're going to mark as Exhibit 101.

(DEPOSITION EXHIBIT 101 MARKED FOR IDENTIFICATION at 11:33 a.m.)

BY MR. SICKON:
Q. This is a training on state complaint investigation that you provided to MDE in March of 2020, right?
A. Yes.
Q. Now, it's kind of an awkward format, so I want to try and make sure that you can see as much of this as possible.

Does that work?
A. I think so.
Q. All right. Here on Slide 6 -- and I'm just going to refer to the slide numbers for ease.

Slide 6 outlines some important context for the system of state complaints, right?

A. Yes.
Q. Okay. And the first is authority, right?
A. Yes.
Q. All right. Well, let's go there.

Here on Slide 8, this recounts that language from the 2013 OSEP document that it believes the state complaint process is fully supported by IDEA, right?
A. Yes.
Q. And that it's necessary for the proper implementation of the Act and these regulations, right?
A. Yes.
Q. That's the same language that was quoted in the 2016 report, right?
A. Yes.
Q. Okay. Now, we've talked about several different OSEP documents since we started, so let's talk a little bit about OSEP's authority in this area.

We talked about where OSEP is located as an office in the Department of Education, right?
A. Yes.
Q. And would you say that OSEP is the office within USDOE that has the most special education expertise?
A. No.

Q. Which office is that?
A. I would say the overall office of OSERS in which OSEP sits.
Q. But OSEP administers IDEA at a federal level, right?
A. I'm not sure that I would agree with the word "administers."
Q. It accepts SEA applications for Part B funds?
A. Yes.
Q. And it makes state determinations about each SEA's compliance with Part B and Part C, right?
A. Yes.
Q. Is there any part of it administering IDEA that I'm missing here?
A. Well, one of their primary functions is to issue guidance, and that is in special education as well. Sometimes that guidance is jointly issued with OSERS. Other times it is issued, like in this case, just through OSEP, but the -- the guidance all comes with a bit of a disclaimer that says that it does not carry the effect or force of law. And the majority, I mean they issue guidance regularly.
Q. Okay. Going back to your report here, Exhibit 100, Page 5, you note after quoting an OSEP DMS report, that OSEP has the ultimate authority as a condition of funding to supervise MDE's state complaint


accomplish that.
Q. Okay. And the mentoring one, too, also stands out to me as one that might be somewhat feasible, but it seems like an extension of the independent expert training in 3, like an ongoing relationship with someone that's an expert. Is that fair?
A. Yes, and I have only ever seen districts go to that level when they have a district that, not so much unwilling, but for whatever reason, they have been unable to remedy a situation.
And we're not talking about they could have improved faster or that they could have done a better job of improving; that they are unable to remedy it.
Q. Okay. And, yeah, withholding funds, I know that is the absolute -- I mean it feels like what people commonly call something like the nuclear option; like it is just not typically ever done, right?
A. It's not typically ever done.
Q. Yeah. Now, providing service directly, it sounds like this would be in line with something that you're saying; unable, more than unwilling is the more common scenario. Is that right?
A. Yes. So by way of example, I do a lot of work with the Bureau of Indian Education. There's a small

school at the bottom of the Grand Canyon in my state, and that school is accessible by helicopter, by foot, which takes about eight hours, or by donkey, which is no one's preferred mode of transportation. That is true for staff that have to work down in the canyon as well, and they struggle with being able to have credentialed providers to provide services at that school. There are times when they're unable to provide, and the SEA steps in to detail federal employees down there.
Q. That's Havasupai, right?
A. Yes.
Q. I've heard Havasupai Lake is beautiful, and I don't know if you've ever been. I'd imagine you have if you've worked with them.
A. I have. It's absolutely beautiful.
Q. But I understand, the remoteness of that location is unique, and the same with the Virgin Islands situation. That sounds like a very unique and difficult situation as well.
MR. SICKON: Okay. I'm going to check back in. I said I would. It's been about a half hour. We can keep going if people are interested, or if we want to take a break for lunch, I'm happy to do that too.

(Recess taken at 12:26 p.m.)
(Back on the record at 12:30 p.m.)
MR. SICKON: And that is going to be it for this December 2020 training. We're going to move now to the Pingora report issued in February of 2021. We're going to mark this as Exhibit 82.
(DEPOSITION EXHIBIT 82 MARKED FOR IDENTIFICATION at 12:31 p.m.)
BY MR. SICKON:
Q. Now, Ms. Knudtson, in the March 2020 training, Pingora had explicitly checked in with some OSE employees about its challenges since 2016, right?
A. Yes.
Q. But Pingora didn't formally revisit the February 2016 report until it issued this follow-up in 2021, right?
A. The process commenced before that, but the report was ultimately issued in February.
Q. So let's take a look at that report. We'll go to Page 3.
Here it states that MDE OSE commissioned this review in order to evaluate changes since the 2016 review, assess current system effectiveness, and receive recommendations to facilitate ongoing improvement, right?

A. Yes.
Q. And regarding those recommendations to facilitate ongoing improvement, down at the end of this page, in the last paragraph here, it says that those recommendations were grounded in requirements and a convergence of data, right?
A. Yes.
Q. And the next sentence goes on to say that more weight was given to those areas where multiple sources of information converged to affirm a strength of the system or area of general supervision needing improvement, right?
A. Yes.
Q. Okay. Now, we're going to skip to Page 18. This starts a section that is a comparison between the 2016 summary and the 2020 review. Is that fair?
A. Yes.
Q. Okay. We're going to jump to Page 22, within that section comparing the two.
Now, this starts a comparison subsection about the 2016's -- 2016 reports recommendation Number 3, right?
A. Yes.
Q. And this is the recommendation then, 2016. I believe it was Subparagraph (1)(b) talked about



Page 97

developing a system of targeted program or district monitoring in the event of systemic noncompliance, right?
A. Yes.
Q. And that there was another recommendation that was Paragraph 3 that said MDE should use monitoring to follow long-term corrective action to ensure appropriate future provision of services for all children with disabilities, right?
A. Yes, from the 2016 report.
Q. Yeah. After kind of recapping that 2016 report's recommendations, the next comparison section is 2020 progress review of implementing that recommendation, right?
A. Yes.
Q. Okay. There's documents and then a snapshot, right?
A. Yes.
Q. After those sections, there's a section on themes from 2020 stakeholder input, right?
A. Yes.
Q. Okay. And in that last bullet on Page 23, the second to the last sentence starts: Many stakeholders felt like the development of dispute resolution corrective action was disconnected from other monitoring activities, including graduated

Page 98

sanctions for similar noncompliance, right?
A. Yes.
Q. And graduated sanctions, that's kind of like where we left off when we were talking about the December 2020 training, right --
A. Yes.
Q. -- with the four different categories?
Now, going back to the summary here on Page 24 of this comparison between 2016 report's Recommendation 3, this states that stakeholders acknowledged efforts made by MDE OSE to align the general supervision system across the departments within MDE OSE. However, it was noticeable to the field that dispute resolution reporting, i.e. general findings of noncompliance, disaggregation of findings by region, and the connection to other monitoring activities still didn't exist. Additionally, corrective action development and verification of noncompliance was identified as a weakness, especially in regions with ongoing noncompliance.
Did I read that right?
A. Yes.
Q. Okay. So fair to say that even though MDE made some progress, it still had not effectively connected

Page 99

dispute resolution reporting with monitoring activities?
A. That's what the stakeholders were acknowledging and reporting. And it starts off: However, it was noticeable to the field. That would be the field of stakeholders.
But, yes, to the extent that these are stakeholder concerns that are being reported up to this -- the part that you've read so far, yes, that's accurate.
Q. Okay. And that through this stakeholder feedback, that it was noticeable that regions with ongoing noncompliance experienced especially weak corrective action development and verification of noncompliance. Is that fair?
A. No. When you say especially weak, I'm not sure what that means. It's not in this sentence.
Q. In the sentence that starts, additionally...
A. Yes.
Q. That corrective action development and verification of noncompliance was identified as a weakness.
A. Yes, but it was not identified as especially weak, as you said.
Q. But it is just especially prevalent in regions with ongoing noncompliance. Is that fair?

Page 100

A. In the stakeholders' eyes, yes.
Q. Okay. And we're going to talk a little bit more about the stakeholder feedback, and we're going to go to Page 27, where we will leave the comparison section. And this is the summary of stakeholder comments, right?
A. Yes.
Q. It's on Page 27, where it says that -- this is a report from a survey that was sent to public school employees, ISD staff, advocates, parents, and attorneys, right?
A. Yes.
Q. We're going to take a look at a couple of different findings from that survey, and we're going to start on Page 29 with the topic area that is the special education state complaint system.
Here on Page 29, there are seven different survey results, right?
A. Yes.
Q. Each of these survey results provides a percentage of survey respondents that agreed or strongly agreed with a certain idea, right?
A. Yes.
Q. So the higher the percentage, the higher that -- or the more survey respondents that agreed with this

particular idea, right?
A. At an agree or strongly agree level.
Q. Yes, at agree or strongly agree.
Okay. And here, the lowest survey result is one that shows that 32.35 percent of the respondents agreed or strongly agreed that special education decisions included meaningful corrective action to address violations, right?
A. Yes.
Q. Okay.
A. At the agree or strongly agree level.
Q. Yes.
A. I don't think we can infer any more than that on this.
Q. And going back up to the start of the summary of comments on Page 27, the only question in the section concerning system changes since 2016 asked whether the survey respondents would -- and I assume that there was a spectrum; strongly disagree, disagree, neutral, agree, strongly agree. Was that the kind of like spread of options available to survey respondents?
A. It was a Likert scale, yes.
Q. Okay. And so the question that they were provided was whether MDE OSE has worked to improve the

special education dispute resolution system over the last five years, right?
A. Yes.
Q. Okay. And in response to that question, there was 49.28 percent of respondents agreed or strongly agreed, right?
A. Yes.
Q. The next section was special education dispute resolution system, right?
A. Yes.
Q. And in this area, the survey had just two questions, right?
A. Yes.
Q. Okay. The lowest result here was that 65.22 percent of respondents agreed or strongly agreed that information on the special education dispute resolution system is widely available, right?
A. Yes.
Q. The next section after the state complaint system we talked about a little bit is the special education mediation system. In this survey, there were three questions, right?
A. Yes.
Q. And here the lowest result was 55.07 percent of survey respondents agreed or strongly agreed that

special education mediation is likely to help resolve disagreements between schools and parents, right?
A. Yes.
Q. The last topic area that the survey addressed was special education due process hearing system, right?
A. Yes.
Q. And in this area of the survey, there were five questions, right?
A. Yes.
Q. In these survey results, the lowest response was a 32.35 percent of survey respondents agreed or strongly agreed that special education due process decisions helped me understand special education requirements, right?
A. Yes.
Q. Okay. And between all of those topic areas, I've kind of highlighted the number of questions and the lowest response rate for that group, right?
A. Yes.
Q. So fair to say based on the data here, the survey respondents have the lowest confidence in state complaint decisions, including meaningful corrective action to address violations, and in due process decisions helping respondents to understand special

education requirements.
A. That's what the survey said.
Q. We're going to go just to the next page where we see that there's a section that starts: The opportunities for continued improvement.
Before we go on, was there any other kind of additional information outside of the surveys that you received about the response to the state complaint system and decisions, including meaningful corrective action to address violations? Anything that you recall?
A. We, again, convened stakeholder groups across the states, and so we had a lot of verbal information that was provided to us.
Q. Okay. And I know in the introduction, it mentioned that the recommendations provided were based on requirements and a convergence of data, right?
A. Yes.
Q. So the survey and then all of the other kind of stakeholder input that you talked about goes into these recommendations, right?
A. As well as a review of data, uh-huh.
Q. Yes. So let's talk about these recommendations.
The recommendations, it states here, are separated into three overarching areas, right;

communication, training resources, and the last one, law policy and procedure, right?
A. Yes.
Q. Now, there's -- before the recommendations, there's an introduction to an idea of tiered implementation. Is that fair?
A. Yes.
Q. Could you describe this tiered system of implementation to me?
A. As the document states, Tier 1 would be resources dedicated to universal needs or universally applicable needs. It's usually lower intensity and lower in frequency and of limited duration. Focuses on areas of broad interest and could be cooperative effort across different domains.
Tier 2 would be targeted needs around a topic or an issue that may be produced and delivered to broad audiences through electronic networks or group events. It could be opportunities to establish like professional networking networks among those with similar problems, and include, but not limited to, webinars, conferences, teleconferences, videoconferences, and communities of practice.
And then 3 is targeted and specialized

for intensive needs. That would be more along the lines of on-site face-to-face kinds of activities, extensive follow-up through meetings, through auditing, through multiple ways of addressing specific needs, and these Tier 3 kinds of implementation activities tend to be more intensive and over the longer term.
Q. Okay. And just so I'm clear, this tiered implementation was meant to apply to the recommendations that you were about to make to MDE, right?
A. Yes, that's --
Q. Sorry, go ahead.
A. Yes, that's fair.
Q. Okay. And so in this way, is it meant to give MDE food for thought in how they ought to implement the recommendations, like in terms of how they see the concerns that you're showing them and how they ought to respond in relation to the recommendations? I just want to make sure I understand how the framework applies.
A. Right. So the tiered approach was a recommendation or a suggestion that they consider when they're -- because every SEA across the country, including MDE, provides professional development activities around

the state. They foster and support communities of practice for more discipline-specific -- you know, depending on one's profession or discipline, more discipline-specific activities, and they have this ongoing and continuous system to investigate complaints, to monitor on a cycle.
And so in addition to those activities, we looked at the possibility of considering a tiered implementation. Not every district needs or requires the same level of assistance with implementation, and it was a way to look at areas of need without expending the same level of resource or commitment with each and every district. It's also a way of recognizing the districts that are performing well.
Q. Okay, all right. So I think I'm starting to get it now.
So the tiered implementation is also the way that MDE could approach any need for intervention or corrective action or anything with districts that were out of compliance. Is that fair?
A. It's not just intervention or corrective action. It's how to understand the requirements of IDEA and the federal regulations and state laws and rules,

how to implement the requirements.
Q. And so it says here right before the introduction of Tier 1, Tier 2, Tier 3: The more significant or intense the needs, the greater the frequency of contact, the longer duration, the higher the intensity of the support, right?
A. Yes.
Q. Now, when we're talking about implementing the requirements, how do the needs fit in and whose needs are those?
A. So the entities responsible for implementation would include school districts, public agencies, ISDs, PSAs, and the more intensive the needs, the more intensive the service. I mean that's --
Q. The more intense -- go ahead.
A. Yeah, that's the model here is that lower-level needs, you have this good quality professional development system set up across the state, and then as the needs go up -- and they could be needs that might be garnered through public agency request for assistance in a particular area, it could be as a result of a self-assessment that's conducted, a data review, any number of things, including state complaints, due process hearings, things like that. So as the needs go up, then it would -- so would the



intensity of the support that's offered, and -- but it's not tied solely to noncompliance. It's tied to needs.
Q. Right, I hear you now. I think that, you know, like it feels like a spectrum. Like if they're just asking for guidance on -- I don't know, it could be a particular mode of instruction that they think is appropriate for a student, you know, that may not necessarily implicate any kind of violation or noncompliance, but they're just trying to make sure that they're doing what's right for the student, that could be a low-level need, MDE could assist in a way that gives their position on a particular methodology and whether it's appropriate, something like that, right?
A. Yes. I mean I see -- again, at that lower level, I see it being more universal. So it's not in relation necessarily to a particular student. It's like what are effective practices for teaching students with autism, what are best practices for writing measurable goals. We would want every public agency to have that information.
Q. Right. So that would be your Tier 1, okay.
A. Yes.
Q. All right. Good, thank you. Now we're going to

head to Page 34, and we're going to look at one of the recommendations under the law, policy, and procedure section.
This last recommendation states that MDE OSE ought to design and utilize a corrective action rubric to track issues of noncompliance for due process hearings and state complaints, right?
A. Yes.
Q. And they ought to develop a corrective action workflow that assists complaint investigators in recognizing ongoing, repeated noncompliance, right?
A. Yes.
Q. MDE OSE ought to review and update their incentives and sanctions to be used to address continued and systemic noncompliance. Is that right?
A. Yes, and OSE has done all of those things.
Q. And so these recommendations in this Area 3, this last bullet, seem to relate to some of the -- more to the noncompliance side of needs that we were talking about previously with the framework, right?
A. No, I don't -- I see these as separate activities.
Q. Uh-huh, but they all relate to noncompliance.
A. Yes, in that paragraph, they all relate to noncompliance.
Q. Okay. And in that paragraph, the second sentence

talks about ongoing repeated noncompliance, and the third one discusses continued and systemic noncompliance, right?
A. Yes. And the first one says track issues of noncompliance, so that bullet is related to noncompliance.
Q. Yes. But in the second -- or in the second and third sentence, I'm just thinking that those might be specifically areas like in that Tier 3 that are in -- require intensive support. Would you agree?
A. I see them as separate purposes, separate activities, so I'm not tracking that. This is about what the SEA is going to do to be able to, you know, collect data and develop workflow, not necessarily to train public agencies.
Q. Okay. All right, fair enough. I'd like to move to another training that was provided in March of 2023, and March is up here. But, Ms. Knudtson, would you agree that this is another -- do you say TAESE?
A. TAESE.
Q. TAESE, a presentation that's more of a national presentation?
A. Yes, that's correct.
Q. Okay. And because MDE produced it to us, and would it be safe to assume that someone at MDE attended

this national presentation?
A. I think that's safe to assume. I don't handle any of the registration. TAESE does all of that, and there's typically over a hundred people attending these trainings, so I don't even get a clear, you know, view of people's names.
Q. Yeah, fair enough. I'm going to still ask you a couple questions about it, and we're going to start with Page 24, I think it is, Slide -- yeah, we'll start with Slide 70 here.
This is another slide that discuss a district's failure to comply, right?
A. Yes.
Q. And this is somewhat similar to the presentation in December 2020 about failure to cooperate, right?
A. Yes.
Q. Okay. And so this also provides some additional advice that without the district's perspective and the records maintained by the district, the investigator must rely more heavily on information provided by the complainant, right?
A. Yes, that's what it says.
Q. And is that another like piece of advice that you think that's helpful for SEAs to communicate if they encounter resistance?



Q. And you provided a considerable amount of informal advice during consultations to MDE over the years, right?
A. Yes.
Q. Have you reviewed drafts of documents that become MDE guidance?
A. Occasionally, historically, but not recently.
Q. Have you ever reviewed documents related to child find?
A. I don't specifically recall that. I've reviewed it on the website, but I did not have a hand in drafting that, at least that I recall.
MR. SICKON: I'm pulling up what I'm going to mark as Exhibit 116.
(DEPOSITION EXHIBIT 116 MARKED FOR IDENTIFICATION at 1:57 p.m.)
BY MR. SICKON:
Q. And this is a document that we were provided concerning child find.
Does this document look familiar, Ms. Knudtson?
A. It does, now that you bring it up, but I don't think it's the most current version of their child find guidance on their website, but that's why I didn't remember it right away.

Q. But this is a document that you edited along with Ms. Weaver concerning child find in Michigan, right?
A. I'd have to see the whole document to know if it pertains specifically to Michigan.
Yes, there we go. Sorry, I truly have no independent recollection of this. I do a lot of work in a lot of different states.
Q. I understand. This is an 11-page document, although I believe there's only text on ten of them. I don't see a date related to it, but we'll move on.
There's other work that you've done with MDE in terms of guidance, is what we've talked about; that occasionally this is something that you do, help them with guidance, right?
A. Yes.
Q. Okay. Now, do you recall ever assisting Rebecca McIntyre with a response to a letter from an attorney representing Kalamazoo Public Schools?
A. I have no independent recollection of that.
Q. Is there any other work that you've done for MDE that I haven't mentioned?
A. No. I mean as mentioned previously, I have investigated state complaints, I've provided consultative guidance, the two reports. And then more so historically, not so much recently, I have

reviewed some guidance documents. I think the most recent one I did review was their due process hearing system documents. So I don't think there's anything else outside of those broad categories.
Q. Could you provide me a kind of ballpark estimate for how much MDE has paid you for your consulting work since 2015?
A. I couldn't, I'm sorry. First of all, I don't keep the books for my little company; and second of all, it's been a long time, and it's not like it's, you know, a weekly payroll that you can calculate right away.
Q. Yeah. Would you be able to ballpark maybe the amount of time that you would on average consult with MDE during any one of the years that you've had this ongoing relationship?
A. Not in a year aggregate. I mean I -- in most months, I meet with them every other week for an hour, sometimes two hours. That's a typical month.
Q. Okay. Would you be able to ballpark the work that went into the 2016 report in terms of time, how much time it took?
A. I would say I -- in a very rough sense, I would ballpark it on hundreds of hours because of the stakeholder meetings.

Q. Would the same kind of number apply for the 2021 report?
A. Yes.
Q. And the trainings that we went over, you know, many of them had hundreds of slides. Would those be all-day trainings?
A. The national trainings are all day or two half days depending on how they structure it. Most of the training with MDE, the complaint investigator training would be scheduled for a full day.
Q. Now, in this case, you're reviewing MDE's state complaint system and its efforts to correct noncompliance at Kalamazoo Public Schools, right?
A. Yes.
Q. Just going back real quick to an earlier question, we found a document that might refresh your recollection.
MR. SICKON: I'm marking it as Exhibit 59.
(DEPOSITION EXHIBIT 59 MARKED FOR IDENTIFICATION at 2:03 p.m.)
BY MR. SICKON:
Q. I had asked earlier about whether you had provided any assistance to Rebecca McIntyre concerning a letter for an attorney.



Page 137

as an expert in this case seem like a conflict of interest?
A. Not at all.
Q. Why not?
A. Because I have firsthand knowledge of what MDE has done over the years, and I see it as improving their practices considerably.
The, yeah, Disability Rights Michigan, or at least the precursor to that, the Michigan PNA, also recognized the improvements. So I wouldn't be alone in that recognition of improvement, and it certainly -- as well as OSEP. You know, the funding source that you questioned me on earlier multiple times, wouldn't they need to be in compliance with OSEP. And when they get their 2020 reports and it's all thumbs up, then, yeah, they're complying with it.
So I don't see my work with the department as an outlier. I don't see it as my view is different than some of the things that I read from OSEP or Disability Rights, and I see continuous improvement as a process, not an event. And I work with multiple states that have improved more slowly than Michigan, some that may have improved more quickly than Michigan.

Page 138

So it's not about my training. It's not about -- whatever the outcome of this is, it has no impact or bearing on the quality of the work that I've done. I don't see it as a conflict.
Q. And you were hired by MDE to produce an expert report in this case, right?
A. Yes.
Q. And that expert report was meant to respond to Mark Mlawer's report, correct?
A. Yes.
Q. And you reviewed that report this spring, right?
A. Yes.
Q. Okay. We're going to go to that report now.
MR. SICKON: We're going to mark this as Exhibit 106.
(DEPOSITION EXHIBIT 106 MARKED FOR IDENTIFICATION at 2:12 p.m.)
BY MR. SICKON:
Q. Now, in your response, your report didn't question Mr. Mlawer's training or expertise in general supervision and IDEA requirements, right?
A. My report questioned his understanding of the law.
Q. Have you ever worked with or, as in this case, across the table from Mr. Mlawer previously?
A. I'm sorry, I missed the first part of what you said.

Page 139

Q. Have you ever worked with or, as in this case, kind of across the table from Mr. Mlawer previously?
A. Both, with and across the table.
Q. Okay. How many times did you work with him?
A. Several, many. He was a court monitor on a Federal Court case in California for years and hired me as the expert to handle the state complaint portion of that monitor work because it was outside of his field of expertise.
Q. And what case was that?
A. That was -- I'll think of it, I'm sorry.
Q. We'll come back to it. If it comes to you, just let me know.
A. Okay. I'm sorry, it will come to me.
Q. Were there any other times that you worked with him?
A. Yes. We have worked on -- together on Wyoming's monitoring system. We have co-presented before at a conference. We have worked on I believe it was the same Federal Court case in response to their monitoring report.
So in total, it would have been a period of years in various capacities that we worked together, and then in a similar capacity to this, he was the expert in the AB case.
Q. The other case against MDE.

Page 140

A. Yes.
Q. That's -- is that the only other time that you've kind of worked across the table from him?
A. I believe so.
Q. You had mentioned the -- he was the special monitor in one case, but that there was another federal case too?
A. I believe it was different aspects of the same case.
Q. Oh, okay, all right. So it would have been that you worked together on one federal case, and then across the table on the AB case, and then across the table in this case, right?
A. Yes.
Q. And is that all of the federal litigation like interactions that you can think of?
A. With Mr. Mlawer.
Q. Yes, okay. Now, he's also worked and trained several state educational agencies, right?
A. I wouldn't be able to answer that. I know he has worked with Wyoming, but I'm not sure how many other states with which he's worked.
MR. SICKON: I'm pulling up Mr. Mlawer's CV. This is Exhibit 107.
(DEPOSITION EXHIBIT 107 MARKED FOR IDENTIFICATION at 2:16 p.m.)



BY MR. SICKON:
Q. Just taking a quick spin here, you can see on Page 1 he still works with the Wyoming Department of Education, right?
A. It may be entirely possible. I would have no firsthand knowledge of that, but I don't doubt it either.
Q. Okay. His CV also includes experience working with the North Dakota Department of Public Instruction. Is that what the CV says?
A. It says that back in 2014, yes.
Q. It says that he's worked with the Louisiana Department of Education for several years as an evaluator and a technical assistance provider. Is that right?
A. Yes. And I have no firsthand knowledge of that work.
Q. All right. And there are other entries here that relate to work with the Florida Department of Education. Is that right?
A. That's what it says in 2006, '03 through '06.
Q. Other work with the Pennsylvania Department of Education. Is that right?
A. Yes, 1997 through '99.
Q. And, you know, if any of the court cases here ring a bell for the one that you worked with him on, feel free to stop me.

There's also work here that he did with the California Department of Education, right?
A. In 1999, yes.
Q. And so seems like he's worked with several state education agencies. Is that fair?
A. Yes.
Q. What's your impression of his work history and credentials in special education?
A. I -- I don't really have one. I mean I think Mark has a skill set that is primarily about monitoring, and I know that in the Emma C case, he hired me to handle the complaint investigation aspect of that Federal Court monitoring because it was out of his skill set.
Q. You said MSC?
A. Emma C. It's right on the screen right there.
Q. Oh, Emma C, okay. So that's the one?
A. Yes.
Q. Great, thank you. Do you think that he had the credentials to qualify as an expert in SEA general supervisor responsibilities?
A. Yes.
Q. And we know that we talked about your report as being in response to his. Let's go to your report now.

MR. SICKON: If I haven't already entered this, we've marked it as Exhibit 100.
BY MR. SICKON:
Q. Here in the introduction, you state that Mr. Mlawer's report made several conclusory remarks based on his erroneous interpretation of IDEA, right?
A. Yes.
Q. Okay. I think I'm going to -- in response to your report, Mr. Mlawer also issued a rebuttal, right?
A. I have not seen that.
Q. You haven't seen the rebuttal report?
A. No.
Q. Okay. Let me bring that up.
MR. SICKON: We're going mark this as Exhibit 109.
(DEPOSITION EXHIBIT 109 MARKED FOR IDENTIFICATION at 2:20 p.m.)
A. I would prefer to have an opportunity to read it before I'm asked questions about it.
BY MR. SICKON:
Q. You go ahead, and let me know when you need me to scroll.

A. How many pages is it?
Q. Eight.
A. Go ahead.
Q. Okay.
A. Go ahead.
Go ahead.
Go ahead.
(Off the record at 2:23 p.m.)
(Back on the record at 2:29 p.m.)
BY MR. SICKON:
Q. And then back up to Page 1, in the introduction here, we see Mr. Mlawer state that his initial report explains why MDE's system -- systemic corrective actions were ineffective, right?
A. Yes.
Q. And to reiterate, there are four subpoints underneath that that discuss some of what his first report concluded, right?
A. Yes.
Q. The first bullet here says that MDE relied on similar corrective actions in each of these complaints without regard to the repetition of child find violations by KPS, violations which clearly showed that its prior corrective actions had not worked, right?



where it starts in earnest the kind of different focus areas and OSEP analysis. Is that fair?
A. Yes.
Q. Okay. And so there were I think it was 14 pages that I counted on the three focus areas. I don't know if you were counting, but do you have any reason to disagree that it was 14 pages?
A. I don't.
Q. Okay. And so after those 14 pages, we get to this concern on Page 19, okay. And so that starts the section state complaint procedures, right?
A. Yes.
Q. Okay. And this section is -- it's about a page long, is that fair, the state complaint procedures section?
A. So it's really difficult for me to watch the scrolling. I have a tendency to get motion sick, so I'm kind of averting my eyes when you're scrolling. I'll have to take your word for it on the page number.
Q. Oh, I'm not moving it anymore. The section here on state complaint procedures, it looks like it's about a page.
A. Yes.
Q. And I apologize. Next time I'll do better to try

and skip to numbers instead of making you seasick. It's not my intention, I apologize.
A. I can get car sick watching a movie, so...
Q. Yeah, no, that can't be fun. I'm going to zoom in now. I don't know if that does the same thing, but I'm -- just so for readability.
Okay. Now, Page 19, this starts the section on the issue about how complaint investigators determine appropriate compensatory services, right?
A. Yes.
Q. Okay. And here OSEP frames the analysis like this: OSEP received a complaint from a constituent alleging that MDE's complaint investigators were ordering too much or too little time for compensatory services. In addition, the Michigan Protection and Advocacy Service submitted a report that corroborated the allegation.
Did I read that right?
A. Yes.
Q. Okay. Now, looking at the following analysis, OSEP reports on Page 19 that it reviewed two kinds of documents. First, it says OSEP reviewed five decisions from MDE ordering compensatory services, right?

A. Yes.
Q. And later it says OSEP also reviewed MDE's guidance for determining the need and amount for compensatory education, right?
A. Yes.
Q. In between those, it says that OSEP interviewed MDE complaint management staff about this concern, right?
A. Yes.
Q. Okay. Do you see any facts here showing that OSEP looked at any other part of MDE's state complaint system other than the process used to determine the type, amount, and frequency of compensatory services?
A. Well, in order to get to type, amount, and frequency, you have to review the violation, the nature of it, the substantive nature, whether it was a material violation. So, yes, I would say in order to get to the point of -- and it speaks to a process, not just the type, amount, and frequency of services. It's about the process used. So, yeah, I think it's more than just type, amount, and frequency. It was about the process.
Q. Process of determining the need and amount of compensatory education.

A. Yes. And the only way you can get there is to have a finding that there has been some denial of FAPE, services were not provided, appropriate services, and then determining the -- possibly the amount of harm or the amount of service owed. There are multiple ways to do that, so it's about the process, and there's no one component of the process that they were looking at.
Q. There was no one component of the process they were looking at?
A. Yes. So it doesn't say here that they were only looking at whether they -- the agency made the right decision in finding a denial of FAPE. They're not looking at whether --
(Reporter clarification.)
A. So they were looking at processes, not just the outcome.
Q. Right, but the only process that they were concerned about was determining the need and amount for compensatory education, right?
A. Yes. And in order to get there, you have to have in your process a determination of a denial of FAPE, what that is based on, the severity of that denial. There are many factors that go into the process of determining the type, amount, and frequency of



compensatory services.
Q. And so they might have looked at information related to these five complaint files, right?
A. I'm assuming they did look at information related to those files, yes.
Q. And that in the complaint files, there were determinations that there were violations because MDE ordered compensatory services, right?
A. And there's, yeah, some process that they went through in order to determine them.
Q. But that wasn't the subject of the OSEP analysis, right?
A. I would disagree with that. That's exactly part of what they looked at, because in order to get to compensatory education, you have to have a verifiable finding that the student was indeed denied FAPE; was it a small denial, was it a large denial, was it a material violation? All of those factors go into determining comp ed.
Q. Determining comp ed for the student at issue, that's part of 151(b)(1), right?
A. Yes.
Q. And in this OSEP report, it doesn't mention any facts related to a systemic issue in any of the five complaint files that it reviewed. Is that right?

A. I don't see mention of a systemic issue, no.
Q. And there's no mention in OSEP's analysis of how to appropriately remedy the appropriate future provision of services for all children with disabilities, right?
A. That's true.
Q. So would it be fair to say that this OSEP analysis was all about the student level part of remedies, the 151(b)(1) part of remedies?
A. I don't know how to answer that because they also reviewed, for instance, MDE's guidance for determining the need and amount of compensatory education, and that could have included a review of systemic findings of noncompliance as well.
The fact that they reviewed five complaint decisions in particular that were singles -- what I'm presuming to be single student complaints, doesn't preclude them from looking at the guidance for determining compensatory education and systemic complaints.
Q. But there's no, like you had already said, analysis of the 151(b)(2) concerns about remedy, so --
A. That's true, but can I just say that I don't equate 151(b)(2) only to systemic complaints. So I guess I was a little lost in your question about systemic.

Q. All right. Let's go back to the report on Page 5.
On Page 5, you start the first full paragraph here with this sentence: When MDE's system of general supervision, including its dispute resolution systems, were monitored by OSEP in 2020, OSEP found in relevant part, right?
A. Yes.
Q. And that leads to the quote, the conclusion of the section we were just in at the DMS report, right?
A. Yes.
Q. Okay. Now, when you stated that OSEP monitors MDE's system of general supervision, including its dispute resolution systems, were you stating that OSEP monitored MDE's due process hearing system?
A. No.
Q. Were you stating that OSEP monitored MDE's use of mediation and dispute resolution?
A. No.
Q. Were you stating that OSEP monitors MDE's investigation of state complaints?
A. No. I'm pointing out the relevant part, which is that state complaint procedures that adjust a district's failure to provide appropriate services. That's all -- that's the relevant part I'm referencing and focusing in on.

Q. In the way that this introductory sentence is structured, though, you say that two things were monitored by OSEP in 2020, right?
A. No.
Q. Oh. The word "were" typically means that there was a plural subject. Did you mean to say was?
A. So the use of the word "including" is a defined term in IDEA, and it means, you know, other or similar like terms. It's not meant to be limiting in any way.
So system of general supervision also includes systems of dispute resolution, and within that, in relevant part for this discussion's purpose, is the state complaint procedure, particularly as it pertains to the district's failure to adjust appropriate services.
Q. In using that introductory sentence and the phrase "including its dispute resolution systems," were you also stating the OSEP monitored MDE's procedures for issuing remedies to ensure the appropriate future provision of services for all children with disabilities?
A. They could have done that. I don't know whether they -- they did not address it in their report, but when you look at state complaint procedures, state

