# EXHIBIT 15



## MICHIGAN
### Department of Education

OFFICE OF SPECIAL EDUCATION

SPECIAL EDUCATION COMPLAINT INVESTIGATION REPORT

**Complainant:**

██████████

████████████████████

██████████████

**Case Number:  17-0159**

**COMPLAINT DECISION
AND
PLAN FOR
CORRECTIVE ACTION**

**Public Agency:**
Michigan Department of Education
Office of Special Education
Joanne Winkelman, Ph.D.,Supervisor
Program Accountability
608 West Allegan
PO Box 30008
Lansing, MI 48909

**District:**
Michael Rice, District Superintendent
Kalamazoo Public Schools
1220 Howard St
Kalamazoo, MI 49008-1882

**Case Manager:**
Terri Noyes

**Date of Decision:**
August 29, 2017

On June 30, 2017, the Michigan Department of Education, Office of Special Education (OSE) received a special education complaint filed by ████████████ (Complainant) on behalf of █████████████. The complaint alleged that the Kalamazoo Public Schools (District), which is under the jurisdiction of the Michigan Department of Education (MDE), violated the Individuals with Disabilities Education Act (IDEA) and the Michigan Administrative Rules for Special Education (MARSE).

<br><br>Complaints may be filed by any individual or organization, in accordance with 34 CFR § 300.153. The Complainant in this matter is a third party. A release of information from the Student's parent was submitted; therefore, the OSE was able to communicate directly with the third party during the investigation of this complaint.<br><br>Pursuant to the Code of Federal Regulations 34 CFR §§ 300.151 through 300.153 implementing the IDEA, the OSE conducted an investigation into the allegations in this complaint. Consistent with the IDEA and

MDE_007656

Federal Regulations, and the MARSE, the OSE issues the following Findings of Fact, Conclusions, Decision and Plan for Corrective Action.<br>

**Complaint Issues:**

1.  Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:
    a.  Whether the District enacted their Child Find obligation, to locate, identify, and evaluate students suspected of a disability for this Student, in accordance with 34 CFR §§ 300.111, 300.304 through 300.311 and R 340.1721a; and

        i.      For all similarly situated students within the District.

    b.  Whether the District implemented the discipline protections, pursuant to 34 CFR §§ 300.530 and 300.536, for this Student; and

        i.      For all similarly situated students within the District.

    c.  Whether the District, in collaboration with the Parent, developed, reviewed, and revised an individualized education program (IEP) that addressed the unique educational and behavioral needs of the Student in an IEP team meeting, consistent with 34 CFR §§ 300.116(a), 300.320 through 300.324, 300.501(c), and R 340.1721e.

2.  Whether the District followed the procedures and processes required by the IDEA and the MARSE. Specifically:
    a.  Whether the District obtained informed consent from the Parent prior to conducting the initial evaluation to determine if the Student was a student with a disability, in accordance with 34 CFR § 300.300(a) and R 340.1721.

**Investigatory Process:**

Documents reviewed include:
> Original letter of complaint;
> Documentation provided by the Complainant; and
> Documentation and educational records provided by the District.

Interviews were conducted with the following:
> The Complainant;
> The Parent;
> The community mental health worker; and
> Various District staff via questionnaires.

The OSE provided the District and Complainant the opportunity to submit additional information for consideration during the investigation of this complaint.

**Applicable Federal Regulations or State Rules:**

| | |
|---|---|
| 34 CFR §300.15 | Evaluation |
| 34 CFR §300.17 | Free appropriate public education |
| 34 CFR §300.22 | Individualized education program |
| 34 CFR §300.101 | Free appropriate public education (FAPE) |
| 34 CFR §300.111 | Child find |
| 34 CFR §300.114 | Least restrictive environment requirements |
| 34 CFR §300.116 | Placements |
| 34 CFR §300.300 | Parental consent |
| 34 CFR §300.501 | Opportunity to examine records; parent participation in meetings |
| 34 CFR §300.530 | Authority of school personnel |
| 34 CFR §300.536 | Change of placement because of disciplinary removals |
| R 340.1721 | Request for Initial Evaluation |
| R 340.1721a | Initial Evaluation |
| R 340.1721e | Individualized education program |

**Relevant Time Period:**

Pursuant to 34 CFR § 300.153(c), the OSE has the authority to investigate allegations of violations that occurred not more than one year from the date the complaint was received. In light of this limitation, the investigation will be limited to the period of time from July 1, 2016 to June 30, 2017 for the purpose of determining if a violation of the IDEA or the MARSE occurred. However, records beyond this timeframe may be reviewed for the purpose of developing a complete record for the student.

**Findings of Fact:**

1.  This state complaint included both child specific and systemic issues. The findings for the systemic investigation are at the end of this section, following the facts specific to the Student.
2.  The Student is an eight-year-old student with a number of mental and physical health issues, including attention deficit hyperactivity disorder, anxiety, mood dysregulation, post-traumatic stress disorder, asthma, and juvenile arthritis. According to the Parent, this information was shared with the school as far back as the 2015-2016 school year.
3.  Beginning at the start of the 2015-2016 school year, the Student attended a different building within the District. At some point during January or February 2016, according to a behavior incident report and an incident detail report, the Student switched school buildings, attending school at the same building the Student was in at the beginning of the 2016-2017 school year.
4.  According to the Student's 2015-2016 attendance record, once the Student switched buildings, beginning on February 5, 2016, the Student exhibited behaviors that included fighting, assault, and property

MDE_007658

destruction seven times, which resulted in a total of 10 days of suspension by the end of the 2015-2016 school year.

5.    Two behavior plans were developed for the Student during the 2015-2016 school year, in cooperation with the Parent:

a.    The first behavior plan, dated December 16, 2015, was developed at the building the Student attended at the beginning of the 2015-2016 school year, which is verified by the staff listed on the behavior plan. Problem behaviors were listed and included anger outbursts, destruction of property, threats/swearing, and attempted injury to those restraining him. The plan also included other data (background information), a hypothesis statement, appropriate behaviors, and positive behavioral interventions to use with the Student, techniques for teaching appropriate behavior, consequences to increase appropriate behaviors and decrease inappropriate behaviors, and a crisis plan.

b.    The second behavior plan was developed at the building the Student moved sometime prior to February 5, 2016 and was enrolled in at the start of the 2016-2017 school year, which was verified by the staff listed on the behavior plan. The second behavior plan did not outline problem behaviors, a hypothesis statement for the function of behavior, or appropriate behaviors/teaching techniques for appropriate behavior. Rather the second behavior plan was only a plan of action for the Student that outlined consequences for behavior, including that the Parent would be provided with a copy of the Code of Student Conduct to explain what behaviors would result in the Student being sent home.

6.    The Student entered the second grade in the fall of the 2016-2017 school year. Soon after the beginning of the school year, on September 16, 2016, the Student began to receive referrals for behavior on the school bus. According to a bus referral form for this date, the Student was defiant and was not following the directions of the bus driver. The consequence was a conference with the Student.

a.    According to the District, the District's 2016-2017 Transportation Handbook outlined all school rules and regulations that apply when students are under the jurisdiction of the school. The Transportation Handbook detailed the range of consequences to the violations of the Student Code of Conduct. "If a specific consequence is not stated for a violation of a particular rule, then reasonable disciplinary actions may be taken. All actions are at the discretion of administration and/or a designee. Actions may range from a verbal warning to a recommendation for expulsion depending on the nature and severity of the offense, the prior behavior records for the student, the recommendation of school personnel and other relevant circumstances. The bus drivers do not determine bus suspensions. That is determined by the building administrator and/or designee."

MDE_007659

7.    On September 20, 2016, the Parent requested that the District evaluate the Student for special education, citing concerns with attention, focus, and anxiety and the impact these concerns had on the Student's behavior in school.

    a.    According to the District, the Student's evaluations began almost immediately, with the District staff completing observations and testing on October 17, 19, 24 and 31, 2016.

8.    Also, on September 20, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with peers in a bus loading zone. The consequence was not listed on the form; however, the Parent called the District on September 21, 2016, concerning the incident.

9.    On September 27, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with peers while on the school bus. No consequence was listed.

10.    On October 4, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with peers while on the school bus. No consequence was listed. According to what was written on the referral form, the Student was not safe to transport as he refused to cooperate with the bus driver.

11.    On October 5, 2016, the District conducted a review of existing evaluation data and developed an evaluation plan. The review of existing evaluation data indicated:

    a.    The Parent expressed concerns with the Student's attention, focus, and anxiety affecting his behaviors in class, which in turn was interfering with his ability to be successful at school.

    b.    The classroom-based assessments and observations included information from the Student's teacher, who reported that the Student was a diligent worker who completed all his academic tasks at a high level. He also reported that the Student was a very active participant in class, seemed to enjoy school, and was very helpful to others. The teacher reported that the only area he had any concerns about at that time was the Student's reading fluency.

    c.    The Student's first grade report card indicated that he struggled with his work habits (staying on task, demonstrating effort, working without disturbing others, completing and returning homework), as well as with life skills (respecting others, respecting authority, following rules, showing self-control, taking initiative); and did well in mathematics and science. However, for reading and writing, the Student was rated as "guidance needed to perform at grade level/progressing with assistance."

    d.    Attendance records identified 34 absences in Kindergarten and 38 absences for first grade.

    e.    The general education teacher further reported that there had been a few incidents of aggression towards authority if the Student did not get what he wanted. Additionally, the Student tended to

MDE_007660

interact with most of the other students in his classroom, however there were some issues with peers during less structured settings. The school bus was not mentioned.

f.  The Parent input section indicated:

i.   The Parent provided documentation for medical diagnoses from Community Mental Health, including disruptive mood dysregulation disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder.

ii.  The Parent reported that the Student struggled to pay attention, stay focused, and he constantly needed to be redirected.

iii. The Parent further reported that the Student could not do homework at home with his siblings' present because he would get too distracted.

iv.  The Parent also reported that the Student was very good at math, but struggled with his reading because he had a hard time focusing on what he was reading, unless there was someone there to constantly redirect his focus. The Parent also reported that the Student had previously struggled with his behavior in school.

g.  The evaluation plan included achievement (formal and informal academic assessments) and socio-emotional/behavioral (classroom observations).

h.  The written notice indicated that options that were considered but not selected included waving the evaluation. This was not selected because it did not meet the Student's need as additional data was needed.

i.  According to the District, at the time that the Parent made the request for a special education evaluation (September 26, 2016), the school year and period covered by this complaint had only been 15 school days old and the Student had no behaviors of concern. The Student was in a new school as of the beginning of that school year and presented with no concerns.

12.  On October 10, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with the bus driver while on the school bus. According to what was written on the referral form the Student was climbing seats, ignoring directions and hit a fellow student. No consequence was listed.

13.  On October 20, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with peers while on the school bus. According to what was written on the referral form, the Student threw his backpack at a fellow student and there was on-going aggression being shown towards fellow students. No consequence was listed.

14.  On October 24, 2016, an IEP team meeting invitation was sent to the Parent. The purpose of the meeting was listed as determining or reviewing this Student's eligibility for special education

MDE_007661

programs/services.

15. Also on October 24, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with peers while on the school bus. No consequence was listed.

16. On November 1, 2016, according to a bus referral form, while on the way to school in the morning, the Student was defiant and not following the directions of the bus driver. According to the referral form, he was doing flips in his seat. No consequence was listed on the form. Later that day according to an incident detail form, while at recess, the Student physically assaulted a peer while on the playground. According to the pattern of behavior determination worksheet, the Student was suspended for one day.

17. On November 9, 2016, according to an incident detail form, in the morning, the Student attempted to physically assault staff, threw objects at staff and peers, and destroyed multiple bulletin boards throughout the school. According to the worksheet, the Student was suspended for three days.

18. In the afternoon of November 9, 2016, following the behaviors of the Student that morning, the District developed a multidisciplinary evaluation team report that included the following:

   a. Reason for referral: Parent concerns included the Student's inability to focus and pay attention, as well as anxiety affecting his behaviors in class and his ability to learn in his current academic environment.

   b. Tests administered: Wechsler Individual Achievement Test-third edition, Grey Oral Reading Tests-fifth edition, AIMSweb Written Expression, AIMSweb Oral Reading Fluency, AIMSweb Nonsense Word Fluency, Designing Effective Math Instruction Assessment, Words Their Way Spelling Inventory, and the Dolch Sight Word Assessment.

   c. Medical Information - Current: Mental health diagnoses of disruptive mood dysregulation disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. The Student also utilized an inhaler due to asthma and received medication for attention deficit hyperactivity disorder, which the Student had not begun taking at that time.

   d. Background information: Concerns of the Parent involved sibling interactions, impact of surgery on his ears/hearing, and hyperactivity. The Parent also reported that the area that she is most concerned with is his inability to stay focused in school. The Parent further reported that her goal for the Student this year was for him to stay in school and learn, and for him not to be sent home.

   e. Teacher report: The teacher reported that the Student was a very diligent worker in class and was always academically engaged. However, during unstructured time was when he had the most issues with peers. The Student also could be aggressive towards

MDE_007662

authority to test them or if he did not get what he wanted. During unstructured settings (such as on the bus, at lunch or at recess) is where the Student was having the majority of behavioral problems.

f.    Classroom observations: Two observations were completed by the school psychologist on two different days. The first observation was conducted during an unknown classroom instruction and work completion time. The second observation was conducted during physical education. Another observation was conducted by the school social worker during math class. For all observations, the Student appeared to be on task, engaged in instruction, and compliant to redirection. No behaviors were displayed.

g.    Individual testing: Results indicated for each test:

   i.    Wechsler Individual Achievement Test-third edition: Below average in word reading, pseudoword decoding, and basic reading subtests. The Student may need some extra practice with decoding sounds and words to be able to function at the same level as his same age peers.

   ii.    Grey Oral Reading Tests-fifth edition: Below average in rate and fluency subtests. Overall, the Student's oral reading fluency skills were slightly lower than the majority of his same age peers.

   iii.    AIMSweb Written Expression: The scores suggested that the Student's written expression skills were within the average to above average range when compared with his same grade peers.

   iv.    AIMSweb Oral Reading Fluency: The scores suggest that the Student's accuracy of decoding needs some improvement. However, his overall oral reading fluency seems to be within the average range of ability for a student of the same age and grade as the Student.

   v.    AIMSweb Nonsense Word Fluency: The Student was able to successfully decode 77 out of the 86 sounds that were read within one minute and this was within the average range compared to peers in the same grade.

   vi.    Designing Effective Math Instruction Assessment: This test was an overall representation of the Student's math skills. The skills that were not demonstrated were all second-grade computation skills (addition two digit, subtraction two digit, and multiplication one and two digit).

   vii.    Words Their Way Spelling Inventory: The spelling list consisted of 25 words of increasing difficulty. For the Student, only the first 15 words were administered. The Student was able to correctly spell 4 out of the 15 words presented to him. The Student's performance suggested that his spelling skills are appropriate for a student of his age.

   viii.    The Dolch Sight Word Assessment: The Student was able to

MDE_007663

read a list of sight words beginning at the pre-primer (97.5%), primer (90%), first grade (88%), and second grade (72%) levels. These scores suggest that the Student has a good fund of knowledge of sight words, but may still need to work on the accuracy of his decoding.

h.    Guidelines and eligibility: Standards were reviewed relative to emotional impairment and other health impairment and included the following statements in response to each standard:

  i.    Emotional Impairment:

  a)    "Based on observations from both the school psychologist and school social worker, as well as a review of school discipline records, the Student does not appear to exhibit behavior problems in school at this time that adversely affect his academic performance. In previous school years, the Student demonstrated behaviors that resulted in discipline referrals, however during this school year, the Student has had minimal discipline incidents and does not appear to be exhibiting behavioral problems that are adversely impacting his education."

  b)    "The Student is able to build and maintain peer relationships, he does not exhibit inappropriate types of behaviors or feelings under normal circumstances, he is generally a happy young man, and he does not demonstrate any physical symptoms or fears associated with school or personal problems."

  c)    "The Student does not have a diagnosis of schizophrenia, and there were no indications that the Student was socially maladjusted."

  d)    "The Student's intellectual functioning appeared to be within normal limits. His writing and mathematics skills were well within the average range for a student of his age, and his reading skills were within the below average range of functioning."

  e)    "There are no reports of the Student demonstrating any problems with adaptive behavior in the community."

  f)    "During observations by both the school psychologist and school social worker, there were no behaviors of primary concern that were exhibited that appeared to interfere with educational and social needs. Additionally, the Student's teacher did not report any behaviors of primary concern in the classroom."

  g)    "The Student has diagnoses of disruptive mood dysregulation disorder, post-traumatic stress disorder, and attention deficit/hyperactivity disorder."

  h)    "The Student missed 19 full school days during his

MDE_007664

first-grade school year, and 12 full school days during his Kindergarten year. The Student is performing within the average range with his mathematics skills, however his reading skills are slightly below average, which could be attributed to missing a high number of school days over his educational career."

     i)    The determination statement included language taken from the MARSE rule, 340.1706(5) which indicated that the multidisciplinary evaluation team included the following members: School psychologist, school social worker, general education teacher, principal, and Parent.

  ii.   Other health impairment:

     a)   "The Student has diagnoses of disruptive mood dysregulation disorder, post-traumatic stress disorder, and attention deficit/hyperactivity disorder. Behaviors that are characteristic of these disorders have not been observed in the school setting during this school year. In addition, having these diagnoses does not seem to adversely impact his educational performance as she (actual pronoun used) is performing within the average to below average range in all academic areas."

     b)   "The Student does not appear to have problems with vision, hearing or motor abilities. The Student does not present with an intellectual impairment. The Student does not appear to be emotionally disturbed."

     c)   The same attendance statement from the emotional impairment standard is contained within these standards.

     d)   The same educational performance statement from the emotional impairment standard is contained within these standards.

     e)   There is no determination statement for this eligibility area.

  i.   Summary and recommendations: Overall, the Student was performing at grade level in all academic areas and there were no academic deficits reported. The Student does not qualify for special education services as a student with an emotional impairment or other health impairment.

  j.   The report was completed by the school psychologist and the school social worker.

  k.   According to the District:

     i.   The multidisciplinary evaluation team reviewed the Student's behavior performance in the school and in the community. At the time of the testing, the Student did not present with behaviors in either the school or community setting, that were negatively impacting him at school. In terms of behaviors, the

MDE_007665

Student did not have any suspensions at the time of the testing and the teacher did not report behaviors of concern.

ii.   At the time of the multidisciplinary evaluation team report, the Student had one suspension for one day and a second suspension administered on the date of the IEP for four days, for a total of five days of suspension.

19.   The eligibility recommendation form dated November 9, 2016 indicated:

a.   The evaluation information section contained the same information as the multidisciplinary evaluation team, except for the following:

i.   The background information only stated that the Student was a second-grade student and this was an initial evaluation.

ii.   The performance in school and other settings section indicated that in previous school years, the Student had demonstrated inappropriate behaviors including anger outbursts, destruction of property, and threats and swearing. Throughout this school year, the Student has not been observed to demonstrate any major negative or inappropriate behaviors. There was no mention of the Student's behaviors on the school bus.

iii.   The systematic observation of primary interfering behaviors section indicated that there were no primary interfering behaviors that were observed by the Student's general education teacher, the school psychologist, or the school social worker.

iv.   The behavior intervention strategies, length of time used, results section indicated that the Student previously had a behavior intervention plan during first grade targeting anger outbursts, destruction of property, and threats and swearing. The plan involved increasing the Student's environmental structure when possible, developing a safe person for him to go to in order to talk things out, and utilizing a daily check-sheet that would go between school and home. Currently, and throughout the Student's second-grade year so far, a behavior intervention plan had not been needed due to the Student exhibiting appropriate behavior the majority of the time. Additionally, the Student received counseling through the community mental health wraparound program.

b.   The diagnostic assurances section was completed for emotional impairment and other health impairment eligibility areas. A review of the standards for each eligibility area are consistent with the standards listed in the MARSE. The source for the eligibility determination for each eligibility area was the multidisciplinary evaluation report dated November 9, 2016.

20.   An IEP was also held on November 9, 2016, which indicated:

a.   The Student was not eligible for special education.

b.   The written notice indicated:

i.   The written notice was provided because the Student was

found ineligible for special education programs-services, and if age-appropriate, the District would support the Student using resources in general education.

    ii.     Options considered included special education services. The reason this was not selected is because the Student did not meet eligibility guidelines.

    iii.     The notice was signed and dated November 9, 2016.

    c.     According to the District:

        i.     The District convened a timely and comprehensive IEP team meeting.

        ii.     The IEP team agreed with the multidisciplinary evaluation team's recommendation that the Student was not eligible for special education or related services under the IDEA or the MARSE as a student with an emotional impairment or as a student with other health impairment.

        iii.     The finding of ineligibility was fully supported by the testing, observations, data and input from the staff and the Parent.

        iv.     The Parent attended the IEP team meeting and no one on the team, including the Parent, indicated any disagreement with the IEP.

21.     On November 15, 2016, according to a bus referral form, the Student engaged in fighting and physical aggression with another student. The Student also was defiant and refused to follow the directions of the bus driver. No consequence was listed.

22.     On November 16, 2016, according to an incident detail form, the Student physically assaulted a peer in the classroom. The incident was serious enough that the parent of the other student sought medical attention for their child. According to the pattern of behavior determination worksheet, the Student was suspended from school for 10 days. On the same date, the principal completed a due process hearing request form regarding the incident.

23.     On November 18, 2016, the following occurred:

    a.     The District sent a letter to the Parent indicating that the Student had been suspended from school for various behaviors and violations of the code of student conduct for the District. According to the letter, the Student was to be suspended from November 16 until December 2, 2016. The letter indicated that, "To the best of my knowledge, the Student is not receiving special education services or Section 504 plan accommodations at this time." The letter goes on to state that the Student may return on December 5, 2016, unless otherwise directed.

    b.     The District sent a text message to the Parent, inviting the Parent to a due process hearing on November 28, 2016.

    c.     The District sent a second letter that indicated the principal confirmed the investigation into the behavioral incident that occurred on November 16, 2016 and that as a result, the Student was being recommended for expulsion. The letter indicated that

MDE_007667

the Parent had a right to a due process hearing, to be held on November 28, 2016 at the District administrative offices. The letter included the notification of suspension, exclusion or expulsion proceedings procedural document, which outlined the procedures regarding suspension, exclusion, and expulsion.

24. The Parent reported that a meeting with the administrator of student services, was held and the Student was permitted to return to school on December 5, 2016.

25. According to an incident report dated December 5, 2016 and an incident detail form, that same day, while at recess, the Student refused to comply with directions and physically assaulted staff. According to the pattern of behavior determination worksheet, the Student was suspended for an additional eight days.

26. The Parent provided the school with a community mental health diagnosis document dated December 6, 2016, which indicated:

    a.    The report was signed by a physician.

    b.    The Student was diagnosed with bipolar disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder, anxiety disorder, intermittent explosive disorder, psychotic disorder with hallucinations, unspecified mental disorder, disruptive mood dysregulation disorder, impulse disorder, and non-rapid eye movement sleep arousal disorder.

    c.    Additional information: Other general medical conditions: Multiple severe organic disturbances mood, affect regulation, lack of impulse control, cognitive processing, and attention/concentration due to closed head injury and other central nervous system insults during the ages of birth to three years old. Features of bipolar disorder. Cognitive difficulties exist in spite of at least possible high average to above average intelligence quotient (IQ).

    d.    Psychosocial, environmental and other factors: "Problems with primary support group, problems related to social environment, educational problems, and other psychosocial and environmental problems."

27. On December 19, 2016, according to a bus referral form, the Student engaged in in fighting and physical aggression with peers and the bus driver. According to the referral form, the Student returned to the bus and on the first day back, got into several fights with fellow students. When the bus driver tried to separate the fight, the Student tried to hit the bus driver. The referral form indicated that this was an ongoing issue and that the Student was unsafe to transport. No consequence was listed.

28. On December 20, 2016, the District found the Student eligible for a Section 504 plan. The plan indicated:

    a.    The community mental health diagnosis document dated December 6, 2016, was attached and was referred to in the plan. The diagnoses listed in the community mental health document were included within the plan.

MDE_007668

b.    The Student required accommodations to assist him in behaving according to school rules.

c.    Accommodations included: "Alternate placement" for specials, alternate recess, the opportunity to debrief after an incident (such as calling the Parent, if staff was not available to talk), a formal behavior plan, and empathy building in the form of apologizing to staff and peers targeted and/or injured in the behavioral incidents.

d.    According to the District:

   i.    Because the Student's behaviors appeared to begin to escalate in November and December 2016, the District convened and completed a Section 504 Plan dated December 20, 2016.

   ii.   In addition to the supports put forth in the Section 504 Plan for the Student, the District conducted a functional behavioral assessment and completed more formal behavior intervention plans for the Student during December 2016 and January 2017.

29.   On December 20, 2016, the District drafted a behavior intervention plan that included the following:

a.    Specific behaviors of concern related to physical and verbal aggression: hitting, destroying property, and making threatening statements.

b.    Preventative Strategies: The Student was to be seated on the bus in an assigned seat; receive an alternative recess placement daily; be given an alternate classroom placement when a substitute teacher was assigned to his classroom; the ability to request a break when angry or frustrated; and in all classroom settings, the Student was to have an assigned seat by himself, still in proximity of the learning environment, including music, art, and physical education.

c.    Replacement behavior: These included appropriate means of gaining attention to be reviewed regularly with the Student; work with school staff and community services staff to practice emotional regulation, empathy building, and anger management skills.

d.    Positive (in the form of rewards) and negative consequences (responses to his behavior) for the Student based on the Student's behavior.

e.    Crisis plan: The Student would be provided with a safe, private space in which to deescalate if his behaviors presented a threat of harm to himself or others.

f.    The behavior plan would be reviewed by the school team and updated or revised as needed. An update was scheduled for January 26, 2017.

30.   On January 10, 2017, according to a bus referral form, the Student engaged in fighting and physical aggression with peers and the bus driver. According to the referral form, the Student fought two separate

MDE_007669

students and ignored all verbal commands to stop from the bus driver.
The bus driver needed to physically separate the fight. The referral form
indicated that this was an ongoing issue and that the Student was
unsafe to transport. No consequence was listed.

31.   On January 11, 2017, according to an incident detail form, the Student
refused to comply with directions and physically assaulted staff and
several peers. A behavior/incident referral form outlined the same
information, including that interventions in place were a behavior
intervention plan and Section 504 plan. The referral form also indicated
that the Student was sent home pending "due process" dated January
11, 2017. Below that written statement, it further indicated that the
Student was to receive three and a half days of suspension and no "due
process." According to the pattern of behavior determination worksheet,
the Student was suspended for three and a half days.

32.   On January 25, 2017, while in the gym, the Student exhibited
inappropriate physical contact with a peer and became defiant with
staff. According to a behavior/incident referral form, the Parent was
called when the Student would not select one or two choices according
to his behavior plan. The Student then went to class at 1:35 pm. After
school, according to the bus referral form, the Student verbally
threatened a fellow student, called other students derogatory names,
and cursed at the bus driver. No consequence was listed.

33.   On January 26, 2017, according to an incident detail form, the Student
physically assaulted a peer and the incident was reported to the local
police department. According to the behavior/incident referral form, the
Student was disruptive, refused to follow the rules, made inappropriate
physical contact, was taken to the office, and then taken home.
According to the pattern of behavior determination worksheet, the
Student was suspended for the rest of the day.

34.   On January 26, 2017, the behavior intervention plan was updated, which
included the following changes:

   a.   Preventative strategies: The Student would have to earn
        lunch/recess privileges daily based on his morning behavior. When
        the Student did not earn lunch/recess for the day, the Student
        would have to go to a different classroom. The Student was to stop
        in the office for five minutes every morning before going to his
        classroom to allow his peers to put their backpacks and coats away
        before the Student entered the classroom.

   b.   Updates/review: The plan would be reviewed by the school team
        and updated/reviewed as needed. The Student changed
        classrooms as of January 15, 2017.

   c.   Updated at a manifestation determination review/re-entry meeting
        on February 23, 2017.

35.   On January 27, 2017, according to the Principal's daily log, the Student
would not go to an alternate lunch area. The community mental health
worker came and assisted after a phone call to the Parent.

36.   On January 30, 2017, a functional behavior assessment was conducted.

MDE_007670

Participants in the development of the functional behavior assessment included two staff members. The functional behavior assessment included the following sections:

a.      The Student's strengths and successes;

b.      Data collection checklist: The indirect sources included a record review, behavior logs, and discipline reports. Direct sources included staff observations conducted January 30, February 1 and 2, 2017;

c.      Behaviors of concern (target behaviors): Physical aggression and defiance/refusal to comply;

d.      Specification/operational definition: The target behaviors were defined. The information was to include baseline data; however, none was provided. The antecedent was not identified for either target behavior;

e.      Previous school-based interventions and strategies for target behaviors: The behavior intervention was listed as the present strategy. The indication was that the Student was able to follow his behavior plan at times; however, he also displayed a resistance to following the plan as well.

f.      Summary hypothesis statement regarding target behaviors: The hypothesis statements for both target behaviors indicated that the antecedent was unknown, however the behaviors occur frequently (at least weekly) and seemed to be an effort for the Student to maintain control over his environment.

37.    On January 30, 2017, according to a bus referral form, the Student became defiant and refused to follow directions. According to the referral form, the Student refused to stay in the front of the bus in his assigned seat, despite being asked several times, and encouraged a fellow student to fight him. The Student then pulled the student's hair out. No consequence was listed. The bus referral forms were submitted by the Complainant and this was the last bus referral form submitted.

a.      According to the District, at this time, there are no referrals to submit after January 30, 2017. However, any referrals obtained after January 30, 2017 would be submitted by the District. No referrals were submitted.

38.    The principal's daily log sheet indicated that on January 30, 2017, the Student was suspended from the bus until the video could be viewed. An entry dated January 31, 2017, indicated that the Student was suspended from the bus until February 9, 2017.

39.    A daily log entry by an unknown staff dated January 30, 2017 indicated that the Student refused to complete his school work. The Parent was contacted and nothing was changed. The Parent agreed that the staff could keep the Student from recess. The Student also refused to get a lunch.

40.    On January 30, 2017, a manifestation determination review was conducted under Section 504. The review indicated:

a.      The Student had been suspended for a total of 22 school days so

far. The review listed all the discipline referrals made for the Student beginning on November 1, 2016 and ending January 26, 2017.

b.    The Parent reported that the Student had reactions to some of the medication that were tried and, at the time of the review, the Student was not on any medication. The Student also was no longer receiving therapy services from an outside agency.

c.    The behavior subject to discipline was a manifestation of the Student's disability.

41.    On January 31, 2017, according to the principal's daily log, the Student refused to go to an alternate location and went to the fifth-grade classroom at 11:30 am, indicating that the Student could return to his class at noon. Also, a "Parent Concern Form" was turned into the student services office and was in the office from 8:30 am to 11:30 am. It is unclear from the entry what was in the office at 8:30 am-the "Parent Concern Form" or the Student. A daily log entry by an unknown staff on the same date indicated that the Student was removed mid-morning due to refusals to do work until the afternoon; however, he finished the day doing well.

42.    On February 1, 2017, the Student refused to follow directions in gym and physically assaulted a peer. According to an incident report dated February 1, 2017, the Student's behavior intervention plan was implemented and the Student was in an alternate location to cool down. However, once there, he assaulted staff (an occupational injury report was completed by the employee) and may have possibly received a self-inflicted injury. According to the pattern of behavior determination worksheet, the Student was suspended for the rest of the day. According to a daily log entry by an unknown staff, the Student had a fine morning. He was sent home because of an incident in the physical education class. As the unknown staff was escorting the Student to get his belonging's, the Student bumped his head against the unknown staff's elbow from the rear. The unknown staff did not know if the bump was purposeful or accidental.

43.    Also, on February 1, 2017, according to the principal's daily log, the Student saw the school psychologist based on a referral from a general education teacher. According to the District, there was no documented referral to the school psychologist, however, she was listed as a witness.

44.    On February 3, 2017, according to the daily log by an unknown staff, the Student was taken to the office because he refused to do any work. The unknown staff spoke to the Parent and notified her that the unknown staff had extra students in his/her classroom. The unknown staff told the Parent that he/she could not focus all of their time and attention to the Student, because of the extra children. The Parent removed the Student from school for the rest of the day.

45.    On February 6, 2017, according to the principal's daily log, the Student was refusing to work in class. He was brought to the office to avoid a blow-up as he was not working in class. The Student was moved to a

MDE_007672

conference room and he did not do much work there either. The principal indicated that the Student would be given a break card to show his teacher if he needed to leave the room and come back to the office. This was substantiated by a daily log entry by an unknown staff.

46. Also on February 6, 2017, an IEP team meeting invitation was sent to the Parent, with instructions on how to access procedural safeguards. The purpose of the meeting was listed as a manifestation determination review and the convening of IEP team members; however, upon further review, the manifestation determination review was for a Section 504 plan that was held on February 10, 2017.

47. On February 7, 2017, according to the principal's daily log, the Student walked out of music class and stayed in the office until music class was over. Later, the Student walked out of the classroom. The Parent was called and was asked to pick up the Student. This was not considered a suspension. A meeting was requested by the principal. This was substantiated by a daily log entry by an unknown staff.

48. On February 10, 2017, the Parent requested that the District provide the Student with additional or different supports. In response to the Parent's requests, the District met on February 10, 2017 to review the Student's section 504 plan; however, no changes were made to the plan. A manifestation determination review for Section 504 was also conducted that day as well. According to the review, the Student began new medication and would be starting therapy services. The determination made was that the behavior subject to discipline was a manifestation of the Student's disability.

49. On February 15, 2017, according to the Student's behavior intervention plan, the Student changed classrooms.

50. On February 21, 2017, according to the incident detail form, the Student physically assaulted a peer. According to the pattern of behavior determination worksheet, the Student was suspended one and a half days.

51. On February 23, 2017, another manifestation determination review was conducted under Section 504. According to the review, the classroom teacher reported that things had not been going well in her classroom since the Student switched to her classroom. The first and second day in the room he did well and made it through the whole day, however he was not able to stay a whole day at school since the classrooms were switched. The determination made was that the behavior subject to discipline was a manifestation of the Student's disability.

52. On February 23, 2017, the Parent sent an email to the District principal, requesting a special education evaluation for the Student because the Section 504 plan was not working. On March 7, 2017, the Parent followed up with the school psychologist, sending a second email concerning the request for a special education evaluation. There was no indication when the District responded to the Parent's request.

53. On February 27, 2017, the Student physically assaulted a peer while on the playground. When staff attempted to intervene, the Student

MDE_007673

assaulted several staff members. The Student was suspended for 10 days, through March 9, 2017.

54. On March 9, 2017, a review of existing evaluation data and evaluation plan was initiated for the Student. According to the form:

    a. The Parent made a referral on March 8, 2017 due to concerns about the Student's behavior and that he is not receiving enough support at school.

    b. The Student was evaluated in November of 2016 and was found ineligible as a student with an emotional impairment and other health impairment. At that time, the Student did not have mental health diagnoses and was not exhibiting problematic behaviors in the classroom.

    c. The general education teacher reported that the Student exhibited major behavior problems in class, including very disrespectful behaviors along with verbal and physical aggression towards peers and staff.

    d. The evaluation plan proposed assessments in the area of social/emotional/behavioral, to include observations and a behavior rating scale.

    e. The Parent provided consent on March 9, 2017; however, a copy of the actual signature was not provided, as the form was provided from the District's TIENET database.

        i. According to the Complainant and the Parent, the Parent never provided consent for any evaluations and this form was not provided to the Complainant following a request for records.

        ii. According to the District, a member of the team who was listed as a participant on the form was unable to verify that consent was provided.

55. On March 20, 2017, the Student refused to follow directions and became verbally aggressive toward staff. The Student was sent to the office and suspended for half a day.

56. On March 29, 2017, an IEP team meeting invitation was sent to the Parent, with instructions on how to access procedural safeguards. The purpose of the meeting was listed as a manifestation determination review and the convening of IEP team members; however, upon further review, the manifestation determination review was for a Section 504 plan that was held on April 25, 2017.

57. On April 14, 2017, an IEP team meeting invitation was sent to the Parent, with instructions on how to access procedural safeguards. The purpose of the meeting was listed as determining or reviewing the Student's eligibility for special education programs/services and for developing, reviewing, or revising this Student's IEP.

58. On April 20, 2017, according to an incident detail form, the Student walked out of class. The Student returned to class, but then walked out a second time, seeking an alternate location to take a break, per his behavior plan. The Student refused to speak to staff and made verbal

MDE_007674

threats if the staff did not leave the location. According to the pattern of behavior determination worksheet, the Student was suspended half a day.

59.  On April 25, 2017, another manifestation determination review was conducted under Section 504. According to that review, the teacher reported that the Student was very bright, read well and that math was a strength for him. However, behavior was a major issue in class and the Student had only been able to stay in school for one full day since he switched classrooms on February 15, 2017. Two entries dated April 26, 2017, were made concerning the Student's behavior in class and that the Student was diagnosed with juvenile arthritis. The determination made was that the behavior subject to discipline was a manifestation of the Student's disability.

   a.  According to the District:

      i.  Because the Student's behaviors continued to cause him to be suspended and because the Section 504 Plan and the formal behavioral interventions and supports were not resulting in eradication of the behaviors, the District re-visited the Student's eligibility under the IDEA and the MARSE.

      ii.  The Student was not left in the District's child study team process. The District provided appropriate interventions and supports for the Student at school.

60.  On April 26, 2017, a multidisciplinary evaluation team was conducted with the school psychologist, the school social worker, and the teacher. The multidisciplinary evaluation team report indicated:

   a.  The Student was referred for a special education evaluation at the request of the Parent, due to the Student's behavior in school and his inability to stay in the classroom.

   b.  Assessments administered included: Informal observations, record review, teacher/parent interview, and the Behavior Assessment System for Children, second edition.

   c.  Medical information-current: Diagnoses from the community mental health diagnosis document dated December 6, 2016 were included. Other medical information included asthma, medication, juvenile arthritis diagnosis, medical concerns regarding vision.

   d.  Background information: Same information as reported on November 9, 2016, with no changes.

   e.  Previous evaluation data from November 2016: Data from the Wechsler Individual Achievement Test-third edition and the Grey Oral Reading Tests-fifth edition were listed. Statement indicated, "The Student's academic skills appear to be within or around the average range of functioning for a student in the 2nd grade."

   f.  Teacher report: Statements indicated that when the Student was having a good day, he did really well. However, when he started out negatively, he would struggle the rest of the day, often being sent home for the afternoon. When having a bad day, the Student could be defiant, disrespectful, verbally aggressive, and on more

severe days, physically aggressive towards students and staff. The Student had more bad days than good days. Additionally, she reported that the Student did not interact with his peers very often, often choosing to sit by himself unless he wanted to play a game.

g.   Individual assessments: Data was listed for the Behavior Assessment System for Children, second edition, which indicated:

i.   Scores in the "clinically significant" range suggest a high level of maladjustment.

ii.   Scores in the "at-risk" range may identify a significant problem that may not be severe enough to require formal treatment or may identify the potential of developing a problem that needs careful monitoring.

iii.   The Parent rated the Student in the "Clinically significant" range for somatization and atypicality. The areas of hyperactivity, aggression, anxiety, attention problems, as well as the externalizing problems, internalizing problems, and behavioral symptoms index composite scores, all scored in the "at-risk" range on the parent assessment. The Student's adaptive skills fell in the "at-risk" range in the areas of adaptability and social skills, as well as the adaptive composite score. In the parent assessment, the Student's internalizing problems composite score was greater than his externalizing problems composite score.

iv.   The teacher's ratings scored in the "clinically significant" range in the areas of aggression and withdrawal, as well as the externalizing problems composite score. The areas of hyperactivity and conduct problems, as well as the behavioral symptoms index, all scored in the at-risk range on the school assessment. The school assessment rated his adaptive skills in the area of adaptability in the "clinically significant" range, and the areas of social skills and the adaptive composite score was in the "at-risk" range. In the school assessment, the Student's externalizing problems composite score was greater than his internalizing problems composite score as well as his school problems composite score.

h.   Classroom observations:

i.   Two observations were made by the school social worker; one in the Student's classroom in the morning and after lunch during math time and recess. During the first observation, the Student did not exhibit any behaviors and he utilized his break card to go to the office to self-calm. During the second observation, the Student worked quietly by himself with a laptop. The Student then went to recess and interacted appropriately with his peers. The Student was late coming back from recess. When given a consequence by the teacher, the Student accepted the consequence without complaint.

MDE_007676

    ii.    Two observations were also made by the school psychologist in the morning and in the afternoon, during work time. While the morning observation showed the Student to be on task and compliant, the afternoon observation showed the Student to be defiant and disrespectful to the teacher, using inappropriate language for school. The Student did attempt to use a break, which was already put in place as a behavior support, but he returned to class quickly and continued to exhibit inappropriate behaviors in class.

i.    Problem validation and conclusion: The following statement was included in this section:  Based on the Student's diagnoses it appears that the Student's disability is negatively impacting his ability to stay in the classroom and profit from the general education environment. The Student would most likely benefit from special education services in order to further support his behavior at school.

j.    Eligibility areas reviewed:

    i.    Emotional impairment: This section included the standards for the eligibility area, however, there was only one statement listed at the bottom of the section: "The school team considered emotional impairment, however, it was ruled out because the Student's behaviors of concern at school do not match the behaviors of concern at home, based on interviews with the Parent, and the results of the home and school Behavior Assessment System for Children, second edition. Also, during this school year the Student has received multiple mental and physical health diagnoses for which treatment is in the early stages, and the impact of his health conditions on school behaviors may very well be significant.".

    ii.    Other health impairment: The following were marked true:

        a)    This student has a chronic or acute health problem.

        b)    Due to the chronic or acute health problem, the student has limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, which results in limited alertness with respect to the educational environment. Due to the Student's mental health diagnoses, the Student struggles to control his behavior, which results in a limited alertness to the educational environment.

        c)    The suspected disability is not due to limited English proficiency.

        d)    The suspected disability is not due to a lack of appropriate instruction in math or the essential components of reading

        e)    The suspected disability adversely affects educational performance and requires special education programs/services.

MDE_007677

k.    Recommended eligibility: The recommendation indicated that the Student met eligibility criteria as a student with other health impairment and the Student should receive special education services to further support his behavior at school.

l.    The report was signed by the school psychologist and the school social worker.

61.    The eligibility recommendation form dated April 26, 2017 indicated:

a.    The reason for referral was that the Parent had concerns about the Student's behavior and that he was not receiving enough support at school.

b.    Background information stated, "The Student was evaluated in November of 2016 and was found ineligible as a student with an emotional impairment and other health impairment. At that time, the Student did not have mental health diagnoses and was not exhibiting problematic behaviors in the classroom. After the evaluation was completed, the Student began having behavioral problems at school and a 504 plan was put into place to address those issues."

c.    The current education/developmental level included the same testing completed November 2016; however, the new Behavior Assessment System for Children, second edition testing completed in April 2017 was not included.

d.    The District included information about the Student's mental health diagnoses from the community mental health diagnosis document dated December 6, 2016; however, there was no reference of the history of a closed head injury and central nervous system trauma mentioned in the same report.

e.    Eligibility area considered was other health impairment and the Student was found eligible.

f.    The present level statement included in the eligibility form indicated that the Student had demonstrated behavioral problems at the school since November 2016. In spite of the use of a behavior plan and Section 504 plan, the Student continued to struggle with inappropriate behavior at school.

62.    An IEP dated April 26, 2017 was developed that included the following:

a.    Student strengths, Parent concerns, and current evaluations.

b.    The Student had been suspended for a total of 37 school days this year.

c.    The Student was eligible for special education as a student with other health impairment.

d.    The present level of academic achievement and functional performance included the following areas of need:

i.    Reading: Decoding, reading fluency, and reading comprehension. An adverse impact statement indicated that the Student's reading scores do not appear to interfere with performance in general education to the extent that special education supports are required.

    ii.    Mathematics: Math problem solving and math calculation. An adverse impact statement indicated that the Student's math scores do not appear to interfere with performance in general education to the extent that special education supports are required.

    iii.    Writing: Written expression. An adverse impact statement indicated that the Student's writing scores do not appear to interfere with performance in general education to the extent that special education supports are required.

    iv.    Socio-Emotional/Behavioral: Behavior. The Student has a high number of discipline referrals and suspensions for: Defiance, disrespect, verbal and physical aggression, and assault. The Student has had a behavior plan in place this year at school as well as during previous years. Additionally, a 504 plan was developed for the Student, however, the Student continues to struggle with appropriate behavior at school.

        a)    This need was addressed via annual goals, supplementary aids and services, and program-services.

    v.    There was no reference to the new Behavior Assessment System for Children, second edition testing completed in April 2017.

e.    The special factors section included the following information:

    i.    The IEP team considered the use of positive behavioral interventions and supports, and other strategies, to address behavior because the Student had behavior that impeded his or her learning or the learning of others.

    ii.    The supplementary aids and services included: Behavior, monitoring/redirection, breaks, and bumpy seat/fidget, daily in all school settings; and breaks, small group setting, and alternate location to take test, for all classroom, District, or state assessments, in the general education classroom.

f.    The annual goals and objectives included the following:

    i.    Annual goal: By April 2018, the Student will keep hands/feet/objects to self, 90% of the time and utilize breaks appropriately.

        a)    Short-term objective: The Student will keep hands/feet/objects to self, 70% of the time when visibly upset/frustrated. Criteria: 70% accuracy. Evaluations: Observations/anecdotal records. Schedule: Card marking.

        b)    Short-term objective: The Student will utilize breaks appropriately 70% of the time when visibly frustrated/upset. Criteria: 70% accuracy. Evaluations: Observations/anecdotal records.

    ii.    Annual goal: By April 2018, the Student will learn and utilize coping strategies to express his emotions in an appropriate

MDE_007679

way, approximately 80% of the time. Examples of coping strategies include: Deep breathing, visualization, progressive muscle relaxation, engaging the five senses, etc. 90% of the time when visibly frustrated/upset.

    a)    Benchmark: By October 2017, the Student will utilize coping strategies to express his emotions in an appropriate way, approximately 50% of the time. Criteria: 50% accuracy. Evaluations: Teacher observation. Schedule: Card marking.

    b)    Benchmark: By January 2018, the Student will utilize coping strategies to express his emotions in an appropriate way, approximately 65% of the time. Criteria: 65% accuracy. Evaluations: Teacher observation. Schedule: Card marking.

g.    Programs and services included:

    i.    Teacher consultant – emotional impairment, consultative, 10 to 20 minutes, one to two sessions per month in general education classes.

    ii.    A checkbox was included, asking if the Student required a reduced day and the box was checked "no."

h.    The written notice indicated:

    i.    The notice and the IEP constitute the District's offer of a FAPE.

    ii.    Options considered but not selected included:

        a)    Communication needs because it does not meet Student's needs at this time; and

        b)    Need for assistive technology devices and services because it does not meet Student's needs at this time.

i.    The Parent provided consent to the provision of special education programs and/or services on April 26, 2017.

j.    According to the District:

    i.    Because the Student's behaviors continued to cause him to be suspended and because the Section 504 Plan and the formal behavioral interventions and supports were not resulting in eradication of the behaviors, the District re-visited the Student's eligibility under the IDEA and the MARSE.

    ii.    The District convened an IEP team meeting and found the Student eligible as a student with other health impairment, based upon his medical conditions, newly-provided information from the Parent regarding his clinical diagnosis and community services and his behaviors that were causing the Student to be suspended.

    iii.    The staff makes various recommendations based on a continuum of support and student needs. Those recommendations are considered by the IEP team and the IEP team makes the decision. In this particular situation, this Student had several outside agencies and supports trying to

MDE_007680

connect with the family. The introduction of various adults and support for relationships is important when providing services for this student. The teacher consultant services determined by the IEP team were for consultation services.

iv.    The Student received support and services from all support staff on a daily and hourly basis. The behavior specialist, special education teacher, paraprofessionals and the principal, as well as the school social worker provided de-escalation, positive behavior support and crisis intervention daily. This data was provided in behavior plans and logs as well.

63.    On May 2, 2017, according to an incident detail form, the Student assaulted a peer with a chair. The Student was suspended for 10 days. At this point for the 2016-2017 school year, according to the pattern of behavior determination worksheet, the Student had been removed for a total of 49 days.

64.    On May 15, 2017, the District conducted a manifestation determination review, which indicated:

a.    The purpose of the review was to determine whether the conduct subject to discipline was a manifestation of this Student's disability.

b.    On May 3, 2017, the District contacted the Parent to arrange for the manifestation determination review meeting.

c.    Relevant evaluations and assessment results were reviewed, including the following information:

i.    The Student's initial evaluation occurred on November 9, 2016, and the Student was found not eligible because the Student did not have mental health diagnoses and was not exhibiting behavioral problems in the classroom at that time.

ii.    The Student began having behavioral problems at school and a 504 plan was put into place to address those issues.

iii.    After continued behavior problems at school, another request was submitted to re-evaluate the Student for special education services. After the Student's second evaluation, he was found eligible as a student with other health impairment due to diagnoses of: Bipolar and related disorder due to another medical condition, post-traumatic stress disorder, attention-deficit/hyperactivity disorder, anxiety disorder due to another medical condition, intermittent explosive disorder, psychotic disorder with hallucinations due to another medical condition, disruptive mood dysregulation disorder, impulse disorder, and unspecified mental disorder due to another medical condition.

iv.    The Student utilizes an inhaler for asthma and had begun taking medication for attention deficit hyperactivity disorder. The Student was recently diagnosed with juvenile arthritis as of April 2017 and takes medication for pain. The Student would be monitored for vision concerns every six months.

MDE_007681

     v.     Northwest Evaluation Association (NWEA) testing results for fall 2016 and winter 2017.

     vi.    The Student was suspended for a total of 49 school days this school year. Discipline referrals were listed, dated from November 1, 2016 through May 2, 2017.

     vii.   Student's current IEP and placement indicated that the Student received special education services with a teacher consultant, for 10 to 20 minutes, one to two times per month.

     viii.  Teacher observations were completed by the Student's classroom teacher and physical education teacher. The classroom teacher indicated that the Student's behavior in her class was a hit or miss. He could be great one day and then struggled with his behavior on other days, such as: becoming defiant, disrespectful, and verbally and physically aggressive with others, both staff and peers. However, since spring break, his behavior appeared to decline-there were less great days. The physical education teacher indicated that the Student had not attended her class since before spring break.

     ix.    Parent relevant information included that the Student continued to struggle and had good days and bad days. The Parent reported an incident in the classroom with the teacher and the Parent on the telephone, whereby the Student called the Parent and waited 15 minutes to receive assistance from the teacher. The Parent further reported that the Student was hyper at home and she did what she could.

     x.    Relevant information included that the Student's community mental health worker has worked with the Student weekly since February 2017. The worker was required to work with the family for two hours per week. The worker reported that she had seen growth in the Student's understanding of his anger and body cues, however he struggled to use coping skills in the moment.

d.    The manifestation determination section indicated that the conduct in question was caused by or directly and substantially related to the Student's disability and was not to a failure to implement the Student's current IEP.

e.    The notice indicated:

     i.    The contents of the manifestation determination review form served as a description of the manifestation determination review process and outcome for the Student. If the Parent disagreed with the determination, the Parent had the right to file an expedited due process hearing by following the procedures outlined in the procedural safeguards notice for special education, which describes protections under the IDEA. If the Parent wanted a copy of the procedural safeguards notice, the Parent would have to contact the special education department for the District or go to a

MDE_007682

website-which when accessed does not provide a copy of the procedural safeguards notice.

f.   According to the District, the behavior plan was revised at the IEP team meeting. However, no revised behavior plan was submitted by the District.

g.   According to the Complainant, the Parent and the community mental health worker:

   i.   The District passed around a sign in sheet for the manifestation determination review. The supervisor of student support services told the team that the manifestation determination review would be completed first, then the team would look at the IEP and make decisions based on the best interest of the Student.

   ii.  The team talked about the Student's behavior and triggers. They reviewed all the information very quickly. The team talked about how many times he had been out of school and the number of times he had been suspended. No documents were reviewed, just the incident report explaining why he had been suspended.

   iii. The behavior intervention plan was never discussed or reviewed.

   iv.  The Student was not returned to the prior placement. The Parent was not in agreement with the change of placement.

65. The IEP dated April 26, 2017 was revised following the manifestation determination review. The IEP dated May 15, 2017, indicated:

a.   The Complainant and the District submitted different versions of this IEP, as indicated below. The Complainant's version came from the Parent.

b.   The District reviewed and revised the Student's IEP, noting that the purpose of the IEP team meeting was for "Annual review, suspension/expulsion." The IEP included the following changes:

   i.   The IEP participants included the Student, both Parents (the District version did not list one of the Parents), the general education teacher (the District version listed a different teacher), the special education teacher, the administrator of student services (not listed on the version submitted by the District), the school social worker, the Student's community mental health worker, the principal, and the school psychologist.

   ii.  Parent concerns, "The Parent reported that the Student struggles with his behavior at home as well."

   iii. Progress on most recent goals and objectives stated, "The Student has not made any progress on his goals since his IEP was finalized on April 26, 2017 as he has been suspended since May 2, 2017."

   iv.  Teacher consultant services changed from one to two sessions per month to one to four sessions per month, however, the

MDE_007683

services remained consultative for 10 to 20 minutes each session.

v.   The checkbox in the program-services section that asked if the Student required a reduced day was checked "yes" and the reason was listed as "medical or psychological reasons."

vi.   A separate page stated, "The Student will come in morning until lunch. Will continue to eat lunch in office before he goes home. Will ride partial day bus home. Need to get bus set up." This information was not on the version submitted by the District.

vii.   Anticipated needs section was different on the version submitted by the District, which indicated:

a)   The Student would be on a partial day through the end of the school year, per the supervisor of student support services at a due process meeting on May 15, 2017.

b)   The Student would eat lunch in the office like normal and then ride the "partial day bus" home from the school building around 11:15 am.

c)   According to the District, this is not a "partial day bus," but transportation provided for the Student, who is participating in a partial school day. A reduced or partial day was recommended by the IEP team and transportation was provided to the student at the end of the designated day. The IEP team, including the Parent agreed to a reduced day to try to increase some school success for the student in shorter increments based on the behavior increases in the afternoon. The offer of curb to curb transportation at the end of the partial day was extended to the family and accepted.

viii.   The written notice was the same except for the additional purpose section indicating that the additional purpose was suspension/expulsion. The version submitted by the Complainant was signed by someone who did not attend the manifestation determination review or IEP team meeting. The District version was not signed.

a)   According to the Complainant, she received her version of the IEP from the Parent via fax.

c.   According to the Complainant, the Parent, and the community mental health worker:

i.   Once the manifestation determination review decision was made, the supervisor of student support services left the room, indicating he was going to talk to the director of special education on the phone. He came back and stated that the Student was going on half days because it was in the best interest of the Student. Nothing else was discussed. The Parent indicated that she did not agree with the placement

MDE_007684

decision, that she had questions, and that the determination was not in the best interest of the Student. The District team stated that it would make the Student more successful. The meeting was then adjourned. The IEP paperwork was given to the Parent after the meeting and she realized later that the placement of the Student had been revised in the IEP.

    d.    According to the District:

        i.    The recommendation for the Student's placement following the manifestation determination review was based on the severity of the incident and previous incidents that resulted in a manifestation determination review during the 2016-2017 school year and data determined that behaviors increased in the afternoon. The recommendation was to try a reduced day until the end of the school year, which was agreed upon by the entire IEP team, including the Parent. The behavior plan was revised at the IEP team meeting with the Parent as well, to include extended breaks in the morning for the Student when needed.

66.    The Student's attendance was recorded throughout the 2016-2017 school year on the student attendance report and the student day total sheet. Behavioral incidents were recorded on the student attendance report, discipline student detail form, the behavior detail form, the incident detail form, and the pattern of behavior determination worksheet.

67.    The student day total sheet for the Student was completed for every day of the school year 2016-2017. However, there were columns that contained codes that were not explained anywhere in the document. According to the District, the District utilizes a student information system called eSchool Plus. The District used this report to have a full view of Student absences. There are other reports that can be generated in eSchool Plus that indicate discipline and suspensions related to absences, which were outlined above. The District did not use this report to track the suspensions and removals of the students within the District.

68.    According to the pattern of behavior determination worksheet, the Student was suspended for 49 days. The worksheet asked at the bottom if there was a pattern of removals. Each incident was listed; however, it was never determined whether there was a pattern of removals as no boxes were checked indicating "yes or no" in response to the question. Only a reason was provided.

    a.    According to the District:

        i.    The District requires every building to have a "suspension team" and a report that tracks removals from schools of students that accrue five or more days. The suspension team provides a "check and balance" with buildings to verify suspensions, interventions provided and correct days of removal. Suspension team reports are completed every month

MDE_007685

by each building team and submitted to the student services department. The eSchool Plus reports are generated for school staff to review student absences and suspensions. Building principals, child accounting secretaries, behavior specialists and support specialists, if designated responsible for inputting student data, are trained on the process through the District.

ii.   If a parent is called by the building administrator to pick up their child for a Category 2 or Category 3 violations that has resulted in a removal from school, it is considered and recorded as a suspension and marked in eSchool Plus as such.

iii.  If a parent is called by the building administrator to pick up their child for a Category 2 or Category 3 violations that has resulted in a removal from school, it is considered and recorded as a suspension and marked in eSchool Plus as such.

69.  The Student's report card for the 2016-2017 school year submitted by the District was completed through the first two marking periods. The third and fourth marking periods were blank.

70.  The District's Staff Handbook included the following information relevant to this complaint:

a.   Behavioral concerns. Students with major behavioral concerns need to have a behavior plan. Suspensions should be kept at a minimum. Serious behavior concerns should be documented on the IEP. All staff in buildings should be proactive and implement alternatives to suspension at the beginning of the school year. Alternatives were listed. This section also outlined manifestation determination reviews and the need for a functional observation behavioral analysis be completed for the student, the pattern of removals determination worksheet, 11th day FAPE plan.

b.   Child Find regulations. According to the information, if a staff member receives a written request from a parent or guardian to evaluate their child for special education eligibility, then the school psychologist, speech therapist, or student services personnel must be notified within 24 hours. The school psychologist or speech therapist need to meet with the parent/guardian within 10 school days to conduct a review of existing evaluation data. The parent/guardian must sign for the evaluation being proposed. This includes Child Find efforts involving any student suspected of having a disability or having a disability who is in need of special education and related services. The consent for evaluation must be signed from the parent to proceed with conducting the evaluation. If staff members determine that an evaluation is not needed, then written support for refusing the evaluation must be made. Staff members need to notify a Student Services administrator if this occurs to review the written notice before it is sent to the parent/guardian.

c.   ESchool Plus. This is the name of the student data base system for the District where information is stored in the system. Attendance

MDE_007686

information must be entered by each teacher and updated correctly by the building child accounting secretary.

   d.    IEPs. Initial evaluations for students by itinerant staff (speech therapist, social workers or school psychologists) need to be comprehensive. All possible disability areas need to be covered in the evaluation.

   e.    PBLS. PBLS is a school wide positive behavior intervention support system that organizes adults and students to create a social culture in schools that will encourage positive behavior and interactions, while discouraging problem behaviors. This includes necessary components for implementation and effective practices.

71.    Referrals. All special education referrals need to have the original signature page turned into student services within two business days of taking the referral. All evaluations need to be completed within 25 school days. Permission is needed from a special education administrator if there are extenuating circumstances to delay the evaluation.

   a.    The Student Code of Conduct included the following information relevant to this complaint:

   b.    The code of student conduct covers only the most obvious and serious types of misconduct.

   c.    The code includes details for infractions as well as the possible range of consequences to the violations of the student code of conduct.
All misconduct is separated into three different sections by categories, which included the following:

      i.    Category I-General misconduct;

      ii.    Category II-Serious misconduct infractions; and

      iii.    Category III-Illegal conduct infractions.

   d.    Bus behavior: All school rules and regulations apply when students are under the jurisdiction of the school. This includes all student transportation activities (to and from school).

   e.    Students with disabilities: This section provided information regarding the discipline protections afforded to students with IEPs and/or section 504 plans.

72.    Child study team process document indicated:

   a.    The child study team is designed as a school based problem-solving model that supports teachers in engaging in pre-referral intervention activities.

   b.    Steps include:

      i.    Teacher identification of student for child study team;

      ii.    Parent notification;

      iii.    Completion of child study team form by referring teacher;

      iv.    Initial information gathering;

      v.    Initial child study team meeting, which includes: Clarification

MDE_007687

of teacher concerns, brainstorming strategies/interventions, development of plan, and schedule of follow-up meeting; and

vi.   Follow-up meeting, which includes: Review progress, additional strategies discussed, and next steps determined.

c.   Reasons for referring a child to the child study team process included:

i.   Academic concerns (student is struggling or needs to be challenged);

ii.   Behavioral concerns;

iii.   Social/emotional concerns;

iv.   Occupational therapy /physical therapy concerns;

v.   Speech and language concerns; and

vi.   When retention is a consideration.

d.   There is a form used by the child study team process that outlines concerns, background information, brainstorming and the next review date. The District did not submit a completed child study process document for the Student.

73.   The District Procedural Checklist: Initial Evaluation document indicated:

a.   The document is a checklist outlining tasks that need to be completed for an initial evaluation and the person responsible for each step. A date completed box is included for each task.

b.   Requests for special education evaluations are submitted by the child study team or by parents in writing.

c.   Steps included:

i.   Request is submitted.

ii.   Communication between the team and the parent within 10 school days.

iii.   The team confirms need for evaluation and obtains signed consent for the evaluation.

iv.   The team completes the review of existing evaluation data and evaluation plan.

v.   The multidisciplinary evaluation completes the evaluation, the eligibility recommendation, develops a present level statement on the eligibility recommendation, attachment of additional documentation in TIENET, finalize eligibility and communicate the eligibility recommendation to the parent and the members of the IEP team two to three days prior to the IEP team meeting.

vi.   Scheduled IEP team meeting must be held within 30 school days of receipt of parent consent. Invitations are sent to the team members.

vii.   Documents are created based on the determination of eligibility.

viii.   After the IEP is held and completed, submit original IEP to student services department within 24-28 hours.

MDE_007688

74. An individual education program checklist for staff review document appears to be a checklist for staff to use to make sure that each part of the IEP has been completed.

75. The District submitted a template for the "Worksheet for Determining a Pattern of Removal" that included guidance and directions on completing the form. The District did not submit this form for the Student. The District submitted several other blank template forms regarding discipline practices utilized within the District, some of which were not completed for this student, specifically: Suspension intervention team report, educational services after the 10th day letter, eleventh day FAPE service documentation form, snap suspension notice, due process hearing procedures document, and due process investigation form.

76. A review was made of District evaluations for students within the same building as the Student, regarding Child Find conducted during the 2016-2017 school year. According to that review:

   a.   Thirteen students were found to have been evaluated for Child Find for the District, including the Student (the Student is not included in the data found below).

   b.   Of the thirteen files reviewed, the following was found:

      i.    The standards for each evaluation were consistent with the IDEA and the MARSE. For a couple students, the standards were not marked correctly based on the information provided.

      ii.   Some students were evaluated in one eligibility area, even though there were concerns in other areas of need.

      iii.  Several students had concerns in the area of social/emotional/behavioral, including behavioral concerns noted in the review of existing evaluation data. Evaluations listed were for observations only.

      iv.   A couple students required further evaluations/documentation, however these were not sought and the students were found ineligible.

**Conclusions:**

Issue #1

1. In conducting the evaluation, the public agency must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent that may assist in determining whether the child is a child with a disability under § 300.8. The public agency must also not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child. 34 CFR § 300.304(b).

2. Districts are required to have in place policies and procedures to locate, identify and evaluate all students with disabilities. "Child find" is the affirmative, ongoing obligation of states and local districts to identify, locate, and evaluate all children with disabilities

MDE_007689

residing within the jurisdiction who are in need of special education and related services 34 CFR § 300.111(a)(1)(i).

3. Assessment tools the District must provide includes medical services, which are "services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." 34 CFR § 300.34(c)(5).

4. According to the US Department of Education, "Services required under Part B may include medical services provided by a licensed physician to determine whether a child has a medically related disabling condition which results in the child's need for special education and related services. If a public agency believes that a medical evaluation by a licensed physician is needed as part of the evaluation to determine whether a child suspected of having attention deficit [hyperactivity] disorder meets the eligibility criteria of the other health impairment category, the school district must ensure that this evaluation is conducted and is at no cost to the parents. If a State requires that a medical evaluation be included as part of all evaluations for eligibility determination for the other health impairment category, it must also ensure that any necessary evaluations by other professionals are also conducted and considered as part of the eligibility determination process." Letter to Parker, 18 IDELR 963 (OSEP 1992).

5. According to the Sixth Circuit, a petitioner needs to prove that the school district "overlooked clear signs of disability" and were negligent in failing to order testing, or that there was "no rational justification for failing to evaluate." Bd. of Educ. of Fayette County, Kentucky v. L.M., 47 IDELR 20122 (6th Cir. 2007), at para. 1, cert. denied, 110 LRP 48155, 128 S. Ct. 693 (2007) (citing Clay T. v. Walton County Sch. Dist., 952 F.Supp. 817, 823 (M.D.Ga.1997)).

6. Districts may not require every student who has or is believed to have a disability to undergo a medical assessment. However, when a medical assessment is required, the district, not the parents, is responsible for arranging and paying for the assessment under the IDEA. Analysis and Comments, 71 Fed. Reg. 46,550 through 73 Fed. Reg. 46,551 (2006); and Letter to Veir, 20 IDELR 864 (OCR 1993).

7. Emotional impairment shall be determined through a manifestation of behavioral problems primarily in the affective domain, over an extended period of time, which adversely affects the student's education to the extent that the student cannot profit from learning experiences without special education support. The problems result in behaviors manifested by one or more of the following characteristics: Inability to build or maintain satisfactory interpersonal relationships within the school environment; inappropriate types of behavior or feelings under normal circumstances; general pervasive mood of unhappiness or

MDE_007690

depression; tendency to develop physical symptoms or fears associated with personal or school problems. R 340.1706(1).

8. An emotional impairment includes students who, in addition to the characteristics specified in this rule, exhibit maladaptive behaviors related to schizophrenia or similar disorders. Emotional impairment also does not include persons who are socially maladjusted, unless it is determined that the persons have an emotional impairment. R 340.1706(2).

9. Emotional impairment does not include students whose behaviors are primarily the result of intellectual, sensory, or health factors. R340.1706(3).

10. When evaluating a student suspected of having an emotional impairment, the multidisciplinary evaluation team report shall include documentation of all of the following: (a) The student's performance in the educational setting and in other settings, such as adaptive behavior within the broader community. (b) The systematic observation of the behaviors of primary concern which interfere with educational and social needs. (c) The intervention strategies used to improve the behaviors and the length of time the strategies were utilized. (d) Relevant medical information, if any. R 340.1706(4).

11. A determination of an emotional impairment shall be based on data provided by a multidisciplinary evaluation team, which shall include a full and individual evaluation by a psychologist or psychiatrist and a school social worker. R 340.1706(5).

12. Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, which results in limited alertness with respect to the educational environment and to which both of the following provisions apply:

    a.   Is due to chronic or acute health problems such as any of the following: asthma, attention deficit disorder, attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia.

    b.   The impairment adversely affects a student's educational performance. R 340.1709a(1)(a)(b).

13. A determination of disability shall be based upon a full and individual evaluation by a multidisciplinary evaluation team, which shall include 1 of the following persons: an orthopedic surgeon, an internist, a neurologist, a pediatrician, or a family physician or any other approved physician as defined in the Michigan Public Health Code. R 340.1709a(2).

14. Upon completion of the assessments and evaluations for a student suspected of a disability, a group of qualified professionals and the parent of the student determines whether the student is a student with a disability. 34 CFR § 300.306(a)(1).

MDE_007691

15. The US Department of Education further opined, "We want to correct your assumption that Part B requires that a particular child accept a particular label in order to be eligible for and receive required special education and related services. The entitlement under Part B is the entitlement of each eligible child with a disability to FAPE and not to a particular label, such as specific learning disability, serious emotional disturbance, other health impairment, or any other eligible disability category under Part B. Rather, the child's IEP, which must reflect the child's educational needs, which forms the basis for the placement decision, and not the category of the child's disability." Letter to Williams, 21 IDELR 73 (OSEP 1994).

16. Whether goals and objectives are required in a student's IEP for transportation provided as a related service depends on the purpose of the transportation. If transportation is being provided solely to enable the student to travel to and from school, in and around school, and between schools, no goals or objectives are needed. If, however, instruction will be provided to enable the student to increase his or her independence or improve his or her behavior or socialization during travel, then goals and objectives must be included in the student's IEP to address the individual student's need to increase independence or improve behavior or socialization. Letter to Smith, 23 IDELR 344 (OSEP 1995).

17. Regarding the Student and Child Find:

    a. The standards used by the District in the emotional impairment and other health impairment eligibility areas were consistent with the IDEA and the MARSE.

    b. The evaluation conducted on November 9, 2016, was not comprehensive because the evaluation plan for the social/emotional/behavioral area included only an observation. According to the MARSE, a determination of impairment shall be based on data obtained from the evaluation. Once the District agreed to evaluate the Student for a suspected disability, the District had the responsibility to ensure that it fully assessed the Student in all areas of suspected need before the evaluation was completed. Another evaluation should have been conducted for the social/emotional/behavioral area in order to obtain data, such as a behavior rating scale, given the behavioral history of the Student, which was known by the staff in the building given that the Student attended school in that building beginning in February 2016.

    c. Furthermore, the Student had behavioral concerns and was experiencing behavioral difficulties on the school bus, which were not referred to in the review of existing evaluation data nor the multidisciplinary evaluation team report. As indicated above by OSEP, as the Student was experiencing behavioral difficulties on the bus, this information should have been in

MDE_007692

the background information for the Student and been part of the consideration in regard to impact on education/instructional needs.

    d.    The four observations (two per staff) conducted for the Student were completed during classroom instruction, which is considered a structured setting. No observations were done in an unstructured setting, even though the teacher indicated the Student struggled with behavior during those settings. At least one observation per staff should have been conducted in an unstructured setting in order to gain a more balanced and accurate view of the Student's overall behavioral functioning.

18.    Regarding the thirteen files reviewed for Child Find, the following was found:

    a.    The standards used by the District for all eligibility areas reviewed were consistent with the IDEA and the MARSE, even though some were not applied correctly.

    b.    Four evaluations were comprehensive.

    c.    Nine evaluations were not comprehensive for the following reasons (see conclusion numbers 18d - h) :

    d.    For several students, only one eligibility area was considered, even though there were concerns across multiple areas. A school district must look at multiple eligibility areas to ensure the student is assessed in all areas of need.

    e.    For some students, evaluations for social/emotional/behavioral area included only observations. An actual evaluation, such as a behavior rating scale, should have been conducted in order to obtain more accurate information related to the underlying causes behind a students behavior.

    f.    For one student, conflicting information in the specific learning disability section stated that the student exhibited a pattern of strengths and weaknesses, however, the determination still said "false" in the eligibility standards. This speaks to a lack of understanding about the wording on the forms and how to make a correct determination.

    g.    For a couple of students, further evaluations/documentation was needed in order to make a determination. These students were then found ineligible rather than seeking to obtain the evaluations/documentation. School districts cannot shift their burden to arrange for a disability diagnosis onto a parent or fail to complete a full and comprehensive evaluation as they are required to provide the evaluations necessary to fulfill their Child Find responsibilities.

    h.    Of the nine evaluations that were not comprehensive, three students were found eligible and six students were not found eligible.

19.    For the purposes of removals of a child with a disability from the child's current educational placement under 34 CFR §§ 300.530

MDE_007693

through 300.535, a change of placement occurs if, the removal is for more than 10 consecutive school days; or the child has been subjected to a series of removals that constitute a pattern because the series of removals total more than 10 school days in a school year; because the child's behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals; and because of such additional factors as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another. 34 CFR § 300.536(a).

20. The public agency determines on a case-by-case basis whether a pattern of removals constitutes a change of placement. 34 CFR § 300.536(b)(1).

21. The District utilizes several different forms to document behavioral referrals for all students. The District also has a worksheet for determining patterns of removal based upon the behavioral referral documentation utilized within the District. According to the District, there is a process in place to record all this information and a team has been established to consider the information as well.

22. Within 10 school days of any decision to change the placement of a student with a disability because of a violation of a code of student conduct, the district, the parent and relevant members of the student's IEP team must review all relevant information in the student's file, including the student's IEP, any teacher observations, and any relevant information provided by the parents to determine if the conduct in question had a direct and substantial relationship to the student's disability or if the conduct in question was the direct result of the district's failure to implement the individualized education program. 34 CFR § 300.530(e)(1)(i).

23. If relevant members of the IEP Team and the parent make the determination that the conduct was a manifestation of the student's disability, the IEP Team must either conduct or review a functional behavioral assessment and implement a behavioral intervention plan for the student; or review the current behavioral intervention plan and modify it, as necessary, to address the behavior; and return the student to the placement from which the student was removed, unless the parent and the LEA agree to a change of placement as part of the modification of the behavioral intervention plan. 34 CFR § 300.530(f).

24. The manifestation determination review conducted May 15, 2017 did not include a review of the behavior intervention plan, as no behavior intervention plan revised on that date was submitted by the District.

25. Furthermore, a review of the IEP dated May 15, 2017 and several testimonies indicated that the placement of the Student was changed by the administrative staff of the District, without agreement from the Parent and that the Student was placed on a

MDE_007694

reduced schedule rather than returning him to the placement he was removed from.

26.    An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in accordance with 34 CFR §§ 300.320 through 300.324." 34 CFR § 300.22.

27.    A free appropriate public education (FAPE) means special education and related services that are provided in conformity with an IEP. 34 CFR § 300.17.

28.    Among other requirements, an IEP must include a statement of the child's current educational performance, articulate measurable educational goals, and specify the nature of the special services that the district will provide. 34 CFR § 300.320(a).

29.    Special education is defined as specially designed instruction intended to meet the unique needs of a child with a disability that can include vocational education. 34 CFR § 300.39(a).

30.    The IEP describes the child's individual needs and describes the proper placement and services designed to meet those unique needs. Schaffer v. Weast, 44 IDELR 150 (U.S. 2005).

31.    An IEP shall include a statement of measurable annual goals and short-term objectives. 34 CFR § 300.320(a)(2)(i) and R 340.1721e(1)(a).

32.    Supplementary aids and services must be described in terms of frequency, location and duration. 34 CFR § 300.320(a)(7).

33.    The 2006 Federal Register (Regulations), Analysis of Comments and Changes was reviewed, relative to 34 CFR § 300.320(a)(7). At page 46667 it states, in part: "What is required is that the IEP include information about the amount of services that will be provided to the child, so that the level of the agency's commitment of resources will be clear to parents and other IEP Team members."

34.    The IEP team is required to determine programs and services for a student with a disability. R 340.1721e(4).

35.    The public agency is required to ensure the placement decision is made by a group of persons, including the parent or other persons knowledgeable about the student and the placement decision. 34 CFR § 300.116.

36.    Each public agency must ensure that students with disabilities, to the maximum extent appropriate, are educated with nondisabled students and that removal of students with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 34 CFR § 300.114(a)(2).

37.    A review of the May 15, 2017 IEP indicated:

    a.    Neither annual goal listed in the IEP is measurable because the criteria listed in the annual goal does not match the criteria listed in the short-term objectives. The second annual goal and benchmarks contain wording that asks the Student

MDE_007695

to express his emotions in an "appropriate way." This is not a measurable skill.

b.  The supplementary aids and services do not include any specific information concerning the frequency of how often or when the accommodations and modifications should be implemented for the Student. This makes it difficult to determine how well each accommodation and modification is working and what type of adjustments should be made to assist the Student in being successful in school. Without this specific detail, it is difficult to see any connection between the supplementary aids and services and the Student's success in school. Subsequently, when the Student's behaviors continued after the April 26, 2017 IEP, rather than making changes to the Student's supplementary aids and services in response, consistent with the least restrictive environment provision from the IDEA, the District reduced the Student's school day. While the District did increase the number of consultative teacher consultant sessions per month, this was offset by the Student's inability to access his educational programming. In order for the supplementary aids and services to provide support for the Student, they need to be written so they can be measured, thereby assisting the IEP team in determining any changes that need to be made so the Student can be successful.

c.  The placement of the Student was changed during the manifestation determination review by the administrative staff without agreement from the Parent.

d.  A student with this level of need requires direct, individualized instruction. The emotional impairment consultant consultative services do not provide the Student the level of specialized instruction necessary for him to receive educational benefit.

Issue #2

38.  The public agency must obtain informed parental consent before conducting an initial evaluation. 34 CFR § 300.300(a)(1)(i).

39.  A review of the documentation and interviews with the District and the Complainant/Parent indicated:

a.  When the Complainant requested documentation from the District, the review of existing evaluation data form containing the consent for the Behavior Assessment System for Children, second edition evaluation was not included in the documentation. It is unclear why the District did not include this document in their submission to the Complainant if it actually existed. When asked about whether the Parent provided consent, a team member listed as a participant was unable to verify that consent had been provided.

40.  According to the Sixth Circuit, the Rowley Court established a two-part test to decide whether a FAPE was provided: (a) Has the

MDE_007696

state (i.e. public agency) complied with the procedures set forth in the IDEA; and (b) Is the IEP developed through the IDEA's procedures reasonably calculated to enable the child to receive educational benefit. The Supreme Court ruled that if the two-part test is satisfied, then courts can expect no more. Nack ex rel. Nack v. Orange City Sch. Dist.,454 F.3d 604, 614 (6th Cir. 2006) (citing Board of Education of the Hendrick Hudson Cent. Sch. Dist. V. Rowley, 553 IDELR 656 (1982). The U.S. Supreme Court recently clarified the standard for an appropriate IEP, stating "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. v. Douglas County Sch. Dist. RE-1, 69 IDELR 174 (U.S. 2017).

41.     The Court explained that this requirement [for a substantively adequate program of education] is satisfied, and a child has received a FAPE, if the child's IEP sets out an educational program that is "reasonably calculated to enable the child to receive educational benefits." For children receiving instruction in the regular classroom, this would generally require an IEP "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Endrew F. v. Douglas County Sch. Dist. RE-1, 69 IDELR 174 (U.S. 2017) (citing Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176 (1982)).

42.     The initial evaluation completed on November 9, 2016, was not comprehensive and the Student was removed for 49 days overall throughout the school year. Both of these violations impacted the overall ability of the Student to receive a FAPE.

**Decision:**

1.     Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§300.17 and 300.101. Specifically:

   a.     Whether the District enacted their Child Find obligation, to locate, identify, and evaluate students suspected of a disability for this Student, in accordance with 34 CFR §§ 300.111, 300.304 through 300.311 and R 340.1721a; and

   **The OSE determines a violation. The District did not conduct a comprehensive Child Find evaluation in November 2016.**

      i.     For all similarly situated students within the District.

   **The OSE determines a violation. Of the 13 Child Find evaluations reviewed for this complaint, nine of the evaluations were not comprehensive. Of those nine evaluations, six of the students were not found eligible.**

   b.     Whether the District implemented the discipline protections, pursuant to 34 CFR §§ 300.530 and 300.536, for this Student; and

   **The OSE determines a violation. The manifestation determination review changed the placement of the Student without agreement**

MDE_007697

**of the Parent. There is also is no indication that the behavior intervention plan was reviewed and revised.**

    i.    For all similarly situated students within the District.

**The District has a process in place to track the removals for students who have been removed due to behaviors. There is no violation.**

    c.    Whether the District, in collaboration with the Parent, developed, reviewed, and revised an individualized education program (IEP) that addressed the unique educational and behavioral needs of the Student in an IEP team meeting, consistent with 34 CFR §§ 300.116(a), 300.320 through 300.324, 300.501(c), and R 340.1721e.

**The OSE determines a violation. The IEP dated April 26, 2017, did not meet the unique educational needs of the Student.<br><br>Overall, in regard to a FAPE, the above violations rise to the level of a denial of a FAPE as the ability of the Student to receive educational benefit was impacted.**

2.    Whether the District followed the procedures and processes required by the IDEA and the MARSE. Specifically:

    a.    Whether the District obtained informed consent from the Parent prior to conducting the initial evaluation to determine if the Student was a student with a disability, in accordance with 34 CFR § 300.300(a) and R 340.1721.

**The OSE determines a violation. There is no indication that consent was provided prior to the Behavior Assessment System for Children, second edition evaluation being conducted.**

**Student Level Corrective Action Plan:**

1.    By October 15, 2017, the District must conduct a review of existing evaluation data and request parent consent to complete a functional behavior assessment of the Student. The functional behavior assessment must be conducted by an individual who is qualified and pre-approved by the OSE.

    a.    Once the functional behavior assessment has been completed, the District must review and revise the behavior intervention plan taking into consideration the findings from the functional behavior assessment.

    b.    By November 15, 2017, the District must submit a copy of the completed functional behavior assessment and behavior intervention plan.

2.    Conduct an IEP team meeting for the purpose of revising the Student's IEP consistent with the conclusions identified in this decision, that includes:

    a.    A present level statement that accurately reflects the Student's academic achievement and functional performance, including how the Student's disability affects the Student's involvement and progress in the general education curriculum, including information

MDE_007698

from the functional behavior assessment and the behavior intervention plan.

  b. Measurable annual goals and short-term objectives/benchmarks designed to meet the Student's needs that result from the disability to enable the Student to be involved in and make progress in the general education curriculum.

  c. Identification of the special education and related services and supplementary aids and services to be provided to the Student, including a clear description of the frequency and duration of the supplementary aids and services and specialized instruction to be delivered to the Student.

  d. The behavior intervention plan must be addressed in the IEP.

  e. Documentation for the newly-revised IEP shall be provided to the OSE by November 30, 2017, and will include copy of the:

   a. IEP invitation;

   b. IEP; and

   c. Written notice of the District's offer of a FAPE.

3. In collaboration with the Parent, the members of the IEP team, the District must develop a plan for providing 49 hours of compensatory services to address the Student's social-emotional/behavioral and/or academic needs. The plan could include participation in supervised group programs and/or activities with same age peers that provide the Student with the opportunity to work on social-emotional/behavioral and/or academic skills. Services provided are to be in addition to the regular school day and the requirements of the current IEP. The programs and activities can be directly provided by the District, or through private organizations, or agencies; however, they must be paid for by the District.

  a. A copy of the plan must be provided to the OSE by October 15, 2017.

  b. Compensatory services must be delivered by August 1, 2018.

  c. Documentation for compensatory services provided to the Student shall be provided to the OSE by August 15, 2018, and will include:

   a. A copy of the receipt(s) for services provided if a contractor is used.

   b. Service provider logs for the compensatory services indicating the dates, starting and ending times, length of sessions.

   c. If the Student is absent on a scheduled day, this session does not need to be made up. Any staff absences require a make-up session.

   d. Transportation logs or reimbursement receipts (if applicable).

**Corrective Action Plan:**

1. By December 1, 2017, in collaboration with the ISD, develop, review or revise the District's written procedures to ensure that, for this and all students, the District implements the provision of the IDEA and the MARSE specific to the areas of noncompliance listed above regarding:

MDE_007699

a.   Provision of a comprehensive evaluation for all students suspected of a disability;

b.   Requirements regarding manifestation determination reviews and changes in placement;

c.   Developing an IEP that addresses a student's unique educational and behavioral needs; and

d.   Obtaining prior consent for evaluations.

2.   For all six students identified under separate cover to the District:

a.   By September 30, 2017, with agreement from the parent(s), convene a review of existing evaluation data for each student to accurately identify all the assessments appropriate for the evaluation of the student.

b.   Complete the following activities maintaining legal timelines for each:

i.   Seek consent from the parent(s) to conduct the evaluation(s) as determined by the review of existing evaluation data;

ii.   Provide prior written notice to the parent(s) for the evaluation(s);

iii.   Conduct the evaluations after consent is given by the parent(s);

iv.   Conduct a multidisciplinary evaluation team meeting to make recommendations for all eligibility areas under consideration; and

v.   Conduct an IEP team meeting within 30 school days of receiving consent from the parent(s) and determine whether or not the student is eligible, consistent with R 340.1721b(1).

3.   By April 15, 2018, the District must provide professional development for all relevant staff regarding the new procedures.

4.   Evidence of change in the District's practice for district level corrective action must be provided and verified by the OSE through the Continuous Improvement Monitoring System (CIMS). This corrective action will appear in the October 2017 workbook.

Evidence of timely compliance and required submissions for Corrective Action Plans and Student Level Corrective Action Plans must be documented in Catamaran. Please direct questions regarding this complaint investigation to Joanne Winkelman at 517-335-0457 or winkelmanj@michigan.gov, and any questions regarding the corrective action to Harmonee Costello at 517-241-7082 or costelloh1@michigan.gov. All correspondence should be clearly marked as pertaining to case 17-0159.

Joanne Winkelman, Ph.D., Supervisor
Program Accountability
Office of Special Education

cc:   Cindy Green
      Laurie Montgomery

Case Number: 17-0159

MDE_007700

David Campbell
Mindy Miller
Miranda Hall