# EXHIBIT 24




OFFICE OF SPECIAL EDUCATION
SPECIAL EDUCATION COMPLAINT INVESTIGATION REPORT

**Complainant:**
Mr. George White

**Case Number:** 19-0088

**Public Agency:**
Michigan Department of Education
Office of Special Education
Rebecca McIntyre, Supervisor
Program Accountability
608 West Allegan
PO Box 30008
Lansing, MI 48909

**COMPLAINT DECISION AND PLAN FOR CORRECTIVE ACTION**

**District:**
Michael Rice, District Superintendent
Kalamazoo Public Schools
1220 Howard St
Kalamazoo, MI 49008-1882

**Case Manager:**
Yvette Lightbourn

**Date of Decision:**
July 2, 2019

On May 3, 2019, the Michigan Department of Education, Office of Special Education (OSE) received a special education complaint filed by Mr. George White (Complainant) on behalf of [redacted]. The complaint alleged that the Kalamazoo Public Schools (District), which is under the jurisdiction of the Michigan Department of Education (MDE), violated the Individuals with Disabilities Education Act (IDEA). Complaints may be filed by any individual or organization, in accordance with to 34 CFR § 300.153. The Complainant in this matter is a third party. A release of information from the Student's parent was not submitted; therefore, the OSE was not able to communicate directly with the third party during the investigation of this complaint. The third party Complainant will not receive a copy of this report but will be notified when the investigation has been concluded. Pursuant to the Code of Federal Regulations 34 CFR §§ 300.151 through 300.153 implementing the Individuals with Disabilities Education Act (IDEA), the OSE conducted an investigation into the allegations in this complaint. In compliance with the IDEA and Federal Regulations, the MDE issues the following Findings of Fact, Conclusions and Decision.

**Complaint Issues:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§ 300.17 and 300.101. Specifically:
   i. Whether the District fulfilled its ongoing child find responsibility as required by 34 CFR § 300.111, including conducting a reevaluation pursuant to 34 CFR §§ 300.303 though 300.311.

2. Whether the District followed the procedures and processes required by the IDEA and the MARSE. Specifically:
   i. Whether the District afforded the Parent the opportunity to examine records pursuant to 34 CFR §§ 300.501 and 300.613.

**Investigatory Process:**

Documents reviewed include:

Original state complaint document;
Educational records submitted by the District;
Educational records submitted by the Complainant;
Communication documentation submitted by the Complainant; and
Communication documentation submitted by the District.

Interviews were conducted with the following:

Parents; and
Multiple District staff.

The OSE provided the District and Complainant the opportunity to submit additional information for consideration during the investigation of this complaint.

**Applicable Federal Regulations or State Rules:**

| | |
|---|---|
| 34 CFR § 300.111 | Child find |
| 34 CFR § 300.301 | Initial evaluations |
| 34 CFR § 300.304 | Evaluation procedures |
| 34 CFR § 300.501 | Opportunity to examine records; parent participation in meetings |
| 34 CFR § 300.613 | Access rights |

**Relevant Time Period:**

Pursuant to 34 CFR § 300.153(c), the OSE has the authority to investigate allegations of violations that occurred not more than one year from the date the complaint was received. In light of this limitation, the investigation will be limited to the period of time from May 4, 2018 to May 3, 2019 for the purpose of determining if a violation of the IDEA or the MARSE occurred. However, records beyond this timeframe may be reviewed for the purpose of developing a complete record for the student.

**Findings of Fact:**

1. The Student was a 13-year-old seventh grader in the District during the 2018-2019 school year. The Student had been found ineligible for special education and related services during the 2017-2018 school year.
2. A review of existing evaluation data and evaluation plan meeting was held on March 15, 2018, for an initial evaluation, and included in relevant part:
   i. Previous evaluation team findings: At the time, the Student had 17 behavioral writeups. These included 11 instances of defiance of school personnel, two incidents of fighting, a single incident of inappropriate physical contact, failure to accept assigned consequences, intimidation, and participation in a disruptive gathering.
   ii. Classroom-based assessment and observations: The Student was failing five of

six classes. The Student's teachers reported the Student put forth little effort, the Student frequently failed to complete work in class and did not complete homework.

iii. Observation by teachers/providers of related services: The Student had failed several classes each marking period during the 2017-2018 school year. The Student was failing five of six classes. The Student had a D in life skills class with a percentage of 64 of the points earned. The Student had an F in strategic mathematics with 37 percentage points of points earned. The Student's other four classes were all F's, ranging from three to fourteen percent.

iv. Evaluations and input provided by Parent/guardian: In an interview with the school psychologist, the Student's mother expressed concerns regarding the Student's academic performance in school. The Parent also reported the Student's behavior could be poor at school. The Parent stated the Student had not previously been tested, and the Parent would like the Student evaluated for possible special education eligibility.

v. Evaluation needs: Whether the child had or continued to have a disability.

vi. Evaluation plan: Standard achievement testing, individual intelligence test and an adaptive behavior assessment to be completed only if the Student's intelligence test results were two or more standard deviations below average.

vii. District notice:

   a. Options considered: No special education evaluation.

   b. Reasons not selected: The team would like to rule out any special education eligibility.

viii. The Parent consented to the proposed evaluation plan by signature on March 23, 2018.

3. The Student's eligibility recommendation and multidisciplinary evaluation reports, both dated May 3, 2018, and the Student ineligible IEP, dated May 5, 2018, included in relevant part:

   i. The Parent was a participant.

   ii. Student strengths: In May of 2017, the Student's Fountas & Pinnell reading was at Level T, which was mid-fifth grade, during the Student's fifth grade year. Kaufman Test of Education Achievement (KTEA) reading achievement test results found a word identification standard score of 89 and a reading comprehension standard score of 87. This was at a level much higher than the Student's current performance in the classroom.

   iii. Parent/guardian concerns: The Student's Parent requested the evaluation because of concerns with the Student's academic progress. The Parent shared this information in an interview with the school psychologist. In addition, the Parent reported the Student's behavior could be poor at school. The Parent stated the Student had not been tested previously and would like for the Student to be evaluated for possible special education eligibility.

   iv. Current evaluations:

      a. As a sixth grader in the District, the Student was failing five of six classes. The Student's teachers reported the Student put forth little effort, the Student frequently failed to complete work in class and did not complete homework. The Student had a D in life skills class with a percentage of 64 of the points earned. The Student had an F in strategic mathematics with 37 percentage points of points earned. The Student's other four classes were all F's, ranging from three to fourteen percent.

b. The Student was administered the Wechsler Intelligence Scale for Children, 5th Edition (WISC-V) to ascertain the Student's current level of intellectual functioning. The WISC-V consisted of five cognitive indexes, which combined to yield an overall full-scale intelligence quotient (FSIQ) score. The Student's full-scale score was 75, which fell in the very low range, at the fifth percentile. Scale standard score/percentile:
   1. Verbal comprehension (VIQ) 86/18%;
   2. Visual spatial (VSI) 81/10%;
   3. Fluid reasoning (FRI) 74/4%;
   4. Working memory (WMI) 74/4%;
   5. Processing speed (PSI) 77/6; and
   6. Full scale intelligence quotient (FSIQ) 75/5% - the examiner noted: FSIQ should be interpreted with caution, as the Student put forth little effort on some tasks. Examiner impressions were the Student's VIQ score was more representation of the Student's actual intellectual ability.

c. The Student was administered the Kaufman Test of Education Achievement – third edition (KTEA-III) to determine current level of academic achievement.
   1. Word recognition - standard score of 89, late 4th to beginning 5th grade level and 21st percentile for age.
   2. Reading comprehension - standard score of 87, late 4th to beginning 5th grade level and 18th percentile for age.
   3. Composite reading score - standard score of 86 and 18th percentile for age.
   4. Mathematics concepts and applications - standard score of 76, mid-3rd grade 5th percentile for age.
   5. Mathematics computation - standard score of 75, late 3.2 grade level and 5th percentile for age.
   6. Mathematics achievement - standard score of 74 and 4th percentile for age.
   7. Spelling - standard score of 79 and 8th percentile for age.

v. Scores to determine specific learning disability:
   a. Oral expression score – no scores were reported for this subtest;
   b. Listening comprehension score - no scores were reported for this subtest;
   c. Written expression score - no scores were reported for this subtest;
   d. Basic reading score - standard score of 86 and 18th percentile for age;
   e. Reading fluency score - no scores were reported for this subtest;
   f. Reading comprehension score - standard score of 87, late 4th to beginning 5th grade level and 18th percentile for age;
   g. Mathematics calculation score - standard score of 75, late 3.2 grade level and 5th percentile for age; and
   h. Mathematics problem solving score - standard score of 76, mid-3rd grade 5th percentile for age.

vi. The Student was not eligible for special education:
   a. The MET recommended the Student did not meet the eligibility requirements for special education services as a learning-disabled student, as the Student's academic achievement was consistent with the Student's intellectual ability. The Student's academic achievement was impacted by

poor school attendance over the years, the Student missed approximately one year of academic instruction due to the Student's poor attendance. The Student's teachers reported during school year (2017-2018), the Student's lack of effort, work avoidance, frequent tardies and skipping classes was problematic. Additionally, the Student had numerous and significant behavior problems. Despite this, as recently as May of 2017, the Student's Fountas and Pinnell reading was at Level T (spring of 2017) which was mid-fifth grade, during the Student's fifth grade year.

b. The evidence did not support a pattern of strengths and weaknesses in academic performance, achievement, or both relative to age, state-approved grade level standards, or intellectual development determined by the group to be relevant to the identification of a special learning disability, using appropriate assessments.

4. Notice for provision of services and programs, dated May 8, 2018, included options or factors considered but not selected, the reason not selected, as follows: Special education service. The multidisciplinary evaluation team found the Student ineligible for special education services.
5. In addition, the multidisciplinary evaluation team report, dated May 3, 2018, included, in relevant part, a review of the Student's cumulative records:
   i. Kindergarten – achieving above average in all areas, with reading as a strength. Absent 12 days and tardy 2 days. Average citizenship.
   ii. First grade – at grade level in both reading and mathematics. Absent 29 days and tardy 33 days. Average citizenship.
   iii. Second grade – making slower progress and achievement was inconsistent. Absent 39 days and tardy an additional 19 days. Average citizenship.
   iv. Records are incomplete and it appears the Student attended 3rd grade outside the District.
   v. Fourth grade – good progress in reading and struggled in mathematics. Absent 33 days and tardy 34 days. Citizenship rated, low.
   vi. Fifth grade – Made slow progress and could do better. Absent 13 days and tardy 68 days. Citizenship rated, low.
      a. Summer school was recommended; however, the Student did not attend.
      b. It was noted as a part of the review of the Student's cumulative records: even though the Student's attendance was very poor, and the Student's behavior was becoming an increasing problem, the Student's end of 5th grade reading level, as per the Fountas and Pinnell system, was Level T (spring of 2017) which was mid-5th grade.
   vii. Sixth grade – The Student was failing five of six classes. The Student's teachers reported the Student put forth little effort, the Student frequently failed to complete work in class and did not complete homework. The Student currently had a D in life skills class with a percentage of 64 of the points earned. The Student had an F in strategic mathematics with 37 percentage points of points earned. The Student's other four classes were all F's, ranging from three to fourteen percent.
   viii. Northwest Evaluation Association (NWEA) testing in the spring of 2017 found the Student's mathematic score at the first percentile and reading at the fifth percentile. Since the Student's Fountas and Pinnell reading level was at grade level, the examiner's impressions were that the Student may have put forth minimal effort on state testing.

6. On April 24, 2019, the Parent advocate sent an e-mail to the District's special education director and communicated in relevant part:
   i. The Parent was told verbally, the Parent request for a new evaluation of the Student was denied and the Parent would receive verification in the mail.
   ii. The Parent asked the advocate to convey to the District a request for an independent educational evaluation (IEE). The Parent would send an e-mail confirmation of the request.
   iii. It appeared, as reported by the advocate, an evaluation was placed in the Student's file without the Parent's knowledge, the Parent received the evaluation after making a written request.
   iv. As reported by the advocate, the information in the evaluation appeared to indicate the Student should qualify for an IEP.
7. The Parents reported receiving a letter from the District before the 2018-2019 school year informing them the Student would be placed at an alternative learning program when the 2018-2019 school year began. The District reported any placement at the alternative learning program followed only after the exhaustion of interventions within the originating building and subsequent determination by staff working with the student that alternative learning program was an appropriate short-term alternative and opportunity for more intensive interventions. Placement of a student at alternative learning program was determined by child study/student assistance building teams as a component of the multi-tiered system of support tier III interventions for the District.
8. On April 24, 2019, the special education director asked the school psychologist via e-mail whether communication with this Parent occurred, as the Parent's advocate was stating the Student had been verbally denied an initial evaluation. The advocate did not mention in the e-mail communication who allegedly denied the Student an initial evaluation and the special education director was not aware of a request for evaluation in writing.
9. On April 24, 2019, the school psychologist for the 2018-2019 school year, responded via e-mail no communication with the Parent advocate had occurred and the school psychologist had plans to call the Parent the same day to ask questions about the evaluation. The school psychologist indicated being in the midst of crafting an e-mail to the special education director and two other District staff members to report the decision not to complete an evaluation, however, questioned the decision.
10. On April 24, 2019, the special education director responded to the Parent advocate's e-mail, thanking the Parent advocate for the "outreach" and indicated there were several inaccuracies in the e-mail communication to the District.
    i. The Parent was not told verbally or in writing the Student would not be evaluated. When the school team received the Parent's request in writing, it would be processed within ten school days.
    ii. The Parent received a copy of the evaluation documents from May 16, 2018.The District would send a copy of the signature page for the Parent's records.
    iii. The District was not contacted until April 16, 2019, via e-mail, to request another copy of the Student's evaluation completed in May 2018.
    iv. The school team would like to meet with the Parent and the Parent advocate, at the Parent's request, to address Parental concerns at the Parent's convenience.
11. On April 24, 2019, the Parent responded to the special education director's e-mail mentioning all meetings the Parent attended were due to the Student's behavioral issues returning back from suspensions. The Parent stated never attending any IEP meetings with any District staff members, including the evaluator.

12. On April 24, 2019, the special education director responded to the Parent, in relevant part:
    i. The process for evaluation for special education programs and services was followed by the team. The school psychologist completed an evaluation the previous school year, and the results indicated the Student was not eligible.
    ii. Being unable to speak to the communications from the school regarding the Parent's behavioral concerns.
    iii. The special education director's review of the District's documents indicated, during the 2017-2018 school year, the school psychologist spoke to the Parent and received the Parent's input as to why the Parent wanted the evaluation, as well as the Student's teachers, and completed all required testing. In addition, the Parent signed consent for a school-based evaluation on March 23, 2018. The review of the evaluation was conducted on May 8, 2018. The record indicated the Parent participated by telephone based on the logs and documents submitted to student services
    iv. The evaluation was completed almost a year ago and last week was the first request to student services the Parent made regarding the evaluation and the results.
    v. The evaluation that was attached to the e-mail communication and shared by the Parent's advocate was considered confidential. The evaluation, observation, and all of the test results were not something the District would share regarding a student to the school board, community members and news/media based on FERPA laws.
    vi. Asked the Parent to submit a request for evaluation in writing, not via e-mail, to the District in order for the District to respond in the legal and appropriate time frame.
13. On April 24, 2019, the Parent responded to the special education director via e-mail requesting the Student be evaluated for a learning disability.
14. On April 25, 2019, the special education director acknowledged the Parent's e-mailed request for a special education evaluation on Thursday, April 25, 2019, and advised the Parent to expect a response to the Parent's request within 10 school days, from the school team.
15. On April 25, 2019, both the Student's Parents e-mailed the special education director separately regarding incorrect information on student services paperwork, an impending court date and made a request for a meeting.
16. On April 25, 2019, the special education director responded to the Parent offering to explain:
    i. The District had a document signed by the Parent, dated March 23, 2018, for consent to evaluate the Student. By law, the District had 30 days to conduct the Student's evaluation. The results of the evaluation and the scheduled meeting to review the information was held on May 8, 2018, with the required IEP District staff members.
    ii. The documents from the meeting were mailed out to the Parent to a specific named street address on May 16, 2018 for the Parent's records.
    iii. The special education director informed the Parent the signed consent form from March 23, 2018 would be mailed out the same day of the April 25, 2019 e-mail, the team would be scheduling a meeting with the Parent to review the testing process and to give the Parent a copy of the procedural safeguards.
17. On April 25, 2019, the Parent responded to the special education director's e-mail,

expressing the desire to meet and review the documents.

18. The District provided a copy of the overnight mailing receipt which indicated a shipping date of April 26, 2019.
19. On May 1, 2019, the school psychologist communicated with the Parents via e-mail acknowledging receipt of the request for a special education evaluation for the Student. The school psychologist requested a meeting with the Parents to gather input and concerns regarding the Student and to obtain signed consent for the evaluation. Meeting times were offered for the following day, or Monday, May 6, 2019.
20. On May 4, 2019, the Parent responded to the school psychologist, stating the ability to meet on Monday, May 6, 2019.
21. The Student had 31 behavior incidents during the 2017-2018 school year:
    i. Participating in disruptive gatherings – one;
    ii. Fighting – two;
    iii. Failure to accept assigned consequences – two;
    iv. Defiance/disrespectful/insubordinate/non-compliant – one;
    v. Intimidation – one;
    vi. Harassment – one;
    vii. Inappropriate physical contact – two;
    viii. Inappropriate sexual comments/gesture – one; and
    ix. Defiance of school personnel – twenty.
22. The Student had 59 behavior incidents during the 2018 -2019 school year.
23. The District's student detail indicated the Student had eight days of suspension, however the Student's attendance records, not including June 2019, indicated 28 days of suspension for the 2018-2019 school year.
24. While outside of the investigation timeline, the Parent signed consent for a new evaluation on Monday, May 6, 2019.
25. The Parent also shared a copy of results from an outside evaluation with the District that was conducted on May 22, 2019 on May 30, 2019. The Parent and advocate indicated the report included diagnoses of attention deficient hyperactivity disorder and intellectual disability, mild.

**Conclusions:**

Issue 1i:

1. Districts are required to have in place policies and procedures to locate, identify and evaluate all students with disabilities. 34 CFR § 300.111(a).
2. Each public agency must conduct a full and individual initial evaluation, in accordance with §§ 300.305 and 300.306, before the initial provision of special education and related services to a child with a disability under this part. 34 CFR § 300.301(a).
3. In conducting the evaluation, the District must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining whether the child has a disability in accordance with 34 CFR § 300.304(b).
4. Districts are required to assess the child in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. 34 CFR § 300.304(c)(4).
5. According to the Sixth Circuit, a petitioner needs to prove that the school district "overlooked clear signs of disability" and were negligent in failing to order testing, or that there was "no rational justification for failing to evaluate." Bd. of Educ. of Fayette

County, Kentucky v. L.M., 47 IDELR 20122 (6th Cir. 2007), at para. 1, cert. denied, 110 LRP 48155, 128 S. Ct. 693 (2007) (citing Clay T. v. Walton County Sch. Dist., 952 F.Supp. 817, 823 (M.D.Ga.1997)).

6. We believe the Child Find and special education referral system is an important function of schools, LEAs, and States. School personnel should refer children for evaluation through the agency's child or special education referral system when the child's behavior or performance indicates that they may have a disability covered under the Act. US Dept. of Educ., Analysis and Comments, 71 Fed. Reg. 46727 (2006).
7. "Of course," an administrative law judge explained, "a parent who is a neophyte to special education and is unacquainted with IDEA cannot be expected to appear and say, 'My child is eligible for special education services under IDEA, and I am here to refer my child for an individual assessment.' A request for assessment is implied when a parent informs a school that a child may have special needs." Robertson County Sch. Sys. v. King, 24 IDELR 1036 (6th Cir. 1996, unpublished).
8. A comprehensive evaluation needed to be completed in all areas of suspected disability.
9. The District attempted to fulfill their child find obligation by completing an initial evaluation of the Student in the Student's 6th grade year. However:
    i. The Student's Parent requested an evaluation because, in addition to the lack of academic progress the Student was making, the Parent reported the Student's behavior could be poor at school. At the time of consent for evaluation, the Student had 17 behavioral writeups. The Student ended the 2017-2018 school year with 31 write ups.The Student's poor behavior was never addressed in the evaluation.
    ii. The District notice, prior to beginning of the evaluation, indicated: "The team wanted to rule out any special education eligibility." The evaluation plan included a standard achievement testing, individual intelligence test and an adaptive behavior assessment to be completed only if the Student's intelligence test results were two or more standard deviations below average. The assessments conducted did not provide evaluative data to consider or support the significant behavioral concerns and lack of attendance/truancy in the school setting or additional eligibility considerations, such as other health impairment or emotional impairment. The evaluation was therefore not comprehensive.

Issue 2i:

1. The District must permit Parents to inspect and review any education records relating to their child that are collected, maintained, or used by the District. The District must comply with a request to inspect and review any education records without unnecessary delay and in no case more than 45 calendar days after the request is made. OSEP Procedural Safeguards model form, June 2009 and 34 CFR § 300.613(a).
2. The IDEA grants parents the right to inspect and review all educational records with respect to the identification, evaluation, educational placement, and the provision of FAPE to the child. 34 CFR § 300.501 (a).
3. The right to inspect and review education records includes the right to request the agency to provide copies of the records if doing so would effectively prevent the parent from exercising the right to inspect and review the records. 34 CFR §300.613(b).
4. The District provided the Parent the right to inspect and review the Student's educational records and provided the Parents with copies as documented by e-mails between the Parent and the District acknowledging receipt and copies of overnight mail.

Overall FAPE

1. A FAPE means special education and related services that are provided in conformity with an IEP. 34 CFR § 300.17(d).
2. According to the Sixth Circuit, the Rowley Court established a two-part test to decide whether a FAPE was provided: (a) Has the district complied with the procedures set forth in the IDEA; and (b) did the child receive educational benefit. The Supreme Court ruled that if this two-part test is satisfied, then courts can expect no more. Nack ex rel. Nack v. Orange City Sch. Dist.,454 F.3d 604, 614 (6th Cir. 2006) (citing Board of Education of the Hendrick Hudson Cent. Sch. Dist. V. Rowley, 553 IDELR 656 (1982).
3. Failing to meet Child Find requirements is a matter of serious concern that can deny FAPE to a student whom a district should have identified. This failure to identify may entitle the student to compensatory education or tuition reimbursement accruing from the time the district first should have suspected the disability. T.B. v. Prince George's County Bd. of Educ., (4th Cir. 2018); Robertson County Sch. Sys. v. King, (6th Cir. 1996, unpublished); Lakin v. Birmingham Pub. Schs., (6th Cir. 2003); and Department of Educ. v. Cari Rae S., (D. Hawaii 2001).
4. Given the District did not conduct a comprehensive initial evaluation and therefore were not compliant with the procedures set forth in the IDEA. For the 2018 - 2019 school year, the Student did not progress adequately in general education and continued to have significant behavioral referrals/removals. The Student's learning and educational benefit was negatively impacted.
5. If the Student is found eligible for special education services, the violation rises to a denial of a FAPE.

**Decision:**

1. Whether the District provided the Student a free appropriate public education (FAPE) pursuant to 34 CFR §§ 300.17 and 300.101. Specifically:
   i. Whether the District fulfilled its ongoing child find responsibility as required by 34 CFR § 300.111, including conducting a reevaluation pursuant to 34 CFR §§ 300.303 though 300.311.

   **The District did not conduct a comprehensive evaluation and therefore did not fulfill their child find obligation. The MDE determines a violation.**
2. Whether the District followed the procedures and processes required by the IDEA and the MARSE. Specifically:
   i. Whether the District afforded the Parent the opportunity to examine records pursuant to 34 CFR §§ 300.501 and 300.613.

   **The District provided the Parents the opportunity to examine records and provided the Parents with copies of the Student's records. The MDE determines no violation.**

**Student Level Corrective Action Plan:**

If the District has not already done so, within 30 school days, or no later than the dates indicated below, the District must provide student level corrective action as follows:

1. By July 26, 2019, consistent with the conclusions outlined in this final decision, conduct a review of existing evaluation data to:
   i. Review all relevant Student data from the Student's educational file, including input from the teacher and the Parent(s);

   ii. Identify all of the Student's special education and related service needs;
   iii. On the basis of the review, determine the evaluations that need to be conducted, consistent with 34 CFR § 300.304 through 300.311, if any;
   iv. If evaluations were identified, seek consent from the Parent to conduct the evaluation(s) as determined at the review of existing evaluation data; and
   v. Provide prior written notice to the Parent for the evaluation(s) or for a determination that no additional evaluations were needed, including the reasons for the determination.

2. By September 6, 2019, consistent with the conclusions outlined in this final decision, conduct a full and individual initial evaluation that is sufficiently comprehensive to identify all of the Student's special education and related service needs, whether or not commonly linked to the disability category in which the Student is suspected as outlined in the review of existing evaluation data, after consent is provided by the Parent, in the following areas of need, as appropriate:
   i. Achievement, social/emotional/behavioral, adaptive skills, cognitive ability, and any other relevant areas of need; and
   ii. A functional behavioral assessment and behavior intervention plan, as appropriate.
3. By September 6, 2019, conduct a multidisciplinary evaluation team meeting to make a recommendation to the IEP team regarding eligibility, and if eligible, identify the educational needs of the Student consistent with the MARSE and the IDEA requirements.
4. By September 6, 2019, conduct an IEP team meeting to determine eligibility. If eligible, develop an IEP that includes:
   i. A present level statement that accurately reflects the student's academic achievement and functional performance, including how the student's disability affects the student's involvement and progress in the general education curriculum.
   ii. Measurable annual goals and short-term objectives designed to meet the student's needs that result from the disability to enable the student to be involved in and make progress in the general education curriculum. The goal/objectives must contain the following components:
      a. Baseline data
      b. Time frame or date
      c. Skill that can be counted or observed (skill/behavior)
      d. A measurement or assessment strategy (measurement/conditions)
      e. Level of attainment to show mastery (accuracy rate/criteria)
   iii. Identification of the special education and related services and supplementary aids and services to be provided to the student.
   iv. A clear description of the frequency, location and duration of the supplementary aids and services.
5. If the Student is found eligible, by September 13, 2019, in collaboration with the Parent and the members of the IEP team, the District must develop a plan for providing 100 hours of compensatory services to address the Student's social emotional/behavioral and/or academic needs. Services provided are to be in addition to the regular school day and the requirements of the current IEP. The plan could include participation in supervised group programs and/or activities with same age peers that provide the Student with the opportunity to work on social-emotional/behavioral and/or academic skills. Services must be delivered no later than April 1, 2020.



PLAINTIFFS 00005441

Evidence of the compensatory services ordered in the student level corrective action plan will be reviewed during the district corrective action verification process. See below for compensatory education requirements.

**Corrective Action Plan:**

The district must revise or develop procedures regarding child find, as needed, by January 15, 2020 to document and ensure that:

1. Child Find obligations are met for all students in the District.

The district must provide professional development by January 15, 2020 for all relevant staff regarding the new procedures.

Evidence of change in the district's practices must be provided and verified by the OSE.

The ISD must upload evidence of the implementation of the compensatory services plan into the technical assistance notes in the district's corrective action plan to be reviewed during the verification process. Documentation must include:

1. Services must be delivered outside the regular school day.
2. A copy of the receipt(s) for services provided if a contractor is used.
3. Service provider logs for the compensatory services indicating the dates, starting and ending times, length of sessions, student absences, make up sessions and a short summary of instruction completed for each session by upload into Catamaran.
4. If the Student is absent on a scheduled day, this session does not need to be made up. Any staff absences require a make-up session.
5. Transportation logs or reimbursement receipts (if applicable).

Evidence of timely compliance and required submissions for Corrective Action Plans and Student Level Corrective Action Plans must be documented in Catamaran. Please direct questions regarding the complaint investigation to Rebecca McIntyre at 517-335-0457 or mcintyrer1@michigan.gov, and any questions regarding the student level corrective action to Harmonee Costello at 517-241-7082 or costelloh1@michigan.gov. All correspondence should be clearly marked as pertaining to case 19-0088.

Rebecca McIntyre, Supervisor
Program Accountability
Office of Special Education

cc: Iesha Williams
Reuquiyah Saunders
Mindy Miller
David Campbell
Tori Wentela
Jordan Bullinger, Clark Hill PLC