# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONQUARION LEWIS; KE'AUJANAA
SHEPHERD-FRIDAY; and K.B., by and
through her parent and next friend H.B.,

          Plaintiffs,

     v.

MICHIGAN DEPARTMENT OF
EDUCATION,

          Defendant.

Case No. 22-cv-00838-RJJ PJG

Hon. ROBERT J. JONKER

MAG. PHILLIP J. GREEN

**PLAINTIFFS' CORRECTED RESPONSE
IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

Erin H. Diaz (P80388)
Mitchell D. Sickon (P82407)
Disability Rights Michigan
*Attorneys for Plaintiffs*
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755
ediaz@drmich.org
msickon@drmich.org

Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Salvatore Prescott Porter & Porter
*Attorneys for Plaintiffs*
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@sppplaw.com
fegley@sppplaw.com

Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER LLP
*Attorney for Plaintiffs*
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com

Jacquelyn N. Kmetz (P83575)
MI AECRES
*Attorney for Plaintiffs*
P.O. Box 705
Ludington, Michigan 49431
(231) 794-2379
jkmetz@miaecres.org

Ticara D. Hendley (P81166)
Kathleen A. Halloran (P76453)
Neil Giovanatti (P82305)
*Attorneys for Defendant*
Michigan Department of
of Attorney General
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
hendleyt1@michigan.gov
giovanattin@michigan.gov
zacka@michigan.gov

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................... ii

INDEX OF AUTHORITIES ................................................................................... iv

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................... 2

   A.   State Responsibilities under the Special Education Laws ............................... 2

         i.   IDEA .................................................................................................. 2

         ii.  Section 504 of the Rehabilitation Act ............................................... 6

         iii. Title II of the ADA ........................................................................... 7

   B.   MDE's Long-Standing Partnership with Pingora Consulting ......................... 7

   C.   Early KPS State Complaint Decisions of Child Find Noncompliance ............ 8

   D.   Plaintiffs' Experience at KPS ...................................................................... 18

III.  ARGUMENT ............................................................................................ 28

   A.   MDE Failed to Discharge its Supervisory Responsibilities Under the IDEA ............. 28

         i.   MDE Denied Plaintiffs a FAPE. ..................................................... 29

         ii.  MDE's State Complaint System Was Broken in 2016 ................... 38

         iii. MDE's State Complaint System Remains Broken ......................... 39

         iv.  Plaintiffs' IDEA Claims are Not Moot. .......................................... 41

   B.   MDE also Violated the Rehabilitation Act and the ADA .............................. 44

         i.   Section 504's Private Right of Action May be Used to Challenge
              MDE's Violations of the IDEA Denied Plaintiffs a FAPE. ................... 46

         ii.  Plaintiffs Have Established a Violation of Section 504/Title II ..................... 47

         iii. Plaintiffs Are Entitled to Compensatory Relief, Regardless of
              the Intent Standard Applied ............................................................ 50

         iv.  Plaintiffs Are Entitled to Injunctive Relief .................................... 52

v.  MDE Has Waived its Right to Assert 11th Amendment Immunity.................. 56

IV.     CONCLUSION ......................................................................................................... 58

# INDEX OF AUTHORITIES

**Cases** <span style="float:right">Page</span>

*A.B. by and through K.B. v. Michigan Department of Education,*
    570 F. Supp. 3d 531 (W.D. Mich. 2021) ............................................................... 42-43, 52

*Ability Center of Toledo v. City of Sandusky,*
    385 F.3d 901 (6th Cir. 2004) ....................................................................................48

*A.G. v. Paradise Valley Unified Sch. Dist. No. 69,*
    815 F.3d 1195 (9th Cir. 2016) ..................................................................................48

*A.J.T. v. Osseo Area Sch.,*
    No. 24-249, 2025 WL 226839 (U.S. Jan. 17, 2025) ...............................................51

*Alexander v. Choate,*
    469 U.S. 304 (1985) .............................................................................................46-47

*Anderson v. City of Blue Ash,*
    798 F.3d 338 (6th Cir. 2015) ....................................................................................45

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................................28

*Barnes v. Gorman,*
    536 U.S. 181 (2002) .................................................................................................46

*Barnett v. Memphis City Schools,*
    113 F. App'x 124 (6th Cir. 2004) .............................................................................53

*Bd. of Sch. Comm'rs of Indianapolis v. Jacobs,*
    420 U.S. 128 (1975)..................................................................................................54

*Bennett v. Hurley Med. Ctr.,*
    86 F.4th 314 (6th Cir. 2023) ....................................................................................45

*Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley,*
    458 U.S. 176 (1982)...........................................................................................29, 37

*Cole v. Oroville Union High Sch. Dist.,*
    228 F.3d 1092 (9th Cir. 2000) ..................................................................................54

*Curry v. Sch. Dist. of the City of Saginaw,*
    452 F. Supp. 2d 723 (E.D. Mich. 2006) ..................................................................54

*Doe By and Through Doe v. Board of Education of Tullahoma City Schools*,
 9 F.3d 455 (6th Cir. 1993) .................................................................................3

*Douglas v. Muzzin*,
 2022 WL 3088240 (6th Cir. Aug. 3, 2022) ......................................................51

*D.R. v. Michigan Dep't of Ed.*,
 No. 16-13694, 2017 WL 4348818 (E.D. Mich. Sept. 29, 2017).......................56

*Endrew F. ex rel. Joesph F. v. Douglas County Sch. Dist. RE-1*,
 580 U.S. 386 (2017)...............................................................28, 30, 32, 36, 47

*Finley v. Huss*,
 102 F.4th 789 (6th Cir. 2024) ...........................................................................45

*Hall v. United States Postal Service*,
 857 F.2d 1073 (6th Cir. 1988) ...........................................................................46

*Hill v. Bradley Cnty. Bd. of Educ.*,
 295 F. App'x 740 (6th Cir. 2008) ......................................................................44

*Honig v. Doe*,
 484 U.S. 305 (1988)...........................................................................................55

*Hunt v. Cromartie*,
 526 U.S. 541 (1999)...........................................................................................28

*I.L. through Taylor v. Knox Cnty. Bd. of Educ.*,
 257 F. Supp. 3d 946 (E.D. Tenn. 2017).............................................................51

*Jones v. City of Detroit, Michigan*,
 20 F.4th 1117 (6th Cir. 2021) ...........................................................................44

*Knox County TN v. MQ*,
 62 F.4th 978 (6th Cir. 2023)..............................................................................51

*Malkentzos v. DeBuono*,
 102 F.3d 50 (2d Cir. 1996) ................................................................................54

*Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys.*,
 No. 3:22-CV-00675, 2023 WL 4633905 (M.D. Tenn. July 19, 2023) ..............35

*Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys.*,
 No. 3:22-CV-00675, 2023 WL 11693271 (M.D. Tenn. Sept. 27, 2023)...........35

*Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys.*,

No. 3:22-CV-00675, 2024 WL 2245117 (M.D. Tenn. Apr. 22, 2024) .............................34

*Matthew B. by & through G.F. v. Clarksville-Montgomery Cnty., Tennessee Sch. Sys.*,
    No. 24-5478, 2024 WL 3839833 (6th Cir. Aug. 1, 2024)...........................................34, 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................28

*McBride v. Michigan Dep't of Corr.*,
    No. CV 15-11222, 2015 WL 13221229 (E.D. Mich. Oct. 30, 2015)...............................58

*Mingus v. Butler*,
    591 F.3d 474 (6th Cir. 2010) ...............................................................................58

*Moreno v. Consolidated Rail Corp.*,
    99 F.3d 782 (6th Cir. 1996) .................................................................................46

*Moseley v. Bd. of Educ. of Albuquerque Pub. Schs.*,
    483 F.3d 689 (10th Cir. 2007) ..............................................................................54

*Mote v. City of Chelsea*,
    284 F. Supp. 3d 863 (E.D. Mich. 2018) .....................................................................7

*MX Group Inc. v. City of Covington*,
    293 F.3d 326 (6th Cir. 2002) ..........................................................................48-49

*Nihiser v. Ohio EPA*,
    269 F.3d 626 (6th Cir. 2001) ...............................................................................56

*Parks v. LaFace Records*,
    329 F.3d 437 (6th Cir. 2003) ...............................................................................28

*Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*,
    276 F.3d 808 (6th Cir. 2001) ...............................................................................58

*Powell v. McCormack*,
    395 U.S. 486 (1969)........................................................................................41-42

*Reid ex rel. Reid v. District of Columbia*,
    401 F.3d 516 (D.C. Cir. 2006) ..........................................................................4, 5, 42

*Roell v. Hamilton Cnty.*,
    870 F.3d 471 (6th Cir. 2017) ...............................................................................45

*Saqr v. University of Cincinnati*,
    2019 WL 699347 (6th Cir. 2019) ...........................................................................57

*S.B. by & through M.B. v. Lee,*
    566 F. Supp. 3d 835 (E.D. Tenn. 2021)................................................................47

*Schroeder v. AT&T Mobility Servs.,*
    568 F. Supp. 3d 889 (M.D. Tenn. 2021) .........................................................45

*Smith v. Kalamazoo Pub. Sch.,*
    703 F. Supp. 3d 822 (W.D. Mich. 2023)................................................36

*Somberg o/b/o Somberg v. Utica Comm. Schs.,*
    908 F.3d 162 (6th Cir. 2018)................................................................5, 53

*St. Tammany Parish Sch. Bd. v. Louisiana,*
    142 F.3d 776 (5th Cir. 1998)................................................................42

*Tennessee v. Lane,*
    541 U.S. 507 (2004)................................................................56

*Thomas v. Cincinnati Bd. of Educ.,*
    918 F.2d 618 (6th Cir. 1990)................................................................4

*Timothy O. v. Paso Robles United Sch. Dist.,*
    822 F.3d 1105 (9th Cir. 2016)................................................................30

*Traynor v. Turnage,*
    485 U.S. 535 (1988) ................................................................46

*Ullmo ex. rel Ullmo v. Gilmour Academy,*
    273 F.3d 671 (6th Cir. 2001)................................................3, 29, 42

*Waskul v. Washtenaw County Comm. Mental Health,*
    979 F.3d 426 (6th Cir. 2020)................................................................46

*W.H. et al. v. Tennessee Dep't of Educ.,*
    No. 3:15-1014, 2016 WL 236996 (M.D. Tenn. Jan. 20, 2016)........................52

*William A. by and through E.A. v. Clarksville-Montgomery County Sch. Sys.,*
    127 F.4th 656 (2025) ................................................................36, 53

*Wise v. Ohio Dep't of Educ.,*
    80 F.3d 177 (6th Cir. 1991)................................................................3

*Z.B. v. District of Columbia,*
    888 F.3d 515 (D.C. Cir. 2018)................................................................30

**Statutes**

20 U.S.C. § 1400(d)(1)(A)..............................................................2, 49

20 U.S.C. § 1412................................................................3, 29

20 U.S.C. § 1414(a)(1)..........................................................2-3

20 U.S.C. § 1415..................................................................42

20 U.S.C. § 1416(a)(1)(C)..........................................................6

20 U.S.C. § 1416(a)(2)..............................................................6

20 U.S.C. § 1416(a)(3)..............................................................6

20 U.S.C. § 1416(d)................................................................6

29 U.S.C. § 794(a)................................................................6

**Rules**

Fed. R. Civ. P. 56(a)................................................................27

**Regulations**

28 C.F.R. § 35.108................................................................25

28 C.F.R. § 35.130(b)(7)..........................................................49

34 C.F.R. § 300.151(b)..............................................................2

34 C.F.R. § 300.111..............................................................2, 3

34 C.F.R.§ 300.151(b)(1)............................................................4

34 C.F.R. § 300.151(b)(2)....................................................5, 37, 48

34 C.F.R. § 300.153................................................................26

34 C.F.R. § 300.301-311..........................................................2, 3

34 C.F.R. § 300.304(c)(6)............................................................3

34 C.F.R. § 303.700(e)..............................................................4

34 C.F.R. § 600(e)................................................................4

71 Fed. Reg. 46601, 46605............................................................4

MARSE R 340.1851-1855......................................................2, 5, 26

**Other authorities**

Mark C. Weber, *Accidentally on Purpose: Intent in Disability Discrimination Law*, 56 B.C. L. Rev. 1417 (2015)..............................................................44, 51

*State General Supervision Responsibilities Under Parts B and C of the IDEA*, OSEP QA 23-01, Question B-13, issued July 24, 2023 ..............................................................................4

## I.  INTRODUCTION

***

What happens to a dream deferred?

> — Langston Hughes, excerpt of "Harlem" from *The Collected Works of Langston Hughes* (University of Missouri Press, 2002)

***

The origins of this lawsuit date back to 2016, when the Michigan Department of Education (MDE) learned that its system of general supervision, including its state complaint system, was not compliant with the Individuals with Disabilities Education Act (IDEA). A special education consulting firm, Pingora Consulting (Pingora), had provided MDE with a report detailing the several areas where MDE was out of compliance.

In 2017, MDE first found Kalamazoo Public Schools (KPS) out of compliance for systemic failures relating to its IDEA obligation to identify and appropriately evaluate students with disabilities. At that time, Disability Rights Michigan (DRM) had already filed a systemic state complaint against KPS, and subsequently, other advocates and parents filed numerous additional state complaints. In short order, MDE had issued multiple decisions finding KPS noncompliant in the same area, each with orders for KPS to comply with its Child Find obligations. But KPS repeatedly failed to do so.

The explanation is simple, and a reasonable jury could well find it convincing. MDE's system of correcting noncompliance was broken, and it was trying to fix evaluation problems at KPS with tools that didn't work. Ex. 1, Mlawer Decl. ¶¶ 13, 28, 29. The problems persisted, and Plaintiffs were failed by a school system that could not meet their individual needs because KPS had not properly evaluated them.

MDE's Assistant Director in its Office of Special Education (OSE) testified that one of her

office's primary responsibilities is to work "on corrective action and making sure that the corrective action . . . was aligned with and getting to the root of the problem . . . identified in the state complaint." Ex. 2, McIntyre Dep. at 14:22-15:1. And the IDEA requires that once noncompliance is found, the state must both correct any student-specific issues *and* correct those issues for all *future* students. 34 C.F.R. § 300.151(b).

MDE was not powerless to monitor and correct the systemic noncompliance at KPS. MDE had other tools that would have been more effective, but it failed to use them. Ex. 1, ¶¶ 31, 35. Pingora provided training to MDE over and over, pushing the idea that repeat noncompliance requires different treatment. The state rules for special education, even in 2016, laid out a series of graduated sanctions to bring school districts into compliance with the law. *See* MARSE for Spec. Educ., R 340.1855. Inexplicably, MDE did not apply any graduated sanctions. Ex. 1, ¶ 35. As a result, Plaintiffs never received the education they were entitled to under the law—resulting in a dream not just deferred, but a dream denied.

## II.  STATEMENT OF FACTS

### A.  State Responsibilities under the Special Education Laws

#### i.    IDEA

The purpose of the Individuals with Disabilities Education Act (IDEA) is to "ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To understand each student's "unique needs," the IDEA requires full and individual initial evaluations of each student who might be eligible for special education. 20 U.S.C. § 1414(a)(1); 34 C.F.R. §§ 300.111 and 300.301-311. IDEA also requires periodic reevaluations to

ensure that schools continue to understand students with disabilities and their "unique needs" throughout their educational career. Each school must ensure that every evaluation "is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

While MDE is correct that much of IDEA's requirements fall on Local Educational Agencies (LEAs), *i.e.* local school districts, IDEA places the ultimate responsibility for its implementation on the State Education Agency (SEA), here MDE. 20 U.S.C. § 1412; *Ullmo ex. rel Ullmo v. Gilmour Academy*, 273 F.3d 671, 678-79 (6th Cir. 2001) (in exchange for receiving IDEA funds, SEAs "must abide by a host of regulations governing the provision of education services") (citing *Wise v. Ohio Dep't of Educ.*, 80 F.3d 177, 181 (6th Cir. 1991)); Ex. 3, MDE-OSE Role and Responsibility, MDE_00001553. In return for federal funding, an SEA must have in effect "policies and procedures to ensure" that a FAPE is available to all children within the state, including those suspended or expelled. 20 U.S.C. § 1412. MDE must also ensure that students with disabilities in need of special education and related services are "identified, located, and evaluated." 20 U.S.C. § 1412(a)(3). This, along with the requirements for a full, initial evaluation, 20 U.S.C. § 1414(a)(1); 34 C.F.R. §§ 300.111 and 300.301-311, is the Child Find duty. *Id.*

In addition to the statute and the regulations passed pursuant to the IDEA, the Michigan Administrative Rules for Special Education (MARSE) are an enforceable extension of the IDEA, incorporated as state standards that enlarge the scope of MDE's responsibility. *Doe By and Through Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455, 457 (6th Cir. 1993) (stating, in the Sixth Circuit it is "settled" that violations of any state law that enlarge the scope of an educational agency's obligations are still enforceable under IDEA, even if federal law is

satisfied) (citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990) (stating it is "beyond cavil that the federal [IDEA] standard explicitly incorporates some of a state's substantive law")).

MDE is required to ensure that KPS, like any other LEA, follows the IDEA. ECF No. 80, PageID.410-411. MDE's state complaint system was created pursuant to 34 C.F.R. §§ 300.151-53. The U.S. Department of Education has described this system as "critical to each State's exercise of its general supervision responsibilities" as it is a "powerful tool to identify and correct noncompliance" with IDEA. 71 Fed. Reg. 46601, Aug. 14, 2006. State complaints are "intended to be less adversarial" than due process complaints and hearings. 71 Fed. Reg. 46605, Aug. 14, 2006. State complaints allow parents and other lay advocates to request that MDE investigate claims of noncompliance without the expense of an attorney.

If noncompliance is found, MDE "must ensure . . . the noncompliance is corrected as soon as possible, and in no case later than one year after the [MDE's] written notification of noncompliance." *State General Supervision Responsibilities Under Parts B and C of the IDEA*, OSEP QA 23-01, Question B-13, issued July 24, 2023 (citing 34 C.F.R. §§ 600(e) and 303.700(e)), available at https://perma.cc/Q76L-NMSR (last accessed April 8, 2025). To ensure that an LEA has corrected its noncompliance, MDE must do two things. First, it must ensure that any noncompliance is corrected for any student directly at issue. 34 C.F.R.§ 300.151(b)(1). This typically involves a student-level corrective action plan (SLCAP), which MDE outlines in a complaint decision but is finalized and delivered by the LEA, in collaboration with the student or the student's parent. If the student was deprived of a FAPE, then the SLCAP provides the student with compensatory education to address the violation. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2006) (stating compensatory education should be "reasonably

calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place"); *accord Somberg o/b/o Somberg v. Utica Comm. Schs.*, 908 F.3d 162, 176-78 (6th Cir. 2018) (citing *Reid* and approving district court's 1,200-hour compensatory education award).

Second, MDE must also ensure that the school district in question has corrected its practices to safeguard the "*future* provision of services for *all* children with disabilities." 34 C.F.R. § 300.151(b)(2) (emphases added). This obligation entails a district-level corrective action plan (CAP). Ex. 4, Brady Dep. 16:6-7. With a local intermediate school district (ISD) representative acting as a liaison, MDE supervises the local district, with a goal of correcting the noncompliance through the CAP's requirements. Ex. 4, 89:3-90:3; Ex. 5, MDE and ISD Responsibilities, MDE_00001562-1564. In this way, MDE should ensure that the LEA has changed its practices for "all children with disabilities." *Id.* at MDE_00001562-1564.

When an LEA engages in repeated noncompliance, Section 8 of the MARSE clarifies MDE's enforcement responsibilities. *See* MARSE R 340.1851-1855. If an LEA, such as KPS, "fails to correct known violations of law in a timely manner . . . or *continues repetition of similar violations*, the [MDE] *shall* do 1 or more of the following . . ." (emphases added). The rule provides several examples of enforcement actions, such as withholding state or federal funds, directing an intermediate school district to step in to provide services, or imposing other penalties under Michigan's Revised School Code. *See* MARSE 340.1855.

As a recipient of IDEA funds, MDE also has responsibilities to submit a yearly annual performance report (APR) that updates its progress on its state performance plan (SPP). *See* Ex. 6, MDE-OSE Overview 2025, p. 3-4, available at https://perma.cc/2XS4-X2TJ (last accessed April 5, 2025). Each year, MDE, like all SEAs, submits an IDEA Part B SPP/APR to the U.S.

Department of Education's Office of Special Education Programs (OSEP), and OSEP uses the SPP/APR to help determine a state's compliance with IDEA. Based on its determination, OSEP can find states compliant or order different levels of assistance or intervention if noncompliant. *See* 20 U.S.C. § 1416(d).

While it is the responsibility of MDE-OSE's Program Accountability Unit (PAU) to "administer[] the state complaint and due process" systems, Ex. 6 at 16, "[m]uch of the Performance Reporting Unit (PRU) work focuses on the data collection and reporting of the SPP/APR Performance Indicators." *Id.* at 13. MDE's PRU is also charged with the required work of proactively monitoring local school districts outside of any responsibility for the SPP/APR. *Id.* at 15; 20 U.S.C. §§ 1416(a)(1)(C), (a)(2)- (3). MDE was repeatedly advised to bring its monitoring activities, supervised by the PRU, into concert with its state complaint system, supervised by the PAU, so that the two systems could reinforce and support each other. Ex. 11, Pingora Report 2016, at MDE_00001210-1211 (Recommendation #3), and Ex. 12, Pingora Report 2021, at MDE_00001231-1233.

### ii.    Section 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act of 1973 (Section 504) is broader than the IDEA. Its purpose is to prevent discrimination in the provision of services to all individuals with disabilities. Section 504's overall goal is to ensure that "[n]o otherwise qualified individual with a disability… shall, solely by reason of her or his disability, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). MDE is one such program.

### iii.     Title II of the ADA

In reviewing claims filed under Title II of the ADA, courts typically refer to the protections in Section 504, as the ADA was modeled after Section 504. MDE's brief treats the two claims alike, and Plaintiffs will follow the same convention, as many courts in the Sixth Circuit have done. *See, e.g. Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 876 (E.D. Mich. 2018) (explaining that federal courts have long recognized that Title II was modeled after Section 504).

### B.  MDE's Long-Standing Partnership with Pingora Consulting

In February 2016, Pingora issued a report MDE had commissioned to evaluate its special education general supervision system. Def. Brief, PageID.435-436; Ex. 13, Knudtson Dep. 25:16-29:2; Ex. 11. Pingora employs two people—Stephanie Weaver, whose expertise focuses on "school district finances," and Lenore Knudtson, whose expertise is in "legal matters." Ex. 13 at 10:24-11:4, 26:10-17, 27:6-10.

In this case, MDE hired Knudtson as its expert. She has produced a report responding to Plaintiffs' expert's report. *Id.* at 17:16-19, 41:11-18, 138:5-10. Knudtson admitted that the 2016 Report showed that MDE was not compliant with IDEA in several areas, including how it handled state complaints. *Id.* at 43:5–47:10.

Since commissioning the Pingora 2016 Report, MDE has had a consistent working relationship with Pingora that continues today. Over the years, Knudtson, in her role as legal expert, has advised MDE in "carrying out [the 2016 Pingora Report's] recommendations" and provided support to MDE's "systems improvement in general." *Id.* at 61:24-62:6. In 2020, MDE commissioned a follow-up report from Pingora, to revisit its 2016 findings. *Id.* at 95:4-18; Ex. 12. According to Knudtson, it took Pingora "hundreds of hours" to create the two reports. Ex. 13 at 131:20-132:3.

Outside of work on the two Pingora reports concerning MDE's general supervisory system, Knudtson and Pingora have performed a wide variety of other work for MDE. This work includes "15 to 20" trainings for MDE personnel on state complaint investigations and "[o]ngoing professional development and technical assistance," which has happened almost biweekly for the past seven years. *Id.* at 13:18-14:1, 15:7-25. Pingora provided detailed feedback to MDE on a draft guidance document related to Child Find. *Id.* at 129:5-130:7. Additionally, Knudtson has performed state complaint investigation work, investigating both MDE and other school districts. *Id.* at 16:5-17:1. For this various work, MDE pays Ms. Knudtson around $200 per hour. *Id.* at 14:20-21, 15:7-25.

### C.  Early KPS State Complaint Decisions of Child Find Noncompliance

The story of MDE's attempt to bring KPS into compliance with IDEA started in 2017 with a systemic state complaint, 17-0159, when MDE found KPS *systemically* noncompliant with Child Find. Over the next six years, MDE issued ten other state complaint decisions finding noncompliance at KPS and one at Kalamazoo Regional Educational Service Area (KRESA) on the same issue.[1]

*State Complaint 17-0159*

MDE issued Complaint Decision 17-0159 on August 29, 2017, finding that KPS was systemically violating IDEA's requirements for full, individual evaluations under Child Find. Ex. 15, Complaint Decision 17-0159, MDE_007656-7701. MDE found that KPS had violated Child Find requirements for the student on whose behalf the complaint was filed (not a Plaintiff) as well

---

[1] For ease of reference, Plaintiffs drafted a spreadsheet of these complaints that shows their filing date, date of decision, and other notable facts. *See* Ex. 7, KPS State Complaints; Ex. 14, Affidavit of Jessica Murphy. In this brief, Plaintiffs will focus on the state complaint decisions that provided MDE notice that KPS was systematically noncompliant with IDEA's Child Find requirements: 17-0159, 18-0085, 19-0088, and 19-0188.

as nine of thirteen additional KPS students whose files were reviewed as part of the investigation. *Id.* at MDE_007697. Even though the student at issue was found eligible, MDE still found that KPS's errors in the evaluation process deprived the student of a FAPE "as the ability of the Student to receive educational benefit was impacted." *Id.* at MDE_007698.

As a remedy, MDE ordered that KPS complete a functional behavior assessment (FBA), revise the student's "behavior intervention plan taking into consideration the findings from the [FBA]," and revise the student's IEP, addressing other specific concerns found in the investigation. *Id.* at MDE_007698-99. MDE also ordered that the student receive "49 hours of compensatory services." *Id.* at MDE_007699.

The district-level CAP required that KPS, "in collaboration with the ISD, develop, review or revise [KPS's] written procedures to ensure that, for this and all students," KPS implements the IDEA "regarding . . . [p]rovision of a comprehensive evaluation for all students suspected of a disability," among other concerns. *Id.* at MDE_007699-7700. Following the CAP, KPS put together a review and analysis process (RAP) team, with help from KRESA. *Corrective Action Process for Noncompliance with the IDEA and MARSE*, p.3, available at https://perma.cc/QQ7Y-9CCW (last accessed April 6, 2025); Ex. 17, 17-0159 CAP Summary. KRESA, which like all ISDs, supports all local districts within its coverage area with correction of noncompliance. Ex. 5, MDE and ISD Responsibilities.

The RAP team "determines the root cause or underlying problems that led to the noncompliance" found in the state complaint decision. *Corrective Action Process for Noncompliance with the IDEA and MARSE*, *supra*. The root cause here was the "lack of consistent guidelines" contributing to findings of non-eligibility, and the lack of "a more comprehensive

system of checks and balances among ancillary staff regarding initial evaluations." Ex. 17, MDE_007646-48.

To fix the issue, KPS committed to "develop, review or revise the district's written procedures," *id.* at MDE_007646, and to upload "new policies and procedures throughout the 2017-2018 school year." *Id.* at MDE_007647. However, per MDE's documentation, KPS did not provide MDE with any updated Child Find policies or procedures, in violation of the district-level CAP. Reuquiyah Saunders, KPS Director of Special Education, testified that while the responsibility would have been hers, she did not remember submitting a revised version of the KPS Child Find policy to MDE during the 2017-2018 school year. Ex. 18, Saunders Dep. 55:9-24.

MDE accepted, as proof of correction of noncompliance in 17-0159, that KPS's attorneys had performed a training and sent updated policies and procedures related to "IEP invitation," manifestation determination reviews, and "special education discipline and IEP placement recommendation requirements." Ex. 19, 17-0159 CAP Closeout, MDE_00007643. None of these topics address the Child Find evaluation concerns that were at the heart of 17-0159. There is no evidence that MDE accepted any additional documentation showing that KPS had corrected its flawed Child Find policies, procedures, or practices. MDE later closed the CAP, determining that KPS was compliant. Ex. 20, 17-0159 CAP Status History.

*State Complaint 18-0085*

MDE next found KPS out of compliance with Child Find in Complaint Decision 18-0085. Ex. 21, Complaint Decision 18-0085. Here, MDE found that the student was enrolled in the Alternative Learning Program (ALP), "an intensive intervention program . . . for a minimum of 17 months," and had continued "significant behavioral and academic concerns that cannot be

attributed to a lack of attendance alone." *Id.* at PLAINTIFFS_00005426. This should have prompted a "referral for a special education evaluation." *Id.*

Based on CAP documentation, the "underlying problems that caused the noncompliance" were "lack of documentation from [KPS] . . . regarding Child Find attempts over the student elementary and middle school years" and that chronic absenteeism was being used as an exclusionary factor. Ex. 22, CAP Summary 18-0085, MDE_007737. KPS stated it would "update policies and procedures in accordance with MDE's interpretation of IDEA and MARSE regarding Child Find based on this case." *Id.* MDE closed the complaint. Ex. 23, 18-0085 CAP Status History. However, there is no evidence that KPS submitted any updated Child Find policies to MDE as proof of correction of its noncompliance. In fact, there is no evidence MDE accepted *any* documentation of *any* district-level change or trainings at KPS in 18-0085.

*State Complaint 19-0088*

In Complaint Decision 19-0088, MDE again found that KPS violated its Child Find obligations. Ex. 24, Complaint Decision 19-0088. KPS had issued a Multidisciplinary Evaluation Team (MET) report, which typically consolidates and interprets the results of any evaluations performed by the district. This MET report included the results of standardized academic, intelligence, and reading level assessments, along with teacher reports and grades. *Id.* at 00005433-34. However, KPS did not evaluate how the student's behavior was impacting the student's access to education, despite ending the school year with "31 write ups." *Id.* at PLAINTIFFS_00005439. Because KPS failed to include behavioral concerns in the evaluation, MDE found the evaluation was "not comprehensive." *Id.* This failure amounted to a "denial of FAPE," *id.* at PLAINTIFFS_00005440, and MDE's order to KPS, for the student-level remedy, was detailed and substantial. *Id.* at PLAINTIFFS_00005440-42. The CAP included a new, full, individual initial

11

evaluation and 100 hours of compensatory education, if the student was found eligible. *Id.* at PLAINTIFFS_00005441.

MDE ordered KPS to "revise or develop procedures regarding Child Find, as needed, by January 15, 2020 to document and ensure that: 1. Child Find obligations are met for all students in the District." *Id.* at PLAINTIFFS_00005442. In this investigation, KPS provided MDE with two Child Find policy documents and a presentation on Child Find that was delivered to KPS staff. Ex. 25, 19-0088 Draft Child Find Policy; Ex. 26, 19-0088 Child Find Procedures; Ex. 27, 19-0088 Child Find Presentation.

However, KPS provided MDE with no specific guidance or information related to appropriately including and evaluating a student's behavioral concerns, the core issue in 19-0088. *Id.* Saunders agreed, stating that, even though "behavioral concerns were at the heart of" 19-0088, Ex. 18 at 79:12-14, none of the Child Find documents produced to MDE would provide sufficient guidance to KPS employees to ensure a student's behavioral concerns were appropriately evaluated. *Id.* at 79:15-90:23.

Instead, Saunders said KPS's approach to behavioral concerns for all students included a Multi-Tiered System of Supports (MTSS) accompanied by a Response to Intervention (RtI) framework, and that these work together to provide KPS employees with behavioral data. *Id.* That data then provides a foundation for considering whether a student may have a disability and whether special education evaluations would be appropriate. *Id.* at 88:3-15. However, there are no details in the documents about how the MTSS or RtI approach would ensure that future students with behavioral concerns were evaluated appropriately when evaluation for special education was warranted. Ex. 25; Ex. 26; Ex. 27.

As with 18-0085, Saunders also testified that the documents MDE accepted in 19-0088 provided no guidance for appropriately considering chronic absenteeism when evaluating a student for special education. Ex. 18 at 89:9-15.

*State Complaint 19-0188*

Last, in Complaint Decision 19-0188, MDE found that KPS had failed in its Child Find obligation regarding K.B. *See* ECF No. 80-37, PageID.790-806. Like the student in 18-0085, K.B. was enrolled in ALP, which was reserved for students with the most challenging needs. *Id.* at PageID.791-792. Here, MDE found that K.B. had "failed to respond to interventions and continued to accrue numerous suspensions and failing grades," and, as a result, KPS had "reason to suspect a disability and pursue an evaluation consistent with their Child Find obligation." *Id.* at PageID.801. Here, the RAP team failed to determine the root cause of noncompliance in 19-0188. Ex. 29, 19-0188 CAP Summary, MDE_00005964.

In the closeout of 19-0188, there was confusion about what documentation MDE required to demonstrate correction of noncompliance. Ex. 30, 19-0188 CAP TA Notes (showing back and forth between MDE Statewide Monitor Lynn Delpy (LD) and KRESA's Program Improvement and Accountability Administrator, Victoria "Tori" Wentela (TW)); Ex. 31, 19-0188 CAP Timeline, MDE_00005958. This confusion was not new, and earlier in the correction process, Delpy had emailed Kristina Collier, an MDE Program Accountability Unit employee, about "[t]wo different ISD/Districts" asking exactly what MDE required as documentation of correction of Child Find noncompliance. Ex. 32, 19-0188 RE Complaint CAP question Emails.[2] Per Delpy, the concerns were coming from ISDs or districts with "similar CAPs" and specifically referenced K.B.'s state

---

[2] While this set of emails has no Bates stamp, it was embedded in an email produced at MDE_00005628 as attachment "RE Complaint CAP question.pdf." *See also* Ex. 33, 19-0188 RE Complaint CAP questions Emails Abbr.

complaint (19-0188) and another state complaint where MDE also found Child Find noncompliance at KPS (19-0189). *Id.*; Ex. 34, Complaint Decision 19-0189, PLAINTIFFS_00014042-4061.

According to Delpy, ISDs wanted clarification about whether it would suffice to provide MDE evidence of correction of noncompliance in Child Find CAPs when a district showed it "followed the child find procedures correctly whether or not they found the student eligible," or would MDE also need a district to "include that . . . the district complete[d] the evaluations correctly in order to find the student eligible?" *See* Ex. 32; *see also* Ex. 2 at 141:17-22. Delpy explained that there "is concern that a district did evaluate but did not do a comprehensive evaluation thus not finding the student eligible when it appears student should have been." Ex. 32. Before responding to Delpy, Collier forwarded the email to Marcia O'Brien, State Complaint Coordinator. *Id.*

O'Brien responded and included the Program Accountability Unit (PAU) Supervisor, Rebecca McIntyre. *Id.* O'Brien wrote:

> As we have SO much history of issues with Kalamazoo, I would say we need to expect more, not less of the district, when reviewing Child Find documents. So when [Ms. Delpy] asks [about the documentation concern], my gut would be to say if the evaluation was not comprehensive—we would not accept it as a verification that child find obligations are met. *Id.*

McIntyre's response emphasized that CAP documentation demonstrating correction of noncompliance must focus on the "issues specifically that resulted in identified noncompliance." *Id.* She went on to reference what an ISD might look for when "doing a file review," which is a normal CAP verification process. *Id.* Near the end of the verification process, an ISD looks at a

certain number of student files from the district that was found noncompliant.[3] Through this file review, the ISD seeks to discover whether noncompliance has been corrected at the district level. Ex. 4 at 84:13-85:7.

No file review was performed in state complaint 19-0188. Ex. 30 at MDE_00005968. On October 27, 2020, Delpy clarified to Wentela that to comply with the CAP, she would need to fill out a form where "you will list any student files reviewed and summarize the interviews in the boxes." *Id.* Wentela's next note, on October 30, 2020, stated that "MSDS data did not indicate any initial evaluations in the [end of year] collection" and "the fall staging area showed one initial [evaluation] that was a transfer in from out of state," and as a result "interviews were used." *See* Ex. 35, 19-0188 CAP Closeout, MDE_00005984.

KPS did provide MDE with documents about its Child Find procedures (Ex. 36, 19-0188 Child Find Procedures and Ex. 37, 19-0188 Child Find Policy), a "snapshot" of the Special Education Handbook on Child Find (Ex. 38, 19-0188 Child Find Snapshot), and a document on Child Study procedures (Ex. 39, 19-0188 Child Study Procedures).

The document submitted to MDE by KPS as Ex. 39, 19-0188 Child Find Procedures, is identical to the document KPS submitted as Ex. 23, 19-0088 Child Find Procedures. Similarly, KPS's Ex. 37, 19-0188 Child Find Policy, is virtually the same document as Ex. 25, 19-0088 Draft Child Find Policy. The only differences are that the document's title has lost the "Draft" designation, and a bracketed sentence under the "Coordination with Non-Educational District Agencies" section on page two has been replaced with a bullet point below naming "Student Services Department" as a department with which KPS maintains contact. *Compare* Ex. 37, 19-

---

[3] The number of student files varies, according to the size of the district. MDE determines the number according to business rules it has developed. Ex. 4 at 81:21-85:7.

0188 Child Find Policy, MDE_00005769-5770 *with* Ex. 25, 19-0088 Draft Child Find Policy, MDE_00007739-7740. KPS also submitted to MDE a Child Find Presentation related to the training provided on January 10, 2020, and it was the same presentation that KPS submitted in 19-0088. *Compare* Ex. 40 *with* Ex. 27.

Complaint Decision 19-0188 also provided a SLCAP for K.B., and it stated that KPS must "conduct a REED" (Review of Existing Evaluation Data), complete "a full and individual initial evaluation," create a MET report, determine if K.B. is eligible, and if so, provide a total of 67 hours of compensatory education. ECF No. 80-37, PageID.803-804. The MET report that KPS submitted was dated October 23, 2019, Ex. 42, 19-0188 MET Report, MDE_00005679-5699, which was more than two weeks before MDE issued its complaint decision on November 8, 2019. *See* ECF No. 80-37, PageID.790. The MET report purports to evaluate K.B. in three areas of eligibility—specific learning disability, other health impairment, and emotional impairment. *See* Ex. 42, 19-0188 MET Report, MDE_0005695-5699. On that same day, KPS issued an Eligibility Recommendation that it also submitted to MDE. Ex. 43, 19-0188 Eligibility Recommendation. The IEP that formalized K.B.'s determination of ineligibility, also issued on October 23, 2019, echoed the MET report's conclusions that K.B. had "refused to participate in additional assessment" and that there were "no data to suggest pattern of strengths/weaknesses" (one means of qualifying as under IDEA's specific learning disability category of eligibility). Ex. 44, 19-0188 IEP. MDE's documentation for K.B.'s SLCAP shows that KPS completed all its corrections on October 23, 2019. 19-0188 SLCAP Summary, ECF No. 80-61, PageID.1079-1082.

Before it issued Complaint Decision 19-0188, MDE knew that KPS had already performed another evaluation for K.B. In an email from Rebecca McIntyre to Gina Alexander on November 1, 2019, McIntyre told Alexander to write the final complaint's SLCAP as though she did not

already know that KPS had performed another evaluation of K.B. Ex. 45, 19-0188 McIntyre-Alexander Emails, MDE_00005603-5605. McIntyre stated, "[i]n this case, the district has already completed the evaluation and so essentially they have completed their SLCAP." *Id.*

Finally, the 19-0188 CAP and SLCAP were issued by the Program Accountability Unit (PAU) at MDE's OSE, as a part of its responsibility to oversee the state complaint process. Ex. 3, MDE-OSE Role and Responsibility, MDE_00001555. However, the work of verifying correction of noncompliance here was performed by the Performance Reporting Unit (PRU). Among other duties, statewide monitors, like Delpy, are assigned to PAU state complaint SLCAP and CAP verification work on a monthly, rotational basis by Jessica Brady, the PRU Supervisor. Ex. 4 at 96:5-97:13.[4]

In the email exchange started by Delpy, Ex. 32, the topic in the later emails turned to the distinctions between the PAU and the PRU. McIntyre's response to O'Brien closes with a sentence about taking responsibility for verification of correction of noncompliance, "we understand our work best and so [I] think we need to take this back. I emailed Jessica [Brady] with my proposal." *Id.* at p.4. Collier's response to McIntyre states:

> I'm wondering if there is a need to be more specific in our language when we're writing CAPs? Because we don't do the close out, I don't think our case managers really process what exactly is needed to fulfill what is being ordered. *Id.* at p.3.

Using the CAP directives for 19-0188 and 19-0189 as examples, Collier goes on to ask a couple rhetorical questions:

> So, when the ISD asks if they need to verify comprehensiveness of an evaluation as part of these CAPs, is that an ISD training issue or a CAP writing issue? What would we need to see in order for the district to verify they are initiating the child find process when needed? *Id.*

---

[4] The PRU can issue its own CAPs based on noncompliance found during PRU monitoring activities, as opposed to state complaint findings of noncompliance made by the PAU.

McIntyre's response states that she has "a vision" for "tak[ing] this over," and "provid[ing] a training for ISDs." *Id.* at p.2; *see also* Ex. 2 at 142:10-143:5 (clarifying McIntyre's "vision" of having PAU investigators verify correction of noncompliance because "they are the ones who would best know if it was corrected or not").

In replying to McIntyre's expressed desire to "take over" verification of correction of noncompliance, O'Brien states that before "[Performance Reporting] took [over district level CAPs]," those district-level CAPs "used to be more robust," and that when PRU took over, PAU investigators were "asked to align our language to the language [PRU] utilized. UGH." *Id.* at p.2. McIntyre's final response was, "Undo, undo, undo!!!" *Id.* at 1.

### D. Plaintiffs' Experience at KPS

#### K.B.

Plaintiff K.B. is now an eighteen-year-old adult who resides in Kalamazoo, Michigan. Ex. 46, K.B. Dep. 8:22-9:3. K.B. is diagnosed with a learning disability, attention deficit hyperactivity disorder (ADHD), emotional trauma disorder, and oppositional defiant disorder. *Id.* at 14:12-25, 16:8-17:4, 56:12-23.

Starting in middle school in 2017, K.B. was repeatedly sent home for disciplinary issues. *Id.* at 20:10-22:18. KPS unilaterally placed K.B. in its ALP in October 2017, where her behaviors escalated. *Id.* at 20:10-22:18; Ex. 47, H.B. Dep. 17:6-19. She attended ALP for sixth and seventh grade, where she was repeatedly suspended for disrespect and not following directions. *Id.* In eighth grade, she was suspended for around two months for fighting. *Id.* at 21:6-22:7.

In summer 2019, K.B. was diagnosed with ADHD and Oppositional Defiant Disorder. ECF No. 80-41, PageID.823. On September 9, 2019, K.B.'s advocate filed state complaint 19-0188, alleging that KPS had failed to properly evaluate and identify K.B. as eligible for special education. ECF No. 80-37, PageID.790-791; Ex. 47 at 26:6-13. In October 2019, KPS completed a

Multidisciplinary Evaluation Team (MET) report, but found her ineligible for special education despite significant absences, low test scores, and behavioral difficulties. ECF No. 80-45 at PageID.877. In Complaint Decision 19-0188, MDE found KPS out of compliance with its Child Find obligation and ordered corrective action. ECF No. 80-37, PageID.803-805. *See* discussion of *Complaint 19-0188*, *supra* Part II.C. In February 2020, KPS again found K.B. ineligible for special education services. Ex. 48, K.B. February 2020 Prior Written Notice, PLFS 00002991.

K.B.'s behavioral challenges continued through 2021. Ex. 47 at 97:14-19, 98:3-5. On January 25, 2021, K.B.'s advocate filed a state complaint against KRESA. *Id.* at 46:1-19; ECF No. 80-49, PageID.890. On March 23, 2021, MDE found that KRESA "did not meet its child find obligation." ECF No. 80-43, PageID.849. MDE ordered a multi-step student-level corrective action plan and a district-wide corrective action plan. *Id*. at PageID.850-851.

On May 26, 2021, KPS's special education evaluation team finally recommended K.B. for special education eligibility under the Other Health Impairment category. ECF No. 80-52 at PageID.920. While an IEP was finally created for K.B., ECF No. 80-53, PageID.927-946; Ex. 46 at 38:15-39:6, its services and accommodations did not meet K.B.'s educational and behavioral needs. Through 2021 and into 2022, K.B. continued to struggle with disability-related behaviors, resulting in frequent suspensions from school. Ex. 47 at 72:14-75:18. Eventually, K.B. simply stopped attending classes. *Id*.

Per KPS's May 2021 evaluation, K.B.'s academic performance was below the 5th percentile in all areas except word recognition, which was at the 25th percentile. ECF No. 80-52 at PageID.913-914. Other tests placed her math mastery and reading levels at around the 2nd grade level. *Id*. at 914.

On February 11, 2022, K.B.'s mother, H.B., filed a Complaint and Request for a Due Process Hearing against KPS, KRESA, and MDE. Ex. 47, H.B. Dep. 66:1-7. After KRESA and MDE were dismissed for lack of jurisdiction, Ex. 49, Decision and Order Granting MDE's Motion for Summary Disposition-KB v. KPS-2022-3-16, PLFS 00002664-66, the parties entered into a settlement agreement. *Id*. at 66:19-67:2; ECF No. 81-2, PageID.1102-1107.

K.B. attended high school at KPS through eleventh grade. Ex. 46 at 24:4-11. She was supposed to graduate in 2024 but dropped out of school in September 2023. *Id*. at 24:12-25:8. K.B. has tried to seek employment but has struggled, lacking a high school diploma. *Id*. at 11:18-12:24. H.B. has enrolled K.B. for school three times since she dropped out, but K.B. refused to attend because she was embarrassed about her low level of academic proficiency. Ex. 47 at 84:14-86:11.

K.B. plans to reenroll in Covenant Academy, where students can attend until age 21, to complete her final year of high school and earn her diploma. Ex. 46 at 24:12-25:20. K.B. wants to go to college to become a travel nurse. *Id*. at 40:18-25.

**Ke'Aujanaa Shepherd-Friday**

Ke'Aujanaa Shepherd-Friday (Ke'Aujanaa) is twenty-two-years-old, and she resides in Kalamazoo. Ex. 50, Ke'Aujanaa Declaration, ¶¶ 4, 6. She is diagnosed with sickle cell anemia, borderline intellectual functioning, major depressive disorder, major neurocognitive disorder, generalized anxiety disorder, trichotillomania, and ADHD. ECF No. 80-18, PageID.639-644; Ex. 51, Neuropsychological Evaluation for Ke'Aujanaa Shepherd-Friday, PLAINTIFFS_00003377. Ke'Aujanaa's sickle cell crises can become so debilitating she requires three to four weeks, including hospitalization, to recuperate from a single episode. Ex. 52, Shepherd-Friday Dep., 15:15-16:23.

Ke'Aujanaa attended KPS for most of her educational career. *See* Ex. 52 at 28:1-30:15. In May 2017, in 9th grade, KPS provided Ke'Aujanaa a Section 504 plan; however, KPS did not

comprehensively evaluate her to determine her educational needs or whether she was IDEA-eligible. Ex. 53, Social Worker Letter 11/23/2009, PLAINTIFFS_00009233; Ex. 54, Social Worker Letter 04/29/2016, PLAINTIFFS_00009232; ECF No. 80-18, PageID.640-644; Ex. 55, Documents submitted by KPS for Investigation 19-0213, MDE_00006010-00006018, 00006025; ECF No. 80-19, PageID.647-651.

Ke'Aujanaa struggled both academically and socially. *See* Ex. 55, MDE_00006010-00006023; Ex. 56, Behavior Incidents for Ke'Aujanaa Shepherd-Friday, PLAINTIFFS_00009196; Ex. 52 at 78:9-83:2. In January 2018, after being repeatedly bullied due to her disability, Ke'Aujanaa got in a fight with another student. ECF No. 80-23, PageID.673-674; Ex. 52 at 31:16-33:9. KPS suspended Ke'Aujanaa and placed her into Phoenix Alternative High School. ECF No. 80-22, PageID.669. During this time, Ke'Aujanaa's grades ranged from GPA of 0.4667 to 1.0917, and she earned only 7.5 credits despite spending three years in high school. Ex. 55, MDE_00006022-00006023.

On September 18, 2019, Ke'Aujanaa enrolled in nearby Comstock Public Schools (CPS) and attended the alternative high school. ECF No. 80-26, PageID.691. Ke'Aujanaa's state complaint 19-0213 was filed on October 4, 2019, less than a month after K.B.'s complaint 19-0188. ECF No. 80-19, PageID.646; ECF No. 80-37, PageID.790. On April 20, 2020, MDE found KPS out of compliance with its Child Find obligations. ECF No. 80-19, PageID.646, 654. MDE found that KPS "took a passive approach to their child find obligation," and should have evaluated Ke'Aujanaa, given her "remarkable lack of progress." *Id.* at 652.

Emails between McIntyre and O'Brien showed their respective thoughts about a draft of the complaint decision and whether there would be an appropriate remedy for KPS's violation of Child Find. *See* Ex. 57, 19-0213 McIntyre-O'Brien Emails, MDE_00006163-6165. O'Brien

begins the discussion, stating: Ke'Aujanaa was "in 9th grade for three years," and while her sickle cell did cause absences, "[h]ow do you know she didn't need specialized instruction unless you evaluate?" McIntyre replied that as an "administrator" she would not have "suspected a disability under IDEA because the medical nature of her disability was being supported through a Section 504 plan," and hypothesized that if KPS had "done a better job enforcing and supporting" the Section 504 plan, Ke'Aujanaa would've been "in class more, [and] her academics might be higher." *Id.*

The email exchange between O'Brien and McIntyre included another aspect: a remedy for Ke'Aujanaa. O'Brien noted that since Ke'Aujanaa was in another district, the decision "doesn't have student implications." *Id.* McIntyre agreed, wondering whether the decision would "benefit the student [in] any way," or "benefit the district in any way." *Id.* McIntyre also asked, "has the district already addressed child find procedures through the other . . . complaints?" *Id.*

In the end, MDE-OSE would not issue a determination about whether KPS's Child Find violations had deprived Ke'Aujanaa of a FAPE for two reasons. First, it stated there was no determination yet made about whether she was eligible under IDEA. ECF No. 80-19, PageID.654. However, in an earlier statement, the Complaint Decision also stated that Ke'Aujanaa had later been found eligible for IDEA at her new district. *Id.* Second, the Complaint Decision noted that there would be no SLCAP because Ke'Aujanaa had moved districts. *Id.* However, in a similar situation, where K.B. was later found eligible, McIntyre testified that MDE could have figured out how to provide compensatory education for the period when K.B. was not eligible and KPS failed to comply with Child Find, but it didn't. Ex. 2 at 176:18-177:5.

In creating the CAP, the RAP team identified the root cause as KPS's failure to "assess students with Tier 2-3 concerns for special education eligibility at [ALP]." Ex. 58, 19-0213 CAP

Summary, MDE_007894-7896. KPS submitted Child Find policies to MDE to demonstrate correction of the noncompliance. *See* Ex. 59, 19-0213 Child Find Policy 1, MDE_00006270-6273, and Ex. 60, 19-0213 Child Find Policy 2, MDE_00006265-6268. These documents do not provide guidance for evaluating "students with Tier 2-3 concerns," and are very similar to previous Child Find policies submitted in 19-0088 and 19-0188. *Compare* Ex. 59 *and* Ex. 60 *with* Ex. 37 *and* Ex. 25. The only differences are that KPS (1) expanded its Child Find responsibility from all students "enrolled at KPS" to "all children with disabilities who reside within the KPS boundaries," (2) corrected a long-standing error concerning KPS's responsibility to "respond to an initial evaluation within 10 school days," and other minor changes. *Id.*

On February 27, 2020, CPS determined Ke'Aujanaa was eligible for special education as a student with other health impairment (OHI). ECF No. 80-25, PageID.685; ECF No. 80-28, PageID.700-701. In twelfth grade, Ke'Aujanaa demonstrated "good basic reading abilities," even though she "lacked understanding of higher-level vocabulary," and scored in the second percentile for math concepts and applications. ECF No. 80-28, PageID.698-699, 702. Ke'Aujanaa's behavioral assessment scores demonstrated that she was at-risk for depression, social stress, and other debilitating mental health symptoms. *Id.* at 699.

Ke'Aujanaa continued to struggle academically and socially at CPS. Ex. 61, Shepherd-Friday IEP 5/13/2021, PLAINTIFFS_00003349-00003351; ECF No. 80-27, PageID.693-694; Ex. 52 at 83:18-84:2; Ex. 62, Transcript for Ke'Aujanaa Shepherd-Friday. Ke'Aujanaa was not making progress, but there is no evidence CPS provided increased or different direct services on her IEP. Ex. 63, IEP Progress Report for Ke'Aujanaa Shepherd-Friday, PLAINTIFFS_00005586-00005588; ECF No. 80-30, PageID.708-724; Ex. 61, PLAINTIFFS_00003349-00003351; Ex. 64,

Ke'Aujanaa Meeting Minutes 11/5/20. Without appropriate support from CPS, Ke'Aujanaa ultimately left the district. Ex. 52 at 41:12-24.

On January 27, 2021, Ke'Aujanaa filed a state complaint, leading MDE to order a CAP after finding that CPS was out of compliance. ECF No.80-32, PageID.731; ECF No. 80-33, PageID.747. On March 17, 2021, following a neuropsychological evaluation concluding that her cognitive ability and independent functioning were six years behind, she filed a due process complaint against KPS, CPS, KRESA, and MDE, which ultimately resulted in a settlement with CPS after the other parties were dismissed. Ex. 51 at PLAINTIFFS_00003362, 00003367-70; ECF No. 80-35, PageID.753-787; Ex. 65, Decision and Order Granting State Respondents' Motion for Summary Disposition 04/06/2022, PLAINTIFFS_00003285; Ex. 66, Decision and Order Regarding KRESA, KPS, and CPS Motion to Dismiss 04/15/2022, PLAINTIFFS_00009109; ECF No. 80-36, Page ID.788.

Without the appropriate supports and services, Ke'Aujanaa has been unable to complete her high school diploma. Ex. 50, ¶¶ 8, 11. Despite this, Ke'Aujanaa remains motivated to earn a diploma and go to college. *Id.* ¶¶ 12-17; Ex. 52 at 87:24-26, 88:1-14. She hopes to become a pharmacy technician and has enrolled in Kalamazoo Valley Community College's certification program to do so. Ex. 52 at 88:1-14; Ex. 50, ¶ 17. Ke'Aujanaa would utilize additional compensatory education time to complete her high school diploma. Ex. 50, ¶ 16.

**Donquarion Lewis**

Donquarion Lewis (DQ) is 22 years old. Ex. 67, DQ Dep. 7:3-4. Prior to 2012, DQ was eligible for special education services in preschool under speech and language impairment. ECF No. 80-14, PageID.562. Beginning in 2012, KPS identified DQ as a student with a disability under the primary category of Specific Learning Disability (SLD). Ex. 67 at 7:7-8; 9:5-13; ECF No. 80-3, PageID.488; ECF No. 80-4, PageID.490; ECF No. 80-7, PageID.513. DQ also has diagnoses of

24

severe specific reading disorder, severe mathematics disorder, ADHD combined-type, posttraumatic stress disorder, complicated grief, major depressive disorder in remission, panic disorder in remission, and rule-out diagnoses of Disruptive Mood Dysregulation Disorder, Mild neurocognitive/post concussive effects affecting cognitive and fine motor functioning, and Central Auditory Processing Disorder, which substantially limit one or more major life activities, including reading, learning, communicating and interacting with others. 28 C.F.R. § 35.108; Ex. 68, Owens Report, at PLFS 00010048; Ex. 67, 11:17-13:23.

In 2012, when DQ was in third grade, KPS found him eligible for special education under SLD, without conducting any cognitive assessments. Ex. 69, DQ DP Hearing transcript, PLFS 00001537-1538; ECF No. 80-3, PageID.484-488, ECF No. 80-4, PageID.490. Per KPS's own records, DQ continued to struggle and his progress stagnated. ECF No. 80-6, PageID.507. In three years, DQ's NWEA reading level went up from 2.0 to 2.5 grade level equivalency. ECF No. 80-6, PageID.507. By 8th grade, DQ's NWEA Reading scores hit 3.0 grade level equivalency, and Math reached 3.5. ECF No. 80-5, PageID.502; ECF No. 80-6, PageID.507. DQ's most recent standardized test data from KPS, from the Fall of 2017, placed him at a third-grade reading proficiency. ECF No. 80-8, PageID.524. There are no standardized test scores or reading data recorded on DQ's IEP or supporting documents after Fall 2017. ECF No. 80-8, PageID.524; ECF No. 80-10, PageID.535; ECF No. 80-7, PageID.513. From 2018 until his graduation, KPS declined to conduct evaluations to determine the source of DQ's lack of progress. Ex. 69, PLFS 00001770:13-00001771:13; ECF No. 80-8, PageID.524; ECF No. 80-10, PageID.535; ECF No. 80-7, PageID.513.

In addition to his academic challenges, DQ has also been negatively affected by two tragic deaths of family members close to him. Ex. 69, PLFS 00001686:11-1687:18. From 2017 to 2020,

KPS documented over 30 behavior incidents involving DQ; however, social work services were never added according to the subsequent IEPs. Ex. 69, PLFS 00001599; Ex. 70, 2019-4-16 DQ IEP, PLFS 00004513, 4528; Ex. 71, 2019-10-16 DQ IEP, PLFS 00004480; Ex. 72, 2019-1-8 DQ IEP, PLFS 00004496; Ex. 73, Discipline Referrals DQ; ECF No. 80-10, PageID.546.

In 2019, KPS noted that DQ was "struggling to make any progress toward his academic goals and objectives," and "can struggle with adult interactions, which can lead to altercations." Ex. 74, DQ MDR, PLFS 00004579-4580; Ex. 69, PLFS 00001898. KPS did not perform any behavior evaluations to determine the cause of DQ's behavior. Ex. 74 at PLFS 00004579-80. Further, KPS repeated IEP goals for multiple years in the substantive areas of reading and transition. ECF No. 80-16, PageID.614; ECF No. 80-10, PageID.543; ECF No. 80-16, PageID.613; Ex. 69, PLFS 00001806-08; Ex. 70, PLFS 00004510, 4525. Again in 2020, at DQ's REED meeting, KPS relied on the incomplete and then five-year-old 2015 data instead of conducting the mandatory three-year reevaluation. ECF No. 80-8, PageID.524-525.

In January 2021, DQ's advocate filed state complaint 21-004 asserting that KPS was violating special education law and that DQ was graduating while functionally illiterate. ECF No. 80-13, PageID.555-557. MDE investigated the previous year of DQ's educational program at KPS, as required by its regulations. 34 C.F.R. § 300.153; MARSE 340.1851(2). MDE investigated whether KPS provided DQ a FAPE, specifically "whether the District developed an individualized education program (IEP) to address the Student's unique educational needs and enable the Student to be involved in and make progress in the general curriculum." Ex. 75, 21-0004 Issues Letter, MDE_00006300. MDE cited the 2018 and 2020 REEDs, which relied on outdated 2015 data. ECF No. 80-14, PageID.561. MDE then determined that KPS complied with the law despite reports that

DQ made very limited progress toward his reading goal and failed English. ECF No. 80-14, PageID.562-564; ECF No. 80-14, PageID.569.

DQ graduated with a diploma, fulfilling a dream of his mother's, who herself never graduated. Ex. 69 at PLFS 00001696-97, PLFS 00001726-27. However, DQ was still reading at a third-grade level. ECF No. 80-16, PageID.626; Ex. 69 at PLFS 00001451.

In August 2021, nine years after KPS determined his eligibility, DQ learned the magnitude of his disabilities through an independent comprehensive neuropsychological evaluation. Ex. 68 at PLFS 00010041-57; Ex. 67 at 11:17-13:23. KPS documented a specific learning disability in reading and math, but never appropriately assessed DQ's cognitive strengths and weaknesses. ECF No. 80-8, PageID.524. According to the independent evaluation, the effects of DQ's disability did not limit his understanding or retaining information. ECF No. 80-16, PageID.603. Though his academic testing showed DQ's performance in English and math to be in the third- and fourth-grade range, he was capable of much more. Ex. 69, PLFS 00001447.

Following this evaluation, on October 21, 2021, DQ filed a due process complaint against KPS, KRESA, and MDE. ECF No. 80-16, PageID.596. The ALJ dismissed both KRESA and MDE for lack of jurisdiction. Ex. 76, Decision and Order Granting MDE's Motion, PLFS 00004689. On October 13, 2022, the ALJ issued a Decision and Order denying DQ's request for relief. ECF No. 80-16, PageID.596, 636.

DQ appealed the due process decision by filing a federal complaint against KPS on December 20, 2022. ECF No. 81-3, PageID.1110. In challenging the ALJ's decision, DQ received a settlement, including 1,080 hours of compensatory education and $100,000 in attorneys' fees and other damages. ECF No. 81-3, PageID.1111-1112. However, additional compensatory education

time and compensation for the lost wages would remedy his deprivation of FAPE and its effects on his life. Ex. 77, Katz Report, PLFS 00024241-44.

### III. ARGUMENT

Summary judgment should be granted if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment "in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### A. MDE Failed to Discharge its Supervisory Responsibilities Under the IDEA

The IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joesph F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017). "[E]very child should have the chance to meet challenging objectives," and the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 402, 404. In assessing whether an educational authority has provided a FAPE, a "reviewing court may fairly expect . . . to [hear] a cogent and responsive explanation for [its] decisions that show the IEP" meets the standard. *Id.* at 404.

When a student challenges the appropriateness of their IEP, courts look to whether the IEP (1) complied with the procedures set forth in the IDEA and (2) whether it was "reasonably calculated to enable the [student] to receive educational benefits." *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982). While an LEA is responsible for providing a FAPE to each eligible student, MDE must ensure that each student is provided a FAPE under these standards. 20 U.S.C. § 1412.

MDE failed to ensure that KPS was complying with IDEA procedures in 2017, and it resulted in KPS persisting in flawed Child Find, evaluation, and reevaluation practices—with the result being that KPS students with disabilities were either not identified as eligible or lacked IEPs "tailored to their unique needs." *Rowley*, 458 U.S. at 181. MDE's failures are even more remarkable because it commissioned a report that provided MDE notice that it was failing to correct noncompliance through the state complaint system as far back as 2016.

A reasonable jury could find in favor of the Plaintiffs on their IDEA claims because (1) MDE's failures to ensure systemic correction of KPS's systemic noncompliance were so blatant that those failures deprived Plaintiffs of FAPE; (2) MDE is liable under IDEA's private cause of action for this deprivation of FAPE; and (3) MDE's argument that Plaintiffs' IDEA claims are moot is without merit.

### i.  MDE Denied Plaintiffs a FAPE

MDE has the ultimate responsibility for IDEA implementation. *See* discussion *supra* Part II.A.i; 20 U.S.C. § 1412; *Ullmo*, 273 F.3d at 671, 678-79 (6th Cir. 2001). IDEA's Child Find and evaluation requirements provide the *only* means for students with disabilities to access IDEA's benefits of special education and related services. This responsibility is MDE's, and it's "crucial." Ex. 78, Mlawer Dep. 46:3-10. The evaluation process allows a school district to understand "the

particulars of a child's current skills and needs." *Z.B. v. District of Columbia*, 888 F.3d 515, 522 (D.C. Cir. 2018) (*citing Endrew F.*, 580 U.S. at 400 ("An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability and potential for growth.")); *accord Timothy O. v. Paso Robles United Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016) (a full and individual initial evaluation "serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child").

Defendant argues that MDE met its obligations because it had a "robust oversight system" and "properly addressed all issues specific to Plaintiffs." ECF No. 80, PageID.431. The evidence is otherwise, and a reasonable jury could certainly conclude that MDE did not meet its obligations.

*Plaintiff K.B.*

MDE deprived K.B. of a FAPE, and there are clear facts that a reasonable jury can use to come to that conclusion. First, MDE's state complaint system was failing by the time that her state complaint 19-0188 arrived. Second, MDE's findings supported a deprivation of FAPE by KPS, but MDE's actions in closing her complaint made it impossible for her to receive any remedy for that deprivation. Last, the facts show that MDE would continue to struggle with correcting Child Find noncompliance at KPS.

From the 2016 Pingora Report showing MDE's broken state complaint system, to the lack of any relevant KPS documentation showing correction of noncompliance in 17-0159, 18-0085, and 19-0088, to the email from Collier—written days before the 19-0188 complaint decision, wondering to her own team (*i.e.* the team in charge of writing CAPs), "What would we need to see in order for the district to verify they are initiating the child find process when needed?"—it is

clear MDE was still discovering how broken its state complaint system was for ensuring correction of noncompliance *when it came to Child Find*.

When it came to correcting the specific noncompliance at issue for K.B., while McIntyre emphasizes that MDE must focus on "root causes" of noncompliance, *see* Ex. 2 at 14:22-15:1, the 19-0188 RAP team never identified what exactly KPS *did wrong* in failing to appropriately fulfill its Child Find obligations *for K.B.* Ex. 29, 19-0188 CAP Summary, MDE_00005964. With a broken system in one hand, and no determination about what went wrong in the other, the rest of MDE's work on K.B.'s state complaint correction was an unmitigated failure.

Putting aside for the moment MDE's clear failure in allowing KPS to resubmit the same Child Find documents that it submitted as proof of correction of noncompliance in other complaints, *compare* Ex. 37, 19-0188 Child Find Policy *with* Ex. 25, 19-0088 Draft Child Find Policy; *compare* Ex. 40, 19-0188 Child Find Presentation *with* Ex. 27, 19-0088 Child Find Presentation, MDE's failure as to K.B. is more startling. MDE's PAU supervisor, McIntyre, rubber-stamped a KPS initial evaluation for K.B. as correction of student-level noncompliance when that evaluation took place *prior* to the issuance of the complaint decision. Ex. 45. McIntyre knew MDE would issue a SLCAP for K.B., knew KPS has already performed an evaluation using the *same Child Find practices* that MDE would soon find noncompliant, and said it would mean, for KPS, "essentially they have completed their SLCAP." *Id.* How can a district conduct a compliant evaluation process for a student when you haven't allowed them the opportunity to correct the noncompliant process at issue? A reasonable jury could well see this as MDE abdicating its responsibility.

Further, KPS submitted SLCAP evaluation documentation and an IEP that did not show any of the "careful consideration of the child's present levels of achievement, disability and

potential for growth" required. *Endrew F.*, 580 U.S. at 400. The documentation did, however, mirror the kind of failures MDE had found in previous KPS Child Find complaints.

The MET Report and the IEP blame K.B. for refusing to participate in the evaluation. Ex. 44 at MDE_00005673; Ex. 42 at MDE_00005686. The school psychologist noted K.B.'s sassy language, Ex. 42 at MDE_00005685-86, and claimed this was K.B. exhibiting "considerable effort to avoid the testing." A reasonable jury might find that, instead of a middle school girl with behavior concerns putting forward "considerable effort to avoid testing," this evaluator simply did not know how to engage a student with disabilities who exhibits difficult behavior. This refusal "to participate" was used as justification for reverting to K.B.'s "2018 MET" to say there was no pattern of strengths or weaknesses. *Id.* at MDE_00005696. Based on KPS's noncompliance history, relying on old data is to rely on Child Find processes that were just as bad, if not worse.

K.B. had behavior issues and a history of missing class, and KPS did not know how to evaluate her. This should come as no surprise. State Complaint 18-0085 involved chronic absenteeism, and State Complaint 19-0088 involved behavior issues. Of course, MDE did not accept any evidence that KPS fixed the issue in 18-0085, and what documentation it did collect in 19-0088 didn't address the "root cause" of not understanding how to address behavior concerns. How straight is the line from 18-0085 to 19-0088 to the deeply flawed evaluation KPS tried to pass off as correction of noncompliance in 19-0188? If MDE accepts that KPS can throw up its hands and say the student did not participate, then isn't MDE's order for KPS to perform a full, individual evaluation an empty promise? These are questions a jury should decide.

*Plaintiff Ke'Aujanaa Shepherd-Friday*

The state of MDE's system of correcting noncompliance did not improve in the month between K.B.'s state complaint and Ke'Aujanaa's. MDE took over six months to issue its decision,

ECF No. 80-19, PageID.646, and when it did, Ke'Aujanaa had already been found eligible under IDEA at her new school district. *Id.* at PageID.651. MDE found that KPS "took a passive approach to their child find obligation," and should have evaluated Ke'Aujanaa, given her "remarkable lack of progress." *Id.* at PageID.652.

Despite recognizing this "remarkable lack of progress," MDE withheld deciding whether Ke'Aujanaa was deprived of a FAPE. *Id.* at PageID.654. It claimed that "without a full evaluation to determine eligibility," it didn't have enough information to determine if FAPE was denied. *Id.* This is odd, and if true, wouldn't any school district be able to escape liability for deprivation of FAPE by simply failing to conduct a full evaluation? Doesn't this leave schools holding their own leash? Further, Ke'Aujanaa *was* evaluated by CPS and found eligible, as MDE recognized in the decision's next sentence. *Id.* Was Ke'Aujanaa eligible for special education at KPS? She was at CPS. Her condition hadn't changed, only her school district. A reasonable jury could easily find that Ke'Aujanaa was eligible at KPS, and MDE should have provided her the dignity of recognizing her deprivation of FAPE, along with the remedy of the compensatory education appropriate to put her in the position she would have occupied, if not for KPS's violation. Outside of the lack of decision on FAPE, MDE alternatively seemed to claim that as "the Student is no longer in the District," MDE would also not issue a SLCAP. However, Ke'Aujanaa missed out on considerable instructional time, ECF 80-19, PageID.650-651, and KPS did not provide her with appropriate supports whether that failure came under a Section 504 plan or not. The fact that she changed districts was no barrier to MDE providing her with compensatory education.

Doing so would have "benefit[ted] the student," Ex. 57, MDE_00006163, and that is an appropriate place for MDE's focus. Whether the decision would "benefit the district in any way" is not. *Id.* It was clear from the parade of violations that KPS had not "already addressed child find

procedures," and MDE would have known that from the time it issued Complaint Decision 17-0159.

And that decision is instructive here, too. MDE showed that a student whose evaluation was not comprehensive, but who *was* found eligible, could still be deprived of FAPE. *See* Ex. 15, MDE_007698 (FAPE violation for student at issue because "the ability of the Student to receive educational benefit was impacted"). Why not for a student who *wasn't initially* found eligible, likely due to Child Find violations, and then was found eligible soon after? In such a situation, McIntyre said MDE could probably "figure out" how to provide compensatory education. Ex. 2, at 176:18-177:5. Since MDE didn't, we now ask a jury to consider the same.

*Plaintiff Donquarion Lewis*

Beginning in 2017, KPS was found noncompliant ten times in seven years for violating IDEA's Child Find, evaluation, and reevaluation requirements. Ex. 14, ¶¶ 1-8; Ex. 7. In each of those decisions, MDE was responsible for correcting the noncompliance for that student and the "future provision of services for all children with disabilities." Ex. 1, ¶¶ 8, 28-32. However, MDE failed in this respect, and so noncompliance continued unabated. *Id.* at ¶ 31. Moreover, KPS had issues regarding comprehensive evaluations and wouldn't be effectively implementing Child Find if those issues continued. Mlawer Dep Ex. 78 47:15-24. During this same time, DQ was deprived a FAPE. Ex. 77 at PLFS 00024238-42; *Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys.*, No. 3:22-CV-00675, 2024 WL 2245117 at *3 (M.D. Tenn. Apr. 22, 2024), *appeal dismissed sub nom. Matthew B. by & through G.F. v. Clarksville-Montgomery Cnty., Tennessee Sch. Sys.*, No. 24-5478, 2024 WL 3839833 (6th Cir. Aug. 1, 2024) (finding a Child Find violation and deprivation of FAPE when a district provided special education services that resulted in no appreciable progress, but declined to reevaluate the student for 9 years). MDE might point the

Court toward the outcome of DQ's state complaint and due process hearing. ECF No. 80-14, PageID.567-569; ECF No. 80-16, PageID.636. However, the state complaint and the due process claim were both only resolved as to whether *KPS* provided a FAPE, not *MDE*. ECF No. 80-14, PageID.560-561, 569; ECF No. 80-16, PageID.597, 599. Neither process addressed the issue of whether KPS's flawed evaluation and reevaluation policies, which MDE should have ensured that KPS had previously corrected, deprived DQ of a FAPE. ECF No. 80-14, PageID.560-561, 569; ECF No. 80-16, PageID.597, 599. Both outcomes, properly understood, are distinguishable, and do not bar his recovery from MDE for its parade of failures.

DQ's state complaint was filed January 27, 2021, meaning MDE only investigated from January 2020 forward, just prior to the onset of the COVID-19 pandemic. ECF No. 80-14, PageID.561. While the complaint did allege that DQ was denied a FAPE, it couched this failure in terms of alternate state standards and failure to provide a compensatory education plan. ECF No. 80-13, PageID.556-557. MDE's questions for district staff show evaluation and reevaluation procedures were never the focus of this investigation. Ex. 79. Instead, the "primary focus [was] reading." Ex. 80. MDE sent a letter identifying IEP development as the substantive issue being investigated. Ex. 75. After investigating those allegations within only the previous year, MDE found "no violation." ECF No. 80-14, PageID.569.

In DQ's due process hearing, the ALJ dismissed all claims that predated October 22, 2019, despite DQ's repeated insistence that a due process complainant can seek a remedy for the entire period of alleged FAPE deprivation. Ex. 76, PLFS 00004690-4691; *Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys.,* No. 3:22-CV-00675, 2023 WL 4633905, at *19 (M.D. Tenn. July 19, 2023), report and recommendation adopted in part sub nom. *Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys*., No. 3:22-CV-00675, 2023 WL 11693271

(M.D. Tenn. Sept. 27, 2023) (calculating the statute of limitations from the date the plaintiff knew or should have known about a denial of FAPE); *Matthew B. by & through G.F. v. Clarksville Montgomery Cnty. Sch. Sys.*, No. 3:22-CV-00675, 2024 WL 2245117, at *3 (M.D. Tenn. Apr. 22, 2024), appeal dismissed sub nom. *Matthew B. by & through G.F. v. Clarksville-Montgomery Cnty., TN Sch. Sys.,* No. 24-5478, 2024 WL 3839833 (6th Cir. Aug. 1, 2024) (providing a remedy for the entire period of the FAPE deprivation); Ex. 81, DL's Motion for Reconsideration; ECF No. 80-16, PageID.628.

This federal lawsuit was filed on September 9, 2022, and it reaches back three years to September 10, 2019. ECF No. 1, PageID.1; *Smith v. Kalamazoo Pub. Sch.*, 703 F. Supp. 3d 822, 829–30 (W.D. Mich. 2023). This federal complaint covers four months of time prior to MDE's investigation of KPS. ECF No. 80-14, PageID.561. DQ was entering the eleventh grade in the 2019-2020 school year. Ex. 71 at PLFS 00004469. Had MDE corrected KPS's noncompliance, the continued failure to appropriately identify DQ's needs and services could have been remedied. DQ's educational story might have had an ending other than graduating with a third-grade reading level. ECF No. 80-16, PageID.626.

DQ had the capability to read at higher level than what he attained and acquired a higher level of academic mastery at KPS had KPS conducted the proper evaluations and provided him appropriate interventions. Ex. 68, Dr. Owens report. Recent Sixth Circuit case law is clear that "when a child if capable of learning to read, and his IEP does not aim to help him overcome his particular obstacles to doing so, that IEP does not provide him the 'free appropriate public education' to which he is entitled." *William A. by and through E.A. v. Clarksville-Montgomery County Sch. Sys.*, 127 F.4th 656, 660 (2025) (citing *Endrew F.*, 580 U.S. at 399).

The last documented effort that KPS made to evaluate DQ's reading ability was fall of 2017. ECF No. 80-8, PageID.524; ECF No. 80-10, PageID.535; ECF No. 80-7, PageID.513. KPS didn't document his reading ability after that time and never used a cognitive assessment to determine where DQ's strengths and weaknesses were. *Id.* A reasonable jury could well find that MDE's failures to bring KPS into compliance led directly to his deprivation of FAPE.

*Conclusion*

MDE's state complaint system was failing students with disabilities at KPS at a time when Plaintiffs needed an SEA to "ensure" they had access to a FAPE. K.B. was failing, her behaviors were challenging, and she needed appropriate support to be able to access her education. Ke'Aujanaa was being bullied for a chronic condition requiring hospitalization, where she would miss instruction and make little progress. DQ was falling further and further behind his peers in reading and math, but KPS relied on old evaluations and never assessed why he was failing to make appropriate progress.

KPS knew these students were struggling and failed to appropriately evaluate them, leaving KPS unable to find them eligible in some cases or provide them a FAPE "tailored to [their] unique needs" in others. *Rowley*, 458 U.S. at 181. A reasonable jury could find that MDE's chronic failures to correct Child Find and evaluation noncompliance at KPS, starting with 17-0159, deprived Plaintiffs of a FAPE and created a barrier to all future students with disabilities from receiving a FAPE at KPS. MDE may have looked over KPS's shoulder on occasion to see if it was "reviewing and revising" its procedures, but MDE never used any of the levers available to it for actually ensuring that KPS changed its *practices* to become compliant. MDE repeatedly failed to address the "[a]ppropriate future provision of services for all children with disabilities" at KPS, and IDEA demands more. 34 C.F.R.§ 300.151(b)(2). In effect, MDE said, "wrong…, wrong…, wrong, still

37

wrong, wrong again, and even more wrong," without stopping the problem or providing an effective remedy for future students.

### ii.   MDE Knew Its State Complaint System Was Broken in 2016

Even before it failed to correct the noncompliance it identified in state complaint 17-0159, MDE knew that its state complaint system was not compliant with the IDEA through its 2016 Pingora report. Ex. 13 at 43:23-46:1. MDE commissioned this report to review and address the flaws in its general supervision, including the state complaint system. Pingora's legal expert, and MDE's expert in this case, Lenore Knudtson, admitted that MDE was in violation of IDEA in 2016 in multiple different areas, based on Pingora's report:

- The report listed seven inconsistencies between MDE's policies and federal regulations, making them noncompliant.
- MDE's state complaint system was not addressing substantive issues, only procedural ones.
- MDE relinquished compensatory education decisions to the IEP team.
- MDE's complaint decisions did not address the future provision of services of all children with disabilities.
- MDE failed to systematically verify the correction of noncompliance.

*Id.* at 43:5-47:10.

The last two admissions are especially important and connected. Failing to systematically verify correction of noncompliance will inevitably lead to a failure to address future provision of services for all students with disabilities. It is exactly what happened to Plaintiffs.

MDE argues that it has corrected all the issues from 2016. Not so. Five years after the 2016 report, Knudtson's Pingora Consulting followed up with a second report on MDE's general supervision. In her deposition, Knudtson affirmed the stakeholder feedback provided to Pingora as part of this updated report. The stakeholders reported that in 2020:

- MDE's "corrective action development and verification of noncompliance was identified as a weakness . . . [and this was] especially prevalent in regions with ongoing noncompliance;"
- MDE "had not effectively connected dispute resolution reporting with monitoring activities;" and
- Only "32.35 percent" of "public school employees, ISD staff, advocates, parents, and attorneys" surveyed "agreed or strongly agreed" that MDE's "special education decisions included meaningful corrective action to address violations."

*Id.* at 98:24-101:12.

In 2021, Pingora also recommended MDE take several actions "relate[d] to noncompliance:"

(1) "design and utilize a corrective action rubric to track issues of noncompliance for due process hearings and state complaints;"
(2) "develop a corrective action workflow that assists complaint investigators in recognizing ongoing, repeated noncompliance;" and
(3) "review and update their incentives and sanctions to be used to address continued and systemic noncompliance."

*Id.* at 104:23-110:16.

A reasonable jury could well find that if Pingora, headed by MDE's own expert, provided an updated report in 2021, with the above findings and recommendations, that MDE's state complaint system of correcting noncompliance was still broken *at the time of the report*. Between the two reports, 2016 and 2021, Plaintiffs were deprived of FAPE by KPS. Evidence supports the argument that MDE had not fixed the issues, and it is a fact-based, open question whether the issues have even been resolved to-date. That issue is explored next.

**iii.  MDE's State Complaint System Remains Broken**

Defendant's brief neglects to mention that both parties retained expert witnesses on the issue of liability. This expert testimony showcases the depth of the systemic issues plaguing MDE and how those systemic failures impacted the three individual Plaintiffs in this case.

Plaintiffs' expert witness is Mark Mlawer, who has been working on special education state

supervision issues across the United States since 1988. Ex. 78 at 28:18-37:10. Through that work, Mlawer has reviewed state complaint systems and trained monitors on how to implement monitoring systems. Ex. 78 at 31:1-36:12. Mlawer additionally served as a court-appointed monitor, reviewing several iterations of a state's monitoring system. Ex. 78 at 30:8-17. Knudtson, MDE's expert, conceded that Mlawer has "the credentials to qualify as an expert in SEA general supervisor[y] responsibilities." Ex. 13 at 142:21-24.

 After reviewing KPS and KRESA complaint decisions from 2017-2023 with Child Find, evaluation, and reevaluation violations, Mlawer concluded that MDE had repeatedly violated federal Child Find requirements under the IDEA. Ex. 1, ¶¶ 5, 39. Those violations continued because: (1) MDE "assigned similar corrective actions for each of these complaints over this period of time despite the repetition of child find violations by KPS"; (2) MDE "failed to take action regarding the repetition of the violations"; (3) MDE "failed to act when the district did not fully cooperate with one investigation"; and (4) MDE "closed complaints without ensuring in an effective manner that KPS was correctly implementing the child find requirements." *Id.* at ¶ 13-15.

Despite the same Child Find violations recurring again and again, MDE continued to rubber-stamp boilerplate CAPs urging KPS to develop/review/revise its procedures and train its staff. *Id*. at ¶ 30. "Despite this habitual corrective action, KPS Child Find noncompliance continued unabated: complaints were unrelenting, and MDE continued to find noncompliance." *Id.* at ¶ 31. But when faced with non-compliance and/or repetition of the same violations, MDE declined to escalate enforcement actions. *Id.* at ¶¶ 27, 32-34. MDE could have required the intermediate school district to provide complying services and programs. *Id.* at ¶ 35. MDE could have withheld federal or state funds. *Id.* MDE could have sought enforcement from a court. *Id.*

But MDE took none of these steps, resulting in devastating consequences for KPS students with disabilities, who were deprived of educational opportunities and the support services they needed. *Id.* at ¶ 35. Mlawer went on to conclude that MDE had failed to review its data for any patterns or to identify any equity issues related to its Child Find program. *Id.* at ¶ 43. According to Mlawer, many of these high-level patterns would have been obvious to anyone reviewing the data, but MDE never did so. *Id.* at ¶ 44; Ex. 4 at 141:25-142:20.

Mlawer concluded that MDE's approach to systemic corrective actions was repetitive and ineffective. Ex. 1, ¶¶ 29-31. Mlawer also concluded that MDE failed to take required action when KPS and KRESA repeatedly and flagrantly violated the law and did not cooperate during one particular systemic investigation. Ex. 1, ¶¶ 27, 32-34. To this, Knudtson had no response: Indeed, her company, Pingora, has repeatedly presented trainings to MDE complaint investigators over the years urging them to consider graduated sanctions as a tool. Ex. 82, March 2020 Training, MDE_00002772; Ex. 83, December 2020 Training, MDE_00002581; Ex. 84, March 2023 Training 2, MDE_00002695. MDE pursued none of these example options against KPS. *Id.* While Knudtson testified that MDE had verified that KPS was correctly implementing specific regulatory requirements, her assertion failed to account for the treadmill of recurring complaints and findings of non-compliance.

A reasonable jury could find that MDE did not and does not have its house in order, and having failed in that job, was not capable of bringing KPS into compliance either.

### iv.  Plaintiffs' IDEA Claims Are Not Moot

Defendant further argues that Plaintiffs' IDEA claims are moot because they have already settled their claims related to Child Find with KPS. This argument has no merit. A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in

41

the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). That is not the case here.

MDE failed to ensure Plaintiffs received a FAPE. Insofar as MDE's failures contributed to that loss, MDE should provide Plaintiffs with compensatory education to put them in a place they would have been but for those failures. *Reid*, 401 F.3d at 524. After their first respective state complaints, MDE never required KPS to provide compensatory education for K.B. and Ke'Aujanaa, and a reasonable jury could find that MDE was responsible for deprivations of FAPE. DQ suffered greatly due to KPS's failures to properly evaluate him, and a reasonable jury could find that MDE failed him as well.

Plaintiffs have a clear private right of action to challenge MDE's failure to provide them a FAPE. 20 U.S.C. §§ 1412; 1415; *see also Ullmo*, 273 F.3d at 679 ("the language and structure of the IDEA suggest that either or both entities, the SEA or LEA, may be held liable for the failure to provide" a FAPE) (citing *St. Tammany Parish Sch. Bd. v. Louisiana*, 142 F.3d 776 (5th Cir. 1998)).

In each due process proceeding, Plaintiffs sought to vindicate their rights against MDE, but each time, MDE was dismissed upon MDE's own motion. *See* for DQ, Ex. 76; for K.B., Ex. 49; for Ke'Aujanaa, Ex. 65. This forum has the authority to issue the compensatory education that MDE should provide to Plaintiffs. While the other local districts have compensated for their part through settlement agreements with Plaintiffs, that is no bar to MDE also being held responsible for its contributions to the legal violations that harmed Plaintiffs. Thus, Plaintiffs' claims are not moot.

This case is similar to *A.B. by and through K.B. v. Michigan Department of Education*, where a special education student filed serial state complaints against his school district and MDE. 570 F. Supp. 3d 531, 533-34 (W.D. Mich. 2021). MDE found the district and *itself* out of compliance under IDEA. *Id.* When MDE's attempts to correct the noncompliance failed, A.B.

brought due process claims against the school district and MDE. *Id.* As here, the ALJ dismissed MDE for lack of jurisdiction, and the due process case settled with the school district. *Id.* at 534-35. When A.B. brought his claims against MDE in federal court, MDE argued that A.B. had failed to exhaust his claim against MDE. *Id.* at 536.

The *A.B.* court rejected this argument because the settlement was with other parties and MDE had been dismissed "*upon a motion from the MDE.*" *Id.* at 537 (emphasis original). If MDE could seek dismissal in the administrative forum and then claim lack of exhaustion in federal court, there would be no forum for plaintiffs to sue MDE for violations of IDEA. *Id.* at 538.

MDE is trying out the same logic here—albeit, substituting failure to exhaust with mootness. Because Plaintiffs here already settled with local districts, the argument goes, there must be nothing left to adjudicate. That argument is without merit.

Further, MDE mischaracterized Plaintiffs' educational goals as already attained and used it to argue that Plaintiffs "lack a legally cognizable interest in the outcome." MDE's inaccuracy is purposefully misleading. Plaintiffs wish to continue making up for lost educational time, and MDE failed to provide several statements—from depositions MDE took—that directly contradict the position it advances. K.B.'s and Ke'Aujanaa's testimony shows both would be willing to return to a school where a free, *appropriate* public education was available. Ex. 52 at 41:19-42:12, 87:24-88:14; Ex. 46 at 25:15-17, 26:23-27:3. Likewise, DQ is attending the compensatory education sessions that KPS is providing under his settlement agreement. He is actively catching up on lost time, and additional compensatory education from MDE would help advance that cause. Far from "double-dipping," ECF No. 80, PageID.429, Plaintiffs are seeking compensatory education from MDE in the only forum available to them.

In mischaracterizing Plaintiffs' educational goals, MDE creates a genuine issue of material fact that is best left to a jury to decide. What position would Plaintiffs occupy if MDE had actually corrected KPS's noncompliant practices in 2017? Or in 2018? How much compensatory education should MDE provide Plaintiffs for the difference between that version of reality and what actually happened? Plaintiffs' settlement agreements do nothing to answer those questions. A jury can and should, and thus Plaintiffs' IDEA claims should go forward.

### B.  MDE also Violated the Rehabilitation Act and the ADA

The IDEA is not the only source of rights for students with disabilities. Plaintiffs are also protected by Section 504 and Title II.

At the outset, MDE mischaracterizes Plaintiffs' theory of discrimination by asserting that Plaintiffs proceed under an intentional discrimination theory. ECF No. 80, PageID.452. But Defendant's framing is incorrect. While the complaint uses the word "intentional," it does so because under current Sixth Circuit precedent, intent must be proven to receive *damages*.[5] *See, e.g., Hill v. Bradley Cnty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008). Moreover, Plaintiffs' theory of liability for these claims is properly analyzed not under an intentional discrimination theory, but rather under a "failure to accommodate" framework. *See, e.g., Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1119 (6th Cir. 2021) ("A Title II plaintiff may bring a claim for intentional discrimination or for failure to provide a reasonable accommodation.").

---

[5] Professor Mark Weber has persuasively argued that no intent requirement should be imposed, either for liability or for monetary relief, for claimants seeking redress under Section 504 or Title II. As Professor Weber explains, courts' insistence on imposing intent requirements for purposes of monetary damages stems from an ill-suited analogy interpreting Title VI and Title IX of the Civil Rights Act. His article methodically reviews the statutory text and legislative history, concluding that these statutes never sought to impose intent requirements. *See* Mark C. Weber, *Accidentally on Purpose: Intent in Disability Discrimination Law*, 56 B.C. L. Rev. 1417 (2015).

The distinction matters: Proving an intentional discrimination theory requires establishing discriminatory intent, meaning specific acts of discrimination targeted against Plaintiffs, in particular. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). In contrast, a plaintiff alleging that a public entity failed to provide reasonable accommodations under Title II requires showing the defendant could have reasonably accommodated the Plaintiff but refused to do so. *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024). "Because failing to grant a reasonable accommodation is itself direct evidence of discrimination, plaintiffs who meet this burden need not provide additional evidence of discriminatory intent." *Id.* And, significantly for purposes of the present motion, courts have recognized that Plaintiffs' reasonable accommodation burden is highly fact-specific, "requiring case-by-case inquiry." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (citing *Roell v. Hamilton Cnty.*, 870 F.3d 471, 489 (6th Cir. 2017)). That "inquiry is often best left for a jury." *Schroeder v. AT&T Mobility Servs.*, 568 F. Supp. 3d 889, 893-94 (M.D. Tenn. 2021).

Here, MDE is liable for both equitable and damages relief to Plaintiffs because it failed to reasonably accommodate their disabilities by failing to correct KPS IDEA noncompliance, despite the obvious need and repeated opportunities to do so. This argument proceeds in five parts: First, Section 504's private right of action allows Plaintiffs to assert violations of the IDEA; MDE's insistence that the IDEA, itself, does not provide an adequate private cause of action is unavailing. Second, Plaintiffs have successfully established their failure-to-accommodate disability discrimination claims. Third, compensatory relief is appropriate, regardless of the intent standard applied. Fourth, injunctive relief is necessary and appropriate. Finally, MDE's alternative argument regarding Eleventh Amendment immunity is unavailing.

i.    **Section 504's Private Right of Action May be Used to Challenge MDE's Violations of the IDEA**

Defendant's brief argues that IDEA's lack of an explicit private right of action regarding an SEA's general supervisory responsibilities prohibits a frontal attack on how MDE discharges those responsibilities. ECF No. 80, PageID.444-447. In MDE's view, Plaintiffs' claims can only challenge how MDE's failures resulted in a denial of FAPE and therefore Plaintiffs should only have FAPE-related remedies available. This view is too narrow, as Section 504 contains its own private right of action, through which Plaintiffs may challenge MDE's failure to correct KPS's chronic noncompliance as discrimination that prevented them from accessing the benefit of a free appropriate public education.

It is well-established that there is an implied private cause of action to enforce Section 504. *Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 789 (6th Cir. 1996) (citing *Hall v. United States Postal Service*, 857 F.2d 1073, 1077-78 (6th Cir. 1988)); *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). And Section 504 has repeatedly been used to challenge government action that creates barriers for people with disabilities. *See Alexander v. Choate*, 469 U.S. 304 (1985) (Section 504 challenge to change in Medicaid coverage); *Traynor v. Turnage*, 485 U.S. 535 (1988) (challenge to GI Bill benefit limitation); *Waskul v. Washtenaw County Comm. Mental Health*, 979 F.3d 426 (6th Cir. 2020) (challenge to change in Medicaid billing practice). Here, MDE's failures had the effect of denying Plaintiffs equal access to education, meaning that the IDEA violations are properly invoked via a Section 504 claim.

In *Alexander v. Choate*, claimants brought a Section 504 challenge to changes in Tennessee's Medicaid program. The Court ruled against claimants, explaining that despite the change's disproportionate effect on people with disabilities, it was not discriminatory because it did not deny "meaningful access to the benefit," 469 U.S. at 301, as "Medicaid programs do not

guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs." *Id.* at 303. Here, IDEA's mandate is precisely that—"special education and related services are tailored to the unique needs of a particular child." *Endrew F.*, 580 U.S. at 391 (internal quotations omitted). The IDEA requires this "tailoring" through Child Find, evaluation, and reevaluation. MDE's repeated failure to correct KPS violations in those areas prevented Plaintiffs' meaningful access to a FAPE's benefit.

### ii.    Plaintiffs Have Established a Violation of Section 504/Title II

The elements of a 504/Title II failure to accommodate claim are that (1) Plaintiffs are individuals with a disability; (2) they are qualified to participate in the services of a public agency; (3) the public agency denied them the full and equal enjoyment of the services, programs, or activities of the public agency; and (4) for Section 504, the public agency receives federal funding.

MDE only contests the third element, arguing that Plaintiffs were not denied the "full and equal enjoyment of the services, programs, or activities of the public agency." ECF No. 80, PageID.452. But MDE incorrectly focuses on the question of intent, repeatedly arguing that Plaintiffs failed to establish proof of discriminatory motive. When viewed through the proper lens, of a failure to accommodate, a reasonable jury could certainly find that MDE violated Title II/Section 504 through its refusal to hold KPS accountable for its repeated violations of Child Find.

"The purpose of a reasonable accommodation is to enable a disabled individual to have, like his or her non-disabled peers, meaningful access to government services, programs, and activities. . . . Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *S.B. by & through M.B. v. Lee*, 566 F. Supp. 3d 835, 844-845 (E.D. Tenn. 2021). As the Sixth Circuit has explained, "[i]n stating that public entities shall not deny qualified disabled

47

individuals the benefits of public services, [Title II] necessarily requires that public entities provide such individuals the means necessary to acquire access to these services." *Ability Center of Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004). In an example about architectural barriers, the *Ability Center* court noted that, if a public entity creates a barrier, then "to ensure that the individual is not denied the benefits of the public service, the public entity must remove the architectural barrier of its own creation." *Id.*

Here, by its unwillingness to hold KPS accountable, MDE created a barrier for all KPS students with disabilities to access the benefit of special education, and MDE's self-created barrier denied Plaintiffs a FAPE. Plaintiffs' reasonable accommodation consists of MDE performing its general supervisory responsibilities sufficiently to ensure that KPS followed IDEA's mandates, for Plaintiffs and for all future students. 34 C.F.R. § 300.151(b)(2). KPS's flagrant and repeated noncompliance with its Child Find obligations compelled MDE to make reasonable modifications to its supervisory approach by issuing graduated sanctions or otherwise taking affirmative steps to ensure compliance. In MDE's failure to do so, Plaintiffs suffered. A reasonable jury could find that this failure satisfies the third element of Plaintiffs' disability discrimination claim; that it denied Plaintiffs the full and equal enjoyment of KPS's services, programs, or activities.

Plaintiffs' lack of an express reasonable accommodation request is no defense. When a public entity is on notice of its own statutory or regulatory obligations, it is not Plaintiffs who must evaluate themselves or articulate the reasonable accommodations that would provide them "full and equal enjoyment of the services, programs, or activities" of their local school; it's the public entity's obligation. *See A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016). A request for accommodation need not be explicit when a necessary modification is obvious because the "law requires no one to perform a useless act." *MX Group Inc. v. City of*

48

*Covington*, 293 F.3d 326, 344 (6th Cir. 2002) (citations omitted). Here, Plaintiffs' request that MDE exercise its general supervisory authority, compliant with IDEA's requirements, would have been "useless." Neither could MDE defend that such a modification would fundamentally alter "the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). IDEA's objective for SEAs is to "ensure" that there is access to special education. 20 U.S.C. § 1400(d)(1)(A).

MDE claims it held KPS accountable, that it investigated each of the Plaintiffs' complaints, issued, findings and ordered CAPs as warranted, and followed-up to ensure CAPs were implemented. ECF No. 80, PageID.443. MDE further touts a 2019 on-site KPS investigation. ECF No. 80, PageID.438. In an internal email, McIntyre blames a lack of adequate staffing, and zealous Kalamazoo community advocacy as the original idea behind its 2019 on-site investigation. Ex. 85, 19-0213 McIntyre-Chapman Email. McIntyre's concern supports Plaintiffs' request for an "appropriate number of staff to ensure that [CAPs] are enforced and result in the correction of identified noncompliance." ECF 10, PageID.100. And as timesaving as MDE thought that on-site investigation would be, KPS's noncompliance with IDEA Child Find regulations continued apace. *See* Ex. 7.

While, admittedly, MDE developed a potentially valuable Child-Find checklist, it never verified its use at KPS. Ex. 1 at ¶ 25-26, "If one assumes that MDE oversaw KPS' use of this checklist and did so effectively, the result would likely have been the referral for evaluation of all students at this facility who could be reasonably suspected of having disabilities." *Id. at* ¶ 25. That did not happen. *Id.*

MDE's reliance on a 2020 report prepared by OSEP is misplaced and highly misleading. Though MDE claims that OSEP had offered a full-throated approval of MDE's entire state complaint system, ECF No. 80, PageID.437, the evidence is otherwise. The OSEP Report was only

probing the method of how MDE-OSE calculates and orders compensatory education—nothing else. Ex. 1 at ¶ 56; ECF No. 80-60, PageID.1073. MDE's expert agreed with this narrow construction. *See* Ex. 13 at 168:18-169:1 (admission that "the only process that [OSEP was] concerned about was determining the need and amount for compensatory education"). Later, when Knudtson stated that OSEP *could have* been reviewing "systemic findings of noncompliance," she pointed to its review of "MDE's guidance for determining the need and amount of compensatory education." *Id.* at 170:10-14. That MDE guidance is two pages long and has no mention of remedying systemic violations. *See* Ex. 86, MDE Guidance Comp. Ed.

In total, MDE's argument concerning its efforts to hold KPS accountable cannot withstand the evidence amassed. Ex. 1 at ¶¶ 4-6, 13-16, 28. MDE's approach of continually finding KPS noncompliant with Child Find and then accepting policy documents and evaluations that fail to address root causes, without ever utilizing graduated sanctions or other measures to impose actual accountability, shows that MDE never found an answer to its own questions about correcting its identified noncompliance at KPS. Ex. 1 at ¶¶ 31, 35; Ex. 32. MDE's claim of correcting KPS's Child Find, evaluation, and reevaluation issues is clearly undermined by its own drum beat of KPS violations. Ex. 1 at ¶¶ 5, 13-14, 16-22. A reasonably jury could well find that MDE's system of correcting noncompliance failed—over and over again.

### iii.    Plaintiffs Are Entitled to Compensatory Relief, Regardless of the Intent Standard Applied

Defendant alleges that even if Plaintiffs prevail on the question of liability, there is no viable path to recover compensatory damages[6] and injunctive relief. ECF No. 80, PageID.458-462. On both counts, Defendant is wrong.

---

[6] Plaintiffs retained expert reports from both a vocational expert and an economics expert related to damages stemming from lost future earning capacity.

The law is in a state of flux regarding whether and to what extent Plaintiffs must show intentional conduct in a Title II/Section 504 claim to secure compensatory damages. There is a compelling argument that no such intent requirement whatsoever should be grafted on to these causes of action (whether for liability or damages) in light of the absence of any such requirement in the statutory language and the judiciary's misguided reliance on an inapt analogy in creating this judge-made rule. *See supra* note 5.

Even within the Sixth Circuit, there is uncertainty regarding precisely the type of intent required. *See Knox County TN v. MQ*, 62 F.4th 978, 1001-02 (6th Cir. 2023) (expressing doubt about a standard requiring Plaintiffs to establish that Defendant state entity exercised bad faith or gross misjudgment, without reaching the issue). Fortunately, this standard will be decided by the U.S. Supreme Court before summer's end. *See A.J.T. v. Osseo Area Sch.,* No. 24-249, 2025 WL 226839 (U.S. Jan. 17, 2025) (granting cert).

Plaintiffs share Professor Weber's view that Plaintiffs need not establish intent for either liability or damages under a reasonable accommodation theory. An intent requirement is judge-created law, divorced from the text of Section 504 or Title II, and stems from an inapt analogy to Title VI, which (unlike Section 504 and Title II) protects only against intentional discrimination. *See* Weber, *supra; I.L. through Taylor v. Knox Cnty. Bd. of Educ.,* 257 F. Supp. 3d 946, 969 (E.D. Tenn. 2017).

However, the Supreme Court's upcoming *A.T.J.* decision aside, Plaintiffs can still show that Defendant acted with either (1) bad faith/gross misjudgment or (2) deliberate indifference.

With deliberate indifference, defendants must have "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Douglas v. Muzzin*, 2022 WL 3088240, at *8 (6th Cir. Aug. 3, 2022). For bad faith / gross

misjudgment, the "element of discriminatory intent . . . does not require malice . . . or a subjective intent to harm students with disabilities, but only a gross misjudgment that has a discriminatory effect." *W.H. et al. v. Tennessee Dep't of Educ.*, No. 3:15-1014, 2016 WL 236996, at *7 (M.D. Tenn. Jan. 20, 2016). In *A.B.*, *supra*, plaintiff brought IDEA, Section 504 and Title II claims, alleging MDE failed to correct identified noncompliance and purposely took a hands-off approach. MDE sought dismissal, arguing that the plaintiff had failed to establish that MDE had acted with bad faith or gross misjudgment. The Court disagreed, noting that, among other things, there were "seven different statements in the complaint where [Plaintiff] allege[d] 'a pattern of knowing failures by MDE.'" *A.B.*, 570 F. Supp. 3d at 539.

This case provides similar facts to *A.B.*, but on a larger scale. MDE knew KPS was *systematically* failing to provide students with disabilities comprehensive evaluations pursuant to IDEA in 2017. MDE failed to correct the issue then. And then MDE had two additional independent chances to correct KPS's noncompliance before any of the Plaintiffs entered the picture, but the noncompliance persisted. Splitting hairs when it comes to Child Find, allowing state complaints to be resolved despite an absence of proof of change, and repeatedly requiring KPS to engage in the same ineffective compliance activities, while simultaneously continuing to find KPS out of compliance for the same issue for years, provides a reasonable jury with more than enough evidence to find that MDE was both (1) deliberately indifferent by seeing the potential for harm and failing to act upon that potential; and (2) exercising "gross misjudgment."

### iv.    Plaintiffs Are Entitled to Injunctive Relief

Plaintiffs' entitlement to relief extends beyond compensatory damages. Injunctive and declaratory relief is also appropriate here, because such relief is necessary to ensure that MDE does not continue to violate special education laws in its supervisory role. The crux of MDE's

injunctive relief argument is that because Plaintiffs have "matriculated out of school and have been compensated for any lose [*sic*] through the settlements with the LEAs," ECF No. 80, PageID.460, such relief is unavailable. This argument is fatally flawed because two of the three plaintiffs have not graduated, and still wish to pursue a merit diploma, contrary to Defendant's suggestion that they have no interest in "re-enroll[ing] or finish[ing] their high school educations." *Id.* And, as discussed above, *see supra* Part III(A)(iv), Plaintiffs' separate settlements with their local districts do not moot their injunctive relief requests.

Defendant's premise is simply mistaken. Compensatory education may extend a student's services beyond the age of eligibility (whether age 22, like most states, or age 26 in Michigan). *See, e.g.*, *Barnett v. Memphis City Schools*, 113 F. App'x 124 (6th Cir. 2004); *Somberg*, 908 F.3d at 162. Graduation itself is no barrier either, as that would create quite a disincentive for providing services to students nearing graduation. Recently, the Sixth Circuit approved more than 800 hours of compensatory education for a student who "graduated" but could not read. *William A.*, 127 F.4th at 656, 660 (6th Cir. 2025).

K.B. and Ke'Aujanaa could enroll at several different school districts, which would be required to implement their last IEP or hold evaluations to create new ones. 34 C.F.R. § 300.301. Given the gap in schooling, it is highly likely that a new school district would opt to reevaluate KB and Ke'Aujanaa, particularly in light of IDEA regulations requiring triennial reevaluations of students with disabilities. § 300.303(b)(2). Should there be any issue with the reevaluation process, K.B. and Ke'Aujanaa would be forced to rely on the same flawed state complaint process that failed them while they were attending KPS to once again attempt to vindicate their IDEA rights.

For purposes of redressability, the particular Michigan *school district* that they might attend is far less important than the *process* MDE uses to ensure that every school district complies with

IDEA requirements in the closely related areas of Child Find, evaluations, and reevaluations. This is why state-wide injunctive relief is merited.[7]

MDE's legal framework is no barrier. Each case cited regarding a bar on injunctive relief for graduating students is inapposite. *See Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128 (1975) (per curiam) (holding that if a particular school's rules infringe upon students' rights and those students graduate, such claims are moot; here, Plaintiffs do not challenge the rules of any particular district and two Plaintiffs remain eligible for merit diplomas); *Malkentzos v. DeBuono*, 102 F.3d 50, 55-56 (2d Cir. 1996) (vacating a lower court's preliminary injunction because student had aged out of the program; here, none of the Plaintiffs have "aged out" ); *Curry v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723 (E.D. Mich. 2006) (finding that injunctive relief Plaintiff sought was moot, because he had since graduated from the middle school where he alleged he faced free speech violations; here, K.B. and Ke'Aujanaa may reenroll at KPS, CPS, or any other school, and would still be subject to MDE's same flawed state complaint system); *Moseley v. Bd. of Educ. of Albuquerque Pub. Schs.*, 483 F.3d 689 (10th Cir. 2007) (deaf student's IDEA and 504/Title II claims concerning his school's decision not to use a captioning service in his classroom were moot upon his graduation, because the "tenor" of his entire case and proceedings sought only injunctive, forward-looking relief; here, the scope of the alleged violation is far more expansive, two of the Plaintiff have not graduated, and all three have requested relief that is both forward-looking and backward-looking).

The decision in *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092 (9th Cir. 2000), is also distinguishable as it concerns a school administrator's one-time denial of a one-time

---

[7] Plaintiffs do concede that Defendant's points concerning ALJ training and lack of funding are well taken. ECF No. 80, PageID.450-451. Plaintiffs no longer pursue injunctive relief upon those two specific grounds.

opportunity for a pair of graduated high school students to give speeches with religious messaging to their graduating classmates. The court found there were no facts supporting an exception to mootness under the theory of "capable of repetition, yet evading review." *Id.* at 1098. In contrast, in the present case, MDE's state complaint system is failing to correct noncompliance in Child Find, evaluation, and reevaluation contexts in districts across the state,[8] and a reasonable jury might expect that K.B. and Ke'Aujanaa would experience the same denials of FAPE as they previously experienced.

In its analysis of "capable of repetition, yet evading review," the Supreme Court has affirmed that a "reasonable expectation" of recurrence may suffice, even if there is no "demonstrated probability" of the concern arising again. *Honig v. Doe*, 484 U.S. 305, 318-19 n.6 (1988) (applying the exception on the grounds that it was reasonably likely that a student with a disability that manifested difficult behaviors would again be subjected to a unilateral disciplinary change of placement). Considering the status of K.B.'s and Ke'Aujanaa's education, there is a "reasonable expectation" that they would be reevaluated to understand their educational needs once enrolled at a new school. Regarding the "yet evading review" prong of the exception, the Court noted that the "ponderous" nature of litigation under the special education laws weighed in favor of plaintiff in *Honig* as any future student with a disability whose rights are violated "will often be finished with school or otherwise ineligible for [IDEA] protections by the time review can be had in this Court." *Id.* at 322-23.[9] So, too, here.

---

[8] Like the pattern of noncompliance found at KPS, Plaintiffs have found repeat noncompliance in the state complaint decisions on this issue from three other school districts, Alpena Public Schools, Flint Community Schools, and Detroit Public School Community District. *See* Ex. 8, Ex. 9, and Ex. 10 (each a spreadsheet of complaint decisions for the respective school district, each admissible under FRE 1006).

[9] *Honig* is relevant for another reason. In discussing the injunctive relief requested in *Honig*, the Court stated that "it matters not that [Plaintiffs] no longer reside within" their previous district, it

**v.    MDE Has Waived its Right to Assert 11th Amendment Immunity**

Finally, Defendant asserts that Plaintiffs' ADA claims are barred by the Eleventh Amendment. ECF No. 80, PageID.455-458. "As a practical matter, this argument is likely of little import, since the plaintiffs would, in any case, be entitled to the same monetary damages under Section 504, and any claim for damages under Title II would be duplicative." *W.H.*, 2016 WL 236996, at *8. It is undisputed that MDE expressly disclaims 11th Amendment immunity under Section 504. *See, e.g., Nihiser v. Ohio EPA*, 269 F.3d 626, 628 (6th Cir. 2001).

But Title II claims are likewise not barred by Eleventh Amendment immunity. Whether Title II is a congruent and proportional means of addressing unconstitutional discrimination, such that it would qualify for waiver of Eleventh Amendment immunity under § 5 of the Fourteenth Amendment, is an analysis done on a case-by-case basis. *See Tennessee v. Lane*, 541 U.S. 507 (2004) (finding Title II validly abrogated 11th Amendment immunity in case concerning right to equal access to courts). Here, the rights at issue are free appropriate public education under IDEA and the right to be free from discrimination while accessing a free appropriate public education under Section 504.

Courts have repeatedly found an abrogation of Eleventh Amendment immunity in cases like this one, which raise allegations of disabled students being deprived of education-related rights. For example, in *D.R. v. Michigan Dep't of Ed.*, No. 16-13694, 2017 WL 4348818, at *8 (E.D. Mich. Sept. 29, 2017). MDE alleged that the Title II claims were barred due to Eleventh Amendment immunity in a case alleging systemic violations related to failures by MDE and local

---

was a failure of "state policy . . . [that] led to" the local practice of unilateral disciplinary placement. 484 U.S. at 320. The Court approved the district court's injunction enjoining the state defendant from authorizing such a practice as "properly balanced" between the students' interest in "receiving a [FAPE]" and the "state and local school officials in maintaining a safe learning environment for all their students." *Id.* at 328.

districts to ensure a FAPE for a class of disabled students. The Court disagreed, explaining that while the Sixth Circuit has not yet ruled on whether the Eleventh Amendment is abrogated in the context of public education, persuasive authority from the First, Third, and Fourth Circuits had found that it was. *Id.* Likewise, in *W.H.*, the court agreed with the reasoning of sister circuits that Title II abrogates a state's immunity under the Eleventh Amendment, *even absent any Constitutional claims*, when it comes to "public *primary* education." 2016 WL 236996, at *8-9 (collecting cases finding abrogation) (emphasis original); *cf. Saqr v. University of Cincinnati*, 2019 WL 699347 (6th Cir. 2019) (finding no abrogation on facts of Title II claim in *post-graduate* education case).

Even if the Court accepts MDE's premise that application of the 3-factor test outlined in *United States v. Georgia* is necessary to establish that Eleventh Amendment immunity is abrogated here, its argument still fails. 546 U.S. 151 (2006). Notably, even though Plaintiffs did not expressly plead a Fourteenth Amendment violation, the third *Georgia* factor considers "insofar as such conduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity in such contexts is nevertheless valid." *Georgia*, 546 U.S. at 152. As one federal court explained, "[t]he possibility that abrogation may be enforceable with respect to claims that do not involve Fourteenth Amendment violations appears to refer to prior Supreme Court precedent explaining that, where there has been a history of constitutional violations in a particular area and Congress has enacted legislation that is congruent with, and proportional to, those violations, such legislation may be enforceable against the states, even to the extent that the legislation regulates conduct not proscribed by the Constitution." *W.H.*, 2016 WL 236996, at *8. The *W.H.* court, relying on persuasive precedent from five different circuit courts, held that "abrogation is valid for such claims, even where there is no Fourteenth

Amendment violation at issue," given that Title II was a congruent and proportional means of preventing and remedying unconstitutional discrimination. *Id*.

Defendant's arguments to the contrary are unpersuasive. Central to MDE's argument is that "Plaintiffs' ADA claims are clearly based on equal protection principles," ECF No. 80, PageID.458, and pursuant to *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*, 276 F.3d 808, 816 (6th Cir. 2001) (en banc), claims sounding in equal protection do not abrogate Eleventh Amendment immunity. But *Popovich* has been abrogated by *Mingus v. Butler*, 591 F.3d 474 (6th Cir. 2010), and courts have since held that reliance on *Popovich* in cases like the present one is misplaced. *See, e.g.*, *McBride v. Michigan Dep't of Corr.*, No. CV 15-11222, 2015 WL 13221229, at *9 (E.D. Mich. Oct. 30, 2015).

## CONCLUSION

Having established genuinely disputed material facts, including through lay and expert testimony canvassing years of repeated failures, summary judgment should be denied.

Respectfully submitted,

Dated: April 10, 2025

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Salvatore Prescott Porter & Porter, PLLC
*Attorneys for Plaintiffs*
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@sppplaw.com
fegley@sppplaw.com

Mitchell D. Sickon (P82407)
Erin H. Diaz (P80388)
Disability Rights Michigan
*Attorneys for Plaintiffs*
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755

ediaz@drmich.org
msickon@drmich.org

Elizabeth K. Abdnour (P78203)
Abdnour Weiker, LLP
*Attorneys for Plaintiffs*
500 E. Michigan Ave., Ste. 130
Lansing, Michigan 48912
(517) 994-1776
liz@education-rights.com

Jacquelyn N. Kmetz (P83575)
MI AECRES
*Attorneys for Plaintiffs*
P.O. Box 705
Ludington, Michigan 49431
(231) 794-2379
jkmetz@miaecres.org

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.2(b)(ii), Plaintiffs certify that this brief complies with Local Rule 7.2(b)(i)—as modified by the Court's Stipulated Order (ECF No. 83, PageID.1123-24) permitted up to 18,000 words—as this brief includes 17,767 words. Microsoft Word Office 365 is the word processing software used to generate the word count in the above brief.

/s/ David L. Fegley
David L. Fegley (P85275)

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2025, I electronically filed the above document and Plaintiffs' Corrected Response to Defendant's Motion for Summary Judgment and accompanying documents using the ECF System which will send notification of such to all represented parties.

/s/ David L. Fegley
David L. Fegley (P85275)