# EXHIBIT 13

Page 1

```
 1              U.S. DISTRICT COURT
 2           WESTERN DISTRICT OF MICHIGAN
 3                SOUTHERN DIVISION
 4
 5  Donquarion Lewis; Ke'Aujanaa
 6  Shepherd-Friday; and K.B., by
 7  and through her parent and
 8  Next friend, H.B.,
 9          Plaintiffs,
10
11     vs.            Case No. 1:22-cv-00838-RJJ-PJG
12
13  MICHIGAN DEPARTMENT OF EDUCATION,
14  a governmental agency,
15          Defendant.
16  _____
17
18
19     Deposition of LENORE KNUDTSON
20     Taken via Remote Videoconference
21     Commencing at 10:00 a.m.
22     Tuesday, October 29, 2024
23     Before Paula S. Raskin, CSR
24
25
```

Page 2

```
 1  A P P E A R A N C E S (All Remote):
 2
 3  Mitchell D. Sickon, Esq.
 4  Erin H. Diaz, Esq.
 5  DISABILITY RIGHTS MICHIGAN
 6  4095 Legacy Parkway
 7  Lansing, Michigan 48911
 8  (517) 487-1755
 9  msickon@drmich.org
10  ediaz@drmich.org
11  and
12  Jennifer B. Salvatore, Esq.
13  Salvatore Prescott Porter & Porter
14  105 East Main Street
15  Northville, Michigan 48167
16  (248) 679-8711
17  salvatore@spplaw.com
18       Appearing on behalf of the Plaintiffs
19
20
21
22
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S  (Continued):
 2
 3  Ticara D. Hendley, Esq.
 4  Michigan Department of Attorney General
 5  Health, Education & Family Services Division
 6  P.O. Box 30758
 7  Lansing, Michigan 48909
 8  (517) 335-7603
 9  hendleyt1@michigan.gov
10       Appearing on behalf of the Defendant
11
12
13  ALSO PRESENT:
14       Meredith Isaac
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              E X A M I N A T I O N S
 2
 3
 4  WITNESS                                     PAGE
 5  LENORE KNUDTSON
 6  EXAMINATION BY MR. SICKON:                     6
 7
 8
 9              E X H I B I T S
10
11  NUMBER          DESCRIPTION                 PAGE
12  EXHIBIT 59   Email Re Draft Letter to KPS    132
13              Counsel
14  EXHIBIT 63   Pingora Report - Feb 2016        24
15  EXHIBIT 67   OSEP General Supervision         57
16              23-01
17  EXHIBIT 82   Pingora Report - Feb 2021        95
18  EXHIBIT 86   23-0051 Final Decision          195
19  EXHIBIT 99   Knudtson CV                      24
20  EXHIBIT 100  Knudtson Expert Report           41
21  EXHIBIT 101  Training March 2020 -            62
22              Pingora
23  EXHIBIT 102  Pingora Training Slides -        74
24              Dec 2020
25
```



Page 9

```
 1     question, okay?
 2  A. Okay.
 3  Q. If you need a break at any time, for any reason,
 4     please tell me or tell your attorney.  I will finish
 5     my line of questioning if we are in the middle of it
 6     and then see to that break.  Does that sound fair?
 7  A. Yes.
 8  Q. Now, because this is all an effort to get your full,
 9     complete, and accurate answers, I have to ask are
10     you taking any medications or drugs of any kind that
11     might make it difficult for you to understand and
12     answer my questions today?
13  A. None.
14  Q. Have you taken any cough syrup or medicine or
15     anything containing alcohol that likewise might make
16     it hard to answer questions today?
17  A. No.
18  Q. Okay.  Are you sick at all today?
19  A. No.
20  Q. Okay.  Glad to hear it.
21         Now, is there any reason other than
22     anything I've talked about why you can't give full,
23     complete, and accurate testimony today?
24  A. I do not have any reasons.
25  Q. Okay.  So we're going to start today talking about
```

Page 10

```
 1     your background, and I'm going to pull up your CV.
 2         Let me make sure it's as big as possible
 3     so that we keep that readable.  How does that look?
 4  A. I can see it.
 5  Q. Okay.  It says here that your first educational
 6     employment experience was working as a school
 7     psychologist.  Is that right?
 8  A. Yes.
 9  Q. And in addition, you were representing students as
10     an attorney from 1997 to 2004?
11  A. Yes.
12  Q. Have you worked representing families since that
13     time?
14  A. No.
15  Q. After that, it looks like you started educational
16     consultation work in 2005.  Is that right?
17  A. Yes.
18  Q. Okay.  And that was on your own through Utah State?
19  A. I'm not sure what you mean by on my own through Utah
20     State.
21  Q. Before you formed Pingora with Stephanie Weaver.
22  A. Oh, okay.  Yes, I have had a consulting relationship
23     with Utah State University since 2005.
24  Q. Okay.  But then you formed Pingora Consulting with
25     Stephanie Weaver in 2012, right?
```

Page 11

```
 1  A. Yes.
 2  Q. Okay.  Are there any other employees at Pingora
 3     Consulting other than you and Ms. Weaver?
 4  A. No.
 5  Q. Since you started consulting in 2005, have you done
 6     any other work in special education?
 7  A. I'm not sure what you mean by any other work.
 8  Q. As an attorney, have you represented any parties in
 9     special education matters?
10  A. No.  If I could clarify my previous response,
11     though, when you asked if I have represented
12     families, any families, since I believe 2005, I
13     have, in addition to my special education practice,
14     at times maintained a small private practice here in
15     my home community just to keep the courtroom skills
16     sharp, and I have on occasion represented, for
17     instance, people with mental health needs, children
18     removed from their home by the child protection
19     system, but not in education in any capacity.
20  Q. Okay.  And that sounds more like abuse and neglect
21     work?  Is that fair?
22  A. There was some abuse and neglect work, and there was
23     also some mental health work.
24  Q. So like commitments and things like that?
25  A. Yes.
```

Page 12

```
 1  Q. Okay, thank you.  I appreciate you adding to -- and
 2     if you need to do that in any other future questions
 3     or answers, something comes to you later, feel free
 4     to supplement in the same way, okay?
 5  A. Yes.
 6  Q. Okay.  I'll move on to Page 2 here where we see your
 7     professional highlights, okay?
 8  A. Yes.
 9  Q. Now, looking through this pretty quickly, it seems
10     like most of these are related to your work
11     performed as an educational consultant.  Is that
12     fair?
13  A. Yes.
14  Q. Okay.  Now, at the very top, we see that you are
15     also a senior consultant at CADRE, the Center for
16     Appropriate Dispute Resolution in Special Education,
17     right?
18  A. That is correct.
19  Q. Okay.  Was that or is that a paid position?
20  A. No.
21  Q. Okay.  So that's a volunteer position?
22  A. It's an invited position.
23  Q. And so it's kind of pro bono?
24  A. Yes.  CADRE invites what they consider to be
25     experts --
```



Page 13

```
 1        (Reporter clarification.)
 2  A.  CADRE invites professionals from the field to become
 3      senior dispute resolution consultants for them.
 4  Q.  And how long have you done that?
 5  A.  I would say two to three years.
 6  Q.  Now I'm going to go through the rest of these
 7      professional highlights and I'm going to talk
 8      specifically about some of the connections with MDE.
 9          First, you list national and state
10      trainer after the presenter, and so in that trainer
11      section, it notes that you have trained MDE in ALJ
12      systems and complaint investigators.  Is that right?
13  A.  Yes.
14  Q.  Okay.  And you've presented repeatedly on complaint
15      investigation to MDE, right?
16  A.  I'm not sure what you mean by repeatedly, but I've
17      had regular training with them.
18  Q.  Do you know how many times you've presented a
19      training that was intensive, maybe say involving a
20      presentation through PowerPoint on that topic to
21      MDE?
22  A.  And by topic, you mean complaint investigations
23      specifically?
24  Q.  Yeah.
25  A.  I would say -- this would be strictly an estimate.
```

Page 14

```
 1      I would say 15 to 20 times.
 2  Q.  Any idea how many times that's been to MDE?
 3  A.  That would be to MDE.
 4  Q.  Okay.  Now, the ALJ systems that's mentioned here,
 5      is that a training for ALJs or training for SEAs
 6      about ALJs?
 7  A.  It is typically to ALJs.
 8  Q.  So ALJs are the intended audience then.
 9  A.  Yes.
10  Q.  Are there any other special education trainings that
11      you've provided to MDE staff on topics other than
12      those two areas?
13  A.  When you train on complaints investigation, or at
14      least when I train on complaints investigation, it
15      also involves substantive topic areas.
16  Q.  Okay.  We'll go through some of -- a couple of those
17      presentations later.
18          Can you tell me what is the rate that you
19      charge for training?
20  A.  It has varied over the years, but training is
21      roughly $200 an hour.
22  Q.  Now, in the next section of the professional
23      highlights is -- that relates to Michigan at least,
24      is the IDEA dispute resolution consultant, slash,
25      investigator, slash, mediator.  And MDE is listed as
```

Page 15

```
 1      one of the folks that you've worked for in that
 2      capacity, right?
 3  A.  Yes.
 4  Q.  All right.  Now, let's take consultant first.
 5      What's involved in that role for you when you work
 6      with MDE?
 7  A.  Ongoing professional development and technical
 8      assistance.
 9  Q.  Okay.  When you say ongoing, how frequently?
10  A.  In Michigan specifically, typically every other week
11      barring a holiday that falls on that day or some
12      other conflict, like staff may be attending some
13      kind of in-house workshop or out-of-state -- or
14      out-of-office training.
15  Q.  Okay.  So the -- twice a month, you said,
16      thereabouts?
17  A.  Thereabouts.
18  Q.  And how long has that kind of ongoing technical
19      assistance relationship been with MDE?
20  A.  I would say roughly since 2017, '18.
21  Q.  Okay.  And would the rate that you charge for that
22      be similar to what you charge for trainings?
23  A.  Yes.
24  Q.  So about 200 an hour?
25  A.  Yes.
```

Page 16

```
 1  Q.  Okay.  Now let's talk about the investigator
 2      component of that role.  It says IDEA dispute
 3      resolution investigator role.  What do you do in
 4      that capacity for MDE?
 5  A.  On occasion I serve as the complaint investigator,
 6      so mostly in the capacity of a complaint filed
 7      against MDE directly, although they have the
 8      authority under the federal regulations to conduct
 9      their own investigation by internal staff when there
10      is a complaint filed against MDE.
11          MDE has, in many instances, opted to
12      assign that out to an investigator, and I've been
13      one of the investigators that have been assigned
14      state complaint investigations when a complaint's
15      filed against MDE.
16          And there have been maybe two or three
17      other times where they have requested that I conduct
18      a complaint investigation that may not be against
19      MDE.  It may be against a district or an ISD.
20  Q.  Okay.  And about how long has -- have you been doing
21      that work, investigating state complaints, whether
22      against MDE or other entities?
23  A.  I would say roughly the same time period, 2017, '18.
24  Q.  And in terms of rate of pay, again is that similar,
25      about $200 an hour, to do the investigation work?
```



Page 17

1   A.  Yes.
2   Q.  The last is mediator.  Do you work as a mediator for
3       MDE?
4   A.  No.
5   Q.  So in this block, it's primarily the consultant and
6       investigator work that you do for MDE.
7   A.  Yes.
8   Q.  All right.  The next section is independent court
9       expert.  It says that you also work with MDE in that
10      capacity as well, right?
11  A.  Yes.
12  Q.  And we talked a little bit before about being
13      deposed and that you were involved in the AB case,
14      which was against MDE, right?
15  A.  Yes.
16  Q.  Other than the AB case, is there any other work that
17      you've done in this capacity as an independent court
18      expert for MDE?
19  A.  This case.
20  Q.  Okay.  That makes sense.
21          All right.  Now, going back just briefly
22      to that dispute resolution consultant work you did
23      for MDE, as a part of Pingora, you issued reports to
24      MDE about its dispute resolution system in 2016 and
25      2021, right?

Page 18

1   A.  Yes.
2   Q.  Okay.  And when you performed that work, were you
3       paid the -- about $200 an hour type rate or was that
4       different?
5   A.  I suspect almost ten years ago, it was a little bit
6       less.
7   Q.  And the 2021, it might have been a little bit more?
8   A.  I don't recall.
9   Q.  Were there any other instances when your consulting
10      with MDE produced a substantive report like the ones
11      Pingora issued in 2016 or 2021?
12  A.  No.
13  Q.  Okay.  Now, when we were last talking about
14      independent court expert as we were going through
15      this list, you had mentioned the New Mexico case, so
16      I would assume that's what the New Mexico
17      Department -- or Education Department reference here
18      is.
19          What was your involvement with the
20      Montana Office of Public Instruction?
21  A.  It was in anticipation of litigation.  I was not
22      deposed in that matter.
23  Q.  What was the case?
24  A.  I do not recall the name.
25  Q.  The SEA was involved in that Montana case?

Page 19

1   A.  Yes.
2   Q.  And that's -- OPI is the SEA Montana?
3   A.  Yes.
4   Q.  Okay.  Do you know if that case settled before it
5       went to Federal Court?
6   A.  I do not.  Again, my involvement was in anticipation
7       of litigation, and I was never formally deposed and
8       I wasn't made aware of the status of any Federal
9       Court case.
10  Q.  Okay.  Now, the last section that references MDE is
11      the ongoing IDEA technical assistance.  Now, we
12      already talked a little bit about this, the kind of
13      twice a month schedule.  Is that what this section
14      refers to when it comes to MDE's relationship with
15      you and your work?
16  A.  Yes.
17  Q.  Now, we've talked about a whole slew of different
18      ways that you've worked with MDE in reviewing your
19      CV, right?
20  A.  I'm not sure what you mean by slew, but there were
21      several or multiple ways, yes.
22  Q.  Sure.  Are there any other ways that you've worked
23      for MDE that we have not talked about?
24  A.  Not to my knowledge, no.  I mean there's --
25      consultation or being a consultant is a broad

Page 20

1       category.
2   Q.  And so they might call you outside of the every, you
3       know, two-week meeting that's scheduled for your
4       opinion on something, just as an example?
5   A.  Yes.  I think that --
6   Q.  Or send an -- just send an email about a question
7       they have, something like that?
8   A.  I think that's possible.
9   Q.  Okay, all right.  So you mentioned that consulting
10      is a broad term, and, you know, I've just mentioned
11      like kind of an informal kind of discussion, and
12      we've talked about the regularly scheduled meetings.
13          Was there anything, you know, that you do
14      in terms of consulting outside of those things with
15      MDE?
16  A.  No.  I would be available to them if they had
17      questions, and I am regularly scheduled to provide
18      technical assistance and consultation to them.
19  Q.  So do you have a contract with them that -- like as
20      an independent contractor to work with them on
21      special education matters?
22  A.  Pingora Consulting does.
23  Q.  How long has that relationship existed between
24      Pingora and MDE?
25  A.  Roughly since -- you mean the ongoing relationship?



Page 25

1  Q.  Your expert report in this case.
2  A.  I'm sorry, I'm not tracking.
3  Q.  In this case, the expert report that you filed was
4      issued under your own name and not through Pingora
5      Consulting.  Is that correct?
6  A.  If you scroll up, it was issued under Pingora
7      Con- -- oh, I'm sorry, you switched.  Okay.  I
8      thought you were still on the other report.  I'm
9      sorry.
10 Q.  No.
11 A.  This is, yes, it is issued under my name.  It is
12     still work through Pingora Consulting.  My business
13     partner is not an attorney, and this would have been
14     work that would be assigned to me as the attorney in
15     the partnership.
16 Q.  I see, thank you.  We are going to get to this 2016
17     report.  I just wanted to clarify some of the
18     relationship and the work from Pingora Consulting
19     and things like that first.
20 A.  Sorry for the confusion, but this report was on the
21     screen when you first asked the question, which --
22 Q.  Yeah, that makes sense.
23         And we talked earlier about the work that
24     Pingora was produced through -- or for MDE, right?
25     There was a lot of work starting, it sounds like,

Page 26

1      2017, 2018 there's been an ongoing relationship.  Is
2      that right?
3  A.  Yes.
4  Q.  Okay.  And your personal contributions were a
5      substantial part of all that work, right?
6  A.  Yes.  Likewise would be my partners.
7  Q.  Yes, absolutely.  Would you say that you and
8      Ms. Weaver contribute roughly equal amounts to any
9      work produced by Pingora Consulting?
10 A.  Roughly.  She works in areas in which I don't work,
11     and I work in areas in which she doesn't work.
12 Q.  Okay.  And you mentioned the kind of legal split;
13     that you handle more legal matters.  Is that right?
14 A.  Yes.
15 Q.  Okay.  Would you agree that through Pingora, you
16     express your expertise in legal matters?
17 A.  Yes.
18 Q.  Okay.  And would you agree that through Pingora, in
19     say presentations or trainings, the depositions and
20     recommendations expressed are also your positions
21     and your recommendations?
22 A.  Yes, if I understand the question correctly.
23 Q.  Yeah, that essentially when Pingora presents
24     materials, that's also a representation of your
25     position.

Page 27

1  A.  Okay.  It's a representation of our position, so
2      meaning that my business partner, Stephanie, and I
3      would have collaborated on that, and it represents
4      our understanding of OSEP's interpretation and
5      guidance of the law.
6  Q.  Now, you had mentioned that you handle more of the
7      legal aspect of Pingora Consulting's work.  What
8      would you say is one of Ms. Weaver's areas of
9      expertise?
10 A.  Finance, school district finances.
11 Q.  Other than those two areas, do you feel like your
12     expertise is fairly equivalent in other areas?
13 A.  I'm not sure I understand your question.
14 Q.  I just don't know if there's other topics where you
15     would defer to her expertise or she would defer to
16     yours.
17 A.  Well, I would definitely defer to her in finance
18     questions, and -- and I can't answer when she would
19     exclusively defer to me.
20 Q.  Okay, fair enough.  Let's jump into the report.  So
21     on Page 2 here --
22         (Reporter clarification.)
23 Q.  So this is Exhibit 63, like I had mentioned before,
24     and here on Page 2, it notes that OSE commissioned
25     this review in order to make improvements to its

Page 28

1      system of general supervision, right?
2  A.  Yes.
3  Q.  Did you or Ms. Weaver have any discussions with MDE
4      personnel about why it wanted to improve its system
5      of general supervision?
6  A.  I'm sure that we did, but I can't recall the
7      substance of those.
8  Q.  Do you have any idea of who you might have talked
9      to?
10 A.  Teri Rink and previous assistant directors and/or
11     supervisors, and I don't recall their names.  I can
12     recall their first names, but not their last names.
13 Q.  Can you recall the general substance of those
14     conversations?
15 A.  The -- so you're talking about preceding the
16     commissioning of this report?
17 Q.  Yes.
18 A.  Yes.  They were interested in taking a look at their
19     general supervision system and getting feedback on
20     how to make improvements to it.
21 Q.  Okay.
22 A.  By way of more context, I had been presenting at a
23     national conference.  Teri Rink was in the audience
24     and spoke to me afterwards about who I was and if I
25     did work at the state level as well.  So that was



Page 29
1 the first time the conversation started about the
2 possibility of doing work in Michigan.
3 Q. You mentioned there was a national conference. Do
4    you remember what you were presenting on?
5 A. No.
6 Q. Okay, all right. We'll head to Page 3 here. Now,
7    this is a page that's titled "System of General
8    Supervision," right?
9 A. Yes.
10 Q. And here in the part that we can see right now, it
11    shows a relationship between due process hearings,
12    state complaints, determinations, and monitoring,
13    right?
14 A. Yes.
15 Q. That relationship seems to be that due process,
16    state complaints, and determinations all provide
17    information for monitoring. Is that right?
18 A. No.
19 Q. What is it showing?
20 A. It shows that the broken lines from due process
21    hearings, state complaints, and monitoring all feed
22    into and factor into the determinations that get
23    made, and then all three of those systems -- due
24    process hearings, state complaints, and
25    determinations -- inform monitoring.

Page 30
1 Q. Okay. And in this way, is it something of a
2    feedback loop?
3 A. Some might say that, yes.
4 Q. And what role do state complaints play in that kind
5    of feedback loop?
6 A. They inform monitoring. They inform determinations.
7 Q. Now, in this upper half of this page, there's also
8    mediation, which just seems to be hanging out by
9    itself, not necessarily informing any of the other
10    parts that we discussed. Is that right?
11 A. Yes.
12 Q. And there's SPPAPR Indicator 16, though, right?
13 A. Well, that indicator exists. I'm not sure what the
14    question is.
15 Q. Mediation informs that indicator. Is that right?
16 A. Yes.
17 Q. So how many mediation agreements there are get
18    reported to OSEP through that indicator.
19 A. Yes, so it is a numeric data point on the mediation
20    system as opposed to a substantive one.
21 Q. Okay. Yeah, but seeing this kind of feedback loop,
22    mediation doesn't really play a role. Would that be
23    fair?
24 A. It's because mediation is confidential, it does not
25    play a role.

Page 31
1 Q. Now, would you say the same of resolution agreements
2    which are sent to OSEP as a part of Indicator 15?
3 A. No, I would not say the same.
4 Q. What's the difference?
5 A. A, it's not a confidential process, and, B, it's
6    part of the due process hearing system.
7 Q. Now, moving on to the second half of this page, and
8    this looks like there's a funnel with three bubbles
9    in it. Is that fair?
10 A. Yes.
11 Q. One is determinations, one is monitoring, the last
12    one is dispute resolution, right?
13 A. Yes.
14 Q. The dispute resolution one has a couple bullet
15    points. It's complaints and due process, right?
16 A. Yes.
17 Q. I assume the complaints is state complaints?
18 A. Yes.
19 Q. Okay. And that seems to be communicating that all
20    those components of the state system of general
21    supervision are being fed into this funnel at the
22    top, right?
23 A. Yes.
24 Q. And then down at the bottom, there's -- at the
25    bottom of the funnel, there's something called

Page 32
1    TA/PD, which I assume is technical assistance,
2    slash, professional development. Is that right?
3 A. Yes.
4 Q. Okay. And so these three components inform how an
5    SEA ought to craft that TA and PD. Is that fair?
6    Is that what this is communicating?
7 A. These three components are not the only sources of
8    information that would be used to craft the TA and
9    PD, but certainly with respect to the focuses --
10    focus of our report on general supervision, these
11    are three strong factors that would inform the
12    technical assistance and professional development
13    needs of the state.
14 Q. Are there other particularly important areas that
15    also feed that system to inform SEAs about what TA
16    to craft or what PD to provide?
17 A. Certainly, new or novel requirements under the law,
18    new or novel court interpretations of a longstanding
19    premise in the law, requests of school districts or
20    the ISDs could also inform that and should inform
21    that.
22 Q. All right. Now we're going to move to Page 4. Here
23    there's a table of contents that show this report
24    reviews several what it calls components of the
25    general supervision system, right?



Page 41

1  end of Paragraph 2 here.
2       This February 2016 report echoes the
3  US DOE statement that the broad scope of the state
4  complaint system is critical to the state's exercise
5  of its general supervision responsibilities, right?
6  A.  Yes.
7  Q.  Would you agree that used with that connotation,
8  when something is critical, it's usually considered
9  necessary?
10 A.  I can't say that it could equate to necessary, no.
11      MR. SICKON:  And your report in this
12 case, we're going to mark this as Exhibit 100.
13      (DEPOSITION EXHIBIT 100 MARKED
14      FOR IDENTIFICATION at 10:51 a.m.)
15 BY MR. SICKON:
16 Q.  And this is the expert report that you provided for
17 this case, right, Ms. Knudtson?
18 A.  Yes.
19 Q.  Okay.  Now, we're going to go to Page 3, state
20 complaint system requirements.
21      Here you quote the dispute resolution
22 procedures under Part B in an OSEP document from
23 2013.  Is that right?
24 A.  Yes.
25 Q.  It's Question B-1 and its answer, right?

Page 42

1  A.  Yes.
2  Q.  The question is:  Why are states required to have
3  complaint procedures when the IDEA statute does not
4  contain those procedures, right?
5  A.  Yes.
6  Q.  And OSEP's answer, which you quote, includes the
7  statement here towards the end:  We believe that the
8  state complaint process is fully supported by the
9  Act and necessary for the proper implementation of
10 the Act and these regulations.
11      Is that right?
12 A.  Yes.
13 Q.  This is language that you've included in other
14 training documents you've presented to MDE for state
15 complaint investigators, right?
16 A.  Yes.
17 Q.  As the authority for the state complaint system?  Is
18 that right?
19 A.  At least in part, yes.
20 Q.  Okay.  And do you agree with the idea that the state
21 complaint system is fully supported by the IDEA?
22 A.  Absolutely.
23 Q.  And would you agree that a compliant state complaint
24 system is necessary for a state's exercise of its
25 general supervision responsibilities?

Page 43

1  A.  Yes.
2  Q.  Now, we're going to jump back to your 2016 report.
3  We're going to go through some of the chart on the
4  state complaint system.
5       On Page 6, Pingora found that OSE had
6  some inconsistencies with federal requirements,
7  right?
8  A.  Yes.
9  Q.  And those -- that federal requirement was
10 300.151(a), right, because the findings correspond
11 to the regulations subpart at issue, right?
12 A.  There's an interplay between sections here 300.151,
13 Paragraph A, requires written procedures that the
14 SEA must adopt, and within the adopted written
15 procedures, there was an inconsistency with
16 300.153(b)4(v).
17 Q.  Okay.  And that's one of the inconsistencies listed
18 in the findings here on Page 6, right?
19 A.  Yes.
20 Q.  Okay.  And there's a total of six inconsistencies
21 that carry over onto Page 7, right?
22 A.  Yes.
23 Q.  Okay.  Now, do you believe that the procedures,
24 considering this list, would be compliant with the
25 requirements of the state complaint system as

Page 44

1  contemplated by IDEA?
2  A.  With respect to the requirements to have written
3  procedures that are compliant with IDEA, not at that
4  time.  Not in 2016, no.
5  Q.  Okay.  We're going to move to Page 8, but we'll be
6  in the same regulation.  We're still in 151 here.
7       Okay.  Now, scroll back up.  We're in
8  151(b), and in Pingora's feedback concerning
9  Regulation 151(b), it states:  The complaint system
10 does not consistently address substantive issues,
11 right?
12 A.  Yes.
13 Q.  On the same page, Pingora's review of information
14 related to 151(b)(1), it found that OSE's corrective
15 action appears to address procedural rather than
16 substantive issues, right?
17 A.  Yes.
18 Q.  Now, with both of those in mind, are those practices
19 compliant with the requirements for a state
20 complaint system?
21 A.  In 2016, when they were discovered, it was not
22 compliant.
23 Q.  Okay.  Now, we're on the same page, and we're still
24 looking at 151(b)(1) findings, states here that
25 Pingora found that the student level corrective



Page 45

1  action lacks specificity, right?
2  A.  Yes.
3  Q.  And that compensatory education determinations are
4      relinquished to the IEP team, right?
5  A.  Yes.
6  Q.  Both of those practices would concern an appropriate
7      remedy for the student at issue.  Would you agree?
8  A.  Yes.
9  Q.  Would those practices be considered compliant with
10     the requirements of a state complaint system when
11     they were discovered in 2016?
12 A.  The last one that you mentioned, compensatory
13     education determinations being relinquished to the
14     IEP team, would be, no, student-level corrective
15     action lacks specificity is not clear enough the way
16     it's written there in that context to be able to say
17     it is compliant or not.
18 Q.  Finally, moving to 151(b)(2), Pingora found that
19     complaint decisions do not appear to address the
20     future provision of services for all children with
21     disabilities.  Is that right?
22 A.  Yes.
23 Q.  Okay.  And with that practice in mind, would that be
24     compliant with the requirements of a state complaint
25     system?

Page 46

1  A.  In 2016, it was not compliant.
2  Q.  Okay.  I'm going to move on to Page 10, and so now
3      we're crossing over into 34 CFR 300.152.
4          Now, when it comes to 152(a)(5)(i),
5      Pingora found that violations -- I'm sorry, found
6      that decisions are difficult and confusing to read,
7      violations are not clear, and correction of
8      noncompliance is not specific to the student, right?
9  A.  Yes.
10 Q.  And to you, would that reinforce the earlier finding
11     that student level corrective action was unclear?
12 A.  I'm not sure what you mean.
13 Q.  In the earlier part of the chart, it mentioned that
14     student level corrective action was unclear.  Do you
15     think that it's at all related to this finding that
16     decisions are difficult and confusing to read and
17     violations are not clear?
18 A.  So first of all, are you referring to the section
19     where I said they lack specificity?
20 Q.  Yes.
21 A.  Okay.  That is -- I'm not sure.  This is a different
22     section, so I'm specifically referring to the
23     content of the decision or the final report here, so
24     I'm not sure how to answer that.  That was a
25     different section where the lack of specificity came

Page 47

1      in.
2  Q.  Okay.  We'll move to 152(b)(2) here on Page 11 where
3      Pingora found there appears to be a lack of systemic
4      verification of correction of noncompliance, right?
5  A.  Yes.
6  Q.  As a practice, would failing to verify the
7      correction of noncompliance be compliant with state
8      complaint system requirements?
9  A.  Not as the practice appeared in 2016, it would not
10     be compliant.
11 Q.  Okay.  And those findings were based on both -- I'm
12     sorry, both on stakeholder feedback and review,
13     right?
14 A.  Yes.
15 Q.  And part of the stakeholder feedback for that same
16     requirement is that there is no system of graduated
17     sanctions, right?
18 A.  That's what the feedback was, yes.
19 Q.  Do you recall if during the review that Pingora
20     performed, you found facts that tended to affirm
21     that stakeholder feedback?
22 A.  I don't recall any specifics.  I can tell you that,
23     you know, based on the comments in the report, the
24     corrective action system was described as needing to
25     improve.

Page 48

1  Q.  Would it surprise you if there were no system of
2      graduated sanctions published by MDE at the time of
3      this report?
4  A.  It would not surprise me in 2016.
5  Q.  Now, let's talk about the second part of this
6      report's focus.
7          In the earlier table of contents, the
8      components that were being reviewed were the state
9      complaint -- or, sorry, the dispute resolution
10     system and the monitoring system, right?
11 A.  Yes.
12 Q.  So we're going to jump right now to the section on
13     monitoring, here on Page 16.
14         Here, starting in the second paragraph,
15     it notes that OSE does not currently utilize dispute
16     resolution data to inform local district monitoring
17     selection.  Is that right?
18 A.  Yes.
19 Q.  And the end of that paragraph, it states that the
20     disconnect of dispute resolution data from the
21     selection rubric for local monitoring may contribute
22     to long-term or systemic noncompliance that remains
23     unaddressed by OSE, right?
24 A.  Yes, that's what it says.
25         MR. SICKON:  Now, we've been going about



Page 61

1 because we have stakeholder meetings across the
2 state and gathered a lot of information from a lot
3 of different groups, and they had specific questions
4 about implementation.
5     They were -- it is my belief that they
6 had commissioned the report knowing that there would
7 be improvements that need to be made, and they set
8 out on the path immediately of making improvements.
9 Q. Okay. And in our previous discussion, we talked a
10 lot about other work that you did for MDE as well.
11 You had mentioned that there was an ongoing
12 relationship from 2016 or 2017 to present. Is that
13 right?
14 A. No, I believe I said 2017, '18 to present.
15 Q. Well, I'm assuming that we would include this 2016
16 report, but then after this 2016 report, it picked
17 up again in 2017? Is that what you're saying?
18 A. At the point of the 2016 report, I did not know it
19 would be an ongoing relationship.
20 Q. So that picked up the year after.
21 A. It was I think through the process of MDE developing
22 a plan to be able to implement some of these that it
23 became an ongoing relationship.
24 Q. Okay. And so you mentioned them getting to work
25 right away, but then you came on through Pingora to

Page 62

1 advise them with carrying out some of these
2 recommendations later in 2017 or thereabouts. Is
3 that what you're saying?
4 A. Yes, in addition to other activities. I mean it
5 wasn't just the report. It was systems improvement
6 in general.
7 Q. Okay. I'd like to talk about a training that you
8 provided to MDE in March of 2020.
9     MR. SICKON: I've pulled up what we're
10 going to mark as Exhibit 101.
11     (DEPOSITION EXHIBIT 101 MARKED
12     FOR IDENTIFICATION at 11:33 a.m.)
13 BY MR. SICKON:
14 Q. This is a training on state complaint investigation
15 that you provided to MDE in March of 2020, right?
16 A. Yes.
17 Q. Now, it's kind of an awkward format, so I want to
18 try and make sure that you can see as much of this
19 as possible.
20     Does that work?
21 A. I think so.
22 Q. All right. Here on Slide 6 -- and I'm just going to
23 refer to the slide numbers for ease.
24     Slide 6 outlines some important context
25 for the system of state complaints, right?

Page 63

1 A. Yes.
2 Q. Okay. And the first is authority, right?
3 A. Yes.
4 Q. All right. Well, let's go there.
5     Here on Slide 8, this recounts that
6 language from the 2013 OSEP document that it
7 believes the state complaint process is fully
8 supported by IDEA, right?
9 A. Yes.
10 Q. And that it's necessary for the proper
11 implementation of the Act and these regulations,
12 right?
13 A. Yes.
14 Q. That's the same language that was quoted in the 2016
15 report, right?
16 A. Yes.
17 Q. Okay. Now, we've talked about several different
18 OSEP documents since we started, so let's talk a
19 little bit about OSEP's authority in this area.
20     We talked about where OSEP is located as
21 an office in the Department of Education, right?
22 A. Yes.
23 Q. And would you say that OSEP is the office within
24 USDOE that has the most special education expertise?
25 A. No.

Page 64

1 Q. Which office is that?
2 A. I would say the overall office of OSERS in which
3 OSEP sits.
4 Q. But OSEP administers IDEA at a federal level, right?
5 A. I'm not sure that I would agree with the word
6 "administers."
7 Q. It accepts SEA applications for Part B funds?
8 A. Yes.
9 Q. And it makes state determinations about each SEA's
10 compliance with Part B and Part C, right?
11 A. Yes.
12 Q. Is there any part of it administering IDEA that I'm
13 missing here?
14 A. Well, one of their primary functions is to issue
15 guidance, and that is in special education as well.
16 Sometimes that guidance is jointly issued with
17 OSERS. Other times it is issued, like in this case,
18 just through OSEP, but the -- the guidance all comes
19 with a bit of a disclaimer that says that it does
20 not carry the effect or force of law. And the
21 majority, I mean they issue guidance regularly.
22 Q. Okay. Going back to your report here, Exhibit 100,
23 Page 5, you note after quoting an OSEP DMS report,
24 that OSEP has the ultimate authority as a condition
25 of funding to supervise MDE's state complaint



Page 93

1     accomplish that.  
2 Q. Okay. And the mentoring one, too, also stands out  
3     to me as one that might be somewhat feasible, but it  
4     seems like an extension of the independent expert  
5     training in 3, like an ongoing relationship with  
6     someone that's an expert. Is that fair?  
7 A. Yes, and I have only ever seen districts go to that  
8     level when they have a district that, not so much  
9     unwilling, but for whatever reason, they have been  
10    unable to remedy a situation.  
11        And we're not talking about they could  
12    have improved faster or that they could have done a  
13    better job of improving; that they are unable to  
14    remedy it.  
15 Q. Okay. And, yeah, withholding funds, I know that is  
16    the absolute -- I mean it feels like what people  
17    commonly call something like the nuclear option;  
18    like it is just not typically ever done, right?  
19 A. It's not typically ever done.  
20 Q. Yeah. Now, providing service directly, it sounds  
21    like this would be in line with something that  
22    you're saying; unable, more than unwilling is the  
23    more common scenario. Is that right?  
24 A. Yes. So by way of example, I do a lot of work with  
25    the Bureau of Indian Education. There's a small  

Page 94

1     school at the bottom of the Grand Canyon in my  
2     state, and that school is accessible by helicopter,  
3     by foot, which takes about eight hours, or by  
4     donkey, which is no one's preferred mode of  
5     transportation. That is true for staff that have to  
6     work down in the canyon as well, and they struggle  
7     with being able to have credentialed providers to  
8     provide services at that school. There are times  
9     when they're unable to provide, and the SEA steps in  
10    to detail federal employees down there.  
11 Q. That's Havasupai, right?  
12 A. Yes.  
13 Q. I've heard Havasupai Lake is beautiful, and I don't  
14    know if you've ever been. I'd imagine you have if  
15    you've worked with them.  
16 A. I have. It's absolutely beautiful.  
17 Q. But I understand, the remoteness of that location is  
18    unique, and the same with the Virgin Islands  
19    situation. That sounds like a very unique and  
20    difficult situation as well.  
21       MR. SICKON: Okay. I'm going to check  
22    back in. I said I would. It's been about a half  
23    hour. We can keep going if people are interested,  
24    or if we want to take a break for lunch, I'm happy  
25    to do that too.  

Page 95

1     (Recess taken at 12:26 p.m.)  
2     (Back on the record at 12:30 p.m.)  
3     MR. SICKON: And that is going to be it  
4    for this December 2020 training. We're going to  
5    move now to the Pingora report issued in February of  
6    2021. We're going to mark this as Exhibit 82.  
7     (DEPOSITION EXHIBIT 82 MARKED  
8     FOR IDENTIFICATION at 12:31 p.m.)  
9 BY MR. SICKON:  
10 Q. Now, Ms. Knudtson, in the March 2020 training,  
11    Pingora had explicitly checked in with some OSE  
12    employees about its challenges since 2016, right?  
13 A. Yes.  
14 Q. But Pingora didn't formally revisit the February  
15    2016 report until it issued this follow-up in 2021,  
16    right?  
17 A. The process commenced before that, but the report  
18    was ultimately issued in February.  
19 Q. So let's take a look at that report. We'll go to  
20    Page 3.  
21       Here it states that MDE OSE commissioned  
22    this review in order to evaluate changes since the  
23    2016 review, assess current system effectiveness,  
24    and receive recommendations to facilitate ongoing  
25    improvement, right?  

Page 96

1 A. Yes.  
2 Q. And regarding those recommendations to facilitate  
3    ongoing improvement, down at the end of this page,  
4    in the last paragraph here, it says that those  
5    recommendations were grounded in requirements and a  
6    convergence of data, right?  
7 A. Yes.  
8 Q. And the next sentence goes on to say that more  
9    weight was given to those areas where multiple  
10   sources of information converged to affirm a  
11   strength of the system or area of general  
12   supervision needing improvement, right?  
13 A. Yes.  
14 Q. Okay. Now, we're going to skip to Page 18. This  
15   starts a section that is a comparison between the  
16   2016 summary and the 2020 review. Is that fair?  
17 A. Yes.  
18 Q. Okay. We're going to jump to Page 22, within that  
19   section comparing the two.  
20      Now, this starts a comparison subsection  
21   about the 2016's -- 2016 reports recommendation  
22   Number 3, right?  
23 A. Yes.  
24 Q. And this is the recommendation then, 2016. I  
25   believe it was Subparagraph (1)(b) talked about  



Page 97

1  developing a system of targeted program or district
2  monitoring in the event of systemic noncompliance,
3  right?
4  A. Yes.
5  Q. And that there was another recommendation that was
6  Paragraph 3 that said MDE should use monitoring to
7  follow long-term corrective action to ensure
8  appropriate future provision of services for all
9  children with disabilities, right?
10 A. Yes, from the 2016 report.
11 Q. Yeah. After kind of recapping that 2016 report's
12 recommendations, the next comparison section is 2020
13 progress review of implementing that recommendation,
14 right?
15 A. Yes.
16 Q. Okay. There's documents and then a snapshot, right?
17 A. Yes.
18 Q. After those sections, there's a section on themes
19 from 2020 stakeholder input, right?
20 A. Yes.
21 Q. Okay. And in that last bullet on Page 23, the
22 second to the last sentence starts: Many
23 stakeholders felt like the development of dispute
24 resolution corrective action was disconnected from
25 other monitoring activities, including graduated

Page 98

1  sanctions for similar noncompliance, right?
2  A. Yes.
3  Q. And graduated sanctions, that's kind of like where
4  we left off when we were talking about the December
5  2020 training, right --
6  A. Yes.
7  Q. -- with the four different categories?
8      Now, going back to the summary here on
9  Page 24 of this comparison between 2016 report's
10 Recommendation 3, this states that stakeholders
11 acknowledged efforts made by MDE OSE to align the
12 general supervision system across the departments
13 within MDE OSE. However, it was noticeable to the
14 field that dispute resolution reporting, i.e.
15 general findings of noncompliance, disaggregation of
16 findings by region, and the connection to other
17 monitoring activities still didn't exist.
18 Additionally, corrective action development and
19 verification of noncompliance was identified as a
20 weakness, especially in regions with ongoing
21 noncompliance.
22      Did I read that right?
23 A. Yes.
24 Q. Okay. So fair to say that even though MDE made some
25 progress, it still had not effectively connected

Page 99

1  dispute resolution reporting with monitoring
2  activities?
3  A. That's what the stakeholders were acknowledging and
4  reporting. And it starts off: However, it was
5  noticeable to the field. That would be the field of
6  stakeholders.
7      But, yes, to the extent that these are
8  stakeholder concerns that are being reported up to
9  this -- the part that you've read so far, yes,
10 that's accurate.
11 Q. Okay. And that through this stakeholder feedback,
12 that it was noticeable that regions with ongoing
13 noncompliance experienced especially weak corrective
14 action development and verification of
15 noncompliance. Is that fair?
16 A. No. When you say especially weak, I'm not sure what
17 that means. It's not in this sentence.
18 Q. In the sentence that starts, additionally...
19 A. Yes.
20 Q. That corrective action development and verification
21 of noncompliance was identified as a weakness.
22 A. Yes, but it was not identified as especially weak,
23 as you said.
24 Q. But it is just especially prevalent in regions with
25 ongoing noncompliance. Is that fair?

Page 100

1  A. In the stakeholders' eyes, yes.
2  Q. Okay. And we're going to talk a little bit more
3  about the stakeholder feedback, and we're going to
4  go to Page 27, where we will leave the comparison
5  section. And this is the summary of stakeholder
6  comments, right?
7  A. Yes.
8  Q. It's on Page 27, where it says that -- this is a
9  report from a survey that was sent to public school
10 employees, ISD staff, advocates, parents, and
11 attorneys, right?
12 A. Yes.
13 Q. We're going to take a look at a couple of different
14 findings from that survey, and we're going to start
15 on Page 29 with the topic area that is the special
16 education state complaint system.
17     Here on Page 29, there are seven
18 different survey results, right?
19 A. Yes.
20 Q. Each of these survey results provides a percentage
21 of survey respondents that agreed or strongly agreed
22 with a certain idea, right?
23 A. Yes.
24 Q. So the higher the percentage, the higher that -- or
25 the more survey respondents that agreed with this

Page 101

```
 1     particular idea, right?
 2  A.   At an agree or strongly agree level.
 3  Q.   Yes, at agree or strongly agree.
 4         Okay.  And here, the lowest survey result
 5     is one that shows that 32.35 percent of the
 6     respondents agreed or strongly agreed that special
 7     education decisions included meaningful corrective
 8     action to address violations, right?
 9  A.   Yes.
10  Q.   Okay.
11  A.   At the agree or strongly agree level.
12  Q.   Yes.
13  A.   I don't think we can infer any more than that on
14     this.
15  Q.   And going back up to the start of the summary of
16     comments on Page 27, the only question in the
17     section concerning system changes since 2016 asked
18     whether the survey respondents would -- and I assume
19     that there was a spectrum; strongly disagree,
20     disagree, neutral, agree, strongly agree.  Was that
21     the kind of like spread of options available to
22     survey respondents?
23  A.   It was a Likert scale, yes.
24  Q.   Okay.  And so the question that they were provided
25     was whether MDE OSE has worked to improve the
```

Page 102

```
 1     special education dispute resolution system over the
 2     last five years, right?
 3  A.   Yes.
 4  Q.   Okay.  And in response to that question, there was
 5     49.28 percent of respondents agreed or strongly
 6     agreed, right?
 7  A.   Yes.
 8  Q.   The next section was special education dispute
 9     resolution system, right?
10  A.   Yes.
11  Q.   And in this area, the survey had just two questions,
12     right?
13  A.   Yes.
14  Q.   Okay.  The lowest result here was that 65.22 percent
15     of respondents agreed or strongly agreed that
16     information on the special education dispute
17     resolution system is widely available, right?
18  A.   Yes.
19  Q.   The next section after the state complaint system we
20     talked about a little bit is the special education
21     mediation system.  In this survey, there were three
22     questions, right?
23  A.   Yes.
24  Q.   And here the lowest result was 55.07 percent of
25     survey respondents agreed or strongly agreed that
```

Page 103

```
 1     special education mediation is likely to help
 2     resolve disagreements between schools and parents,
 3     right?
 4  A.   Yes.
 5  Q.   The last topic area that the survey addressed was
 6     special education due process hearing system, right?
 7  A.   Yes.
 8  Q.   And in this area of the survey, there were five
 9     questions, right?
10  A.   Yes.
11  Q.   In these survey results, the lowest response was a
12     32.35 percent of survey respondents agreed or
13     strongly agreed that special education due process
14     decisions helped me understand special education
15     requirements, right?
16  A.   Yes.
17  Q.   Okay.  And between all of those topic areas, I've
18     kind of highlighted the number of questions and the
19     lowest response rate for that group, right?
20  A.   Yes.
21  Q.   So fair to say based on the data here, the survey
22     respondents have the lowest confidence in state
23     complaint decisions, including meaningful corrective
24     action to address violations, and in due process
25     decisions helping respondents to understand special
```

Page 104

```
 1     education requirements.
 2  A.   That's what the survey said.
 3  Q.   We're going to go just to the next page where we see
 4     that there's a section that starts:  The
 5     opportunities for continued improvement.
 6         Before we go on, was there any other kind
 7     of additional information outside of the surveys
 8     that you received about the response to the state
 9     complaint system and decisions, including meaningful
10     corrective action to address violations?  Anything
11     that you recall?
12  A.   We, again, convened stakeholder groups across the
13     states, and so we had a lot of verbal information
14     that was provided to us.
15  Q.   Okay.  And I know in the introduction, it mentioned
16     that the recommendations provided were based on
17     requirements and a convergence of data, right?
18  A.   Yes.
19  Q.   So the survey and then all of the other kind of
20     stakeholder input that you talked about goes into
21     these recommendations, right?
22  A.   As well as a review of data, uh-huh.
23  Q.   Yes.  So let's talk about these recommendations.
24         The recommendations, it states here, are
25     separated into three overarching areas, right;
```



Page 105

1  communication, training resources, and the last one,
2  law policy and procedure, right?
3  A.  Yes.
4  Q.  Now, there's -- before the recommendations, there's
5      an introduction to an idea of tiered implementation.
6      Is that fair?
7  A.  Yes.
8  Q.  Could you describe this tiered system of
9      implementation to me?
10 A.  As the document states, Tier 1 would be resources
11     dedicated to universal needs or universally
12     applicable needs.  It's usually lower intensity and
13     lower in frequency and of limited duration.  Focuses
14     on areas of broad interest and could be cooperative
15     effort across different domains.
16         Tier 2 would be targeted needs around a
17     topic or an issue that may be produced and delivered
18     to broad audiences through electronic networks or
19     group events.  It could be opportunities to
20     establish like professional networking networks
21     among those with similar problems, and include, but
22     not limited to, webinars, conferences,
23     teleconferences, videoconferences, and communities
24     of practice.
25         And then 3 is targeted and specialized

Page 106

1  for intensive needs.  That would be more along the
2  lines of on-site face-to-face kinds of activities,
3  extensive follow-up through meetings, through
4  auditing, through multiple ways of addressing
5  specific needs, and these Tier 3 kinds of
6  implementation activities tend to be more intensive
7  and over the longer term.
8  Q.  Okay.  And just so I'm clear, this tiered
9      implementation was meant to apply to the
10     recommendations that you were about to make to MDE,
11     right?
12 A.  Yes, that's --
13 Q.  Sorry, go ahead.
14 A.  Yes, that's fair.
15 Q.  Okay.  And so in this way, is it meant to give MDE
16     food for thought in how they ought to implement the
17     recommendations, like in terms of how they see the
18     concerns that you're showing them and how they ought
19     to respond in relation to the recommendations?  I
20     just want to make sure I understand how the
21     framework applies.
22 A.  Right.  So the tiered approach was a recommendation
23     or a suggestion that they consider when they're --
24     because every SEA across the country, including MDE,
25     provides professional development activities around

Page 107

1  the state.  They foster and support communities of
2  practice for more discipline-specific -- you know,
3  depending on one's profession or discipline, more
4  discipline-specific activities, and they have this
5  ongoing and continuous system to investigate
6  complaints, to monitor on a cycle.
7         And so in addition to those activities,
8  we looked at the possibility of considering a tiered
9  implementation.  Not every district needs or
10 requires the same level of assistance with
11 implementation, and it was a way to look at areas of
12 need without expending the same level of resource or
13 commitment with each and every district.  It's also
14 a way of recognizing the districts that are
15 performing well.
16 Q.  Okay, all right.  So I think I'm starting to get it
17     now.
18         So the tiered implementation is also the
19     way that MDE could approach any need for
20     intervention or corrective action or anything with
21     districts that were out of compliance.  Is that
22     fair?
23 A.  It's not just intervention or corrective action.
24     It's how to understand the requirements of IDEA and
25     the federal regulations and state laws and rules,

Page 108

1  how to implement the requirements.
2  Q.  And so it says here right before the introduction of
3      Tier 1, Tier 2, Tier 3:  The more significant or
4      intense the needs, the greater the frequency of
5      contact, the longer duration, the higher the
6      intensity of the support, right?
7  A.  Yes.
8  Q.  Now, when we're talking about implementing the
9      requirements, how do the needs fit in and whose
10     needs are those?
11 A.  So the entities responsible for implementation would
12     include school districts, public agencies, ISDs,
13     PSAs, and the more intensive the needs, the more
14     intensive the service.  I mean that's --
15 Q.  The more intense -- go ahead.
16 A.  Yeah, that's the model here is that lower-level
17     needs, you have this good quality professional
18     development system set up across the state, and then
19     as the needs go up -- and they could be needs that
20     might be garnered through public agency request for
21     assistance in a particular area, it could be as a
22     result of a self-assessment that's conducted, a data
23     review, any number of things, including state
24     complaints, due process hearings, things like that.
25     So as the needs go up, then it would -- so would the



Page 109

1   intensity of the support that's offered, and -- but
2   it's not tied solely to noncompliance.  It's tied to
3   needs.
4  Q.  Right, I hear you now.  I think that, you know, like
5   it feels like a spectrum.  Like if they're just
6   asking for guidance on -- I don't know, it could be
7   a particular mode of instruction that they think is
8   appropriate for a student, you know, that may not
9   necessarily implicate any kind of violation or
10  noncompliance, but they're just trying to make sure
11  that they're doing what's right for the student,
12  that could be a low-level need, MDE could assist in
13  a way that gives their position on a particular
14  methodology and whether it's appropriate, something
15  like that, right?
16 A.  Yes.  I mean I see -- again, at that lower level, I
17  see it being more universal.  So it's not in
18  relation necessarily to a particular student.  It's
19  like what are effective practices for teaching
20  students with autism, what are best practices for
21  writing measurable goals.  We would want every
22  public agency to have that information.
23 Q.  Right.  So that would be your Tier 1, okay.
24 A.  Yes.
25 Q.  All right.  Good, thank you.  Now we're going to

Page 110

1   head to Page 34, and we're going to look at one of
2   the recommendations under the law, policy, and
3   procedure section.
4           This last recommendation states that MDE
5   OSE ought to design and utilize a corrective action
6   rubric to track issues of noncompliance for due
7   process hearings and state complaints, right?
8  A.  Yes.
9  Q.  And they ought to develop a corrective action
10  workflow that assists complaint investigators in
11  recognizing ongoing, repeated noncompliance, right?
12 A.  Yes.
13 Q.  MDE OSE ought to review and update their incentives
14  and sanctions to be used to address continued and
15  systemic noncompliance.  Is that right?
16 A.  Yes, and OSE has done all of those things.
17 Q.  And so these recommendations in this Area 3, this
18  last bullet, seem to relate to some of the -- more
19  to the noncompliance side of needs that we were
20  talking about previously with the framework, right?
21 A.  No, I don't -- I see these as separate activities.
22 Q.  Uh-huh, but they all relate to noncompliance.
23 A.  Yes, in that paragraph, they all relate to
24  noncompliance.
25 Q.  Okay.  And in that paragraph, the second sentence

Page 111

1   talks about ongoing repeated noncompliance, and the
2   third one discusses continued and systemic
3   noncompliance, right?
4  A.  Yes.  And the first one says track issues of
5   noncompliance, so that bullet is related to
6   noncompliance.
7  Q.  Yes.  But in the second -- or in the second and
8   third sentence, I'm just thinking that those might
9   be specifically areas like in that Tier 3 that are
10  in -- require intensive support.  Would you agree?
11 A.  I see them as separate purposes, separate
12  activities, so I'm not tracking that.  This is about
13  what the SEA is going to do to be able to, you know,
14  collect data and develop workflow, not necessarily
15  to train public agencies.
16 Q.  Okay.  All right, fair enough.  I'd like to move to
17  another training that was provided in March of 2023,
18  and March is up here.  But, Ms. Knudtson, would you
19  agree that this is another -- do you say TAESE?
20 A.  TAESE.
21 Q.  TAESE, a presentation that's more of a national
22  presentation?
23 A.  Yes, that's correct.
24 Q.  Okay.  And because MDE produced it to us, and would
25  it be safe to assume that someone at MDE attended

Page 112

1   this national presentation?
2  A.  I think that's safe to assume.  I don't handle any
3   of the registration.  TAESE does all of that, and
4   there's typically over a hundred people attending
5   these trainings, so I don't even get a clear, you
6   know, view of people's names.
7  Q.  Yeah, fair enough.  I'm going to still ask you a
8   couple questions about it, and we're going to start
9   with Page 24, I think it is, Slide -- yeah, we'll
10  start with Slide 70 here.
11          This is another slide that discuss a
12  district's failure to comply, right?
13 A.  Yes.
14 Q.  And this is somewhat similar to the presentation in
15  December 2020 about failure to cooperate, right?
16 A.  Yes.
17 Q.  Okay.  And so this also provides some additional
18  advice that without the district's perspective and
19  the records maintained by the district, the
20  investigator must rely more heavily on information
21  provided by the complainant, right?
22 A.  Yes, that's what it says.
23 Q.  And is that another like piece of advice that you
24  think that's helpful for SEAs to communicate if they
25  encounter resistance?



Page 129

1  Q.  And you provided a considerable amount of informal
2      advice during consultations to MDE over the years,
3      right?
4  A.  Yes.
5  Q.  Have you reviewed drafts of documents that become
6      MDE guidance?
7  A.  Occasionally, historically, but not recently.
8  Q.  Have you ever reviewed documents related to child
9      find?
10 A.  I don't specifically recall that.  I've reviewed it
11     on the website, but I did not have a hand in
12     drafting that, at least that I recall.
13         MR. SICKON:  I'm pulling up what I'm
14     going to mark as Exhibit 116.
15         (DEPOSITION EXHIBIT 116 MARKED
16         FOR IDENTIFICATION at 1:57 p.m.)
17 BY MR. SICKON:
18 Q.  And this is a document that we were provided
19     concerning child find.
20         Does this document look familiar,
21     Ms. Knudtson?
22 A.  It does, now that you bring it up, but I don't think
23     it's the most current version of their child find
24     guidance on their website, but that's why I didn't
25     remember it right away.

Page 130

1  Q.  But this is a document that you edited along with
2      Ms. Weaver concerning child find in Michigan, right?
3  A.  I'd have to see the whole document to know if it
4      pertains specifically to Michigan.
5          Yes, there we go.  Sorry, I truly have no
6      independent recollection of this.  I do a lot of
7      work in a lot of different states.
8  Q.  I understand.  This is an 11-page document, although
9      I believe there's only text on ten of them.  I don't
10     see a date related to it, but we'll move on.
11         There's other work that you've done with
12     MDE in terms of guidance, is what we've talked
13     about; that occasionally this is something that you
14     do, help them with guidance, right?
15 A.  Yes.
16 Q.  Okay.  Now, do you recall ever assisting Rebecca
17     McIntyre with a response to a letter from an
18     attorney representing Kalamazoo Public Schools?
19 A.  I have no independent recollection of that.
20 Q.  Is there any other work that you've done for MDE
21     that I haven't mentioned?
22 A.  No.  I mean as mentioned previously, I have
23     investigated state complaints, I've provided
24     consultative guidance, the two reports.  And then
25     more so historically, not so much recently, I have

Page 131

1      reviewed some guidance documents.  I think the most
2      recent one I did review was their due process
3      hearing system documents.  So I don't think there's
4      anything else outside of those broad categories.
5  Q.  Could you provide me a kind of ballpark estimate for
6      how much MDE has paid you for your consulting work
7      since 2015?
8  A.  I couldn't, I'm sorry.  First of all, I don't keep
9      the books for my little company; and second of all,
10     it's been a long time, and it's not like it's, you
11     know, a weekly payroll that you can calculate right
12     away.
13 Q.  Yeah.  Would you be able to ballpark maybe the
14     amount of time that you would on average consult
15     with MDE during any one of the years that you've had
16     this ongoing relationship?
17 A.  Not in a year aggregate.  I mean I -- in most
18     months, I meet with them every other week for an
19     hour, sometimes two hours.  That's a typical month.
20 Q.  Okay.  Would you be able to ballpark the work that
21     went into the 2016 report in terms of time, how much
22     time it took?
23 A.  I would say I -- in a very rough sense, I would
24     ballpark it on hundreds of hours because of the
25     stakeholder meetings.

Page 132

1  Q.  Would the same kind of number apply for the 2021
2      report?
3  A.  Yes.
4  Q.  And the trainings that we went over, you know, many
5      of them had hundreds of slides.  Would those be
6      all-day trainings?
7  A.  The national trainings are all day or two half days
8      depending on how they structure it.  Most of the
9      training with MDE, the complaint investigator
10     training would be scheduled for a full day.
11 Q.  Now, in this case, you're reviewing MDE's state
12     complaint system and its efforts to correct
13     noncompliance at Kalamazoo Public Schools, right?
14 A.  Yes.
15 Q.  Just going back real quick to an earlier question,
16     we found a document that might refresh your
17     recollection.
18         MR. SICKON:  I'm marking it as
19     Exhibit 59.
20         (DEPOSITION EXHIBIT 59 MARKED
21         FOR IDENTIFICATION at 2:03 p.m.)
22 BY MR. SICKON:
23 Q.  I had asked earlier about whether you had provided
24     any assistance to Rebecca McIntyre concerning a
25     letter for an attorney.



Page 137

1  as an expert in this case seem like a conflict of
2  interest?
3  A. Not at all.
4  Q. Why not?
5  A. Because I have firsthand knowledge of what MDE has
6     done over the years, and I see it as improving their
7     practices considerably.
8         The, yeah, Disability Rights Michigan, or
9     at least the precursor to that, the Michigan PNA,
10    also recognized the improvements.  So I wouldn't be
11    alone in that recognition of improvement, and it
12    certainly -- as well as OSEP.  You know, the funding
13    source that you questioned me on earlier multiple
14    times, wouldn't they need to be in compliance with
15    OSEP.  And when they get their 2020 reports and it's
16    all thumbs up, then, yeah, they're complying with
17    it.
18        So I don't see my work with the
19    department as an outlier.  I don't see it as my view
20    is different than some of the things that I read
21    from OSEP or Disability Rights, and I see continuous
22    improvement as a process, not an event.  And I work
23    with multiple states that have improved more slowly
24    than Michigan, some that may have improved more
25    quickly than Michigan.

Page 138

1         So it's not about my training.  It's not
2     about -- whatever the outcome of this is, it has no
3     impact or bearing on the quality of the work that
4     I've done.  I don't see it as a conflict.
5  Q. And you were hired by MDE to produce an expert
6     report in this case, right?
7  A. Yes.
8  Q. And that expert report was meant to respond to Mark
9     Mlawer's report, correct?
10 A. Yes.
11 Q. And you reviewed that report this spring, right?
12 A. Yes.
13 Q. Okay.  We're going to go to that report now.
14        MR. SICKON:  We're going to mark this as
15    Exhibit 106.
16        (DEPOSITION EXHIBIT 106 MARKED
17        FOR IDENTIFICATION at 2:12 p.m.)
18 BY MR. SICKON:
19 Q. Now, in your response, your report didn't question
20    Mr. Mlawer's training or expertise in general
21    supervision and IDEA requirements, right?
22 A. My report questioned his understanding of the law.
23 Q. Have you ever worked with or, as in this case,
24    across the table from Mr. Mlawer previously?
25 A. I'm sorry, I missed the first part of what you said.

Page 139

1  Q. Have you ever worked with or, as in this case, kind
2     of across the table from Mr. Mlawer previously?
3  A. Both, with and across the table.
4  Q. Okay.  How many times did you work with him?
5  A. Several, many.  He was a court monitor on a Federal
6     Court case in California for years and hired me as
7     the expert to handle the state complaint portion of
8     that monitor work because it was outside of his
9     field of expertise.
10 Q. And what case was that?
11 A. That was -- I'll think of it, I'm sorry.
12 Q. We'll come back to it.  If it comes to you, just let
13    me know.
14 A. Okay.  I'm sorry, it will come to me.
15 Q. Were there any other times that you worked with him?
16 A. Yes.  We have worked on -- together on Wyoming's
17    monitoring system.  We have co-presented before at a
18    conference.  We have worked on I believe it was the
19    same Federal Court case in response to their
20    monitoring report.
21        So in total, it would have been a period
22    of years in various capacities that we worked
23    together, and then in a similar capacity to this, he
24    was the expert in the AB case.
25 Q. The other case against MDE.

Page 140

1  A. Yes.
2  Q. That's -- is that the only other time that you've
3     kind of worked across the table from him?
4  A. I believe so.
5  Q. You had mentioned the -- he was the special monitor
6     in one case, but that there was another federal case
7     too?
8  A. I believe it was different aspects of the same case.
9  Q. Oh, okay, all right.  So it would have been that you
10    worked together on one federal case, and then across
11    the table on the AB case, and then across the table
12    in this case, right?
13 A. Yes.
14 Q. And is that all of the federal litigation like
15    interactions that you can think of?
16 A. With Mr. Mlawer.
17 Q. Yes, okay.  Now, he's also worked and trained
18    several state educational agencies, right?
19 A. I wouldn't be able to answer that.  I know he has
20    worked with Wyoming, but I'm not sure how many other
21    states with which he's worked.
22        MR. SICKON:  I'm pulling up Mr. Mlawer's
23    CV.  This is Exhibit 107.
24        (DEPOSITION EXHIBIT 107 MARKED
25        FOR IDENTIFICATION at 2:16 p.m.)



Page 141

1  BY MR. SICKON:
2  Q.  Just taking a quick spin here, you can see on Page 1
3      he still works with the Wyoming Department of
4      Education, right?
5  A.  It may be entirely possible.  I would have no
6      firsthand knowledge of that, but I don't doubt it
7      either.
8  Q.  Okay.  His CV also includes experience working with
9      the North Dakota Department of Public Instruction.
10     Is that what the CV says?
11 A.  It says that back in 2014, yes.
12 Q.  It says that he's worked with the Louisiana
13     Department of Education for several years as an
14     evaluator and a technical assistance provider.  Is
15     that right?
16 A.  Yes.  And I have no firsthand knowledge of that
17     work.
18 Q.  All right.  And there are other entries here that
19     relate to work with the Florida Department of
20     Education.  Is that right?
21 A.  That's what it says in 2006, '03 through '06.
22 Q.  Other work with the Pennsylvania Department of
23     Education.  Is that right?
24 A.  Yes, 1997 through '99.
25 Q.  And, you know, if any of the court cases here ring a

Page 142

1      bell for the one that you worked with him on, feel
2      free to stop me.
3             There's also work here that he did with
4      the California Department of Education, right?
5  A.  In 1999, yes.
6  Q.  And so seems like he's worked with several state
7      education agencies.  Is that fair?
8  A.  Yes.
9  Q.  What's your impression of his work history and
10     credentials in special education?
11 A.  I -- I don't really have one.  I mean I think Mark
12     has a skill set that is primarily about monitoring,
13     and I know that in the Emma C case, he hired me to
14     handle the complaint investigation aspect of that
15     Federal Court monitoring because it was out of his
16     skill set.
17 Q.  You said MSC?
18 A.  Emma C.  It's right on the screen right there.
19 Q.  Oh, Emma C, okay.  So that's the one?
20 A.  Yes.
21 Q.  Great, thank you.  Do you think that he had the
22     credentials to qualify as an expert in SEA general
23     supervisor responsibilities?
24 A.  Yes.
25 Q.  And we know that we talked about your report as

Page 143

1      being in response to his.  Let's go to your report
2      now.
3             MR. SICKON:  If I haven't already entered
4      this, we've marked it as Exhibit 100.
5  BY MR. SICKON:
6  Q.  Here in the introduction, you state that
7      Mr. Mlawer's report made several conclusory remarks
8      based on his erroneous interpretation of IDEA,
9      right?
10 A.  Yes.
11 Q.  Okay.  I think I'm going to -- in response to your
12     report, Mr. Mlawer also issued a rebuttal, right?
13 A.  I have not seen that.
14 Q.  You haven't seen the rebuttal report?
15 A.  No.
16 Q.  Okay.  Let me bring that up.
17            MR. SICKON:  We're going mark this as
18     Exhibit 109.
19            (DEPOSITION EXHIBIT 109 MARKED
20            FOR IDENTIFICATION at 2:20 p.m.)
21 A.  I would prefer to have an opportunity to read it
22     before I'm asked questions about it.
23 BY MR. SICKON:
24 Q.  You go ahead, and let me know when you need me to
25     scroll.

Page 144

1  A.  How many pages is it?
2  Q.  Eight.
3  A.  Go ahead.
4  Q.  Okay.
5  A.  Go ahead.
6          Go ahead.
7          Go ahead.
8          (Off the record at 2:23 p.m.)
9          (Back on the record at 2:29 p.m.)
10 BY MR. SICKON:
11 Q.  And then back up to Page 1, in the introduction
12     here, we see Mr. Mlawer state that his initial
13     report explains why MDE's system -- systemic
14     corrective actions were ineffective, right?
15 A.  Yes.
16 Q.  And to reiterate, there are four subpoints
17     underneath that that discuss some of what his first
18     report concluded, right?
19 A.  Yes.
20 Q.  The first bullet here says that MDE relied on
21     similar corrective actions in each of these
22     complaints without regard to the repetition of child
23     find violations by KPS, violations which clearly
24     showed that its prior corrective actions had not
25     worked, right?



Page 165

1 where it starts in earnest the kind of different
2 focus areas and OSEP analysis.  Is that fair?
3 A.  Yes.
4 Q.  Okay.  And so there were I think it was 14 pages
5   that I counted on the three focus areas.  I don't
6   know if you were counting, but do you have any
7   reason to disagree that it was 14 pages?
8 A.  I don't.
9 Q.  Okay.  And so after those 14 pages, we get to this
10   concern on Page 19, okay.  And so that starts the
11   section state complaint procedures, right?
12 A.  Yes.
13 Q.  Okay.  And this section is -- it's about a page
14   long, is that fair, the state complaint procedures
15   section?
16 A.  So it's really difficult for me to watch the
17   scrolling.  I have a tendency to get motion sick, so
18   I'm kind of averting my eyes when you're scrolling.
19   I'll have to take your word for it on the page
20   number.
21 Q.  Oh, I'm not moving it anymore.  The section here on
22   state complaint procedures, it looks like it's about
23   a page.
24 A.  Yes.
25 Q.  And I apologize.  Next time I'll do better to try

Page 166

1   and skip to numbers instead of making you seasick.
2   It's not my intention, I apologize.
3 A.  I can get car sick watching a movie, so...
4 Q.  Yeah, no, that can't be fun.  I'm going to zoom in
5   now.  I don't know if that does the same thing, but
6   I'm -- just so for readability.
7       Okay.  Now, Page 19, this starts the
8   section on the issue about how complaint
9   investigators determine appropriate compensatory
10   services, right?
11 A.  Yes.
12 Q.  Okay.  And here OSEP frames the analysis like this:
13   OSEP received a complaint from a constituent
14   alleging that MDE's complaint investigators were
15   ordering too much or too little time for
16   compensatory services.  In addition, the Michigan
17   Protection and Advocacy Service submitted a report
18   that corroborated the allegation.
19       Did I read that right?
20 A.  Yes.
21 Q.  Okay.  Now, looking at the following analysis, OSEP
22   reports on Page 19 that it reviewed two kinds of
23   documents.  First, it says OSEP reviewed five
24   decisions from MDE ordering compensatory services,
25   right?

Page 167

1 A.  Yes.
2 Q.  And later it says OSEP also reviewed MDE's guidance
3   for determining the need and amount for compensatory
4   education, right?
5 A.  Yes.
6 Q.  In between those, it says that OSEP interviewed MDE
7   complaint management staff about this concern,
8   right?
9 A.  Yes.
10 Q.  Okay.  Do you see any facts here showing that OSEP
11   looked at any other part of MDE's state complaint
12   system other than the process used to determine the
13   type, amount, and frequency of compensatory
14   services?
15 A.  Well, in order to get to type, amount, and
16   frequency, you have to review the violation, the
17   nature of it, the substantive nature, whether it was
18   a material violation.  So, yes, I would say in order
19   to get to the point of -- and it speaks to a
20   process, not just the type, amount, and frequency of
21   services.  It's about the process used.  So, yeah, I
22   think it's more than just type, amount, and
23   frequency.  It was about the process.
24 Q.  Process of determining the need and amount of
25   compensatory education.

Page 168

1 A.  Yes.  And the only way you can get there is to have
2   a finding that there has been some denial of FAPE,
3   services were not provided, appropriate services,
4   and then determining the -- possibly the amount of
5   harm or the amount of service owed.  There are
6   multiple ways to do that, so it's about the process,
7   and there's no one component of the process that
8   they were looking at.
9 Q.  There was no one component of the process they were
10   looking at?
11 A.  Yes.  So it doesn't say here that they were only
12   looking at whether they -- the agency made the right
13   decision in finding a denial of FAPE.  They're not
14   looking at whether --
15       (Reporter clarification.)
16 A.  So they were looking at processes, not just the
17   outcome.
18 Q.  Right, but the only process that they were concerned
19   about was determining the need and amount for
20   compensatory education, right?
21 A.  Yes.  And in order to get there, you have to have in
22   your process a determination of a denial of FAPE,
23   what that is based on, the severity of that denial.
24   There are many factors that go into the process of
25   determining the type, amount, and frequency of



Page 169

1  compensatory services.
2  Q.  And so they might have looked at information related
3     to these five complaint files, right?
4  A.  I'm assuming they did look at information related to
5     those files, yes.
6  Q.  And that in the complaint files, there were
7     determinations that there were violations because
8     MDE ordered compensatory services, right?
9  A.  And there's, yeah, some process that they went
10    through in order to determine them.
11 Q.  But that wasn't the subject of the OSEP analysis,
12    right?
13 A.  I would disagree with that.  That's exactly part of
14    what they looked at, because in order to get to
15    compensatory education, you have to have a
16    verifiable finding that the student was indeed
17    denied FAPE; was it a small denial, was it a large
18    denial, was it a material violation?  All of those
19    factors go into determining comp ed.
20 Q.  Determining comp ed for the student at issue, that's
21    part of 151(b)(1), right?
22 A.  Yes.
23 Q.  And in this OSEP report, it doesn't mention any
24    facts related to a systemic issue in any of the five
25    complaint files that it reviewed.  Is that right?

Page 170

1  A.  I don't see mention of a systemic issue, no.
2  Q.  And there's no mention in OSEP's analysis of how to
3     appropriately remedy the appropriate future
4     provision of services for all children with
5     disabilities, right?
6  A.  That's true.
7  Q.  So would it be fair to say that this OSEP analysis
8     was all about the student level part of remedies,
9     the 151(b)(1) part of remedies?
10 A.  I don't know how to answer that because they also
11    reviewed, for instance, MDE's guidance for
12    determining the need and amount of compensatory
13    education, and that could have included a review of
14    systemic findings of noncompliance as well.
15      The fact that they reviewed five
16    complaint decisions in particular that were
17    singles -- what I'm presuming to be single student
18    complaints, doesn't preclude them from looking at
19    the guidance for determining compensatory education
20    and systemic complaints.
21 Q.  But there's no, like you had already said, analysis
22    of the 151(b)(2) concerns about remedy, so --
23 A.  That's true, but can I just say that I don't equate
24    151(b)(2) only to systemic complaints.  So I guess I
25    was a little lost in your question about systemic.

Page 171

1  Q.  All right.  Let's go back to the report on Page 5.
2       On Page 5, you start the first full
3     paragraph here with this sentence:  When MDE's
4     system of general supervision, including its dispute
5     resolution systems, were monitored by OSEP in 2020,
6     OSEP found in relevant part, right?
7  A.  Yes.
8  Q.  And that leads to the quote, the conclusion of the
9     section we were just in at the DMS report, right?
10 A.  Yes.
11 Q.  Okay.  Now, when you stated that OSEP monitors MDE's
12    system of general supervision, including its dispute
13    resolution systems, were you stating that OSEP
14    monitored MDE's due process hearing system?
15 A.  No.
16 Q.  Were you stating that OSEP monitored MDE's use of
17    mediation and dispute resolution?
18 A.  No.
19 Q.  Were you stating that OSEP monitors MDE's
20    investigation of state complaints?
21 A.  No.  I'm pointing out the relevant part, which is
22    that state complaint procedures that adjust a
23    district's failure to provide appropriate services.
24    That's all -- that's the relevant part I'm
25    referencing and focusing in on.

Page 172

1  Q.  In the way that this introductory sentence is
2     structured, though, you say that two things were
3     monitored by OSEP in 2020, right?
4  A.  No.
5  Q.  Oh.  The word "were" typically means that there was
6     a plural subject.  Did you mean to say was?
7  A.  So the use of the word "including" is a defined term
8     in IDEA, and it means, you know, other or similar
9     like terms.  It's not meant to be limiting in any
10    way.
11      So system of general supervision also
12    includes systems of dispute resolution, and within
13    that, in relevant part for this discussion's
14    purpose, is the state complaint procedure,
15    particularly as it pertains to the district's
16    failure to adjust appropriate services.
17 Q.  In using that introductory sentence and the phrase
18    "including its dispute resolution systems," were you
19    also stating the OSEP monitored MDE's procedures for
20    issuing remedies to ensure the appropriate future
21    provision of services for all children with
22    disabilities?
23 A.  They could have done that.  I don't know whether
24    they -- they did not address it in their report, but
25    when you look at state complaint procedures, state

