# EXHIBIT 18

---

```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MICHIGAN

DONQUARION LEWIS, et al,

        Plaintiffs,        File No. 1:22-cv-00838-RJJ-PJG

vs.

MICHIGAN DEPARTMENT
OF EDUCATION,

        Defendant.
_____/



                    DEPOSITION OF

                  REUQUIYAH SAUNDERS




                Friday - June 14, 2024
                      10:11 a.m.
            215 S. Washington Square, Suite 200
                    Lansing, Michigan




                Karen L. Banks, CER 3592
              Certified Electronic Recorder
                Esquire Deposition Solutions
              Firm Registration Number 8035
```

---

1  here probably helped me through that process.  There's one
2  coordinator for special education, which was the only person I
3  had and myself, and then Tori Wentela was the monitor before
4  Shelly Hawthorne.
5  Q  Okay.
6  A  And then other administrator of our department, but not a
7     special education administrator, Mr. Smith.  And then one of
8     our school psychologists.
9  Q  Okay.  On page 3 of Exhibit 14 at the top, there's a question,
10    "What documentation will your district have available as
11    evidence that your tasks and activities were completed ..."
12 A  Yes.
13 Q  It notes there that, "The District will upload meeting notes,
14    agendas and new policies and procedures throughout the '17-18
15    school year."  Right?
16 A  Yes.
17 Q  Do you remember submitting a revised version of the KPS Child
18    Find policy to MDE during that school year?
19 A  I don't.
20 Q  Okay.
21 A  I don't recall the -- I mean actually uploading this.
22 Q  Okay.  Do you know if anyone else would have uploaded it?
23 A  I don't think so.  It would have been me or maybe Tori, but
24    really the responsibility was me, mine to upload.
25 Q  Okay.  And speaking of Tori Wentela, just real quick, do you

---

1     person, whether it was Tori Wentela or somebody else?
2  A  Not to my knowledge.  And I can safely say that they -- no one
3     from my team probably would.  They don't -- they will try to
4     reach out.  They have tried to reach out sometimes to team or
5     administrators, but they usually come through me.  Their
6     communication comes through me.
7  Q  Okay, all right.  I'd like to move to Exhibit 24.
8            (Deposition Exhibit 24 marked)
9  BY MR. SICKON:
10 Q  This is one of the Child Find policy documents that KPS
11    provided to MDE as demonstration of coming into compliance.
12    We had talked about how behavioral concerns were at the heart
13    of this particular case; right?
14 A  Yes.
15 Q  Okay.  If you go to page 4 of this Child Find policy, we'll
16    find the only mention of behavior in a section titled
17    "Multi-Tiered System of Supports."  Do you see the word
18    "behavioral" in that paragraph?
19 A  Yes.
20 Q  Would you review that paragraph, please, and let me know when
21    you're done?
22 A  Yes.
23 Q  Okay.  Now, after reviewing that paragraph, do you believe
24    that that paragraph would ensure that a student's behavioral
25    concerns are considered and assessed appropriately in initial

---

1     evaluation?
2  A  Not alone, no.  This is one document.  We have several other
3     documents that speak to if students aren't making progress
4     academically and behaviorally.  So I wouldn't anticipate that
5     this would be the only document staff who are trained would
6     use to determine if student behavior needs to be addressed in
7     an initial evaluation.
8  Q  Okay.  So this --
9  A  This is a very --
10 Q  -- wouldn't do it on its own?
11 A  No.  This is a very -- I don't even know what date, but this
12    is -- yeah, this is a very general document.
13 Q  Okay.  We're going to stick with it for just a second more.
14    If we flip back to page 2.
15 A  Um-hmm.
16 Q  I'm sorry.  Page 3.  The first paragraph of the referral
17    processes section states that a district -- I'm sorry, that
18    KPS "... is required to make reasonable efforts to obtain
19    parental consent for the initial evaluation within thirty
20    calendar days of receipt of a referral ..."; is that right?
21 A  Yes.
22 Q  Is that an accurate statement of law?
23 A  I believe that it is -- the district is required.  I think
24    that you're asking me -- reasonable efforts, we have to obtain
25    parental consent for the initial evaluation within thirty days

```
 1         of the receipt of the referral.  What part are you asking?
 2    Q    Does the thirty-day timeline sound right to you?
 3    A    Yes.
 4    Q    Okay.  Now, this was something that I imagine you had
 5         uploaded, because you mentioned that it was more or less your
 6         sole responsibility in uploading things for CAPs at KPS;
 7         right?
 8    A    Yes, or whatever we would provide for training or maybe the
 9         website.  Anything that we would produce, I would just give
10         copies of just to make sure that if there were pieces that we
11         mentioned anything about evaluation, they were provided.  Or
12         anything to do with the department, they were provided if it
13         had something to do with compliance or a CAP.
14    Q    That you would upload it so MDE could have it?
15    A    Right.  So sometimes I'd -- you know, I would do a screenshot
16         of, you know, a QR code where people could access our
17         department or anything that was related to what we were
18         providing for students.  So it didn't have to always be a
19         document like this.  It could be a PowerPoint.  It could be,
20         you know, a survey.  As I mentioned, sign-in sheets, all kinds
21         of things.
22    Q    Okay.  Do you know if Tori Wentela might have reviewed this
23         document after it was uploaded?
24    A    I don't.
25    Q    Do you know if anybody at MDE reviewed it after it was
```



```
 1         uploaded?
 2    A    I don't.
 3    Q    And one last thing on page 2.  In the section that is
 4         Coordination with Non-Educational District Agencies, there is
 5         a bracketed and italicized section that states:
 6                "LEAs should tailor this section to describe all
 7             relevant relationships with District agencies and
 8             coordination efforts around Child Find responsibilities."
 9         Right?
10    A    Yes.
11    Q    Who do you think wrote that?
12    A    I'm not sure.  In this section I've seen where an LEA may list
13         all of their local, so this was a draft.  So updated
14         procedures or updated information so germane to Kalamazoo may
15         be, you know, Family and Children Services, may mean other
16         agencies that collaborate with us, and we have brochures,
17         fliers, different things for people in doctors' offices for
18         Child Find.  So I'm not sure.  This was a draft.
19    Q    Does it sound like something, framed as it is for LEAs in
20         general, that a KPS employee would write?
21    A    No.
22    Q    Any idea if it would have been somebody from KRESA?
23    A    Could be.  I mean using the term "LEAs" is not a term that we
24         use --
25    Q    Right.
```



```
 1    A    -- on a regular basis.  So it would have to be someone in a
 2         position that would be, you know, either in a KRESA or in a
 3         state kind of position.  It wouldn't be something that just an
 4         administrator would write or a staff member.
 5    Q    From KPS.
 6    A    Yes.
 7    Q    Okay, all right.  There's another Child Find policy document
 8         that was uploaded concerning this complaint as well, and we'll
 9         go there.  That's 42.
10                (Deposition Exhibit 42 marked)
11    BY MR. SICKON:
12    Q    And like I said, this is another one that was submitted to MDE
13         in this complaint to demonstrate compliance with the CAP
14         ordered.  Are you familiar with this document?
15    A    Yes.  It's is an old document, but yes.
16    Q    On page 1 there's a section titled "KPS Student Services
17         Handbook Child Find Procedures"; right?
18    A    Yes.
19    Q    And that entire paragraph is highlighted, it appears.
20    A    Yes.
21    Q    Now, I know that we talked earlier about a handbook when we
22         were discussing the complaint right before lunch, 22-85.
23    A    Um-hmm, yes.
24    Q    We were looking at Exhibit 22 then and it discussed the
25         handbook.  Do you remember that?
```

```
 1    A    Yes.
 2    Q    Could this be the section that was discussed in that Exhibit
 3         22?
 4    A    It could be a portion of that.  It looks like it's been cut
 5         out of something else.
 6    Q    Okay.  So the document in 22 may have been a larger document?
 7    A    Yes.
 8    Q    The handbook that --
 9    A    Yes.
10    Q    The staff handbook is a larger document.
11    A    Yes.  Because uploading in Catamaran, there's a process that
12         you upload what you currently have, and there's a process that
13         you upload after you've been given recommendations or reports.
14         So some of the information may be the same and some of it may
15         be changed if they say you just need to update this section or
16         you need to address this or you need to do your policies and
17         procedures all over.  So Child Find is one that's pretty
18         general, so -- and looking at each individual case, many times
19         I would upload the same information if they said, "What do you
20         currently have if it hasn't been addressed, and then here's
21         the pieces that you need to change."  So this looks like it
22         might be a portion of some of that, but --
23    Q    Okay.
24    A    -- without seeing like the whole entire document.
25    Q    Okay.
```

## Page 85

REUQUIYAH SAUNDERS  June 14, 2024
LEWIS vs MI DEPT OF EDUCATION

1  A   But I know that it's something that we provided.
2  Q   All right.  And you had mentioned that the first document we
3      saw, Exhibit 24, was a more general overview of Child Find;
4      right?
5  A   Yes.
6  Q   Now --
7  A   And that it looks like myself and -- were working on or in the
8      midst of working on during like '17, maybe '17-18 --
9  Q   Okay.
10 A   -- when I first started.
11 Q   And the handbook that you're mentioning contains sometimes
12     updates that might be more particular, more specific than that
13     general document?
14 A   Yes.
15 Q   And this seems to be part of that staff handbook, right,
16     pulled out?
17 A   At some level, yes.  It doesn't have any page numbers on it,
18     but yes.
19 Q   Okay.
20 A   It seems to be.
21 Q   Now, for the purposes of this CAP, we had talked about a
22     student's behavioral concerns being considered and evaluated
23     appropriately.  In combination with Exhibit 24, do you believe
24     that this paragraph provides KPS employees enough information
25     to ensure that a student's behavioral concerns are considered

## Page 86

REUQUIYAH SAUNDERS  June 14, 2024
LEWIS vs MI DEPT OF EDUCATION

1      and evaluated appropriately?
2  A   Not alone.
3  Q   Not alone and not in --
4  A   But given the rest of the document and if -- it talks about
5      MTSS, it talks about RtI, topics that we talk about pretty
6      much at every turn, every meeting and training, and behavior
7      is a major part of what we try to support, so -- not alone,
8      but in part of a larger conversation about child study team
9      processes and tier one, tier two, tier three interventions,
10     and staff should be able to know that.
11 Q   And those are part of MTSS?
12 A   Yes.
13 Q   All right.  Those different tiers that you mentioned.
14 A   Yes.
15 Q   And as the tiers go up, so do the intensity of supports?
16 A   Yes.
17 Q   Typically fewer and fewer students end up with the higher-tier
18     supports; correct?
19 A   That's the hope.
20 Q   Yes.
21 A   That's the design.  Yes.
22 Q   And in the document here that discusses both MTSS and RTI, --
23 A   Yes.
24 Q   -- there's a chart that discusses RtI and MTSS, and if these
25     are concepts that are important that we should discuss, could

## Page 87

REUQUIYAH SAUNDERS  June 14, 2024
LEWIS vs MI DEPT OF EDUCATION

1      you just -- because the chart says, "What is the difference
2      between RtI and MTSS?"  Could you kind of run through some of
3      the highlights of those differences?
4  A   RtI is the intervention and I think we look at how that looks.
5      MTSS is the model.  So, you know, multi-tiered systems of
6      supports include academic and behavioral pieces, and the
7      response to the intervention that is decided within that model
8      is what we try to look at before we make determinations before
9      looking at any accommodations, eligibility, supports, in that
10     tier three.  So part of the job of our ancillary staff is to
11     sit on these teams so that they are aware and trained in what
12     those interventions look like and to give, in their expertise,
13     recommendations of evidence-based practices in these tiers,
14     behavior and academic.
15         We have a big district, so it could vary from
16     building to building of what that looks like, but we've over
17     the last several years had a district child study team process
18     that every person has been trained in as part of compliance.
19     We made sure that everyone has a specific way that they're
20     looking at across the district.  So that's the role.  It
21     doesn't live in special education, but it -- somehow we are
22     kind of the driver of making sure that those processes are in
23     place before we even go tier three, which would be
24     eligibility.
25 Q   Okay.  So like you said, this is a model that can be applied

## Page 88

REUQUIYAH SAUNDERS  June 14, 2024
LEWIS vs MI DEPT OF EDUCATION

1      in the general ed --
2  A   It's supposed to be.  Yes.
3  Q   And so this helps to collect information that you might then
4      use in the event that you do suspect a student may have a
5      disability?
6  A   Yes.  Or if there hasn't been sufficient intervention or
7      response to it, yes.
8  Q   Okay.  And so in bridging the gap between the MTSS/RtI and the
9      Child Find process, this CAP seeks to make sure that
10     behavioral concerns are considered and evaluated
11     appropriately; right?
12 A   Yes.
13 Q   So MTSS and RtI could be collecting that behavioral data;
14     right?
15 A   Yes, yes.  And, you know, quite frankly we do a lot of
16     behavioral collection.  So this is -- this CAP, you know -- of
17     course, we went back and reviewed it, but, you know, a lot of
18     our students don't come without behavior if they have academic
19     concerns.  So it's unlike us not to check if there are any
20     behavioral concerns that might be affecting their ability to
21     access the general education setting.
22 Q   Okay.  And you had mentioned, though, that this on its own --
23 A   Yeah.
24 Q   -- would not be enough to ensure that a student's behavioral
25     concerns are considered and evaluated appropriately.





```
 1  A    No, but our staff have enough other pieces that know that that
 2       is a huge piece of how we look at the whole child.
 3  Q    Okay.
 4  A    So I wouldn't expect one document to do that, especially again
 5       for training staff who are psychologists, social workers, you
 6       know, resource teachers, literacy support folks.  Those are
 7       all part of the team, so one document alone would not be
 8       appropriate.
 9  Q    There is one other concern that I wanted to bring up that does
10       go back to the Complaint 18-0085, which if you recall, the
11       underlying problem in that case or that complaint was that
12       chronic absenteeism was being used as an exclusionary factor;
13       right?  And that is not something that's considered in this
14       document; correct?
15  A    I don't see it.  No.
16  Q    Okay.  But like you said, this is only a portion of the staff
17       handbook; correct?
18  A    Um-hmm, um-hmm, yes.
19  Q    Okay.  So it may be in that handbook, but not here?
20  A    It may be in the handbook.  It may be in presentations.  It
21       may be a lot of learning pieces that we provide staff.
22  Q    And speaking of presentations, there's another exhibit I'd
23       like to go to, which is just the next one, 43.
24              (Deposition Exhibit 43 marked)
25  BY MR. SICKON:
```



```
 1  Q    This is another document that KPS provided to MDE in
 2       satisfaction of its CAP for 19-0088.  Does this look familiar
 3       to you?
 4  A    2019, yes.
 5  Q    I'll give you a couple minutes to just go through.  It's not
 6       too long.  It's ten or fifteen pages.  Just let me know when
 7       you're done.
 8  A    Okay.
 9  Q    Now, this document discusses both Child Find and MTSS, like we
10       had been speaking about; right?
11  A    Yes.
12  Q    Okay.  But in your opinion, does this document have guidance
13       to KPS employees about ensuring that a student's behavioral
14       concerns are considered and addressed appropriately in an
15       initial evaluation?
16  A    It doesn't specifically say "behavioral concerns," but MTSS,
17       again, that's part of the process.  So if this multi-tier
18       system does support it, it's academic and behavior.  Again,
19       that's not new learning for staff or anyone that's been, you
20       know, providing any kind of eligibility support.  So it
21       doesn't highlight behavior specifically in here, but it
22       doesn't highlight a lot of things, either.  It's pretty
23       general.
24  Q    Okay.  Now, do you recall submitting any other Child Find
25       policy documents to MDE regarding this complaint's CAP?
```