# EXHIBIT 69

IN THE MATTER OF: D.L. v. KALAMAZOO PUBLIC SCHOOLS, DOCKET NO.: 21-027515, HEARING VOLUME I

January 10, 2022

Prepared by



NetworkReporting
STATEWIDE COURT REPORTERS

depos@networkreporting.com
Phone: 800.632.2720
Fax: 800.968.8653
www.networkreporting.com

*Let us assist you GLOBALLY for all of your deposition needs.*

PLAINTIFFS 00001403

---

```
                    STATE OF MICHIGAN
       MICHIGAN OFFICE OF ADMINISTRATION HEARINGS AND RULES
In the matter of:            Docket No.:    21-027515
D.L.,                        Case No.:      DP-21-0038
        Petitioner,          Agency:        Education
v                            Case Type:     ED Sp Ed
                                            Regular
Kalamazoo Public Schools,
                             Filing Type:   Appeal
        Respondent.
                    /

                    HEARING - VOL I
       BEFORE MICHAEL ST. JOHN, ADMINISTRATIVE LAW JUDGE
                    via Microsoft Teams
          Monday, January 10, 2022, 9:00 a.m.
APPEARANCES:
For the Petitioner:     MS. ERIN HANKINS DIAZ (P80388)
                        MR. MITCHELL DAVID SICKON (P82407)
                        Disability Rights Michigan (DRM)
                        4095 Legacy Parkway
                        Lansing, Michigan 48911
                        (517) 487-1755

For the Petitioner:     MS. ELIZABETH K. ABDNOUR (P78203)
                        Elizabeth Abdnour Law, PLLC
                        1100 West Saginaw Street, Suite 4A-2
                        Lansing, Michigan 48915
                        (517) 292-0067

For the Petitioner:     MS. JACQUELYN BABINSKI (P83575)
                        MI AECRES
                        PO Box 705
                        Ludington, Michigan 49431
                        (231) 794-2379


                        Page 1
```



PLAINTIFFS 00001404

---

```
 1  For the Respondent:     MR. JORDAN MICHAEL BULLINGER (P72441)
                            Clark Hill, PLC
 2                          200 Ottawa Avenue, NW, Suite 500
                            Grand Rapids, Michigan 49503
 3  .                       (616) 608-1146

 4  For the Respondent:     MS. KATIE ILIJIC (ESQ)
                            Clark Hill, PLC
 5                          500 Woodward Avenue, Suite 3500
                            Detroit, Michigan 48226
 6                          (313) 965-8300

 7  Also Present:           D.L., Reuquiyah Saunders

 8  RECORDED BY:            Marcy A. Klingshirn, CER 6924
                            Certified Electronic Recorder
 9                          Network Reporting Corporation
                            Firm Registration Number 8151
10                          1-800-632-2720

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                    Page 2
```

PLAINTIFFS 00001405

---

```
 1      interesting, form a very small percentage of the basis for
 2      your evaluation; correct?
 3  .           THE WITNESS:  Yes.
 4           JUDGE ST. JOHN:  Yeah.  All right.  You relied on
 5      the tests that you did and presumably you interviewed the
 6      young man, too; right?
 7           THE WITNESS:  Yes, your Honor.
 8           JUDGE ST. JOHN:  And that that's the majority of
 9      your opinion.  You review records in the past to give you
10      sort of a better view and to get a full picture, but the
11      vast majority of your opinion is based on your -- the tests
12      that you did and the interview you performed with him;
13      correct?
14           THE WITNESS:  Yes, your Honor.
15           JUDGE ST. JOHN:  All right.  Yeah.  The objections
16      are noted but overruled.  This is admitted as Petitioner's
17      Exhibit Number 2.
18           MS. DIAZ:  Thank you.
19           (Petitioner's Exhibit 2 received)
20           JUDGE ST. JOHN:  All right.  You're welcome.  But
21      you have to give me a minute to make a note of that.  All
22      right.  Go ahead with your direct exam.
23           MS. DIAZ:  Thank you.
24  Q   Dr. Owens, through your evaluation what did you determine
25      about D.L.?
                    Page 43
```

PLAINTIFFS 00001446

IN THE MATTER OF: D.J., v, KALAMAZOO PUBLIC SCHOOLS, DOCKET NO.: 21-027515, HEARING VOLUME I                                    January 10, 2022

```
 1    with the verbal and the nonverbal, but also there was the
 2    working memory which is huge, the attention piece.  But in
 3    terms of accommodations, we would have emphasized -- and
 4    I'm -- sight based approaches, we would have had assistive
 5    devices, we would use audio text, we would use dictation
 6    systems such as speech to text.  In addition to, you know,
 7    these interventions by the educational specialist to target
 8    his reading performance.
 9  Q Okay.  And you had said his reading was at about a third
10    grade level and his math is about a fourth grade level; is
11    that accurate?
12  A I would have to look at the report, but between third and
13    fourth grade for the academic areas that I screened, yes.
14  Q Okay.  And I apologize.  You mentioned you wanted to talk
15    about the working memory piece.  So what kinds of
16    accommodations would have helped with the working memory?
17  A Working structured situations, so where he would sit close
18    to the teacher, where he would have had a desk that limited
19    distractions, that he would have had a peer to help him stay
20    on task as he spoke of daydreaming interfering with task
21    performance.  There are numerous things that an educational
22    specialist could put in place and one of the things that
23    would address both of them that is highly recommended and
24    traditional is that he had a safe person that he could go
25    to, to, one, reiterate what compensatory strategies that he
                              Page 48
```



---

IN THE MATTER OF: D.J., v, KALAMAZOO PUBLIC SCHOOLS, DOCKET NO.: 21-027515, HEARING VOLUME I                                    January 10, 2022

```
 1  A I would --
 2        MS. ILIJIC:  Objection; relevance.  We're going
 3    back to 2012 again.
 4        JUDGE ST. JOHN:  Response?
 5        MR. SICKON:  Dr. Bateman's already established
 6    that the comprehensive battery of evaluations at the initial
 7    eligibility stage sets the foundation for the entire
 8    educational program.  Missing information at that stage is
 9    critical.  It informs all the rest of the educational
10    programming going forward.
11        JUDGE ST. JOHN:  I mean, I think he's got a point
12    there.  I mean, I'm limited the remedy to two years back,
13    but to the extent that they're going to establish that
14    the -- or try and establish that the district missed things
15    going back beyond two years.
16        MS. ILIJIC:  Can I respond?
17        JUDGE ST. JOHN:  Go ahead.
18        MS. ILIJIC:  As your Honor noted in your ruling on
19    the orders, Child Find is an ongoing issue.  So presumably
20    if there was an issue in 2012, counsel can make a showing
21    that there was also an issue in 2019 without creating a
22    record that spans over a decade.
23        JUDGE ST. JOHN:  Well, but I think the point
24    they're making is, is nobody looked in 2019, at least that's
25    my understanding of their, their case.  Is they weren't
                              Page 133
```



---

IN THE MATTER OF: D.J., v, KALAMAZOO PUBLIC SCHOOLS, DOCKET NO.: 21-027515, HEARING VOLUME I                                    January 10, 2022

```
 1    looking in 2019 and they should have been because they had
 2    information as far back as 2012 with this document and
 3    teacher Brown's concerns.  So I think that's appropriate, so
 4    your objection is overruled.  So why don't you ask the
 5    question again, Counselor?
 6        MR. SICKON:  Sure thing.
 7  Q Dr. Bateman, based on, you know, the teacher concerns that
 8    you're seeing both here and on the MET, what would you
 9    expect to see in terms of evaluations?
10  A I would have expected an evaluation to help us determine the
11    social emotional needs of a student.  Because of you having
12    a teacher who's raised this, or basically waving this red
13    flag saying that this student is having these problems
14    seldom or never in this multiple areas, that I would have
15    expected at least an evaluation that would have looked at
16    some social emotional skills of this child and make a
17    determination whether social or emotional skills were a
18    weakness in addition to the reading problems that were
19    highlighted as a part of the previous document.
20  Q No.  That's what you would expect to see.  What did you see?
21  A That -- I didn't see that.  I just saw things related to
22    reading.
23  Q Oh, in terms of evaluations performed?  I apologize.
24  A I'm sorry.  I didn't see that.  I only saw things relating
25    to reading.  I apologize if I didn't make myself clear.
                              Page 134
```



---

IN THE MATTER OF: D.J., v, KALAMAZOO PUBLIC SCHOOLS, DOCKET NO.: 21-027515, HEARING VOLUME I                                    January 10, 2022

```
 1  Q No.  That's probably my fault.  Now, could you describe as
 2    an expert what the impact is of not having that information
 3    at the outset for D.L.?
 4  A Without that information, then you can't provide a -- you
 5    can't make an appropriate determination first about their
 6    full eligibility for special education services, and then
 7    you can't make an adequate determination about the
 8    appropriate programming for a child.  Because with --
 9    without -- without information relating to any information
10    related to social emotional issues, you can't provide
11    programming that would help or assist if that was found to
12    be a need for a child.
13  Q Okay.
14        MR. SICKON:  I'd like to move now back to
15    Respondent's Exhibit 6.
16        (Judge shares exhibit via video)
17  Q Now, in D.L.'s educational record, did you find any academic
18    performance evaluations?
19  A There were -- occasionally there were some academic
20    performance evaluations, but I think that maybe we can look
21    more specifically at a document here to see as you scroll
22    down that the review of existing data on this one.  Okay.  I
23    mean, you have -- you have some -- you have some state
24    assess- -- you have some state assessments, but state and
25    district assessments since they're given as a group should
                              Page 135
```

1  not be used to help make a determination about a child's
2  individual educational programming.  The individual
3  assess- -- it's very specific that we need to make sure that
4  the assessments provided to a child are individualized and
5  given not as a part of a group administration.  So, yes.
6  But I would absolutely report group administered tests as a
7  part of an evaluative tool.  So I think it's appropriate
8  that they did include that, such as that, but that's not
9  what I would use to rely on where we are with the child.
10 Q  Yeah.  And so to that point, what is the difference between
11    some of these more foundational evaluations you're talking
12    about and let's say the NEWEA (sic) assessments or the state
13    and local assessments?  What's the difference between those?
14 A  The individualized assessments are a normative basis that
15    gives us some sense of where the child is functioning
16    compared to their peers, exactly like the other ones are.
17    However, the NWEA and the other state assessments are
18    typically given as a grade level assessment.  And so if a
19    child is not functioning at that grade level, it's not going
20    to give an accurate determination yea or nay about how
21    they're functioning.  So the other one goes across a broader
22    range of scores and a wide arrange of variability so we have
23    a better sense of where the child's currently functioning.
24    That's the purpose behind these tests.  For instance, like
25    I'll posit ones like we often give is the Woodcock-Johnson.

Page 136



PLAINTIFFS 00001539

1  appropriate.  However, for students eligible for special
2  education related services, one of -- especially those with
3  behavior problems, one of the things we have to look at very
4  specifically is whether the behavior is a manifestation of
5  the disability and are there appropriate goals and supports
6  necessary to approve and work with said disability that the
7  child has relating to their behavioral issues.
8  Q  Based on your review of the IEPs, were there supports in
9    place to provide D.L. the appropriate skills to change his
10    behavior to learn prosocial skills?
11 A  There were not.
12        MR. SICKON:  Judge, I'd like to move to admit
13    Plaintiff's (sic) Exhibit 23.
14        JUDGE ST. JOHN:  Any objection?
15        MS. ILIJIC:  No objection.
16        JUDGE ST. JOHN:  23 is admitted then without
17    objection.
18        (Petitioner's Exhibit 23 received)
19 Q  Okay.  And just one last question on this, Dr. Bateman.
20    Would you expect more explanation in the rationale for
21    their -- the school's determination?
22 A  Yes.
23 Q  Could you expand on that?
24 A  Yeah.  I would expect more and what I would expect was
25    clearly defined list of the behaviors this child is

Page 196

PLAINTIFFS 00001599

Page 250

1  the football players that's doing GradPoint, too, would help
2  me.
3  Q  When you say they helped you, they -- they just sort of did
4    it for you?
5  A  Yeah.  And I focused on my other classes.
6  Q  Okay.  All right.  Now one of the attorneys wanted me to ask
7    you that there was -- there was somebody who stood in as
8    sort of a father figure for you as you were growing up.  Who
9    was that?
10 A  Can you repeat that?
11 Q  That one of the attorneys wanted me to ask you about there
12    was somebody who stood in as sort of like a father figure
13    for you?  It's a little hard to follow, but maybe your
14    cousin?  Your cousin who passed away, is that --
15 A  Yeah.  My ninth grade year.
16 Q  Oh, ninth grade year.  Okay.  What happened to your cousin?
17 A  He had got in a car accident.
18 Q  I'm sorry to hear that.  All right.  And he was sort of like
19    a father figure to you?
20 A  He was like a big brother.
21 Q  Big brother.  Okay.
22 A  I think you talking about my uncle.
23 Q  Oh, your uncle.  Okay.
24 A  Yeah.  He died from a gun violence.
25 Q  Oh, I'm sorry to hear that, too.  How old were you when that

PLAINTIFFS 00001686

Page 251

1  happened?
2  A  That was going in my senior year.
3  Q  Oh, okay.
4  A  Turning 18.
5  Q  Was it over the summer before your senior year or during
6    your senior year?
7  A  Yeah, the summer.
8  Q  The summer.  Okay.
9  A  During football practice and stuff.
10 Q  Oh, jeez.  I'm sorry to hear that.  How did that -- how did
11    that affect you, losing your cousin and losing your uncle?
12 A  I stopped talking to people.
13 Q  How long did that last?
14 A  A minute.  I feel like I was going to explode on somebody so
15    I just -- but during that I had got in trouble during
16    football practice.  I had to sit -- sit out two games
17    against two rival teams because I had got -- I had exploded
18    during practice, my helmet.
19 Q  Yeah, that's a no-no.
20 A  Yeah.  But then I came back, played a game, and then I got
21    kicked out of the last -- our last game, too.  So senior
22    year wasn't my best year.
23 Q  Okay.  Yeah.  Sometimes that happens.  Do you still want to
24    play do you think?
25 A  Yeah.

PLAINTIFFS 00001687

Page 260

```
 1        caught me doing that.
 2  Q     Okay.  All right.  We're getting there.  So do you need a
 3        break?  You doing okay?
 4  A     No.
 5  Q     Okay.  Let's keep going then.  I don't see any of the
 6        attorneys frantically waving their hands or harms to need a
 7        break, so we'll keep going.  But I'm not really looking
 8        either, so -- do you remember going to some of these IEP
 9        team meetings, especially after you turned 18?
10  A     Yeah.  I remember the one in December.
11  Q     Okay.  Had they invited you to other ones before that or was
12        that the first one?
13  A     That was the -- that was the first one.
14  Q     Okay.  All right.  So if there was one earlier that they
15        invited you to that maybe you didn't make it to --
16  A     Yeah.
17  Q     Yeah?  Okay.
18  A     I didn't have IEP meetings like that my whole four years.
19        That was the first time.
20  Q     Okay.  All right.  So what happened at that December IEP
21        meeting?
22  A     I was -- they wanted me to go to -- well, I wanted to
23        graduate on time and they wanted me to switch schools and do
24        it that way, but they said if I switched schools, I wasn't
25        going to get help.  But I feel like I wasn't getting help at
```

Page 261

```
 1        Central anyway, so I might as well stay and graduate with
 2        the class that I -- I am and graduate with my friends.  And
 3        somebody said that wasn't going to look good.  I don't
 4        remember who said it in the meeting, but they said it wasn't
 5        going to look good for recruiting for football meets which
 6        in school is at the end of the year.  That's when they said
 7        something about GradPoint.
 8  Q     And that's where you could recover some of the credits you
 9        missed out on earlier; right?
10  A     Yeah.
11  Q     Yeah.  Okay.  Did you want to go -- it sounds like at some
12        point somebody offered some summer school?
13  A     Yeah.  They said I could do summer school or I could do a
14        lot of GradPoint classes, but once I do GradPoint I'm all on
15        my own.
16  Q     Okay.
17  A     I just decided to do the GradPoint.  And my mom had told me
18        don't go out the easy way.  Don't switch schools at the last
19        minute.  Because at Phoenix, it's only 18 credits.  That was
20        taking the easy route.  So she told me just fight it, then
21        that's when I got to buckling down on my work.
22  Q     Okay.  They talk about possibly coming back for a fifth year
23        of high school?
24  A     Yeah.  George White had said -- he brung that up to me, but
25        he brung that up to me, like, the week before I graduated.
```

Page 334

```
 1        it's very subjective.
 2  Q     You didn't do any testing that would have provided you with
 3        a full-scale IQ for D.L.; correct?
 4  A     Correct.  It's not required.  The federal government and the
 5        state government doesn't require a cognitive assessments and
 6        they don't require standardized assessment for that fact
 7        either.  So it's not a federal government requirement, it's
 8        not a state government requirement, and so, and I didn't
 9        feel that it was necessary as far as providing services for
10        D.L.
11  Q     And you didn't feel -- didn't feel like it was necessary to
12        do a psychoeducational evaluation?
13  A     No, I didn't feel like it was necessary to administer a
14        cognitive assessment.
15  Q     Okay.  Yeah, and at the end of the REED in 2018 you found
16        that no additional needed -- data was needed to determine
17        D.L.'s educational needs; right?
18  A     Correct.
19  Q     Okay.  I'd like to move on to behavior.  In addition to
20        academic performance and cognitive ability, there are
21        evaluations for behavior; right?
22  A     There are -- again, this is tricky.  There are not -- there
23        are eval- -- when you do an evaluation, we have to look at
24        all eligibility areas.  So I'm not -- I'm not saying I'm not
25        doing an evaluation for behavior necessarily.  I'm doing an
```

Page 335

```
 1        evaluation and I'm looking at all eligibility areas.
 2  Q     Okay.  I was just asking if there were behavior evaluations?
 3  A     There are -- there are rating scales that you can administer
 4        that relate to behavior, correct.
 5  Q     Okay.  And there's other kinds of assessments.  For example,
 6        if there's information that you learned that a student was
 7        having behavior issues and you were aware that they had a
 8        recent traumatic event, would it be appropriate to do a kind
 9        of trauma evaluation for that student?
10  A     I'm not -- that is not an area of my expertise.  I do not do
11        trauma evaluations.  That would be something that I would --
12        that I would try to connect them with a community mental
13        health resource depending on the severity of the trauma.
14  Q     And during your time working with D.L., you knew that he had
15        recurring behavior issues; right?
16  A     I knew that there were some behavioral incidences, yes.
17        However, they, as far as I understood, they were being
18        addressed through a behavior plan.
19              MR. SICKON:  And, Judge, if we could go, leave the
20        REED and head to Petitioner's Exhibit 20, specifically Bates
21        stamp number 317?  And this one I think might be flipped.
22        I'm not sure.  This one got scanned a little bit funny.
23        Yeah, thank you.
24              (Judge shares exhibit via video)
25  Q     So here, Ms. Morcom, we're looking at a history of
```

IN THE MATTER OF: D.L. v. KALAMAZOO PUBLIC SCHOOLS, DOCKET NO. 21-027515, HEARING VOLUME II                                  January 11, 2022

Page 370

1    under advisement, again, raising the standing objections
2    we're going to begin to talk about the record.
3                  JUDGE ST. JOHN:  Yeah.
4                  MR. BULLINGER:  Putting the objection there.
5                  JUDGE ST. JOHN:  Noted but overruled.  The first
6    page of this is 253, so --
7                  MR. SICKON:  My apology.  I will pull it up in my
8    binder and give you a better number.  263, Judge.
9                  JUDGE ST. JOHN:  Okay.  Of 16.
10                 MR. SICKON:  Yes.
11                 JUDGE ST. JOHN:  263.
12                 (Judge shares exhibit via video)
13                 MR. SICKON:  Okay.  And just so we can see the
14   short term or actually the annual goal there?
15   Q   Ms. Morcom, for this IEP in 2019, D.L.'s reading goal was to
16       progress from -- no, it was to include two details by
17       reading various texts at grade level and use comprehension
18       strategies to identify four to six important key details
19       with 85 percent accuracy; isn't that right?
20   A   **Correct.**
21                 MR. SICKON:  And if we could move to Petitioner's
22       Exhibit 17, please, Judge?  And that's 278 for that Bates
23       stamp.
24                 (Judge shares exhibit via video)
25   Q   Okay.  And, Ms. Morcom, this is an IEP for D.L. that's from



---

IN THE MATTER OF: D.L. v. KALAMAZOO PUBLIC SCHOOLS, DOCKET NO. 21-027515, HEARING VOLUME II                                  January 11, 2022

Page 371

1    October 2019; correct?
2    A   **I'm still looking at the goal for -- I don't know.  I'm --**
3        **are we loo- -- are we still looking at the reading goal and**
4        **objective?  Is that what I'm supposed to be looking at?**
5    Q   Yeah.  We've moved from the April 2019 IEP to the October
6        2019 IEP.  We're still looking at the same reading goal, but
7        I just asked if you could confirm that this is the October
8        2019 IEP?
9    A   **I don't know.  I can't see the date.  I don't -- I don't**
10       **know what I'm looking at.**
11   Q   It's in the top corner.
12                 JUDGE ST. JOHN:  Right here (indicating).
13                 THE WITNESS:  Where is it?
14                 JUDGE ST. JOHN:  Where my hand is moving.  IEP
15       date up in the upper right-hand corner.
16   A   **So we're on the October 2019 IEP; correct?**
17   Q   That's what I was asking.
18   A   **Yes, correct.**
19   Q   Okay.  And D.L.'s goal in this IEP for reading is that he be
20       able to read from a grade appropriate text providing a
21       summary that includes two details by reading various texts
22       and use comprehension strategies to identify four to six
23       important key details with 85 percent accuracy; correct?
24   A   **Correct.**
25   Q   That's identical from his previous one; correct?



---

IN THE MATTER OF: D.L. v. KALAMAZOO PUBLIC SCHOOLS, DOCKET NO. 21-027515, HEARING VOLUME II                                  January 11, 2022

Page 372

1    A   **Apparently, yes.**
2                  MR. SICKON:  I'd like to move to Petitioner's
3        Exhibit 19, your Honor.
4                  (Judge shares exhibit via video)
5                  MR. SICKON:  This is at 307.  Yup, got it.  Thank
6        you.
7    Q   And Ms. Morcom, can you confirm that this is D.L.'s IEP from
8        October of 2020?
9    A   **Correct.**
10   Q   And his reading goal in this IEP is that he will read a
11       grade appropriate text and provide two details from reading
12       these texts and use comprehension strategies to identify
13       four to six important key details with 80 percent accuracy;
14       is that right?
15   A   **Correct.**
16   Q   So it would be accurate to say that we've lowered the bar of
17       expectations for D.L. between these three IEP goals because
18       the first two were 85 percent and now it's at 80; right?
19   A   **Correct.**
20   Q   Otherwise, the goals are identical; correct?
21   A   **They appear to be, yes.**
22   Q   Thank you.  You also had a discussion with Mr. Bullinger on
23       a couple of different areas about the subject of concussion
24       or trauma.
25   A   **Correct.**

---

IN THE MATTER OF: D.L. v. KALAMAZOO PUBLIC SCHOOLS, DOCKET NO. 21-027515, HEARING VOLUME II                                  January 11, 2022

Page 373

1    Q   And while you confirmed that nobody spoke directly to you
2        about those concerns, it's possible that those concerns were
3        voiced to another staff member; correct?
4    A   **Correct.**
5                  MR. BULLINGER:  Objection, your Honor.  Calls for
6        speculation.
7                  JUDGE ST. JOHN:  Well, that was implied in the
8        question, so noted but overruled.
9    A   **Yeah, that was possible --**
10                 JUDGE ST. JOHN:  (inaudible) sustained.
11                 MR. SICKON:  Thank you.  Nothing further.
12                 JUDGE ST. JOHN:  Redirect?  Re-redirect, wherever
13       we are?  Further questions, Mr. Bullinger?
14                 MR. BULLINGER:  Thank you, Judge.
15                 THE WITNESS:  Re-redirect?  Is that what that is?
16                 JUDGE ST. JOHN:  After 3:00 o'clock I get a little
17       punchy, so -- we still have one witness to go, so --
18                 MR. BULLINGER:  Thank you, Judge.  I'm just
19       reviewing my notes to make sure that I've got what I need
20       to.
21                 JUDGE ST. JOHN:  Sure.
22                 MR. BULLINGER:  Judge, no further questions.
23                 JUDGE ST. JOHN:  Okay.  Thank you very much, Ms.
24       Morcom.  You are excused.  You have a wonderful day and
25       please stay safe out there.  Okay?

Page 432

```
 1        "Student's Current IEP and placement."
 2                    (Judge shares exhibit via video)
 3   Q    Did you provide the information for that section?
 4   A    Yes, I did.
 5   Q    And you noted that D.L. was struggling to make progress;
 6        correct?
 7   A    Yes, I did.
 8   Q    And to what, if anything, did you attribute those struggles?
 9   A    D.L. struggled to make progress towards his goals as well as
10        progress towards graduation requirements due to his
11        struggles to follow classroom rules and expectations,
12        school-wide rules and expectations.  He also struggled due
13        to attendance to class as well as behavior in class.
14   Q    Do you recall whether those struggles were discussed at this
15        meeting?
16   A    It is very typical during a manifestation determination to
17        discuss student's behavior as well as the barriers to their
18        success, which in D.L.'s case was his behavior.
19   Q    And did the team determine that this behavior at this
20        meeting was a manifestation of his disability?
21   A    I believe we determined it was not a manifestation of his
22        disability.
23   Q    Is that what's reflected on the page that's currently on the
24        screen?
25   A    Yes.
```



Network Reporting
STATEWIDE COURT REPORTERS
800-632-2720

PLAINTIFFS 00001898