# EXHIBIT 78

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

D.L.; K.S.F.; and K.B., by and
through her parent and next
friend H.B.,

              Plaintiffs,

vs.                                Case No. 22-cv-00838-RJJ-PJG
                                   Hon. Robert J. Jonker
                                   Mag. Phillip J. Green

MICHIGAN DEPARTMENT OF
EDUCATION,

              Defendant.
_____/

DEPOSITION OF:    MARK MLAWER
LOCATION:         Remote Location
DATE:             Friday, November 1, 2024
TIME:             10:00 a.m.


Taken remotely in the above-entitled cause, before
Stefanie S. Pohl, Certified Shorthand Reporter, CSR 5616,
and Notary Public for the County of Clinton.
```

1  questions.
2       MS. DIAZ:  Can we take, sorry, about a
3  ten-minute break before I ask questions?  Thanks.
4       (Brief recess.)
5            EXAMINATION
6  BY MS. DIAZ:
7  Q  Good morning, Mr. Mlawer, how are you today?
8  A  Good morning.  I'm fine.
9  Q  Good.
10 A  Hope you are.
11 Q  Thanks.  I am.
12      MS. DIAZ:  And, Ticara, I just want to put on
13 the record that we'd like the 30 days for Mr. Mlawer to
14 be able to have the chance to review the transcript
15      MS. HENDLEY:  Okay.
16      MS. DIAZ:  Thanks.
17 Q  (By Ms. Diaz)  Mr. Mlawer, Ms. Hendley went through your
18 CV a little bit, but could you tell us what expertise
19 you have regarding general supervision under IDEA?
20 A  Sure.  I began working on general supervision issues in
21 1988 in my position as executive director of a coalition
22 for inclusive education.  That -- that appointment
23 coincided with a federal monitoring event or the
24 aftermath of a federal monitoring event here in
25 Maryland, and I did a fair amount of work around the --

1  a suppressed draft monitoring report from the feds in
2  1989 and the follow-up monitoring that took place a few
3  years later in terms of preparing for that.  That was a
4  course several years ago under IDEA so much has changed
5  since then and in that era there was a state -- a state
6  plan, and I reviewed such documents, provided comments
7  to the feds, and I got quite interested in these kinds
8  of issues so that's where it all began.
9  Q  Okay.  And since 1988 and 1989 have you had experience
10 reviewing general supervision in other states?
11 A  Yes.  If you could put my rèsumè back up I can --
12 Q  I can do that.
13 A  If you'd like me to.
14 Q  Yup.
15 A  I don't have a copy of that with me, so.
16 Q  Okay.  I'll pull it up for you.
17 A  Okay.
18 Q  Let me adjust my settings a little bit.
19       Okay.
20       Can you see that okay?
21 A  It's a blank -- black screen for me.
22 Q  Oh, goodness.  Okay.  Maybe it's still loading.  Let me
23 try it one more time.  Okay.  I can see a black screen.
24 Interesting.
25      MS. DIAZ:  Mitch, can you go ahead and try

1  sharing it on your screen.  I'm not sure why it's not
2  coming up on mine.  Yup, that looks great or at least on
3  my end.
4  Q  (By Ms. Diaz)  Mr. Mlawer, can you see it okay?
5  A  Yes, I can.
6  Q  Okay.  Just let Mitch know where you want to scroll up
7  or down.
8  A  Well, I can go in reverse chronological order.  In the
9  Emma C. case the State, in addition to the district,
10 they were both defendants.  The State side of the case
11 concerned its monitoring system and technically
12 continues to concern its monitoring system so I had
13 occasion over the course of this project to review
14 multiple iterations -- multiple generations of the
15 State's monitoring system and make determinations
16 regarding it and draw conclusions regarding it depending
17 on which era of the case you're referring to.
18     My work -- my most recent work from 2021 to the
19 present for Wyoming Department of Ed is all about
20 general supervision specific -- specifically performance
21 based monitoring.  That aspect of general supervision.
22     In the AB case my -- my work also had to do with
23 MDE's general supervision in -- in this one particular
24 case that concerned one student.
25     In North Carolina my brief -- relatively brief work

1 with them, I helped counsel for the P&A in North
2 Carolina understand their state's general supervision
3 system through the review of complaints and complaint
4 resolutions that the instruments North Carolina used for
5 monitoring and there were several other kinds of
6 documents that related to monitoring and general
7 supervision.
8     Utah Disability Law Center, that was -- just that
9 concerned one school district and its attempt to realign
10 placements for students with disabilities so that was
11 not really general supervision.
12     In ACL/Michigan I reviewed aspect of what the
13 State's -- Michigan special ed monitoring system looked
14 like at that time. It's specifically for the issues
15 that were raised by plaintiffs in that litigation so
16 that was general supervision.
17     This -- my prior work for Wyoming Department of Ed
18 which is listed here was all about general supervision
19 which included an evaluation of the state's monitoring
20 system and then some training and technical assistance
21 that I provided as the state redeveloped and then
22 implemented its performance based systems. I also
23 facilitated meetings that were prestaffing of monitoring
24 visits.
25     Please tell me if I'm getting into too much detail

1 or if there's something in specific -- specifically
2 you'd like me to focus on.
3 Q You're fine. You can keep going.
4 A Okay. The 2015 project for what was then DRM looked at
5 two complaints, one of which was systemic and drew some
6 conclusions about -- about those complaints and their
7 resolutions.
8     The North Dakota project was just facilitation of
9 prestaffing for monitoring visits that the North Dakota
10 was about to go on. That, of course, is general
11 supervision as well.
12     The project for the Louisiana Department of
13 Education also concerned general supervision and
14 monitoring in that I was -- in the first generation I
15 was training the people who were going to be monitors
16 and how to implement the monitoring system. I assisted
17 to some extent in the development of that system and
18 provided technical assistance in the early years to
19 monitoring teams as they monitored. So I did their two
20 evaluations, one after the first year of implementation
21 and the second after the fourth year of implementation.
22 I also wrote a manual that the state continued to use
23 for training, both the leaders and the members of
24 monitoring teams.
25     The New Hampshire project was a full evaluation of

1 that state's monitoring system at that time and --
2 complete with recommendations were approved.
3     The external expert in Newark, New Jersey also had
4 the state as -- as a defendant, and I don't recall if I
5 reviewed the state's monitoring system for that project.
6 I don't think so. I was basically -- after the first
7 year or so I was reviewing drafts of corrective action
8 plans that the parties were negotiating about and
9 providing advice and assistance to plaintiff's counsel
10 in that case.
11     The Southern Poverty Law Center projects which had
12 to do with multiple states and districts, I was
13 reviewing -- I took the complaints that were systemic
14 and broke them down into recommended complaint
15 investigation methodologies for those states to use. I
16 then -- those were for the plaintiffs in those
17 situations and who then used those documents as I
18 understood it to negotiate with those SEAs around what
19 steps the state was going to take.
20     In the Jamie S. case in Wisconsin there had been
21 proposed by the defendants in -- in that matter a
22 monitoring system that purported to be able to fix the
23 problems in Milwaukee at that time and that was called a
24 building based assessment process, and I reviewed that,
25 critiqued it and then testified both by deposition and a

1 trial.
2     The Florida project was all general supervision.
3 Had to do with complaint management. I did a -- an
4 evaluation of their complaint system as of I think that
5 was about 2005 and I trained -- did some training for
6 their complaint investigators and their monitors for how
7 -- regarding how you support findings of noncompliance
8 with adequate evidence of reason. I facilitated a task
9 force for them, but that was not really general
10 supervision.
11     The -- that Michigan project about the charter
12 schools was all general supervision. I looked at the --
13 how the state was monitoring special educating
14 compliance in its charter schools.
15     The Texas expert witness work was all monitoring.
16 The -- the experts hired by plaintiffs collaboratively
17 developed a potential monitoring system for Texas to use
18 that would resolve the issues in that complaint. My
19 testimony however concerned TEA's monitoring
20 instruments. The standards they -- the agency was using
21 to draw conclusions in their monitoring and then I
22 testified regarding that.
23     The Pennsylvania project in the Cordero case I did
24 two evaluations of the state's compliance with -- with
25 the federal -- the court orders that had been put in

place, did that project and that -- so that was general supervision but I was looking not at the statute but at those court orders and we assess you can see the list of things that that -- that those reports assessed which included monitoring policy development and implementation.

The first report in '97 I did alone. The second report I did in partnership with one of the R -- so-called RRCs, it doesn't exist anymore, Regional Resource Centers, which were funded by the -- the US Department of Ed to provide assistance. At that time it was all regional, so this one covered a region that included Pennsylvania.

That technical assistant little project concerned the case of which I'm court monitor before I was appointed as court monitor and what I did for the first Corrective Action Plan was develop -- essentially they were called performance effectiveness parameters. They were ways to monitor compliance with that Corrective Action Plan. At the point I did that, of course, I had no idea I was going to be appointed as the monitor myself but so that was what I did.

The National Council on Disability project, which was ultimately published in the year 2000 as Baptist One Civil Rights, was all about general supervision. It

---

looked at federal monitoring and oversight of state's implementation of the act so in the course of doing that I read the -- I read and analyzed the most recent monitoring report that the feds had done of every single state and created a database to capture the information and then looked at six states in depth over time to see to what extent the problems that had been noted originally had been fixed by the federal monitoring and oversight system and then I wrote draft chapters -- I think it was two draft chapters, of that report based on that information most of which ended up in the final report which is available online to review.

The Plaintiff's Representative Project, that was -- there was a longstanding lawsuit, a class action in Baltimore called the Vaughn G. case, and in 1994 the parties attempted to settle that case, and they created an entity called the Management Oversight Team in which the state superintendent of schools participated on behalf of the state, the city superintendent of schools on behalf of the LEA and me on behalf of the plaintiffs.

There were at that time 18,000 students in that class, and it had the authority in theory at least to -- I have the language in there -- make, review and direct all decisions which affected special education in the district. The reality turned out to be somewhat

---

different, but that was the charge of the team.

Ultimately that was disbanded and when another -- yet another settlement was reached in the case.

Q Okay. I'm going to stop you right there.
A Sure.
Q So based on the portion of your résumè you just reviewed for us, it sounds like you've had experience looking at general supervision all over the country. Would you agree with that?
A I would.
Q Okay. And you mention a few court cases where you either were deposed or you testified. Is Jamie S. one of them?
A Jamie S., yes.
Q Okay. And there was a Texas case as well?
A Yes, that was TEA -- Angel G. versus TEA, if I remember right.
Q And in either of those cases were you determined to be an expert by the Court when you testified?
A I believe so, but it's so long ago I don't remember if that was challenged or how it went down, but I did testify, so.
Q Okay. And do you recall which areas you were determined to be an expert regarding or you were proposed to be an expert regarding in those cases?

---

conclusion. In general that's how I would approach it.
Q Okay. Okay. What is Child Find?
A Child Find is ensuring state -- requirement on the state is to ensure that all students who can be reasonably suspected of having a disability and needing special education are identified, located and evaluated.
Q Okay. And who has that obligation?
A The state does.
Q Is it an important obligation?
A It's crucial.
Q Okay.
A If you're not evaluated and given an IEP then you're not going to receive services that respond to your particular unique needs in the words of staff.
Q So ultimately children are harmed when states don't fulfill this obligation?
A Yes, that's correct.
Q Okay. How many categories of eligibility are there in IDEA?
A I don't remember the number, 12, 13, 14, something like that.
Q So a number of them, right?
A Yeah. There are a number of different disabilities you can be identified under.
Q Okay. So what happens if a school can't appropriately

```
 1        evaluate or a school district rather can't appropriately
 2        evaluate for one of those categories?
 3   A    Can't?  Mean does not have the expertise?
 4   Q    Correct.
 5   A    They -- what a state -- a district should be doing under
 6        that circumstance is reach out to the state that has the
 7        ultimate authority, explain to the state what it lacks
 8        and ask the state for assistance in getting that
 9        expertise that they need.
10   Q    Okay.  And if one piece of that Child Find system within
11        a district is not working, does the district have a
12        functioning Child Find system?
13   A    No, if it's not -- if it's not working, it's not
14        functioning.
15   Q    Okay.  So, for instance, with KPS you identified that
16        there were issues regarding comprehensive evaluations --
17   A    Yes.
18   Q    -- so in that situation -- sorry.
19   A    That was part of the issues that the complaint
20        resolutions uncovered, yes.
21   Q    Correct.  Would the district be effectively implementing
22        Child Find if it continued to have issues with
23        comprehensive evaluations?
24   A    No, it would not.
25   Q    Why not?
```