## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONQUARION LEWIS; KE'AUJANAA
SHEPHERD-FRIDAY; and K.B., by and
through her parent and next friend H.B.,

Case No. 22-cv-00838-RJJ PJG

      Plaintiffs,

Hon. ROBERT J. JONKER

      v.

MICHIGAN DEPARTMENT OF
EDUCATION,

MAG. PHILLIP J. GREEN

      Defendant.

Erin H. Diaz (P80388)
Disability Rights Michigan
*Attorney for Plaintiffs*
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755
ediaz@drmich.org

Jennifer B. Salvatore (P66640)
David L. Fegley (P85275)
Salvatore Prescott Porter & Porter
*Attorneys for Plaintiffs*
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@sppplaw.com
fegley@sppplaw.com

Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER LLP
*Attorney for Plaintiffs*
325 E. Grand River Ave.
Suite 250
East Lansing, MI 48823
(517) 994-1776
liz@education-rights.com

Jacquelyn N. Kmetz (P83575)
MI AECRES
*Attorney for Plaintiffs*
P.O. Box 705
Ludington, Michigan 49431
(231) 794-2379
jkmetz@miaecres.org

Ticara D. Hendley (P81166)
Kathleen A. Halloran (P76453)
Neil Giovanatti (P82305)
*Attorneys for Defendant*
Michigan Department of
of Attorney General
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
hendleyt1@michigan.gov
giovanattin@michigan.gov
hallorank1@michigan.gov

## PLAINTIFFS' SUPPLEMENTAL BRIEF

## TABLE OF CONTENTS

Table of Contents…………………………………………………………..…..i

Table of Authorities……………………………………………………………ii

I.      Introduction and Procedural Posture……………………………………………1

II.     The *Y.A.* Opinion Has No Impact on the IDEA or Section 504 of the Rehabilitation Act, Neither of Which is Subject to Eleventh Amendment Immunity…………………1

      A.      *Y.A.* Does Not Affect the Long Line of Case Law Establishing that States Waive Their Eleventh Amendment Immunity Under the IDEA and Section 504 of the Rehabilitation Act………………………………………………...2

III.    *Y.A.* Requires a "Claim by Claim" Analysis for Title II, and Plaintiffs' Claims Differ from Those Alleged in *Y.A.* Because They Arise from MDE's Independent Duties…………………………………………………………..…5

IV.     The *Y.A.* Court's Passing Reference to the IDEA is Clearly Inapplicable Dicta……...…10

V.      Section 504 Imposes Specific Obligations on MDE and MDE's Conduct Discriminated Against Plaintiffs……………………………………………14

VI.     Conclusion…………………………………………………………………....16

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*A.B. by & through K.B. v. Michigan Dep't of Educ.*,
    570 F. Supp. 3d 531 (W.D. Mich. 2021)................................................................15

*A.W. v. Jersey City Public Schools*, 341 F.3d 234 (3d Cir. 2003)....................................2

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985)................................................2

*Bacon v. City of Richmond, Virginia*, 475 F.3d 633 (4th Cir. 2007)................................6

*Board of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E.*,
    207 F.3d 931 (7th Cir.), *cert. denied,* 531 U.S. 824 (2000)..................................3

*Dellmuth v. Muth*, 491 U.S. 223 (1989)..........................................................................2

*Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13 (1st Cir. 2006)..............................................3

*Doe By and Through Doe v. Board of Education of Tullahoma City Schools*,
    9 F.3d 455 (6th Cir. 1993)....................................................................................16

*Doe v. Ohio*, No. 2:91-CV-464, 2004 WL 7347115 (S.D. Ohio July 9, 2004)................4

*Edelman v. Jordan*, 415 U.S. 651 (1974)........................................................................5

*Everett H. v. Dry Creek Joint Elementary School Dist.*, 5 F. Supp. 3d 1167 (E.D. Cal. 2014)........3

*J.M. by & through Mata v. Tennessee Dep't of Educ.*, No. 3:17-CV-00405,
    2017 WL 11671746 (M.D. Tenn. Dec. 14, 2017)................................................12

*L.H. v. Tennessee Dep't of Educ.*, No. 3:19-CV-00517,
    2019 WL 5898092 (M.D. Tenn. Nov. 12, 2019)…...............................................4

*La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388 (W.D. Tex. 2022)..............9

*M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335 (3d Cir. 2003)......3

*Mitchell through Mitchell v. Cmty. Mental Health of Cent. Michigan*,
    243 F. Supp. 3d 822 (E.D. Mich. 2017)................................................................4

*Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*,
    258 F. Supp. 3d 1114 (E.D. Cal. 2017)................................................................13

*N.S. v. Tennessee Department of Education*, No. 3:16-CV-0610,
    2016 WL 3763264 (M.D. Tenn. July 14, 2016)..................................................15

*Nihiser v. Ohio E.P.A.*, 269 F.3d 626 (6th Cir. 2001)......................................................4-5

*Pace v. Bogalusa City School Board*, 403 F.3d 272 (5th Cir. 2005)...............................3-4

*S.P. v. Knox Cty. Bd. of Educ.*, 329 F. Supp. 3d 584 (E.D. Tenn. 2018)........................13

*Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618 (6th Cir. 1990).................................16

*United States v. Georgia*, 546 U.S. 151 (2006)...........................................................1, 5

*Y.A. by Alzandani v. Hamtramck Pub. Sch.*,
    No. 24-1855, 2025 WL 1463285 (6th Cir. May 22, 2025).......................................*passim*

**Statutes**

29 U.S.C. § 794….................................................................................................................4

20 U.S.C. § 1403.............................................................................................................2-4

20 U.S.C. § 1403(a)...........................................................................................................2

20 U.S.C. § 1403(b).......................................................................................................2, 4

20 U.S.C. § 1412.........................................................................................................10-12

20 U.S.C. § 1412(a)(1).....................................................................................................11

20 U.S.C. § 1412(a)(3).....................................................................................................11

20 U.S.C. § 1412(a)(5).....................................................................................................11

20 U.S.C. § 1412(a)(11)...................................................................................................11

20 U.S.C. § 1413….........................................................................................................12

20 U.S.C. § 1413(g)..........................................................................................................12

20 U.S.C. § 1413(g)(1)(B)................................................................................................12

20 U.S.C. § 1416(a)(1)(C)................................................................................................11

20 U.S.C. § 1416(a)(3)(A)................................................................................................11

42 U.S.C. § 2000d-7….................................................................................................2, 4

42 U.S.C. § 12131...................................................................................................6

42 U.S.C. § 12132................................................................................................6, 8

42 U.S.C. § 12133...................................................................................................6

42 U.S.C. § 12134...................................................................................................6

**Regulations**

28 C.F.R. § 35.130(b)..............................................................................................9

28 C.F.R. § 35.130(b)(1)(v).....................................................................................9

34 C.F.R. § 104.31.................................................................................................14

34 C.F.R. § 104.4..................................................................................................16

34 C.F.R. § 300.100...............................................................................................11

34 C.F.R. § 300.101(b)(2).......................................................................................10

34 C.F.R. § 300.101(c)(1).......................................................................................10

34 C.F.R. § 300.111...............................................................................................11

34 C.F.R. § 300.151.................................................................................................6

34 C.F.R. § 300.600(e)............................................................................................7

MARSE R. 340.1701.............................................................................................6

MARSE R. 340.1855.........................................................................................8, 16

**Constitutional Provisions**

U.S. Const. amend. XI.....................................................................................*passim*

## I.    Introduction and Procedural Posture

On May 23, 2025, the Court requested supplemental briefing regarding the Sixth Circuit's decision in *Y.A. by Alzandani v. Hamtramck Pub. Sch.*, No. 24-1855, 2025 WL 1463285 (6th Cir. May 22, 2025) and the implications that *Y.A.* may have for the present case. (ECF No. 93, PageID.2506).  The short answer is that *Y.A.*, a case about Eleventh Amendment immunity under Title II for a state educational agency (MDE), has absolutely no bearing on Plaintiff's IDEA and Section 504 claims.   And under Title II, *Y.A.* was a prematurely filed case that simply removes *vicarious liability* of MDE for its local districts' conduct. By contrast, in the present case, Plaintiffs claim (and show with substantial evidence) violations of MDE's own independent duties, quite apart from the local school districts' duties. For the reasons below, summary judgment should be denied.

## II.    The *Y.A.* Opinion Has No Impact on the IDEA or Section 504 of the Rehabilitation Act, Neither of Which is Subject to Eleventh Amendment Immunity

Eleventh Amendment sovereign immunity is a broad doctrine, but it is not absolute. There are exceptions, including congressional abrogation. That exception requires a complex weighing of numerous factors, including the extent to which Congress exercised its enforcement powers pursuant to Section 5 of the Fourteenth Amendment and whether its exercise of those powers was congruent and proportional to the constitutional violations it sought to remedy. *See United States v. Georgia*, 546 U.S. 151 (2006).

But when it comes to the IDEA and Section 504 of the Rehabilitation Act, a different and far more straightforward exception applies: the states' waiver of their sovereign immunity under the Eleventh Amendment in exchange for access to federal funds. Courts have consistently held that states knowingly waive their Eleventh Amendment immunity by accepting federal funds under the IDEA and the Rehabilitation Act, both of which constitute appropriate exercises of

Congress's spending power and both of which expressly provide that states are not immune under the Eleventh Amendment for violations thereof.[1]

### A.  *Y.A.* Does Not Affect the Long Line of Case Law Establishing that States Waive Their Eleventh Amendment Immunity Under the IDEA and Section 504 of the Rehabilitation Act

Caution should be taken against conflating *Y.A.*'s limited reasoning for Title II into the IDEA and Section 504.  They are different.

First, the IDEA provides that: "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." 20 U.S.C. § 1403(a). Additionally, Congress stated that "[i]n a suit against a State for a violation of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as those remedies are available for such a violation in the suit against any public entity other than a State." 20 U.S.C. § 1403(b).  While this section of the statute is titled, "Abrogation of State Sovereign Immunity," courts have recognized it as both an abrogation and a *waiver* provision, because it "unambiguously expresses Congress's intent to condition entitlement to federal financial assistance under the IDEA on a state's surrender of immunity." *A.W. v. Jersey City Public Schools*, 341 F.3d 234, 245 (3d Cir. 2003).

Courts that have addressed this issue have uniformly found that states waive their immunity under the IDEA by accepting federal funds that are expressly conditioned on compliance with the statute's requirements. *Id.* (finding that the state waived its immunity by

---

[1] With both statutes, the Supreme Court found that earlier versions were missing a clear intent by Congress to abrogate States' 11th Amendment Immunity. *Dellmuth v. Muth*, 491 U.S. 223, 232 (1989) (holding the language of IDEA's predecessor did "not evince an unmistakably clear intention to abrogate the States' constitutionally secured immunity from suit."); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985) ("A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment"). Congress acted quickly to amend each act to ensure that its intent to abrogate states' immunity was clear. *See* 20 U.S.C. § 1403 and 42 U.S.C. § 2000d-7.

consenting to suit and accepting federal funds under both the IDEA and the Rehabilitation Act); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 33 (1st Cir. 2006) ("[T]he Commonwealth defendants do not have Eleventh Amendment immunity against the federal IDEA and Rehabilitation Act claims, because they waived such immunity by accepting federal funds"); *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 346 (3d Cir. 2003) ("One clear and unmistakable component of the IDEA is a state's waiver of Eleventh Amendment immunity"); *Board of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E.,* 207 F.3d 931, 935 (7th Cir.), *cert. denied,* 531 U.S. 824 (2000) ("Having enacted legislation under its spending power, Congress did not need to rely on § 5 [of the Fourteenth Amendment]. States that accept federal money, as Illinois has done, must respect the terms and conditions of the grant"); *Everett H. v. Dry Creek Joint Elementary School Dist.*, 5 F. Supp. 3d 1167, 1179 (E.D. Cal. 2014) ("It is uncontroverted that states receiving federal funding under the IDEA waive sovereign immunity under 20 U.S.C. § 1403").

A leading decision on this point is the *en banc* opinion of the Fifth Circuit in *Pace v. Bogalusa City School Board*, 403 F.3d 272 (5th Cir. 2005). In *Pace*, relying on Supreme Court precedent, the court explained that there were two principal exceptions to the doctrine of Eleventh Amendment immunity: congressional abrogation and waiver. *Id.* at 279. Focusing on waiver, the court explained, "[i]f waiver results from participation in a Spending Clause program, the program must be a valid exercise of Congress's spending power; the waiver condition must satisfy the clear-statement rule (thereby ensuring that the state's waiver is 'knowing'); and the program must be non-coercive (automatically establishing that the waiver is 'voluntary')." *Id.* The Fifth Circuit found that Congress passed all three tests when it passed the IDEA and Section 504 of the Rehabilitation Act by expressly and non-coercively conditioning

states' receipt of federal funds on their waiver of Eleventh Amendment immunity. *Id.* at 281-87. Thus, a state educational agency like MDE that accepts IDEA funds has knowingly and voluntarily waived any Eleventh Amendment immunity to IDEA claims.

Courts within the Sixth Circuit agree. In *Doe v. Ohio*, the court explained that Ohio had "waived immunity from suit by accepting federal funding under the IDEA." No. 2:91-CV-464, 2004 WL 7347115, at *9 (S.D. Ohio July 9, 2004). Citing to 20 U.S.C. § 1403(b), the court further determined that because "Congress also provided for remedies '[i]n a suit against a State for a violation of [the IDEA],' . . . Congress had contemplated that suit could be brought not only against educational agencies but also against the States themselves." *Id.* at *7; *L.H. v. Tennessee Dep't of Educ.*, No. 3:19-CV-00517, 2019 WL 5898092, at *8 (M.D. Tenn. Nov. 12, 2019) (noting that state sovereign immunity has either been abrogated or waived under 20 U.S.C. § 1403).

Second, under Section 504, courts in the Sixth Circuit have long recognized that, to receive federal funds, Congress expressly required that states waive their Eleventh Amendment immunity under the Rehabilitation Act. *See* 42 U.S.C. § 2000d–7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794]"); *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 628 (6th Cir. 2001), *Mitchell through Mitchell v. Cmty. Mental Health of Cent. Michigan*, 243 F. Supp. 3d 822, 838 (E.D. Mich. 2017). The Sixth Circuit observed that "[t]he U.S. Supreme Court, as well as every circuit court to address the question, has recognized Section 2000d–7 as a valid and unambiguous waiver." *Nihiser,* 269 F.3d at 628. Courts find waiver of Eleventh Amendment immunity "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any

4

other reasonable construction.'" *Id.* (quoting *Edelman v. Jordan*, 415 U.S. 651 (1974)). As a result, because of the "most express language" of the statute, "[s]tates waive their Eleventh Amendment immunity with regard to Rehabilitation Act claims when they accept federal funds." *Id.*

It is undisputed that MDE accepts federal funds pursuant to the IDEA and Rehabilitation Act. (ECF No. 13, PageID.120-121) (MDE acknowledging in its Answer to Plaintiffs' Amended Complaint that it is a state education agency under the IDEA and accepts federal funds under the IDEA and Rehabilitation Act). Thus, Defendant MDE cannot possibly obtain immunity under the Eleventh Amendment as a defense to Plaintiffs' IDEA or Section 504 claims.

### III.    *Y.A.* Requires a "Claim by Claim" Analysis for Title II, and Plaintiffs' Claims Differ from Those Alleged in *Y.A.* Because They Arise from MDE's Independent Duties

Rather than imposing a blanket holding covering all Title II causes of action against the state, the *Y.A.* Court carefully explained that it "must instead evaluate [the statute] on a 'claim-by-claim basis,' asking whether Title II is appropriate legislation *based on the particular lawsuit before us.*" *Id.* (citing *Georgia*, 546 U.S. at 159) (emphasis added).

In *Y.A.*'s "particular lawsuit," the Sixth Circuit determined that the plaintiffs had failed to identify conduct by MDE that had violated Title II, and therefore MDE was entitled to Eleventh Amendment immunity in that case. *Id.* at *5. The court explained that Title II did not allow for "supervisory liability," meaning that the students' alleged exclusion from the school's service, program, or activity was not a *de facto* exclusion from a service, program, or activity *of the state*.

*Id.*[2] There was no vicarious liability.  And as a result, the court held that MDE's action or inaction did not deprive the plaintiffs of MDE's services, programs, or activities.

To be sure, Plaintiffs acknowledge *some* similarities to *Y.A.*: both sets of plaintiffs included allegations that MDE's failure to adequately supervise local districts resulted in students with disabilities being excluded from educational programs and opportunities.[3]  But they are different, too.

In *Y.A.,* the court wrote that "*[i]n this case*, the school district, not the State, allegedly discriminated against children with disabilities." *Id.* at *5 (emphasis added). The *Y.A.* amended complaint asserted that MDE "failed to comply with its general supervisory responsibilities by failing to adequately oversee and supervise" local districts to ensure that the Plaintiffs received FAPE. (Ex. 1, *Y.A.* Amended Complaint at ¶ 260). And it alleged that "MDE failed to prevent,

---

[2] In its discussion of Title II, the Sixth Circuit quoted *Bacon v. City of Richmond, Virginia*, for the proposition that "'[t]o hold that a city or State by virtue of its funding authority is liable for injury caused solely by a separate and independent corporate body is a novel and unprecedented theory.'" *Y.A.*, 2025 WL 1463285 at *5 (*quoting Bacon v. City of Richmond, Virginia*, 475 F.3d 633, 636 (4th Cir. 2007)). However, *Bacon* was examining the relationship between a city and a school district. The Fourth Circuit was "asked to decide whether a city may be required to fund a federal court order mandating the system-wide retrofitting of city schools, under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–34 (2000), without any determination that the city discriminated against or otherwise excluded plaintiffs from its services and activities." *Bacon*, 475 F.3d at 636. In reversing the lower court, the Fourth Circuit explained that the city could only raise taxes and provide funding, but it could not dictate school services or programs. Thus, "[t]o impose funding liability . . . places the City between a rock and a hard place: The City must 'ensure that the City schools become ADA-compliant within [five years],' but is powerless to control the expenditure of school funds." *Id.* at 640–41. Indeed, "Title II does not contemplate funding liability for an independent public entity that neither controls the challenged services nor discriminated against plaintiffs because of disability." *Id.* at 642. In contrast, MDE is charged with ensuring that school districts comply with both the IDEA and MARSE. *See* MARSE R. 340.1701, 34 C.F.R. § 300.151.

[3] Notwithstanding the existing distinctions between Plaintiffs' currently operative First Amended Complaint and the claims at issue in *Y.A.*, Plaintiffs intend to file a motion for leave to file a Second Amended Complaint to clarify their theory of the case and MDE's discriminatory conduct, in light of *Y.A.*

correct, or remedy [the district's] violations of the rights of the plaintiffs and all those similarly situated." (*Id.* at ¶ 129). Throughout their complaint, the *Y.A.* plaintiffs made broad allegations about MDE failing to provide sufficient funding, systemically failing to ensure compliance with IDEA, and otherwise failing in its supervisory obligations. (*Id.* at ¶25-28). However, the factual allegations demonstrate the district's failings, not MDE's actions.

Why did *Y.A.* assume a *respondeat superior*, or vicarious liability, theory, instead of an independent one? The answer is because the *Y.A.* plaintiffs jumped the gun. Under 34 C.F.R. § 300.600(e), MDE is given a full year to correct identified noncompliance of the local districts. Inexplicably, the *Y.A.* plaintiffs filed their federal complaint within months of MDE's issuance of the state complaint decisions. (Ex. 1, *Y.A.* Am. Compl. at ¶ 116).[4]  Obviously, no independent duty arose for MDE at that point—*the duty was still with the local school district*. Quite understandably, as the *Y.A.* court explained, it was the local district, not the state, that was acting in a manner that allegedly discriminated against students with disabilities.

Again, the present case is far different in its timing and, as a result, the duties of MDE. Plaintiffs patiently waited for the local district. Once the district failed to act, now well after one year, it became incumbent on MDE to act.   *Y.A.* determined that MDE cannot be held accountable under Title II for the *district*'s exclusions and discrimination.  But here, Plaintiff is not asserting a vicarious liability theory against MDE for actions of the district. Quite the opposite, Plaintiffs specifically take aim at MDE's *own* independent failures regarding its own services, programs and activities. Where *Y.A.* was about "the school district, not the State," the present case is about "MDE, not the school district." The State failed in its own right. For instance, in ¶ 214 of Plaintiffs' Amended Complaint (incorporated into Plaintiff's ADA claim by

_____
[4] The Plaintiffs relied on the two state complaints they had filed, which had resulted in decisions issued on April 7, 2023, and June 15, 2023, respectively. (*Id.* at ¶¶ 157, 194).

virtue of ¶ 228), Plaintiffs allege that MDE "failed to maintain an effective complaint resolution process, resulting in the continued denial of a free appropriate public education for Plaintiffs." (ECF No. 10, PageID.96). The complaint resolution process is governed by MDE, not local districts. Put another way, the state complaint system is decidedly a "service, program or activity" *of the state*, not the local district.

As Plaintiffs previously discussed in their response brief to Defendants' motion for summary judgment, abrogation is warranted. (ECF No. 86, PageID.1861-1863). Plaintiffs' First Amended Complaint alleges that MDE "intentionally violated Plaintiffs' rights under the ADA and its regulations by denying them access to equal educational opportunities . . . by excluding Plaintiffs from participation in and denying them the benefits of the district's *and State's services, programs and activities*, and by subjecting them to discrimination. 42 U.S.C. § 12132." (ECF No. 10, PageID.98) (emphasis added).

The evidence gathered over the course of this case overwhelmingly substantiates that allegation: Plaintiffs' expert analyzed state complaints and documentation collected by MDE to demonstrate its own compliance with the IDEA and the Michigan Administrative Rules for Special Education (MARSE). Instead, these documents demonstrated that MDE's system did not correct districts' noncompliance, and, after learning this, MDE did not make any changes to its complaint system or take any affirmative actions to come into compliance as mandated by MARSE 340.1855. (ECF No. 86-2, PageID.1880-1882). During the course of this litigation, MDE continued to find the district out of compliance with the child find requirement of the IDEA, providing clear evidence that its state complaint system continued to fail. (ECF No. 86, PageID.1813; ECF No. 86-8, PageID.1921). As noted in Plaintiffs' response brief, MDE's failure to properly manage *its own state complaint system* is a systemic problem that extends beyond a

single school district, denying FAPE to both the Plaintiffs in this case and similarly situated students with disabilities throughout Michigan. (ECF No. 86, PageID.1860).

And when Plaintiffs' Amended Complaint alleges that MDE "intentionally violated Plaintiffs' rights under the ADA and its regulations by denying [Plaintiffs] access to equal educational opportunities . . ." (ECF No. 10, PageID.98) that reference to the ADA's regulations necessarily includes 28 C.F.R. § 35.130(b) (mandating that a public entity is barred from actions that "[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program").

Once again, the regulation does not constitute an imposition of vicarious liability; it instead imposes an affirmative obligation on MDE to avoid aiding or perpetuating discrimination through its relationships with entities that are, themselves, engaging in discrimination. Here, Kalamazoo Public Schools (KPS) is such an entity. MDE cannot delegate its own responsibilities to the local school district when its own conduct violates the ADA. *See La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 421-422 (W.D. Tex. 2022) (in case where plaintiffs alleged that Texas violated ADA in its administration of elections, court invoked 28 C.F.R. § 35.130(b)(1)(v) and rejected state defendant's argument that it was merely local election officials, rather than the Texas Secretary of State, responsible for administering Texas' elections: the court explained that the regulation encompassed the Secretary's "provision of assistance to counties and local officials.").

**IV.    The *Y.A.* Court's Passing Reference to the IDEA is Clearly Inapplicable Dicta**

The *Y.A.* court did not reach the merits of the plaintiffs' separate IDEA claims. Those claims were not before the court and not decided by the court. Again, the issue was whether MDE was entitled to Eleventh Amendment immunity for the plaintiffs' *ADA Title II claims*. Yes, the *Y.A.* opinion briefly mentions the IDEA, *Y.A.*, No. 24-1855, 2025 WL 1463285, at *7, but it is plainly dicta. In fact, the only reason the Court discussed the IDEA is because the *Y.A.* Plaintiffs, themselves, invoked the statute in their briefing. They claimed that the *IDEA*'s general supervision requirements supported their argument that MDE was not subject to Eleventh Amendment immunity on their *ADA* claims. *Id.* The court found that the *Y.A.* plaintiffs' references to the IDEA were misplaced. Yet again, these were school district obligations, not independent obligations under the IDEA for MDE. As a result, the *Y.A.* court did not reach the merits of the plaintiffs' separate IDEA claims.

That IDEA is a very different statute from Title II of the ADA cannot be gainsaid. While Title II broadly prohibits discrimination on the basis of disability and *limits* what a subject entity can do, the IDEA provides federal financial assistance to state and local education agencies to guarantee special education and related services for eligible children with disabilities, thus *expanding* what a subject entity must do.  The state MUST ensure that its special education programs and services are in compliance with IDEA. Unlike the ADA, the IDEA explicitly requires the State Educational Agencies (SEAs) (here, MDE) to take certain actions and imposes specific obligations with which states must comply in order to continue receiving federal funds. For example, each state must ensure that "[a]n IEP . . . is in effect for the child" by age three and that "FAPE is available to any individual child with a disability who needs special education and

related services." 34 C.F.R. § 300.101(b)(2), (c)(1); *see* 20 U.S.C. § 1412(a)(1), (a)(5); 1416(a)(1)(C), (a)(3)(A). (*See also* Pls.' Am. Compl., ECF No. 10, PageID.78).

The state must also "have in effect policies and procedures to ensure that all children with disabilities "who are in need of special education and related services, are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3). As Plaintiffs explained in their First Amended Complaint, "MDE is ultimately responsible for ensuring a functioning child find process for all students with disabilities in Michigan, as a part of its supervisory duties. 20 U.S.C. § 1412(a)(11); 34 C.F.R. §§ 300.100; 300.111." (ECF No. 10, PageID.73).

Congress expressly assigned the SEA the responsibility of ensuring that IDEA's requirements are carried out. General supervision is not a vague or passive notion under IDEA; it is an affirmative obligation imposed upon the SEA by Congress, through the statute. The IDEA spells out the SEA's general supervision requirements in Section 1412(11). Defendant understands the obligations imposed upon it by the IDEA, as MDE Office of Special Education Assistant Director Rebecca McIntyre defined general supervision in her deposition as the "State's obligation . . . to ensure that students with disabilities are receiving the free, appropriate public education in the least restrictive environment that they're entitled to." (ECF No. 80-2, PageID.473; ECF No. 86-3, PageID.1890). Moreover, as Defendant wrote in its Answer to Plaintiff's First Amended Complaint, "MDE admits that federal and state law govern MDE's responsibilities for the general supervision of implementation of the IDEA." (ECF No. 13, PageID.114).

Under the IDEA, the SEA has numerous responsibilities, including the responsibility for

ensuring that—
(i) the requirements of this subchapter are met;

(ii) *all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency*

(I) are *under the general supervision of individuals in the State who are responsible for educational programs* for children with disabilities; and

(II) meet the educational standards of the State educational agency

20 U.S.C. § 1412 (emphasis added). Further, a local educational agency (LEA), or school district, only becomes eligible to receive IDEA funds by submitting a plan to the SEA "that provides assurances to the State educational agency that the local educational agency meets" conditions including that it "has in effect policies, procedures, and programs that are consistent with the State policies and procedures established under section 1412." 20 U.S.C. § 1413. Plaintiffs alleged a violation of subsection 1413(g), which is entitled "Direct services by the State educational agency." (ECF No. 10, PageID.96, ¶213). In that subsection, IDEA mandates that if the SEA determines the LEA is "unable to establish and maintain programs of free appropriate public education" then the SEA *shall* use the special education funds and provide the necessary special education supports and services on its own. 20 U.S.C. § 1413(g)(1)(B). If MDE determines that a district cannot provide a FAPE on its own, MDE must provide funding to ensure the student in question receives the services required to provide them with a FAPE. Thus, the IDEA places affirmative obligations on the state to ensure that IDEA compliance is achieved within the state.

Given the structure of the IDEA, it's no wonder that numerous federal courts across circuits, including the Sixth Circuit, have held that SEAs are proper defendants in cases involving systemic failures to comply with the IDEA. Where an SEA promulgates rules, oversees implementation, or fails to ensure local compliance, it engages in state action cognizable under the IDEA. *See J.M. by & through Mata v. Tennessee Dep't of Educ.*, No. 3:17-CV-00405, 2017 WL 11671746, at *5 (M.D. Tenn. Dec. 14, 2017) ("Those systemic,

state-level failures are relevant not only to [plaintiff's] past deprivations but whether he can expect, with any confidence, to receive a [Free and Appropriate Public Education (FAPE)] going forward. The State Defendants are therefore appropriate parties to the case. . ."); *Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 258 F. Supp. 3d 1114, 1125 (E.D. Cal. 2017) ("Congress . . . anticipated private suits in response to statewide, systemic failures in the education of students with disabilities"); *S.P. v. Knox Cty. Bd. of Educ.*, 329 F. Supp. 3d 584, 594 (E.D. Tenn. 2018) (rejecting Defendant Tennessee Department of Education's (TDOE) motion for summary judgment and explaining that "as the state educational authority, [TDOE] is responsible for ensuring that the requirements of the IDEA are carried out" and therefore "must correct non-compliance where the local school district fails to meet its obligations."). These cases reinforce that state-level oversight and regulation of local districts under IDEA trigger obligations that can be enforced in federal court.

The distinctions between Title II and IDEA matter. They illuminate how the reasoning at the heart of *Y.A.*'s Title II analysis cannot and should not be extended to claims under the IDEA. While the court in *Y.A.* emphasizes that the "schools" are a service of local districts in Michigan under Title II, IDEA makes clear that the district *and the state* are jointly responsible for ensuring students with disabilities receive the necessary programs. To the extent that the *Y.A.* court found that MDE could not be liable under Title II for conduct that was, practically speaking, the result of failures by the local school district, that framework collapses under the IDEA and its explicit directives to the SEA regarding its own obligations to students with disabilities. To the extent that *Y.A.* found attenuation between the plaintiff students and MDE for purposes of ADA Title II claims, that same attenuation is not at play under the IDEA.

Unlike *Y.A.*, the present case is not before the court at the motion to dismiss stage. There is a highly developed factual record where Plaintiffs have gathered significant evidence to support their claims. These are not, as the *Y.A.* court put it, "conclusory assertions" lodged in a complaint, but rather allegations of statutory violations supported by competent evidence that should be heard by a factfinder.

As Plaintiffs explained in their brief in response to Defendant's motion for summary judgment, MDE's actions within the state complaint process were not effective in correcting the IDEA violations MDE itself identified at KPS. (ECF No. 86-2, PageID.1881-1882). MDE's own emails demonstrated clear knowledge that KPS had a longstanding history of a failed, nonfunctioning child find system, but MDE didn't require that KPS do anything to fix it. (ECF No. 86, PageID.1819-1821). Instead, MDE repeatedly accepted the same evidence of "correction" that had never yet corrected the same past identified noncompliance. *Id.* While MDE had tools at its disposal that it was *mandated* to use to correct KPS's noncompliance, it refused to use them. (ECF No. 86-2, PageID.1881-1882).

Thus, the *Y.A.* decision should not affect the evaluation of the present IDEA claims against Defendant, which should proceed to trial.

## V.    Section 504 Imposes Specific Obligations on MDE and MDE's Conduct Discriminated Against Plaintiffs

*Y.A.* should not be read to impact this Court's analysis of the merits of the Plaintiffs' Section 504 claims, either. As Plaintiffs' First Amended Complaint explained, "[t]he regulations regarding preschool, elementary, and secondary education apply to 'preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate or *that received Federal financial assistance for the operation of, such programs or activities*.' 34 C.F.R. § 104.31." (ECF No. 10, PageID.972, ¶22) (emphasis

added). MDE receives federal financial assistance for the operation of educational programs within the state. (ECF No. 13, PageID.191-192).

In the educational context, within the Sixth Circuit, Section 504 claims have proceeded against the state when the state had knowledge of a system-wide problem with providing a FAPE to students and failed to correct that problem. In *N.S. v. Tennessee Department of Education*, plaintiffs' Section 504 claim against the state department of education was allowed to proceed because plaintiffs alleged that the state "had knowledge of system-wide problems but chose not to address them." No. 3:16-CV-0610, 2016 WL 3763264, at *12 (M.D. Tenn. July 14, 2016). So, too, here.

In a 2022 Western District of Michigan case, the plaintiffs filed IDEA, ADA, and Section 504 claims against MDE after MDE found the district and itself out of compliance in separate complaints and then upon a site visit created an action plan that was never effectuated. *A.B. by & through K.B. v. Michigan Dep't of Educ.*, 570 F. Supp. 3d 531, 533-34 (W.D. Mich. 2021). When MDE failed to ensure correction of the noncompliance as the student continued to be excluded from school, plaintiffs first filed a due process complaint against the district, the intermediate school district, and MDE, in which MDE was dismissed on its own motion. *Id.* at 534. The federal complaint followed against MDE, which again sought dismissal. *Id.* at 535. In denying MDE's motion to dismiss for failure to state a claim under Section 504, the court found the allegations that MDE failed "to provide proper oversight and financial assistance in resolving his alleged denial of a FAPE, and that the MDE took a deliberate 'hands off' approach in handling the matter" were enough to overcome the motion. *Id.* at 539.

In the present case, Plaintiffs pled sufficient facts to allege MDE's failings and offered substantial evidence of such in their response to Defendant's motion for summary judgment to

15

demonstrate that MDE knew KPS's child find system was not functioning for years, in violation of IDEA and Section 504. (ECF No. 10, PageID.93, ¶196, ECF No. 10, PageID.97 ¶225). MDE then for years repeatedly told KPS to fix its child find system by assigning "similar corrective actions for each of these complaints over this period of time despite the repetition of child find violations by KPS." (ECF No. 10, PageID.93, ¶195, ECF No. 86, PageID.1845). MDE then continued to find KPS out of compliance with child find, ECF No. 86, PageID.1845, and yet refused to use its available tools to bring KPS into compliance, as required by federal law. *Id.*

Section 504's regulations contemplate a situation where a federally funded entity might enable discrimination to occur through its actions or inactions, and thus prohibits such an entity from "[a]id[ing] or perpetuat[ing] discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipients program or activity." 34 C.F.R. § 104.4. That is the case here. While the district at issue discriminated against Plaintiffs and failed to provide them with a FAPE, MDE continued to pass IDEA funding through and failed to exercise its mandatory powers under MARSE 340.1855.[5]

**VI.    Conclusion**

The holding in *Y.A.* is narrow, not broad. It focused specifically on the question of whether Eleventh Amendment immunity should be applied to specific plaintiffs' specific ADA Title II claims in a specific case. The *Y.A.* plaintiffs blamed the state too quickly, before its duties

---

[5] As explained in Plaintiffs' First Amended Complaint:

> IDEA incorporates the standards of the MMSEA and MARSE. *Doe By and Through Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455, 457 (6th Cir. 1993) (stating, in the 6th Circuit, it is "settled" that violations of any state law that enlarges the scope of an educational agency's obligations are still enforceable under IDEA, even if federal law is satisfied) (citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990) (It is "beyond cavil that the federal [IDEA] standard explicitly incorporates some of a state's substantive law.")). (ECF No. 10, PageID.77).

even arose. And the Sixth Circuit would not make MDE vicariously liable under Title II for its districts.

This case is far different. Plaintiffs' claims under ADA Title II, Section 504 of the Rehabilitation Act or the IDEA, focus on MDE's direct liability and failings, supported by overwhelming evidence. Accordingly, it must not be dismissed on either immunity or substantive grounds. Defendant's motion for summary judgment should be denied, and this case should be heard at trial.

Respectfully submitted,

/s/ David L. Fegley
David L. Fegley (P85275)
Jennifer B. Salvatore (P66640)
Salvatore Prescott Porter & Porter, PLLC
105 E. Main Street
Northville, Michigan 48167
(248) 679-8711
salvatore@sppplaw.com
fegley@sppplaw.com

Erin H. Diaz (P80388)
Disability Rights Michigan
4095 Legacy Parkway
Lansing, Michigan 48911
(517) 487-1755
ediaz@drmich.org

Elizabeth K. Abdnour (P78203)
Abdnour Weiker, LLP
325 E. Grand River Ave., Ste. 250
East Lansing, Michigan 48823
(517) 994-1776
liz@education-rights.com

Jacquelyn N. Kmetz (P83575)
MI AECRES
P.O. Box 705
Ludington, Michigan 49431
(231) 794-2379
jkmetz@miaecres.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.2(b)(ii), Plaintiffs certify that this brief complies with Local Rule 7.2(b)(i) as this brief includes 5,907 words. Microsoft Word Office 365 is the word processing software used to generate the word count in the above brief.

/s/ David L. Fegley
David L. Fegley (P85275)

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I electronically filed the above document and Plaintiffs' Supplemental Briefing and accompanying documents using the ECF System which will send notification of such to all represented parties.

/s/ David L. Fegley
David L. Fegley (P85275)